**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DR. KAMIAR ALAEI,

                                Plaintiff,                           1:21-cv-00377 (BKS/TWD)

v.

STATE UNIVERSITY OF NEW YORK AT ALBANY,
HAVIDAN RODRIGUEZ, individually and in his official
capacity on behalf of the STATE UNIVERSITY OF NEW
YORK AT ALBANY, BRUCE P. SZELEST, individually
and in his official capacity on behalf of the STATE
UNIVERSITY OF NEW YORK AT ALBANY, and
JAMES R. STELLAR, individually and in his official
capacity on behalf of the STATE UNIVERSITY OF NEW
YORK AT ALBANY,

                                Defendants.

**Appearances:**

*For Plaintiff:*
Joseph F. Castiglione
Young Sommer, LLC
Five Palisades Drive, Suite 300
Albany, NY 12205

*For Defendants:*
Letitia James
Attorney General for the State of New York
Helena O. Pederson
David C. White
Assistant Attorneys General, of Counsel
Office of the Attorney General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Kamiar Alaei brings this action against the State University of New York at Albany ("SUNYA"), his former employer, as well as Defendants Havidan Rodriguez, Bruce P. Szelest, and James R. Stellar (collectively, "individual defendants").[1] (Dkt. No. 1). Plaintiff alleges that Defendants: discriminated against him on the basis of sex, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"); discriminated against him on the basis of race, religion, and national origin, in violation of 42 U.S.C. § 1981; and deprived him of due process and equal protection, in violation of the Fourteenth Amendment, 42 U.S.C. § 1983. (*Id.*). Presently before the Court is Plaintiff's motion to amend the Complaint under Federal Rule of Civil Procedure 15 to add a state law claim for negligent infliction of emotional distress, (Dkt. No. 23), and Defendants' cross-motion under Rule 12(c) for partial judgment on the pleadings, (Dkt. No. 24). Both parties have filed opposition and reply papers. (Dkt. Nos. 24, 33, 38, 39). For the reasons stated below, Plaintiff's motion to amend is denied as futile, and Defendants' cross-motion for partial judgment on the pleadings is granted in part and denied in part.[2]

---

[1] Defendant Rodriguez was the President of SUNYA, Defendant Szelest was the Chief of Staff to the President of SUNYA, and Defendant Stellar was the Provost and Senior Vice President for Academic Affairs at SUNYA. (Dkt. No. 1, ¶¶ 19, 21, 23).

[2] Since Plaintiff has voluntarily withdrawn the First Amendment claim asserted in the original Complaint as well as the intentional infliction of emotional distress claim asserted in the proposed Amended Complaint. (Dkt. No. 35), the Court does not address Defendants' arguments concerning those claims.

II.     FACTS[3]

A.      **Plaintiff's Background and Employment with SUNYA**

Plaintiff, a male born and raised in Iran and of Shi'i/Yarstan faith, is "a global health policy expert" who studies "medicine, epidemiology, international health, health policy, and international human rights law." (Dkt. No. 1, ¶¶ 25, 28). He began his career promoting the prevention and care of HIV/AIDS and helped develop several harm-reduction programs, as well as a medical clinic, in Iran. (*Id.* ¶¶ 28, 31). While in Iran, Plaintiff was convicted of trying to overthrow the government "in a secret, one-day trial" and was detained for two years. (*Id.* ¶ 29). He states that his conviction and resulting detention stemmed from his association with the United States and the Iranian government's opposition to his work. (*Id.*). Plaintiff continued his work upon his release; he was published in various academic journals and won several awards, including the Ellis Island Medal of Honor Award. (*Id.* ¶¶ 26–27, 31–34).

In 2014, Plaintiff was appointed by SUNYA as a lecturer and director of SUNYA's Global Institute for Health and Human Rights ("GIHHR"), which he founded. (*Id.* ¶¶ 34, 36). The GIHHR's goals "were to advance the understanding and protection of health and human rights in a theoretical, academic, practical, and ethical context." (*Id.* ¶ 36). Plaintiff's employment was effectuated by Appointment Letter in April 2014 and renewed through 2018. (*Id.* ¶ 37; Dkt. No. 1-1, at 2–3 (August 16, 2014 Appointment Letter)). His contributions to SUNYA were consistently commended, and having received no discipline or negative evaluations, Plaintiff was promoted to Associate Dean for Global and Interdisciplinary Research in January 2016. (Dkt. No. 1, ¶¶ 39–42). He was also the "principal investigator of two major

---

[3] The facts are drawn from the Complaint, (Dkt. No. 1), and the attachments thereto. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

federal grants," making him responsible for securing approximately three million dollars in funds. (*Id.* ¶ 61).

As part of his employment, Plaintiff was a member of the United University Professions, and as such, was entitled to the benefits and protections established in the 2011-2016 Contract Between United University Professions and the State of New York ("UUP Agreement"). (*Id.* ¶¶ 43–44). The UUP Agreement provided Plaintiff with certain rights pertaining to disciplinary actions. (*Id.* ¶ 46). It stated that discipline could only be imposed for "just cause," and that SUNYA employees must receive a notice specifying both the conduct for which discipline is being imposed and the proposed penalty. (*Id.* ¶ 47). The UUP Agreement also included several antidiscrimination provisions. (*See* Dkt. No. 1-2, at 4). Specifically, in §§ 10.1 and 10.2, the State agreed to continue its "established policy prohibiting discrimination" on race, religion, national origin, and sex. (*Id.*).

### B.     Plaintiff's Placement on Alternative Assignment

On February 8, 2018, acting in response to concerns allegedly raised about Plaintiff in a student complaint,[4] Randy Stark, an Associate Vice President in SUNYA's Office of Human Resource Management, sent a letter to Plaintiff invoking the alternative assignment provision of the UUP Agreement. (*Id.* ¶¶ 53, 55, 220).[5] However, Plaintiff alleges that neither SUNYA, nor Stark, provided him with any explanation as to why he was placed on alternative assignment. (*Id.* ¶ 56). The letter instructed Plaintiff not to discuss the matter with anyone, including SUNYA staff, students, and alumni, and SUNYA subsequently blocked Plaintiff from accessing

---

[4] In an email attached to the Complaint, a SUNYA employee seems to indicate that the complaint was from a student, (Dkt. No. 1-12, at 3), though Plaintiff avers that no record of a formal or informal student complaint exists, (Dkt. No. 1, ¶ 190).

[5] Twice in his proposed amended complaint, Plaintiff refers to Mr. Stark as "Defendant Stark." (Dkt. No. 1, ¶¶ 94, 188). Stark is not named as a Defendant in this action and the Court does not treat him as such.

university facilities and email. (*Id.* ¶¶ 57–60). Additionally, SUNYA informed numerous individuals and institutions that Plaintiff had been removed as director of the GIHHR and replaced with two new co-directors; both were non-Iranian white females. (*Id.* ¶ 69). SUNYA did not inform Plaintiff, or anyone else, why Plaintiff was removed as director, and thus, Plaintiff alleges that SUNYA "implied to [Plaintiff's] colleagues and others . . . that it believed there was 'just cause' to replace" Plaintiff. (*Id.* ¶ 68). Several days later, SUNYA personnel emailed Plaintiff to recommend that he contact all venues with which he had previous commitments and advise them not to describe his previous affiliation with the GIHHR and SUNYA. (*Id.* ¶ 71). The same email advised Plaintiff that he could only participate in public events in his personal capacity, and also prohibited Plaintiff from engaging in any education programs offered by SUNYA. (*Id.*).

Following Plaintiff's placement on an alternative assignment, Stark began a Title IX investigation. (*Id.* ¶¶ 93, 95). However, Plaintiff alleges that Title IX personnel later disclosed that there was never a formal or informal complaint made against Plaintiff. (*Id.* ¶ 190).

### C.   Plaintiff's Letters of Complaint and Grievance

In letters dated February 16 and 28, 2018 to SUNYA, Plaintiff's attorney wrote objecting to SUNYA's actions toward Plaintiff, demanded that SUNYA comply with the UUP Agreement, and demanded that SUNYA "provide [Plaintiff] with access to his email accounts and allow [Plaintiff] to address his federal grant projects." (*Id.* ¶ 87). On March 20, 2018, Plaintiff filed a grievance pursuant to the UUP Agreement alleging that SUNYA wrongfully disciplined him by removing him from his position "without conducting [a] fair and unbiased investigation." (*Id.*

¶¶ 122–24). By letter dated May 23, 2018, Plaintiff filed an additional grievances "appealing his initial March 2018 grievance to Step 3" under the UUP Agreement. (*Id.* ¶ 179).[6]

### D.    Discussions of Plaintiff's "Non-Renewal"

Plaintiff alleges that Defendants had decided as early as March 2018 that Plaintiff would not be returning. A March 26, 2018, email exchange between Brian Selchick, a SUNYA employee, and Chantel Cleary, SUNYA's Title IX Coordinator, reflects Cleary's understanding that, at that point it had been agreed that Plaintiff would not be returning to his position and Selchick's understanding that Plaintiff would need to return for a "short" period of time before the "non-renewal pre buy out." (Dkt. No. 1-6, at 2). Notes dated April 3, 2018, reflect Selchick's ideas for how to "maintain the integrity of the non-renewal W/ or W/O the [Notice of Discipline]/ Interrogation." (Dkt. No. 1-8, at 2). The notes also state that it was SUNYA's "[g]oal . . . to make sure [Plaintiff] does not come back." (*Id.*). If performance evaluations were necessary to support non-renewal, Selchick indicated that SUNYA "could recreate them." (*Id.*). On April 4, 2018, Leslie Zwicklebauer advised Selchick, Stark, and Cleary that, if they wished to seek non-renewal of Plaintiff's employment, they would need a "current performance program and an evaluation" before issuing a formal notice of non-renewal. (Dkt. No. 1, ¶ 142).

Several weeks later, on April 28, 2018, SUNYA personnel contacted Dr. Harvey Charles, Plaintiff's supervisor, and asked him to sign a document for Plaintiff's non-renewal. (*Id.* ¶ 150). However, the document was addressed to Provost Stellar and written as if Dr. Charles authored it himself. (*Id.* ¶ 151). Dr. Charles refused to sign the document because he felt uncomfortable making a recommendation "without a basis to do so," and asked that the matter be handled differently. (*Id.* ¶ 152). Nevertheless, on April 30, 2018, SUNYA personnel provided Plaintiff

---

[6] Plaintiff also sued the State of New York in the New York State Court of Claims ("state lawsuit"). (*Id.* ¶ 91).

with a proposed non-renewal document indicating that Dr. Charles recommended Plaintiff be non-renewed. (*Id.* ¶ 161). Dr. Charles wrote to Stark in early May 2018 to inform him that he never signed the document because he had no basis on which to recommend non-renewal; he also indicated that he would not seek such information as it was "clear to [him] that the provost ha[d] decided not to renew Kamiar's contract." (*Id.* ¶ 162).

E.    **Plaintiff's Termination**

On May 14, 2018, SUNYA personnel communicated to Plaintiff that the provost approved and signed the proposed non-renewal and communicated no basis or reasoning for doing so to Plaintiff. (*Id.* ¶ 166). Shortly after, in late May or early June 2018, Rodriguez approved the predetermination for non-renewal and the decision to provide Plaintiff with only one year of continued employment.[7] (*Id.* ¶ 181).

Plaintiff further claims that Defendants recognized that there was no "just cause" for his non-renewal. (*Id.* ¶ 185). To support this claim, Plaintiff cites emails from July 6 and 9, 2018, which show SUNYA personnel discussing their failure to establish a basis to continue the investigation. (*Id.* ¶ 186). In a July 6, 2018, email, Stark wrote the following to SUNYA employee Valerie Ayers:

> I've attached a counseling letter we worked on for Kamiar Alaei. It was a struggle writing it as there wasn't anything to counsel him on since the sexual misconduct allegations were unfounded. We planned to give him policies on sexual harassment, Workplace Violence etc., but for what purpose, as we are going to non-renew him and buy him out. After discussing the question, does it really serve any purpose to issue this memo other than it gives KA and his attorney more info for their war chest?

---

[7] Plaintiff alleges that, while Defendants Stellar and Rodriguez did not renew his employment, they approved the renewals of several non-Middle Eastern, non-Shi'i/Yarstan, and non-male SUNYA employees with lesser credentials. (*Id.* ¶ 183). He also alleges that, during the same period, Stellar and Rodriguez did not pursue or approve the non-renewal of several other non-Middle Eastern, non-Shi'i/Yarstan, and non-male SUNYA Faculty with lesser credentials. (*Id.* ¶ 184).

(Dkt. No. 1-12, at 2). Ayers responded to Stark's email stating that "there has to be something you can get out of the student's complaint." (*Id.* at 3). Plaintiff alleges that in further emails, SUNYA officials stated that there was no record of a formal or informal complaint against Plaintiff. (Dkt. No. 1, ¶ 190).

Subsequently, on August 9, 2018, Stark and Selchick conducted a "counseling session" with Plaintiff and shared that there was in fact no just cause to terminate, or basis to discipline, Plaintiff, and that no SUNYA policies were violated. (*Id.* ¶ 194–95). At the end of the session, Plaintiff was directed to return to work the next morning. (*Id.* ¶ 196).

The next day, on August 10, 2018, SUNYA terminated Plaintiff's employment by letter without explanation and despite his entitlement to two years of guaranteed employment under the UPA Agreement and Appointment Letter. (*Id.* ¶¶ 171, 197). Nevertheless, the termination letter stated that Plaintiff would not be renewed and that he would be paid for one year of employment, ending on August 9, 2019. (*Id.* ¶ 198).

## F.   Plaintiff's Professional Losses and Adverse Effects

Plaintiff alleges that he suffered various professional losses and adverse effects, physical and mental, because of Defendants' "illegal campaign of wrongful conduct intended to violate [his] rights." (*Id.* ¶ 203). For example, Plaintiff asserts that he was a finalist for a deanship at York College, but that when SUNYA announced their investigation, the College withdrew its interest. (*Id.* ¶ 211). Further, without access to his email account, Plaintiff was unable to maintain two sensitive, technical, and high security grants, which demanded constant oversight; cut off from several other professional projects; unaware that he received a prestigious scholarly award; and forced to decline an invitation to speak at Los Alamos National Laboratory. (*Id.* ¶¶ 61–64, 76, 81). Additionally, SUNYA allegedly "deterred several organizations and funders around the

world from collaborating or dealing with Dr. Alaei on the projects that he was leading . . . by asking them to work with other individuals rather than Dr. Alaei." (*Id.* ¶ 80).

### G.    Allegations from Proposed Amended Complaint

As relevant here, according to the Proposed Amended Complaint, Plaintiff suffered from "severe depression and anxiety" as a result of his termination, as well as "humiliation and embarrassment with friends, family, colleagues, and respective employers." (Dkt. No. 23-4, ¶ 275). He was prescribed medication to address his depression and anxiety. (*Id.* ¶ 278). Additionally, Plaintiff had pre-existing emotional distress from his imprisonment in Iran, which he alleges was exacerbated by Defendants' conduct. (*Id.* ¶ 277). He also contends that he suffered physical side effects as a result of Defendants' conduct, including sleep loss, hair loss, weight loss, and severe skin problems. (*Id.* ¶ 276).

## III.   MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

### A.    Standard of Review

"The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010). To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations

contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.     Analysis

#### 1.     Materials Outside the Pleadings

In opposition to Defendants' motion for judgment on the pleadings, Plaintiff has submitted a number of documents, including: (1) a 34-page affirmation by Plaintiff's counsel containing facts not contained in the Complaint, (Dkt. No. 33-1); (2) Appointment Letters dated April 16, 2014, December 9, 2014, and December 4, 2017, and a change of status form dated November 20 and 21, 2017, (Dkt. No. 33-2); (3) an excerpt from the UUP Agreement, (Dkt. No. 33-3; (4) three deposition transcripts, (Dkt. Nos. 33-4 (Selchick), 33-5 (Stark), 33-6 (Rodriguez); (5) emails authored by SUNYA employees, Defendants, and at least one student, concerning Plaintiff, (Dkt. Nos. 37 and 33-8); and (6) the August 10, 2018 termination letter, (Dkt. No. 33-9). Defendants object to the Court's consideration of most of these materials. (Dkt. No. 39, at 5–7).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is

integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Court may properly consider the April 16, 2014, Appointment Letter, because, in addition to submitting it in opposition to Defendant's motion for judgment on the pleadings, (Dkt. No. 33-2, at 2–3), Plaintiff attached it as an exhibit to the Complaint. (Dkt. No. 1-1). The Court will also consider the August 10, 2018, termination letter, (Dkt. No. 33-9), as the Complaint expressly references and relies on the letter. (Dkt. No. 1, ¶¶ 197–99), as well as the exhibit containing Article I of the "2011–2016" UUP Agreement, (Dkt. No. 33-3). The 2011–2016 UUP Agreement is not only referenced in the Complaint, (Dkt. No. 1, ¶ 44), but Articles 5–7, 10–11, and 18–20 are attached as an exhibit to the Complaint, (Dkt. No. 1-2). Further, there is no dispute as to authenticity or accurateness of the Articles from the 2011–2016 UUP Agreement.

Turning to the Selchick, Stark, and Rodriguez depositions, (Dkt. Nos. 33-4 to 33-6), the Court notes that the Complaint refers to depositions, but, for the most part, does so in a general manner that does not enable the Court to determine what depositions Plaintiff is relying on. (*See, e.g.*, Dkt. No. 1 ¶¶ 117 (alleging that "SUNY personnel also admitted in depositions" they were not aware of aware of concerns regarding Plaintiff's email use), 120 ("SUNY personnel stated in depositions in the State Lawsuit that such actions were not the usual course of action by SUNYA for similar situations.")). While the Complaint contains no reference to the Selchick deposition, it

contains several references to the Stark deposition, (*id.* ¶¶ 116 ("Mr. Stark . . . stated at his deposition in the State Lawsuit that prohibiting email access was not normal protocol . . . and was a violation of the UUP Agreement."), 118 ("Mr. Stark further stated . . . that the SUNYA President's office had directed that Dr. Alaei have no access to his email account and no access to SUNYA/activities."), 200 ("During a recent deposition of Mr. Stark in the State Lawsuit, Mr. Stark stated SUNYA had made the decision to terminate Dr. Alaei before the August 9, 2018 counseling session."); *see also id.* ¶¶ 201–02, 247), and one reference to the Rodriguez deposition, (*see id.* ("Based upon the . . . deposition testimony provided in the State Lawsuit, Defendant[] Rodriguez [sic] . . . w[as] pushing non-renewal and termination.")). When viewed in the context of the 50-page, 269-paragraph Complaint as a whole, the Complaint's few references to the Rodriguez and Stark depositions do not support a conclusion that the Complaint relies heavily on the terms and effects of those depositions. *See Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) ("Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the document is not enough.'" (quoting *Global Network Commc'ns*, 458 F.3d at 156)). Accordingly, the Court declines to consider the deposition testimony of Selchick, Rodriguez, or Stark. *See, e.g.*, *id.* at 560 (finding reliance on deposition testimony improper, noting that although the complaint referred several times to "sworn testimony" from a separate action, there was no basis for finding that the complaint "relied so heavily rely on the terms and effect of [the] testimony that the deposition transcript may fairly be deemed integral to the complaint").

The remainder of the exhibits Plaintiff submitted in opposition to Defendant's motion are neither referenced in or integral to the Complaint, and therefore will not be considered in connection with Defendants' motion.

2.      **Sovereign Immunity**

Defendants move to dismiss Plaintiff's claims against SUNYA and the individual

defendants in their official capacities on the basis of sovereign immunity. (Dkt. No. 24-2, at 18–

20). Plaintiff opposes the motion, arguing that by virtue of the UUP Agreement, New York State

"expressly waived its immunity to claims of discrimination." (Dkt. No. 33, at 21). The Eleventh

Amendment bars suits against a state unless Congress has abrogated the state's sovereign

immunity, the state has consented to suit, or the plaintiff is "seeking injunctive relief against a

state official for an ongoing violation of law or the Constitution." *N.Y. State Corr. Officers &*

*Police Benevolent Ass'n, Inc. v. New York*, 911 F. Supp. 2d 111, 124–25 (N.D.N.Y. 2012) (citing

*Ex Parte Young*, 209 U.S. 123 (1908)). "This jurisdictional bar also immunizes a state entity that

is an 'arm of the state,' . . . including, in appropriate circumstances, a state official acting in his

or her official capacity." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (citation

omitted); *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015). The State

University of New York ("SUNY"), including SUNYA, is considered an arm of the state, and as

such, is entitled to sovereign immunity. *See Leitner*, 779 F.3d at 136 (explaining that "SUNY

itself is entitled to sovereign immunity because it is 'an integral part of the government of the

State'" (quoting *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990))). So too are

SUNYA employees in their official capacities. *See Deposit Ins. Agency*, 482 F.3d at 617; *Garcia*

*v. S.U.N.Y. Health Scis. Ctr. Of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (noting that when a

plaintiff sues "individual defendants in their official capacities, he [seeks] damages from New

York, and the Eleventh Amendment therefore shields [the individual defendants] to the same

extent that it shields SUNY").

However, "[i]n the Rehabilitation Act Amendments of 1986, . . . 42 U.S.C. § 2000d-7,

Congress abrogated the States' Eleventh Amendment immunity" from Title IX claims. *Franklin*

*v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 72 (1992); *Vega v. State Univ. of N.Y. Bd. of Trustees*, 67 F. Supp. 2d 234, 340 (S.D.N.Y. 1999). Given the recognized congressional abrogation of immunity for Title IX claims, to the extent Defendants move to dismiss Plaintiff's Title IX claim on the basis of sovereign immunity, the Court denies the motion.[8]

Conversely, Congress has not abrogated, and New York has not waived, sovereign immunity with respect to §§ 1981 and 1983 claims. *Jackson v. Battaglia*, 63 F. Supp. 3d 214, 219–20 (N.D.N.Y. 2014); *Wagner v. Conn. Dep't of Corr.*, 599 F. Supp. 2d 229, 237–38 (D. Conn. 2009). Nevertheless, Plaintiff argues that, in this instance, New York waived its sovereign immunity by virtue of the UUP Agreement. (Dkt. No. 33, at 22–24). Specifically, he contends that § 10.4 of the UUP Agreement, which states, in part, that "[c]laims of illegal discrimination under Sections 10.1 and 10.2 shall . . . be subject to review in accordance with State and Federal procedures," constitutes an express waiver of immunity. (*Id.*). The Court disagrees. States may waive sovereign immunity through contract provisions invoking a federal court's jurisdiction, but as Plaintiff acknowledges, (*id.* at 14), "[a] state will be deemed to have waived its immunity 'only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Marisol A. ex rel. Forbes v. Giuliani*, 157 F. Supp. 2d 303, 313–14 (S.D.N.Y. 2001) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)) (internal quotations omitted). The language of § 10.4 of the UUP Agreement, which is included as an attachment to the Complaint, does not meet that burden because it is too vague. (Dkt. No. 1-2, at 4). The review of discrimination claims "in accordance with State and Federal procedures established for such purpose," (*id.*) could refer to procedures other than a

---

[8] In their memorandum of law in support of the cross-motion to dismiss, Defendants contend that "Plaintiff's claims against SUNYA and the individual defendants in their official capacities are barred by the Eleventh Amendment," (Dkt. No. 24-2, at 18), but only address the claims under §§ 1981 and 1983, (*id.* at 18–20).

lawsuit invoking the jurisdiction of the federal courts. As such, there is no "overwhelming implication[]" that New York waived its immunity, *see Forbes*, 157 F. Supp. 2d at 314.

In a sur-reply letter, Plaintiff wrote to "clarify the relief available to the Plaintiff under his claims under 42 U.S.C. § 1981," and asserted that the "relief available . . . includes reinstatement to his former position under § 1981." (Dkt. No. 38, at 1). "Under the well-known exception to [the sovereign immunity bar] first set forth in *Ex parte Young*, 209 U.S. 123 (1908), 'a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law.'" *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (quoting *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007)); *see also Ford v. Reynolds*, 316 F.3d 351, 354–55 (2d Cir. 2003) (explaining that "there is 'a limited exception to the general principle of sovereign immunity [that] allows a suit for injunctive relief challenging the constitutionality of a state official's actions in enforcing state law under the theory that such a suit is not one against the State, and therefore not barred by the Eleventh Amendment'" (quoting *CSX Transp. v. N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002))). Here, however, as discussed *infra*, Plaintiff's § 1981 claim is dismissed. But even if Plaintiff asserted a viable § 1981 claim, because the Complaint contains no reference to reinstatement and makes only a vague request for "equitable relief," (Dkt. No. 1, ¶ 269(f)), there is no basis for finding that the *Ex parte Young* exception is applicable in this case. *See Emmons v. City Univ. of New York*, 715 F. Supp. 2d 394, 407 (E.D.N.Y. 2010) (dismissing "all claims purportedly brought pursuant to the" *Ex parte Young* exception where the complaint was "far less clear in its request for equitable relief, and 'reinstatement' is never mentioned"); *Falcon v. City Univ. of New York*, No. 15-cv-3421, 2016 WL 3920223, at *9, 2016 U.S. Dist. LEXIS 92396, at *25–26 (E.D.N.Y. July 15, 2016)

(dismissing the plaintiff's claim for prospective injunctive relief, where the "only reference to any kind of injunctive relief is a single mention of the phrase alongside every other form of damages remotely available" and the proposed amended complaint did "not assert an explicit claim for reinstatement or any other kind of prospective injunctive remedies").

Therefore, as Plaintiff does not seek injunctive relief for an ongoing constitutional or statutory violation, the Court grants the motion to dismiss the §§ 1981 and 1983 claims against SUNYA and the individual defendants in their official capacities.

### 3. Title IX Claim

Defendant SUNYA argues that Plaintiff's Title IX claim against it must be dismissed because the statute does not confer a private right of action for employees who allege gender discrimination in the course of their employment. (Dkt. No. 24-2, at 21). Plaintiff disagrees, contending that a private right of action does exist, given several "Supreme Court cases broadly construing the application of Title IX." (Dkt. No. 33, at 27). Title IX provides, with certain exceptions not relevant here: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). According to the Second Circuit, "[i]t is now well settled that, while Title IX does not itself provide for a private cause of action to enforce its requirements, a private right of action is implied in a variety of circumstances." *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 104 (2d Cir. 2022); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688–709 (1979). In its recent *Vengalattore* decision,[9] the Second Circuit held that "Title IX allows a private right of action for a university's

---

[9] Defendants moved to dismiss the Title IX claim before the Second Circuit's decision in *Vengalattore*, (Dkt. No. 24); prior to *Vengalattore*, district courts in the Second Circuit were split on the issue of whether a private right of action was available. *See Hauff v. State Univ. of N.Y.*, 425 F. Supp. 3d 116, 129–30 (E.D.N.Y. 2019) (collecting cases).

intentional gender-based discrimination against a faculty member." 36 F.4th at 106. Plaintiff alleges that Defendants intentionally discriminated against him because of his gender; a private right of action is therefore available to him under Title IX. *See id.* Because Defendants move to dismiss Plaintiff's Title IX claim solely on the basis that Title IX does not allow a private right of action, that motion is denied.

### 4.    Section 1981 Claim

Defendants move to dismiss Plaintiff's claim alleging that Defendants violated his rights under 42 U.S.C. § 1981. (Dkt. No. 24-2, at 27–28). Plaintiff opposes Defendants' motion arguing he is permitted to seek redress for the denial of his rights under § 1981, via § 1983 "as the enforcement mechanism." (Dkt. No. 33, at 28–29 (citing *Duplan v. City of N.Y.*, 888 F.3d 612, 621 (2d Cir. 2018); *Smalls v. Collins*, 10 F.4th 117, 144–45 (2d Cir. 2021))). The Second Circuit has expressly held that "§ 1981 does not provide a separate private right of action against state actors." *Duplan*, 888 F.3d at 621; *Smalls*, 10 F.4th at 144–45. As the Circuit has explained, "[b]ecause § 1983 already provides a remedy against state actors, there is no reason to infer [that § 1981] creates an additional, and duplicative, remedy." Duplan, 888 F.3d at 620–21. Therefore, because "the express cause of action for damages created by § 1983 constitutes *the exclusive federal remedy* for violation of the rights guaranteed in § 1981 by state governmental units," *id.* at 619, Plaintiff's § 1981 claims are dismissed.

### 5.    Punitive Damages Claim

Defendants move to dismiss Plaintiff's fifth claim for punitive damages. (Dkt. No. 24-2, at 28–29). Plaintiff argues that the issue is irrelevant because "Defendants are on express notice that Plaintiff is seeking punitive damages in this case." (Dkt. No. 33, at 32). Defendants are correct that a claim for punitive damages does not constitute an independent cause of action; it is instead a form of relief. *Farina v. Metro. Transp. Auth.*, 409 F. Supp. 3d 173, 220 (S.D.N.Y.

2019); *Doe v. Indyke*, 457 F. Supp. 3d 278, 284 (S.D.N.Y. 2020) (noting that punitive damages "are a form of damages, not an independent cause of action") (citation omitted). When requests for punitive damages are styled as independent causes of action, courts most often treat motions to dismiss such requests as motions to strike under Fed. R. Civ. P. 12(f) when punitive damages are unavailable as a matter of law. *See Indyke*, 457 F. Supp. 3d at 284–85 (collecting cases). Defendants do not argue that punitive damages are unavailable to Plaintiff as a matter of law, and the Court does not reach that issue. However, the Court notes that because Plaintiff's request for relief expressly includes punitive damages, (Dkt. No. 1, ¶ 269(e)), Plaintiff's Fifth Claim for Punitive Damages, not only fails as an independent cause of action, but is redundant. *See* Fed. R. Civ. P. 12(f) (providing that on a motion or "on its own," a court may strike from a pleading "any *redundant*, immaterial, impertinent, or scandalous matter."). Accordingly, the Court strikes Plaintiff's Fifth Claim for Punitive damages as redundant of Plaintiff's request for relief.

## IV. MOTION TO AMEND THE COMPLAINT

### A. Standard of Review

In general, leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). If the claims in a proposed amended complaint cannot survive a motion to dismiss, a plaintiff's motion to amend will be denied as futile. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6).").

### B. Analysis

Plaintiff moves to amend the Complaint to add a claim for negligent infliction of emotional distress. (Dkt. No. 23, at 1).[10] Defendants oppose the motion asserting that amendment

---

[10] Plaintiff also sought to add a claim for intentional infliction of emotional distress in the proposed amended complaint, but later withdrew that claim by stipulation on January 19, 2022. (Dkt. No. 35, at 1–2).

would be futile because Plaintiff fails to allege Defendants owed Plaintiff a special duty or that they endangered his physical safety. (Dkt. No. 24-2, at 10). Plaintiff replies that Defendants owed Plaintiff a special duty by virtue of the UUP Agreement and Appointment Letter, and that although Defendants never endangered Plaintiff, they caused him to fear for his physical safety. (Dkt. No. 33, at 15–18).

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021).

A plaintiff may establish a claim for negligent infliction of emotional distress under "(1) the bystander theory," which is inapplicable here as it typically involves witnessing harm to a close family member, "or (2) the direct duty theory," which allows a plaintiff to recover for emotional injury caused by a defendant's breach of a duty which "unreasonably endangered" the plaintiff's physical safety. *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000). Under both theories, the duty owed "must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Truman v. Brown*, 434 F. Supp. 3d 100, 123 (S.D.N.Y. 2020) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)). As stated, "[b]oth theories require 'physical injury or the threat of danger, either to the plaintiff . . . or to a close family member.'" *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 298 (S.D.N.Y. 2015) (quoting *Vaughn v. Am. Multi Cinema, Inc.*, No. 09–cv–8911, 2010 WL 3835191, at *5, 2010 U.S. Dist. LEXIS 96609, at *16 (S.D.N.Y. Sept. 13, 2010)). Here, there is no claim under the bystander theory; accordingly, the Court must consider whether Plaintiff sufficiently alleges a claim under the "direct duty" theory.

Defendants argue that the Proposed Amended Complaint fails to allege a "direct duty" theory of liability because Plaintiff fails to allege that they owed a "special duty" to Plaintiff, and further fails to allege that Defendants' conduct endangered his physical safety. (Dkt. No. 24-2, at 17). The Court agrees. An employment relationship is generally insufficient to show a special duty. *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 112 (E.D.N.Y. 2011) (explaining that "an employer does not owe a special duty to an individual employee, because it has an obligation to treat all employees in the same manner" (citing *Cucchi v. New York City Off–Track Betting Corp.*, 818 F. Supp. 647, 656 (S.D.N.Y. 1993))). Plaintiff has not cited to any caselaw in support of his claim that Defendants owed him a special duty based on his alleged status as a third-party beneficiary of the UUP or the Appointment Letter.

In any event, Plaintiff's claim must be dismissed because there is no allegation that Defendants' alleged breach of this duty caused Plaintiff physical injury or threatened Plaintiff "with physical harm as a result of defendant's negligence." *Mortise*, 102 F.3d at 696; *see Green*, 96 F. Supp. 3d at 299 (dismissing negligent infliction of emotional distress claim because even assuming that the defendants "had a special duty" to the plaintiffs, the claim still failed because any duty breach did not "unreasonably endanger" the plaintiff's safety or cause her to fear for her safety) (internal quotation marks and alteration omitted).

Plaintiff acknowledges that his actual physical safety was not endangered by Defendants' conduct, but asserts he did fear for his physical safety. (Dkt. No. 33, at 18). Specifically, Plaintiff argues that:

> In Iran, Dr. Alaei was alleged to have done something wrong as part of his professional endeavors and his rights were violated as a result of the allegations, as he was not given a fair trial and he feared for his physical safety when he was wrongfully imprisoned. In the instant circumstance Dr. Alaei's rights were violated and he again faced unfounded and arbitrary discipline from Defendants, who stirred

up his post-traumatic fears and caused him to once again fear for his physical safety, including wrongful punishment without legal process.

(*Id.*; *see also* Dkt. No. 23-4, ¶ 277 (Proposed Amended Complaint alleging that "based upon his wrongful imprisonment by the government of Iran, Dr. Alaei has suffered from pre-existing emotional distress" and that Defendants' "extreme and outrageous conduct . . . has significantly exacerbated pre-existing emotional distress suffered by Dr. Alaei")). However, the "unreasonable endangerment" element is subject to an objective inquiry; it is not a "subjective evaluation dependent on the plaintiff's state of mind." *Carney v. Boston Mkt.*, No. 18-cv-713, 2018 WL 6698444, at *3, 2018 U.S. Dist. LEXIS 214453, at *7 (S.D.N.Y. Dec. 20, 2018) (quoting *Torain v. Casey*, No. 16-cv-2682, 2016 WL 6780078, at *6, 2016 U.S. Dist. LEXIS 127681, at *15 (S.D.N.Y. Sept. 16, 2016)). Therefore, even accepting Plaintiff's factual allegations regarding his imprisonment in Iran as true and drawing all inferences in his favor, because Plaintiff's subjective fears are insufficient as a matter of law, and because there are no allegations that would allow a plausible inference that Defendants' conduct endangered Plaintiff's physical safety, Plaintiff fails to state a negligent infliction of emotional distress claim under the "direct duty" theory. *See Reid v. United States*, No. 19-cv-1221, 2020 WL 3256331, at *6, 2020 U.S. Dist. LEXIS 104250, at *17 (E.D.N.Y. June 15, 2020) (noting that the plaintiff had not alleged any words or physical conduct "that, viewed objectively, caused plaintiff to reasonably fear for his physical safety."); *Vaughn*, 2010 WL 3835191, at *5, 2010 U.S. Dist. LEXIS 96609, at *16–17 (finding allegations that the employer failed "to adequately investigate the circumstances surrounding [the plaintiff's] disciplinary warning and ensuing grievance" did not support bystander or direct duty theory of liability as there was "no suggestion" that the plaintiff's "or anyone else's well-being was ever close to being compromised").

Finally, as referenced above, in addition to the "bystander" and "direct duty" theories, "New York . . . recognizes a cause of action in cases where there is 'an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious.'" *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. State*, 372 N.Y.S.2d 638, 642 (N.Y. 1975)). "Special circumstances" may exist where, for example, an individual is misinformed by a medical provider that loved one has died. *Id.* Here, Plaintiff's allegations that Defendants discriminated against him and failed to utilize the proper procedures in placing him on alternative assignment, in connection with the ensuing investigation, and in terminating him without just cause, fail to allow a plausible inference of "special circumstances." Indeed, courts have frequently held that "similar circumstances concerning the termination of employment were not sufficient 'special circumstances'" to constitute a negligent infliction of emotional distress claim. *Vaughn*, 2010 WL 3835191, at *5, 2010 U.S. Dist. LEXIS 96609, at *17; *see also Kelly v. Chase Manhattan Bank*, 717 F. Supp. 227, 235 (S.D.N.Y. 1989) ("Even under the most optimal circumstances, however, termination of an employee is likely to give rise to bad feelings and anxiety. This cannot mean that every adverse employment decision may give rise to a claim of negligent infliction of emotional distress."); *Dollman v. Mast Indus., Inc.*, 731 F. Supp. 2d 328, 341 (S.D.N.Y. 2010) ("Learning that you or your spouse was terminated by an employer—a common occurrence in this economy—is not sufficient to support a claim for negligent infliction of emotional distress."). Thus, the Proposed Amended Complaint fails to allege special circumstances.

Accordingly, as the Proposed Amended Complaint fails to state a negligent infliction of emotional distress claim, and that is the only basis on which Plaintiff seeks to amend, the motion to amend is denied as futile.

## V.   CONCLUSION

For these reasons, it is hereby

ORDERED that Defendants' cross-motion to dismiss (Dkt. No. 24) is **GRANTED** as to the following claims, and that the following claims are **DISMISSED**: Plaintiff's § 1981 claim against all Defendants, and Plaintiff's § 1983 claims against SUNYA and the individual defendants in their official capacities; and it is further

ORDERED that the Fifth Claim for Punitive Damages is **STRICKEN** from the Complaint; and it is further

ORDERED that Defendants' cross-motion to dismiss (Dkt. No. 24) is otherwise **DENIED**; and it is further

ORDERED that Plaintiff's motion to amend the Complaint (Dkt. No. 23) is **DENIED** as futile.

**IT IS SO ORDERED.**

Dated: <u>September 7, 2022</u>
      Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

23