**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DR. KAMIAR ALAEI,

                              Plaintiff,                    1:21-cv-00377 (BKS/TWD)

v.

STATE UNIVERSITY OF NEW YORK AT ALBANY,
HAVIDAN RODRIGUEZ, individually and in his official
capacity on behalf of the STATE UNIVERSITY OF NEW
YORK AT ALBANY, BRUCE P. SZELEST, individually
and in his official capacity on behalf of the STATE
UNIVERSITY OF NEW YORK AT ALBANY, and
JAMES R. STELLAR, individually and in his official
capacity on behalf of the STATE UNIVERSITY OF NEW
YORK AT ALBANY,

                              Defendants.

**Appearances:**

*For Plaintiff:*
Joseph F. Castiglione
Young Sommer, LLC
Five Palisades Drive, Suite 300
Albany, NY 12205

*For Defendants:*
Letitia James
Attorney General for the State of New York
David C. White
Assistant Attorney General, of Counsel
Office of the Attorney General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Dr. Kamiar Alaei brings this action against the State University of New York at Albany ("SUNY Albany" or the "University"), his former employer, as well as Defendants Havidan Rodriguez, President of SUNY Albany, Bruce P. Szelest, Chief of Staff to the President, and James R. Stellar, Senior Vice President for Academic Affairs. (Dkt. No. 1). Plaintiff alleges that Defendants: discriminated against him on the basis of sex, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"); and deprived him of procedural and substantive due process and equal protection, in violation of the Fourteenth Amendment, 42 U.S.C. § 1983. (*Id.*). Presently before the Court is Defendants' motion under Federal Rule of Civil Procedure 56 for summary judgment. (Dkt. No. 75). Defendants have filed a reply. (Dkt. No. 86). For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## II.     FACTS[1]

### A.      Plaintiff's Background

Plaintiff is a Shia Muslim of Iranian descent. (Dkt. No. 75-3, at 31–32). According to his attorney, Plaintiff "is a global health policy expert who has been working in conservative social settings for two decades." (Dkt. No. 83-1, ¶ 30). In addition to having three masters degrees, Plaintiff has doctorates in medicine and health policy management. (Dkt. No. 75-3, at 10–12). Plaintiff has served as a temporary advisor for the United Nations and a consultant for the Pan

---

[1] The facts are drawn from Defendants' Statement of Undisputed Material Facts, (Dkt. No. 76-1), and Plaintiff's Response to Defendant's Statement of Material Facts, (Dkt. No. 83-10), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

American Health Organization in the Pan American region and has received numerous awards for his work in global health and human rights, including the Ellis Island Medal of Honor. (Dkt. No. 83-3, at 54, 59–60).

In 2008, while visiting Iran with a group of students "to do research," Plaintiff was arrested and imprisoned for more than two year for political reasons. (Dkt. No. 88-3, at 56–57). Plaintiff returned to the United States upon his release and continued his education at SUNY Albany. (*Id.* at 59). While a student, Plaintiff received a $2.5 million grant and was hired by the SUNY Research Foundation[2] to implement the grants. (*Id.* at 65). In or about 2013, Plaintiff founded the Global Institute for Health and Human Rights ("GIHHR"), [3] and served as Director. (*Id.* at 64, 865).

### B.    Term Appointment to Lecturer at SUNY Albany

In a letter dated April 16, 2014, ("Appointment Letter"), SUNY Albany notified Plaintiff of his appointment to the University "as a Research Associate Professor and Lecturer in the Department of Public Administration and Policy, Rockefeller College of Public Affairs and Policy." (Dkt. No. 75-1, ¶ 1; Dkt. No. 83-10, ¶ 1). Plaintiff's "initial appointment" was "for three years, commencing on May 1, 2014." (Dkt. No. 83-3, at 985). The Appointment Letter further stated that Plaintiff would "have a 12-month full-time obligation," that "[t]he Lecturer budget title is a non-tenure-track position in accordance with the Policies of the Trustees of the State University of New York," and that in order to "give [Plaintiff] the security of at least two years

---

[2] Plaintiff explained that despite its name, the SUNY Research Foundation is not part of SUNY Albany, but is a separate non-for-profit entity. (Dkt. No. 83-3, at 65).

[3] Plaintiff testified that GIHHR is a "university-wide institute working on . . . research and education and working with the community" and is focused on promoting the "right to health and right to education for underserved population." (Dkt. No. 75-3, at 83). Plaintiff stated that during the relevant time period "[m]ore than fifty students were working" at GIHHR, as undergraduate and graduate research assistants. (Dkt. No. 83-3, at 85). Plaintiff's brother, Arash Alaei, also worked at GIHHR. (Dkt. No. 75-3, at 88).

of employment, the appointment will be reviewed annually for possible extension by another year." (*Id.*). Plaintiff's appointment was "to a United University Professions (UUP) represented position, subject to the laws of [New York] and the Policies of the SUNY Board of Trustees."[4] (*Id.* at 987). In addition, SUNY Albany advised Plaintiff that he would continue to serve as Director of GIHHR, "with responsibility for oversight, grants development, national outreach and programming." (*Id.*).

SUNY Albany renewed Plaintiff's term appointment twice: on or about July 18, 2016, Plaintiff's term appointment was renewed "for the period beginning May 1, 2017 and ending April 30, 2018," (*id.* at 990); and on or about April 6, 2017, Plaintiff's term appointment was renewed "for the period beginning May 1, 2018 and ending April 30, 2019," (*id.* at 991).

### C.    Plaintiff's Brother's Separation from SUNY Albany

According to Defendants, in or about 2017, Arash Alaei, Plaintiff's brother and co-worker, was "found to have sexually assaulted multiple SUNY Albany students," (Dkt. No. 75-28, ¶ 17; Dkt. No. 83-3, at 967–71 (separation agreement dated Sept. 18, 2017)), and was "terminated based upon serious sexual misconduct," (Dkt. No. 75-1, ¶ 12). On September 18,

---

[4] The UUP collective bargaining agreement  provides that "Appointments of employees shall be made in accordance with Article XI of the Policies." (Dkt. No. 75-9, at 40, § 30.1). Article XI of the Policies, "Appointments of Employees," provides in relevant part:

> Title D. Term Appointment
>
> § 1. Definition . . . a term appointment shall be an appointment for a specified period of not more than three years which shall automatically expire at the end of that period unless terminated earlier because of resignation, retirement, or termination.
>
> . . .
>
> §4. Renewal of Term . . . term appointments may be renewed by the chief administrative officer of the college for successive periods of not more than three years each; such renewals shall be reported to the Chancellor. No term appointment, of itself, shall be deemed to create any manner of legal right, interest or expectancy in any other appointment or renewal.

(Dkt. No. 75-15, at 34–35).

2017, Arash Alaei signed a separation agreement with SUNY Albany, which "prohibited him from being on SUNY Albany property or interacting with SUNY Albany students." (Dkt. No. 75-1, ¶ 13; Dkt. No. 83-3, at 967–71). Plaintiff testified that although they were both teaching at SUNY Albany at the time, he was unaware of the sexual harassment allegations by SUNY Albany students against his brother. (Dkt. No. 75-3, at 170).

### D.   Student Complaints

In early February 2018, SUNY Albany received two separate complaints regarding Plaintiff: one regarding Plaintiff's alleged facilitation of interaction between Arash Alaei and students and the second regarding Plaintiff's alleged sexual misconduct toward a student. (Dkt. No. 75-28, ¶¶ 15, 18). According to Defendants, on or about February 2, 2018, James Stellar, then-Provost and Senior Vice President for Academic Affairs, was approached by "a number of students," who "expressed significant concerns regarding their safety" based on Plaintiff's "continued facilitation of interaction between students and [Plaintiff's] brother and former co-worker Arash Alaei." (Dkt. No. 75-28, ¶ 15; Dkt. No. 75-22, ¶¶ 3, 9). Provost Stellar referred the students' concerns to Chantelle Botticelli, Assistant Vice President of Equity and Compliance, who was responsible for "overseeing the institutional response to prohibited discrimination" and "conducting investigations into complaints brought to the attention of the Title IX office either formally or informally." (Dkt. No. 75-5, at 17; Dkt. No. 75-22, ¶ 13; Dkt. No. 75-28, ¶ 5). Several days later, on February 5, 2018, Brian Selchick, "an employee relations specialist in the Human Resources office," (Dkt. No. 75-23, ¶ 4; Dkt. No. 75-28, ¶ 18), "received information that a student had been subject to alleged sexual misconduct by [Plaintiff] during a trip that both parties took to Beirut, Lebanon," (Dkt. No. 75-23, ¶ 11). Selchick testified that as a result of the complaints regarding Plaintiff's alleged facilitation of contact between Arash Alaei and students,

and the complaint of sexual misconduct, Human Resources and the Title IX Office commenced a

collaborative investigation.[5] (Dkt. No. 75-8, at 26, 30–31).

### E.     Placement on Alternative Assignment and Removal from GIHHR

Botticelli testified that "given the volume" and "content" of the students' concerns, which

included complaints from "students saying I feel unsafe in the GIHHR under [Plaintiff's]

supervision," and out of concern for "Dr. Alaei's safety," Botticelli recommended to Human

Resources that Plaintiff "not have interaction with these students" "while the investigation is

pending." (Dkt. No. 75-6, at 62–63). In a letter dated February 8, 2018, Randy Stark, Associate

Vice President of Human Resources, advised Plaintiff that he was "the President's designee,"

that he was "conducting a disciplinary investigation," and that the action was "being taken

pursuant to the authority granted under Section 19.10.c" of the collective bargaining agreement

("CBA"), and that he was enclosing "a copy of Article 19, which contains the procedure for the

imposition of discipline,"[6] for Plaintiff's reference. (Dkt. No. 75-24, at 2). Stark informed

---

[5] Selchick explained that "if there was a unionized employee who is the subject of a [Title IX] complaint, then typically HR would be brought in as a . . . collaborative person as part of the investigation" and a union representative must be present for any "interview or question[ing]" of the "target of discipline" in any "Title IX process." (Dkt. No. 75-8, at 15).

[6] Sections 19.4 and 19.10.c., of the "Discipline" section of the CBA provides:

§ 19.4 Disciplinary Procedure

a. Discipline shall be imposed only for just cause. Where the College President, or designee, seeks to impose discipline, notice of such discipline shall be made in writing . . . . The conduct for which discipline is being imposed and the penalty proposed shall be specified in the notice [and t]he notice . . .  shall contain a detailed description of the alleged acts and conduct including reference to dates, times and places.

b. The penalty proposed may not be implemented until the employee (1) fails to file a disciplinary grievance within 10 days of service of the notice of discipline, or (2) having filed a disciplinary grievance, fails to file a timely appeal to disciplinary arbitration, or (3) having appealed to disciplinary arbitration, until and to the extent that it is upheld by the disciplinary arbitrator, or (4) until the matter is settled.

. . . .

Plaintiff that "until further notice," he was being "directed to perform an alternate assignment" and "to work from home," and that Plaintiff would have "no professional obligations that require or warrant" his "presence on University facilities." (*Id.*). Stark also notified Plaintiff that he was "expressly prohibited from having any verbal, written or electronic communication of any nature or kind, in any medium, with any current or former University students or employees."[7] (*Id.* at 3). Stark stated that the matter was "confidential," and that Plaintiff was not permitted "to attempt to identify and/or make contact with any individual(s) who" Plaintiff "believe[d] to have participated in the University's investigation" and that Plaintiff was not permitted to "discuss this matter in any way with others" except for the "EAP coordinator," Plaintiff's attorney, or his union representative. (*Id.* at 2–3). In addition to placing Plaintiff on an alternative assignment, Stark, at the direction of Provost Stellar and Bruce Szelest, Chief of Staff to President Rodriguez, removed Plaintiff's building access card and keys and "cut off Plaintiff's access to SUNY email." (Dkt. No. 83-3, at 329–30). As part of the alternative assignment, Plaintiff was removed as Director of GIHHR. (Dkt. No. 75-24, at 2; *see* Dkt. No. 83-3, at 820 (February 9, 2019 email notifying "GIHHR colleagues and supporters" "that effective today" two new "interim co-directors" of GIHHR have been named)). Stark testified that Plaintiff was also told not to attend speaking engagements or lectures as a representative of SUNY Albany. (Dkt. No. 83-3, at 331).

---

c. Prior to an interrogation pursuant to Section 19.8, the College President or designee may direct the employee to perform an alternate assignment, which may be at an alternate work location. Such alternate assignment shall not be regarded as discipline nor a temporary reassignment as referred to in this Article.

(Dkt. No. 75-9, at 20, 23).

[7] Selchick states in his declaration that "[a]lternative assignment protects both the reporting individual and the respondent" and that it was "standard operating procedure" to place subjects of an investigation "on alternative assignment while an investigation was undertaken." (Dkt. No. 75-23, ¶ 17).

### F.     Joint Investigation by Human Resources and the Title IX Office

Botticelli testified that Szelest, President Rodriguez's chief of staff, asked her to make the

investigation a top priority:

> In this particular case . . . there was concerns about the student and
> about Dr. Alaei. And so [Szelest] said . . . there's very serious
> allegations being made, emotions are rising, those emotions can
> impact the stability and safety of the students in the center, and they
> can impact the safety and stability of Dr. Alaei, so let's get to the
> bottom of this quickly so that we can address it.

(Dkt. No. 75-6, at 140). According to Defendants, the joint investigation by Human Resources

and the Title IX Office "spanned more than two months and involved interviews of at least forty-

three individuals," (Dkt. No. 75-28, ¶ 22; Dkt. No. 75-8, at 54–55), including the alleged victim

of sexual misconduct, who "alleged she had been subjected to multiple instances of sexually

inappropriate behavior" by Plaintiff. (Dkt. No. 75-28, ¶ 19). Following the investigation, the

Title IX Office completed an investigative report "summarizing the evidence gathered during the

investigation." (Dkt. No. 75-6, at 28; Dkt. No. 75-30). The investigative report states that the

"investigation focused on the following possible violations of the University at Albany policies"

by Plaintiff: "insubordination and general misconduct for permitting Dr. Arash Alaei to conduct

business on behalf of the GIHHR after his separation from the University at Albany;"

"insubordination and general misconduct for facilitating contact between Dr. Arash Alaei and the

GIHHR staff and students during Dr. Arash Alaei's alternative assignment and after his

separation from the University at Albany"; and "violation of the University at Albany's sexual

harassment policy for engaging in unwelcome conduct of a sexual nature directed at GIHHR

student intern [blank] that created a sexually hostile environment for working and learning." [8]

---

[8] Botticelli and Selchick state in their declarations that during the investigation, "multiple individuals" alleged "additional possible violations of SUNY Albany policies." (Dkt. No. 75-28, ¶ 23; Dkt. No. 75-23, ¶ 14).

(Dkt. No. 75-6, at 28–29). Botticelli testified her assessment of the "credibility and reliability" of the students' allegations was that they "were supported by the evidence," (*id.* at 34), and that it was her opinion and recommendation "that HR should proceed through the disciplinary process," (*Id.* at 129). However, Botticelli stated, Human Resources was responsible for the final decision regarding how to move forward with respect to the allegations against Plaintiff. (*Id.* at 43).

### G.   Non-Renewal of Term Appointment

As noted above, SUNY Albany had previously renewed Plaintiff's term appointment "for the period beginning May 1, 2018 and ending April 30, 2019." (Dkt. No. 83-3, at 991). On April 28, 2018, William Hedberg, the Senior Associate Provost, emailed Plaintiff's supervisor, Harvey Charles a draft letter of nonrenewal for Plaintiff and requested that Charles sign it. (*Id.* at 853). Charles responded that because the draft was "actually a recommendation from [him] to" Provost Stellar, and because he knew "practically nothing about this situation," he felt "uncomfortable making a recommendation to the Provost without a basis to do so" and asked whether "this [c]ould be handled differently?" (*Id.*). Hedberg replied that Charles was "the supervisor of record," that this started "the negotiated process provided in the UUP Agreement," that Plaintiff would have "an opportunity to respond," and that Provost Stellar would then "take[] up the matter." (*Id.*). Charles signed the non-renewal form.[9] (*Id.* at 857).

On April 30, 2018, Hedberg emailed Plaintiff the "the attached form to non-renew your University appointment" and advised that Plaintiff was "entitled to provide a written response before the document is presented to the Provost" and that any response was due by May 8, 2018.

---

[9] In an email dated May 2, 2018, to Stark, Charles wrote that he initially declined to sign the non-renewal form as he had "no information that can be used as a basis to recommend that [Plaintiff] not be renewed" but that he did not seek "such information" since it was "clear . . . that the Provost has decided not to renew [Plaintiff's] contract," and that he had signed the form "in order the [sic] complete the paperwork per the wishes of the Provost." (Dkt. No. 83-3, at 854).

(*Id.* at 855). In a letter to Hedberg dated May 8, 2018, Plaintiff responded that he believed the non-renewal was "unfair and unwarranted given [his] productivity and accomplishments in the areas of scholarship, extramural funding, teaching, and mentoring." (*Id.* at 862). Plaintiff noted, among other accomplishments, the $6.5 million in "extramural funding" that he secured, his development of "an interdisciplinary graduate certificate program in health and human rights" as well as an LLM degree in the same area in collaboration with a nearby law school, the popularity of his courses, and the creation of the GIHHR. (*Id.* at 862–66). Plaintiff therefore requested that his appointment be extended. (*Id.* at 866). In addition, Plaintiff asserted that because his "initial appointment dated on April 16, 2014," gave him "the security of at least two years of employment," he was entitled to two-years' notice, and that the proposed end date was not April 30, 2019, but April 30, 2020. (*Id.*).

## H.     Disciplinary Interrogation

 In a memorandum dated May 8, 2018, Selchick directed Plaintiff to report "for a disciplinary interrogation" on May 9, 2018. (Dkt. No. 75-25, at 2). Selchick advised Plaintiff that he had the right "to have representation by UUP or counsel at this meeting." (*Id.*). Plaintiff, Plaintiff's attorney, Selchick, Stark, and Charles attended the May 9, 2018 meeting, where, according to Selchick, Plaintiff "was interrogated pursuant to the provisions of the UUP agreement and was questioned in relation to the allegations being made against him in order to provide him with the opportunity to tell his side of the story." (Dkt. No. 83-3, at 130; Dkt. No. 75-23, ¶ 22). Castiglione, Plaintiff's attorney, states in his declaration that he attended this meeting and that while "HR asked Dr. Alaei numerous questions about various matters," it "never directly advised what the basis was for putting Dr. Alaei on alternative assignment and initiating the disciplinary investigation" or "about the Title IX sexual misconduct investigation either." (Dkt. No. 83-1, ¶ 106).

## I.   Non-Renewal Correspondence

On or about May 14, 2018, Provost Stellar signed the "Change of Status Request Form"
directing the issuance of a "one year notice of non-renewal" to Plaintiff. (Dkt. No. 83-3, at 861).
In a May 14, 2018, email, Hedberg notified Plaintiff that "[t]he Provost has signed the form from
Dean Harvey Charles for non-renewal of your appointment" and that the next step would be for
the President Rodriguez "to review the file and make his decision," but that "[b]efore the
decision," Plaintiff had "five working days to review the file and to submit a statement in
response." (Dkt. No. 75-19, at 2). In a letter to President Rodriguez dated May 22, 2018, Plaintiff
wrote that he had been informed that his "appointment was not renewed" and outlined "reasons
why [his] contract should be continued," including his receipt of nearly $4 million in funding,
and his securing of $6.5 million "in extramural funding," development of new courses that have
been popular with students, development of "several federally funded international online
education initiatives," service as "a consultant to the World Health Organization," provision of
"mentorship to over 60 interns and research assistants and scholars each semester," and receipt
of positive feedback on his performance from the administration. (Dkt. No. 75-16, at 2). Plaintiff
testified that no one at SUNY Albany explained why they were seeking non-renewal. (Dkt. No.
83-3, at 140–41).

## J.   Counseling Memo

On July 6, 2018, Stark emailed SUNY counsel, Valerie Ayers, "a counseling memo that
we worked on for" Plaintiff. (Dkt. No. 83-3, at 874). Stark told Ayers that "[i]t was a struggle" to
write because:

> There wasn't really anything to counsel him on since the sexual
> misconduct allegations were unfounded. We planned to give him
> policies on sexual harassment, Workplace Violence, etc., but for
> what purpose, as we are going to non-renew him and buy him out.
> After discussing the question, does it really serve any purposes to

issue this memo other than it gives [Plaintiff] and his attorney more info for their war chest? We are now thinking that we do not issue the memo unless there is some value to having issued it.

What are your thoughts about not issuing and going right to the president signing off on the non-renewal?

(*Id.* at 325, 874). Stark sent Ayers a second email on July 9, 2019, stating:

After thinking about this over the weekend, if this was in fact a formal complaint we probably need to close the loop in the event the student decides to pursue this any further and by having the counseling session it documents our follow up and findings and closes our investigation. We are checking with the Title IX folks to see if there was a formal complaint made.[10]

(*Id.* at 875). In a July 9, 2018 email, Ayers responded: "I agree you need to wrap it up. . . . There has to be something you can get out of the student's complaint." (*Id.*). Selchick states in his declaration:

25. Ultimately, [Human Resources] determined that while the allegations made against Kamiar Alaei were credible, meaning there was no reason to doubt the veracity of the complainants, there was insufficient evidence for the University to prove the allegations beyond a preponderance of the evidence at a disciplinary arbitration, which is what was required pursuant to the UUP agreement.

26. This determination not to pursue disciplinary charges was made not based upon the truthfulness of the complaints, but upon the difficulty associated with presenting evidence at an arbitration proceeding absent subpoena power in order to secure necessary testimony.

27. As a result, my office found the allegations against Kamiar Alaei to be unsubstantiated which resulted in Kamiar Alaei being issued a counseling memo and no formal discipline being taken against him in relation to the investigation.

(Dkt. No. 75-23, ¶¶ 25–27).

---

[10] The Title IX office had no record of a formal or informal complaint. (Dkt. No. 83-3, at 876).

On August 9, 2018, Plaintiff attended a "counseling session" with Stark and Selchick. (Dkt. No. 83-3, at 877). Plaintiff testified that he attended with counsel, and that Stark and Selchick told him "there is nothing founded" and that he was "good to go back to work next day [sic] nine a.m." (*Id.* at 141). Plaintiff stated that when he asked about his access to email, which had been blocked for six months, and mentioned that all his "projects was [sic] damaged," Stark and Selchick responded that it was "no problem," that they would "fix it," and that Plaintiff would have access to email the next morning. (*Id.*). Stark testified that at that meeting, he explained to Plaintiff that no discipline would be imposed and that he was to return to work. (*Id.* at 346–47).

### K.    Termination

Plaintiff testified that when he reported to work the next day, he was called to Human Resources, where Stark and Selchick met him with a letter dated August 10, 2018, and signed by Stark, stating that his employment was terminated. (Dkt. No. 83-3, at 142–43, 994; Dkt. No. 83-3, at 347 (Stark testifying that on August 10, 2018, he met with Plaintiff and handed him a letter advising him that his employment had been terminated)). The letter stated:

> On behalf of the President and in compliance with the Policies of the Board of Trustees, this letter is to inform you of the renewal of your term appointment with the terms detailed below.
>
> > Title: Lecturer (12 month)
> > Status: Full-time Term
> > Salary: $130,000 annual salary
> > Dates: August 10, 2018-August 9, 2019
>
> This letter will also serve to notify you that your term appointment as a Lecturer in the Global Institute for Health and Human Rights (GIHHR) will not be extended beyond the present termination date, close of business August 9, 2019.
>
> In accordance with Article 32.3 of the UUP Agreement. the University is exercising its right and has elected to terminate your appointment effective August 10, 2018. The University will pay the

> balance of salary remaining on your term appointment from August
> 10, 2018 through August 9, 2019.

(Dkt. No. 83-3, at 993).

### L.     Plaintiff's Filing of a Grievance

On March 20, 2018, Plaintiff filed a grievance asserting that despite the UUP contractual mandate that the "alternative assignment is not a form of discipline," SUNY Albany "has taken several disciplinary measures against" him, including the directions that he not "discuss 'the matter' with 'anyone'" (despite the fact that "the details of [the matter] were not shared with him") or contact his students or University staff, blocking Plaintiff "from accessing to his University email account," and appointing interim co-directors the GIHHR, "thereby removing [Plaintiff] from his position in the eyes of the community." (Dkt. No. 75-17, at 5). On May 23, 2018, noting that there had "been no decision issued at Step 2 within the time limits given," Plaintiff appealed to Step 3 of the grievance procedure. (Dkt. No. 83-3, at 896). On February 27, 2019, Plaintiff's grievance was settled; Selchick testified that "[a]ll I recall is that it was that the State would reaffirm its obligations under Article 19 and in exchange the Union will withdraw the contract grievance." (Dkt. No. 75-14, at 8–9; Dkt. No. 75-8, at 49).[11]

## III.   STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);

---

[11] On January 23, 2019, Plaintiff filed a verified notice of claim against the State of New York in the New York State Court of Claims alleging breach of contract, negligent infliction of emotional distress, and defamation. (Dkt. No. 83-3, at 14, 882–83). A trial was held from June 6–7, 2022, at which exhibits were presented and six witnesses, including Plaintiff, Charles, Stark, and Selchick, testified. (*Id.* at 36–38, 268–70). On June 6, 2023, the Court of Claims entered judgment dismissing Plaintiff's claims. (*Id.* at 14–15; *see also id.* at 16–34 (Decision by Court of Claims Judge Frank P. Milano dismissing Plaintiff's claims)). An appeal is pending. (*Id.* at 11).

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d

15

Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159,

166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.   DISCUSSION

### A.   Plaintiff's Attorney's Declaration

Defendants argue that in determining their motion for summary judgment, the Court

should disregard the declaration by Plaintiff's attorney, Joseph F. Castiglione, on the ground that

it contains improper factual and legal arguments. (Dkt. No. 86, at 11–14). Defendants further

argue that the Court should disregard the more than one thousand pages of exhibits attached to

Castiglione's declaration because they consist of "inadmissible and irrelevant" documents. (*Id.* at

11). Plaintiff contends that his attorney's declaration is proper and that Defendants' arguments

should be rejected.[12] (*See generally*, Dkt. No. 88).

In his seventy-five page declaration, Castiglione outlines his "involvement" with Plaintiff

as "the primary attorney" since "the outset of the underlying matters at issue," in 2018. (Dkt. No.

83-1, ¶ 3). To "demonstrate to the Court that [he has] *extensive personal knowledge* of this

matter, including based [on his] in depth and extensive familiarity with testimony from the

various witnesses as well as the numerous emails, agreements, union matters and related

information concerning Dr. Alaei's claims," Castiglione outlines the efforts he undertook to

familiarize himself with the evidence in this case, preparation of materials, attendance of

---

[12] Plaintiff requests oral argument to allow the parties "to better edify the Court as to the significant factual and legal issues" and in order to address Defendants' arguments regarding Castiglione's declaration. (Dkt. Nos, 87, at 1; Dkt. No. 88, at 2). Alternatively, Plaintiff requests that the Court allow his "limited sur-reply" set forth in his April 17, 2024, letter motion. (Dkt. No. 88, at 1). As the Court has considered Plaintiff's "sur-reply" and otherwise finds oral argument unnecessary, Plaintiff's requests for oral argument are denied.

meetings with SUNY Albany personnel during the events leading to Plaintiff's termination, his representation of Plaintiff in the state lawsuit through trial and appeal. (Dkt. No. 83-1, ¶¶ 1–25) (emphasis added).

Rule 56(c) states that: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). At the same time, it is "well established that an attorney's affidavit can be used, in connection with a summary judgment motion, to place documents produced in discovery before the Court." *Pace v. Air & Liquid Sys. Corp.*, 171 F. Supp. 3d 254, 272 (S.D.N.Y. 2016) (quoting *Harrison-Hoge Indus., Inc. v. Panther Martin S.R.L.*, No. 05-cv-2851, 2008 WL 905892, at *27, 2008 U.S. Dist. LEXIS 25480, at *80 (E.D.N.Y. Mar. 31, 2008)).

"A court may therefore strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999), abrogated on other grounds, *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133 (2000). "Alternatively, a court may, in considering a motion for summary judgment, simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible." *Doe v. Nat'l Bd. of Podiatric Med. Exam'rs*, No. 03–cv–4034, 2004 WL 912599, at *4, 2004 U.S. Dist. LEXIS 7409, at *11 (S.D.N.Y. Apr. 29, 2004) (collecting cases). The Court follows the latter approach here, and considers only those aspects of Castiglione's declaration that appear to be based on personal knowledge. *See*, *e.g.*, *Pace*, 171 F. Supp. 3d at 272 (explaining that "the Court is capable of discerning from that affirmation what statements were made on the basis of [attorney's] firsthand knowledge; what statements are

summaries of evidence in the record; and what documents the Court should review in

determining the accuracy of those summaries").[13]

## B.     Title IX Claim

Defendants move for summary judgment dismissing Plaintiff's claim that SUNY Albany

subjected Plaintiff to discipline because of his gender on the grounds that SUNY Albany had a

legitimate, nondiscriminatory reason for its termination and "non-renewal" of Plaintiff's

employment and Plaintiff has failed to identify evidence of gender bias.[14] (Dkt. No. 75-32, at

12–15). Plaintiff opposes Defendants' motion. (Dkt. No. 83, at 17–20).

Title IX provides, with certain exceptions not relevant here: "No person in the United

States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or

be subjected to discrimination under any education program or activity receiving Federal

financial assistance." 20 U.S.C. § 1681(a). "Because Title VII's discrimination prohibition

---

[13] Defendants note that Castiglione's "declaration seems to implicate counsel as a witness in this matter" and suggest that "counsel may have independent knowledge concerning the allegations at issue in this case that would necessitate him being called as a witness at any potential trial." (Dkt. No. 86, at 11 n.10). As Defendants do not request any relief in connection with this issue, the Court does not address it further at this juncture. *Cf.*, *Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (explaining that "'[b]ecause courts must guard against the tactical use of motions to disqualify counsel, they are subject to fairly strict scrutiny, particularly motions' under" "the witness-advocate rule set out in Rule 3.7 of the New York Rules of Professional Conduct" (quoting *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989)).

[14] Defendants advance two additional arguments with respect to Plaintiff's Title IX claim. First, Defendants assert that to the extent Plaintiff asserts claims of racial or religious discrimination under Title IX, such claims fail as a matter of law. (Dkt. No. 75-32, at 11). Second, Defendants assert that because Title IX does not provide for individual liability, to the extent Plaintiff seeks to hold President Rodriguez, Provost Stellar, and Szelest liable, his claim fails as a matter of law. (*Id.* at 11–12). Plaintiff has not responded to either argument. As "Title IX prohibits sex discrimination by recipients of federal education funding," *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005), any claim of racial or religious discrimination thereunder is dismissed, *see Mason v. Antioch Univ.*, No. 15-cv-5841, 2016 WL 2636257, at *4 n.3, 2016 U.S. Dist. LEXIS 60378, at *11–12 n.3 (E.D.N.Y. May 5, 2016 ) (noting that the plaintiffs' complaint alleging, inter alia racial and religious discrimination "does not state a claim for relief under Title IX because plaintiffs do not allege therein that defendants discriminated . . . on the basis of . . . gender"). Further, "Title IX 'has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals.'" *Doe v. Haas*, 427 F. Supp. 3d 336, 355 (E.D.N.Y. 2019) (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009)). Thus, to the extent Plaintiff asserts a Title IX claim against the individual defendants, any such claim is dismissed.

overlaps Title IX's prohibition against sex discrimination in education programs, and because employment discrimination claims often have much in common with claims under Title IX," courts in the Second Circuit "have . . . long interpreted Title IX 'by looking to . . . the caselaw interpreting Title VII.'" *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 103 (2d Cir. 2022) (quoting *Menaker v. Hofstra Univ.*, 935 F.3d 20, 31 (2d Cir. 2019)). "Thus, Title VII's burden-shifting framework generally guides [a court's] analysis of claims brought under Title IX." *Radwan v. Manuel*, 55 F.4th 101, 130 (2d Cir. 2022).

First, the plaintiff must establish a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Radwan*, 55 F.4th at 130. "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citation omitted) (first quoting *St. Mary's*, 509 U.S. at 506 (1993); then quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the plaintiff. *St. Mary's*, 509 U.S. at 506. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Id*. at 507. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). "The plaintiff must produce . . . sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the

real reason for the [employment action]." *Weinstock*, 224 F.3d at 42 (alterations in original) (internal quotation marks omitted).[15]

### 1.    Prima Facie Case

To establish a prima facie case of gender discrimination under Title IX, a plaintiff must show that: (1) he is a member of a protected class, (2) he was qualified for position, (3) he suffered an adverse action, and (4) "the facts imply a discriminatory intent." *Radwan*, 55 F.4th at 130; *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). The fourth factor of this test may be satisfied "through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (citation omitted).

Defendants appear to assume, for purposes of summary judgment, that Plaintiff can establish a prima facie showing of gender discrimination. (Dkt. No. 75-32, at 12 ("While Defendants do not concede that Plaintiff can establish a prima facie showing of gender discrimination, Defendants will begin with the second step of the analysis for purposes of efficiency.")). The Court will do likewise.

### 2.    Legitimate, Nondiscriminatory Reason

Defendants provide the following reason for the non-renewal of Plaintiff's employment: "Over the course of the investigation, multiple unsettling allegations were uncovered that gave SUNY Albany . . . great concern for the safety of students, and the integrity of SUNY Albany

---

[15] The Second Circuit has not yet decided whether a Title IX must satisfy the "but-for" causation standard. *See Radwan*, 55 F.4th at 131 (observing that the Supreme Court has found discrimination claims under 42 U.S.C. § 1981 and retaliation claims under Title VII "require[] proof of but-for causation" but that it has not yet "revisited this issue under Title IX in the wake of this Supreme Court precedent"). Even assuming the "but-for" standard applies here, the Court would conclude, for the reasons stated below, that Plaintiff's proof is sufficient under the higher standard.

and its programs, if Plaintiff were to continue to be employed at SUNY Albany." (Dkt. No. 75-32, at 13). The need to protect the safety of students is a legitimate, nondiscriminatory reason for renewal. *See*, *e.g.*, *Bryant v. S. Country Cent. Sch. Dist.*, No. 14-cv-5621, 2017 WL 1216553, at *15, 2017 U.S. Dist. LEXIS 49651, at *41 (E.D.N.Y. Mar. 31, 2017) (concluding the defendant's proffered reason for adverse action, namely the "need to ensure the safety of all employees pending further investigat[ion] of that Complaint," satisfied its burden-shifting obligation).

### 3.    Pretext

Plaintiff argues that he has adduced sufficient evidence from which a reasonable factfinder could find Defendants' reason for his non-renewal and termination was a pretext for gender-based discrimination. *See Weinstock*, 224 F.3d at 42 ("For the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."). Here, Plaintiff has presented evidence from which a reasonable factfinder could conclude that SUNY Albany used its "unfounded" determination as a pretext for circumventing the CBA's disciplinary procedures, enabling it to summarily terminate and non-renew Plaintiff's employment in order to avoid the potential adverse reaction by female students to Plaintiff's return to campus.

In the Title IX context, the Second Circuit has observed that one way a plaintiff may raise an inference of bias is to show that the university has disregarded the procedural protections it has promised its employees. *See Menaker*, 935 F.3d at 33 ([O]nce a university has promised procedural protections to employees, the disregard or abuse of those procedures may raise an inference of bias."). Here, Plaintiff has presented evidence that during the August 9, 2018, counseling session, Stark and Selchick told Plaintiff that the sexual misconduct and other allegations were unfounded and that he was "good to go back to work," but that when Plaintiff

reported for work the next day, they terminated his employment and advised him that his term would not be renewed. (Dkt. No. 83-3, at 141–43, 994). Article 19 of the CBA provides that (1) "[d]iscipline shall be imposed only for just cause," (2) that the employee is entitled to detailed notice of the conduct for which discipline is to be imposed and of the proposed penalty, and (3) that penalty may not be imposed until after, inter alia, the employee has had the opportunity to file a disciplinary grievance or appealed to arbitration. (Dkt. No. 75-9, at 20 (§ 19.4.a.–b.)). Viewing the evidence in the light most favorable to Plaintiff, a factfinder could reasonably conclude that the termination of Plaintiff's term appointment was a disciplinary action,[16] and could infer gender-related bias from SUNY Albany's imposition of the penalty of termination without providing detailed notice of the alleged wrongful conduct, or the opportunity to challenge the proposed penalty. *See Radwan*, 55 F.4th at 140 (finding sufficient evidence of pretext and gender discrimination on Title IX claim based on, inter alia, purported procedural irregularities, including the university's failure to refer the plaintiff's case to the student disciplinary authority or to give the plaintiff the opportunity to contest the violation or penalty imposed "before a neutral decisionmaker," noting that although the university argued none of the procedural issues showed pretext or undermined its misconduct determination, such issues were "fact-specific" and could not be resolved on summary judgment); *see also Menaker*, 935 F.3d at 34 (finding, on motion to dismiss, allegations that the plaintiff was terminated despite the fact that university official "knew that at least one of the accusations" against the plaintiff was false, that university official failed to provide investigation report after promising to do so, that the university disregarded the process provided for in its harassment policy by failing to provide

---

[16] While the CBA states that the provisions of Article 19 "do not apply to non-renewal of term appointments," it does not appear to exempt the *termination* of term appointments from the "just cause" requirement. (Dkt. No. 75-9, at 20 (§ 19.3)).

opportunity to submit a written response or "written determination of reasonable cause" sufficient to allow inference of bias). Given the decisions to terminate and not renew Plaintiff's term appointment were made together, a factfinder could likewise conclude that SUNY Albany's non-renewal decision was motivated by discriminatory bias.

Further, based on President Rodriguez's testimony that he had decided that it was better for SUNY Albany to terminate and non-renew Plaintiff's appointment based on the allegations, including the allegations of sexual misconduct, (Dkt. No. 75-7, at 29–30; *see also* Dkt. No. 75-8, at 84–85 (Selchick testifying that "the university had decided that . . . this area was . . . fraught with issues, that there were . . . student concerns, Title IX issues," and that "at the end of the day the university felt that it would be best to part ways with Dr. Alaei"); *id.* at 96 (Selchick testifying that Botticelli concluded that regardless of the validity of the allegations, female students would have "such an adverse reaction" to Plaintiff's return to campus that "it would be institutionally . . . problematic")), a factfinder could conclude that SUNY Albany used its "unfounded" determination as a pretext for circumventing procedural protections and his termination and non-renewal was a discriminatory adjudication of the sexual misconduct complaint against him. *See*, *e.g.*, *Menaker*, 935 F.3d at 36 (rejecting as absurd the university's argument that the plaintiff had "no right to the [harassment] Policy's procedural protections because he was found *not guilty* of the accusations," noting that the "Policy applies—regardless of how the University chooses to characterize its ultimate findings," and explaining that because "[p]rocedural protections safeguard the rights of the accused during the investigative and adjudicative process[,] [o]ne cannot . . . wait until after that process has concluded to determine (based on its result) whether these protections apply") (emphasis added).

Finally, although SUNY Albany contends that its concern for students, the "Title IX issues," and interest in avoiding an adverse reaction by female students to Plaintiff's return to campus were "lawful motivations" for its determination to terminate and non-renew Plaintiff, a factfinder could conclude that such motivations reflect an impermissible bias favoring female students. In *Doe v. Columbia University*, the Second Circuit explained that:

> A defendant is not excused from liability for discrimination because the discriminatory motivation does not result from a discriminatory heart, but rather from a desire to avoid practical disadvantages that might result from unbiased action. A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.

831 F.3d 46, 58 n.11 (2d Cir. 2016). Thus, viewing the facts in the light most favorable to Plaintiff, a factfinder could reasonably infer that in deciding to "part ways" with Plaintiff despite the lack of evidence to sustain a disciplinary action, SUNY Albany was impermissibly motivated by its concern regarding the reaction by its female students to the return of Plaintiff, a male professor against whom allegations of sexual misconduct had been made. *See Simons v. Yale Univ.*, No. 19-cv-1547, 2024 WL 182208, at *12, 2024 U.S. Dist. LEXIS 8309, at *31 (D. Conn. Jan. 17, 2024) (finding factual question as to whether the university was motivated "by discriminatory animus against men" where, after the plaintiff completed formal sanction for sexual harassment (suspension and salary reduction), the university, in response "to the negative sentiment within the [university] community," rescinded the plaintiff's professorship, explaining that "if the University treated Plaintiff differently because of his sex, even if such treatment resulted from a desire to avoid unpleasantries which would have followed unbiased treatment,

that treatment still is discrimination"). Accordingly, Defendants' motion for summary judgment is denied.

### C.      Fourteenth Amendment Claims

Defendants move for summary judgment dismissing Plaintiff's Fourteenth Amendment substantive and procedural due process claims as well as Plaintiff's equal protection claim. (Dkt. No. 75-32, at 15–29). Plaintiff has not responded to Defendants' arguments regarding substantive due process,[17] but specifically opposes summary judgment with respect to his procedural due process and equal protection claims. (Dkt. No. 83, at 20–36).

#### 1.      Procedural Due Process

Defendants argue that they are entitled to summary judgment with respect to Plaintiff's claim that in terminating and non-renewing his employment, Defendants violated Plaintiff's right to procedural due process. (Dkt. No. 75-32, at 16–18). Plaintiff opposes Defendants' motion. (Dkt. No. 83, at 21–31).

The Due Process Clause of the Fourteenth Amendment provides that a State may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The "two threshold questions" in any procedural due process claim are (1) whether the plaintiff "possessed a liberty or property interest protected by the United States Constitution or federal statutes" and (2) "if so, what process was due before the plaintiff could be deprived of that interest." *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995) (citations omitted).

---

[17] The failure to oppose a motion for summary judgment on a certain claim is deemed abandonment of the claim. *E.g.*, *Feacher v. Intercontinental Hotels Grp.*, 563 F. Supp. 2d 389, 399 (N.D.N.Y. 2008). In any event summary judgment is warranted. The Complaint does not specify the basis for, or the individual Defendants whom, Plaintiff claims violated his substantive due process rights. (Dkt. No. 1, ¶¶ 255–67). And Plaintiff fails to identify evidence in the record showing that any Defendant engaged in conduct that shocked the conscience. *See, e.g.*, *Murphy v. Hughson*, 82 F.4th 177, 189 (2d Cir. 2023) (explaining that "[t]o defeat summary judgment, [the plaintiff] was required to present evidence that a reasonable jury could find that [the defendant's] actions shocked the conscience.").

Plaintiff argues that he had a property interest in his Associate Professor and Lecturer position and that SUNY Albany could not discipline him by placing him on alternative assignment, terminating his position prior to the end of his term on August 9, 2019, or non-renewing his term appointment without just cause. (Dkt. No. 83, at 21–31). "Property interests are not created by the Constitution; rather, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). To establish a property interest, "a person clearly must have more than an abstract need or desire for it;" instead, he must "have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "Property interests under the Due Process Clause are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law,'" *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 212 (2d Cir. 2003) (quoting *Roth*, 408 U.S. at 577), contract, or collective bargaining agreement, *see Ciambriello*, 292 F.3d at 314 ("We have repeatedly recognized that a collective bargaining agreement may give rise to a property interest in continued employment."); *see also Harhay*, 323 F.3d at 212 (determining "whether a contractual right can be characterized as a constitutionally protected property interest," requires a court to look "'to whether the interest involved would be protected under state law and must weigh the 'importance to the holder of the right.'" (quoting *Ezekwo v. NYC Health & Hosps. Corp.*, 940 F.2d 775, 783 (2d Cir. 1991)). For example, "[a] public employee has a property interest in continued employment if the employee is guaranteed continued employment absent 'just cause' for discharge." *Ciambriello*, 292 F.3d at 313 (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).

Here, in arguing that Plaintiff has failed to show a property interest in renewal of his term appointment, Defendants rely heavily on the general proposition that where the terms of an employee's appointment secures no interest in re-employment following the expiration of the term, the employee lacks a protectable property interest in continued employment. *Roth*, 408 U.S. at 578; *see Williams v. Woodhull Med. & Mental Health Ctr.*, 891 F. Supp. 2d 301, 331 (E.D.N.Y. 2012) (explaining that a "public employee lacks a protected property interest in reappointment where neither the terms of the original appointment nor any state statute, rule, or policy secures an interest in reappointment for the next year"); *see also Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) (explaining that "[a] 'unilateral expectation' is not sufficient to establish a constitutionally protected property right" and that "a plaintiff must have 'a legitimate claim of entitlement to' the alleged property interest" (quoting *Roth*, 408 U.S. at 577)). However relevant Defendants' argument may be to the issue of whether Plaintiff had a property interest in the renewal of his term appointment (addressed below), Defendants do not cite any caselaw showing that such principles apply to Plaintiff's claim that he had a protectable property interest in employment for his renewed term—August 10, 2018 to August 9, 2019, in which he had more than a "unilateral expectation" of continuing employment. *Roth*, 408 U.S. at 577.

The parties cite to the Appointment Letter(s), the CBA, and the Policies. (*See*, *e.g.*, Dkt. No. 75-32, at 18; Dkt. No. 83, at 25). As relevant here, the April 16, 2014, Appointment Letter states that Plaintiff's initial appointment will be for three years, that the title is "a non-tenure-track" position in accordance with the Policies, and that "the appointment will be reviewed annually for possible extension by another year." (Dkt. No. 83-3, at 985). SUNY Albany renewed Plaintiff's term appointment twice more: first, "for the period beginning May 1, 2017 and ending April 30, 2018"; and again, "for the period beginning May 1, 2018 and ending April

30, 2019." (*Id.* at 990–91). On August 10, 2018, SUNY Albany renewed Plaintiff's term

appointment for the term beginning August 10, 2018 and ending August 9, 2019. (Dkt. No. 75-

13, at 2). SUNY Albany's August 10 2018, letter renewing Plaintiff's Lecturer term appointment

therefore gave Plaintiff an expectation in employment until the end of that term, on August 9,

2019. *See Roth*, 408 U.S. at 577 (explaining that property interests "are created and their

dimensions are defined by existing rules or understandings that stem from an independent source

such as state law-rules or understandings that secure certain benefits and that support claims of

entitlement to those benefits"). Moreover, the CBA states that "[d]iscipline shall only be

imposed for just cause." (Dkt. No. 83-3, at 617). In *Ciambriello*, the Second Circuit "read the

word 'discipline'" as used in the collective bargaining agreement at issue "more broadly to

include any dismissal or demotion, regardless of the . . . stated reason for the adverse

employment action." 292 F.3d at 316. Thus, a reasonable factfinder could conclude that Plaintiff

had a property interest in his one-year term appointment from August 10, 2018 to August 9,

2019, and reading the definition of discipline in the collective bargaining agreement broadly, that

SUNY Albany could not terminate his employment before the end of that term without just

cause. *Id.*

   However, it is undisputed that SUNY Albany paid Plaintiff his salary for the entire term.

It is well-settled that "'[a]n employee who is on leave and receiving [her] normal salary' is not

'deprived of a property right merely b[y] virtue of being relieved of [her] job duties." *Knights v.*

*City Univ. of New York*, 639 F. Supp. 3d 395, 400 (E.D.N.Y. 2022) (quoting *MacFall v. City of*

*Rochester*, 495 F. App'x 158, 160 (2d Cir. 2012)); *see also Henneberger v. Cnty. of Nassau*, 465

F. Supp. 2d 176, 193 (E.D.N.Y. 2006) ("The Court finds that the denial of additional benefits

allegedly due to plaintiffs under the CBA does not constitute the kind of deprivation that may

give rise to a due process claim in the Second Circuit."); *MacFall*, 746 F. Supp. 2d at 484–85

("[D]ue process claims based on the loss of such additional pay or benefits, beyond an

employee's base pay, have routinely been rejected by the courts."), *aff'd*, 495 F. App'x 158 (2d

Cir. 2012). Plaintiff therefore has failed to raise a material issue of fact as to any denial of a

property interest for the time period of August 10, 2018 to August 9, 2019.[18] Accordingly, the

Court next considers whether Plaintiff has adduced evidence of a property interest in the renewal

of his term employment or continued employment beyond the August 9, 2019, expiration of his

term appointment.

The April 16, 2014, Appointment Letter promised Plaintiff employment from May 1,

2014 to on or about May 1, 2017, and that "the appointment will be reviewed annually for

possible extension by another year." (Dkt. No. 75-10, at 2).[19] The CBA provides that

"[a]ppointments of employees shall be made in accordance with Article XI of the Policies." (Dkt.

No. 75-9, at 40 (§ 30.1)). Article XI of the Policies provides that "a term appointment shall be an

appointment for a specified period of not more than three years which shall automatically expire

at the end of that period unless terminated earlier because of resignation, retirement, or

termination" and that "term appointments may be renewed . . . for successive periods of not more

than three years each." (Dkt. No. 75-15, at 34 (Article XI, Title D, §§ 1, 4)). The Policies further

---

[18] For the same reason, to the extent Plaintiff argues placement on alternative assignment violated his procedural due process rights, throughout which he continued to work and was paid the same salary, his claim fails.

[19] In a footnote in his brief, Plaintiff asserts that the April 16, 2014 Appointment Letter's reference to an annual review providing "at least two years of continued employment" was "an 'Evergreen Appointment'"—a term Plaintiff does not define—which entitled him to "two years of continued employment as of August 2018," i.e., to August 2020. (Dkt. No. 83, at 14 n.5). However, Plaintiff acknowledges that in his New York State Court of Claims lawsuit, the court "determined that Dr. Alaei was not entitled to two years under his Appointment Letter," and Plaintiff does not press the issue further in this case. (*Id.*). He states that he was "entitled to at least one more year of employment as of August 2018," which SUNY Albany admitted when it "paid him for one more year of salary." (*Id.* at 24). The Court, accordingly, does not address any issue regarding the reference to two years in the 2014 Appointment Letter.

state: "No term appointment, of itself, shall be deemed to create any manner of legal right, interest or expectancy in any other appointment or renewal." (*Id.* at 35 (Article XI, Title D, § 4)). Thus, while the CBA and Policies define term appointments and allow for the possibility of renewal, they say nothing from which Plaintiff could infer an expectation of renewal, and, in fact, the Policies explicitly state that a term appointment, in itself, "shall not be deemed" to create an expectation of continued employment. *See Looney*, 702 F.3d at 709 (finding, on motion to dismiss, that the plaintiff, who had been appointed for a four-year term, failed to allege a property interest where "the Employee Handbook, the town's Charter, and the CBA" defined "'full time' employment" and addressed "whether an employee could expect to receive . . . benefits," but did not "affirmatively indicate[]" that the plaintiff "could expect to continue being a full-time employee").

Plaintiff, however, seems to argue that it is a different provision in the Policies, the provision governing the evaluation of academic employees, when read together with his April 16, 2014 Appointment Letter, which, he asserts, contained "the right to have an annual evaluation for extending his term appointment," that gave him a property interest in renewal. (Dkt. No. 83, at 26). Article XII of the Policies, "Evaluation and Promotion of Academic and Professional Employees," provides that during an evaluation of academic employees, criteria such as "[m]astery of subject matter," "[e]ffectiveness in teaching," and "[s]cholarly ability," are to be considered, (Dkt. No. 75-15, at 59–60 (Article XII, Title A, § 4 (a)–(e))). Although not clearly articulated, it appears that Plaintiff is arguing that the criteria to be considered during an evaluation set the terms for renewal, and give rise to an inference or expectation of a term renewal unless the relevant criteria are unmet. The Court disagrees. First, the April 2014 Appointment Letter refers to an annual "review[]" and does not mention "evaluation." (Dkt. No.

83-3, at 592). Second, the Policies specify that the "[p]urpose" of the "evaluation of academic employees" "shall be the appraisal of the extent to which each academic employee has met his or her professional obligation" and that the use of an evaluation with respect to the renewal of term appointments is discretionary. (Dkt. No. 75-15, at 59 (Article XII, Title A, § 2 (explaining that an evaluation "*may* be considered in making decision or recommendations with respect to . . . renewal of term appointments . . . and for any other purpose where an academic employee's performance may be a relevant consideration" but that "[n]othing contained herein shall prevent the chief administrative officer from taking such action as" he or she may "deem appropriate to the operating requirements of the college"))) (emphasis added). Thus, the Court finds no basis for concluding that the evaluation provisions of the Policies gave Plaintiff an expectation or property interest in the renewal of his appointment.

Nor has Plaintiff presented any evidence that Defendants, or any other individual at SUNY Albany, provided any guarantee or explicit indication that Plaintiff should expect renewal of his term appointment following any of his previous renewals. In *Looney*, the plaintiff, who had served four, four-year terms as a "building official," but was not reappointed after he filed a lawsuit alleging, inter alia, that the defendants violated his First Amendment rights, claimed that the defendants violated his procedural due process rights when they declined to reappoint him to another term. 702 F.3d at 706–10. The Second Circuit found that neither state law nor, among other documents, the CBA or the plaintiff's final notice of reappointment (which guaranteed only an "additional four years"), provided any indication that the plaintiff could expect reappointment. *Id.* at 709. The Circuit therefore concluded that "[t]he complaint's allegations, without any written or spoken guarantee as to the terms of his employment, leave Looney with nothing more than a 'unilateral expectation' that he would continue to be reappointed to his position," and that

"[s]uch a unilateral expectation does not qualify as a constitutionally protected property right."
*Id.* In reaching this conclusion, the Circuit distinguished *Harhay*, *Ciambriello*,[20] and *Ezekwo*,
where the plaintiffs "had been promised something explicitly—either verbally or in terms of the
applicable collective bargaining agreement—about specific conditions during the *future term* of
their employment." *Id.* at 708 (emphasis added). The Circuit explained that in *Harhay*, the CBA
at issue "provided the plaintiff a 'contractual right . . . to be reappointed to any vacant position
for which she was qualified,'" and that it had therefore "determined that it was 'clear' that the
plaintiff, a tenured school teacher, had a constitutionally protected property right in being
reappointed," *Looney*, 702 F.3d at 708 (quoting *Harhay*, 323 F.3d at 212); that in *Ciambriello*,
the plaintiff "was working pursuant to a collective bargaining agreement that stated he would not
be demoted without engaging in incompetence or misconduct," *Looney*, 702 F.3d at 708 (quoting
*Ciambriello*, 292 F.3d at 319); and that in *Ezekwo*, the plaintiff "was told both in writing and in
person that she could expect to be chief resident during her third year of residency." *Looney*, 702
F.3d at 708 (quoting *Ezekwo*, 940 F.2d at 782).

     Here, there is no evidence that Plaintiff was told in person or in writing, at any point, that
he could expect renewal of his term appointment. *See Knights*, 639 F. Supp. 3d at 401 (finding
that the plaintiff failed to identify a "property interest in continued employment outside of being
able to finish his extended substitute appointment," explaining that "a 'mere subjective
expectancy' of re-employment is not protected by procedural due process; [the plaintiff] must

---

[20] In his briefing, Plaintiff's relies extensively on *Ciambriello*, arguing it is analogous. (Dkt. No. 83, at 21–24).
Although the CBA in *Ciambriello*, like the CBA in this case, contains a "just cause" requirement for discipline, in
*Ciambriello*, the plaintiff, having served in the position to which he was promoted "in excess of the CBA's twenty-
six week trial period," was, at the time of his demotion "entitled to the protection" of the "just cause" provision.
*Ciambriello*, 292 F.3d at 316. Here, there is evidence that while Plaintiff was entitled to the protection of the "just
cause" provision for the duration of his term, *i.e.*, until August 9, 2019, there is no evidence that he was entitled to
the provision's protection in connection with any future employment or renewal.

show he was entitled to it under 'the policies and practices of the institution.'" (quoting *Perry v. Sindermann*, 408 U.S. 593, 603 (1972)); *Rehman v. State Univ. of N.Y. at Stony Brook*, 596 F. Supp. 2d 643, 657 (E.D.N.Y. 2009) (granting motion to dismiss procedural due process claim, finding "the plaintiff's employment was dictated by the appointment letter" to position as professor, "which by its express terms was a [one-year] term appointment" and that "[a] the plaintiff's term was renewed . . . he had no right to renewal or a constitutionally protected property interest in his expectation of renewal" and identified "no specific SUNY Stony Brook policy or practice sufficient to create an implied understanding that his contract would be continually renewed"). Thus, as Plaintiff fails to raise a genuine issue of material fact as to a property interest in his termination, for which he was paid his full salary through the expiration of his term, or in the renewal of his term appointment, Defendants' motion for summary judgment as to Plaintiff's Fourteenth Amendment procedural due process claim is granted.[21]

### 2.    Equal Protection

Defendants move for summary judgment as to Plaintiff's Fourteenth Amendment equal protection claim on the grounds that Plaintiff has failed to raise a material issue of fact with respect to his claims of gender, race, and religion-based, termination and non-renewal of his employment at SUNY Albany. (Dkt. No. 75-32, at 25–29). Plaintiff opposes Defendants' motion. (Dkt. No. 83, at 31–36).

In this case, Plaintiff brings his employment-related equal protection claim under the "class of one" and "selective enforcement" theories of liability. (*Id.*; *see also* Dkt. No. 75-32, at 25–29 (Defendants seeking summary judgment arguing Plaintiff fails to raise a material issue of

---

[21] Defendants also seek summary judgment "to the extent the Complaint can be construed to allege any procedural due process violations pursuant to the 'stigma plus' analysis." (Dkt. No. 75-32, at 21–23). Plaintiff does not respond to this argument and cites no evidence in support of any such claim.

fact as to "class of one" or "selective enforcement" equal protection claim). However, "the Supreme Court and the Second Circuit both have held that "class of one" claims do not apply to public employment. *Apatow v. Town of Stratford*, 651 F. Supp. 3d 573, 585 (D. Conn. 2023) (citing *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008) ("[T]he class-of-one theory of equal protection has no application in the public employment context"); *Appel v. Spiridon*, 531 F.3d 138, 141 (2d Cir. 2008)). Further, in the Second Circuit, there is a question as to whether selective enforcement claims are still viable in the public employment context, *see Hu v. City of New York*, 927 F.3d 81, 100 n.5 (2d Cir. 2019) ("We have not decided whether the Supreme Court's decision in *Engquist* to bar [class of one] claims in the employment context also applies to malice-based [selective enforcement] claims."); a question on which district courts are divided, *see Apatow*, 651 F. Supp. 3d at 585 (recognizing that "to date, district courts in the Circuit have reached divergent conclusions"); *compare id.* (concluding "that *Engquist's* prohibition on 'class of one' claims in the public employment context extends to malice-based selective enforcement claims as well"); *with Airday v. City of New York*, No. 14-cv-8065, 2020 WL 4015770, at *6, 2020 U.S. Dist. LEXIS 125803, at *15–16  (S.D.N.Y. July 16, 2020) (allowing selective enforcement public employment claim to proceed). Neither party has briefed this issue. However, the Court need not resolve this issue because even assuming Plaintiff could pursue a selective enforcement claim in the public employment context, Plaintiff has not identified any similarly situated comparators—a necessary element of any selective enforcement claim.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotation marks omitted). To establish selective enforcement claim under the Equal Protection Clause, the plaintiff must show that: (1) compared with others similarly situated, [the plaintiff] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as [gender,] race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu*, 927 F.3d at 91 (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)); *see also Annis v. Cnty. of Westchester*, 136 F.3d 239, 247–48 (2d Cir. 1988) (affirming that gender constitutes an impermissible consideration).

　　Defendants assert that Plaintiff has failed "to set forth evidence beyond conclusory and speculative claims that other unknown individuals were treated differently." (Dkt. No. 75-32, at 27). In response, Plaintiff asserts that Stark and Selchick testified that, unlike "prior disciplinary investigations and alternative assignments," SUNY Albany "treated Dr. Alaei differently . . . including by" "blocking his email," "telling him he could not represent himself as an employee" of SUNY Albany, "supplanting him as Director of GIHHR and replacing him with new directors," "seeking to non-renew Dr. Alaei contrary to the usual protocol of having the employees' [sic] supervisor support and initiate the non-renewal process," and "non-renewing and terminating Dr. Alaei's employment even though [it] had never done that for another employee where it was determined that there were no policy violations and no 'just cause' to impose discipline." (Dkt. No. 83, at 35 (citing Dkt. No. 83-1, ¶¶ 214–23, 226, 265)). However, none of the record evidence[22] Plaintiff cites in support of these assertions contains anything more

---

[22] Indeed, the "evidence" Plaintiff cites in his brief is his attorney's declaration, which contains summaries and characterizations of testimony by witnesses during the state court of claims trial.

than general and conclusory statements. (*See*, *e.g.*, Dkt. No. 83-1, ¶ 216 (Plaintiff's attorney asserting that Dr. Kevin Williams, Vice Provost for Academic Affairs, testified during the state court of claims trial that "generally for non-renewal of faculty without tenure, there is an annual performance review for the employee that is measured against their workplan," and "that generally the employee's supervisor is responsible for initiating the non-renew process for an employee," and that Dr. Williams testified "he never experienced a situation where someone asked a supervisor" to recommend "non-approval for an employee" (quoting Dkt. No. 83-3, at 213–15)); *id.* ¶ 223 (asserting that Selchick "testified that "[i]n his experience with Human Resources . . . it was not typical to seek to non-renew an employee without having the employee's supervisor being supportive of the non-renewal process" (quoting Dkt. No. 83-3, at 383–84)).

Further, the evidence Plaintiff cites in support of his assertion that SUNY Albany has "*never*" non-renewed or terminated an employee's employment where there were no policy violations or "just cause" for discipline found, is his attorney's summary of Selchick's testimony, which does not accurately reflect Selchick's testimony, (c*ompare* Dkt. No. 83-1, ¶ 226 (Plaintiff's attorney asserting that Selchick testified "that there were no other instances in prior disciplinary investigations where it was determined not to issue discipline against the employee but the employee still had his employment non-renewed and bought out"); *with* Dkt. No. 83-2, at 381–82 (Selchick agreeing in response to counsel's questioning that "of the five to ten disciplinary investigations" conducted by Human Resources between January 2018 and September 2018, there were "no other instances where it was determined not to issue discipline against the employee, but the employee was still bought out and had his employment not renewed"), and his attorney's summary of Stark's testimony during the Court of Claims trial,

where Stark agreed that during a prior deposition, when asked "After there has been a determination of no policy violations or determination not to impose discipline, is it common to terminate the employee?" he responded that "It did not happen while I was at the University of Albany." (*See* Dkt. No. 83-1, ¶ 265 (citing Dkt. No. 83-3, at 335)).

Even setting aside the presentation of such evidence in an attorney's affidavit, the vague, generalized testimony by Selchick and Stark is devoid of factual detail and fails to identify any comparators or indicate whether any individual under investigation was similarly situated in any respect. Indeed, while the "plaintiff's and comparator's circumstances" need not be "identical," they "must bear a reasonably close resemblance." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (internal quotation marks omitted). Here, following discovery, Plaintiff fails to identify even a single comparator; he provides no evidence that any individual being investigated by Human Resources or the Title IX office was a professor subject to a term appointment. Thus, Plaintiff's selective enforcement claim fails as a matter of law. *See Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 790–91 (2d Cir. 2007) (affirming summary judgment dismissing equal protection selective enforcement claim, where "following discovery, plaintiffs proffered no evidence that these businesses were indeed similarly situated in any material way," noting that "[g]enerally, whether two entities are similarly situated is a factual issue," but that "this rule is not absolute and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met"); *see also MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010) (dismissing complaint where the plaintiffs failed to "identify any comparators or similarly situated entities at all"); *Cassidy v. Scoppetta*, 365 F. Supp. 2d 283, 290–91 (E.D.N.Y. 2005) (finding that the plaintiffs "failed to allege the most fundamental aspect of an equal protection claim" when they did not compare

themselves to similarly situated individuals). Accordingly, as Plaintiff's "class of one" and

"selective enforcement" claims fail as a matter of law and as Plaintiff has identified no other

theory of liability, Defendants are entitled to summary judgment on Plaintiff's equal protection

claim.[23]

## V.   CONCLUSION[24]

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 75) is

**GRANTED** with respect to Plaintiff's Title IX claims against the individual Defendants only

and **GRANTED** with respect to Fourteenth Amendment procedural due process, substantive due

process, and equal protection claims; and it is further

**ORDERED** that that Plaintiff's Title IX claims against the individual Defendants and

Fourteenth Amendment procedural due process, substantive due process, and equal protection

claims are **DISMISSED** with prejudice; and it is further

**ORDERED** that Rodriguez, Szelest, and Stellar are **DISMISSED** as Defendants in this

case; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 75) is otherwise

**DENIED** in its entirety; and it is further

**ORDERED** that Plaintiff's requests for oral argument, (Dkt. Nos. 87, 88), are **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>June 11, 2024</u>
Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge

---

[23] Having granted summary judgment on all of Plaintiff's § 1983 claims, the Court need not reach Defendants' arguments regarding qualified immunity.

[24] In opposing Defendants' motion, Plaintiff urges the Court "to search the record and grant summary judgment to Dr. Alaei as the non-movant if warranted." (Dkt. No. 83, at 16) (quotation marks and brackets omitted). The Court finds no basis for granting summary judgment in Plaintiff's favor.