**EXHIBIT A**

# In The Matter Of:

*DR. KAMIAR ALAEI v.*
*STATE UNIVERSITY OF NEW YORK, et al.*

---

*BRIAN SELCHICK*
*April 9, 2021*

---

COVERING ALL UPSTATE NEW YORK



MFReportingNY.com

Office: 518-478-7220          Mail to: 5 Southside Dr., Suite 11
Fax: 518-371-8517                   Clifton Park, NY 12065

*Min-U-Script® with Word Index*

```
 1      STATE OF NEW YORK

 2      COURT OF CLAIMS

 3      --------------------------------------------------:

 4      In the Matter of the Claim by

 5      DR. KAMIAR ALAEI,

 6                              Claimant,

 7

 8      - Against -                        Claim Number:

 9                                         132554

10      STATE UNIVERSITY OF NEW YORK,

11      STATE UNIVERSITY OF NEW YORK AT ALBANY,

12      and THE STATE OF NEW YORK,

13                              Respondents.

14      --------------------------------------------------:

15              DEPOSITION of:  BRIAN SELCHICK

16                  (Respondent Agent)

17

18              Friday, April 9, 2021

19              10:05 a.m. - 1:09 p.m.

20

21

22      HELD:  Via Zoom Video Conferencing

23

24      Reported by:  Deborah M. McByrne

25
```

```
 1        APPEARANCES: (All via Zoom)

 2

 3        APPEARING FOR CLAIMANT:

 4            YOUNG/SOMMER LLC

 5                    Five Palisades Drive, Suite 300

 6                    Albany, New York 12205

 7                    (518) 438-9907

 8            BY:   JOSEPH F. CASTIGLIONE, ESQ.

 9                    Jcastiglione@youngsommer.com

10

11

12        APPEARING FOR RESPONDENTS:

13            NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

14                    The Capitol

15                    Albany, New York 12224

16                    (518) 776-2576

17            BY:   ANTHONY ROTONDI, ESQ.

18                    Assistant Attorney General

19                    Anthony.Rotondi@ag.ny.gov

20

21        ALSO PRESENT:

22            Dr. Kamiar Alaei

23

24

25
```

1             S T I P U L A T I O N S

2

3            IT IS HEREBY STIPULATED, by and between the
4    attorneys hereto, that:

5            All rights provided by the C.P.L.R, and
6    Part 221 of the Uniform Rules for the Conduct of
     Depositions, including the right to object to any
7    question, except as to form, or to move to strike
     any testimony at this examination is reserved; and
8    in addition, the failure to object to any question
     or to move to strike any testimony at this
9    examination shall not be a bar or waiver to make
     such motion at, and is reserved to, the trial of
10   this action.

11

12           This deposition may be sworn to by the
     witness being examined before a Notary Public other
13   than the Notary Public before whom this examination
     was begun, but the failure to do so or to return the
14   original of this deposition to counsel, shall not be
     deemed a waiver of the rights provided by Rule 3116
15   of the C.P.L.R, and shall be controlled thereby.

16           The filing of the original of this
     deposition is waived.

17

18           IT IS FURTHER STIPULATED, that a copy of
     this examination shall be furnished to the attorney
19   for the witness being examined without charge.

20

21

22

23

24

25

BRIAN SELCHICK                                    4

```
 1                          BRIAN SELCHICK,
 2              was called as a witness, and having been first
 3              duly sworn, was examined and testified as
 4              follows:
 5      EXAMINATION BY
 6      MR. CASTIGLIONE:
 7  Q.  Good morning, Mr. Selchick.  My name is
 8      Joe Castiglione.  I'm the attorney for Claimant
 9      Kamiar Alaei in this matter.  You're here today as a
10      possible witness concerning claims by Mr. Alaei
11      against New York State concerning his employment
12      while with SUNY Albany.  Just so to be clear, when I
13      mention SUNY Albany, I'm referring to the State
14      University of New York at Albany, okay?
15  A.  Sure.
16  Q.  I'm going to ask you questions today to probe your
17      knowledge to see what information you might have or
18      don't have concerning this matter and the claims at
19      issue.  The stenographer is here to swear you under
20      oath and to create a transcript of the record of
21      what we're discussing here today.
22                      For purposes of the stenographer and
23      the record, let me ask a question and finish my
24      question before you answer, just simply because she
25      can't type us both at the same time talking.  And if
```

BRIAN SELCHICK                                5

```
 1          I ask you a question, if you can respond verbally,
 2          some people tend to nod or make a noise.  So if we
 3          can articulate a response, we would appreciate it.
 4   A.     Understood.
 5   Q.     And if an objection is made by your counsel, let it
 6          be made and then you have to answer the question
 7          unless otherwise directed not to by your counsel,
 8          just for purposes of preserving objections for the
 9          record.  Everything is on the record, unless we
10          otherwise agree to go off the record.
11                    If I ask you a question, please
12          respond to the best of your ability.  If you don't
13          understand the question as posed, let me know.  I'll
14          try to rephrase.  If you need to take a break,
15          bathroom or whatnot, let us know.  If a question is
16          posed to you before a break or if you need to speak
17          to counsel, you have to respond to the question
18          before we take a break or before you respond or talk
19          to counsel.
20                    Is there any reason today that you
21          can't respond truthfully or accurately, to the best
22          of your ability, to questions being posed?
23   A.     No.
24   Q.     Can you, again, state your name for the record?
25   A.     Brian Selchick, B-R-I-A-N.
```

BRIAN SELCHICK                                        6

```
1    Q.    Okay.  That's fine.  We have the spelling the first
2          time, sorry.
3                    Did you review any documents today in
4          advance for your deposition for preparing?
5    A.    About a month and a half ago, I did, yes.
6    Q.    Okay.  What did you review?
7    A.    Okay.  Actually, wait.  I reviewed some of the
8          documentations like the alternate assignment, et
9          cetera.  But then I also did have an opportunity to
10         review the exhibits that I believe you have up on
11         the screen now.
12   Q.    And other than your legal counsel, did you have any
13         discussions with anybody in preparation for today's
14         deposition?
15   A.    In preparation, no, but I did speak to another
16         individual about the deposition.  I spoke to
17         Randy Stark last night.
18   Q.    Okay.  Are you currently employed?
19   A.    I am.
20   Q.    What is your current employment position and where
21         are you employed?
22   A.    I'm employed at the University at Albany for the
23         State University of New York, and I serve as the
24         Director of Employee Relations.
25   Q.    And how long have you held that position?
```

```
1   A.   I've been the Director of Employee Relations since
2        March of 2019.
3   Q.   And what are the responsibilities in your role as
4        Director of Employment -- or Employer Relations for
5        SUNY Albany?
6   A.   My job duties and responsibilities include
7        maintaining a positive working relationship by and
8        between the University and its unionized workforce,
9        as well as its management confidential employees.  I
10       represent the University at labor management
11       meetings, as well as in negotiating local
12       agreements.  I also administer all of the collective
13       bargaining agreements that are applicable to the
14       University for six unions, nine contracts total, and
15       make sure that we are compliant with those
16       agreements.
17                 And I -- you know, of course, I take,
18       you know, management position with respect with my
19       job, to manage the administration of them.  I also
20       handle a variety of different types of
21       investigations on behalf of the University,
22       primarily as related to allegations of misconduct,
23       which would include, but certainly not be limited
24       to, you know, allegations of fraud, time and
25       attendance abuse, hostile work environment, and at
```

```
 1            times, you know, allegations of discrimination,
 2            sexual harassment, things of that nature.
 3                         I'm also responsible for the
 4            University's training program, so I oversee all of
 5            the University's mandatory training.  And then last,
 6            but not least, certainly as of late, I have been
 7            substantially responsible for the University's
 8            COVID-19 response.
 9    Q.      Are you familiar with what I'm putting up on the
10            screen?  I'm showing you what's previously been
11            identified as Exhibit K, what's identified as the
12            agreement between United University Professions and
13            the State of New York.  This one here, particularly,
14            is from July 11th -- or excuse me, July 2011 to
15            July 2016?
16    A.      I am familiar with this agreement, as well as its,
17            you know, predecessor preceding it.
18    Q.      Is this the agreement that's still in place between
19            SUNY Albany and its employees?
20    A.      Not, the current applicable collective bargaining
21            agreement is effective July 2016 to -- I want to
22            say -- I'm not sure exactly, but somewhere in the
23            middle of 2022.
24    Q.      And do you recall if this agreement that I'm showing
25            you here as Exhibit K was the agreement in effect in
```

```
 1        2018?
 2   A.   I do.  And it was -- I don't believe it was.
 3   Q.   Okay.
 4   A.   I believe it was the successor agreement.
 5   Q.   And just so you know, if I refer to the UUP
 6        agreement, I'm referring to what's identified here
 7        as Exhibit K as the agreement between United
 8        University Professions and the State of New York,
 9        July 2011 to July 2016.
10   A.   Okay.
11   Q.   So your current position you've held since
12        March 2019, did you have a former position at that
13        time with SUNY Albany?
14   A.   I did.  I previously served as the Assistant
15        Director of Employee Relations, reporting to the
16        Associate Vice President of Human Resources,
17        Randy L. Stark.  And I held that position from,
18        approximately, September of '18 and until my change
19        in appointment in March of '19.
20   Q.   Before September 2018, did you hold a position with
21        SUNY Albany?
22   A.   I did.
23   Q.   What was that position?
24   A.   I held the position of Employee Relations Associate
25        and I commenced that employment on June 28th of 2017
```

```
 1            up until the date that I was appointed as the
 2            Assistant Director.
 3    Q.     Okay.
 4    A.     It may be of help for you to know that while those
 5            titles are campus titles, my, in fact, budget title
 6            was Personnel Associate and remained as such until
 7            March of 2019 when I was changed to a Senior
 8            Personnel Associate.
 9    Q.     Okay.  For your position between June 2017 and
10            September 2018, can you explain to me what your
11            responsibilities were?
12    A.     Yep, my job was generally to assist the Associate
13            Vice President in all of the job duties I described
14            as the Director, and I was primarily assigned to
15            handle matters related to the classified service,
16            which would include the Civil Service Employees'
17            Association, Public Employees' Federation, the New
18            York State Correctional Officers Police Benevolent
19            Association, Police Benevolent Association of New
20            York State, and that was primarily the job.
21                      And then I subsequently did also
22            became involved in UUP related matters.  They were
23            trying to cross-train me in that and I started to
24            take over that work sort of over time.
25    Q.     If I could refer you to what was previously
```

BRIAN SELCHICK                                    11

```
 1          identified as Plaintiff's Exhibit A-1.  It's coming
 2          up on screen shortly.  And I'll just slowly scroll
 3          down.
 4    A.    Thank you.
 5    Q.    Do you recognize what's identified as Plaintiff's or
 6          Claimant's Exhibit A-1, this letter dated
 7          February 8, 2018?
 8    A.    I do.
 9    Q.    What is this letter?
10    A.    This letter is an alternate assignment delivered to
11          Dr. Kamiar Alaei.  And it was done on February 8th
12          of 2018.  I can see that in the document, though.
13          And this is standard alternate assignment letter
14          that we would provide to any employee under Article
15          1910.C of the collective bargaining agreement, the
16          UUP agreement when we are conducting a disciplinary
17          investigation.
18    Q.    This letter, you just mentioned disciplinary
19          investigation, and the first paragraph identifies a
20          disciplinary investigation was being conducted.
21          Were you involved in conducting that disciplinary
22          investigation concerning Dr. Alaei?
23    A.    I was.
24    Q.    When did you first get involved with the
25          disciplinary investigation identified in Claimant's
```

```
 1          Exhibit A-1, this February 8, 2018 letter?
 2     A.   Immediately prior to this February 8th letter, so I
 3          would say, approximately, the very beginning of
 4          February.
 5     Q.   What triggered your involvement in this
 6          investigation?
 7     A.   A report had been made that went to -- was shared
 8          with the Associate Vice President and a meeting was
 9          called by and among a variety of different
10          University officials up at University Hall, which we
11          call UNH, and I attended that meeting.
12     Q.   Do you recall what the grounds were that triggered
13          this investigation and the meeting you just referred
14          to?
15     A.   I do.
16     Q.   What were they?
17     A.   The grounds, as I recall, were that there were
18          allegations that Dr. Kamiar Alaei, if I'm saying
19          that -- I apologize -- had had some inappropriate
20          contact with one and/or two potential students and
21          for us to address that concern.
22     Q.   Did you participate in the disciplinary
23          investigation over time?
24     A.   I did.
25     Q.   What was your role in that investigation over time?
```

BRIAN SELCHICK                                                    13

1    A.    I was one of two investigators on it, so I

2          was -- from human resources, I should say.  So

3          myself and Randy Stark.  But I also worked

4          collaboratively with the Title IX office, which

5          would include Chantelle Cleary and her staff, which,

6          if I recall correctly, included Lisa Recore, Abby

7          DelGoshio at the time and Tricia -- Patricia George

8          at the time.

9                    So there was a collaborative

10         investigation that ensued and I played the employee

11         relations role, you know, in that investigation.

12   Q.    So is it fair to say there was a joint investigation

13         between office of human resource management and

14         Title IX?

15   A.    Initially, yes.

16   Q.    Did that change?  You just said "initially, yes."

17         Did that change over time?

18   A.    It did, because eventually Chantelle's office, which

19         is the Office of Equity and Compliance, is how it's

20         referred to, eventually, at least to my

21         recollection, concluded what they felt was their end

22         of the investigation and I took lead on it

23         thereafter.

24   Q.    Do you recall about when that Title IX investigation

25         concluded?

```
 1   A.   I don't recall exactly.

 2   Q.   Okay.

 3   A.   But if you're asking about, I would say about early

 4        April.

 5   Q.   That would be early April 2018?

 6   A.   Correct.

 7   Q.   Did others have any role in conducting the

 8        investigation, besides the people you just

 9        mentioned; Ms. Cleary, Mr. Stark and the other woman

10        you mentioned?

11   A.   Not that I can recall.  In conducting the actual

12        investigation?

13   Q.   Yeah.

14   A.   No.

15   Q.   Who was charged with gathering information for the

16        investigation?  Those four individuals?

17   A.   That's correct.

18   Q.   Was anyone overseeing this investigation at SUNY

19        Albany?

20   A.   Ultimately, it was overseen, collaboratively, by

21        Randy Stark and Chantelle Cleary.

22   Q.   Did anyone report to you as part of this

23        investigation?

24   A.   As a subordinate?

25   Q.   Yes.
```

BRIAN SELCHICK                                    15

1    A.    No.

2    Q.    Did you report to -- or strike that.

3                     Who did you report to as part of this

4          investigation?

5    A.    I reported to Randy Stark, the ADP of Human

6          Resources.

7    Q.    Do you know who was involved with employment

8          decisions concerning Dr. Alaei after this

9          February 8, 2018 letter?

10   A.    I do.

11   Q.    Can you identify to me who those individuals were?

12   A.    Yep, President Dr. Havidan Rodriguez,

13         Dr. Bruce Szelest, Randy Stark, James Stellar and

14         Chantelle Cleary and myself.

15   Q.    For President Rodriguez what was his involvement?

16   A.    Well, employee relations acts as the president's

17         designee for labor relations.  So labor relations --

18         employee relations, labor relations can only make

19         recommendations.  The collective bargaining

20         agreement reserves the determinations to be made by

21         the President.

22   Q.    And what about Bruce Szelest, S-Z-E-L-E-S-T?

23   A.    Bruce Szelest serves as the Chief of Staff to the

24         President and we frequently -- it has been and

25         continues to be routine for us to communicate with

BRIAN SELCHICK                          16

```
 1           him about what our recommendations are to the
 2           President.
 3    Q.     What about James Stellar at the time in 2018?
 4    A.     I recall that at the time, James Stellar was the
 5           Interim President.  He had been the Provost
 6           previously, and I don't recall when Havidan became
 7           the President and that turned over.
 8    Q.     Okay.  What about William Hedberg, H-E-D-B-E-R-G?
 9    A.     Yes, commonly referred to as Bill Hedberg?  Yep, he
10           was present in some meetings, but not a substantial
11           decision-making role.  He's a Senior Vice Provost,
12           really more academic side.
13    Q.     Okay.  Sorry, I'm just --
14    A.     It's okay.  You're doing good.
15    Q.     Thank you.
16                    When did the portion of the
17           disciplinary investigation concerning Dr. Alaei
18           terminate?
19    A.     Approximately six months after the initial alternate
20           assignment.
21    Q.     Would it be fair to say it was formally concluded in
22           or about August 2018?
23    A.     It would be, yes.
24    Q.     During that time in 2018, while this
25           investigation -- when I say "investigation," I'm
```

```
 1         referring to both the disciplinary investigation,
 2         the Title IX investigation.  Are you aware of
 3         efforts by SUNY Albany to non-renew Dr. Alaei's
 4         employment in the spring of 2018?
 5    A.   I am.
 6    Q.   Did you have any involvement in those efforts?
 7    A.   I had, you know, discussions about them and I
 8         provided advice to Randy Stark regarding the
 9         permissibility of doing so.
10    Q.   As between you and Mr. Stark, who was the primary
11         person conducting the investigation?
12    A.   I was.
13    Q.   Did there come a time when SUNY Albany determined to
14         terminate Dr. Alaei's employment on or about
15         August 10, 2018?
16    A.   No, there was a determination to non-renew his
17         contract.
18    Q.   So is there a distinction between non-renewing his
19         contract and terminating his employment?
20    A.   Yes.  Termination would require, under Article 19,
21         that we have just cause to terminate his employment,
22         and that would be subject to an appeal right under
23         Article 19, whereas Article 32 of the collective
24         bargaining agreement permits the University to
25         non-renew and/or buy out an employee's remainder of
```

```
 1            their term appointment up to the maximum of the time
 2            period for the term appointment for any reason.
 3    Q.      Okay.  Let me ask you this:  If I can refer you to
 4            what was previously marked as Plaintiff's
 5            Exhibit -- or excuse me -- Claimant's Exhibit B-8.
 6    A.      Okay.
 7    Q.      Do you recognize this document, which is identified
 8            as Claimant's Exhibit B-8 and is a letter dated
 9            August 10, 2018, signed by Randy Stark to Dr. Alaei?
10    A.      I do.
11    Q.      Okay.  What is this letter?
12    A.      This letter is advising of his renewal,
13            Dr. Kamiar Alaei's renewal to a specific period of
14            time, and advising that his appointment, you know,
15            will not be extended beyond then and that the
16            University is going to utilize Article 32 to provide
17            him with a lump sum payout for the balance of his
18            term appointment and that that appointment will, you
19            know, terminate, it appears -- because I have the
20            document in front of me -- effective August 10,
21            2018.
22    Q.      Why did University of Albany, as reflected in this
23            letter, exercise its right and elect to terminate
24            Dr. Alaei's employment effective August 10, 2018?
25    A.      It was the opinion of this new leadership, as I
```

```
 1         understood it, that to bring Kamiar back to campus
 2         would have had a negative impact on our student body
 3         and, therefore, they decided to proceed with a
 4         non-renewal.
 5    Q.   And how did you learn the basis of that opinion?
 6    A.   At a certain point in time -- I don't recall the
 7         date -- but I was advised by -- well, I was not
 8         personally advised, but I was present for the
 9         statement made by Chantelle Cleary in which she said
10         that if we brought him back, that the students
11         would -- they would go berserk or -- and that they
12         would not -- they would not accept that.
13    Q.   Do you recall when she made that statement?
14    A.   I do not.
15    Q.   Now, let's go back through some of these issues.  If
16         I could refer you back to Plaintiff's Exhibit -- or
17         excuse me, Claimant's Exhibit A-1.  It's Claimant's
18         Exhibit A-1 is being shown to you, Mr. Selchick.
19         Who decided to start the disciplinary investigation
20         identified in this document?
21    A.   We were directed at the time by President Stellar,
22         as in collaboration with Chantelle Cleary, to
23         proceed with the alternate assignment and to conduct
24         an investigation.
25    Q.   Okay.  At the time, how many of these investigations
```

BRIAN SELCHICK                                20

```
 1          had you participated in before?
 2   A.     Involving alternate assignments?
 3   Q.     Yes, involving discipline investigation and
 4          alternative assignment.
 5   A.     Well, disciplinary investigations, a tremendous
 6          number, easily over 50.
 7   Q.     At that point?
 8   A.     Oh, yeah.
 9   Q.     Okay.
10   A.     Well, 5,000 employees, classified service,
11          maintenance, take your pick, right?  I mean, issues
12          are all over the board, time and attendance, so a
13          substantial number of investigations, generally.
14          Once that involved UUP-represented employees where
15          there were alternate assignments involved, by that
16          point, I would say approximately five.  Could have
17          been more.
18   Q.     This letter, on the second page -- This letter
19          refers to Dr. Alaei not being allowed at University
20          facilities at the time?
21   A.     That's correct, he's directed to work from home.
22   Q.     Okay.  Why was he not allowed at University
23          facilities as part of the investigation?
24   A.     This is typical.  This letter that you're looking
25          at, with the exception of what the actual alternate
```

BRIAN SELCHICK                                    21

| 1 | | assignment work is -- is a -- it's a template. |
|---|---|---|
| 2 | Q. | Okay. |
| 3 | A. | We do that routinely, alternate assignments, to |
| 4 | | mitigate the potentiality that a potential |
| 5 | | respondent or subject, a potential subject of |
| 6 | | disciplinary action will attempt to interfere with |
| 7 | | the investigation or may take some sort of |
| 8 | | retaliatory action.  So it's intended to keep the |
| 9 | | investigation clean, you know, to preserve the |
| 10 | | sanctity of the investigation and make sure there's |
| 11 | | no interference. |
| 12 | Q. | Okay.  So that's a common requirement as part of |
| 13 | | these investigations? |
| 14 | A. | Very, very. |
| 15 | Q. | Had any concerns been raised at the time about |
| 16 | | Dr. Alaei undertaking any inappropriate conduct |
| 17 | | further if he were allowed to stay at the facility? |
| 18 | A. | There were some concerns presented by some of the |
| 19 | | students involved, that they could be retaliated |
| 20 | | against.  They -- Many of them were foreign students |
| 21 | | and they had expressed concern that, given his |
| 22 | | authority and the like, that he may yank their |
| 23 | | funding or he may take some sort of adverse |
| 24 | | employment action against them for participating, |
| 25 | | you know, in our investigation.  So yeah. |

BRIAN SELCHICK                                    22

```
 1    Q.    Okay.  On the second page of this document, it talks
 2          about not discussing this matter in any way with
 3          others, and I'm running the key arrowhead over it,
 4          the mouse arrowhead.
 5    A.    I see it.
 6    Q.    Is that also common in these types of situations,
 7          that directive?
 8    A.    It is, although I will say that it has since been
 9          modified to clearly state that they may discuss the
10          investigation with their attorney, union
11          representative or -- sorry, or the EAP coordinator.
12    Q.    Okay.  If I can refer you to what's been previously
13          identified as Claimant's Exhibit A, sub 2.  If you
14          can take a look at this e-mail?
15    A.    Yep, if you could just give me a minute to read it?
16    Q.    Sure, yeah.
17    A.    Okay.  I've read it.
18    Q.    This e-mail refers to removing card and key access.
19          Is that typical in these types of investigations,
20          alternative assignments?
21    A.    It's not typical, but it does occur at times.  In
22          this particular instance, we were -- both myself and
23          Randy Stark were directed to do so.
24    Q.    Who directed you to do so?
25    A.    The President Havidan Rodriguez.
```

BRIAN SELCHICK                                        23

1   Q.   Did Mr. Rodriguez ever explain to you why?

2   A.   If I recall correctly, he stated that he wanted

3        there to be no, you know, potentiality for harm and

4        that this is the way he had done it at his previous

5        institution.

6   Q.   This e-mail, Claimant's Exhibit A-2, also talks

7        about relieving Kamiar Alaei of e-mail access.  Why

8        was that done?

9   A.   For the same reason just stated.

10  Q.   Did the President direct you to do that?

11  A.   He did.

12  Q.   Is that typical, removing an employee's access to

13       e-mail in these disciplinary investigations?

14  A.   It is atypical unless the employee is really a

15       threat to persons or property, including themselves.

16  Q.   So at the time of this e-mail, February 8, 2018,

17       from you to others, were there any concerns raised

18       or any actions by Dr. Alaei at the time

19       demonstrating he was inappropriately using his

20       e-mail?

21  A.   There was some concerns that he was utilizing his

22       e-mail to communicate with his brother, Arash, who

23       we had had a former -- a prior disciplinary matter

24       that related to him and that there could be, you

25       know, retribution against students.

BRIAN SELCHICK                                    24

```
 1   Q.   Who had raised those concerns?
 2   A.   Chantelle Cleary, James Stellar, and -- that's it.
 3        Actually, I don't recall anyone else raising those
 4        concerns.
 5   Q.   Okay.  But otherwise, removing access to e-mail is
 6        not typical protocol on alternative assignments?
 7   A.   No, and it's not, because they typically need access
 8        to their e-mail in order to perform the alternate
 9        assignment.
10   Q.   Was the President aware of the Exhibit A-1 letter
11        before it went out?
12   A.   I don't know whether -- I don't know whether he was
13        personally aware, but he certainly should have been
14        and copied.  We wouldn't have done so without
15        providing a copy to Bruce, as well as the President.
16   Q.   Okay.  The e-mail -- removing e-mail access, is
17        there any basis in the UUP agreement for taking that
18        action during an alternative assignment?
19   A.   During alternate assignment?
20   Q.   Yes.
21   A.   No.  The only basis that would exist there would be
22        if the employee was suspended without pay.
23   Q.   So there was no basis under the UUP agreement, in
24        this instance, for removing Dr. Alaei's e-mail
25        access?
```

BRIAN SELCHICK                                    25

```
 1   A.   Not in my opinion.
 2   Q.   Okay.  If I can refer you to what was previously
 3        identify as Plaintiff's Exhibit A-3, sub 3.  I'll
 4        scroll down here to this e-mail.  Actually, I'm
 5        going to scroll down to this e-mail.
 6                    There appears to be an e-mail here,
 7        which is a chain of e-mails in A-3, and I'm showing
 8        you the one that's identified from Karl Rethemeyer,
 9        R-E-T-H-E-M-E-Y-E-R.  It's dated February 8, 2018.
10        You appear to be a cc recipient on this e-mail.
11        Just take a look at this e-mail and see if you
12        recall this e-mail.
13   A.   I don't recall it specifically, so I appreciate the
14        opportunity.
15   Q.   Sure.  Yeah, take your time.
16   A.   Okay.  I've read it.
17   Q.   Okay.  So I'm referring you to -- there's an
18        underlined -- excuse me.  Sorry about that.
19                    On this e-mail, there is an underlined
20        line and it's the paragraph with the Number 1 says:
21        "We will also need to change all references to KA,"
22        referring to the website?
23   A.   I see it.
24   Q.   Why was that needed, in terms of changing references
25        to Dr. Alaei on the website?
```

```
 1   A.   I don't think it was.

 2   Q.   Okay.  Who was Mr. Rethemeyer at the time?

 3   A.   Was and remains the Dean for the Rockefeller

 4        College.

 5   Q.   Is removing an employee's information on the SUNY

 6        maintained website something that's usually done

 7        during an alternative assignment?

 8   A.   No.

 9   Q.   What about during a disciplinary investigation?

10   A.   Not without a suspension without pay.

11   Q.   Okay.  Are you aware if the President at the time or

12        Provost Stellar at the time was aware of this

13        decision?

14   A.   I'm not specifically aware, no.  I believe, yes, but

15        I don't know from firsthand knowledge.

16   Q.   Okay.  If I can refer you to what was previously

17        identified as Claimant's Exhibit A-4.  And I'm

18        referring, this is an e-mail from Harvey Charles,

19        dated February 8, 2018.  Subject is an invitation to

20        a GIHHR-wide meeting Friday 2/9.

21                  My question is:  Do you recall there

22        being a meeting held by SUNY personnel concerning

23        leadership of GIHHR's reference in this first

24        paragraph?

25   A.   I do.
```

BRIAN SELCHICK                                    27

1    Q.    Why was that meeting held?

2    A.    We were receiving a substantial -- and when I say

3          "we," I mean, the University.  We were receiving a

4          substantial number of inquiries from students as to

5          what was going on with GIHHR, what was occurring

6          with Arash, and what was occurring with Kamiar.

7          Students were expressing concern for their safety.

8          They were alleging that we were not doing enough to

9          protect them from what they felt was predatory

10         behavior and, you know, alleged abuse as a power.

11         And the leadership decided that it would be best to

12         hold this meeting to explain, to the extent that we

13         could, that -- to the students that we were

14         addressing their concerns to the best of our

15         abilities.

16   Q.    Okay.

17                  THE WITNESS:  Counsel, if you

18            don't mind, before you ask that next question,

19            may I have -- I kid you not -- less then two

20            minutes to go to the bathroom?

21                  MR. ROTONDI:  Sure, that's fine.

22                  MR. CASTIGLIONE:  Let's take a break.

23                  (Whereupon, a recess is taken.)

24       BY MR. CASTIGLIONE:

25   Q.    Okay.  If we could go back to Claimant's Exhibit

```
 1        A-4.
 2                    Okay.  Do you recall who attended that
 3        meeting on 2/9?
 4    A.  Generally, on the employee side, yes.
 5    Q.  Can you tell me what you recall about who attended?
 6    A.  I attended, Harvey Charles attended,
 7        Chantelle Cleary attended, Randy Stark attended,
 8        Bruce Szelest attended.  I believe that
 9        Karl Rethemeyer attended and then there were
10        a -- there was a plethora of students who attended,
11        who I don't know and can't recall.
12    Q.  Do you recall, generally, what was discussed at that
13        meeting?
14    A.  Yes, I do.
15    Q.  As you recall, what was discussed?
16    A.  What was discussed was the current -- the current
17        status of GIHHR, whether students would -- graduate
18        students, student assistants, et cetera, whether
19        they would have the -- continue to have employment
20        and, you know, what, if anything, were we doing
21        to -- and there was -- it was just questions firing
22        off from the students; what, if anything, were we
23        doing to prevent Arash from having contact with
24        students on or, specifically, off campus.  And they
25        were inquiring as to whether or not -- why we had
```

```
 1            not told them that he was -- that Arash was not
 2            permitted to have contact with them specifically.
 3            And they felt that that presented a safety concern
 4            for them.  And we were seeking to address that.
 5                        And let's see.  What else?  And then,
 6            of course -- I actually don't recall anything beyond
 7            that.  I do believe there was some discussion around
 8            from -- because Randy Stark spoke.  This is two
 9            years ago now.  He did speak and, you know, advised
10            that, you know, personnel matters are confidential,
11            but that we take their concerns seriously and that,
12            you know, we're looking into it.
13    Q.      Okay.
14    A.      Something to that effect.
15    Q.      On this e-mail I'm showing you, there looks -- it
16            appears to be outside e-mail addresses besides
17            Albany.edu, there's a Virginia.edu, there's -- right
18            here, I'm showing a Columbia.edu.  Do you know why
19            outside e-mail addresses were used as part of this
20            e-mail?
21    A.      I do not.
22    Q.      If I can show you what was previously marked as
23            Claimant's Exhibit G.  Claimant's Exhibit G is a
24            chain of e-mails.  The first one is dated
25            February 14, 2018.  It's from a K. Williams at
```

```
 1        Albany.edu to James Stellar.  Do you know who
 2        K. Williams is?
 3   A.   Yes.
 4   Q.   Who is that?
 5   A.   That's Dr. Kevin Williams.  He is the Dean of the
 6        Graduate School.
 7   Q.   Was he the dean at the Graduate School at the time
 8        in 2018?
 9   A.   I don't recall.
10   Q.   In this e-mail, he indicates:  "I'm forwarding, with
11        permission from the author, this e-mail to you.
12        This student expresses several concerns that I have
13        also heard and sensed from GIHHR Board Members to
14        Harvey's e-mail" -- and then it continues on with
15        some other issues.
16                  And if you scroll down in the e-mail,
17        and I'll -- It's referring to an e-mail from
18        someone, dated February 14, 2018, to K. Williams.
19        And I'll just let you read through it.
20   A.   Yep.  Thank you.
21                  Now, I'm at the bottom of "the
22        implied" -- "that implied the."
23   Q.   Okay.
24   A.   Thank you.
25                  Okay.  I'm at "how will the individual
```

```
 1          continue?"  Thank you.
 2                      Okay.  Scroll down, please.
 3                      Okay.  Okay.
 4   Q.   In this e-mail, Defendant's -- or excuse me,
 5        Claimant's Exhibit G-1, the student raises a number
 6        of issues.  Do you receive any e-mails or inquiries
 7        over time or just sent any communication from
 8        students in support of Dr. Alaei?
 9   A.   I did.  I received in support and against.
10   Q.   This student raises concerns about accusations being
11        vaguely and implicitly -- well, before I get to
12        that.  Strike that.
13                      Were you aware of this student's
14        concerns at the time of this e-mail?
15   A.   I was not, no.
16   Q.   Were you aware of any similar concerns raised by
17        other people who attend that February 9 meeting?
18   A.   Yes.
19   Q.   Who else had expressed these types of concerns?
20   A.   I don't recall the name of the student.  This may
21        have been that particular student, I don't recall,
22        but there were, as is a frequent occurrence amongst
23        faculty and staff and students when we conduct these
24        types of investigations, you know, desire -- a
25        desire to influence the investigation one way or the
```

1          other, desire for more information, you know, this
2          is -- It's pretty typical, at least in my
3          experience.
4     Q.   Do you know if there were other written -- strike
5          that.
6               This individual raises issues about a
7          racial dynamic being in place at the meeting.  Did
8          others who attended the meeting ever raise those
9          concerns with SUNY Albany, as far as you are aware?
10    A.   No.
11    Q.   Did Mr. Stellar ever provide this e-mail to you?
12    A.   Not that I can recall.
13    Q.   Do you know who Elizabeth Grey is?
14    A.   Yes.
15    Q.   Okay.  Was it -- is it fair to say she was
16         interviewed as part of this investigation?
17    A.   Yes.
18    Q.   Do you recall whether or not Ms. Grey raised
19         concerns that there were possibly cultural
20         differences that were being misunderstood or
21         misinterpreted?
22    A.   I do.
23    Q.   Did anybody look further into that at the time and
24         during this -- in doing this investigation?
25    A.   Yes.

```
 1   Q.   Okay.  Can you explain to me what was looked at or
 2        what you did to further look into that issue?
 3   A.   So I, both myself and Randy Stark, interviewed -- in
 4        addition to her interview with Chantelle Cleary,
 5        there was a follow-up interview subsequently by
 6        myself and Randy Stark with Elizabeth Grey in which
 7        we asked her additional questions that we thought we
 8        needed clarification on regarding the allegations at
 9        hand, in which she did raise some of these, you
10        know, purported cultural differences, such as being,
11        you know, a close talker, you know, putting -- sort
12        of putting your hands on somebody, expressing a
13        certain interest, you know, in people, you know,
14        things of that nature.
15                    And we did speak to, including myself,
16        other individuals about that, about the potentiality
17        of there being cultural differences, including the
18        complainant.  And then subsequently, as you are
19        aware, Counsel, we had an interrogation.  And during
20        the course of the interrogation, I did ask Dr. Alaei
21        about the potentiality of that having played some
22        role in the alleged underlying misconduct.
23   Q.   This follow-up interview you just mentioned between
24        you and Mr. Stark and Ms. Grey, was that transcribed
25        or recorded anywhere?
```

BRIAN SELCHICK                                    34

```
 1   A.   I could have -- I thought it was, but now I am
 2        unsure and I really cannot recall.
 3   Q.   Okay.
 4   A.   But I was certainly present for it.  I asked the
 5        majority of the questions.
 6   Q.   If I can refer you to what had been previously
 7        identified as Plaintiff's A-6 -- Claimant's A-6 is a
 8        chain of e-mails.  The first page starts with an
 9        e-mail from you to others, dated February 9, 2018.
10        And I'll just scroll up from the bottom.
11   A.   Yeah, I recall this chain, yeah.
12   Q.   Okay.  So in the first page of Claimant's A-6, the
13        e-mail from you to others dated February 9, you
14        stated your opinion that, you're referring to
15        Dr. Charles, "is correct so long as he does so as a
16        private citizen, not as a representative of the
17        University."
18                   Do you recall this was referring to
19        Dr. Alaei speaking in or doing public speaking
20        events?
21   A.   Yes, I believe it was a conference of sorts.
22   Q.   Yes.  And this refers to the bottom e-mail,
23        Dr. Alaei was asked to sit on a panel with a North
24        Korean refugee and U.S. Ambassador to the U.N.,
25        Nikki Haley, based on his imprisonment in Iran.
```

BRIAN SELCHICK                                    35

1    A.    Okay.

2    Q.    Why was Dr. Alaei not allowed to attend these as a

3          representative of the University at the time?

4    A.    Due to the alternate assignment.  So when we provide

5          an alternate assignment, under 1910C, that's the

6          entirety of the employee's work obligation unless

7          they get expressed permission from the University to

8          do so.  It's no longer a part of what we call their

9          professional obligation.

10                      So the professional obligation

11         consists of teaching research service, and we

12         essentially redefine what that professional

13         obligation is for the course of the alternate

14         assignment when we put one into place.

15                      So if you review the alternate

16         assignment, this particular engagement is not

17         included in his work to become the directed work for

18         him to perform during the course of the assignment.

19   Q.    But if an employee wants to voluntarily take on a

20         public speaking engagement, they're precluded from

21         representing themselves as being employed with SUNY

22         Albany as part of an alternative assignment?

23   A.    Well, ultimately, yeah, I think the answer's yes.  I

24         mean, if it's not specifically authorized and

25         they're not -- and they're not acting in the scope

```
 1            of their employment.
 2    Q.    So you're saying there's a prohibition on an
 3            employee representing their affiliation on a
 4            speaking engagement with SUNY Albany if they're on
 5            alternative assignment?
 6    A.    No, I guess I -- that's a fair point.
 7                        No, I guess I can't say that they're
 8            expressly prohibited in policy anywhere from
 9            mentioning their affiliation.  That's -- yeah.
10    Q.    Okay.
11    A.    The honorarium is a different story.  That's about
12            being paid for, you know, presenting.
13    Q.    Okay.  The issue here about participating as a
14            citizen, not as a representative of the University,
15            did you make the final decision on that matter?
16    A.    No.  No, they were interested in my thoughts, but at
17            the end of the day, that's a decision for
18            management, which ultimately lies with Randy Stark,
19            Harvey Charles and, in this instance, I recall it
20            lying with Harvey Charles.
21    Q.    So Dr. Charles was the one who made the decision
22            here?
23    A.    I believe so.
24    Q.    Was there any concerns ever expressed at the time
25            about Dr. Alaei speaking at these types of matters
```

```
 1          and identifying himself as a University employee?
 2   A.     There were.
 3   Q.     Do you recall what those concerns were?
 4   A.     Those concerns had to do with the fact that these
 5          allegations were out there, the students had written
 6          us a very open letter demanding that, you know, we
 7          do more and so the University was concerned about,
 8          you know, potentially exposing the University to
 9          what we perceived to be additional or further
10          liability, you know, outside -- at outside
11          conferences, et cetera, things of that nature.
12   Q.     But there were a number of individuals who had
13          contacted the University in support of Dr. Alaei; is
14          that fair to say?
15   A.     That's correct.
16   Q.     Yeah, okay.  If I can refer you to what was
17          previously identified as Claimant's Exhibit A-7.
18          This is a chain of e-mails.  I'm focused on the one
19          here from Harvey Charles, dated February 9, 2018, to
20          a number of individuals.  It's says:  "Subject,
21          GIHHR."
22   A.     I see it, yep.
23   Q.     If you can just read through this?
24   A.     Okay.  I've read it.
25   Q.     Is it fair to say this e-mail was from Dr. Charles
```

BRIAN SELCHICK                                    38

```
 1          to various GIHHR colleagues and supporters advising
 2          them of an appointment of interim co-directors of
 3          GIHHR?
 4    A.    Yes.
 5    Q.    Do you know why this e-mail was sent?
 6    A.    We were -- The University was receiving a lot of
 7          questions about the status of GIHHR, given the
 8          alternate assignment and who would handle that work
 9          during the course of the alternate assignment.  And
10          this was, in part, a response to those questions
11          from the Board, as well as from the students.
12    Q.    And when you say "board," you mean the GIHHR
13          Advisory Board?
14    A.    That's correct.
15    Q.    And does the Advisory Board -- or did the Advisory
16          Board consist of a number of people and entities
17          worldwide?
18    A.    Honestly, I don't know the makeup of the Board,
19          specifically.  I just know that there were people
20          from various institutions on there.
21    Q.    Were there any concerns raised by SUNY
22          personnel -- well, strike that.
23                    Before this e-mail was sent out, did
24          anyone review it, in terms of the investigation or
25          just protocol on an alternative assignment?
```

1  A.   I don't recall specifically, but I'm inclined to say
2       that I believe we did, but I don't recall.
3  Q.   Were there any concerns raised by anybody with SUNY
4       Albany that SUNY Albany personnel, themselves, that
5       sending this e-mail might violate Dr. Alaei's rights
6       under the UUP agreement?
7  A.   I believe -- I don't know if it was before, but I do
8       believe that subsequently, both myself and Mr. Stark
9       expressed some concerns regarding that, that it
10      could be perceived as discipline.
11 Q.   Okay.
12 A.   And subsequently as -- which I believe is a matter
13      of the record, the United University of Professions
14      did file a contract grievance against the University
15      at Albany alleging that this, among other things,
16      were, in fact, disciplinary and, therefore, violated
17      Article 19 of the contract.
18 Q.   Before this e-mail was sent, were there any concerns
19      that this e-mail might imply that Dr. Alaei did
20      something wrong?
21 A.   Not that I could recall.
22 Q.   Do you know if the President approved this e-mail
23      before it was sent?
24 A.   I do not.
25 Q.   This e-mail talks about interim co-directors,

1           Dana Reski, R-E-S-K-I and Gina Volynsky,

2           V-O-L-Y-N-S-K-Y?

3     A.    Yeah.

4     Q.    Do you know who made the decision to appoint those

5           interim directors to replace Dr. Alaei?

6     A.    I do not.  At least, I should say I don't recall.

7     Q.    Do you know if Dr. Charles actually drafted this

8           e-mail?

9     A.    I do not know if he personally drafted it or not.

10    Q.    Okay.  I'm going to refer you to what's been

11          previously identify as Claimant's Exhibit A-11.

12                    Specifically, I'm referring to an

13          e-mail from James Stellar, dated February 22, 2018,

14          to Bruce Szelest and some others, including

15          Jordan Carleo, C-A-R-L-E-O, dash, Evangelist,

16          E-V-A-N-G-E-L-I-S-T.

17    A.    Yes.

18    Q.    Do you recall if you ever saw this e-mail?

19    A.    I mean, I know I saw it in the, you know, packet

20          that was sent over to me prior to you today, but I

21          don't recall if I -- if I saw it prior to that date.

22    Q.    Okay.  This e-mail from James Stellar, it identifies

23          his title at the time as Provost and Senior Vice

24          President for academic affairs.

25                    So is it fair to say at that time,

BRIAN SELCHICK                                          41

```
 1          President Rodriguez was in place and Mr. Stellar was
 2          the Provost?
 3    A.    I believe so.  I can't recall, though.
 4    Q.    Okay.  In this e-mail, the provost identifies, or
 5          Mr. Stellar identifies meeting with the new
 6          directors.  Are you aware, as of February 22, 2018,
 7          if there had been a determination by SUNY Albany
 8          that Dr. Alaei had been removed as Director of GIHHR
 9          and replaced with new directors?
10    A.    No, he was not replaced.  We were -- They were just
11          appointing interims.
12    Q.    Would Provost Stellar have the authority to make an
13          appointment of new directors at the time for GIHHR?
14    A.    Yeah, I mean, it's pretty typical for supervisors
15          to, you know, have input and, you know, make
16          determinations as to what their subordinates should
17          be doing, who should be handling what interim roles.
18                   You know, obviously the appointment
19          letters do come from -- through HR with the approval
20          of the President, but, you know, that's a fairly
21          administrative process with heavy input from the
22          supervisor.
23    Q.    But you're not aware of any formal decision at the
24          time about appointing new directors?
25    A.    Interim directors, yes.  New directors, permanent,
```

1        no.

2    Q.   These two individuals that were appointed the

3         interim co-directors, it was the last e-mail,

4         Dana Reski and Gina Volynsky, do you know their

5         race?

6    A.   I -- I don't know specifically, no.

7    Q.   They're both females?

8    A.   I believe they both identify as females, yes.

9    Q.   Do you know whether they are more qualified, in

10        terms of professional qualifications, than Dr. Alaei

11        for the directorship position of GIHHR at the time?

12   A.   I do not.

13   Q.   Do you know if GIHHR was supervised by the Vice

14        President for research at the time?

15   A.   I do not.  Actually, that was -- Let me correct

16        that.

17   Q.   Sure.

18   A.   It was my understanding that Harvey Charles was

19        always the supervisor of GIHHR, at least based upon

20        the records and hierarchy.  So that would have been

21        the next level supervisor above Arash.

22   Q.   And in this e-mail here, this Exhibit A-11,

23        Mr. Stellar is reaching out to Mr. Szelest

24        seeking -- or having a discussion.  Is it fair to

25        say Mr. Szelest was overseeing employment issues at

```
 1          that time for Dr. Alaei?
 2   A.     No, he was certainly playing a substantial role.
 3   Q.     Okay.  Is that common to have the Chief of Staff or
 4          the President play a substantial role in employment
 5          issues when an employee is on alternative
 6          assignment?
 7   A.     Depends upon the issue.  Typically, it's not.  It is
 8          typical for, at least in my experience as director
 9          from, you know, March 2019 to present, for the
10          president's office, of course, to be made aware and
11          apprised of what's going on, given the authority
12          that's granted to the president and the
13          recommendation that we tend to make out of employee
14          relations to the president.  We don't want to, you
15          know, at the last minute, you know, get them up to
16          speed and we certainly don't want to be doing
17          something that -- or taking an action that they
18          haven't authorized us to do.  So it's certainly
19          routine for Bruce to be looped in and aware.  It is
20          less frequent and I would say infrequent for Bruce
21          to be directly involved in the decision-making.
22   Q.     So his involvement in this matter concerning
23          Dr. Alaei was not typical, in terms of alternative
24          assignment employee matters, is that fair to say?
25   A.     I think that is a fair statement.
```

BRIAN SELCHICK                                    44

```
1    Q.   In Claimant's Exhibit A-12, now I'm now going to

2         refer you to -- Claimant's Exhibit A-12 is an e-mail

3         from Dr. Alaei to Harvey Charles, dated February 27,

4         2018, and this e-mail, generally -- and you can see

5         I'm pointing at it with the mouse arrow.  Dr. Alaei

6         is talking about the University at Albany barring

7         him from communicating on any of the grants or

8         programs he's been administering and reflexes,

9         sharing concerns with Dr. Charles concerning these

10        grants.

11   A.   I can see that, yeah.

12   Q.   Are you aware of Dr. Alaei making these or raising

13        these concerns at the time about not being able to

14        administer specific grants or projects he was

15        dealing with and concerns about if they were being

16        appropriately shepherded by SUNY Albany?

17   A.   I have a vague recollection of it, but yes.

18   Q.   Do you know if SUNY Albany undertook any response

19        related to these concerns being raised by Dr. Alaei?

20   A.   I can't recall the specific response.

21   Q.   Okay.  I'm going to refer you to what was previously

22        marked as Claimant's Exhibit A-13.  This is an

23        e-mail from Chantelle, C-H-A-N-T-E-L-L-E, Cleary

24        dated March 9, 2018.  You appear to be a recipient

25        of the e-mail.
```

BRIAN SELCHICK                                        45

1   A.   I was.

2   Q.   Do you recall this e-mail?

3   A.   I just need to read it.

4   Q.   Sure.

5   A.   Right.  And this is from Chantelle.  Sorry.  Just go

6        back up.  Thank you.

7                     Yeah, I do recall this.  Yep, I recall

8        this.

9   Q.   Okay.  In this e-mail, Chantelle says, "I have been

10       asked, Bruce, to make this matter our top priority."

11       I assume she means Bruce is asking her to make it a

12       top priority?

13  A.   I don't know.

14  Q.   So do you have any recollection about Chantelle or

15       Bruce Szelest identifying this matter to be a top

16       priority?

17  A.   I mean, I do recall Chantelle feeling that it was a

18       very high priority.

19  Q.   Did she ever explain to you why she felt it was a

20       very high priority?

21  A.   She felt that there could be a lot going on here.

22       There were like 50 plus students who worked over at

23       GIHHR and she felt that, you know -- look, given the

24       Me Too era, et cetera, everything that was going on,

25       the University, as I'm sure is true of any

```
 1         university certainly, you know, today, but certainly
 2         any public university at the time, these
 3         are -- these were really sensitive matters, you
 4         know, and they -- the public and the students were
 5         demanding swift action on things.  Quite frankly, at
 6         times, that was, I felt, a bit unreasonable.  But,
 7         you know, given the nature of the allegations, yeah,
 8         you know, was it important for us to get to it
 9         sooner rather than later, yeah?  And I think that
10         she probably felt that more so than others.  I'm
11         getting into my own opinion, but because of the
12         nature of the role that she played at the
13         University, with the top priority being Title IX.
14    Q.   And you just, you know, mentioned there was a number
15         of students and people raising concerns about the
16         allegations.  Was there a significant number of
17         people raising concerns about the University's
18         treatment of Dr. Alaei during this process and
19         considering it, you know, poor and inadequate
20         treatment?
21    A.   There were some.  I wouldn't say significant.  There
22         were some, and again for and against.  Just, you
23         know, on both sides.  That's actually pretty common
24         for me to get on faculty members, faculty matters.
25         You know, people don't understand the process.
```

```
 1                         They don't understand that an
 2          alternate assignment is a non-disciplinary action.
 3          They don't understand that means we're doing our due
 4          diligence, that it means that we're looking at it
 5          and we're going to just -- we're going to review it
 6          and we're not going to make a decision until we've
 7          spoken to, you know, the potential respondent.  They
 8          just see it as action.  They don't understand the
 9          collective bargaining agreement, which is, quite
10          frankly, probably why I have a job and --
11                         MR. ROTONDI:  Brian?  Brian, can you
12             just answer the question?
13                         THE WITNESS:  Yes.
14                         MR. ROTONDI:  And not editorialize.
15                         THE WITNESS:  Yes, yes.
16     A.   Sorry.  Restate the question, please.
17                         MR. CASTIGLIONE:  Can you go back and
18             reread the question, please?
19                         (The previous question is read back.)
20     A.   Yes.
21     Q.   Were there other alternative assignments going on at
22          this time?
23     A.   I don't -- I don't recall.
24     Q.   Okay.  If I can refer you to what was previously
25          identified as Claimant's Exhibit J.
```

```
 1                    Before February 2018, do you know how
 2         long Ms. Cleary had been working at SUNY Albany in
 3         this role as Title IX Coordinator?
 4    A.   I don't know specifically, no.
 5    Q.   Do you know when Ms. Cleary left employment with
 6         SUNY Albany?
 7    A.   Approximately, late 2018, I believe.  I'm not sure.
 8    Q.   Do you know why Ms. Cleary left the employment of
 9         SUNY Albany?
10    A.   It was my understanding that she left to accept a
11         position at Cornell University.
12                         MR. CASTIGLIONE:  Let me just go off
13              for a second.  I'm having trouble downloading
14              this, so I'm going to ask somebody to e-mail it
15              to me.
16                         THE WITNESS:  Actually, Counsel, if
17              you don't mind, that also gives me an
18              opportunity to take a break.
19                         MR. CASTIGLIONE:  Go ahead.
20                         (Whereupon, a recess is taken.)
21         BY MR. CASTIGLIONE:
22    Q.   Okay.  We got it.
23                    Mr. Selchick, I'm showing you what's
24         been previously identified as Claimant's Exhibit J.
25         This is a copy of a memorandum, an order from the
```

```
 1        State of New York Supreme Court Appellate Division
 2        Third Judicial Department, dated November 25, 2020,
 3        identified as being in the matter of Alexander M.
 4        v. Chantelle Cleary, as former Title X Coordinator
 5        at the State University of New York.
 6                    If I can refer you to page 6 of this
 7        decision, and I'm scrolling down.
 8                    In the first instance, Mr. Selchick,
 9        are you aware of a decision issued by the Third
10        Department concerning actions by Ms. Cleary while
11        working in her capacity as Title IX Coordinator for
12        SUNY Albany?
13   A.   Yes.
14   Q.   Do you know the background for this decision?
15   A.   I don't.
16   Q.   Okay.  On page 6, and I'm pointing at it with the
17        little hand here, it says:  "As to the possibility
18        of individual bias, Cleary admittedly altered the
19        facts as reported to her."
20                    Are you aware of any concerns ever
21        being raised by Ms. Cleary in the past regarding
22        other investigations where she was altering facts
23        being reported to her?
24   A.   No, I do not.
25   Q.   Are you aware of any concerns being raised in the
```

1        investigation concerning Dr. Alaei about Ms. Cleary

2        altering facts that were reported to her?

3   A.   No.

4   Q.   The bottom of page 6, going to 7, this decision

5        states, in part:  "Cleary's phrasing portrays a

6        significantly different rendering of the event.  At

7        the hearing, when Cleary was asked why she changed

8        the wording, her response, in the words of Supreme

9        Court's order denying petitioner's motion for

10       discovery, 'bordered on the incoherent.'  It is not

11       unreasonable to question whether Cleary changed the

12       wording (and as such the alleged facts) to

13       correspond with the definition of Sexual Assault

14       One, as found in the student code."

15                Are you aware of any concerns being

16       raised in the investigation during Dr. Alaei,

17       whether Ms. Cleary was seeking to alter facts or

18       events reported to her to fit into violations of

19       Title IX?

20  A.   No.

21  Q.   Were you aware of the underlying Alex case that's

22       referred to here?

23  A.   I was not.  I don't handle student matters unless

24       they're -- the allegation is against an employee.

25  Q.   Okay.  On page 7 of this decision, it also states,

BRIAN SELCHICK                                                51

```
 1         in part:  "In addition, petitioner presented an
 2         affidavit from his advisor, who was present with him
 3         in his meetings with Cleary.  The advisor averred
 4         that at said meetings, Cleary raised her voice,
 5         physically leaned toward petitioner and acted in an
 6         aggressive manner.
 7                    Are you aware of Ms. Cleary acting in
 8         such a manner as described in this court decision?
 9   A.    I am not.
10   Q.    Okay.  You've never witnessed that or anyone ever
11         told you she was acting in such a manner during her
12         work with SUNY Albany?
13   A.    No.
14   Q.    Was Ms. Cleary ever subject to an investigation by
15         Office of Human Resources?
16   A.    Not to the best of my knowledge.
17   Q.    During 2018, did Ms. Cleary ever express an opinion
18         to her -- to you that she believed Dr. Alaei was
19         guilty of violating any SUNY policies?
20   A.    She did.
21   Q.    When did she express that opinion?
22   A.    I don't recall exactly, but it was sometime in
23         between the e-mail that you had showed me
24         previously, and I was speaking with all the graduate
25         students and teaching assistants, and shortly after
```

```
 1              the conclusion of that discussion.
 2    Q.   Is it fair to say it was before May 2018?
 3    A.   I think that's fair.
 4    Q.   Did she ever express an opinion that Dr. Alaei
 5         had -- strike that.
 6                        Can you explain to me, as you sit
 7         here, recall what Ms. Cleary said to you?
 8    A.   I can't recall specifically, but something to -- you
 9         know, words of the effect that his conduct was -- at
10         least as reported to her, was consistent with, you
11         know, predatory conduct and that she believed that
12         the report was credible.
13    Q.   Did anyone else ever make any such statement to you
14         that they believed Dr. Alaei was guilty of violating
15         any kind of SUNY policy during this investigation?
16    A.   Yes.
17    Q.   Who else had made those statements to you?
18    A.   A number of graduate assistants and teaching
19         assistants who we interviewed -- yeah.
20    Q.   Did they explain that they had any personal
21         information or facts or were they just conveying
22         their opinion?
23    A.   At times, opinion.  At times, fact, or their
24         statements of fact.
25    Q.   I want to show you what's been previously marked as
```

BRIAN SELCHICK                                          53

1          Claimant's Exhibit K -- excuse me -- Claimant's

2     Exhibit M.

3                    Claimant's Exhibit M is a series of

4     letters, including one from my office Young/Sommer,

5     dated February 14, 2018.  I'm going to scroll

6     through and let you see the different letters first

7     and then I can -- It's a letter from my office dated

8     February 16, 2018, a letter from my office dated

9     February 28, 2018, and an e-mail from me to

10    Mr. Stark dated March 7, 2018.

11                    Do you, generally, recall receiving

12    letters from Young/Sommer on behalf of Dr. Alaei

13    objecting to the process followed by SUNY Albany at

14    that point?

15  A.   I do, sent to Randy, but yes.

16  Q.   Okay.  Do you recall if anyone at SUNY ever

17    undertook a review of these letters to determine if

18    SUNY had made any mistake regarding actions taken to

19    that point?

20  A.   Both Randy and I had reviewed them collaboratively,

21    and we were of the opinion that we were complying

22    with the collective bargaining agreement.

23  Q.   Okay.

24  A.   But other than that, I do not know if there was

25    other review conducted by counsel of the like.

1    Q.    In the first letter, M, sub 1, it's the letter from

2          Young/Sommer dated February 14, 2018, on page 2, at

3          paragraph stating:  "Initially, Article 19, Section

4          19.1, the agreement states that the purpose of this

5          article is to provide a prompt, equitable and

6          efficient procedure in discipline matters where

7          there is just cause.  Further, the agreement is

8          clear that prior to initiating any formal action

9          under the Article, the University is encouraged to

10         resolve matters of discipline informally."

11                   At the time, were you aware whether

12         the UUP agreement provided for SUNY Albany to try to

13         pursue matters of discipline informally?

14   A.    I was.

15   Q.    Why did SUNY choose not to pursue informal type of

16         resolution with this disciplinary investigation at

17         the time?

18   A.    At what time?

19   Q.    At the commencement of this investigation.

20   A.    Because we didn't have the facts yet, and just cause

21         requires us to conduct a full fair and thorough

22         investigation.  So until we have that information,

23         we're not making a decision one way or the other.

24   Q.    If I could refer to you M-4, the e-mail from me to

25         Randy Stark dated March 7th.  I'm citing to the

```
 1           third paragraph.  It says:  "Also, my client would
 2           like to reiterate his request that he be given
 3           access to his University e-mail account."
 4                     At that time, was that issue ever
 5           reviewed again after the initial denial of access or
 6           prohibition on access to e-mail?
 7    A.     It was, subsequent to the filing of a contract
 8           agreement by UUP.
 9    Q.     Okay.  Was a determination made that -- to continue
10           to decline e-mail access for Dr. Alaei?
11    A.     It's my understanding that the parties settled the
12           matter and that the grievance was withdrawn.
13    Q.     So your understanding is that there was a settlement
14           concerning Dr. Alaei's denial of access to his
15           e-mail?
16    A.     Correct.  In -- With respect to it being filed as a
17           contract grievance by the bargaining agreement.
18    Q.     So, in other words, the Union filing the grievance
19           on behalf of Dr. Alaei?
20    A.     Correct.
21    Q.     Do you know when that settlement allegedly occurred?
22    A.     I don't recall exactly.
23    Q.     Would it have been after Dr. Alaei was -- his
24           continued employment was ended with SUNY in
25           August 2018?
```

```
 1    A.    I believe it was.
 2    Q.    After the February 8, 2018 letter putting
 3          Dr. Alaei -- or notifying him he was on alternative
 4          assignment, what did SUNY do, in terms of conducting
 5          its investigation at that point moving forward?
 6    A.    I apologize.  Can you restate the beginning of the
 7          question?
 8    Q.    Sure.
 9                      After the February 8, 2018 letter was
10          issued, which put Dr. Alaei on alternative
11          assignment, what did SUNY do to conduct its
12          investigation moving forward from that day
13          concerning the disciplinary investigation and
14          the -- concerning the disciplinary investigation?
15    A.    We conducted a collaborative investigation between
16          employee relations, as well as the Office of Equity
17          and Compliance.  And then subsequently, when the
18          Office of Equity and Compliance felt they had
19          nothing further to contribute, myself and
20          Randy Stark conducted further investigation into the
21          matter and -- yeah.
22    Q.    Okay.  I'm showing you what was previously marked as
23          Claimant's Exhibit L-2.
24                      And I'm just going to scroll down so
25          you can see the whole thing first.  And then go back
```

```
 1            to the top of this document.
 2                      Do you know what this document is?
 3   A.   I do.
 4   Q.   Can you explain to me what your understanding of
 5        this document is?
 6   A.   This is what we commonly refer to as an SMRR.  It
 7        is, essentially, a referral report -- investigative
 8        report, sorry, from the Office of Equity and
 9        Compliance that is shared with the Office of
10        Employee Relations -- well, sorry, the Office of
11        Human Resources Management, subsequent to an
12        investigation having been conducted.
13   Q.   Do you know when this -- strike that.
14                      So in other words, this was a report
15        from Chantelle Cleary's office for Title IX?
16   A.   Correct.
17   Q.   Do you know when this report was issued?
18   A.   I don't recall the date of issuance.
19   Q.   Okay.  In this report, the first paragraph says:
20        "The following report details the University at
21        Albany's coordinated response to report received on
22        February 2, 2018, from Dr. James Stellar.
23        Specifically, the report alleges that several
24        students reported to him that Dr. Arash Alaei has
25        been interacting with students in violation of a
```

BRIAN SELCHICK                                    58

```
 1           separation agreement entered into with the
 2           University on blank date.
 3                      "This report initiated an inquiry
 4           which resulted in a joint investigation by the
 5           Office of Equity and Compliance and the Office of
 6           Human Resource Management.  The investigation
 7           focused on the following possible violations of
 8           University at Albany policies by Dr. Kamiar Alaei."
 9           And then there's three Roman numerals identifying
10           three purported separate possible violations of
11           policies.
12                      If you could just read those three, I
13           mean, not out loud just to yourself.
14   A.   Okay.  I read it.
15   Q.   The first two Roman numerals, the first one concerns
16           violations allegedly by Dr. Alaei allowing
17           Dr. Arash Alaei to conduct business on behalf of
18           GIHHR.  Roman Numeral II identifies possible
19           violation for facilitating contact between
20           Dr. Arash Alaei and GIHHR staff and students during
21           Dr. Alaei's alternate assignment and after a
22           separation.
23                      Numbers one and two -- number one and
24           two, I'm sorry, at the beginning of those alleged
25           violation, there's a blank.  It says:  "Insert
```

```
1          policy violations"?
2    A.    Yes.
3    Q.    Do you know why that no actual policies are
4          identified there to support those alleged
5          violations?
6    A.    Because we don't have a specific policy unless
7          there's a directive stating that -- Yeah, because
8          there is no policy.
9    Q.    Okay.  Number three, it says:  "Violation of the
10         University at Albany sexual harassment policy for
11         engaging in unwelcome conduct of a sexual nature
12         directed at GIHHR student intern, blank, that
13         created a sexually hostile environment for working
14         and learning."  And just for the record, I said
15         "blank" instead of the student's name.
16                       Was there any -- strike that.
17                       This Roman Numeral Number III only
18         identifies one student intern.  Is it fair to say
19         that that was the only area of concern for student
20         interns, based on it just being limited to one?
21   A.    With respect to sexual unwelcomed conduct of a
22         sexual nature?
23   Q.    Yes.
24   A.    Yes.
25   Q.    Okay.  Is it fair to say that these three Roman
```

1         Numerals are the underlying basis for the joint

2         investigation between Office of Human Resources

3         Management and Title IX concerning Dr. Kamiar Alaei?

4    A.   Yes.

5    Q.   Scrolling down, there's a timeline here.  You can

6         see it's the bottom of page 1.  Talks about

7         2/2/2018, a report was received.  And then if you go

8         down, there's, you know, interviews with a number of

9         people on different dates and meetings and whatnot.

10        And this ends with March 13, 2018.

11                  Do you know if -- well, strike that.

12        I see it says above that March 5 through 23, 2018.

13        Do you know if Title IX's investigation or portion

14        of the investigation ended around March 23, 2018?

15   A.   I don't recall specifically when it ended.

16   Q.   So then, the report continues.  It says, on page 2

17        at the bottom, "individuals interviewed."  And then

18        it lists numbers one through 43.

19                  So there were 43 individuals

20        interviewed as part of this Title IX investigation?

21   A.   That's correct.

22   Q.   Okay.  So is that common in these types of matters

23        to interview that many people?

24   A.   It can be.  It depends upon the nature of the

25        investigation, but, you know, whenever I have an

1        allegation against a professor that involves a

2        classroom, I interview every student in the class.

3   Q.   Was this an allegation that involved an individual

4        in a setting where there were other individuals for

5        SUNY Albany also in that setting?

6   A.   I'm sorry, can you repeat that question?

7   Q.   Sure.  Did this matter involve an allegation by an

8        individual where there were other SUNY interns

9        involved in the situation?

10  A.   (No response.)

11  Q.   In other words --

12  A.   I'm having a little bit of a hard time

13       understanding.

14  Q.   In other words, was this student's allegation based

15       on a single interaction between her and Dr. Alaei

16       and nobody else around?

17  A.   Yes.  Yes.

18  Q.   Okay.  At the beginning of this, it talks about:

19       "The following report details the University of

20       Albany's coordinated response to a report received

21       on February 2nd from Dr. James Stellar."

22                   Does this refresh your recollection as

23       to whether Dr. Stellar was the one who started this

24       underlying investigation?

25  A.   It does.

BRIAN SELCHICK                                                 62

```
1    Q.    Okay.  And is it fair to say that Dr. Stellar is the
2          one who started it?
3    A.    Yes, it is.
4    Q.    Was there ever a formal complaint registered by this
5          student with Title IX or with your office against
6          Dr. Alaei?
7    A.    Not that I was provided with.
8    Q.    Okay.  So on issues one and two here on Claimant's
9          Exhibit L-2, what did you do to investigate Roman
10         Numerals I and II on Exhibit L, page 1?
11                     MR. ROTONDI:  I'm sorry.  Could you
12            guys hold on just one minute?
13                     MR. CASTIGLIONE:  Sure.
14                     MR. ROTONDI:  Thank you.
15                     (Whereupon, a recess is taken.)
16   BY MR. CASTIGLIONE:
17   Q.    What did you do to investigate Roman Numerals I and
18         II on the first page of defendant's -- or excuse me,
19         Claimant's Exhibit L-2?
20   A.    I reviewed this document.  I reviewed the interviews
21         of the individuals denoted below.  And then,
22         additionally, I reviewed some of my -- you know,
23         some other e-mails, et cetera, and spoke to other
24         witnesses who I believed may have had information
25         relevant to the investigation.
```

 1   Q.   Okay.  Did you speak with Harvey Charles at any
 2        point during the investigation, specifically about
 3        Roman Numerals I and Roman Numerals II?
 4   A.   I did.
 5   Q.   Do you recall the discussions you had with
 6        Dr. Charles?
 7   A.   I do.
 8   Q.   Could you explain to me what those discussions were?
 9   A.   They were about, generally, his role with respect to
10        GIHHR and, admittedly, his lack of knowledge
11        regarding these issues and issues at GIHHR in
12        general.
13   Q.   Okay.  If I can show you what was previously
14        identified as Plaintiff's -- or excuse
15        me -- Claimant's Exhibit F-1.  This is a -- F-1 is a
16        series of e-mails.  First one here is an e-mail
17        concern -- between Harvey Charles and Arash Alaei
18        dated March 29, 2017.  Second one is between
19        Arash Alaei and Harvey Charles dated March 29 2017.
20        Third one is an e-mail between those two on the same
21        date.  And the fourth is an e-mail from Arash to
22        Harvey Charles dated March 22, 2017.
23                 Was Harvey Charles Arash Alaei's
24        supervisor while he was employed in 2017 with SUNY
25        Albany?

```
 1   A.    Yes.
 2   Q.    In this March 22, 2017 e-mail, Arash Alaei is asking
 3         Harvey Charles to be able to go to campus to attend
 4         an event; is that fair to say?
 5   A.    Yes.
 6   Q.    Okay.  And then there's a response from
 7         Harvey Charles dated March 29, 2017 to Arash that's,
 8         basically, denying that request; is that fair to
 9         say?
10   A.    Yes.
11   Q.    At any point during your discussions with
12         Harvey Charles, did you ever ask him if he was
13         having discussions with Arash Alaei about Arash
14         inquiring whether he could go to campus?
15   A.    Yes.
16   Q.    Okay.  If I can show you the next document that's
17         attached as part of Claimant's Exhibit F-1.  This is
18         an e-mail dated Tuesday, March 28, 2017 from
19         Arash Alaei to Harvey Charles.  I'm going to scroll
20         down to the bottom where it says:  "In order to
21         complete the above-mentioned tasks, I need to be in
22         touch with the following people.  For some, I will
23         need to be in touch in person.  And for most, I will
24         just need to be in touch long distance."  And then
25         he identifies six individuals.
```

1              Do you know if Harvey Charles approved

2      this request for Arash Alaei to be in touch with

3      these individuals either in person or by e-mail?

4  A.   I do not know.

5  Q.   Do you know who these individuals are that are

6      identified as numbers one through six?

7  A.   I am familiar with number one, of course, number two

8      and number five.  The remainder, I am not.

9  Q.   Okay.  Number one being Dr. Kamiar Alaei?

10 A.   Correct.

11 Q.   So -- strike that.

12              If I could refer you to what had been

13      marked as Claimant's Exhibit N?

14              I'm going to refer you to what had

15      previously been marked as Claimant's Exhibit 4.  I'm

16      showing you what's been previously marked as

17      Claimant's Exhibit F-4, and this is specifically,

18      e-mails from Harvey Charles and Arash Alaei dated

19      June 14, 2017.  Subject line is:  "My report and

20      communication with interns."  And then there's an

21      earlier e-mail dated June 13, 2017, with a similar

22      subject and between the same people.

23              In the e-mail from Arash Alaei to

24      Harvey Charles dated June 13, 2017, did you come

25      across this e-mail in your investigation concerning

```
1            whether Kamiar Alaei was allegedly allowing
2            Arash Alaei to have improper contact with GIHHR
3            students or personnel?
4      A.    I did not.  It predates my employment at the
5            University and predated the investigation.
6      Q.    The investigation during Dr. Kamiar Alaei in 2018?
7      A.    Correct.
8      Q.    So this e-mail, just Plaintiff's F-4, this June 13,
9            2017 e-mail, talks about being assigned to work
10           remotely.  At the second part, second page here, it
11           says:  "In addition, I just wanted to inform you
12           that I need to have Skype communication with" blank,
13           who's identified as a doctor, a Ph.D. student,
14           another individual and another individual, who are
15           identified as Ph.D. students, and then another
16           individual is identified as a U Albany alumni.
17                      Arash Alaei says:  "They are GIHHR's
18           interns and I need to have Skype meetings with them
19           to develop grant proposals."
20                      Dr. Charles, in his June 14, 2017
21           e-mail, says:  "I've inquired of HR and am awaiting
22           advice on this matter.  I have conveyed that we need
23           to know as soon as possible."
24                      So during your investigation in 2018
25           concerning whether Dr. Kamiar Alaei was allegedly
```

```
 1          improperly allowing his brother, Arash Alaei, to
 2          have contact with interns, did you talk to
 3          Harvey Charles about whether or not he was giving
 4          the approval or reviewing the issue of whether
 5          Arash Alaei should have communication with interns,
 6          as reflected in this e-mail?
 7    A.    As reflected in this e-mail, no.
 8    Q.    Okay.  Did you ever ask Harvey Charles for any
 9          records where maybe he was reviewing and giving
10          approval to Arash to have communication with people?
11    A.    I asked for any and all information to be provided
12          to me that's relevant or even if they think it's
13          irrelevant in any investigation, including in this
14          one.
15    Q.    Okay.  Do you know if Harvey Charles approved
16          Arash's request here to have communication with
17          these GIHHR interns?
18    A.    I do not.
19    Q.    Do you know if Harvey Charles was Arash Alaei's
20          supervisor in 2017?
21    A.    I do not, no.
22    Q.    Do you know who was Arash Alaei's supervisor at
23          around the time he left SUNY Albany?
24    A.    I believe it was Harvey Charles, but I'm not sure.
25    Q.    Was Harvey Charles Dr. Kamiar Alaei's supervisor in
```

```
 1        2017?
 2   A.   I'm not sure.
 3   Q.   What about in 2018?
 4   A.   Yes.
 5   Q.   Was Kamiar Alaei a supervisor for Arash Alaei in
 6        2018 or 2017?
 7   A.   I don't know.
 8   Q.   This e-mail reflects that Harvey Charles was
 9        inquiring of HR.  Do you know if Harvey Charles
10        e-mailed HR about this issue, communicating with
11        interns?
12   A.   I do not.
13   Q.   I'm going to refer you to what was previously
14        identified as Claimant's Exhibit L.  And this is
15        specifically Claimant's Exhibit L-1.
16                   MR. ROTONDI:  Sorry, Joe.  Could you
17            slow down just a little bit?
18                   MR. CASTIGLIONE:  Sure.
19                   MR. ROTONDI:  That would be great.
20                   MR. CASTIGLIONE:  I think it might
21            help if I scroll through the whole thing first
22            and then I'll go from top down so you can see
23            the overview.  I'll just scroll through it
24            first.  And then I'll start from here.
25        BY MR. CASTIGLIONE:
```

BRIAN SELCHICK                                          69

1   Q.   Mr. Selchick, let me ask you in the first instance:

2        Do you know what this document is?

3   A.   Yes.

4   Q.   Can you explain to me what this document is?

5   A.   This document is the University's planned response

6        to the letter that we received from the below-signed

7        individuals that we intended on addressing in

8        that -- in a broader meeting, and these are our

9        responses, our planned responses.

10  Q.   Were these responses ever communicated to anybody?

11  A.   I believe that they were.  I believe that they were

12       communicated during that meeting we had at which

13       Chantelle and Randy spoke at.

14  Q.   So you're referring to the February 9, 2018 meeting

15       about GIHHR leadership?

16  A.   That would be the meeting I'm referring to, but that

17       seems to not fit the timeline.  I'm not sure.

18  Q.   Okay.  But at some point, these responses were

19       communicated to the students?

20  A.   Not necessarily.  This is, again, more of an

21       internal document, internal playbook, so I'm not

22       sure.

23  Q.   On this page here, it's page -- I guess the second

24       page of this Exhibit L-1.  It says that "it was

25       Arash Alaei and Kamiar Alaei who mislead students,

```
 1        not the University.  In hindsight, if the University
 2        was aware of their activity as it is now, it would
 3        have moved to correct the situation."
 4                  Do you know who wrote that -- prepared
 5        that statement?
 6   A.   I don't.
 7   Q.   Do you know what the reference is to D. Kamiar Alaei
 8        misleading students?
 9   A.   I don't know specifically, no.
10   Q.   It does refer, it looks like, the student's letter,
11        it said:  "In October 2017, Arash was officially
12        removed from his role at University at Albany and
13        all University-related communication should have
14        ceased."
15   A.   Yes.
16   Q.   So --
17   A.   Sorry.  That helps to refresh my recollection.  I
18        think that is intended to refer to Arash's
19        employment status as conveyed to students.
20   Q.   So when it says "University-related communications
21        should have ceased," that's not referring to
22        Arash Alaei allegedly having communication with
23        students while he was on alternative assignment?
24   A.   No, it would be -- It would have been after he
25        separated employment.
```

```
 1   Q.   And so this statement about Kamiar Alaei misleading
 2        students, not the University, do you have any
 3        understanding now, in the context of communications
 4        having ceased, what that's referring to?
 5   A.   Could you go up just a little bit in there?
 6   Q.   Sure.
 7   A.   Actually, we're good.  Okay.
 8                      Okay.  Sorry, can you repeat the
 9        question?
10   Q.   In terms of now reading that issue about
11        University-related communication, do you have any
12        understanding about the statement Dr. Kamiar Alaei
13        "misleading students"?
14   A.   My understanding is that it was being alleged that,
15        you know, Kamiar was conveying that Arash still had
16        an active role in the University, but that was not
17        correct.
18   Q.   If I could refer you to Plaintiff's Exhibit L-3, or
19        Claimant's Exhibit L-3.  This document is identified
20        as FAQ Global Institute for Health and Human Rights,
21        and it says in the upper left corner, last edit,
22        JCE, 2/8/118 -- or excuse me, 2/8/18.  Do you know
23        what this document is?
24   A.   Yes.
25   Q.   What is this document?
```

```
 1   A.   This is the prepared question and answer response
 2        for the meeting that was held in February with the
 3        students and others present.
 4   Q.   And where this initial JCE is, do you have any
 5        understanding what that's referring to?
 6   A.   Those are the initials of Jordan Carleo-Evangelist,
 7        who is the University spokesman.
 8   Q.   Did there come a time where you conducted an
 9        interrogation of Dr. Kamiar Alaei?
10   A.   Yes.
11   Q.   Was that held in or around early May 2018?
12   A.   Yes, it was.
13   Q.   Do you recall learning anything new at that
14        interrogation that you had otherwise not known about
15        before as part of your investigation?
16   A.   Yes.
17   Q.   As you sit here and -- can you tell me what you
18        recall was learned as new at that time?
19   A.   What I can recall is that there was information and
20        evidence provided of welcome contact by and between
21        the student who alleged the unwelcome conduct,
22        including photographic evidence, as well as a
23        substantial amount of information provided by
24        Dr. Kamiar Alaei regarding the interactions he may
25        or may not have had with Arash, regarding any
```

BRIAN SELCHICK                                              73

```
 1           directives he may or may not have received regarding
 2           contact with Arash and other students, as well as
 3           regarding the events that are alleged to have
 4           occurred regarding that unwelcome conduct that
 5           night, including consumption of alcohol or the lack
 6           thereof.  It, you know -- Yeah, those are the things
 7           I can recall off the top of my head.
 8      Q.   Okay.  And I'm showing you what's been marked as
 9           Claimant's Exhibit C-3.  Do you recall reading this
10           letter, which is a letter from my office to
11           Randy Stark, dated May 21, 2018?
12      A.   Yes, I do.
13      Q.   Did you share this letter with anybody -- or strike
14           that.
15                     Do you know if your office shared this
16           letter with people outside of your office?
17      A.   I believe -- I don't.
18      Q.   You don't recall?
19      A.   I don't recall.
20      Q.   At the time of reading this letter, was there any
21           further action needed -- or strike that.
22                     At the time of receiving this letter
23           and after the interrogation was conducted in early
24           May, was there anything else conducted by your
25           office in terms of continuing with the
```

1           investigation?

2    A.    I reviewed -- yes.

3    Q.    Okay.  What did you do?  What else?

4    A.    I reviewed the information provided by your office,

5          including the photographs, as well as this letter.

6    Q.    Okay.

7    A.    And -- but otherwise, nothing else.

8    Q.    So there were no other interviews after the

9          interrogation?

10   A.    No.

11   Q.    Was there any other activity conducted besides

12         reading this Claimant's Exhibit C-3?

13   A.    There was a lot of consideration on our side, but

14         no.

15   Q.    Do you recall there being a counseling session held

16         on August 9, 2018 concerning the investigation?

17   A.    Yes, I do.

18   Q.    If I could refer you to Claimant's prior Exhibit H.

19         Did your office issue a formal letter reflective of

20         that counseling session?

21   A.    Yes, we did.

22   Q.    And Claimant's Exhibit H, would that be a copy of

23         that counseling memo issued by your office?

24   A.    Yes, it is.

25   Q.    Okay.  And is it fair to say at that time, SUNY had

1        conveyed to Dr. Alaei that they determined that no
2        policies had been violated?
3    A.  That's correct.
4    Q.  And is it fair to say, at that time SUNY conveyed to
5        Dr. Alaei that there was no just cause to impose
6        discipline?
7    A.  That's correct.
8    Q.  Did your office receive input from anybody else
9        before making those findings and determinations?
10   A.  No, I -- having been the person who conducted a lot
11       of the investigation and -- sorry, strike that.
12                   I'm so used to saying "strike that."
13       I apologize.
14                   We did receive some feedback from OEC.
15       We disagreed with some of that feedback and we
16       proceeded with the non-disciplinary action based
17       upon our review of the facts.
18   Q.  Do you recall what the feedback was?
19   A.  Yes.
20   Q.  What was it?
21   A.  The feedback was that they were surprised that it
22       was our opinion that we did not have just cause to
23       discipline, nor that -- as well as that both myself
24       and Randy Stark were of the opinion that we did not
25       have a preponderance of the evidence to prove any

BRIAN SELCHICK                                    76

```
1          misconduct allegations.
2    Q.    And did Chantelle Cleary convey that feedback to
3          you?
4    A.    She did.
5    Q.    If I can refer you to what was previously identified
6          as Claimant's Exhibit B-8.  Claimant's Exhibit B-8
7          is a copy of the letter from SUNY Albany dated
8          August 10, 2018, addressing Dr. Alaei -- SUNY's
9          election to terminate his appointment, effective
10         August 10, 2018.
11                    Are you aware of whether SUNY had
12         determined before August 10, 2018 to elect to
13         terminate Dr. Alaei's appointment?
14   A.    Yes.  If you mean the non-renewal, yes.
15   Q.    When did they make that determination?
16   A.    I actually don't -- I don't recall exactly, but I
17         can say that it was -- it was sometime immediately
18         after -- immediately prior to or immediately after
19         the interrogation.  So somewhere in there.  That's
20         my recollection.
21   Q.    So when you say "non-renewal," if SUNY had
22         determined to non-renew Dr. Alaei's contract and he
23         still had one year remaining on his term, would he
24         be able to continue working at SUNY Albany?
25   A.    Okay.  Had the University not invoked Article 32,
```

1          that's correct.

2    Q.    But in this letter dated August 10, 2018, Exhibit B,

3          this is reflective of SUNY electing to terminate his

4          employment so he was no longer continued employed

5          with SUNY; is that fair to say?

6    A.    Correct.

7    Q.    Okay.  All right.  So I want to backtrack here a

8          little bit.  I'm going to show you what's been

9          previously marked as Claimant's Exhibit D-1.  If you

10         can look at what's been marked as Claimant's Exhibit

11         D-1, which is a series of e-mails between you and

12         Chantelle Cleary on March 26, 2018.  Do you recall

13         these e-mails?

14   A.    I do.  Now I do.

15   Q.    In this e-mail, the second e-mail, March 26, 2018,

16         at 8:33 p.m., Ms. Cleary says:  "I thought we agreed

17         he wasn't going to come back?  I'm confused."

18                     As of March 26, 2018, had SUNY made a

19         determination that Dr. Alaei was not going to return

20         to his employment?

21   A.    The President had not made that determination, but

22         that was the strong opinion of Chantelle Cleary.

23   Q.    Your response is:  "Right, but there will probably

24         be a short gap in time between the interrogation,

25         after which we have to bring him back and the

```
 1          non-renewal pre-buyout, assuming the President
 2          approves the buyout.  It could be that there is no
 3          gap, but I want to cover all potential outcomes.
 4          Sorry, should have explained why I was asking."
 5                      So were you not agreeing with
 6          Ms. Cleary's position that I thought we agreed he
 7          wasn't going to come back?
 8    A.    I didn't really have the authority.  I didn't have
 9          the authority, one way or the other, to make this
10          decision.  So I was a bit surprised, as was one way
11          for me to describe it.
12    Q.    So at this point, is this reflective of Ms. Cleary
13          had already made a determination on her end that
14          Mr. Alaei was not going to come back to employment
15          with SUNY Albany, based on her end of the
16          investigation?
17    A.    That was my impression.
18    Q.    So Ms. Cleary's decision would have been based on
19          her Title IX end of the investigation?
20    A.    I don't know.
21    Q.    Okay.  She never communicated anything further about
22          the basis of her decision there?
23    A.    Just that she solely stated to me that she -- that
24          the one that I can recollect was that the students
25          would not tolerate Kamiar coming back, they would
```

```
 1        go -- you know, they would go berserk if that
 2        happened.
 3   Q.   If I could refer you to what had been previously
 4        identified as Claimant's Exhibit L-4.  And before
 5        that, let me ask you:  If you knew that SUNY had
 6        determined to elect to terminate Dr. Alaei's
 7        continued presence and employment at SUNY as of
 8        August 9 when the counseling session was held, why
 9        did your office advise Dr. Alaei to return to work
10        the next morning?
11   A.   Because that would be the appropriate procedure, the
12        disciplinary investigation concluded at the end of
13        an interrogation and you cannot -- it's
14        impermissible under the collective bargaining
15        agreement to continue to have someone on an
16        alternative assignment for the purposes of
17        conducting a disciplinary investigation when the
18        last step in the disciplinary investigation is,
19        typically, the interrogation, and when you decided
20        that you're not going to discipline the employee, so
21        it was -- yeah, it was standard.
22   Q.   Okay.  So in other words, you can't terminate
23        somebody while they're on alternative assignment
24        because the UUP agreement provides for other
25        procedures?
```

```
 1   A.   Article 19 provides for the appeal rights and --
 2        correct.
 3   Q.   Okay.  I'm going to show you what's been previously
 4        marked as Claimant's Exhibit L-4, if you could take
 5        a look at this document?
 6   A.   I see it.
 7   Q.   Do you recognize what this document is?
 8   A.   Yes, I do.
 9   Q.   Are these your handwritten notes?
10   A.   They are.
11   Q.   In upper right corner, there's a four slash three
12        slash.  You can't really make it out.  Is it fair to
13        say these were handwritten notes by you written on
14        April 3, 2018?
15   A.   It is.
16   Q.   Okay.  This first sentence that I'm running the
17        mouse pointer over, it says:  "How do we maintain
18        the integrity of the non-renewal with or without the
19        NOD/interrogation?"
20                 Did SUNY Albany make a determination
21        at that point to not renew Dr. Alaei's employment?
22   A.   No, my recollection is that in this meeting, we're
23        being asked a lot of -- we were being asked these
24        questions.
25   Q.   So, I'm sorry, what was -- why did you take these
```

```
 1        notes?
 2   A.   I take notes on as much as I possibly can, plus
 3        Randy took notes.  He took copious notes.
 4   Q.   So are these notes that were taken that you took at
 5        a meeting that was held?
 6   A.   Yes.
 7   Q.   Okay.
 8   A.   The top left indicates who was present at the
 9        meeting.
10   Q.   Okay.  So can you explain -- and I see in the top
11        left, it looks like a BBS?
12   A.   Yep, that's me.
13   Q.   And this is RLS?
14   A.   Randy.
15   Q.   And what is this, the next one?  Looks like few R.
16   A.   I can't make that one out, and I can't recall.  Oh,
17        I don't know for sure.  It could be John Riley, our
18        former Senior Managing Counsel, but I don't know.
19   Q.   Was there a Lewis Rethemeyer in the past?
20   A.   Oh, sorry, Lewis Rosenthal.
21   Q.   Lewis Rosenthal.  Who is he?
22   A.   Lewis Rosenthal is our outside counsel for labor
23        Employment matters --
24   Q.   Okay.
25   A.   -- at the University for the same.
```

1   Q.   So these notes reflect discussions at that meeting?

2   A.   Correct, with counsel.

3   Q.   Okay.  I'm now referring you to a line here that

4        says:  "Goal is to make sure he does not come back."

5                 Did SUNY Albany make a decision at

6        that point that its position was to make sure that

7        Dr. Alaei did not come back to SUNY Albany for

8        employment?

9   A.   The President had made that decision, but that was

10       the way this was trending, and that was Chantelle's

11       strong desire.

12  Q.   Okay.  There is then a line that says:  "Can we keep

13       the non-renewal clean?"

14                 Can you explain to me what you were

15       referring to?

16  A.   Umm-hmm.  What I was referring to is making sure

17       that the -- that Article 32 and Article 19 were both

18       complied with and not, you know, across -- crossed

19       over, right?  It was of and remains of great import

20       that, you know, the University conduct full, fair

21       and thorough investigation, finalize the Article 19

22       process prior to, you know, co-mingling that action.

23  Q.   Okay.  Then at the end, there's the line that's:

24       "Performance evaluations to support non-renewal,

25       dash, we could recreate them."

BRIAN SELCHICK                                    83

```
 1                        Can you explain to me what that is
 2        referring to?
 3   A.   So Article 7 of the collective bargaining agreement
 4        says that we cannot -- typically, we cannot renew an
 5        employee if they don't have performance evaluations
 6        and performance programs on file.  You can go back
 7        and retroactively provide somebody with their annual
 8        performance evaluations.  That's permissible.  But
 9        you do, typically, need to have them.
10   Q.   When you say "that's permissible," is that something
11        that's specifically identified in the UUP agreement?
12   A.   No, it's practice.  I mean, nobody's ever on time on
13        their performance evaluations, Joe.
14   Q.   Do you recall -- well, strike that.
15                        Do you recall a time when SUNY Albany
16        began to pursue non-renewal of Dr. Alaei's
17        employment?
18   A.   I don't recall the exact -- I don't recall the exact
19        time, no.
20   Q.   Okay.  If I can refer you to what has been marked as
21        Claimant's Exhibit E-1, Claimant's Exhibit E sub 1?
22                        THE WITNESS:  Counsel, if you don't
23           mind, I feel like --
24                        MR. CASTIGLIONE:  No, I was going to
25           say, if you need to, I can --
```

```
 1                   THE WITNESS:  Two minutes?
 2                   MR. CASTIGLIONE:  Sure, go ahead.
 3                   (Whereupon, a recess is taken.)
 4      BY MR. CASTIGLIONE:
 5   Q.  Mr. Selchick, do you recall a time of ever trying to
 6       look for performance programs or evaluations for
 7       Dr. Alaei?
 8   A.  I do.
 9   Q.  Do you recall about when you started looking for
10       those?
11   A.  I do not recall specifically, no.
12   Q.  Do you recall why you were looking for those?
13   A.  Yeah, it's routine for me to review the entire
14       personnel file during the course of any
15       investigation.
16   Q.  Okay.  And do you know what a performance program
17       is?
18   A.  Yes, I do.
19   Q.  What is that?
20   A.  A performance program is established under the
21       collective bargaining agreement.  It is -- it
22       outlines the core functions of any employee's job
23       duties and responsibilities that they have to
24       perform and, you know, perform at a particular level
25       in order to receive a satisfactory evaluation.  It's
```

```
 1        not intended to be entirely inclusive, just job
 2        description.  It's really focused on the core
 3        functions and the core expectations.  It is,
 4        essentially, a matter of due process.  It's intended
 5        to give the employee notice of the work that they
 6        need to do and the work that they're required to be
 7        successful at the University and it's a performance
 8        management tool.
 9   Q.   And do you recall locating any performance programs
10        for Dr. Alaei?
11   A.   I don't recall whether I did or did not.
12   Q.   Did you find any evaluations for Dr. Alaei?
13   A.   I don't recall, but I don't believe I did.
14   Q.   Okay.  I'm showing you what's been marked as
15        Claimant's Exhibit E-1.  This is an e-mail from
16        Liesl Zwicklbauer, dated April 4, 2018.  It looks to
17        be sent to you, Mr. Stark and Ms. Cleary.  This
18        e-mail says, in part:  "Okay.  His volunteer
19        appointment is as a clinical professor.  You need to
20        find out what his real appointment is for.  Is that
21        also in a faculty line, or is that a director?"
22                  She goes on and says:  "You need to
23        make sure he has a current performance program and
24        evaluation before you can non-renew.  There is more
25        process involved."
```

```
 1                       Do you know why Ms. Zwicklbauer sent
 2          you this e-mail?
 3    A.    Yes.
 4    Q.    Why?
 5    A.    Because there's a substantial difference between the
 6          collective bargaining agreement requirements for a
 7          program and evaluation for a faculty member than
 8          there is for a professional staff member.  So what
 9          we refer to as the professional faculty are those
10          who are in non-academic titles under the Board of
11          Trustees polices and collective bargaining
12          agreement.  They are required to have performance
13          programs and performance evaluations.
14                       However, academic titles do not have
15          performance evaluations and -- excuse me, and
16          performance evaluations.  Instead, they have faculty
17          activity reports and they are either in a tenure
18          track or non-tenure track position.  The two are
19          markedly different, as well as the rights that are
20          attended to the position, in terms of the term
21          appointments that are given under appendix A,
22          appendix B or appendix C of the Board of Trustees
23          policies.
24    Q.    Where was your office at this point, in terms of the
25          status of the investigation?
```

1   A.   At this point, we had gone through our collaborative

2        investigation and now it was more so on Randy's desk

3        and my desk to decide what, if any, next steps we

4        would take if we were performing additional due

5        diligence.

6   Q.   But at this point, you had not conducted the

7        interrogation of Dr. Alaei?

8   A.   That's correct.

9   Q.   Okay.  Is it fair to say that Ms. Cleary's

10       Title X -- or Title IX investigation had ended at

11       this point?

12  A.   Yes.

13  Q.   Okay.  And is it clear to say Ms. Cleary's position

14       was that Dr. Alaei should be terminated?

15  A.   Yes.

16  Q.   Okay.  Did Ms. Cleary ever have a meeting or an

17       interview with Dr. Alaei as part of her

18       investigation?

19  A.   No.

20  Q.   So after this e-mail -- or strike that.

21              I'm going to -- This Claimant's

22       Exhibit E-1, it also includes a December 4, 2017

23       letter to Dr. Alaei, as well as a change of status

24       request form HRM-3.  Did you review these documents

25       as part of this e-mail, if you recall?

```
 1   A.   I don't recall, but, typically, I don't -- but I
 2        would have.  I would have, sorry.
 3   Q.   Okay.
 4   A.   But, typically, I don't review them.  Like, these
 5        are transactional forms.  I wouldn't see them on the
 6        day-to-day.  I would only see them in the course of
 7        investigation.
 8   Q.   This document, this third page, the HRM-3 form, I'm
 9        pointing to the box that's in -- looks like number
10        one, extension of temp appointment or renewal of UUP
11        term appointment.  And it says:  "Appointment type,
12        term."  Do you have any understanding of what that
13        means?
14   A.   Yes.
15   Q.   What is your understanding?
16   A.   So there are temp appointments which are temporary.
17        There are term appointments which provide for, like
18        any contract, some term, right?  That could be a
19        year, it could be two years, it could be three
20        years, it could be five years -- up to five years
21        for a director title, or -- and/or a permanent
22        appointment.
23   Q.   So is this referring to Dr. Alaei's appointment
24        being a term appointment?
25   A.   Yes, it is.
```

```
1    Q.   And for duration, it says:  "Term appointments" and
2         then it says:  "Other, two years, nine months."  Is
3         it fair to say that Dr. Alaei's term appointment
4         here was for two years, nine months?
5    A.   Yes, it is.
6    Q.   And at the bottom of this, it talks about direct
7         being a complimentary appointment as director of
8         GIHHR?
9    A.   That's correct.
10   Q.   Do you recall what SUNY did in furtherance of
11        non-renewal efforts for Dr. Alaei after this
12        April 4, 2018 e-mail at Exhibit E-1?
13   A.   We did review his -- his title and his status, as
14        well as his term appointment.  And we advised Liesl,
15        as well as the President's office of those facts.
16   Q.   Did you find any evaluations of Dr. Alaei that you
17        reviewed?
18   A.   Not that I can recall.
19   Q.   Did you find any negative evaluations of Dr. Alaei
20        that you reviewed?
21   A.   In his personnel file?
22   Q.   Yes, as part of --
23   A.   No.
24   Q.   -- after this April 4, 2018 e-mail?
25   A.   No.
```

```
 1   Q.   Did you talk to Harvey Charles about Dr. Alaei and
 2        his employment or work quality after this April 4,
 3        2018, e-mail?
 4   A.   Yes.
 5   Q.   All right.  And what were your discussions?
 6   A.   The discussion, in sum and substance, was that
 7        Harvey Charles did not -- did not strongly supervise
 8        Dr. Kamiar Alaei, even though he was the supervisor
 9        on paper.  He had very little knowledge as to the
10        actual work that was occurring, as well as the
11        success, or the lack thereof, of the GIHHR.
12   Q.   Did you have any conversations with Dr. Charles
13        about his impressions of Dr. Alaei's work, the
14        quality of his work?
15   A.   I did.  Sorry.
16   Q.   What were those discussions?  What did Dr. Charles
17        convey to you?
18   A.   Dr. Charles simply conveyed that he really did not
19        have, you know, much other than anecdotal or sort of
20        word-of-mouth information.  It seemed to be bringing
21        in money and that was all he really knew.
22   Q.   Did you talk to anybody else that was familiar with
23        Dr. Alaei's work as part of the non-renewal process?
24   A.   Personally, I did not.
25   Q.   Okay.  Did you have any understanding at the time of
```

```
1          the quality of Dr. Alaei's work?
2    A.    I did not, and I didn't have an impression one way
3          or the other.
4    Q.    If I can refer you to what has been identified as
5          Exhibit B-1?
6                         Claimant's Exhibit B-1 is a letter
7          dated April 27, 2018.  It says from Provost -- to
8          Provost James Stellar from Dean Harvey Charles, re:
9          Dr. Kamiar Alaei.  Do you know who created this
10         document?
11   A.    I do not.
12   Q.    If I can refer you to what has been identified as
13         Exhibit B-3, which is a series of e-mails between
14         Harvey Charles and William Hedberg, dated
15         April 28th.  There's an e-mail in here, April 28,
16         2018, from Harvey Charles to Bill saying:  "I'm
17         looking at the letter of non-renewal and it's
18         actually a recommendation from me to the Provost.
19         As you know, I know practically nothing about this
20         situation and I feel uncomfortable making a
21         recommendation to the Provost without a basis to do
22         so.  Could this be handled differently?"
23                         Were you aware of Dr. Charles'
24         feelings as reflected in this e-mail?
25   A.    I was.
```

BRIAN SELCHICK                                    92

1    Q.    Okay.  Do you know who was pushing for non-renewal
2          of Dr. Alaei?
3    A.    Chantelle Cleary and the President.
4    Q.    What about the Provost, Mr. Stellar?
5    A.    He seemed to be in agreement as well, yeah.
6    Q.    If I can show you what's been marked as Exhibit B-4?
7          This is an e-mail or chain of e-mails dated May 2nd,
8          2018, between William Hedberg, Harvey Charles,
9          Randy Stark and James Stellar.  In the e-mail from
10         Harvey Charles, he says, in part:  "I decline to
11         sign that letter because I have no information that
12         can be used as a basis to recommend that Kamiar not
13         be renewed.  I am not seeking such information,
14         since it is clear to me the Provost has decided to
15         not renew Kamiar's contract."
16                        Is that your understanding at the time
17         about the Provost being -- having already decided to
18         not renew Kamiar's contract?
19   A.    It is.
20   Q.    Okay.  Is it typical in these matters that the
21         Provost be the one pushing for non-renewal of an
22         employee where a supervisor does not agree?
23   A.    It certainly can happen that way.  It's sort of all
24         over the board, since they're, you know, academic
25         appointments.  There are times when there are

```
 1            recommendations at the supervisory level that are to
 2            non-renew and the Provost office disagrees and
 3            vice-versa.
 4                        But by and large, the reality is that
 5            this type of direct and specific involvement is
 6            uncommon.
 7    Q.    Okay.
 8    A.    I mean, it always goes up through the chain, right?
 9            And that's not to say that people don't disagree one
10            way or the other, but -- and that decisions don't
11            get reversed one way or the other, but normally it's
12            not micromanaged at this level.
13    Q.    Okay.  So in other words, usually a non-renewal or
14            renewal situations, it's not the Provost driving the
15            push for either way, renewal or non-renewal?
16    A.    Correct.
17    Q.    Okay.  Did Chantelle Cleary have any authority over
18            Professor Stellar, as far as you're aware?
19    A.    No.
20    Q.    In terms of the structure of SUNY Albany and their
21            employment positions?
22    A.    No.  He would -- He did and it would have outranked
23            her.
24    Q.    If I could refer you to what had been marked as
25            Exhibit B-6.
```

```
 1                        Claimant's Exhibit B, sub 6, is an
 2           e-mail dated May 14, 2018, from William Hedberg to
 3           Kamiar Alaei and James Stellar, Harvey Charles.
 4           This e-mail reflects the Provost signed the form
 5           from Harvey Charles for non-renewal of Dr. Alaei's
 6           appointment.
 7                        Did you have any discussions or your
 8           office have any discussions with the Provost before
 9           he signed the non-renewal?
10     A.    I did not.  Randy may have, but if he did, I'm
11           not -- I can't recall.
12     Q.    Okay.  This document reflects that the President is
13           next to review the file and make a decision.  Before
14           that, Dr. Alaei had five days to submit a statement
15           in response.
16                        Are you aware of whether the President
17           had already made a determination at this point to
18           non-renew Dr. Alaei?
19     A.    He seemed to be trending in that direction.  Whether
20           he had made that final determination or not, I do
21           not know.  And I can tell that you those five
22           working days are required by the collective
23           bargaining agreement.
24     Q.    Okay.  Are you aware of the basis of the Provost's
25           decision to sign the non-renewal?
```

BRIAN SELCHICK                                    95

1   A.   I'm not.

2   Q.   Included in this Exhibit B-6 is a copy of a letter

3        from Dr. Alaei dated May 8, 2018, to

4        William Hedberg.  And I'll just scroll through it.

5        Do you recall reading this letter?

6   A.   I don't recall reading it.

7   Q.   Okay.  So the response letter -- strike that.

8                  Mr. Hedberg had identified in this

9        e-mail that Dr. Alaei had, you know, five days to

10       submit a response letter.  Do you recall ever

11       reviewing that response letter?

12  A.   No.

13  Q.   And did there come a time when the President

14       determined to approve non-renewal of Dr. Alaei?

15  A.   Yes.

16  Q.   Did you ever talk to the President about that

17       decision?

18  A.   Not that I believe, no.

19  Q.   Did anyone ever tell you why the President made that

20       decision?

21  A.   No.

22  Q.   Part of the non-renewal, there was an issue about

23       whether Dr. Alaei was entitled to one year of

24       employment or two years of employment under his

25       term.  Does that sound familiar?

```
 1   A.    Yes.
 2   Q.    Do you recall my office or Dr. Alaei directly
 3         raising the term "evergreen contract" or "evergreen
 4         appointment" and the right to two years of secured
 5         employment?
 6   A.    I do.
 7   Q.    Do you recall who made the decision for SUNY Albany
 8         to only give Dr. Alaei one year of employment versus
 9         two years?
10   A.    I do.
11   Q.    Who was that?
12   A.    The President.
13   Q.    Okay.  Did anybody in your office consult with the
14         President on that issue?
15   A.    Yes.
16   Q.    Okay.  Who consulted with the President?
17   A.    Randy Stark.
18   Q.    What was that decision based on?
19   A.    I'm sorry, you lost me.
20   Q.    Sure.  What was the decision --
21   A.    Consultation versus decision, that's where you lost
22         me.
23   Q.    Okay.  So the consultation, you said, occurred
24         between Randy Stark and the President; is that fair
25         to say?
```

```
 1   A.   Yes.
 2   Q.   And that was based on a determination by Mr. Stark
 3        that Dr. Alaei was only entitled to one year of
 4        continued employment?
 5   A.   Actually, it was Randy Stark's impression that
 6        Dr. Alaei was entitled to two years.
 7   Q.   Okay.  But the President is the one who decided that
 8        it was just one year?
 9   A.   That's correct.
10   Q.   Did he ever explain to you why the -- strike that.
11                 Did you ever have any discussion with
12        the President as to why he decided it was only one
13        year of continued employment versus two?
14   A.   Not directly, no.
15   Q.   Did Randy ever explain to you why the President made
16        the determination that it was only one year versus
17        two?
18   A.   Yes.
19   Q.   What did Mr. Stark explain to you?
20   A.   All he stated was, very generically, that it was the
21        President's impression that the letter did -- that
22        his appointment letter did not require payment of
23        that second year.
24   Q.   Okay.  I'm going to refer you to what had been
25        marked as Claimant's Exhibit E-2 this is a letter
```

BRIAN SELCHICK                                          98

1          from SUNY Albany dated April 16, 2014, to

2          Dr. Kamiar Alaei.  Do you recall ever reading this

3          letter?

4     A.   Yes, I do.

5     Q.   And it's fair to say this was the appointment letter

6          for Dr. Alaei?

7     A.   Yes, it is.

8     Q.   Okay.  Did you ever have any discussion of the

9          language that I'm going to point to you right here

10         on page 1 and quote, it says:  "To give you the

11         security of at least two years of employment, the

12         appointment will be reviewed annually for possible

13         extension by another year"?

14    A.   Yes, I did.

15    Q.   Did you have any understanding of what that language

16         was, in terms of what Dr. Alaei was entitled to

17         under the UUP agreement?

18    A.   Yes, I did.

19    Q.   Okay.  What was your understanding?

20    A.   My understanding is that he was entitled to the two

21         years of compensation.

22    Q.   If I can refer you to what had been previously

23         identified as Claimant's Exhibit B-4.  The last

24         letter identified Kevin Williams on it.  I can show

25         you -- let's see.  That was E-2.  This is the

```
 1        appointment letter dated April 16, 2014 for
 2        Dr. Alaei.  It cc's Vice Provost Kevin Williams.
 3                  Do you -- Are you aware of whether Dr.
 4        Williams would have oversight of appointment terms
 5        for people working for SUNY Albany?
 6   A.   I am.
 7   Q.   Would he?
 8   A.   He may have some input.  Typically, the appointment
 9        letters are drafted by -- on the academic side
10        drafted by the Provost office and reviewed by human
11        resources.  And that would be on the transactional
12        side of the house, so personnel operations not
13        employer relations.
14   Q.   Okay.  I'm showing you what's been previously
15        identified as Claimant's Exhibit E-4.  This is an
16        e-mail -- the document I'm showing you is the e-mail
17        from Kevin Williams from Kamiar Alaei dated May 31,
18        2017.
19                  Do you recall ever reviewing this
20        e-mail from Mr. Williams regarding a concept of
21        evergreen employment?
22   A.   I don't recall.
23   Q.   Do you have any familiarity -- strike that.
24                  Before Dr. Alaei's employment issue
25        came up about one year versus two years, were you
```

```
 1            familiar with the evergreen appointment concept?
 2    A.    I was familiar with the general concept, yeah.  I
 3            had had some experience with it and had been given
 4            some explanation of it by William Hedberg.
 5    Q.    Did Mr. Hedberg have any discussions with your
 6            office about what the terms of Dr. Alaei's
 7            employment were?
 8    A.    He did.
 9    Q.    What was his -- what discussions did you have, if
10            you recall?
11    A.    My recollection is that he read the provision as
12            being what they referred to as an evergreen
13            appointment.
14    Q.    Okay.  So that would be two years of continued
15            employment if your employment was terminated?
16    A.    That's my understanding, correct.
17    Q.    I'm going to refer you to what was identified as
18            Plaintiff's Exhibit I -- or excuse me, Claimant's
19            Exhibit I.
20                    Claimant's Exhibit I-3 is a series of
21            e-mails between Valerie Ayers and Randy Stark on
22            May 23, 2018.  If you could just take a look.
23    A.    Sorry, could you just go back up a little bit?
24    Q.    Sure.
25    A.    I wanted to see when and who.  Okay.  Stark.  Okay.
```

```
 1   Q.   So this first e-mail, Ms. Ayers is asking about
 2        non-renewal.  Mr. Stark responds he did, it's one
 3        year for two.  He says:  "One year versus two has
 4        been discussed.  We're staying with one year."
 5                    Is that reflective of your
 6        understanding about the conversations between your
 7        office and the President's office regarding the one
 8        year versus the two years?
 9   A.   It is.
10   Q.   And in this next e-mail, May 23, 2018, at 11:33
11        a.m., Ms. Ayers asks:  "Are you going to issue an
12        NOD?"
13                    Do you have an understanding of what
14        NOD is referring to?
15   A.   I do.  It means notice of discipline.
16   Q.   Okay.  Mr. Stark says:  "At some point, we probably
17        will."
18                    Do you recall at the time
19        having -- strike that.
20                    Do you recall at the time your office
21        having -- considering issuing the NOD as of May 23,
22        2018?
23   A.   We were considering potential disciplinary action,
24        but that had not been decided yet.  We don't make
25        that decision until after the interrogation.
```

BRIAN SELCHICK                                          102

```
 1   Q.   When he says "at some point, we probably will."  Is
 2        that reflective of more likely than not you were
 3        intending to issue disciplinary action?
 4                     MR. ROTONDI:  Objection to form.  You
 5             can answer.
 6   A.   Yes, it is, based upon what we likely knew at the
 7        time.
 8   Q.   Okay.  Can you explain to me what your office was
 9        doing at that time for its investigation still into
10        this matter?
11   A.   Yeah, so I actually felt that there were some
12        additional items that needed to be addressed in the
13        course of the investigation, including following up
14        with Elizabeth Grey, as well as following up with
15        the complainant, who proved somewhat difficult to
16        get in touch with.  And I conducted, you know,
17        personal interviews of both of them, in addition to
18        reviewing the SMLR and all the, you know,
19        documentation in its entirety and then subsequently
20        prepared all the interrogation questions.
21   Q.   Was this e-mail issued after the interrogation was
22        held?
23   A.   I don't -- I don't recall.  Timeline is goofed up in
24        my head.
25   Q.   Sure.
```

BRIAN SELCHICK                                    103

```
1                        If I can refer you to what was

2         previously marked as Claimant's Exhibit C-3?

3                        Do you recall the letter from

4         Young/Sommer to you -- your office, I'm sorry -- May

5         21, 2018?

6    A.   Yes, I do.

7    Q.   And this letter mentions --

8    A.   May 9.

9    Q.   -- sending to you at May 9, 2018.  Does that refresh

10        your recollection as to when the interrogation was

11        held?

12   A.   Yes, it does.

13   Q.   And did you testify or give any statements already

14        in this matter that after May 9, the only thing you

15        did was look at the letter from my office and the

16        documents from my office?

17   A.   That's correct.

18   Q.   Did you do anything else, in terms of your

19        investigation, after May 9, 2018?

20   A.   No, I did not.

21   Q.   Okay.

22   A.   Other than those items, no.

23   Q.   So as --

24   A.   So those interviews that I previously mentioned

25        occurred prior to May 9.
```

 1   Q.   Okay.

 2   A.   Yeah.

 3   Q.   So do you have any understanding as to referring to

 4        Exhibit I-3, Mr. Stark's statement that "at some

 5        point we probably will," referring to issuing an

 6        NOD?

 7   A.   I think that was his impression after the

 8        interrogation.  I, having led the interrogation, as

 9        you're aware, had a different opinion.

10   Q.   Okay.  And what was your opinion at the time?

11   A.   My opinion was that the --

12               MR. ROTONDI:  I'm going to object.

13        He's not asking opinion questions.

14               MR. CASTIGLIONE:  But he was

15        conducting the investigation about whether or

16        not discipline should be imposed under the UUP

17        agreement.

18               MR. ROTONDI:  Yes, I understand.  But

19        he's not here to answer opinion questions.  If

20        you could rephrase it.

21               MR. CASTIGLIONE:  Okay.

22   BY MR. CASTIGLIONE:

23   Q.   Did you find any -- As of that time, May 23, 2018,

24        did you uncover any evidence to support issuing

25        notice of discipline against Dr. Alaei?

BRIAN SELCHICK                                    105

1    A.    I did.

2    Q.    As of May 23, 2018, what was the evidence you had

3          uncovered to support issuing discipline against

4          Dr. Alaei?

5    A.    For instance, the statements that were provided to

6          us by the complainant and some of the corroborating

7          individuals, such as Elizabeth Grey.  However, it

8          was the determination of our office that even if we

9          were to discipline for them, that we weren't able to

10         prove, by a preponderance of the evidence, that

11         those -- that that misconduct occurred.

12   Q.    So, in other words, there were allegations, but you

13         didn't have enough evidence to substantiate the

14         allegations?

15   A.    That's correct.

16   Q.    Okay.  And under the UUP, are you able to impose

17         discipline when you can't substantiate allegations?

18   A.    We could try, but, you know, it would go to

19         arbitration and the likelihood of success would be

20         low.

21   Q.    So I'm going to refer you to what's been previously

22         marked as -- or Claimant's Exhibit D-2.  Yes, D-2.

23         Exhibit D-2 is an e-mail from Randy Stark, dated

24         January -- or July 6, 2018, to a number of

25         individuals including you.  If you could take a look

BRIAN SELCHICK                                              106

1         at this?
2    A.   I've read it.
3    Q.   In this e-mail, Mr. Stark, you know, states the
4         sexual misconduct allegations were unfounded.  Did
5         you agree with Mr. Stark's position at that time?
6    A.   I did.
7    Q.   Did anything change between May 23, 2018, when
8         Mr. Stark indicated likely issuing notice of
9         discipline, and July 6, 2018, when he had determined
10        the allegations were unfounded?
11   A.   I think that my -- I made my determine -- my
12        personal determination known to Mr. Stark.  I think
13        that's the only thing that would have changed.
14   Q.   And what did you convey to him?
15   A.   That I did not feel that -- that there was enough to
16        succeed on a disciplinary charge in this matter and
17        that we would have difficulty proving the charges,
18        if any.  And that based upon the just cause
19        standard, it was my belief that an arbitrator would
20        not uphold a disciplinary penalty, even if we could
21        prove them.
22   Q.   In this e-mail, Mr. Stark says, in part:  "Does it
23        really serve any purpose" -- actually, it says:
24        "After discussing the question, does it really serve
25        any" -- oh, no, I'm sorry.  Before that.

```
 1                    "But for what purpose, as we're going
 2          to non-renew him and buy him out."  Do you know what
 3          he was referring to there?
 4     A.   Umm-hmm.  So he's referring to -- Kamiar Alaei's
 5          referring to -- at that time to the decision to
 6          non-renew Kamiar and to do the Article 32 buyout.
 7     Q.   So at that time, a decision had already been made by
 8          SUNY Albany to non-renew and buyout Dr. Alaei?
 9     A.   Yes, it appears that way, yeah.
10     Q.   Okay.  Are you aware and does your office ever
11          communicate these findings about allegations being
12          unfounded to the President's office?
13     A.   We did.  It was framed in the way that we, you know,
14          to be blunt, that we didn't have it.  You know, that
15          there was not sufficient evidence and that we did
16          not feel that we had just cause.
17     Q.   And did the President's office ever explain to you
18          why it decided to move forward to buy out and
19          non-renew Dr. Alaei?
20     A.   No.
21     Q.   Okay.  Do you know when the decision to buy out
22          Dr. Alaei was made?
23     A.   I'm sorry.  Could you say that again?
24     Q.   Do you know when the decision by the President's
25          office to buy Dr. Alaei out was made?
```

BRIAN SELCHICK                               108

1    A.    I don't know specifically, no.

2    Q.    Based on this e-mail, was it made before July 6,

3          2018?

4    A.    It appears so, but I don't know personally.

5    Q.    Okay.

6    A.    I was pretty far in rank from the President at that

7          point.  Still am, but.

8    Q.    If I can refer you to what was identified as

9          Claimant's Exhibit D-3?  If you could take a look at

10         these e-mails, series of e-mails dated July 9, 2018,

11         including between you and Mr. Stark and others.

12                    So is this document, these e-mails, an

13         accurate reflection that there was never any formal

14         or informal complaint filed regarding Dr. Alaei with

15         a Title IX office?

16   A.    That's correct.

17   Q.    Okay.  Between January 1, 2018, and September 1,

18         2018, were there any other disciplinary

19         investigations conducted by your office?

20   A.    Could you state that time frame again?

21   Q.    Sure.  January 1, 2018, to September 1, 2018?

22   A.    Yes.

23   Q.    Do you have an idea of how many there were?

24   A.    I typically handle about 308 cases a year, so, I

25         mean, I can give you a guesstimate, but that's as

BRIAN SELCHICK                                              109

```
 1        close as I can get.  A guesstimate would be there
 2        was probably at a minimum, an ongoing of five to ten
 3        disciplinary investigations across all bargaining
 4        units, including management common actual employees
 5        at that time -- during that time.
 6   Q.   Okay.  Do you recall there being any other instances
 7        where it was determined not to issue discipline
 8        against an employee, but they were still bought out?
 9   A.   Yes -- not bought -- no, not bought out.
10   Q.   Okay.  During that time, were there any non-renewals
11        of -- strike that.
12                    In your experience while with SUNY
13        Albany, was there any non-renewals of non-Middle
14        Eastern females?
15   A.   In the course of my entire employment?
16   Q.   Yes.
17   A.   Of non-Middle Eastern --
18   Q.   Non-middle Eastern females?
19   A.   Have any of them been non-renewed?
20   Q.   Yes.
21   A.   Certainly, yes, there are women who -- people I
22        identify as women who are of non-Middle Eastern
23        descent that have been non-renewed, yeah.
24   Q.   Do you have an idea of how many that, you know,
25        total out of the all the non-renewals?
```

```
 1   A.    It's gotten higher since COVID-19, of course, and
 2         the budgetary impacts on the University, that's
 3         moved up substantially.  But, typically, on an
 4         analyzed basis -- I mean, I don't see all the
 5         non-renewals, they don't come across my desk.  I
 6         only hear about the ones that the Union briefs,
 7         so --
 8                    MR. ROTONDI:  Do you have an answer,
 9            Randy?
10                    THE WITNESS:  Sorry.  You mean Brian.
11   A.    Sorry.  Approximately, 20.
12   Q.    So, typically, non-renewals don't go across your
13         desk unless there's a disciplinary investigation
14         involved?
15   A.    For performance or a procedural question.
16   Q.    Okay.  During the ones that you dealt with, are
17         there any non-Middle Eastern males that were
18         non-renewed for employment?
19   A.    Yes.
20   Q.    And those were related to disciplinary matters?
21   A.    Not all, no.
22   Q.    Were there any non-Middle Eastern males that were
23         non-renewed and bought out when they were found to
24         be no policy violations and unfounded accusations?
25   A.    No.
```

BRIAN SELCHICK                                  111

1   Q.   What about the same question for non-Middle Eastern

2        females?

3   A.   No.

4   Q.   Is it typical to seek non-renewal of an employee, in

5        your experience, without having the supervisor

6        supportive of non-renewal?

7   A.   No.

8   Q.   If I can refer you to one last document, Claimant's

9        Exhibit D-2, specifically referring to an e-mail

10       from Valerie Ayers to Randy Stark, which you were a

11       cc recipient, dated July 9, 2018.  And that's

12       responding to an e-mail from Mr. Stark.

13                    In the Ayers e-mail, at the end, she

14       says:  "There has to be something you can get out of

15       the student's complaint."

16                    How did you understand that when you

17       received and read that e-mail?

18  A.   Just that, you know, there should be some -- That

19       the University should address the student's

20       complaint in some way, shape or form, right?

21       Whether that's informal counseling or counseling or

22       discipline.

23  Q.   Even where the allegations were unfounded?

24  A.   Yes.

25                    MR. CASTIGLIONE:  Okay.  I don't have

1          anymore questions at this time.

2                    MR. ROTONDI:  All right.  Thanks,

3          Brian.

4                    (Transcript requests are as follows.)

5                    MR. CASTIGLIONE:  Standard delivery,

6          E-mail only.

7                    (Whereupon, the above-titled matter

8          was concluded at 1:09 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X   P A G E

2

3        WITNESS:

4                  BRIAN SELCHICK

5        EXAMINATION BY MR. CASTIGLIONE                4

6

7

8                      E X H I B I T S

9        EXHIBIT       DESCRIPTION                   PAGE

10       (Whereupon no exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T I O N

STATE OF NEW YORK:
COUNTY OF WARREN:

          I, Deborah M. McByrne, do hereby certify
that the foregoing testimony was duly sworn to;
that I reported in machine shorthand the
foregoing pages of the above-styled cause, and
that they were prepared by computer-assisted
transcription under my personal supervision and
constitute a true and accurate record of the
proceedings;

     I further certify that I am not an attorney
or counsel of any parties, nor a relative or
employee of any attorney or counsel connected
with the action, nor financially interested in
the action.

     WITNESS my hand in the City of Queensbury,
County of Warren, State of New York

_____

DEBORAH M. McBYRNE

Court Reporter

1        DECLARATION/WITNESS CERTIFICATION

2        Case:  Alaei v. State University of New York

3        Witness:  Brian Selchick

4        Deposition Date:  April 9, 2021

5
            I declare under penalty of perjury that I
6        have read the entire transcript of my Deposition
         taken in the captioned matter or the same has
7        been read to me, and the same is true and
         accurate, save and except for changes and/or
8        corrections, if any, as indicated by me on the
         DEPOSITION ERRATA SHEET hereof, with the
9        understanding that I offer these changes as if
         still under oath.

10
                    _____
11                       BRIAN SELCHICK

12       Sworn to before me, this _____ day
         of_____     20_____ .
13
         [                                  ](print)
14       Notary Public.

15       Registration No:  _____

16       State of_____

17       Qualified in_____County.

18       My commission expires_____.

19

20

21

22

23

24

25

```
1      DEPOSITION ERRATA SHEET

2      Case:  Alaei v. State University of New York
       Witness:  Brian Selchick
3      Deposition Date:  April 9, 2021

4                    Reason Codes:
       1:  To clarify the record
5      2:  To conform to the facts
       3:  To correct transcription errors.
6
       PAGE/LINE              CORRECTION    REASON CODE
7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____
```

```
 1                        DEPOSITION ERRATA SHEET

 2        PAGE/LINE              CORRECTION      REASON CODE

 3        _____

 4        _____

 5        _____

 6        _____

 7        _____

 8        _____

 9        _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____ Subject to the above changes, I certify

20        that the transcript is true and correct.

21        _____ No changes have been made.  I certify that

22        the transcript is true and correct.

23

24        _____

25                        BRIAN SELCHICK
```

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 120 of 131

DR. KAMIAR ALAEI v.                                    BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                   April 9, 2021

## A

**A-1 (6)** 11:1,6;12:1;
19:17,18;24:10
**A-11 (2)** 40:11;42:22
**A-12 (2)** 44:1,2
**A-13 (1)** 44:22
**A-2 (1)** 23:6
**A-3 (2)** 25:3,7
**A-4 (2)** 26:17;28:1
**A-6 (3)** 34:7,7,12
**A-7 (1)** 37:17
**Abby (1)** 13:6
**abilities (1)** 27:15
**ability (2)** 5:12,22
**able (5)** 44:13;64:3;
76:24;105:9,16
**above (3)** 42:21;
60:12;117:19
**above-mentioned (1)**
64:21
**above-titled (1)** 112:7
**abuse (2)** 7:25;27:10
**academic (5)** 16:12;
40:24;86:14;92:24;
99:9
**accept (2)** 19:12;
48:10
**access (12)** 22:18;
23:7,12;24:5,7,16,25;
55:3,5,6,10,14
**account (1)** 55:3
**accurate (1)** 108:13
**accurately (1)** 5:21
**accusations (2)** 31:10;
110:24
**across (5)** 65:25;
82:18;109:3;110:5,12
**acted (1)** 51:5
**acting (3)** 35:25;51:7,
11
**action (14)** 21:6,8,24;
24:18;43:17;46:5;
47:2,8;54:8;73:21;
75:16;82:22;101:23;
102:3
**actions (3)** 23:18;
49:10;53:18
**active (1)** 71:16
**activity (3)** 70:2;
74:11;86:17
**acts (1)** 15:16
**actual (5)** 14:11;
20:25;59:3;90:10;
109:4
**Actually (14)** 6:7;24:3;
25:4;29:6;40:7;
42:15;46:23;48:16;
71:7;76:16;91:18;
97:5;102:11;106:23
**addition (4)** 33:4;
51:1;66:11;102:17

**additional (4)** 33:7;
37:9;87:4;102:12
**additionally (1)** 62:22
**address (3)** 12:21;
29:4;111:19
**addressed (1)** 102:12
**addresses (2)** 29:16,
19
**addressing (3)** 27:14;
69:7;76:8
**administer (2)** 7:12;
44:14
**administering (1)** 44:8
**administration (1)**
7:19
**administrative (1)**
41:21
**admittedly (2)** 49:18;
63:10
**ADP (1)** 15:5
**advance (1)** 6:4
**adverse (1)** 21:23
**advice (2)** 17:8;66:22
**advise (1)** 79:9
**advised (4)** 19:7,8;
29:9;89:14
**advising (3)** 18:12,14;
38:1
**advisor (2)** 51:2,3
**Advisory (3)** 38:13,15,
15
**affairs (1)** 40:24
**affidavit (1)** 51:2
**affiliation (2)** 36:3,9
**again (6)** 5:24;46:22;
55:5;69:20;107:23;
108:20
**against (13)** 4:11;
21:20,24;23:25;31:9;
39:14;46:22;50:24;
61:1;62:5;104:25;
105:3;109:8
**aggressive (1)** 51:6
**ago (2)** 6:5;29:9
**agree (5)** 5:10;92:22;
106:5
**agreed (2)** 77:16;78:6
**agreeing (1)** 78:5
**agreement (35)** 8:12,
16,18,21,24,25;9:4,6,
7;11:15,16;15:20;
17:24;24:17,23;39:6;
47:9;53:22;54:4,7,12;
55:8,17;58:1;79:15,
24;83:3,11;84:21;
86:6,12;92:5;94:23;
98:17;104:17
**agreements (3)** 7:12,
13,16
**ahead (2)** 48:19;84:2
**Alaei (120)** 4:9,10;
11:11,22;12:18;15:8;
16:17;18:9;20:19;

21:16;23:7,18;25:25;
31:8;33:20;34:19,23;
35:2;36:25;37:13;
39:19;40:5;41:8;
42:10;43:1,23;44:3,5,
12,19;46:18;50:1,16;
51:18;52:4,14;53:12;
55:10,19,23;56:3,10;
57:24;58:8,16,17,20;
60:3;61:15;62:6;
63:17,19;64:2,13,19;
65:2,9,18,23;66:1,2,6,
17,25;67:1,5;68:5,5;
69:25,25;70:7,22;
71:1,12;72:9,24;75:1,
5;76:8;77:19;78:14;
79:9;82:7;84:7;85:10,
12;87:7,14,17,23;
89:11,16,19;90:1,8;
91:9;92:2;94:3,14,18;
95:3,9,14,23;96:2,8;
97:3,6;98:2,6,16;
99:2,17;104:25;
105:4;107:8,19,22,
25;108:14
**Alaei's (26)** 17:3,14;
18:13,24;24:24;39:5;
55:14;58:21;63:23;
67:19,22,25;76:13,
22;79:6;80:21;83:16;
88:23;89:3;90:13,23;
91:1;94:5;99:24;
100:6;107:4
**Albany (49)** 4:12,13,
14;6:22;7:5;8:19;
9:13,21;14:19;17:3,
13;18:22;32:9;35:22;
36:4;39:4,4,15;41:7;
44:6,16,18;48:2,6,9;
49:12;51:12;53:13;
54:12;58:8;59:10;
61:5;63:25;66:16;
67:23;70:12;76:7,24;
78:15;80:20;82:5,7;
83:15;93:20;96:7;
98:1;99:5;107:8;
109:13
**Albanyedu (1)** 29:17;
30:1
**Albany's (2)** 57:21;
61:20
**alcohol (1)** 73:5
**Alex (1)** 50:21
**Alexander (1)** 49:3
**allegation (5)** 50:24;
61:1,3,7,14
**allegations (16)** 7:22,
24;8:1;12:18;33:8;
37:5;46:7,16;76:1;
105:12,14,17;106:4,
10;107:11;111:23
**alleged (8)** 27:10;
33:22;50:12;58:24;

**allegedly (5)** 55:21;
58:16;66:1,25;70:22
**alleges (1)** 57:23
**alleging (2)** 27:8;
39:15
**allowed (4)** 20:19,22;
21:17;35:2
**allowing (3)** 58:16;
66:1;67:1
**alter (1)** 50:17
**altered (1)** 49:18
**altering (2)** 49:22;
50:2
**alternate (19)** 6:8;
11:10,13;16:19;
19:23;20:2,15,25;
21:3;24:8,19;35:4,5,
13,15;38:8,9;47:2;
58:21
**alternative (16)** 20:4;
22:20;24:6,18;26:7;
35:22;36:5;38:25;
43:5,23;47:21;56:3,
10;70:23;79:16,23
**although (1)** 22:8
**alumni (1)** 66:16
**always (2)** 42:19;93:8
**Ambassador (1)** 34:24
**among (2)** 12:9;39:15
**amongst (1)** 31:22
**amount (1)** 72:23
**analyzed (1)** 110:4
**and/or (3)** 12:20;
17:25;88:21
**anecdotal (1)** 90:19
**annual (1)** 83:7
**annually (1)** 98:12
**answer's (1)** 35:23
**anymore (1)** 112:1
**apologize (3)** 12:19;
56:6;75:13
**appeal (2)** 17:22;80:1
**appear (2)** 25:10;
44:24
**appears (5)** 18:19;
25:6;29:16;107:9;
108:4
**Appellate (1)** 49:1
**appendix (3)** 86:21,
22,22
**applicable (2)** 7:13;
8:20
**appoint (1)** 40:4
**appointed (2)** 10:1;
42:2
**appointing (2)** 41:11,
24
**appointment (32)**
9:19;18:1,2,14,18,18;
38:2;41:13,18;76:9,
13;85:19,20;88:10,

11,11,22,23,24;89:3,
7,14;94:6;96:4;97:22;
98:5,12;99:1,4,8;
100:1,13
**appointments (5)**
86:21;88:16,17;89:1;
92:25
**appreciate (2)** 5:3;
25:13
**apprised (1)** 43:11
**appropriate (1)** 79:11
**appropriately (1)**
44:16
**approval (3)** 41:19;
67:4,10
**approve (1)** 95:14
**approved (3)** 39:22;
65:1;67:15
**approves (1)** 78:2
**approximately (6)**
9:18;12:3;16:19;
20:16;48:7;110:11
**April (12)** 14:4,5;
80:14;85:16;89:12,
24;90:2;91:7,15,15;
98:1;99:11
**Arash (34)** 23:22;
27:6;28:23;29:1;
42:21;57:24;58:17,
20;63:17,19,21,23;
64:2,7,13,13,19;65:2,
18,23;66:2,17;67:1,5,
10,19,22;68:5;69:25;
70:11,22;71:15;
72:25;73:2
**Arash's (2)** 67:16;
70:18
**arbitration (1)** 105:19
**arbitrator (1)** 106:19
**area (1)** 59:19
**around (5)** 29:7;
60:14;61:16;67:23;
72:11
**arrow (1)** 44:5
**arrowhead (2)** 22:3,4
**Article (16)** 11:14;
17:20,23,23;18:16;
39:17;54:3,5,9;76:25;
80:1;82:17,17,21;
83:3;107:6
**articulate (1)** 5:3
**Assault (1)** 50:13
**assigned (2)** 10:14;
66:9
**assignment (30)** 6:8;
11:10,13;16:20;
19:23;20:4;21:1;24:9,
18,19;26:7;35:4,5,14,
16,18,22;36:5;38:8,9,
25;43:6,24;47:2;56:4,
11;58:21;70:23;
79:16,23
**assignments (6)** 20:2,

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 121 of 131

DR. KAMIAR ALAEI v.                                          BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                          April 9, 2021

15;21:3;22:20;24:6;
47:21
**assist (1)** 10:12
**Assistant (2)** 9:14;
10:2
**assistants (4)** 28:18;
51:25;52:18,19
**Associate (6)** 9:16,24;
10:6,8,12;12:8
**Association (3)** 10:17,
19,19
**assume (1)** 45:11
**assuming (1)** 78:1
**attached (1)** 64:17
**attempt (1)** 21:6
**attend (3)** 31:17;35:2;
64:3
**attendance (2)** 7:25;
20:12
**attended (12)** 12:11;
28:2,5,6,6,7,7,8,9,10;
32:8;86:20
**attorney (2)** 4:8;22:10
**atypical (1)** 23:14
**August (12)** 16:22;
17:15;18:9,20,24;
55:25;74:16;76:8,10,
12;77:2;79:8
**author (1)** 30:11
**authority (6)** 21:22;
41:12;43:11;78:8,9;
93:17
**authorized (2)** 35:24;
43:18
**averred (1)** 51:3
**awaiting (1)** 66:21
**aware (31)** 17:2;
24:10,13;26:11,12,
14;31:13,16;32:9;
33:19;41:6,23;43:10,
19;44:12;49:9,20,25;
50:15,21;51:7;54:11;
70:2;76:11;91:23;
93:18;94:16,24;99:3;
104:9;107:10
**Ayers (5)** 100:21;
101:1,11;111:10,13

---

### B

**B-1 (2)** 91:5,6
**B-3 (1)** 91:13
**B-4 (2)** 92:6;98:23
**B-6 (2)** 93:25;95:2
**B-8 (4)** 18:5,8;76:6,6
**back (18)** 19:1,10,15,
16;27:25;45:6;47:17,
19;56:25;77:17,25;
78:7,14,25;82:4,7;
83:6;100:23
**background (1)** 49:14
**backtrack (1)** 77:7
**balance (1)** 18:17

**bargaining (15)** 7:13;
8:20;11:15;15:19;
17:24;47:9;53:22;
55:17;79:14;83:3;
84:21;86:6,11;94:23;
109:3
**barring (1)** 44:6
**based (12)** 34:25;
42:19;59:20;61:14;
75:16;78:15,18;
96:18;97:2;102:6;
106:18;108:2
**basically (1)** 64:8
**basis (10)** 19:5;24:17,
21,23;60:1;78:22;
91:21;92:12;94:24;
110:4
**bathroom (2)** 5:15;
27:20
**BBS (1)** 81:11
**became (2)** 10:22;
16:6
**become (1)** 35:17
**began (1)** 83:16
**beginning (4)** 12:3;
56:6;58:24;61:18
**behalf (4)** 7:21;53:12;
55:19;58:17
**behavior (1)** 27:10
**belief (1)** 106:19
**below (1)** 62:21
**below-signed (1)** 69:6
**Benevolent (2)** 10:18,
19
**berserk (2)** 19:11;
79:1
**besides (3)** 14:8;
29:16;74:11
**best (5)** 5:12,21;
27:11,14;51:16
**beyond (2)** 18:15;
29:6
**bias (1)** 49:18
**Bill (2)** 16:9;91:16
**bit (7)** 46:6;61:12;
68:17;71:5;77:8;
78:10;100:23
**blank (5)** 58:2,25;
59:12,15;66:12
**blunt (1)** 107:14
**board (11)** 20:12;
30:13;38:11,12,13,15,
16,18;86:10,22;92:24
**body (1)** 19:2
**bordered (1)** 50:10
**both (12)** 4:25;17:1;
22:22;33:3;39:8;42:7,
8;46:23;53:20;75:23;
82:17;102:17
**bottom (8)** 30:21;
34:10,22;50:4;60:6,
17;64:20;89:6
**bought (4)** 109:8,9,9;

110:23
**box (1)** 88:9
**break (5)** 5:14,16,18;
27:22;48:18
**BRIAN (7)** 4:1;5:25;
47:11,11;110:10;
112:3;117:25
**B-R-I-A-N (1)** 5:25
**briefs (1)** 110:6
**bring (2)** 19:1;77:25
**bringing (1)** 90:20
**broader (1)** 69:8
**brother (2)** 23:22;67:1
**brought (1)** 19:10
**Bruce (11)** 15:13,22,
23;24:15;28:8;40:14;
43:19,20;45:10,11,15
**budget (1)** 10:5
**budgetary (1)** 110:2
**business (1)** 58:17
**buy (5)** 17:25;107:2,
18,21,25
**buyout (3)** 78:2;107:6,
8

---

### C

**C-3 (3)** 73:9;74:12;
103:2
**call (2)** 12:11;35:8
**called (2)** 4:2;12:9
**came (1)** 99:25
**campus (5)** 10:5;19:1;
28:24;64:3,14
**can (72)** 5:1,3,24;
10:10;11:12;14:11;
15:11,18;18:3;22:12,
14;25:2;26:16;28:5;
29:22;32:12;33:1;
34:6;37:16,23;44:4,
11;47:11,17,24;49:6;
52:6;53:7;56:6,25;
57:4;60:5,24;61:6;
63:13;64:16;68:22;
69:4;71:8;72:17,19;
73:7;76:5,17;77:10;
78:24;81:2,10;82:12,
14;83:1,6,20,25;
85:24;89:18;91:4,12;
92:6,12,23;94:21;
98:22,24;102:5,8;
103:1;108:8,25;
109:1;111:8,14
**capacity (1)** 49:11
**card (1)** 22:18
**Carleo (1)** 40:15
**C-A-R-L-E-O (1)**
40:15
**Carleo-Evangelist (1)**
72:6
**case (1)** 50:21
**cases (1)** 108:24
**CASTIGLIONE (21)**

4:6,8;27:22,24;
47:17;48:12,19,21;
62:13,16;68:18,20,
25;83:24;84:2,4;
104:14,21,22;111:25;
112:5
**cause (7)** 17:21;54:7,
20;75:5,22;106:18;
107:16
**cc (2)** 25:10;111:11
**cc's (1)** 99:2
**ceased (2)** 70:14,21;
71:4
**certain (2)** 19:6;33:13
**certainly (11)** 7:23;
8:6;24:13;34:4;43:2,
16,18;46:1,1;92:23;
109:21
**certify (1)** 117:19,21
**cetera (5)** 6:9;28:18;
37:11;45:24;62:23
**chain (7)** 25:7;29:24;
34:8,11;37:18;92:7;
93:8
**change (6)** 9:18;
13:16,17;25:21;
87:23;106:7
**changed (4)** 10:7;
50:7,11;106:13
**changes (2)** 117:19,
21
**changing (1)** 25:24
**Chantelle (21)** 13:5;
14:21;15:14;19:9,22;
24:2;28:7;33:4;
44:23;45:5,9,14,17;
49:4;57:15;69:13;
76:2;77:12,22;92:3;
93:17
**C-H-A-N-T-E-L-L-E (1)**
44:23
**Chantelle's (2)** 13:18;
82:10
**charge (1)** 106:16
**charged (1)** 14:15
**charges (1)** 106:17
**Charles (46)** 26:18;
28:6;34:15;36:19,20,
21;37:19,25;40:7;
42:18;44:3,9;63:1,6,
17,19,22,23;64:3,7,
12,19;65:1,18,24;
66:20;67:3,8,15,19,
24,25;68:8,9;90:1,7,
12,16,18;91:8,14,16;
92:8,10;94:3,5
**Charles' (1)** 91:23
**Chief (2)** 15:23;43:3
**choose (1)** 54:15
**citing (1)** 54:25
**citizen (2)** 34:16;
36:14
**Civil (1)** 10:16

**Claimant (1)** 4:8
**Claimant's (61)** 11:6,
25;18:5,8;19:17,17;
22:13;23:6;26:17;
27:25;29:23,23;31:5;
34:7,12;37:17;40:11;
44:1,2,22;47:25;
48:24;53:1,1,3;56:23;
62:8;19:63:15;64:17;
65:13,15,17;68:14,
15;71:19;73:9;74:12,
18,22;76:6,6;77:9,10;
79:4;80:4;83:21,21;
85:15;87:21;91:6;
94:1;97:25;98:23;
99:15;100:18,20;
103:2;105:22;108:9;
111:8
**claims (2)** 4:10,18
**clarification (1)** 33:8
**class (1)** 61:2
**classified (2)** 10:15;
20:10
**classroom (1)** 61:1
**clean (2)** 21:9;82:13
**clear (4)** 4:12;54:8;
87:13;92:14
**clearly (1)** 22:9
**Cleary (36)** 13:5;14:9,
21;15:14;19:9,22;
24:2;28:7;33:4;
44:23;48:2,5,8;49:4,
10,18,21;50:1,7,11,
17;51:3,4,7,14,17;
52:7;76:2;77:12,16,
22;78:12;85:17;
87:16;92:3;93:17
**Cleary's (6)** 50:5;
57:15;78:6,18;87:9,
13
**client (1)** 55:1
**clinical (1)** 85:19
**close (2)** 33:11;109:1
**code (2)** 50:14;117:2
**co-directors (3)** 38:2;
39:25;42:3
**collaboration (1)**
19:22
**collaborative (3)** 13:9;
56:15;87:1
**collaboratively (3)**
13:4;14:20;53:20
**colleagues (1)** 38:1
**collective (13)** 7:12;
8:20;11:15;15:19;
17:23;47:9;53:22;
79:14;83:3;84:21;
86:6,11;94:23
**College (1)** 26:4
**Columbiaedu (1)**
29:18
**coming (2)** 11:1;78:25
**co-mingling (1)** 82:22

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 122 of 131
DR. KAMIAR ALAEI v.                                              BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                              April 9, 2021

**commenced (1)** 9:25
**commencement (1)** 54:19
**common (6)** 21:12; 22:6;43:3;46:23; 60:22;109:4
**commonly (2)** 16:9; 57:6
**communicate (3)** 15:25;23:22;107:11
**communicated (4)** 69:10,12,19;78:21
**communicating (2)** 44:7;68:10
**communication (9)** 31:7;65:20;66:12; 67:5,10,16;70:13,22; 71:11
**communications (2)** 70:20;71:3
**compensation (1)** 98:21
**complainant (3)** 33:18;102:15;105:6
**complaint (4)** 62:4; 108:14;111:15,20
**complete (1)** 64:21
**Compliance (5)** 13:19;56:17,18;57:9; 58:5
**compliant (1)** 7:15
**complied (1)** 82:18
**complimentary (1)** 89:7
**complying (1)** 53:21
**concept (3)** 99:20; 100:1,2
**concern (6)** 12:21; 21:21;27:7;29:3; 59:19;63:17
**concerned (1)** 37:7
**concerning (18)** 4:10, 11,18;11:22;15:8; 16:17;26:22;43:22; 44:9;49:10;50:1; 55:14;56:13,14;60:3; 65:25;66:25;74:16
**concerns (32)** 21:15, 18;23:17,21;24:1,4; 27:14;29:11;30:12; 31:10,14,16,19;32:9, 19;36:24;37:3,4; 38:21;39:3,9,18;44:9, 13,15,19;46:15,17; 49:20,25;50:15;58:15
**concluded (5)** 13:21, 25;16:21;79:12;112:8
**conclusion (1)** 52:1
**conduct (13)** 19:23; 21:16;31:23;52:9,11; 54:21;56:11;58:17; 59:11,21;72:21;73:4; 82:20

**conducted (13)** 11:20; 53:25;56:15,20; 57:12;72:8;73:23,24; 74:11;75:10;87:6; 102:16;108:19
**conducting (5)** 11:16, 21;14:7,11;17:11; 56:4;79:17;104:15
**conference (1)** 34:21
**conferences (1)** 37:11
**confidential (2)** 7:9; 29:10
**confused (1)** 77:17
**consideration (1)** 74:13
**considering (3)** 46:19; 101:21,23
**consist (1)** 38:16
**consistent (1)** 52:10
**consists (1)** 35:11
**consult (1)** 96:13
**Consultation (2)** 96:21,23
**consulted (1)** 96:16
**consumption (1)** 73:5
**contact (8)** 12:20; 28:23;29:2;58:19; 66:2;67:2;72:20;73:2
**contacted (1)** 37:13
**context (1)** 71:3
**continue (5)** 28:19; 31:1;55:9;76:24; 79:15
**continued (6)** 55:24; 77:4;79:7;97:4,13; 100:14
**continues (3)** 15:25; 30:14;60:16
**continuing (1)** 73:25
**contract (11)** 17:17, 19;39:14,17;55:7,17; 76:22;88:18;92:15, 18;96:3
**contracts (1)** 7:14
**contribute (1)** 56:19
**conversations (2)** 90:12;101:6
**convey (3)** 76:2; 90:17;106:14
**conveyed (5)** 66:22; 70:19;75:1,4;90:18
**conveying (2)** 52:21; 71:15
**coordinated (2)** 57:21; 61:20
**coordinator (4)** 22:11; 48:3;49:4,11
**copied (1)** 24:14
**copious (1)** 81:3
**copy (5)** 24:15;48:25; 74:22;76:7;95:2
**core (1)** 84:22;85:2,3
**Cornell (1)** 48:11

**corner (2)** 71:21; 80:11
**CORRECTION (1)** 117:2
**Correctional (1)** 10:18
**correctly (2)** 13:6;23:2
**correspond (1)** 50:13
**corroborating (1)** 105:6
**counsel (13)** 5:5,7,17, 19;6:12;27:17;33:19; 48:16;53:25;81:18, 22;82:2;83:22
**counseling (6)** 74:15, 20,23;79:8;111:21,21
**course (13)** 7:17; 29:6;33:20;35:13,18; 38:9;43:10;65:7; 84:14;88:6;102:13; 109:15;110:1
**Court (2)** 49:1;51:8
**Court's (1)** 50:9
**cover (1)** 78:3
**COVID-19 (2)** 8:8; 110:1
**create (1)** 4:20
**created (2)** 59:13; 91:9
**credible (1)** 52:12
**crossed (1)** 82:18
**cross-train (1)** 10:23
**cultural (3)** 32:19; 33:10,17
**current (6)** 6:20;8:20; 9:11;28:16,16;85:23
**currently (1)** 6:18

## D

**D-1 (2)** 77:9,11
**D-2 (4)** 105:22,22,23; 111:9
**D-3 (1)** 108:9
**Dana (2)** 40:1;42:4
**dash (2)** 40:15;82:25
**date (6)** 10:1;19:7; 40:21;57:18;58:2; 63:21
**dated (42)** 11:6;18:8; 25:9;26:19;29:24; 30:18;34:9,13;37:19; 40:13;44:3,24;49:2; 53:5,7,8,10;54:2,25; 63:18,19,22;64:7,18; 65:18,21,24;73:11; 76:7;77:2;85:16;91:7, 14;92:7;94:2;95:3; 98:1;99:1,17;105:23; 108:10;111:11
**dates (1)** 60:9
**day (2)** 36:17;56:12
**days (3)** 94:14,22; 95:9

**day-to-day (1)** 88:6
**dealing (1)** 44:15
**dealt (1)** 110:16
**Dean (4)** 26:3;30:5,7; 91:8
**December (1)** 87:22
**decide (1)** 87:3
**decided (10)** 19:3,19; 27:11;79:19;92:14, 17;97:7,12;101:24; 107:18
**decision (32)** 26:13; 36:15,17,21;40:4; 41:23;47:6;49:7,9,14; 50:4,25;51:8;54:23; 78:10,18,22;82:5,9; 94:13,25;95:17,20; 96:7,18,20,21; 101:25;107:5,7,21,24
**decision-making (2)** 16:11;43:21
**decisions (2)** 15:8; 93:10
**decline (2)** 55:10; 92:10
**Defendant's (2)** 31:4; 62:18
**definition (1)** 50:13
**DelGoshio (1)** 13:7
**delivered (1)** 11:10
**delivery (1)** 112:5
**demanding (2)** 37:6; 46:5
**demonstrating (1)** 23:19
**denial (2)** 55:5,14
**denoted (1)** 62:21
**denying (2)** 50:9;64:8
**Department (2)** 49:2, 10
**Depends (2)** 43:7; 60:24
**deposition (4)** 6:4,14, 16;117:1
**descent (1)** 109:23
**describe (1)** 78:11
**described (2)** 10:13; 51:8
**description (1)** 85:2
**designee (1)** 15:17
**desire (4)** 31:24,25; 32:1;82:11
**desk (4)** 87:2,3;110:5, 13
**details (2)** 57:20; 61:19
**determination (14)** 17:16;41:7;55:9; 76:15;77:19,21; 78:13;80:20;94:17, 20;97:2,16;105:8; 106:12
**determinations (3)**

**determine (2)** 53:17; 106:11
**determined (8)** 17:13; 75:1;76:12,22;79:6; 95:14;106:9;109:7
**develop (1)** 66:19
**difference (1)** 86:5
**differences (3)** 32:20; 33:10,17
**different (8)** 7:20; 12:9;36:11;50:6; 53:6;60:9;86:19; 104:9
**differently (1)** 91:22
**difficult (1)** 102:15
**difficulty (1)** 106:17
**diligence (2)** 47:4; 87:5
**direct (3)** 23:10;89:6; 93:5
**directed (7)** 5:7; 19:21;20:21;22:23, 24;35:17;59:12
**direction (1)** 94:19
**directive (2)** 22:7;59:7
**directives (1)** 73:1
**directly (3)** 43:21; 96:2;97:14
**Director (11)** 6:24;7:1, 4;9:15;10:2,14;41:8; 43:8;85:21;88:21; 89:7
**directors (7)** 40:5; 41:6,9,13,24,25,25
**directorship (1)** 42:11
**disagree (1)** 93:9
**disagreed (1)** 75:15
**disagrees (1)** 93:2
**disciplinary (29)** 11:16,18,20,21,25; 12:22;16:17;17:1; 19:19;20:5;21:6; 23:13,23;26:9;39:16; 54:16;56:13,14; 79:12,17,18;101:23; 102:3;106:16,20; 108:18;109:3;110:13, 20
**discipline (17)** 20:3; 39:10;54:6,10,13; 75:6,23;79:20; 101:15;104:16,25; 105:3,9,17;106:9; 109:7;111:22
**discovery (1)** 50:10
**discrimination (1)** 8:1
**discuss (1)** 22:9
**discussed (4)** 28:12, 15,16;101:4
**discussing (3)** 4:21; 22:2;106:24
**discussion (6)** 29:7;

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 123 of 131

DR. KAMIAR ALAEI v.                                                    BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                                   April 9, 2021

42:24;52:1;90:6;
97:11;98:8

**discussions (13)** 6:13;
17:7;63:5,8;64:11,13;
82:1;90:5,16;94:7,8;
100:5,9
**distance (1)** 64:24
**distinction (1)** 17:18
**Division (1)** 49:1
**doctor (1)** 66:13
**document (25)** 11:12;
18:7,20;19:20;22:1;
57:1,2,5;62:20;64:16;
69:2,4,5,21;71:19,23,
25;80:5,7;88:8;91:10;
94:12;99:16;108:12;
111:8
**documentation (1)**
102:19
**documentations (1)**
6:8
**documents (3)** 6:3;
87:24;103:16
**done (5)** 11:11;23:4,
8;24:14;26:6
**down (12)** 11:3;25:4,
5;30:16;31:2;49:7;
56:24;60:5,8;64:20;
68:17,22
**downloading (1)**
48:13
**Dr (135)** 11:11,22;
12:18;15:8,12,13;
16:17;17:3,14;18:9,
13,24;20:19;21:16;
23:18;24:24;25:25;
30:5;31:8;33:20;
34:15,19,23;35:2;
36:21,25;37:13,25;
39:5,19;40:5,7;41:8;
42:10;43:1,23;44:3,5,
9,12,19;46:18;50:1,
16;51:18;52:4,14;
53:12;55:10,14,19,
23;56:3,10;57:22,24;
58:8,16,17,20,21;
60:3;61:15,21,23;
62:1,6;63:6;65:9;
66:6,20,25;67:25;
71:12;72:9,24;75:1,5;
76:8,13,22;77:19;
79:6,9;80:21;82:7;
83:16;84:7;85:10,12;
87:7,14,17,23;88:23;
89:3,11,16,19;90:1,8,
12,13,16,18,23;91:1,
9,23;92:2;94:5,14,18;
95:3,9,14,23;96:2,8;
97:3,6;98:2,6,16;
99:2,3,24;100:6;
104:25;105:4;107:8,
19,22,25;108:14
**drafted (4)** 40:7,9;

99:9,10
**driving (1)** 93:14
**Due (1)** 35:4;47:3;
85:4;87:4
**duly (1)** 4:3
**duration (1)** 89:1
**During (24)** 16:24;
24:18,19;26:7,9;
32:24;33:19;35:18;
38:9;46:18;50:16;
51:11,17;52:15;
58:20;63:2;64:11;
66:6,24;69:12;84:14;
109:5,10;110:16
**duties (3)** 7:6;10:13;
84:23
**dynamic (1)** 32:7

### E

**E-1 (4)** 83:21;85:15;
87:22;89:12
**E-2 (2)** 97:25;98:25
**E-4 (1)** 99:15
**EAP (1)** 22:11
**earlier (1)** 65:21
**early (4)** 14:3,5;
72:11;73:23
**easily (1)** 20:6
**Eastern (7)** 109:14,17,
18,22;110:17,22;
111:1
**edit (1)** 71:21
**editorialize (1)** 47:14
**effect (3)** 8:25;29:14;
52:9
**effective (4)** 8:21;
18:20,24;76:9
**efficient (1)** 54:6
**efforts (3)** 17:3,6;
89:11
**either (3)** 65:3;86:17;
93:15
**elect (3)** 18:23;76:12;
79:6
**electing (1)** 77:3
**election (1)** 76:9
**Elizabeth (4)** 32:13;
33:6;102:14;105:7
**else (12)** 24:3;29:5;
31:19;52:13,17;
61:16;73:24;74:3,7;
75:8;90:22;103:18
**e-mail (112)** 22:14,18;
23:6,7,13,16,20,22;
24:5,8,16,16,24;25:4,
5,6,10,11,12,19;
26:18;29:15,16,19,
20;30:10,11,14,16,17;
31:4,14;32:11;34:9,
13,22;37:25;38:5,23;
39:5,18,19,22,25;
40:8,13,18,22;41:4;

42:3,22;44:2,4,23,25;
45:2,9;48:14;51:23;
53:9;54:24;55:3,6,10,
15;63:16,20,21;64:2,
18;65:3,21,23,25;
66:8,9,21;67:6,7;
68:8;77:15,15;85:15,
18;86:2;87:20,25;
89:12,24;90:3;91:15,
24;92:7,9;94:2,4;
95:9;99:16,16,20;
101:1,10;102:21;
105:23;106:3,22;
108:2;111:9,12,13,
17;112:6
**e-mailed (1)** 68:10
**e-mails (16)** 25:7;
29:24;31:6;34:8;
37:18;62:23;63:16;
65:18;77:11,13;
91:13;92:7;100:21;
108:10,10,12
**employed (6)** 6:18,21,
22;35:21;63:24;77:4
**Employee (26)** 6:24;
7:1;9:15,24;11:14;
13:10;15:16,18;
23:14;24:22;28:4;
35:19;36:3;37:1;43:5,
13,24;50:24;56:16;
57:10;79:20;83:5;
85:5;92:22;109:8;
111:4
**employees (5)** 7:9;
8:19;20:10,14;109:4
**Employees' (2)** 10:16,
17
**employee's (5)** 17:25;
23:12;26:5;35:6;
84:22
**Employer (2)** 7:4;
99:13
**employment (45)**
4:11;6:20;7:4;9:25;
15:7;17:4,14,19,21;
18:24;21:24;28:19;
36:1;42:25;43:4;48:5,
8;55:24;66:4;70:19,
25;77:4,20;78:14;
79:7;80:21;81:23;
82:8;83:17;90:2;
93:21;95:24,24;96:5,
8;97:4,13;98:11;
99:21,24;100:7,15,
15;109:15;110:18
**encouraged (1)** 54:9
**end (8)** 13:21;36:17;
78:13,15,19;79:12;
82:23;111:13
**ended (4)** 55:24;
60:14,15;87:10
**ends (1)** 60:10
**engagement (3)**

35:16,20;36:4
**engaging (1)** 59:11
**enough (3)** 27:8;
105:13;106:15
**ensued (1)** 13:10
**entered (1)** 58:1
**entire (2)** 84:13;
109:15
**entirely (1)** 85:1
**entirety (2)** 35:6;
102:19
**entities (1)** 38:16
**entitled (5)** 95:23;
97:3,6;98:16,20
**environment (2)** 7:25;
59:13
**equitable (1)** 54:5
**Equity (5)** 13:19;
56:16,18;57:8;58:5
**era (1)** 45:24
**ERRATA (1)** 117:1
**essentially (3)** 35:12;
57:7;85:4
**established (1)** 84:20
**et (5)** 6:8;28:18;
37:11;45:24;62:23
**evaluation (3)** 84:25;
85:24;86:7
**evaluations (11)**
82:24;83:5,8,13;
84:6;85:12;86:13,15,
16;89:16,19
**Evangelist (1)** 40:15
**E-V-A-N-G-E-L-I-S-T (1)**
40:16
**even (5)** 67:12;90:8;
105:8;106:20;111:23
**event (2)** 50:6;64:4
**events (3)** 34:20;
50:18;73:3
**eventually (2)** 13:18,
20
**evergreen (5)** 96:3,3;
99:21;100:1,12
**evidence (8)** 72:20,
22;75:25;104:24;
105:2,10,13;107:15
**exact (2)** 83:18,18
**exactly (5)** 8:22;14:1;
51:22;55:22;76:16
**EXAMINATION (1)**
4:5
**examined (1)** 4:3
**exception (1)** 20:25
**excuse (11)** 8:14;
18:5;19:17;25:18;
31:4;53:1;62:18;
63:14;71:22;86:15;
100:18
**exercise (1)** 18:23
**Exhibit (81)** 8:11,25;
9:7;11:1,6;12:1;18:5,
5,8;19:16,17,18;

22:13;23:6;24:10;
25:3;26:17;27:25;
29:23,23;31:5;37:17;
40:11;42:22;44:1,2,
22;47:25;48:24;53:1,
2,3;56:23;62:9,10,19;
63:15;64:17;65:13,
15,17;68:14,15;
69:24;71:18,19;73:9;
74:12,18,22;76:6,6;
77:2,9,10;79:4;80:4;
83:21,21;85:15;
87:22;89:12;91:5,6,
13;92:6;93:25;94:1;
95:2;97:25;98:23;
99:15;100:18,19,20;
103:2;104:4;105:22,
23;108:9;111:9
**exhibits (1)** 6:10
**exist (1)** 24:21
**expectations (1)** 85:3
**experience (5)** 32:3;
43:8;100:3;109:12;
111:5
**explain (18)** 10:10;
23:1;27:12;33:1;
45:19;52:6,20;57:4;
63:8;69:4;81:10;
82:14;83:1;97:10,15,
19;102:8;107:17
**explained (1)** 78:4
**explanation (1)** 100:4
**exposing (1)** 37:8
**express (3)** 51:17,21;
52:4
**expressed (5)** 21:21;
31:19;35:7;36:24;
39:9
**expresses (1)** 30:12
**expressing (2)** 27:7;
33:12
**expressly (1)** 36:8
**extended (1)** 18:15
**extension (2)** 88:10;
98:13
**extent (1)** 27:12

### F

**F-1 (3)** 63:15,15;
64:17
**F-4 (2)** 65:17;66:8
**facilitating (1)** 58:19
**facilities (2)** 20:20,23
**facility (1)** 21:17
**fact (5)** 10:5;37:4;
39:16;52:23,24
**facts (9)** 49:19,22;
50:2,12,17;52:21;
54:20;75:17;89:15
**faculty (7)** 31:23;
46:24,24;85:21;86:7,
9,16

**fair (27)** 13:12;16:21;
32:15;36:6;37:14,25;
40:25;42:24;43:24,
25;52:2,3;54:21;
59:18,25;62:1;64:4,8;
74:25;75:4;77:5;
80:12;82:20;87:9;
89:3;96:24;98:5
**fairly (1)** 41:20
**familiar (7)** 8:9,16;
65:7;90:22;95:25;
100:1,2
**familiarity (1)** 99:23
**FAQ (1)** 71:20
**far (3)** 32:9;93:18;
108:6
**February (29)** 11:7,
11;12:1,2,4;15:9;
23:16;25:9;26:19;
29:25;30:18;31:17;
34:9,13;37:19;40:13;
41:6;44:3;48:1;53:5,
8,9;54:2;56:2,9;
57:22;61:21;69:14;
72:2
**Federation (1)** 10:17
**feedback (5)** 75:14,
15,18,21;76:2
**feel (4)** 83:23;91:20;
106:15;107:16
**feeling (1)** 45:17
**feelings (1)** 91:24
**felt (10)** 13:21;27:9;
29:3;45:19,21,23;
46:6,10;56:18;102:11
**females (5)** 42:7,8;
109:14,18;111:2
**few (1)** 81:15
**file (5)** 39:14;83:6;
84:14;89:21;94:13
**filed (2)** 55:16;108:14
**filing (2)** 55:7,18
**final (2)** 36:15;94:20
**finalize (1)** 82:21
**find (5)** 85:12,20;
89:16,19;104:23
**findings (2)** 75:9;
107:11
**fine (2)** 6:1;27:21
**finish (1)** 4:23
**firing (1)** 28:21
**first (22)** 4:2;6:1;
11:19,24;26:23;
29:24;34:8,12;49:8;
53:6;54:1;56:25;
57:19;58:15,15;
62:18;63:16;68:21,
24;69:1;80:16;101:1
**firsthand (1)** 26:15
**fit (2)** 50:18;69:17
**five (8)** 20:16;65:8;
88:20,20;94:14,21;
95:9;109:2

**focused (3)** 37:18;
58:7;85:2
**followed (1)** 53:13
**following (6)** 57:20;
58:7;61:19;64:22;
102:13,14
**follows (2)** 4:4;112:4
**follow-up (2)** 33:5,23
**foreign (1)** 21:20
**form (5)** 87:24;88:8;
94:4;102:4;111:20
**formal (5)** 41:23;54:8;
62:4;74:19;108:13
**formally (1)** 16:21
**former (4)** 9:12;23:23;
49:4;81:18
**forms (1)** 88:5
**forward (3)** 56:5,12;
107:18
**forwarding (1)** 30:10
**found (2)** 50:14;
110:23
**four (2)** 14:16;80:11
**fourth (1)** 63:21
**frame (1)** 108:20
**framed (1)** 107:13
**frankly (2)** 46:5;47:10
**fraud (1)** 7:24
**frequent (2)** 31:22;
43:20
**frequently (1)** 15:24
**Friday (1)** 26:20
**front (1)** 18:20
**full (2)** 54:21;82:20
**functions (2)** 84:22;
85:3
**funding (1)** 21:23
**further (9)** 21:17;
32:23;33:2;37:9;
54:7;56:19,20;73:21;
78:21
**furtherance (1)** 89:10

**G**

**G-1 (1)** 31:5
**gap (2)** 77:24;78:3
**gathering (1)** 14:15
**general (2)** 63:12;
100:2
**generally (7)** 10:12;
20:13;28:4,12;44:4;
53:11;63:9
**generically (1)** 97:20
**George (1)** 13:7
**GIHHR (24)** 27:5;
28:17;30:13;37:21;
38:1,3,7,12;41:8,13;
42:11,13,19;45:23;
58:18,20;59:12;
63:10,11;66:2;67:17;
69:15;89:8;90:11
**GIHHR's (2)** 26:23;

66:17
**GIHHR-wide (1)**
26:20
**Gina (2)** 40:1;42:4
**given (8)** 21:21;38:7;
43:11;45:23;46:7;
55:2;86:21;100:3
**gives (1)** 48:17
**giving (2)** 67:3,9
**Global (1)** 71:20
**Goal (1)** 82:4
**goes (2)** 85:22;93:8
**Good (3)** 4:7;16:14;
71:7
**goofed (1)** 102:23
**graduate (5)** 28:17;
30:6,7;51:24;52:18
**grant (1)** 66:19
**granted (1)** 43:12
**grants (3)** 44:7,10,14
**great (2)** 68:19;82:19
**Grey (6)** 32:13,18;
33:6,24;102:14;105:7
**grievance (4)** 39:14;
55:12,17,18
**grounds (2)** 12:12,17
**guess (3)** 36:6,7;
69:23
**guesstimate (2)**
108:25;109:1
**guilty (2)** 51:19;52:14
**guys (1)** 62:12

**H**

**Haley (1)** 34:25
**half (1)** 6:5
**Hall (1)** 12:10
**hand (2)** 33:9;49:17
**handle (5)** 7:20;
10:15;38:8;50:23;
108:24
**handled (1)** 91:22
**handling (1)** 41:17
**hands (1)** 33:12
**handwritten (2)** 80:9,
13
**happen (1)** 92:23
**happened (1)** 79:2
**harassment (2)** 8:2;
59:10
**hard (1)** 61:12
**harm (1)** 23:3
**Harvey (36)** 26:18;
28:6;36:19,20;37:19;
42:18;44:3;63:1,17,
19,22,23;64:3,7,12,
19;65:1,18,24;67:3,8,
15,19,24,25;68:8,9;
90:1;7;91:8,14,16;
92:8,10;94:3,5
**Harvey's (1)** 30:14
**Havidan (3)** 15:12;

16:6;22:25
**head (2)** 73:7;102:24
**Health (1)** 71:20
**hear (1)** 110:6
**heard (1)** 30:13
**hearing (1)** 50:7
**heavy (1)** 41:21
**Hedberg (9)** 16:8,9;
91:14;92:8;94:2;95:4,
8;100:4,5
**H-E-D-B-E-R-G (1)**
16:8
**held (13)** 6:25;9:11,
17,24;26:22;27:1;
72:2,11;74:15;79:8;
81:5;102:22;103:11
**help (2)** 10:4;68:21
**helps (1)** 70:17
**hierarchy (1)** 42:20
**high (2)** 45:18,20
**higher (1)** 110:1
**himself (1)** 37:1
**hindsight (1)** 70:1
**hold (3)** 9:20;27:12;
62:12
**home (1)** 20:21
**Honestly (1)** 38:18
**honorarium (1)** 36:11
**hostile (1)** 7:25;59:13
**house (1)** 99:12
**HR (4)** 41:19;66:21;
68:9,10
**HRM-3 (2)** 87:24;88:8
**Human (9)** 9:16;
13:2,13;15:5;51:15;
57:11;58:6;60:2;
71:20;99:10

**I**

**I-3 (2)** 100:20;104:4
**idea (2)** 108:23;
109:24
**identified (35)** 8:11,
11;9:6;11:1,5,25;
18:7;19:20;22:13;
25:8;26:17;34:7;
37:17;47:25;48:24;
49:3;59:4;63:14;
65:6;66:13,15,16;
68:14;71:19;76:5;
79:4;83:11;91:4,12;
95:8;98:23,24;99:15;
100:17;108:8
**identifies (7)** 11:19;
40:22;41:4,5;58:18;
59:18;64:25
**identify (5)** 15:11;
25:3;40:11;42:8;
109:22
**identifying (3)** 37:1;
45:15;58:9
**II (4)** 58:18;62:10,18;

63:3
**III (1)** 59:17
**Immediately (4)** 12:2;
76:17,18,18
**impact (1)** 19:2
**impacts (1)** 110:2
**impermissible (1)**
79:14
**implicitly (1)** 31:11
**implied (2)** 30:22,22
**imply (1)** 39:19
**import (1)** 82:19
**important (1)** 46:8
**impose (2)** 75:5;
105:16
**imposed (1)** 104:16
**impression (5)** 78:17;
91:2;97:5,21;104:7
**impressions (1)** 90:13
**imprisonment (1)**
34:25
**improper (1)** 66:2
**improperly (1)** 67:1
**inadequate (1)** 46:19
**inappropriate (2)**
12:19;21:16
**inappropriately (1)**
23:19
**inclined (1)** 39:1
**include (4)** 7:6,23;
10:16;13:5
**included (3)** 13:6;
35:17;95:2
**includes (1)** 87:22
**including (13)** 23:15;
33:15,17;40:14;53:4;
67:13;72:22;73:5;
74:5;102:13;105:25;
108:11;109:4
**inclusive (1)** 85:1
**incoherent' (1)** 50:10
**indicated (1)** 106:8
**indicates (2)** 30:10;
81:8
**individual (9)** 6:16;
30:25;32:6;49:18;
61:3,8;66:14,14,16
**individuals (16)**
14:16;15:11;33:16;
37:12,20;42:2;60:17,
19;61:4;62:21;64:25;
65:3,5;69:7;105:7,25
**influence (1)** 31:25
**inform (1)** 66:11
**informal (3)** 54:15;
108:14;111:21
**informally (2)** 54:10,
13
**information (14)** 4:17;
14:15;26:5;32:1;
52:21;54:22;62:24;
67:11;72:19,23;74:4;
90:20;92:11,13

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 125 of 131

DR. KAMIAR ALAEI v.                                              BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                             April 9, 2021

**infrequent (1)** 43:20

**initial (3)** 16:19;55:5;
72:4

**Initially (3)** 13:15,16;
54:3

**initials (1)** 72:6

**initiated (1)** 58:3

**initiating (1)** 54:8

**input (4)** 41:15,21;
75:8;99:8

**inquired (1)** 66:21

**inquiries (2)** 27:4;31:6

**inquiring (3)** 28:25;
64:14;68:9

**inquiry (1)** 58:3

**Insert (1)** 58:25

**instance (6)** 22:22;
24:24;36:19;49:8;
69:1;105:5

**instances (1)** 109:6

**instead (2)** 59:15;
86:16

**Institute (1)** 71:20

**institution (1)** 23:5

**institutions (1)** 38:20

**integrity (1)** 80:18

**intended (5)** 21:8;
69:7;70:18;85:1,4

**intending (1)** 102:3

**interacting (1)** 57:25

**interaction (1)** 61:15

**interactions (1)** 72:24

**interest (1)** 33:13

**interested (1)** 36:16

**interfere (1)** 21:6

**interference (1)** 21:11

**Interim (7)** 16:5;38:2;
39:25;40:5;41:17,25;
42:3

**interims (1)** 41:11

**intern (2)** 59:12,18

**internal (2)** 69:21,21

**interns (8)** 59:20;
61:8;65:20;66:18;
67:2,5,17;68:11

**interrogation (17)**
33:19,20;72:9,14;
73:23;74:9;76:19;
77:24;79:13,19;87:7;
101:25;102:20,21;
103:10;104:8,8

**interview (6)** 33:4,5,
23;60:23;61:2;87:17

**interviewed (5)** 32:16;
33:3;52:19;60:17,20

**interviews (5)** 60:8;
62:20;74:8;102:17;
103:24

**into (9)** 29:12;32:23;
33:2;35:14;46:11;
50:18;56:20;58:1;
102:9

**investigate (2)** 62:9,17

**investigation (90)**
11:17,19,20,22,25;
12:6,13,23,25;13:10,
11,12,22,24;14:8,12,
16,18,23;15:4;16:17,
25,25;17:1,2,11;
19:19,24;20:3,23;
21:7,9,10,25;22:10;
26:9;31:25;32:16,24;
38:24;50:1,16;51:14;
52:15;54:16,19,22;
56:5,12,13,14,15,20;
57:12;58:4,6;60:2,13,
14,20,25;61:24;
62:25;63:2;65:25;
66:5,6,24;67:13;
72:15;74:1,16;75:11;
78:16,19;79:12,17,
18;82:21;84:15;
86:25;87:2,10,18;
88:7;102:9,13;
103:19;104:15;
110:13

**investigations (11)**
7:21;19:25;20:5,13;
21:13;22:19;23:13;
31:24;49:22;108:19;
109:3

**investigative (1)** 57:7

**investigators (1)** 13:1

**invitation (1)** 26:19

**invoked (1)** 76:25

**involve (1)** 61:7

**involved (12)** 10:22;
11:21,24;15:7;20:14,
15;21:19;43:21;61:3,
9;85:25;110:14

**involvement (5)** 12:5;
15:15;17:6;43:22;
93:5

**involves (1)** 61:1

**Involving (1)** 20:2,3

**Iran (1)** 34:25

**irrelevant (1)** 67:13

**issuance (1)** 57:18

**issue (15)** 4:19;33:2;
36:13;43:7;55:4;
67:4;68:10;71:10;
74:19;95:22;96:14;
99:24;101:11;102:3;
109:7

**issued (5)** 49:9;56:10;
57:17;74:23;102:21

**issues (10)** 19:15;
20:11;30:15;31:6;
32:6;42:25;43:5;
62:8;63:11,11

**issuing (5)** 101:21;
104:5,24;105:3;106:8

**items (2)** 102:12;
103:22

**IX (15)** 13:4,14,24;
17:2;46:13;48:3;

49:11;50:19;57:15;
60:3,20;62:5;78:19;
87:10;108:15

**IX's (1)** 60:13

**J**

**James (12)** 15:13;
16:3,4;24:2;30:1;
40:13,22;57:22;
61:21;91:8;92:9;94:3

**January (3)** 105:24;
108:17,21

**JCE (2)** 71:22;72:4

**job (8)** 7:6,19;10:12,
13,20;47:10;84:22;
85:1

**Joe (3)** 4:8;68:16;
83:13

**John (1)** 81:17

**joint (3)** 13:12;58:4;
60:1

**Jordan (2)** 40:15;72:6

**Judicial (1)** 49:2

**July (11)** 8:14,14,15,
21;9:9,9;105:24;
106:9;108:2,10;
111:11

**June (7)** 9:25;10:9;
65:19,21,24;66:8,20

**K**

**KA (1)** 25:21

**Kamiar (31)** 4:9;
11:11;12:18;18:13;
19:1;23:7;27:6;58:8;
60:3;65:9;66:1,6,25;
67:25;68:5;69:25;
70:7;71:1,12,15;72:9,
24;78:25;90:8;91:9;
92:12;94:3;98:2;
99:17;107:4,6

**Kamiar's (2)** 92:15,18

**Karl (2)** 25:8;28:9

**keep (2)** 21:8;82:12

**Kevin (4)** 30:5;98:24;
99:2,17

**key (2)** 22:3,18

**kid (1)** 27:19

**kind (1)** 52:15

**knew (3)** 79:5;90:21;
102:6

**knowledge (5)** 4:17;
26:15;51:16;63:10;
90:9

**known (2)** 72:14;
106:12

**Korean (1)** 34:24

**L**

**L-1 (2)** 68:15;69:24

**L-2 (3)** 56:23;62:9,19

**L-3 (2)** 71:18,19

**L-4 (2)** 79:4;80:4

**labor (5)** 7:10;15:17,
17,18;81:22

**lack (5)** 63:10;73:5;
90:11

**language (2)** 98:9,15

**large (1)** 93:4

**last (8)** 6:17;8:5;42:3;
43:15;71:21;79:18;
98:23;111:8

**late (2)** 8:6;48:7

**later (1)** 46:9

**lead (1)** 13:22

**leadership (4)** 18:25;
26:23;27:11;69:15

**leaned (1)** 51:5

**learn (1)** 19:5

**learned (1)** 72:18

**learning (2)** 59:14;
72:13

**least (8)** 8:6;13:20;
32:2;40:6;42:19;
43:8;52:10;98:11

**led (1)** 104:8

**left (7)** 48:5,8,10;
67:23;71:21;81:8,11

**legal (1)** 6:12

**less (2)** 27:19;43:20

**letter (54)** 11:6,9,10,
13,18;12:1,2;15:9;
18:8;11,11,23;20:18,
18,24;24:10;37:6;
53:7,8;54:1,1;56:2,9;
69:6;70:10;73:10,10,
13,16,20,22;74:5,19;
76:7;77:2;87:23;91:6,
17;92:11;95:2,5,7,10,
11;97:21,22,25;98:3,
5,24;99:1;103:3,7,15

**letters (6)** 41:19;53:4,
6,12,17;99:9

**level (4)** 42:21;84:24;
93:1,12

**Lewis (4)** 81:19,20,21,
22

**liability (1)** 37:10

**lies (1)** 36:18

**Liesl (2)** 85:16;89:14

**likelihood (1)** 105:19

**likely (3)** 102:2,6;
106:8

**limited (2)** 7:23;59:20

**line (6)** 25:20;65:19;
82:3,12,23;85:21

**Lisa (1)** 13:6

**lists (1)** 60:18

**little (7)** 49:17;61:12;
68:17;71:5;77:8;
90:9;100:23

**local (1)** 7:11

**locating (1)** 85:9

**long (4)** 6:25;34:15;
48:2;64:24

**longer (2)** 35:8;77:4

**look (12)** 22:14;
25:11;32:23;33:2;
45:23;77:10;80:5;
84:6;100:22;103:15;
105:25;108:9

**looked (1)** 33:1

**looking (6)** 20:24;
29:12;47:4;84:9,12;
91:17

**looks (6)** 29:15;70:10;
81:11,15;85:16;88:9

**looped (1)** 43:19

**lost (2)** 96:19,21

**lot (5)** 38:6;45:21;
74:13;75:10;80:23

**loud (1)** 58:13

**low (1)** 105:20

**lump (1)** 18:17

**lying (1)** 36:20

**M**

**M-4 (1)** 54:24

**maintain (1)** 80:17

**maintained (1)** 26:6

**maintaining (1)** 7:7

**maintenance (1)**
20:11

**majority (1)** 34:5

**makeup (1)** 38:18

**making (5)** 44:12;
54:23;75:9;82:16;
91:20

**males (2)** 110:17,22

**manage (1)** 7:19

**management (10)** 7:9,
10,18;13:13;36:18;
57:11;58:6;60:3;
85:8;109:4

**Managing (1)** 81:8

**mandatory (1)** 8:5

**manner (3)** 51:6,8,11

**many (5)** 19:25;
21:20;60:23;108:23;
109:24

**March (20)** 7:2;9:12,
19;10:7;43:9;44:24;
53:10;54:25;60:10,
12,14;63:18,19,22;
64:2,7,18;77:12,15,18

**marked (19)** 18:4;
29:22;44:22;52:25;
56:22;65:13,15,16;
73:8;77:9,10;80:4;
83:20;85:14;92:6;
93:24;97:25;103:2;
105:22

**markedly (1)** 86:19

**matter (19)** 4:9,18;
22:2;23:23;36:15;

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 126 of 131

DR. KAMIAR ALAEI v.                                              BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                              April 9, 2021

39:12;43:22;45:10,
15;49:3;55:12;56:21;
61:7;66:22;85:4;
102:10;103:14;
106:16;112:7
**matters (15)** 10:15,22;
29:10;36:25;43:24;
46:3,24;50:23;54:6,
10,13;60:22;81:23;
92:20;110:20
**maximum (1)** 18:1
**may (34)** 10:4;21:7,
22,23;22:9;27:19;
31:20;52:2;62:24;
72:11,24,25;73:1,1,
11,24;92:7;94:2,10;
95:3;99:8,17;100:22;
101:10,21;103:4,8,9,
14,19,25;104:23;
105:2;106:7
**maybe (1)** 67:9
**mean (14)** 20:11;
27:3;35:24;38:12;
40:19;41:14;45:17;
58:13;76:14;83:12;
93:8;108:25;110:4,10
**means (5)** 45:11;47:3,
4;88:13;101:15
**meeting (23)** 12:8,11,
13;26:20,22;27:1,12;
28:3,13;31:17;32:7,8;
41:5;69:8,12,14,16;
72:2;80:22;81:5,9;
82:1;87:16
**meetings (6)** 7:11;
16:10;51:3,4;60:9;
66:18
**member (2)** 86:7,8
**Members (2)** 30:13;
46:24
**memo (1)** 74:23
**memorandum (1)**
48:25
**mention (1)** 4:13
**mentioned (6)** 11:18;
14:9;10;33:23;46:14;
103:24
**mentioning (1)** 36:9
**mentions (1)** 103:7
**micromanaged (1)**
93:12
**middle (1)** 8:23
**might (4)** 4:17;39:5,
19;68:20
**mind (3)** 27:18;48:17;
83:23
**minimum (1)** 109:2
**minute (3)** 22:15;
43:15;62:12
**minutes (2)** 27:20;
84:1
**misconduct (5)** 7:22;
33:22;76:1;105:11;

106:4
**misinterpreted (1)**
32:21
**mislead (1)** 69:25
**misleading (3)** 70:8;
71:1,13
**mistake (1)** 53:18
**misunderstood (1)**
32:20
**mitigate (1)** 21:4
**modified (1)** 22:9
**money (1)** 90:21
**month (1)** 6:5
**months (3)** 16:19;
89:2,4
**more (10)** 16:12;
20:17;32:1;37:7;
42:9;46:10;69:20;
85:24;87:2;102:2
**morning (2)** 4:7;79:10
**most (1)** 64:23
**motion (1)** 50:9
**mouse (3)** 22:4;44:5;
80:17
**move (1)** 107:18
**moved (2)** 70:3;110:3
**moving (2)** 56:5,12
**much (2)** 81:2;90:19
**myself (9)** 13:3;15:14;
22:22;33:3,6,15;39:8;
56:19;75:23

## N

**name (4)** 4:7;5:24;
31:20;59:15
**nature (8)** 8:2;33:14;
37:11;46:7,12;59:11,
22;60:24
**necessarily (1)** 69:20
**need (16)** 5:14,16;
24:7;25:21;45:3;
64:21,23,24;66:12,18,
22;83:9,25;85:6,19,
22
**needed (2)** 25:24;
33:8;73:21;102:12
**negative (2)** 19:2;
89:19
**negotiating (1)** 7:11
**New (17)** 4:11,14;
6:23;8:13;9:8;10:17,
19;18:25;41:5,9,13,
24,25;49:1,5;72:13,
18
**next (8)** 27:18;42:21;
64:16;79:10;81:15;
87:3;94:13;101:10
**night (2)** 6:17;73:5
**Nikki (1)** 34:25
**nine (3)** 7:14;89:2,4
**nobody (1)** 61:16
**nobody's (1)** 83:12

**nod (5)** 5:2;101:12,
14,21;104:6
**NOD/interrogation (1)**
80:19
**noise (1)** 5:2
**non-academic (1)**
86:10
**non-disciplinary (2)**
47:2;75:16
**non-Middle (7)**
109:13,17,18,22;
110:17,22;111:1
**non-renew (11)** 17:3,
16,25;76:22;85:24;
93:2;94:18;107:2,6,8,
19
**non-renewal (23)**
19:4;76:14,21;78:1;
80:18;82:13,24;
83:16;89:11;90:23;
91:17;92:1,21;93:13,
15;94:5,9,25;95:14,
22;101:2;111:4,6
**non-renewals (5)**
109:10,13,25;110:5,
12
**non-renewed (4)**
109:19,23;110:18,23
**non-renewing (1)**
17:18
**non-tenure (1)** 86:18
**nor (1)** 75:23
**normally (1)** 93:11
**North (1)** 34:23
**notes (8)** 80:9,13;
81:1,2,3,3,4;82:1
**notice (4)** 85:5;
101:15;104:25;106:8
**notifying (1)** 56:3
**November (1)** 49:2
**number (21)** 20:6,13;
25:20;27:4;31:5;
37:12,20;38:16;
46:14,16;52:18;
58:23;59:9,17;60:8;
65:7,7,8,9;88:9;
105:24
**Numbers (3)** 58:23;
60:18;65:6
**Numeral (2)** 58:18;
59:17
**numerals (7)** 58:9,15;
60:1;62:10,17;63:3,3

## O

**oath (1)** 4:20
**object (1)** 104:12
**objecting (1)** 53:13
**objection (2)** 5:5;
102:4
**objections (1)** 5:8
**obligation (4)** 35:6,9,

10,13
**obviously (1)** 41:18
**occur (1)** 22:21
**occurred (2)** 55:21;
73:4;96:23;103:25;
105:11
**occurrence (1)** 31:22
**occurring (3)** 27:5,6;
90:10
**October (1)** 70:11
**OEC (1)** 75:14
**off (5)** 5:10;28:22,24;
48:12;73:7
**office (50)** 13:4,13,18,
19;43:10;51:15;53:4,
7,8;56:16,18;57:8,9,
10,15;58:5,5;60:2;
62:5;73:10,15,16,25;
74:4,19,23;75:8;79:9;
86:24;89:15;93:2;
94:8;96:2,13;99:10;
100:6;101:7,7,20;
102:8;103:4,15,16;
105:8;107:10,12,17,
25;108:15,19
**Officers (1)** 10:18
**officially (1)** 70:11
**officials (1)** 12:10
**Once (1)** 20:14
**one (53)** 8:13;12:20;
13:1;25:8;29:24;
31:25;35:14;36:21;
37:18;50:14;53:4;
54:23;58:15,23,23;
59:18,20;60:18;
61:23;62:2,8,12;
63:16,18,20;65:6,7,9;
67:14;76:23;78:9,10,
24;81:15,16;88:10;
91:2;92:21;93:9,11;
95:23;96:8;97:3,7,8,
12,16;99:25;101:2,3,
4,7;111:8
**ones (2)** 110:6,16
**ongoing (1)** 109:2
**only (13)** 15:18;
24:21;59:17,19;88:6;
96:8;97:3,12,16;
103:14;106:13;110:6;
112:6
**open (1)** 37:6
**operations (1)** 99:12
**opinion (19)** 18:25;
19:5;25:1;34:14;
46:11;51:17,21;52:4,
22,23;53:21;75:22,
24;77:22;104:9,10,
11,13,19
**opportunity (3)** 6:9;
25:14;48:18
**order (5)** 24:8;48:25;
50:9;64:20;84:25
**others (10)** 14:7;22:3;

23:17;32:8;34:9,13;
40:14;46:10;72:3;
108:11
**otherwise (5)** 5:7,10;
24:5;72:14;74:7
**out (19)** 17:25;24:11;
37:5;38:23;42:23;
43:13;58:13;80:12;
81:16;85:20;107:2,
18,21,25;109:8,9,25;
110:23;111:14
**outcomes (1)** 78:3
**outlines (1)** 84:22
**outranked (1)** 93:22
**outside (6)** 29:16,19;
37:10,10;73:16;81:22
**over (16)** 10:24,24;
12:23,25;13:17;16:7;
20:6,12;22:3;31:7;
40:20;45:22;80:17;
82:19;92:24;93:17
**oversee (1)** 8:4
**overseeing (2)** 14:18;
42:25
**overseen (1)** 14:20
**oversight (1)** 99:4
**overview (1)** 68:23
**own (1)** 46:11

## P

**packet (1)** 40:19
**page (19)** 20:18;22:1;
34:8;12;49:6,16;50:4,
25;54:2;60:6,16;
62:10,18;66:10;
69:23,23,24;88:8;
98:10
**PAGE/LINE (1)** 117:2
**paid (1)** 36:12
**panel (1)** 34:23
**paper (1)** 90:9
**paragraph (6)** 11:19;
25:20;26:24;54:3;
55:1;57:19
**part (23)** 14:22;15:3;
20:23;21:12;29:19;
32:16;35:8,22;38:10;
50:5;51:1;60:20;
64:17;66:10;72:15;
85:18;87:17,25;
89:22;90:23;92:10;
95:22;106:22
**participate (1)** 12:22
**participated (1)** 20:1
**participating (2)**
21:24;36:13
**particular (4)** 22:22;
31:21;35:16;84:24
**particularly (1)** 8:13
**parties (1)** 55:11
**past (4)** 49:21;81:19
**Patricia (1)** 13:7

**pay (2)** 24:22;26:10

**payment (1)** 97:22

**payout (1)** 18:17

**penalty (1)** 106:20

**people (18)** 5:2;14:8;
31:17;33:13;38:16,
19;46:15,17,25;60:9,
23;64:22;65:22;
67:10;73:16;93:9;
99:5;109:21

**perceived (2)** 37:9;
39:10

**perform (2)** 24:8;
35:18;84:24,24

**Performance (16)**
82:24;83:5,6,8,13;
84:6,16,20;85:7,9,23;
86:12,13,15,16;
110:15

**performing (1)** 87:4

**period (2)** 18:2,13

**permanent (2)** 41:25;
88:21

**permissibility (1)** 17:9

**permissible (2)** 83:8,
10

**permission (2)** 30:11;
35:7

**permits (1)** 17:24

**permitted (1)** 29:2

**person (4)** 17:11;
64:23;65:3;75:10

**personal (3)** 52:20;
102:17;106:12

**personally (5)** 19:8;
24:13;40:9;90:24;
108:4

**Personnel (10)** 10:6,
8;26:22;29:10;38:22;
39:4;66:3;84:14;
89:21;99:12

**persons (1)** 23:15

**petitioner (2)** 51:1,5

**petitioner's (1)** 50:9

**PhD (2)** 66:13,15

**photographic (1)**
72:22

**photographs (1)** 74:5

**phrasing (1)** 50:5

**physically (1)** 51:5

**pick (1)** 20:11

**place (4)** 8:18;32:7;
35:14;41:1

**Plaintiff's (10)** 11:1,5;
18:4;19:16;25:3;
34:7;63:14;66:8;
71:18;100:18

**planned (2)** 69:5,9

**play (1)** 43:4

**playbook (1)** 69:21

**played (3)** 13:10;
33:21;46:12

**playing (1)** 43:2

**please (4)** 5:11;31:2;
47:16,18

**plethora (1)** 28:14

**plus (2)** 45:22;81:2

**pm (2)** 77:16;112:8

**point (23)** 19:6;20:7,
16;36:6;53:14,19;
56:5;63:2;64:11;
69:18;78:12;80:21;
82:6;86:24;87:1,6,11;
94:17;98:9;101:16;
102:1;104:5;108:7

**pointer (1)** 80:17

**pointing (3)** 44:5;
49:16;88:9

**Police (2)** 10:18,19

**polices (1)** 86:11

**policies (6)** 51:19;
58:8,11;59:3;75:2;
86:23

**policy (7)** 36:8;52:15;
59:1,6,8,10;110:24

**poor (1)** 46:19

**portion (2)** 16:16;
60:13

**portrays (1)** 50:5

**posed (3)** 5:13,16,22

**position (18)** 6:20,25;
7:18;9:11,12,17,20,
23,24;10:9;42:11;
48:11;78:6;82:6;
86:18,20;87:13;106:5

**positions (1)** 93:21

**positive (1)** 7:7

**possibility (1)** 49:17

**possible (6)** 4:10;
58:7,10,18;66:23;
98:12

**possibly (2)** 32:19;
81:2

**potential (6)** 12:20;
21:4,5;47:7;78:3;
101:23

**potentiality (4)** 21:4;
23:3;33:16,21

**potentially (1)** 37:8

**power (1)** 27:10

**practically (1)** 91:19

**practice (1)** 83:12

**pre-buyout (1)** 78:1

**preceding (1)** 8:17

**precluded (1)** 35:20

**predated (1)** 66:5

**predates (1)** 66:4

**predatory (2)** 27:9;
52:11

**predecessor (1)** 8:17

**preparation (2)** 6:13,
15

**prepared (3)** 70:4;
72:1;102:20

**preparing (1)** 6:4

**preponderance (2)**

75:25;105:10

**presence (1)** 79:7

**present (7)** 16:10;
19:8;34:4;43:9;51:2;
72:3;81:8

**presented (3)** 21:18;
29:3;51:1

**presenting (1)** 36:12

**preserve (1)** 21:9

**preserving (1)** 5:8

**President (41)** 9:16;
10:13;12:8;15:12,15,
21,24;16:2,5,7;19:21;
22:25;23:10;24:10,
15;26:11;39:22;
40:24;41:1,20;42:14;
43:4,12,14;77:21;
78:1;82:9;92:3;94:12,
16;95:13,16,19;
96:12,14,16,24;97:7,
12,15;108:6

**president's (8)** 15:16;
43:10;89:15;97:21;
101:7;107:12,17,24

**pretty (4)** 32:2;41:14;
46:23;108:6

**prevent (1)** 28:23

**previous (2)** 23:4;
47:19

**previously (31)** 8:10;
9:14;10:25;16:6;
18:4;22:12;25:2;
26:16;29:22;34:6;
37:17;40:11;44:21;
47:24;48:24;51:24;
52:25;56:22;63:13;
65:15,16;68:13;76:5;
77:9;79:3;80:3;
98:22;99:14;103:2,
24;105:21

**primarily (3)** 7:22;
10:14,20

**primary (1)** 17:10

**prior (9)** 12:2;23:23;
40:20,21;54:8;74:18;
76:18;82:22;103:25

**priority (6)** 45:10,12,
16,18,20;46:16

**private (1)** 34:16

**probably (7)** 46:10;
47:10;77:23;101:16;
102:1;104:5;109:2

**probe (1)** 4:16

**procedural (1)** 110:15

**procedure (2)** 54:6;
79:11

**procedures (1)** 79:25

**proceed (2)** 19:3,23

**proceeded (1)** 75:16

**process (8)** 41:21;
46:18,25;53:13;
82:22;85:4,25;90:23

**professional (6)** 35:9,

10,12;42:10;86:8,9

**Professions (3)** 8:12;
9:8;39:13

**professor (3)** 61:1;
85:19;93:18

**program (5)** 8:4;
84:16,20;85:23;86:7

**programs (5)** 44:8;
83:6;84:6;85:9;86:13

**prohibited (1)** 36:8

**prohibition (2)** 36:2;
55:6

**projects (1)** 44:14

**prompt (1)** 54:5

**property (1)** 23:15

**proposals (1)** 66:19

**protect (1)** 27:9

**protocol (2)** 24:6;
38:25

**prove (3)** 75:25;
105:10;106:21

**proved (1)** 102:15

**provide (7)** 11:14;
18:16;32:11;35:4;
54:5;83:7;88:17

**provided (8)** 17:8;
54:12;62:7;67:11;
72:20,23;74:4;105:5

**provides (2)** 79:24;
80:1

**providing (1)** 24:15

**proving (1)** 106:17

**provision (1)** 100:11

**Provost (21)** 16:5,11;
26:12;40:23;41:2,4,
12;91:7,8,18,21;92:4,
14,17,21;93:2,14;
94:4,8;99:2,10

**Provost's (1)** 94:24

**Public (5)** 10:17;
34:19;35:20;46:2,4

**purported (2)** 33:10;
58:10

**purpose (3)** 54:4;
106:23;107:1

**purposes (4)** 4:22;
5:8;79:16

**pursue (3)** 54:13,15;
83:16

**push (1)** 93:15

**pushing (2)** 92:1,21

**put (2)** 35:14;56:10

**putting (4)** 8:9;33:11,
12;56:2

**Q**

**qualifications (1)**
42:10

**qualified (1)** 42:9

**quality (3)** 90:2,14;
91:1

**Quite (2)** 46:5;47:9

**quote (1)** 98:10

**R**

**race (1)** 42:5

**racial (1)** 32:7

**raise (2)** 32:8;33:9

**raised (12)** 21:15;
23:17;24:1;31:16;
32:18;38:21;39:3;
44:19;49:21,25;
50:16;51:4

**raises (3)** 31:5,10;
32:6

**raising (5)** 24:3;
44:12;46:15,17;96:3

**Randy (33)** 6:17;9:17;
13:3;14:21;15:5,13;
17:8;18:9;22:23;
28:7;29:8;33:3,6;
36:18;53:15,20;
54:25;56:20;69:13;
73:11;75:24;81:3,14;
92:9;94:10;96:17,24;
97:5,15;100:21;
105:23;110:9;111:10

**Randy's (1)** 87:2

**rank (1)** 108:6

**rather (1)** 46:9

**re (1)** 91:8

**reaching (1)** 42:23

**read (13)** 22:15,17;
25:16;30:19;37:23,
24;45:3;47:19;58:12,
14;100:11;106:2;
111:17

**reading (7)** 71:10;
73:9,20;74:12;95:5,6;
98:2

**real (1)** 85:20

**reality (1)** 93:4

**really (11)** 16:12;
23:14;34:2;46:3;
78:8;80:12;85:2;
90:18,21;106:23,24

**reason (5)** 5:20;18:2;
23:9;117:2

**recall (96)** 8:24;12:12,
17;13:6,24;14:1,11;
16:4,6;19:6,13;23:2;
24:3;25:12,13;26:21;
28:2,5,11,12,15;29:6;
30:9;31:20,21;32:12,
18;34:2,11,18;36:19;
37:3;39:1,2,21;40:6,
18,21;41:3;44:20;
45:2,7,7,17;47:23;
51:22;52:7,8;53:11,
16;55:22;57:18;
60:15;63:5;72:13,18,
19;73:7,9,18,19;
74:15;75:18;76:16;
77:12;81:16;83:14,

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 128 of 131
DR. KAMIAR ALAEI v.                                                    BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                                    April 9, 2021

15,18,18;84:5,9,11,
12;85:9,11,13;87:25;
88:1;89:10,18;94:11;
95:5,6,10;96:2,7;
98:2;99:19,22;
100:10;101:18,20;
102:23;103:3;109:6
**receive (4)** 31:6;75:8,
14;84:25
**received (7)** 31:9;
57:21;60:7;61:20;
69:6;73:1;111:17
**receiving (5)** 27:2,3;
38:6;53:11;73:22
**recess (4)** 27:23;
48:20;62:15;84:3
**recipient (3)** 25:10;
44:24;111:11
**recognize (3)** 11:5;
18:7;80:7
**recollect (1)** 78:24
**recollection (9)** 13:21;
44:17;45:14;61:22;
70:17;76:20;80:22;
100:11;103:10
**recommend (1)** 92:12
**recommendation (3)**
43:13;91:18,21
**recommendations (3)**
15:19;16:1;93:1
**record (8)** 4:20,23;
5:9,9,10,24;39:13;
59:14
**recorded (1)** 33:25
**records (2)** 42:20;
67:9
**Recore (1)** 13:6
**recreate (1)** 82:25
**redefine (1)** 35:12
**refer (37)** 9:5;10:25;
18:3;19:16;22:12;
25:2;26:16;34:6;
37:16;40:10;44:2,21;
47:24;49:6;54:24;
57:6;65:12,14;68:13;
70:10,18;71:18;
74:18;76:5;79:3;
83:20;86:9;91:4,12;
93:24;97:24;98:22;
100:17;103:1;105:21;
108:8;111:8
**reference (2)** 26:23;
70:7
**references (2)** 25:21,
24
**referral (1)** 57:7
**referred (5)** 12:13;
13:20;16:9;50:22;
100:12
**referring (27)** 4:13;
9:6;17:1;25:17,22;
26:18;30:17;34:14,
18;40:12;69:14,16;

70:21;71:4;72:5;82:3,
15,16;83:2;88:23;
101:14;104:3,5;
107:3,4,5;111:9
**refers (3)** 20:19;
22:18;34:22
**reflect (1)** 82:1
**reflected (4)** 18:22;
67:6,7;91:24
**reflection (1)** 108:13
**reflective (5)** 74:19;
77:3;78:12;101:5;
102:2
**reflects (3)** 68:8;94:4,
12
**reflexes (1)** 44:8
**refresh (3)** 61:22;
70:17;103:9
**refugee (1)** 34:24
**regarding (14)** 17:8;
33:8;39:9;49:21;
53:18;63:11;72:24,
25;73:1,3,4;99:20;
101:7;108:14
**registered (1)** 62:4
**reiterate (1)** 55:2
**related (6)** 7:22;
10:15,22;23:24;
44:19;110:20
**Relations (15)** 6:24;
7:1,4;9:15,24;13:11;
15:16,17,17,18,18;
43:14;56:16;57:10;
99:13
**relationship (1)** 7:7
**relevant (2)** 62:25;
67:12
**relieving (1)** 23:7
**remainder (2)** 17:25;
65:8
**remained (1)** 10:6
**remaining (1)** 76:23
**remains (2)** 26:3;
82:19
**remotely (1)** 66:10
**removed (2)** 41:8;
70:12
**removing (6)** 22:18;
23:12;24:5,16,24;
26:5
**rendering (1)** 50:6
**renew (4)** 80:21;83:4;
92:15,18
**renewal (5)** 18:12,13;
88:10;93:14,15
**renewed (1)** 92:13
**repeat (2)** 61:6;71:8
**rephrase (2)** 5:14;
104:20
**replace (1)** 40:5
**replaced (2)** 41:9,10
**report (19)** 12:7;
14:22;15:2,3;52:12;

57:7,8,14,17,19,20,
21,23;58:3;60:7,16;
61:19,20;65:19
**reported (7)** 15:5;
49:19,23;50:2,18;
52:10;57:24
**reporting (1)** 9:15
**reports (1)** 86:17
**represent (1)** 7:10
**representative (4)**
22:11;34:16;35:3;
36:14
**representing (2)**
35:21;36:3
**request (5)** 55:2;64:8;
65:2;67:16;87:24
**requests (1)** 112:4
**require (2)** 17:20;
97:22
**required (3)** 85:6;
86:12;94:22
**requirement (1)** 21:12
**requirements (1)** 86:6
**requires (1)** 54:21
**reread (1)** 47:18
**research (2)** 35:11;
42:14
**reserves (1)** 15:20
**Reski (2)** 40:1;42:4
**R-E-S-K-I (1)** 40:1
**resolution (1)** 54:16
**resolve (1)** 54:10
**resource (2)** 13:13;
58:6
**Resources (7)** 9:16;
13:2;15:6;51:15;
57:11;60:2;99:11
**respect (4)** 7:18;
55:16;59:21;63:9
**respond (5)** 5:1,12,17,
18,21
**respondent (2)** 21:5;
47:7
**responding (1)** 111:12
**responds (1)** 101:2
**response (17)** 5:3;
8:8;38:10;44:18,20;
50:8;57:21;61:10,20;
64:6;69:5;72:1;
77:23;94:15;95:7,10,
11
**responses (4)** 69:9,9,
10,18
**responsibilities (4)**
7:3,6;10:11;84:23
**responsible (2)** 8:3,7
**Restate (2)** 47:16;
56:6
**resulted (1)** 58:4
**retaliated (1)** 21:19
**retaliatory (1)** 21:8
**Rethemeyer (4)** 25:8;
26:2;28:9;81:19

R-E-T-H-E-M-E-Y-E-R (1)
25:9
**retribution (1)** 23:25
**retroactively (1)** 83:7
**return (2)** 77:19;79:9
**reversed (1)** 93:11
**review (14)** 6:3,6,10;
35:15;38:24;47:5;
53:17,25;75:17;
84:13;87:24;88:4;
89:13;94:13
**reviewed (12)** 6:7;
53:20;55:5;62:20,20,
22;74:2,4;89:17,20;
98:12;99:10
**reviewing (5)** 67:4,9;
95:11;99:19;102:18
**right (16)** 17:22;
18:23;20:11;29:17;
45:5;77:7,23;80:11;
82:19;88:18;90:5;
93:8;96:4;98:9;
111:20;112:2
**rights (4)** 39:5;71:20;
80:1;86:19
**Riley (1)** 81:17
**RLS (1)** 81:13
**Rockefeller (1)** 26:3
**Rodriguez (5)** 15:12,
15;22:25;23:1;41:1
**role (13)** 7:3;12:25;
13:11;14:7;16:11;
33:22;43:2,4;46:12;
48:3;63:9;70:12;
71:16
**roles (1)** 41:11
**Roman (9)** 58:9,15,
18;59:17,25;62:9,17;
63:3,3
**Rosenthal (3)** 81:20,
21,22
**ROTONDI (12)** 27:21;
47:11,14;62:11,14;
68:16,19;102:4;
104:12,18;110:8;
112:2
**routine (3)** 15:25;
43:19;84:13
**routinely (1)** 21:3
**running (2)** 22:3;
80:16

## S

**safety (2)** 27:7;29:3
**same (6)** 4:25;23:9;
63:20;65:22;81:25;
111:1
**sanctity (1)** 21:10
**satisfactory (1)** 84:25
**saw (3)** 40:18,19,21
**saying (4)** 12:18;36:2;
75:12;91:16

**School (2)** 30:6,7
**scope (1)** 35:25
**screen (3)** 6:11;8:10;
11:2
**scroll (12)** 11:2;25:4,
5;30:16;31:2;34:10;
53:5;56:24;64:19;
68:21,23;95:4
**scrolling (2)** 49:7;60:5
**second (9)** 20:18;
22:1;48:13;63:18;
66:10,10;69:23;
77:15;97:23
**Section (1)** 54:3
**secured (1)** 96:4
**security (1)** 98:11
**seek (1)** 111:4
**seeking (4)** 29:4;
42:24;50:17;92:13
**seemed (3)** 90:20;
92:5;94:19
**seems (1)** 69:17
**SELCHICK (9)** 4:1,7;
5:25;19:18;48:23;
49:8;69:1;84:5;
117:25
**sending (2)** 39:5;
103:9
**Senior (4)** 10:7;16:11;
40:23;81:18
**sensed (1)** 30:13
**sensitive (1)** 46:3
**sent (9)** 31:7;38:5,23;
39:18,23;40:20;
53:15;85:17;86:1
**sentence (1)** 80:16
**separate (1)** 58:10
**separated (1)** 70:25
**separation (2)** 58:1,22
**September (5)** 9:18,
20;10:10;108:17,21
**series (6)** 53:3;63:16;
77:11;91:13;100:20;
108:10
**seriously (1)** 29:11
**serve (3)** 6:23;106:23,
24
**served (1)** 9:14
**serves (1)** 15:23
**service (4)** 10:15,16;
20:10;35:11
**session (3)** 74:15,20;
79:8
**setting (2)** 61:4,5
**settled (1)** 55:11
**settlement (2)** 55:13,
21
**several (2)** 30:12;
57:23
**sexual (7)** 8:2;50:13;
59:10,11,21,22;106:4
**sexually (1)** 59:13
**shape (1)** 111:20

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 129 of 131

DR. KAMIAR ALAEI v.                                                    BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                                    April 9, 2021

**share (1)** 73:13
**shared (3)** 12:7;57:9;
73:15
**sharing (1)** 44:9
**SHEET (1)** 117:1
**shepherded (1)** 44:16
**short (1)** 77:24
**shortly (2)** 11:2;51:25
**show (8)** 29:22;52:25;
63:13;64:16;77:8;
80:3;92:6;98:24
**showed (1)** 51:23
**showing (12)** 8:10,24;
25:7;29:15,18;48:23;
56:22;65:16;73:8;
85:14;99:14,16
**shown (1)** 19:18
**side (5)** 16:12;28:4;
74:13;99:9,12
**sides (1)** 46:23
**sign (2)** 92:11;94:25
**signed (3)** 18:9;94:4,9
**significant (2)** 46:16,
21
**significantly (1)** 50:6
**similar (2)** 31:16;
65:21
**simply (2)** 4:24;90:18
**single (1)** 61:15
**sit (3)** 34:23;52:6;
72:17
**situation (3)** 61:9;
70:3;91:20
**situations (2)** 22:6;
93:14
**six (4)** 7:14;16:19;
64:25;65:6
**Skype (2)** 66:12,18
**slash (2)** 80:11,12
**slow (1)** 68:17
**slowly (1)** 11:2
**SMLR (1)** 102:18
**SMRR (1)** 57:6
**solely (1)** 78:23
**somebody (4)** 33:12;
48:14;79:23;83:7
**someone (2)** 30:18;
79:15
**sometime (2)** 51:22;
76:17
**somewhat (1)** 102:15
**somewhere (2)** 8:22;
76:19
**soon (1)** 66:23
**sooner (1)** 46:9
**sorry (27)** 6:2;16:13;
22:11;25:18;45:5;
47:16;57:8,10;58:24;
61:6;62:11;68:16;
70:17;71:8;75:11;
78:4;80:25;81:20;
88:2;90:15;96:19;
100:23;103:4;106:25;

107:23;110:10,11
**sort (6)** 10:24;21:7,
23;33:11;90:19;92:23
**sorts (1)** 34:21
**sound (1)** 95:25
**speak (5)** 5:16;6:15;
29:9;33:15;63:1
**speaking (6)** 34:19,
19;35:20;36:4,25;
51:24
**specific (5)** 18:13;
44:14,20;59:6;93:5
**specifically (21)**
25:13;26:14;28:24;
29:2;35:24;38:19;
39:1;40:12;42:6;
48:4;52:8;57:23;
60:15;63:2;65:17;
68:15;70:9;83:11;
84:11;108:1;111:9
**speed (1)** 43:16
**spelling (1)** 6:1
**spoke (4)** 6:16;29:8;
62:23;69:13
**spoken (1)** 47:7
**spokesman (1)** 72:7
**spring (1)** 17:4
**staff (6)** 13:5;15:23;
31:23;43:3;58:20;
86:8
**standard (4)** 11:13;
79:21;106:19;112:5
**Stark (41)** 6:17;9:17;
13:3;14:9,21;15:5,13;
17:8,10;18:9;22:23;
28:7;29:8;33:3,6,24;
36:18;39:8;53:10;
54:25;56:20;73:11;
75:24;85:17;92:9;
96:17,24;97:2,19;
100:21,25;101:2,16;
105:23;106:3,8,12,
22;108:11;111:10,12
**Stark's (3)** 97:5;104:4;
106:5
**start (2)** 19:19;68:24
**started (4)** 10:23;
61:23;62:2;84:9
**starts (1)** 34:8
**State (12)** 4:11,13;
5:24;6:23;8:13;9:8;
10:18,20;22:9;49:1,5;
108:20
**stated (5)** 23:2,9;
34:14;78:23;97:20
**statement (9)** 19:9,13;
43:25;52:13;70:5;
71:1,12;94:14;104:4
**statements (4)** 52:17,
24;103:13;105:5
**states (4)** 50:5,25;
54:4;106:3
**stating (2)** 54:3;59:7

**status (6)** 28:17;38:7;
70:19;86:25;87:23;
89:13
**stay (1)** 21:17
**staying (1)** 101:4
**Stellar (23)** 15:13;
16:3,4;19:21;24:2;
26:12;30:1;32:11;
40:13,22;41:1,5,12;
42:23;57:22;61:21,
23;62:1;91:8;92:4,9;
93:18;94:3
**stenographer (2)** 4:19,
22
**step (1)** 79:18
**steps (1)** 87:3
**still (6)** 8:18;71:15;
76:23;102:9;108:7;
109:8
**story (1)** 36:11
**strike (20)** 15:2;31:12;
32:4;38:22;52:5;
57:13;59:16;60:11;
65:11;73:13,21;
75:11,12;83:14;
87:20;95:7;97:10;
99:23;101:19;109:11
**strong (2)** 77:22;
82:11
**strongly (1)** 90:7
**structure (1)** 93:20
**student (16)** 19:2;
28:18;30:12;31:5,10,
20,21;50:14,23;
59:12,18,19;61:2;
62:5;66:13;72:21
**students (36)** 12:20;
19:10;21:19,20;
23:25;27:4,7,13;
28:10,17,18,22,24;
31:8,23;37:5;38:11;
45:22;46:4,15;51:25;
57:24,25;58:20;66:3,
15;69:19,25;70:8,19,
23;71:2,13;72:3;73:2;
78:24
**student's (6)** 31:13;
59:15;61:14;70:10;
111:15,19
**sub (5)** 22:13;25:3;
54:1;83:21;94:1
**subject (9)** 17:22;
21:5,5;26:19;37:20;
51:14;65:19,22;
117:19
**submit (2)** 94:14;
95:10
**subordinate (1)** 14:24
**subordinates (1)**
41:16
**subsequent (2)** 55:7;
57:11
**subsequently (7)**

10:21;33:5,18;39:8,
12;56:17;102:19
**substance (1)** 90:6
**substantial (8)** 16:10;
20:13;27:2,4;43:2,4;
72:23;86:5
**substantially (2)** 8:7;
110:3
**substantiate (2)**
105:13,17
**succeed (1)** 106:16
**success (2)** 90:11;
105:19
**successful (1)** 85:7
**successor (1)** 9:4
**sufficient (1)** 107:15
**sum (2)** 18:17;90:6
**SUNY (62)** 4:12,13;
7:5;8:19;9:13,21;
14:18;17:3,13;26:5,
22;32:9;35:21;36:4;
38:21;39:3,4;41:7;
44:16,18;48:2,6,9;
49:12;51:12,19;
52:15;53:13,16,18;
54:12,15;55:24;56:4,
11;61:5,8;63:24;
67:23;74:25;75:4;
76:7,11,21,24;77:3,5,
18;78:15;79:5,7;
80:20;82:5,7;83:15;
89:10;93:20;96:7;
98:1;99:5;107:8;
109:12
**SUNY's (1)** 76:8
**supervise (1)** 90:7
**supervised (1)** 42:13
**supervisor (11)** 41:22;
42:19,21;63:24;
67:20,22,25;68:5;
90:8;92:22;111:5
**supervisors (1)** 41:14
**supervisory (1)** 93:1
**support (7)** 31:8,9;
37:13;59:4;82:24;
104:24;105:3
**supporters (1)** 38:1
**supportive (1)** 111:6
**Supreme (2)** 49:1;
50:8
**Sure (30)** 4:15;7:15;
8:22;21:10;22:16;
25:15;27:21;42:17;
45:4,25;48:7;56:8;
61:7;62:13;67:24;
68:2,18;69:17,22;
71:6;81:17;82:4,6,16;
84:2;85:23;96:20;
100:24;102:25;
108:21
**surprised (2)** 75:21;
78:10
**suspended (1)** 24:22

**suspension (1)** 26:10
**swear (1)** 4:19
**swift (1)** 46:5
**sworn (1)** 4:3
**Szelest (8)** 15:13,22,
23;28:8;40:14;42:23,
25;45:15
**S-Z-E-L-E-S-T (1)**
15:22

## T

**talk (5)** 5:18;67:2;
90:1,22;95:16
**talker (1)** 33:11
**talking (2)** 4:25;44:6
**talks (7)** 22:1;23:6;
39:25;60:6;61:18;
66:9;89:6
**tasks (1)** 64:21
**teaching (3)** 35:11;
51:25;52:18
**temp (2)** 88:10,16
**template (1)** 21:1
**temporary (1)** 88:16
**ten (1)** 109:2
**tend (2)** 5:2;43:13
**tenure (1)** 86:17
**term (15)** 18:1,2,18;
76:23;86:20;88:11,
12,17,18,24;89:1,3,
14;95:25;96:3
**terminate (10)** 16:18;
17:14,21;18:19,23;
76:9,13;77:3;79:6,22
**terminated (2)** 87:14;
100:15
**terminating (1)** 17:19
**Termination (1)** 17:20
**terms (14)** 25:24;
38:24;42:10;43:23;
56:4;71:10;73:25;
86:20,24;93:20;
98:16;99:4;100:6;
103:18
**testified (1)** 4:3
**testify (1)** 103:13
**Thanks (1)** 112:2
**thereafter (1)** 13:23
**therefore (2)** 19:3;
39:16
**thereof (2)** 73:6;90:11
**Third (5)** 49:2,9;55:1;
63:20;88:8
**thorough (1)** 54:21;
82:21
**though (3)** 11:12;
41:3;90:8
**thought (3)** 33:7;34:1;
77:16;78:6
**thoughts (1)** 36:16
**threat (1)** 23:15
**three (7)** 58:9,10,12;

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 130 of 131

DR. KAMIAR ALAEI v.                                              BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                              April 9, 2021

59:9,25;80:11;88:19
**timeline (3)** 60:5;
  69:17;102:23
**times (6)** 8:1;22:21;
  46:6;52:23,23;92:25
**title (22)** 10:5;13:4,14,
  24;17:2;40:23;46:13;
  48:3;49:4,11;50:19;
  57:15;60:3,13,20;
  62:5;78:19;87:10,10;
  88:21;89:13;108:15
**titles (4)** 10:5,5;86:10,
  14
**today (7)** 4:9,16,21;
  5:20;6:3;40:20;46:1
**today's (1)** 6:13
**told (2)** 29:1;51:11
**tolerate (1)** 78:25
**took (4)** 13:22;81:3,3,
  4
**tool (1)** 85:8
**top (9)** 45:10,12,15;
  46:13;57:1;68:22;
  73:7;81:8,10
**total (2)** 7:14;109:25
**touch (5)** 64:22,23,24;
  65:2;102:16
**toward (1)** 51:5
**track (2)** 86:18,18
**training (2)** 8:4,5
**transactional (2)** 88:5;
  99:11
**transcribed (1)** 33:24
**transcript (4)** 4:20;
  112:4;117:20,22
**treatment (2)** 46:18,20
**tremendous (1)** 20:5
**trending (2)** 82:10;
  94:19
**Tricia (1)** 13:7
**triggered (2)** 12:5,12
**trouble (1)** 48:13
**true (3)** 45:25;117:20,
  22
**Trustees (2)** 86:11,22
**truthfully (1)** 5:21
**try (3)** 5:14;54:12;
  105:18
**trying (2)** 10:23;84:5
**Tuesday (1)** 64:18
**turned (1)** 16:7
**two (29)** 12:20;13:1;
  27:19;29:8;42:2;
  58:15,23,24;62:8;
  63:20;65:7;84:1;
  86:18;88:19;89:2,4;
  95:24;96:4,9;97:6,13,
  17;98:11,20;99:25;
  100:14;101:3,3,8
**type (4)** 4:25;54:15;
  88:11;93:5
**types (7)** 7:20;22:6,
  19;31:19,24;36:25;

60:22
**typical (11)** 20:24;
  22:19,21;23:12;24:6;
  32:2;41:14;43:8,23;
  92:20;111:4
**typically (11)** 24:7;
  43:7;79:19;83:4,9;
  88:1,4;99:8;108:24;
  110:3,12

**U**

**Ultimately (3)** 14:20;
  35:23;36:18
**Umm-hmm (2)** 82:16;
  107:4
**UN (1)** 34:24
**uncomfortable (1)**
  91:20
**uncommon (1)** 93:6
**uncover (1)** 104:24
**uncovered (1)** 105:3
**under (16)** 4:19;
  11:14;17:20,22;
  24:23;35:5;39:6;
  54:9;79:14;84:20;
  86:10,21;95:24;
  98:17;104:16;105:16
**underlined (2)** 25:18,
  19
**underlying (4)** 33:22;
  50:21;60:1;61:24
**Understood (2)** 5:4;
  19:1
**undertaking (1)** 21:16
**undertook (2)** 44:18;
  53:17
**unfounded (5)** 106:4,
  10;107:12;110:24;
  111:23
**UNH (1)** 12:11
**union (3)** 22:10;
  55:18;110:6
**unionized (1)** 7:8
**unions (1)** 7:14
**United (3)** 8:12;9:7;
  39:13
**units (1)** 109:4
**University (55)** 4:14;
  6:22,23;7:8,10,14,21;
  8:12;9:8;12:10,10;
  17:24;18:16,22;
  20:19,22;27:3;34:17;
  35:3,7;36:14;37:1,7,
  8,13;38:6;39:13,14;
  44:6;45:25;46:1,2,13;
  48:11;49:5;54:9;
  55:3;57:20;58:2,8;
  59:10;61:19;66:5;
  70:1,1,12;71:2,16;
  72:7;76:25;81:25;
  82:20;85:7;110:2;
  111:19

**University-related (3)**
  70:13,20;71:11
**University's (5)** 8:4,5,
  7;46:17;69:5
**unless (7)** 5:7,9;
  23:14;35:6;50:23;
  59:6;110:13
**unreasonable (2)**
  46:6;50:11
**unsure (1)** 34:2
**unwelcome (3)** 59:11;
  72:21;73:4
**unwelcomed (1)**
  59:21
**up (18)** 6:10;8:9;10:1;
  11:2;12:10;18:1;
  34:10;43:15;45:6;
  71:5;88:20;93:8;
  99:25;100:23;102:13,
  14,23;110:3
**uphold (1)** 106:20
**upon (6)** 42:19;43:7;
  60:24;75:17;102:6;
  106:18
**upper (2)** 71:21;80:11
**used (3)** 29:19;75:12;
  92:12
**using (1)** 23:19
**usually (2)** 26:6;93:13
**utilize (1)** 18:16
**utilizing (1)** 23:21
**UUP (14)** 9:5;10:22;
  11:16;24:17,23;39:6;
  54:12;55:8;79:24;
  83:11;88:10;98:17;
  104:16;105:16
**UUP-represented (1)**
  20:14

**V**

**vague (1)** 44:17
**vaguely (1)** 31:11
**Valerie (2)** 100:21;
  111:10
**variety (2)** 7:20;12:9
**various (2)** 38:1,20
**verbally (1)** 5:1
**versus (7)** 96:8,21;
  97:13,16;99:25;
  101:3,8
**Vice (7)** 9:16;10:13;
  12:8;16:11;40:23;
  42:13;99:2
**vice-versa (1)** 93:3
**violate (1)** 39:5
**violated (2)** 39:16;
  75:2
**violating (2)** 51:19;
  52:14
**violation (4)** 57:25;
  58:19,25;59:9
**violations (7)** 50:18;

58:7,10,16;59:1,5;
  110:24
**Virginiaedu (1)** 29:17
**voice (1)** 51:4
**voluntarily (1)** 35:19
**volunteer (1)** 85:18
**Volynsky (2)** 40:1;
  42:4
**V-O-L-Y-N-S-K-Y (1)**
  40:2

**W**

**wait (1)** 6:7
**wants (1)** 35:19
**way (15)** 22:2;23:4;
  31:25;54:23;78:9,10;
  82:10;91:2;92:23;
  93:10,11,15;107:9,
  13;111:20
**website (3)** 25:22,25;
  26:6
**welcome (1)** 72:20
**weren't (1)** 105:9
**whatnot (2)** 5:15;60:9
**what's (18)** 8:10,11;
  9:6;11:5;22:12;
  40:10;43:11;48:23;
  52:25;65:16;73:8;
  77:8,10;80:3;85:14;
  92:6;99:14;105:21
**whenever (1)** 60:25
**whereas (1)** 17:23
**Whereupon (5)** 27:23;
  48:20;62:15;84:3;
  112:7
**whole (2)** 56:25;68:21
**who's (1)** 66:13
**William (6)** 16:8;
  91:14;92:8;94:2;
  95:4;100:4
**Williams (9)** 29:25;
  30:2,5,18;98:24;99:2,
  4,17,20
**withdrawn (1)** 55:12
**without (7)** 24:14,22;
  26:10,10;80:18;
  91:21;111:5
**witness (9)** 4:2,10;
  27:17;47:13,15;
  48:16;83:22;84:1;
  110:10
**witnessed (1)** 51:10
**witnesses (1)** 62:24
**woman (1)** 14:9
**women (2)** 109:21,22
**wording (1)** 50:8,12
**word-of-mouth (1)**
  90:20
**words (9)** 50:8;52:9;
  55:18;57:14;61:11,
  14;79:22;93:13;
  105:12

**work (19)** 7:25;10:24;
  20:21;21:1;35:6,17,
  17;38:8;51:12;66:9;
  79:9;85:5,6;90:2,10,
  13,14,23;91:1
**worked (2)** 13:3;45:22
**workforce (1)** 7:8
**working (7)** 7:7;48:2;
  49:11;59:13;76:24;
  94:22;99:5
**worldwide (1)** 38:17
**written (3)** 32:4;37:5;
  80:13
**wrong (1)** 39:20
**wrote (1)** 70:4

**Y**

**yank (1)** 21:22
**year (16)** 76:23;
  88:19;95:23;96:8;
  97:3,8,13,16,23;
  98:13;99:25;101:3,3,
  4,8;108:24
**years (16)** 29:9;88:19,
  20,20,20;89:2,4;
  95:24;96:4,9;97:6;
  98:11,21;99:25;
  100:14;101:8
**Yep (8)** 10:12;15:12;
  16:9;22:15;30:20;
  37:22;45:7;81:12
**York (9)** 4:11,14;6:23;
  8:13;9:8;10:18,20;
  49:1,5
**Young/Sommer (4)**
  53:4,12;54:2;103:4

**Z**

**Zwicklbauer (2)**
  85:16;86:1

**1**

**1 (10)** 25:20;54:1;
  60:6;62:10;83:21;
  98:10;108:17,17,21,
  21
**1:09 (1)** 112:8
**10 (8)** 17:15;18:9,20,
  24;76:8,10,12;77:2
**11:33 (1)** 101:10
**11th (1)** 8:14
**13 (4)** 60:10;65:21,
  24;66:8
**14 (7)** 29:25;30:18;
  53:5;54:2;65:19;
  66:20;94:2
**16 (3)** 53:8;98:1;99:1
**18 (1)** 9:18
**19 (8)** 9:19;17:20,23;
  39:17;54:3;80:1;

Case 1:21-cv-00377-BKS-TWD    Document 119-1    Filed 04/29/25    Page 131 of 131

DR. KAMIAR ALAEI v.                                              BRIAN SELCHICK
STATE UNIVERSITY OF NEW YORK, et al.                               April 9, 2021

82:17,21
**19.1 (1)** 54:4
**1910C (2)** 11:15;35:5

**2**

**2 (4)** 22:13;54:2;
    57:22;60:16
**2/2/2018 (1)** 60:7
**2/8/118 (1)** 71:22
**2/8/18 (1)** 71:22
**2/9 (2)** 26:20;28:3
**20 (1)** 110:11
**2011 (2)** 8:14;9:9
**2014 (2)** 98:1;99:1
**2016 (3)** 8:15,21;9:9
**2017 (20)** 9:25;10:9;
    63:18,19,22,24;64:2,
    7,18;65:19,21,24;
    66:9,20;67:20;68:1,6;
    70:11;87:22;99:18
**2018 (87)** 9:1,20;
    10:10;11:7,12;12:1;
    14:5;15:9;16:3,22,24;
    17:4,15;18:9,21,24;
    23:16;25:9;26:19;
    29:25;30:8,18;34:9;
    37:19;40:13;41:6;
    44:4,24;48:1,7;51:17;
    52:2;53:5,8,9,10;
    54:2;55:25;56:2,9;
    57:22;60:10,12,14;
    66:6,24;68:3,6;69:14;
    72:11;73:11;74:16;
    76:8,10,12;77:2,12,
    15,18;80:14;85:16;
    89:12,24;90:3;91:7,
    16;92:8;94:2;95:3;
    100:22;101:10,22;
    103:5,9,19;104:23;
    105:2,24;106:7,9;
    108:3,10,17,18,21,21;
    111:11
**2019 (4)** 7:2;9:12;
    10:7;43:9
**2020 (1)** 49:2
**2022 (1)** 8:23
**21 (2)** 73:11;103:5
**22 (4)** 40:13;41:6;
    63:22;64:2
**23 (8)** 60:12,14;
    100:22;101:10,21;
    104:23;105:2;106:7
**25 (1)** 49:2
**26 (3)** 77:12,15,18
**27 (2)** 44:3;91:7
**28 (3)** 53:9;64:18;
    91:15
**28th (2)** 9:25;91:15
**29 (3)** 63:18,19;64:7
**2nd (2)** 61:21;92:7

**3**

**3 (2)** 25:3;80:14
**308 (1)** 108:24
**31 (1)** 99:17
**32 (5)** 17:23;18:16;
    76:25;82:17;107:6

**4**

**4 (6)** 65:15;85:16;
    87:22;89:12,24;90:2
**43 (2)** 60:18,19

**5**

**5 (1)** 60:12
**5,000 (1)** 20:10
**50 (2)** 20:6;45:22

**6**

**6 (7)** 49:6,16;50:4;
    94:1;105:24;106:9;
    108:2

**7**

**7 (4)** 50:4,25;53:10;
    83:3
**7th (1)** 54:25

**8**

**8 (9)** 11:7;12:1;15:9;
    23:16;25:9;26:19;
    56:2,9;95:3
**8:33 (1)** 77:16
**8th (2)** 11:11;12:2

**9**

**9 (15)** 31:17;34:9,13;
    37:19;44:24;69:14;
    74:16;79:8;103:8,9,
    14,19,25;108:10;
    111:11