**EXHIBIT B**

# In The Matter Of:

*DR. KAMIAR ALAEI v.*
*STATE UNIVERSITY OF NEW YORK, et al.*

---

*BRUCE SZELEST*
*April 12, 2021*

---

COVERING ALL UPSTATE NEW YORK



MFReportingNY.com

Office: 518-478-7220          Mail to: 5 Southside Dr., Suite 11
Fax: 518-371-8517                        Clifton Park, NY 12065

*Min-U-Script® with Word Index*

```
 1    STATE OF NEW YORK

 2    COURT OF CLAIMS

 3    -------------------------------------------------:

 4    In the Matter of the Claim by

 5    DR. KAMIAR ALAEI,

 6                              Claimant,

 7

 8    - Against -                          Claim Number:

 9                                          132554

10    STATE UNIVERSITY OF NEW YORK,

11    STATE UNIVERSITY OF NEW YORK AT ALBANY,

12    and THE STATE OF NEW YORK,

13                              Respondents.

14    -------------------------------------------------:

15              DEPOSITION of:  BRUCE SZELEST

16                 (Respondent Agent)

17

18              Monday, April 12, 2021

19              10:03 a.m. - 12:45 p.m.

20

21

22    HELD:  Via Zoom Video Conferencing

23

24    Reported by:  Deborah M. McByrne

25
```

```
 1        APPEARANCES: (All via Zoom)

 2

 3        APPEARING FOR CLAIMANT:

 4            YOUNG/SOMMER LLC

 5                    Five Palisades Drive, Suite 300

 6                    Albany, New York 12205

 7                    (518) 438-9907

 8            BY:   JOSEPH F. CASTIGLIONE, ESQ.

 9                    Jcastiglione@youngsommer.com

10

11

12        APPEARING FOR RESPONDENTS:

13            NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

14                    The Capitol

15                    Albany, New York 12224

16                    (518) 776-2576

17            BY:   ANTHONY ROTONDI, ESQ.

18                    Assistant Attorney General

19                    Anthony.Rotondi@ag.ny.gov

20

21        ALSO PRESENT:

22            Dr. Kamiar Alaei

23

24

25
```

1                    S T I P U L A T I O N S

2

3

              IT IS HEREBY STIPULATED, by and between the
4        attorneys hereto, that:

5

              All rights provided by the C.P.L.R, and
6        Part 221 of the Uniform Rules for the Conduct of
         Depositions, including the right to object to any
7        question, except as to form, or to move to strike
         any testimony at this examination is reserved; and
8        in addition, the failure to object to any question
         or to move to strike any testimony at this
9        examination shall not be a bar or waiver to make
         such motion at, and is reserved to, the trial of
10       this action.

11

              This deposition may be sworn to by the
12       witness being examined before a Notary Public other
         than the Notary Public before whom this examination
13       was begun, but the failure to do so or to return the
         original of this deposition to counsel, shall not be
14       deemed a waiver of the rights provided by Rule 3116
         of the C.P.L.R, and shall be controlled thereby.

15

16            The filing of the original of this
         deposition is waived.

17

18            IT IS FURTHER STIPULATED, that a copy of
         this examination shall be furnished to the attorney
19       for the witness being examined without charge.

20

21

22

23

24

25

BRUCE SZELEST                                          4

```
 1                       BRUCE SZELEST,
 2             was called as a witness, and having been first
 3             duly sworn, was examined and testified as
 4             follows:
 5     EXAMINATION BY
 6     MR. CASTIGLIONE:
 7  Q. Good morning.  My name is Joe Castiglione.  I'm an
 8     attorney in the with the law firm of Young Sommer.
 9     We represents Dr. Kamiar Alaei in a lawsuit
10     concerning the State of New York in the New York
11     State Court of Claims.  You're here as a possible
12     witness concerning Dr. Alaei's claims, concerning
13     his appointment while with SUNY Albany.
14                  And just for reference, if I say SUNY
15     Albany or the University, I'm referring to the State
16     University of New York at Albany; is that clear?
17  A. Umm-hmm, yes.
18  Q. Okay.  I'm going to ask you some questions today to
19     probe your knowledge and find out maybe what
20     information you have and don't have, to see what
21     information you might have of documents that we'll
22     go through.
23                  If you could please answer the
24     questions as presented.  If an objection is made by
25     your counsel, that's for purposes of just preserving
```

```
 1        the record.  You have to answer the question unless

 2        otherwise specifically directed not to answer by

 3        your counsel.

 4                    The stenographer is here to swear you

 5        under oath, to create a transcript of the deposition

 6        today and what we're discussing.  For purposes of

 7        maintaining an accurate record, please let me ask

 8        you the full question first before you answer.  When

 9        I'm done, you can then answer.  She just simply

10        can't type us both talking at the same time.

11                    Everything is on the record unless we

12        otherwise both agree to go off the record.  If I ask

13        you a question, please respond to the best of your

14        ability.  If you don't understand the question as

15        presented, let me know and I'll try to rephrase.  We

16        can take a break if you need to talk to your counsel

17        or bathroom or anything like that, just let us know,

18        that's no problem.  But if a question has been posed

19        to you, you have to first answer the question before

20        we go on break or before you speak with your

21        counsel.

22                    Is there any reason today that you are

23        not able to respond truthfully or accurately to the

24        best of your ability to questions presented?

25    A.    No.
```

```
 1   Q.   Okay.  And I'm sorry, can you state your name again
 2        for the record?
 3   A.   Bruce Szelest.
 4   Q.   And Mr. Szelest, did you review any documents today
 5        in review of your deposition?
 6   A.   I did.
 7   Q.   Can you tell me what you reviewed?
 8   A.   A recommendation from University Counsel John Reilly
 9        to me about these matters from April 10, 2018.
10   Q.   Did you review any other documents?
11   A.   No.
12   Q.   Okay.  Other than your legal counsel, did you have
13        any conversations with anybody in anticipation of
14        today's deposition?
15   A.   No.
16   Q.   Can you explain to me your current -- if you're --
17        strike that.
18                  Are you currently employed?
19   A.   I am.
20   Q.   Explain to me what your current employment position
21        is.
22   A.   I am Chief of Staff to the President at the
23        University at Albany.
24   Q.   And how long have you held that position?
25   A.   For five years, I believe.
```

BRUCE SZELEST                                         7

```
1   Q.   So that would include the years 2017 and 2018?
2   A.   Yes.
3   Q.   Can you explain to me what your job responsibilities
4        are as Chief of Staff to the President of SUNY
5        Albany?
6   A.   I help coordinate with the vice presidents on their
7        priorities that are aligned with the campus'
8        strategic priorities and strategic plan.  And I am
9        the primary liaison between the various vice
10       presidents, as well as tracking major University
11       initiatives and making sure that they are
12       accomplished and pursued.
13  Q.   Okay.
14  A.   I also administer the -- kind of the administrative
15       -- run the administrative functions of the office of
16       the President, which involves supervising staff,
17       managing the budget and such.
18  Q.   Okay.  Were those employment responsibilities
19       essentially the same in 2017 and 2018?
20  A.   Yes, sir.
21  Q.   Have you ever been deposed before?
22  A.   I have not.
23  Q.   I'm going to be showing you what was previously
24       identified as Plaintiff's -- excuse me, Claimant's
25       Exhibit A-1.  If I can share screen here.
```

BRUCE SZELEST                                          8

```
 1                     I'm showing you what's been previously
 2          identified as Claimant's Exhibit A-1.  If you could
 3          just take a look at this letter and I'll just scroll
 4          through it first, its entirety, and then go slowly
 5          through.
 6                     Are you familiar with this document
 7          identified as Claimant's Exhibit A-1, which is a
 8          letter from SUNY Albany dated February 8, 2018, to
 9          Dr. Alaei?
10    A.    I remember seeing this, so I did look at some
11          materials several weeks ago, but I did not look at
12          other materials today in preparation for this.  So I
13          have seen this previously, I believe.
14    Q.    And do you recall a time where SUNY Albany had
15          placed Dr. Kamiar Alaei on alternative assignment?
16    A.    Yes.
17    Q.    When did you first learn of the grounds for SUNY
18          Albany to conduct the disciplinary investigation
19          concerning Dr. Alaei as identified in this
20          February 8, 2018 letter?
21    A.    I would have no idea.  Probably weeks or prior to
22          this memo, I would assume.
23    Q.    Okay.  So sometimes -- sometime before this
24          February 8, 2018 letter?
25    A.    Yes.
```

BRUCE SZELEST                                          9

1   Q.   Do you recall what the grounds were that were raised
2        as the basis for this disciplinary investigation
3        concerning Dr. Alaei?
4   A.   There were allegations of sexual harassment and then
5        in the conduct of that or, coincidently, potential
6        administrative issues that were unearthed or came to
7        light that led to questions about the administration
8        of the institute.  I think those are the two primary
9        things.
10  Q.   Okay.  When you say "allegations of sexual
11       harassment," was it from one individual or more than
12       one individual?
13  A.   I could not say.
14  Q.   This letter, this Claimant's Exhibit A-1, February
15       8, 2018 letter is from the Office of Human Resource
16       Management, specifically Randy Stark.  Was
17       offices -- Was the Office of Human Resources
18       Management or OHRM charged with primary
19       responsibility for conducting the investigation?
20  A.   I do not know the answer to that.  I don't know the
21       answer to that.
22  Q.   Okay.  Do you know if the investigation reflected in
23       this February 8, 2018 letter from SUNY Albany,
24       Claimant's Exhibit A-1, was part of an investigation
25       which may have also included the Title IX office at

BRUCE SZELEST                                    10

```
 1         SUNY Albany?
 2   A.    I would assume so.  I don't think Human Resources
 3         would investigate sexual harassment.  That would be
 4         the Title IX office.
 5   Q.    Okay.  Do you recall if it was, basically, a joint
 6         investigation between Office of Human Resource
 7         Management and Title IX?
 8   A.    I do not.
 9   Q.    Did you participate -- and when I refer to
10         investigation, I'm referring to just the
11         investigations at issue in this letter concerning
12         Dr. Alaei after February 8, 2018.  Did you
13         participate in that investigation?
14   A.    No.
15   Q.    No?  Do you know who participated in that
16         investigation?
17   A.    I think it was led by Chantelle Cleary.  And if
18         there were things on the human resources side, in
19         terms of supervisory responsibility and execution of
20         one's official duties, that would be Randy Stark.
21   Q.    Do you know who was overseeing the investigation by
22         Mr. Stark and Ms. Cleary?
23   A.    No.
24   Q.    Okay.  Was the President's office overseeing the
25         investigation at any time?
```

BRUCE SZELEST                                11

1    A.    What do you mean by "overseeing the investigation"?

2    Q.    So were people from Human Resource Management and/or

3          Title IX reporting to the President's office as time

4          passed about the investigation?

5    A.    No.

6    Q.    No?  Okay.  So the President's office had no

7          involvement with the investigation over time?

8    A.    Correct.

9    Q.    Do you know who was charged with the ultimate

10         decision about whether or not Dr. Alaei had violated

11         any SUNY Albany policies to justify closing

12         discipline pursuant to this February 8, 2018,

13         letter?

14   A.    I would think Randy Stark, because the disciplinary

15         process is brought in by Human Resources --

16   Q.    Okay.

17   A.    -- under University contract, to my knowledge.

18   Q.    Do you know who was involved in making decisions

19         concerning Dr. Alaei's employment after February 8,

20         2018?

21   A.    I believe there were -- ultimately, the President

22         makes that final decision.  And University Counsel

23         made recommendation, or outlined possible paths of

24         action.

25   Q.    Do you recall when the investigation concerning

1        Dr. Alaei concluded?

2   A.   In a general sense.

3   Q.   Is it fair to say in or about August 2018?

4   A.   I don't recall.

5   Q.   You don't recall?  That's fine.

6                Do you recall what the conclusion was

7        as a result of conducting the investigation

8        concerning Dr. Alaei?

9   A.   I -- The result of the investigation?

10  Q.   Yeah.  Well, what the conclusion was.  They

11       conducted an investigation.  What did the people

12       conducting the investigation ultimately conclude

13       regarding the merit of the allegations being

14       investigated?

15  A.   I think there were -- it could not be substantiated

16       that there was sexual harassment, given the folks

17       that were interviewed or available to them.  And I

18       believe there was no financial malfeasance uncovered

19       at that time.

20  Q.   Do you recall if there was any conclusion regarding

21       whether or not to impose discipline concerning

22       Dr. Alaei?

23  A.   I do not.  I think that was -- that's a good

24       question.  I don't recollect.

25  Q.   Are you aware of any efforts or do you recall any

BRUCE SZELEST                                    13

```
 1        efforts to non-renew Dr. Alaei's employment in or
 2        about the spring of 2018?
 3   A.   So that would be after this letter?
 4   Q.   Yes, that would be, let's say, starting in March or
 5        April 2018?
 6   A.   I think the -- a decision was made to non-renew
 7        Dr. Alaei.
 8   Q.   Were you involved in the determination to non-renew
 9        Dr. Alaei?
10   A.   What do you mean by "determination"?
11   Q.   I'll get to that later.  That's fine.
12   A.   I have no determinative authority in the matter.
13   Q.   Okay.  Let me ask you this:  Do you recall there
14        ultimately being a determination to non-renew
15        Dr. Alaei?
16   A.   Yes.
17   Q.   Did you participate in any discussions or provide
18        any input concerning the ultimate determination not
19        to renew Dr. Alaei?
20   A.   Yes.
21   Q.   What extent did you involve -- What extent were you
22        involved in that determination or provide input?
23   A.   There was discussion of whether Dr. Alaei was
24        entitled to two years compensation or one year of
25        compensation.  And my read of his appointment letter
```

BRUCE SZELEST                                    14

```
 1          was that that was at the discretion of the
 2          University, and I had advised to the President that
 3          we should seek to exercise the one-year
 4          compensation.
 5   Q.     Okay.  Do you recall a time when SUNY Albany
 6          ultimately determined to terminate Dr. Alaei's
 7          employment on or about August 10, 2018?
 8   A.     I don't know the date, but at some point, I believe
 9          we did effect paperwork to that effect.
10   Q.     And if I could just refer you to what's been
11          previously identify as Claimant's Exhibit B-8?
12                   It's not opening.
13                   I'm showing you what's been previously
14          identified as Claimant's Exhibit B-8.  Do you recall
15          this document, which is a letter dated August 10,
16          2018, to Dr. Alaei?
17   A.     Yes, I have seen that before.
18   Q.     Okay.  And is this the letter that effected the
19          termination of Dr. Alaei's remaining appointment?
20   A.     I see a date on there, August 9, 2018, so I assume
21          so.
22   Q.     Well, is this the letter, as you recall, that
23          advised Dr. Alaei he was being terminated or his
24          appointment was being terminated effected August 9,
25          2018?
```

```
 1   A.    Yes.
 2   Q.    Were you involved or did you provide any input in
 3         that determined -- strike that.
 4                     Do you know who was involved in making
 5         the determination to terminate Dr. Alaei's
 6         appointment effective August 10, 2018?
 7   A.    I believe the Provost at the time, Randy Stark,
 8         made -- University Counsel, made recommendations to
 9         the President, I would think, or let him know that
10         this was the path that we were going down as an
11         institute.
12   Q.    Do you recall -- or strike that.
13                     Did you have any input regarding that
14         determination?
15   A.    Not -- no.
16   Q.    Okay.  Do you recall why Dr. Alaei's appointment was
17         terminated effective August 10, 2018?
18   A.    I think that the situation, given the sexual
19         harassment allegations and the institute was being
20         run in a -- I would say in a silo way, where they
21         were pretty much off on their own, I think the
22         determination was to close down the institute.  The
23         institute also had an advisory board that, best we
24         could tell, did not have any bylaws or charge to it,
25         so it was kind of not a -- not a streamline
```

BRUCE SZELEST                                      16

```
 1        bureaucratic administrative operation, if you will.
 2   Q.   Do you recall if Dr. Alaei's appointment was for
 3        other work besides being director of GIHHR?  And
 4        just for -- to be clear, when I reference that --
 5        Just to be clear when I say "GIHHR," I'm referring
 6        to the Global Institute on Health and Human
 7        Resources.
 8   A.   Correct, yes.
 9   Q.   Okay.
10   A.   I'm not sure.  I know -- I think he taught a course
11        or two and might have had an affiliated appointment
12        with our School of Public Health.  I say affiliated
13        to mean it's kind of in name only; they don't
14        necessarily provide compensation.  But there is a
15        professional affiliation with the school, given the
16        area of work.
17   Q.   Okay.  If I can refer you back to what had been
18        identified as Claimant's Exhibit A-1.  Do you know
19        who determined to start the disciplinary
20        investigation identified in Claimant's Exhibit A-1?
21   A.   No.
22   Q.   The Claimant's Exhibit A-1 refers to an agreement
23        between the State of New York and United University
24        Professions.  At the time, do you know what -- did
25        you know what that was referring to?
```

```
 1   A.   I just -- from past interactions with Human
 2        Resources, there are certain procedural steps that
 3        the University can or cannot take pursuant to a
 4        collective bargaining agreement with the United
 5        University Professions.  And whatever was done would
 6        have to be in lock step with what was allowable or
 7        not with that contract.
 8   Q.   Okay.  And if can I refer you to what had been
 9        previously identified as Claimant's Exhibit K.  Is
10        this the agreement we were just referring to as --
11        and I know I'm only showing you the cover page, but.
12   A.   Yes.
13   Q.   So if -- When I refer to the UUP agreement, going
14        forward, I'm referring to the agreement between
15        United University Professions and the State of New
16        York that was in place during 2018.
17   A.   Correct.
18   Q.   Okay.  Do you know who was charged with making sure
19        that the disciplinary investigation at issue in
20        Claimant's Exhibit A-1, which I will go back to, was
21        performed in accordance with Dr. Alaei's rights
22        under the UUP agreement?
23   A.   I would assume that would -- or I would expect
24        Randy Stark to discharge those responsibilities.
25   Q.   Okay.  At this time, in February 8, 2018, had you
```

BRUCE SZELEST                                    18

```
 1        been involved in any disciplinary investigations
 2        before this?
 3   A.   No.
 4   Q.   Had you been involved in any Title IX investigations
 5        at this point?
 6   A.   No.
 7   Q.   What about since February 8, 2018?
 8   A.   No.
 9   Q.   And same answer for disciplinary investigations
10        since February 8, 2018?
11   A.   Correct.
12   Q.   In this February 8, 2018 alternate assignment
13        letter, Claimant's Exhibit A-1, it notes, in part,
14        that Dr. Alaei had no obligation, or there was
15        nothing to warrant his presence on University
16        facilities.
17                   Do you know who decided that Dr. Alaei
18        was not to be allowed or have any presence at
19        University facilities?
20   A.   No.
21   Q.   Do you know if that's common in these types of
22        matters?
23   A.   I believe it is.
24   Q.   Okay.  And if I can refer you to what's been
25        previously identified as Claimant's Exhibit A-1?
```

```
 1                    This is an e-mail identified
 2          as -- dated February 8, 2018, concerning KA
 3          alternate assignment letter, it's from
 4          Brian Selchick S-E-L-C-H-I-C-K.
 5                    In this e-mail, Mr. Selchick refers to
 6          Dr. Alaei having his -- being relieved of his card
 7          access and keys.  Do you know why Dr. Alaei had his
 8          card access and keys removed?
 9   A.     No.
10   Q.     Was that a direction from the President's office to
11          Office of Human Resource Management?
12   A.     Not to my knowledge.
13   Q.     This e-mail also refers to Dr. Alaei being relieved
14          of e-mail access.  Do you know made that
15          determination?
16   A.     No.
17   Q.     Was that a directive from the President's office, as
18          far as you're aware, to Office of Human Resource
19          Management?
20   A.     Not to my recollection.
21   Q.     Do you know if that's typical in these types of
22          alternative assignment matters?
23   A.     I would think that it would be.
24   Q.     Are you aware if the President was aware of these
25          issues about Dr. Alaei being prohibited from
```

BRUCE SZELEST                                    20

```
 1          accessing school facilities, Dr. Alaei having his
 2          card and keys removed and Dr. Alaei not being able
 3          to have e-mail access before these actions were
 4          undertaken by University staff?
 5   A.     I would -- if I knew about it, then he would know
 6          about it.
 7   Q.     Okay.  Did you know about it?
 8   A.     I understood what was going to happen, yes.
 9   Q.     But you don't recall who made the decisions to do
10          those actions?
11   A.     Correct.
12   Q.     Do you know if there's any basis in the UUP
13          agreement to remove access keys or e-mail access
14          during alternative assignment?
15   A.     I don't know the answer to that.
16   Q.     If I can refer you to what had been identified as
17          Claimant's Exhibit A-3.  I'm going to scroll down to
18          the e-mail at issue.  Actually, Claimant's Exhibit
19          A-3 is a chain of e-mails.  The first one is dated
20          February 8, 2018, from a Kristin Marshall,
21          M-A-R-S-H-A-L-L.  It appears that you are identified
22          as a recipient.
23                  The second e-mail is from
24          Harvey Charles, dated February 8, 2018, and it also
25          appears that you are a recipient.
```

BRUCE SZELEST                                    21

```
 1              The third e-mail is an e-mail from
 2      Kristin Marshall, dated February 8, 2018, which,
 3      again, you were a recipient.
 4              There is also, then, an e-mail from
 5      Karl Rethemeyer, R-E-T-H-E-M-E-Y-E-R, dated
 6      February 8, 2018, and it appears that you were also
 7      a recipient on that.
 8              In this e-mail from Mr. Rethemeyer, if
 9      you just take a look, he's referring to the GIHHR
10      website and then states:  "We will also need to
11      change all references to KA."
12              Do you know why that was needed to
13      change all the references to Dr. Alaei at this point
14      in time on the GIHHR website?
15   A. I don't, but I assume if this was during his
16      reassignment, then we would not want people to
17      contact him to conduct business of the center or the
18      institute if he was not the director of the
19      institute at the time.
20   Q. Do you know if it's typical to remove an employee's
21      references on a SUNY maintained website during
22      alternative assignment?  And I could re-ask the
23      question there, if you need to.
24   A. Yeah, if you could please.
25   Q. Sure.
```

BRUCE SZELEST                                        22

```
 1                      Do you know if it's typical on
 2         alternative assignment for SUNY to remove references
 3         or to change references to the employee's
 4         information?
 5    A.   I do not.
 6    Q.   Okay.  Do you know if the President was aware of
 7         this decision or proposed course of action before it
 8         was made?
 9    A.   I don't know for certain, but again, if I knew it,
10         then the President probably knew it, even though we
11         were not involved in the -- you know, to make that
12         final determination.
13    Q.   So the President would not have been involved in the
14         final determination about changing references to
15         Dr. Alaei on the GIHHR website?
16    A.   I don't think so.
17    Q.   Okay.  If I can refer you to what had been
18         previously identified as Claimant's Exhibit A-4.
19         Claimant's Exhibit A-4 is an e-mail from
20         Harvey Charles to a number of other individuals,
21         dated February 8, 2018.  The subject is invitation
22         to a GIHHR-wide meeting Friday, 2/9.  If you can
23         take a look at this e-mail.
24                      Do you recall reading this e-mail at
25         the time in February 2018?
```

BRUCE SZELEST                                              23

```
1   A.   No, but I was aware of the meeting that was being

2        proposed.

3   Q.   Okay.  Did the President's office approve holding

4        the meeting before it was held?

5   A.   I don't think we were asked to approve.

6   Q.   Okay.  Do you know why this e-mail -- strike that.

7                   Do you know why this meeting was

8        decided to be held?

9   A.   Depends on -- So can you scroll up to the date up

10       top, please?

11  Q.   Sure.

12  A.   So this is the day after the non-renewal was

13       effected?

14  Q.   This is February 8, 2018.  This was the day the

15       alternative assignment letter was issued.  And it's

16       referring to a meeting on the next day, which would

17       be Friday, 2/9?

18  A.   So I recollect that this was to explain to the staff

19       and students of the GIHHR that Dr. Alaei was on

20       alternative assignment and how they should conduct

21       their business during that time.

22  Q.   Do you -- Sorry, go ahead.

23  A.   No, that is my recollection of the purpose of that

24       e-mail and the -- for the meeting.

25  Q.   Okay.  Do you recall -- or strike that.
```

BRUCE SZELEST                                    24

```
 1                      Did you attend that meeting?
 2  A.   No, I did not.
 3  Q.   Do you know what was generally said at that meeting?
 4  A.   I do not.
 5  Q.   Okay.  Do you know if the President was aware of
 6       what was said or the conduct of the meeting?
 7  A.   Not about the details, no.
 8  Q.   Okay.  If I can show you what had been previously
 9       identified as Claimant's Exhibit G?
10                      Claimant's Exhibit G is two e-mails.
11       It's -- The first is an e-mail from a K. Williams to
12       a James Stellar, dated February 14, 2018.  It
13       states:  "I am forwarding, with permission from the
14       author, this e-mail to you.  This student expresses
15       several concerns that I have also heard and sensed
16       from GIHHR Board Members to Harvey's e-mail.  This
17       student has been around since before GIHHR
18       began - she was involved in the initial
19       grant... that provided higher education
20       opportunities for politically-at-risk students.  She
21       and others are not happy with how this is being
22       handled.  I think you should know of their
23       concerns."
24                      And then refers to a second e-mail
25       from a person who I'll identify as student, dated
```

```
 1              February 14, 2018, to Dr. Williams, and then there
 2              is an e-mail from this student.
 3                        Do you recall ever receiving this
 4              e-mail or being told about this e-mail from
 5              Dr. Williams to James Stellar?
 6    A.   No.
 7    Q.   In this e-mail -- and I'll go through so you can
 8              read, but I'm referring to this second paragraph on
 9              what's identified as page 1 of Claimant's Exhibit G.
10              This paragraph says:  "I'm sending this e-mail as
11              I'm very concerned about another matter and I was
12              wondering if I can share it with you.  On Friday, I
13              attended a meeting organized by the leadership of
14              the University to discuss the leadership of the
15              GIHHR.  I was quite shocked about what I heard at
16              the meeting.  I could not believe my ears and eyes.
17              The dynamic of the session was rather bizarre.  I
18              totally understand that for a high-rank person like
19              Dr. Alaei, issues may emerge that may require
20              further scrutiny on the side of the University and I
21              would certainly appreciate it, but the meeting was
22              organized in a manner that implied the decision had
23              been made through a very short process that, by the
24              way, could not be transparently discussed with other
25              members of this community.  This dynamic did not
```

BRUCE SZELEST                                    26

```
1          seem to be fair to me as a citizen of the
2          University."
3                    In this first paragraph on page two
4          starting with "obviously."  The student then adds,
5          "Obviously, Dr. Alaei was not allowed in the
6          meeting.  He was not able to defend himself
7          vis-à-vis the accusations that were vaguely and
8          implicitly projected here and there."
9                    The student then continues at the end
10         of that paragraph:  "I certainly have not been
11         feeling safe at the University since after the
12         meeting that I attended on Friday."
13                   Generally speaking, were you
14         previously aware of concerns raised by students or
15         issues raised by students regarding the conduct of
16         that meeting on February 9, 2018 by SUNY personnel?
17    A.   No.
18    Q.   This e-mail continues with a final paragraph on the
19         third page, it says:  "I am so sorry for bothering
20         you with this long and rather emotional e-mail, but
21         the Friday meeting was quite similar to the travel
22         banned meeting in the manner it was organized.  One
23         could feel a very strong, yet implicit, cultural and
24         racial dynamic in place.  The current dynamic of the
25         U.S. is strongly to the disadvantage of the minority
```

BRUCE SZELEST                                        27

```
 1        communities, especially those who are citizens of
 2        the so-called profaned countries.  We are hoping
 3        that this prestigious and inclusive institution does
 4        not replicate the political climate.  We certainly
 5        hope."
 6                        Were you aware of concerns or issues
 7        being raised by students or attendees concerning
 8        concerns with cultural and racial dynamics in place
 9        by the people conducting this meeting?
10   A.   No.
11   Q.   Do you know if anyone else communicated these types
12        of concerns to SUNY Albany?
13   A.   Not to my knowledge.
14   Q.   Do you know there were any steps taken by SUNY
15        personnel to address concerns of racism as part of
16        the conduct of the investigation concerning
17        Dr. Alaei?
18                        MR. ROTONDI:  Object to the form of
19            the question.
20   Q.   You can still answer.
21   A.   No.
22   Q.   Do you know if anyone at SUNY Albany talked to
23        anyone conducting the investigation about these
24        concerns about cultural and racial dynamics in
25        dealing with the investigation, itself?
```

1    A.    No.

2    Q.    Are you aware of a person at the time who was

3          interviewed named Elizabeth Grey?

4    A.    Yes.

5    Q.    Are you aware of whether or not Ms. Grey had raised

6          concerns that some of the issues being raised

7          concerning Dr. Alaei that were the basis of the

8          investigation may have been cultural differences?

9    A.    No.

10   Q.    Do you know if anybody took any action to address

11         that issue being raised by Ms. Grey?

12   A.    I do not.

13   Q.    Okay.  So you don't know if anybody spoke to the

14         people conducting the investigation concerning

15         Dr. Alaei as to whether or not they should, you

16         know, take certain steps to address those types of

17         concerns?

18   A.    I do not.

19   Q.    Okay.  If I can refer you to what's been previously

20         identified as Claimant's Exhibit A-6.

21               Claimant's Exhibit A-6 is a series of

22         e-mails, with the first e-mail being dated

23         February 9, 2018, from Brian Selchick to other

24         individuals.  And then there being an e-mail from

25         Harvey Charles, dated February 8, 2018, to a number

BRUCE SZELEST                                          29

1          of individuals; an e-mail from James Dias, dated

2          February 8, 2018, to several individuals; an e-mail

3          between James Dias and Dr. Alaei concerning -- or

4          dated February 8, 2018.  It's regarding sn

5          invitation to speak at Los Alamos National

6          Laboratory in June 2018.

7                     I'll scroll down.  There's additional

8          e-mails from Dr. Alaei and an individual named

9          John Ventura, all dated February 2018.  Apparently,

10         Dr. Alaei was asked to sit on a panel with the North

11         Korean refugee and the U.S. Ambassador to the U.N.,

12         Nikki Haley, to discuss his experience while being

13         in prison in Iran.

14                     I'm going to scroll up now to this

15         e-mail from Mr. Selchick, dated February 9, 2018,

16         the first document in Plaintiff's -- or Claimant's

17         Exhibit A-6.

18                     Mr. Selchick states, basically, that

19         Dr. Alaei can participate in such a panel as a

20         private citizen and not as a representative of the

21         University.  Were you aware of Office of Human

22         Resource Management making the determination that

23         Dr. Alaei could only participate in these types of

24         speaking events as a private citizen and not as a

25         representative of the University?

BRUCE SZELEST                                30

1    A.    I think I was.  Yes, I think I was.

2    Q.    Okay.  Do you know if any concerns were raised about

3          whether Dr. Alaei, if he did participate and

4          identified himself as an employee of SUNY Albany,

5          that there would be some sort of harm to SUNY

6          Albany?

7    A.    I believe at this time Dr. Alaei was either on

8          alternative assignment or the non-renewal had been

9          effected.  And so, therefore, Dr. Alaei would not be

10         representing the University.

11   Q.    If Dr. Alaei was still on alternative assignment at

12         this matter, is there grounds in the UUP, as far as

13         you're aware of the UUP agreement, that a person on

14         alternative assignment cannot identify their

15         affiliation or employment with the University as

16         part of private speaking events?

17   A.    I do not know the answer to that.

18   Q.    Okay.  Do you know if the President directed that

19         Dr. Alaei not be allowed to identify himself as

20         employed or affiliated with SUNY Albany as part of

21         the speaking engagements if he engaged in any of

22         these engagements?

23   A.    Not to my knowledge.

24   Q.    Okay.  I'm going to refer you to what's been

25         previously identified as Claimant's Exhibit A-7.

BRUCE SZELEST                                                     31

1           Claimant's Exhibit A-7, I'm referring to an e-mail

2           from Harvey Charles, dated February 9, 2018, sent at

3           6:59 p.m. to a number of individuals.  The subject

4           is GIHHR.  It looks like you are a recipient on

5           that, Mr. Szelest.  If you could just take a look at

6           this e-mail?

7                      Mr. Szelest, do you have any

8           recollection of this e-mail?

9    A.     Yes.

10   Q.     Did you have any input on the content of this e-mail

11          before it was sent?

12   A.     I don't think so.

13   Q.     Do you know if the President had any input on the

14          content of this e-mail before it was sent?

15   A.     I do not know.

16   Q.     Do you know if there was any -- strike that.

17                      Do you know why this e-mail was

18          drafted and sent to these individuals?

19   A.     What is the date on that?

20   Q.     February 9, 2018.

21   A.     Then that was after alternative assignment or

22          non-renewal?

23   Q.     The alternative assignment was sent by a letter

24          dated February 8, 2018, so the day before?

25   A.     And your question to me is:  Why was this letter

1         sent?

2    Q.   Yes.

3    A.   I believe to establish what the leadership of the

4         institute was during a time when the existing

5         director was placed on alternative assignment.

6    Q.   Do you know if there was any discussion by SUNY

7         personnel before this e-mail was sent out as to

8         whether it may have violated Dr. Alaei's rights

9         under the UUP agreement?

10   A.   I do not know.  I would assume that whatever was

11        done, was done in consultation with Human Resources,

12        who would be, I think, responsible for ensuring that

13        the University stayed in congruence with the UUP

14        contract, at least that would be my expectation.

15   Q.   Do you know if there was any discussion beforehand

16        by SUNY personnel whether this e-mail might wrongly

17        imply that Dr. Alaei had done something wrong?

18   A.   I don't know the answer.  I -- By "SUNY," you mean

19        University at Albany staff?

20   Q.   Yes, I'm sorry, SUNY Albany staff.

21   A.   That's fine.

22                  I don't know the answer to that.

23   Q.   Do you know if the President approved this e-mail

24        before it was sent?

25   A.   I do not, no.

1   Q.   Okay.  Do you know who decided or made the decision,

2        the final decision, to appoint these two individuals

3        as interim co-directors as represented in this

4        e-mail?

5   A.   I -- Final determination likely would have been

6        Provost Stellar, I think.

7   Q.   Do you know if the President had any approval -- or

8        strike that.

9                 Do you know if the President had to

10       approve that before they were formally appointed as

11       interim co-directors?

12  A.   I do not think so.

13  Q.   If I can refer you to what had been identified as

14       Claimant's Exhibit A-11?

15  A.   It might have been Dean Rethemeyer who made the

16       final recommendation.  I'm just a little foggy on

17       whether GIHHR reports to the Rockefeller Dean or to

18       the Provost or to the Vice President for research.

19       Whichever one of those parties that's institute

20       effectively reports to would have been responsible

21       for the final determination on who the interim

22       directors would be, if that helps.

23  Q.   Okay.  If I can refer you to Claimant's Exhibit

24       A-11.  And Claimant's Exhibit A-11, I'm referring to

25       an e-mail from James Stellar to you, Mr. Szelest,

```
 1              dated February 22, 2018, and others.  If you could
 2              take a look at this e-mail.
 3                        Do you recall receiving this e-mail?
 4     A.   Not really, but I see my name on it.
 5     Q.   Okay.  In this e-mail, Mr. Stellar refers to:  "We
 6              may not need to set up a meeting of or with the new
 7              directors."
 8                        What was Mr. Stellar's responsibility
 9              at the time as to GIHHR and Dr. Alaei, if you know?
10     A.   I'm not sure.  As Provost, Dr. Stellar's
11              responsibility encompassed all things academic.
12     Q.   Okay.  Do you know if there was a determination by
13              SUNY Albany at this point that Dr. Alaei had been
14              removed as director of GIHHR?
15     A.   I'm not sure about the question.  Is this during the
16              time that he was on alternative assignment?
17     Q.   Yes, he would still be on alternative assignment at
18              this point.
19     A.   And there were interim directors appointed?
20     Q.   Per to the last e-mail, as far as I can tell.
21     A.   So that's the situation then.
22     Q.   My question is, though:  Do you know if there was a
23              determination by SUNY that Dr. Alaei had been
24              removed as director?  So is that yes?
25     A.   It sounds to me like during the alternative
```

BRUCE SZELEST                                                35

```
 1        assignment, he was effectively removed as director
 2        and new directors were put in place.
 3   Q.   Okay.  Are you familiar with the two individuals
 4        that were appointed as these interim directors or
 5        new directors?
 6   A.   I know of them and their work.  I know them, yes.
 7   Q.   Okay.  Do you know the race of these two women?
 8   A.   Yes.
 9   Q.   What is it?
10   A.   Gina is a white female and Dina is a female -- I
11        think she's international by origin, and I'm not
12        sure if that international origin would classify her
13        as potentially Asian or not or white.
14   Q.   Okay.  And they're both females, obviously, or
15        identify as females?
16   A.   Yes.
17   Q.   Do you know if, at the time, these two individuals
18        had higher quality professional credentials for
19        running GIHHR than Dr. Alaei had, as far as you're
20        aware?
21   A.   I am not equipped to answer that question.
22   Q.   So you don't know?
23   A.   I do not know.
24   Q.   Okay.  Do you know why Mr. Stellar was communicating
25        with you about this issue here as reflected in
```

1           Claimant's Exhibit A-11?

2      A.   Could you scroll down?  Is that the end of the

3           e-mail?

4      Q.   Yes, this is the only e-mail we have for this.

5      A.   I would assume --

6      Q.   He might have been referring to he -- well, part of

7           an earlier e-mail from Jordan Carleo-Evangelist, but

8           my question was:  Do you recall why Mr. Stellar was

9           communicating with you regarding updates on GIHHR as

10          of February 22, 2018?

11     A.   Yeah, this may be in reference -- or due to

12          interactions with the Advisory Board at the time,

13          and so some of those folks are high-powered

14          nationally, internationally-prominent individuals.

15          And so anything that could go back and forth that

16          could potentially injure the reputation of the

17          University or whatnot, I could see Provost Stellar

18          sharing information and chatting about the

19          situation.

20     Q.   Okay.  And had people, as you recall from the

21          Advisory Board, been responding Dr. Charles' prior

22          e-mail advising them about the appointment of

23          interim directors?  And let me just go back to

24          Dr. Charles' e-mail, Exhibit 7.

25                    So referring back to Claimant's

1           Exhibit A, sub 7, the e-mail from Dr. Charles dated
2           February 9, 2018, regarding GIHHR.  "This e-mail
3           announcing that Dana Refki, R-E-F-K-I, and
4           Gina Volynsky, V-O-L-Y-N-S-K-Y, had been appointed
5           as interim co-directors.  This was sent to people,
6           including the GIHHR Advisory Board members?
7     A.    Yes.
8     Q.    Okay.
9     A.    Yes.  So your question to me is -- if you could
10          repeat it, please?
11    Q.    Sure.  You were just discussing that -- you were
12          communicating with Mr. Stellar likely because of
13          concerns being raised by GIHHR Board Members and
14          ensuring to protect the reputation and name of SUNY
15          Albany?
16    A.    Yes.
17    Q.    And so in response to this e-mail from Dr. Charles
18          to these GIHHR individuals, did you receive
19          responses from GIHHR Advisory Board Members
20          concerning this matter?
21    A.    I don't know if I, personally, received them, but I
22          believe either Provost Stellar or other members of
23          the University have.  And there was a lot
24          of -- because of the -- as you read from
25          Dr. Charles' announcement, that little to no

BRUCE SZELEST                                                    38

```
 1            information was provided about Dr. Alaei and,
 2            therefore, folks were asking questions, well, what's
 3            going on and whatnot.  And as a matter of practice,
 4            the University would not comment on the particulars
 5            of the case, to my knowledge, and that left them
 6            with a vacuum of information that they did not like.
 7    Q.      So if I can refer you to Claimant's Exhibit 10 -- or
 8            I'm sorry, Claimant's Exhibit A, sub 10, which
 9            includes an e-mail from a Naz Boniadi, which is
10            B-O-N-I-A-D-I, dated February 15, 2018.  It appears
11            to be responding to an e-mail from Provost Stellar
12            about an update on GIHHR.  It looks like you're a
13            recipient.
14                      This e-mail appears to be supporting
15            somebody else's sentiments.  There then there's an
16            e-mail from a Kaveh, K-A-V-E-H, Khoshnood,
17            K-H-O-S-H-N-O-O-D, advising Provost Stellar he found
18            his explanation unsatisfactory.  So are these the
19            types of e-mails that SUNY Albany was receiving
20            concerning this advisement about two interim
21            directors being appointed?
22    A.      Yes, I believe so.
23    Q.      Were there a lot of e-mails received?  Were there
24            only a couple, as far you're aware?
25    A.      I think a couple to a few.
```

BRUCE SZELEST                                               39

```
1    Q.    In your capacity as Chief of Staff for the
2          President, are you usually involved in Title IX or
3          disciplinary investigations?
4    A.    No.
5    Q.    So your involvement here was based upon, as you
6          said, concerns about maintaining and protecting the
7          University's reputation; is that fair to say?
8    A.    Yes.
9    Q.    If I could show you what's been marked as Claimant's
10         Exhibit A-12.  This is an e-mail from Dr. Alaei to
11         Harvey Charles, dated February 27, 2018.  As part of
12         this Dr. Alaei states:  "Unfortunately, University
13         at Albany has barred me from communicating on any of
14         the grants and programs I've been administering."
15                   Dr. Alaei goes on to identify, you
16         know, some of these programs concerning individuals
17         in Iran as participants and concerns about
18         administering these grants and programs.  Do you
19         know if SUNY Albany undertook any specific action in
20         response to concerns being raised by Dr. Alaei about
21         these grants or programs that he had been working on
22         but now was precluded from working on?
23   A.    I do not know the details of that.
24   Q.    If I can refer you to what had been previously
25         identified as Claimant's Exhibit A-13.  Claimant's
```

```
 1           Exhibit A-13 is an e-mail from Chantelle Cleary to
 2           others dated March 9, 2018.
 3                       If you can take a look at this e-mail.
 4           Let me ask you first:  Who is Chantelle Cleary at
 5           the time?
 6   A.      She is our Title IX officer.
 7   Q.      And is she still the Title IX officer for SUNY
 8           Albany?
 9   A.      She is not.
10   Q.      When did she cease being the Title IX officer for
11           SUNY Albany?
12   A.      When she -- I don't know the exact date.  She left
13           for a job at Cornell University.
14   Q.      Was she asked to leave by SUNY Albany or did she
15           leave of her own decision?
16   A.      Of her own decision, to the best of my knowledge.
17   Q.      Okay.  In this e-mail, in the first sentence, it
18           says:  "I have been asked Bruce to make this matter
19           our top priority."
20                       Do you recall advising Ms. Cleary at
21           around March 2018 that the investigation concerning
22           GIHHR and Dr. Alaei should be her top priority?
23   A.      I don't, but I'm not surprised.
24   Q.      When you say you're not surprised, can you please
25           explain to me why you're not surprised?
```

BRUCE SZELEST                                    41

```
 1   A.   This was an important matter and we've had an

 2        employee under -- depending on the date --

 3        alternative assignment.  You know, it was the

 4        Advisory Board -- some members of the Advisory Board

 5        were writing the University.  So it would be good to

 6        perform the investigation and get this matter behind

 7        us as soon as possible.

 8   Q.   And so part of the concern -- well, strike that.

 9                  So you don't have any specific

10        recollection advising Ms. Cleary that the matter was

11        top priority, but it doesn't surprise you because

12        you felt there was implications concerning the

13        school's reputation and wanting to get this

14        investigation done as soon as possible?

15   A.   I think that's a fair statement.

16   Q.   Okay.  I want to refer you to what's been previously

17        identified as Claimant's Exhibit J.  Claimant's

18        Exhibit J is identified as a memorandum and order by

19        the State of New York Supreme Court, Appellate

20        Division, Third Judicial Department, dated

21        November 25, 2020, identified as being in the matter

22        of Alexander M. v. Chantelle Cleary, as former Title

23        IX Coordinator at the State University of New York.

24                  Are you aware of this memorandum and

25        order concerning Ms. Cleary and her work while at
```

```
 1        SUNY Albany as a Title IX Coordinator?
 2   A.   I think I vaguely recollect this, yes.
 3   Q.   Can you explain to me what your recollection is?
 4   A.   I think this was a -- Alexander M. was a student
 5        involved in a Title IX complaint.  I forget which
 6        side, but I think our University counsel shared it
 7        with me as an informational item and there was -- I
 8        think this person felt that they were somehow
 9        disadvantage by Ms. Cleary during the investigation.
10        I think that's about the gist of what I remember.
11   Q.   Okay.  If I can refer you to page 6 of this
12        memorandum and order, specifically the second
13        paragraph on this page.  The paragraph at issue
14        says, in part:  "As to the possibility of individual
15        bias, Cleary admittedly altered the facts as
16        reported to her."
17             Are you aware of any concerns ever
18        being raised over time about Ms. Cleary altering
19        facts reported to her in her role as Title IX
20        Investigator?
21   A.   No.
22   Q.   If I can scroll down towards the ends of that
23        paragraph, it states, in part:  "Cleary's phrasing
24        portrays a significantly different rendering of the
25        event at the hearing.  When Cleary was asked why she
```

1           changed the wording, her response, in the words of

2           Supreme Court's order denying Petitioner's motion

3           for discovery, 'bordered on the incoherent.'  It is

4           not unreasonable to question whether Cleary changed

5           the wording, and as such, the alleged facts, to

6           correspond with the definition of sexual assault

7           one, as found in the student code."

8                      Are you aware of any concerns ever

9           being raised about Ms. Cleary changing alleged facts

10          or reported facts to her to correspond with the

11          issues she was investigating under Title IX?

12  A.      No.

13  Q.      The second paragraph on page seven, in part, states:

14          "In addition, Petitioner presented an affidavit from

15          his advisor, who was present with him in his

16          meetings with Cleary.  The advisor averred that at

17          said meetings, Cleary raised her voice, physically

18          leaned toward Petitioner and acted in an aggressive

19          manner."

20                      Are you aware of Ms. Cleary ever

21          acting in such a way during her Title IX

22          investigation work?

23  A.      No.

24  Q.      Do you know if Ms. Cleary was ever investigated by

25          SUNY Albany for alleged improper actions in

BRUCE SZELEST                                                    44

1              conducting herself as Title IX Coordinator?
2     A.    Not that I'm aware of.
3     Q.    Are you aware of Ms. Cleary exercising any bias
4              against Dr. Alaei in her investigation in this
5              matter?
6     A.    No, I am not.
7     Q.    Did Ms. Cleary ever -- strike that.
8                       Did Ms. Cleary's office report to the
9              President's office in her role as Title IX
10             Investigator?
11    A.    I don't think so.  At one point, that office did
12             report to us, but I think while she -- I want to say
13             she reports to the Associate Vice President for
14             Enterprise Risk Management.
15    Q.    Do you know if the University ever took any actions
16             to rectify issues raised in this matter of
17             Alexander M. v. Chantelle Cleary matter?
18    A.    That was the affidavit of November 2020?
19    Q.    No, this -- the case explains -- It appears to be in
20             2017, is when this investigation started.  And
21             that's just based on --
22    A.    So this is -- this is that Claimant's affidavit
23             or --
24    Q.    This document?
25    A.    Yes.

BRUCE SZELEST                                        45

1   Q.   This document, Exhibit G, is findings by the Supreme

2        Court Appellate Division Third Department?

3   A.   Yeah.  No, I --

4   Q.   Do you know if -- sorry.

5             Do you know if SUNY ever took any

6        actions in response to matter raised by Alexander M.

7        for what the court found by behavior by Ms. Cleary?

8   A.   Not to my knowledge.

9   Q.   Did Ms. Cleary ever express to you or to the

10       President, as far as you're aware, any opinion that

11       she believed Dr. Alaei had violated any SUNY Albany

12       policy during the investigation?

13  A.   Not to my knowledge.

14  Q.   Did she ever tell you or the President, if you're

15       aware, that she believed Dr. Alaei had done what was

16       being alleged against him for her Title IX

17       investigation?

18  A.   Not to my knowledge.

19  Q.   Okay.  Did anyone ever convey any statements to you

20       or opinions that they believed Dr. Alaei had

21       violated SUNY Albany policies based on the

22       allegations at issue that were being investigated?

23  A.   Not to my knowledge.

24  Q.   Okay.  If I can refer you to what's been previously

25       identified as Plaintiff's -- excuse me, Claimant's

BRUCE SZELEST                                          46

```
 1        Exhibit M.  Claimant's Exhibit M is a series of
 2        letters from Young Sommer, LLC, attorneys for
 3        Dr. Alaei, first dated February 14, 2018, and then
 4        dated February 16, 2018, dated February 18, 2018,
 5        and then an e-mail from Joseph Castiglione to
 6        Randy Stark, dated March 7, 2018.
 7                    Did you ever review letters being sent
 8        on behalf of Dr. Alaei concerning -- or raising
 9        objections to the investigation and various actions
10        by SUNY Albany in February 2018?
11   A.   Could you repeat the question, please?
12   Q.   Sure.
13                    Do you recall counsel for Dr. Alaei
14        sending letters to SUNY Albany objecting to the
15        process being followed by SUNY Albany and actions by
16        SUNY Albany when they were beginning this
17        investigation in February 2018?
18   A.   I don't recollect.
19   Q.   Okay.  Do you know or do you recall, then, if SUNY
20        had ever reconsidered whether the actions it was
21        undertaking at the time in 2018 were wrong?
22   A.   No.
23   Q.   So that -- Just to be clear, you do not recall SUNY
24        Albany ever re-looking at the issues to determine if
25        they had made a mistake?
```

1   A.   The mistake at this time in alternative assignment?

2   Q.   No, I'm sorry.  So my question was:  Did you recall

3        whether SUNY Albany reviewed the investigation or

4        actions taken in February 2018 concerning its

5        investigation and treatment of Dr. Alaei to

6        determine if they had made a mistake and were

7        actually wrong in any of their actions at that

8        point?

9   A.   No.

10  Q.   No, they did not?

11  A.   Correct.  We were at the investigation stage then,

12       correct.

13  Q.   Okay.  Do you know what SUNY Albany personnel did

14       for their investigation, both the disciplinary

15       investigation and Title IX investigation after

16       Dr. Alaei was put on alternative assignment on

17       February 8, 2018?

18  A.   Other than, I believe, they conducted interviews on

19       the Title IX side, might have on the Human Resources

20       side.  And that also involved reviewing financial

21       accounts and transactions, I believe.

22  Q.   If I can refer you to what had been previously

23       identified as Claimant's Exhibit L-2?

24            THE WITNESS:  So after this question,

25        could we take a 30-second break or 45 second?

```
 1                  I just need to talk to my --
 2                      MR. CASTIGLIONE:  No, we can take
 3           a -- you want to take a five-minute break right
 4           now, Anthony?
 5                      MR. ROTONDI:  Two minutes?
 6                      MR. CASTIGLIONE:  Two minutes?  Yeah,
 7              that's fine.
 8                      THE WITNESS:  Is that convenient?
 9                      MR. CASTIGLIONE:  Yeah, it works for
10              me.
11                      THE WITNESS:  Okay.  I just to have
12              tell somebody something.
13                      MR. CASTIGLIONE:  Sure, no problem.
14                      MR. ROTONDI:  That's fine.
15                  (Whereupon a recess is taken.)
16      BY MR. CASTIGLIONE:
17  Q.  I'm showing you what's been previously identified as
18      Claimant's Exhibit L-2.  If you could take a look at
19      this, sir.  It's identified as Sexual Misconduct
20      Response Report Number 18-013.  And I'll scroll
21      through it quickly and then go slowly back up to the
22      top.
23                  Mr. Szelest, are you familiar with
24      what this document is?
25  A.  I believe so.
```

BRUCE SZELEST                                          49

1   Q.   Can you just explain to me what your understanding
2        is?
3   A.   Is this -- I believe this is Ms. Cleary's report,
4        her investigation into sexual harassment
5        allegations, based on what you showed me as you were
6        scrolling.
7   Q.   Okay.  In this report, if you read the first
8        paragraph, it states:  "Overview of report.  The
9        following report details the University at Albany's
10       coordinated response to a report received on
11       February 2, 2018 from Dr. James Stellar.
12       Specifically, the report alleges that several
13       students reported to him that Dr. Arash Alaei had
14       been interacting with students in violation of a
15       separation agreement entered into with the
16       University on blank date.  This report initiated an
17       inquiry which resulted in a joint investigation by
18       the Office of Equity and Compliance and the Office
19       of Human Resource Management.  The investigation
20       focused on the following possible violations of the
21       University at Albany policies by Dr. Kamiar Alaei."
22                   There's Roman Numeral Number I, it
23       says:  "Insert policy violations for permitting
24       Dr. Arash Alaei to conduct business on behalf of the
25       GIHHR after his separation from the University at

```
 1        Albany."
 2                        Roman Numeral Numeral Number II:
 3        "Insert policy violations for facilitating contact
 4        between Dr. Arash Alaei and GIHHR staff and students
 5        during Arash Alaei's alternative assignment and
 6        after his separation from the University at Albany."
 7                        And then Roman Numeral III says:  "A
 8        violation of the University at Albany sexual
 9        harassment policy for engaging in unwelcome conduct
10        of a sexual nature directed at GIHHR student intern
11        blank and that was created -- that created a
12        sexually-hostile environment for working and
13        learning."
14                        And for the record, I said "blank"
15        instead of the student's name.
16                        Does this refresh your recollection
17        about the basis for the investigation concerning
18        Dr. Kamiar Alaei?
19   A.   Yes.
20   Q.   Okay.  And is it fair to say that these three Roman
21        Numerals on page 1 of this Claimant's Exhibit L,
22        this Sexual Misconduct Response Report, that those
23        were the three issues that were raised that were
24        being investigated by SUNY Albany concerning
25        Dr. Kamiar Alaei?
```

```
 1   A.   Yes.
 2   Q.   Did you discuss investigation efforts and findings
 3        with Human Resources and Title IX over time
 4        regarding these three issues?
 5   A.   I don't think so.
 6   Q.   I'm sorry, you said you don't think so?
 7   A.   I don't think so, until the final report.
 8   Q.   Okay.  Do you know who Harvey Charles was at the
 9        time of this investigation in February to
10        August 2018?
11   A.   Yes.
12   Q.   Who was Harvey Charles?
13   A.   He was the Vice Provost and Dean of the Center for
14        International Education and Global Studies.
15   Q.   Was Harvey Charles the supervisor for GIHHR and
16        Kamiar Alaei at the time in 2018?
17   A.   Yes, I believe so.
18   Q.   Do you know if Harvey Charles was the supervisor of
19        Arash Alaei in 2017?
20   A.   I don't know the answer to that.
21   Q.   Do you know if Dr. Kamiar Alaei was ever in a
22        position of authority over Arash Alaei --
23   A.   I believe --
24   Q.   -- as part of their job work?
25   A.   I believe he was.
```

```
 1   Q.   Okay.  Do you recall what that position of authority
 2        would be?
 3   A.   I think Kamiar was the director of the institute.
 4   Q.   Okay.  Are you aware of any agreement between
 5        James Stellar and Harvey Charles regarding
 6        Arash Alaei's involvement with GIHHR and contact
 7        with staff and students when Arash Alaei went on
 8        alternative assignment?
 9   A.   No.
10   Q.   So Mr. Stellar never advised you of any such alleged
11        agreement?
12   A.   Correct.
13   Q.   As to Arash Alaei having contact or conducting
14        business with GIHHR and GIHHR staff and students,
15        are you aware of whether or not, while he was on
16        alternative assignment, Arash Alaei was having
17        conversations or, I'll say, discussions
18        communications with Harvey Charles about whether or
19        not Arash Alaei could actually communicate with
20        interns and GIHHR staff?
21   A.   No.
22   Q.   If I can refer you to what has been previously
23        identified as Claimant's Exhibit F?  And were
24        Arash Alaei and Kamiar Alaei co-directors of GIHHR
25        or was Kamiar a director and Arash was a
```

BRUCE SZELEST                                        53

```
 1         subordinate?
 2    A.   I think Kamiar was director and Arash a subordinate,
 3         but I'm not 100 percent certain.  Something makes me
 4         think they might have been co-directors, but I'm not
 5         positive.
 6    Q.   I want to refer you to what had been previously
 7         identify as Claimant's Exhibit F-1, specifically an
 8         e-mail from Arash Alaei to Harvey Charles, dated
 9         March 28, 2017.  The first paragraph discussed:
10         "Based upon requirements, I've listed my primary
11         activities from February to the end of March and
12         planned activities for April to May."
13                    If you scroll down, Arash Alaei
14         states, in part:  "In order to complete the
15         above-mentioned tasks, I need to be in touch with
16         the following people.  For some, I will need to be
17         in touch in person, and for most, I will just need
18         to be in touch long distance."  Then Arash Alaei
19         identifies six people.
20                    Were you aware of this communication
21         from March 28, 2017, during the investigation of
22         Kamiar Alaei and whether Kamiar Alaei had acted
23         improperly as to Arash Alaei having communications
24         with GIHHR people or conducting business for GIHHR?
25    A.   So this memo or e-mail is from 2017, which predates
```

BRUCE SZELEST                                              54

```
 1            the investigation, correct?
 2   Q.   Correct.  But if I can -- if I can refer -- that's
 3        correct.  If I can refer you back to L-2, one of
 4        the -- one of the alleged bases for investigating
 5        Dr. Kamiar Alaei for possible violations of
 6        University policies was Roman Numeral II,
 7        facilitating contact between Dr. Arash Alaei and
 8        GIHHR staff and students while Arash Alaei was on
 9        alternative assignment.
10                   So my question --
11   A.   And that also says:  "After his separation from the
12        University."
13   Q.   Correct.
14   A.   Okay.
15   Q.   And so my question to you is:  During the
16        investigation, were you aware of communications --
17        strike that.
18                   During the investigation of
19        Kamiar Alaei in 2018 about whether or not he had
20        facilitated Arash Alaei communicating during
21        Arash Alaei's alternative assignment in 2017, and
22        then after he left, whether Kamiar Alaei facilitated
23        contact between Arash and interns, were you aware of
24        or was it ever brought to your attention e-mails
25        between Harvey Charles and Arash from 2017 seeking
```

BRUCE SZELEST                                              55

```
 1          to have communications with various individuals, as
 2          reflected in this e-mail?
 3    A.    No.
 4    Q.    Do you know if Arash was given approval to have
 5          communications, as reflected in this e-mail,
 6          Claimant's Exhibit F-2?
 7    A.    I do not.
 8    Q.    Okay.  If I can refer you to Claimant's Exhibit N?
 9                    Claimant's Exhibit N is -- and
10          specifically, I'm referring to e-mails between
11          Harvey Charles and Arash Alaei dated June 14, 2017,
12          with the subject line:  "My Report and Communication
13          with Interns and an e-mail from Arash to
14          Harvey Charles, dated June 13, 2017, with a subject
15          My Report and Communication with Interns."
16                    As part of this e-mail, this one from
17          Arash Alaei dated June 13, 2017, Arash Alaei states:
18          "In addition, I just want to inform you that I need
19          to have Skype communications with" -- and he
20          identifies several people that he states are GIHHR's
21          interns.
22                    In response, Harvey Charles, on
23          June 4, 2017, responds that:  "I've inquired of HR
24          and am awaiting advice on this matter."
25                    Were you aware that as of June 2017,
```

BRUCE SZELEST                                              56

1            Arash and Harvey Charles were having conversations
2            about allowing Arash to have discussions with GIHHR
3            interns?
4     A.     No.
5     Q.     Do you know if SUNY Albany ever approved allowing
6            Arash to have communications with interns while he
7            was on alternative assignment, consistent with
8            what's being asked in this e-mail?
9     A.     Not to my knowledge.
10    Q.     In 2017, while Arash was on alternative assignment,
11           who, at SUNY Albany, would be responsible for
12           overseeing if Arash was complying with the terms of
13           his alternative assignment?
14    A.     I would think it would either be Harvey Charles
15           and/or Human Resources.
16    Q.     Did there come a time, as far as you recall, when
17           Office of Human Resource Management conducted an
18           interrogation of Dr. Kamiar Alaei?
19    A.     I assume they did because that prior report you
20           showed me was a joint investigation, wasn't it,
21           between Human Resources and Title IX?
22    Q.     Actually, do you know if Title IX and
23           Chantelle Cleary's office ever interviewed
24           Dr. Kamiar Alaei about the allegations against him?
25    A.     I'd have to go back to that.  I do not know offhand.

BRUCE SZELEST                                    57

```
 1  Q.   Okay.  Would that be standard protocol to actually
 2       investigate the person subject to allegations in a
 3       Title IX matter?
 4  A.   I am -- do not have the knowledge to answer that
 5       question.
 6  Q.   Okay.  If I can refer you to what's been previously
 7       marked as Claimant's Exhibit C-3?
 8                    Claimant's Exhibit C-3 is a letter
 9       from Young Sommer, LLC on behalf of Dr. Alaei,
10       Kamiar Alaei, to Randy Stark.  It's dated May 21,
11       2018.  Do you recall ever seeing or reading this
12       letter?
13  A.   No.
14  Q.   This letter reflects that there was an interrogation
15       with Human Resources and Dr. Alaei at Human
16       Resources office on May 9, 2018.  Does that refresh
17       your recollection about when interrogation of
18       Dr. Alaei may have been held in this investigation
19       concerning Dr. Kamiar Alaei?
20  A.   Yes, it does.
21  Q.   Okay.  Do you recall being advised of the
22       discussions that occurred during that interrogation
23       on May 9, 2018?
24  A.   Not really, no.
25  Q.   Do you know if the President was advised of the
```

BRUCE SZELEST                                    58

```
 1          discussions at the interrogation on May 9, 2018?
 2    A.    Nope.
 3    Q.    This letter that I'm identifying for you here,
 4          Claimant's Exhibit C-3 and the issues raised in this
 5          letter, do you know if these were ever reviewed by
 6          the President?
 7    A.    I do not know.
 8    Q.    Okay.  But you did not read this letter; is that
 9          correct?
10    A.    I don't recollect it and it's -- I do not recollect
11          reading it.
12    Q.    Okay.  Do you know if this letter, Plaintiff's
13          Exhibit C-3, caused SUNY Albany personnel to take
14          any different course of action after receiving the
15          letter and conducting the interrogation concerning
16          the investigation regarding Dr. Alaei?
17    A.    I do not know.
18    Q.    If I can refer you to what's been previously marked
19          as Claimant's Exhibit H.
20                    Claimant's Exhibit H is a letter
21          identified as Counseling Memorandum to
22          Dr. Kamiar Alaei, dated August 9, 2018, from
23          Randy Stark, Office of Human Resources.
24                    Do you recall a time when SUNY Albany
25          ultimately determined to do a counseling session
```

```
 1        with Dr. Kamiar Alaei regarding the investigations
 2        at issue?
 3   A.   Yes.
 4   Q.   Do you have any understanding if Office of Human
 5        Resource Management made any finding -- or excuse
 6        me -- any determination about Dr. Alaei violating
 7        any SUNY Albany policies?
 8   A.   No.
 9   Q.   You don't recall?
10   A.   I don't think they did find that he violated
11        policies.
12   Q.   Okay.  Do you have any understanding of whether
13        Human Resources made any determination about there
14        being just cause under the UUP disciplinary
15        provisions to discipline Dr. Alaei?
16   A.   No.
17   Q.   If I can refer you to Claimant's Exhibit B-8?
18        Claimant's Exhibit B-8 is a letter from SUNY Albany
19        dated August 10, 2018, to Dr. Alaei.  This letter
20        states, in part:  In accordance with the Article
21        32.3 of the UUP agreement, the University is
22        exercising its right and has elected to terminate
23        your appointment effective August 10, 2018."
24                  Do you recall why, after Human
25        Resources, the day before, conveyed its findings
```

BRUCE SZELEST                                          60

```
 1            that there was no just cause to discipline Dr. Alaei
 2            and there had been no violation of any SUNY
 3            policies, why SUNY Albany elected to terminate
 4            Dr. Alaei's appointment effective August 10, 2018?
 5     A.     I think it was -- The University, per the contract,
 6            has the ability to non-renew somebody, period, when
 7            the time comes up.  And the University chose to
 8            execute that action.
 9     Q.     Well, first, is there a distinction or difference
10            between non-renewing an employee and electing to
11            terminate their employment as an effective date?
12     A.     I think there is a distinction.  I'd have to refer
13            to my colleagues at Human Resources for the finer
14            definition.
15     Q.     Okay.  So here, I'm focusing on there's an election
16            to terminate the appointment effective August 10,
17            2018.  And my question is:  Why did SUNY Albany make
18            that determination to elect to terminate Dr. Alaei's
19            appointment when the day before, they advised
20            Dr. Alaei there had been no violation of SUNY policy
21            and there was no just cause to impose discipline?
22     A.     I can't answer that.  You would have to ask Human
23            Resources.
24     Q.     So Human Resources would be the ones who made the
25            decision and would have the grounds to terminate
```

BRUCE SZELEST                                            61

```
 1        Dr. Alaei's appointment as of August 10, 2018?
 2   A.   No, I meant Human Resources could provide you the
 3        rationale why the day before they issued whatever it
 4        was they issued.
 5   Q.   Okay.  Well, let me -- Do you know why SUNY Albany
 6        elected to terminate Dr. Alaei's appointment as of
 7        August 10, 2018?
 8   A.   I think, in a nutshell, there was much unrest and
 9        unease amongst the students and student interns in
10        the center, as well as the administrative financial
11        management of the center was not run as shipshape as
12        one would want it.  The Advisory Board thought they
13        ran the center, and so the University decided that
14        we would -- or the institute -- the University
15        decided to -- let's close out the institute.
16   Q.   That's for closing out the institute, but why
17        terminating Dr. Alaei's appointment?
18   A.   He was the Director of the institute.  We don't have
19        an institute, we don't need the Director of an
20        institute, I think in my view, and I'm not, you
21        know, Human Resources.
22   Q.   Okay.  Do you know whether Dr. Alaei's appointment,
23        however, was -- his primary appointment was a
24        faculty appointment with the Rockefeller College?
25   A.   I do not know that.
```

BRUCE SZELEST 62

| | | |
|---|---|---|
| 1 | Q. | Do you know if his directorship of GIHHR was a |
| 2 | | complimentary non-paid appointment? |
| 3 | A. | I can't answer that question. |
| 4 | Q. | Was Dr. Alaei, at the time, not capable, in the |
| 5 | | opinion of SUNY Albany, to conduct -- continue with |
| 6 | | faculty appointment work with the Rockefeller |
| 7 | | College? |
| 8 | A. | I can't answer that.  I don't know the answer to |
| 9 | | that question. |
| 10 | Q. | Okay.  Do you know when SUNY Albany first decided |
| 11 | | that it was going to terminate Dr. Alaei's |
| 12 | | appointment effective August 10, as reflected in |
| 13 | | this August 10, 2018 letter identified as Claimant's |
| 14 | | Exhibit B-8? |
| 15 | A. | I do not. |
| 16 | Q. | Was it before August 9, 2018? |
| 17 | A. | I don't know the answer to that. |
| 18 | Q. | Okay.  I want to backtrack here for a second. |
| 19 | | If I can refer you to what had |
| 20 | | previously been identified as Claimant's Exhibit |
| 21 | | D -- Claimant's Exhibit D-1.  Claimant's Exhibit D-1 |
| 22 | | is a chain of e-mails between Chantelle Cleary and |
| 23 | | Brian Selchick, dated March 26, 2018, if you can |
| 24 | | just take a look at these e-mails. |
| 25 | | These e-mails are discussing |

BRUCE SZELEST                                          63

```
 1          Dr. Kamiar Alaei.  In the middle, in response to a
 2          question raised by Brian Selchick, Ms. Cleary says:
 3          "I thought we agreed he wasn't going to come back."
 4                    Are you aware if there was a
 5          determination by SUNY Albany at that point to
 6          terminate Dr. Alaei's employment and make sure he
 7          didn't come back as of March 26, 2018?
 8    A.    No, I didn't.
 9    Q.    Do you have any understanding of what the discussion
10          is between Brian Selchick and Chantelle Cleary as
11          reflected in Claimant's Exhibit D-1?
12    A.    I do not.
13    Q.    If I can refer you to what had previously been
14          identified as Claimant's Exhibit L-4.  I'm showing
15          you what's been marked as Claimant's Exhibit L-4,
16          which appears to be handwritten notes, dated
17          4/3/2018.  Brian Selchick has stated during a
18          deposition that these are his handwritten notes that
19          he took as a result of a meeting.  This first note
20          on Claimant's Exhibit L-4, it states:  "How do we
21          maintain the integrity of the non-renewal with or
22          without the NOD interrogation?"
23                    Do you have any understanding of what
24          Mr. Selchick was referring to about maintaining the
25          integrity of non-renewal at that time?
```

BRUCE SZELEST                                          64

1   A.   No.

2   Q.   Do you know if there had been a determination by

3        SUNY Albany as of April 3, 2018 to not renew

4        Dr. Alaei's employment?

5   A.   No.

6   Q.   There's handwritten notes here, it's the fourth line

7        of handwritten notes, it says:  "The goal is to make

8        sure he does not come back."

9                   Are you aware if SUNY Albany had

10       decided a goal of making sure Dr. Alaei did not come

11       back to employment with SUNY Albany as of 4/3/2018?

12  A.   No.

13  Q.   At the end of this document, it says:  "Performance

14       evaluations to support non-renewal - we could

15       recreate them."

16                  Are you aware of a determination or

17       efforts by SUNY Albany personnel to try to recreate

18       performance evaluations to support a non-renewal for

19       Dr. Alaei as of April 3, 2018.

20  A.   I am not.

21  Q.   We have been discussing non-renewal of Dr. Alaei.

22       Do you recall about when SUNY Albany began to seek

23       to non-renew Dr. Alaei's employment?

24  A.   I would think it would have been after April 10th.

25  Q.   After April 10, 2018?

BRUCE SZELEST                                          65

1    A.    Yes.

2    Q.    Why do you say April 10, 2018?

3    A.    I have a recommendation advice document from

4          University Counsel at the time listing that as one

5          of the options to pursue.

6    Q.    Okay.  Do you know who was involved in the efforts

7          to non-renew Dr. Alaei's appointment?  Or excuse me,

8          do you recall who was involved in the efforts to

9          non-renew Dr. Alaei's employment?

10   A.    I think there would have been conversations around

11         continuing or non-renewing, and those would have

12         involved Harvey Charles, Provost, I think the Vice

13         President for Research.

14   Q.    Okay.  Do you know, did the President approve

15         starting the efforts to non-renew Dr. Alaei's

16         employment?

17   A.    I don't think so.

18   Q.    If I could show you what's been previously

19         identified as Claimant's Exhibit B-1.  Claimant's

20         Exhibit B-1 appears to be a letter or memo dated

21         April 27, 2018, to Provost James Stellar from

22         Dean Harvey Charles, subject:  Dr. Kamiar Alaei.  It

23         says:  "I'm writing to recommend that

24         Dr. Kamiar Alaei's appointment be non-renewed, that

25         it not be extended beyond its current termination

BRUCE SZELEST 66

```
 1        date (or one year following notice of
 2        non-renewal.)?"
 3                    Are you familiar with this?
 4   A.   I am.
 5   Q.   Do you know who created this?
 6   A.   No.  I would assume Harvey Charles.
 7   Q.   This says:  "Or one year following notice of
 8        non-renewal."  Do you have any understanding what
 9        that's referring to?
10   A.   I think that pertains to the specifics of the UUP
11        contract.
12   Q.   About whether Dr. Alaei, if he was non-renewed, if
13        he was entitled to one year or two years of
14        additional employment?
15   A.   I don't know about the one year versus two year, but
16        I would agree the one year following notice of
17        non-renewal is a standard, I assume, language in the
18        contract that governs non-renewals by termination.
19   Q.   Okay.  If I can refer you to what's been identified
20        as Claimant's Exhibit B-3.  Claimant's Exhibit B-3
21        includes several documents, the first one is a
22        series of e-mails dated 4/28/2018 between
23        Bill Hedberg and Harvey Charles.  And if you could
24        just take a look at these for a minute.
25                    Mr. Szelest, in this e-mail dated
```

BRUCE SZELEST                                    67

```
1          4/28/2018, in part, Harvey Charles responds to
2          Bill Hedberg saying:  "I'm looking at the letter of
3          non-renewal and it's actually a recommendation from
4          me to the Provost.  As you know, I practically know
5          nothing about the situation and I feel uncomfortable
6          making a recommendation to the Provost without a
7          basis to do so.  Can this be handled differently?"
8                     Were you aware that Harvey Charles
9          had -- was feeling uncomfortable about making a
10         recommendation to non-renew Dr. Alaei because he
11         didn't have a basis to do so?
12    A.   No.
13    Q.   So you've never -- you -- this issue was never
14         brought to your attention?
15    A.   Correct.
16    Q.   Do you know if the President was aware of this
17         issue?
18    A.   I do not know.
19    Q.   Okay.  Included in this Claimant's Exhibit B-3 is a
20         Change of Status Request Form, HRM-3 -- no, that's
21         not the one.  Strike that.
22                     If I can refer you to -- hold on a
23         second.  If I can refer you to what's been
24         previously identified as Claimant's Exhibit E-1.
25         Claimant's Exhibit E-1 includes an e-mail from
```

1          Liesl Zwicklbauer to others dated April 4, 2018.  It
2          also includes a letter dated December 4, 2018, to
3          Dr. Kamiar Alaei from James Stellar, stating, in
4          part:  "Based on a recommendation from your
5          Department Chair and Dean, it is my pleasure to
6          confirm the renewal of your appointment as a
7          Clinical Associate Professor in the Department of
8          Health Policy Management and Behavior."
9                      There's also included rank, which
10         states:  "Clinical Associate Professor without
11         stipend."  And then duration, November 10, 2017, to
12         August 31, 2020.  There is also a Change Status
13         Request Form, HRM-3 that has various information.
14                      Specifically, on this HRM-3 form,
15         there's a box that says:  "Number one, extension of
16         temp appointment or renewal of UUP term
17         appointment."  It says:  "Appointment type, term."
18                      Do you have an understanding of what
19         that is referring to when it says:  "Appointment
20         type, term"?
21   A.    I believe that means that it lasts for -- or the
22         appointment is for a certain duration of time, as
23         opposed to, for example, a faculty member who
24         receives tenure, who, effectively, is on a
25         continuing appointment in perpetuity until they

BRUCE SZELEST                                                    69

```
 1        retire or for whatever reason separates service.
 2   Q.   So this reflects there was a certain appointment for
 3        a definitive term?
 4                    That's a yes?  Sorry, if you nod, she
 5        can't record it.  So you have to articulate the
 6        response.
 7   A.   Yes.  But up above, does it say "no stipend"?  Was
 8        that part of the the transmittal memorandum,
 9        "without stipend"?  So, yeah.
10   Q.   There is a rank, "Clinical Associate Professor
11        without stipend."
12   A.   Correct.  So it sounds to me like a courtesy type of
13        appointment.
14   Q.   So with this Clinical Associate Professor, it says:
15        "Renewal start date, 11/10/2017, and a new end date
16        of 8/31/2020 with a duration, term appointments,
17        other, two years, nine months."
18                    Is it fair to say that refers to the
19        term appointment for Dr. Alaei reflected in this
20        HRM-3 form was for two years, nine months?
21   A.   Yeah.
22   Q.   At the bottom for remarks, it says:  "There was no
23        cost associated with this volunteer appointment, two
24        other complimentary appointments, Director of GIHHR
25        and Research Professor in Department of Public
```

```
 1        Administration and Policy."
 2                   So would this appointment be
 3        Dr. Alaei's Clinical Associate Professor appointment
 4        and these other two were complementary appointments,
 5        Director of GIHHR and Research Professor in
 6        Department of Public Administration and Policy?
 7   A.   I want to say yes, but because there's no stipend,
 8        I'm unsure.  I would defer to my colleagues in Human
 9        Resources to answer that.
10   Q.   But what is your understanding of the term "without
11        stipend" mean?
12   A.   It means unpaid.
13   Q.   So this would be --
14   A.   He should state somewhere.  I don't know where.
15   Q.   Because otherwise, this letter, December 4, 2017,
16        would reflect:  "Based on your interpretation and
17        without stipend, that Dr. Alaei was appointed as a
18        Clinical Associate Professor in the Department of
19        Public Health Management and Behavior, but without
20        being paid"?
21   A.   That is my interpretation.
22   Q.   Okay.
23   A.   Whether correct or incorrect.
24   Q.   If I can refer you back to Claimant's Exhibit
25        B -- Claimant's Exhibit B-4.  Claimant's Exhibit B-4
```

```
 1          includes an e-mail about term renewals, is the
 2          subject, dated May 2, 2018, from William Hedberg to
 3          Harvey Charles, includes Randy Stark and
 4          James Stellar.  It also includes an e-mail from
 5          Harvey Charles, apparently to Randy Stark, dated May
 6          2, 2018.
 7                    This e-mail says, in part, "This May
 8          2, 2018, 5:00 p.m. e-mail from Harvey Charles.  I'm
 9          writing to let you know that he Bill Hedberg sent me
10          both the HRM-3 for Kamiar, as shown in this
11          attachment, and a letter addressed to the Provost
12          from me recommending -- underlined -- that Kamiar
13          not be renewed.  I declined to sign that letter
14          because I have no information that can be used as a
15          basis to recommend that Kamiar not be renewed.  I am
16          not seeking such information since it's clear to me
17          that the Provost has decided not to renew Kamiar's
18          contract.  I did sign the HRM-3, however, in order
19          to complete the paperwork, per the wishes of the
20          Provost."
21                    Were you aware of this e-mail and
22          feelings by Dr. Charles concerning non-renewing
23          Dr. Alaei, as reflected in this May 2, 2018 e-mail?
24     A.   Yes.
25     Q.   Okay.  Did you have any particular response to
```

```
 1         Dr. Charles' concerns or issues, I'll say, raised in
 2         this E-mail?
 3   A.    No, I was not asked by Dr. Charles anything.  I was
 4         aware of the general situation, not necessarily of
 5         the -- seeing the e-mail, per se.
 6   Q.    Do you know, was the President aware of the same
 7         general situation you just referred to?
 8   A.    I'm sure.
 9   Q.    Okay.  Do you know if the President was aware that
10         Dr. Charles was not recommending that Kamiar not be
11         renewed?
12   A.    I do not know that.
13   Q.    Are you aware if SUNY personnel ever found any
14         evaluations for Dr. Alaei before seeking to
15         non-renew Dr. Alaei, as reflected in this May 2,
16         2018 e-mail?
17   A.    I do not know the answer to that.
18   Q.    Okay.  Do you know if anyone ever talked to
19         Harvey Charles before asking him to sign the
20         recommendation to non-renew Dr. Alaei about his
21         opinions and thoughts concerning non-renewing
22         Dr. Alaei?
23   A.    I do not know.
24   Q.    Do you know if anyone had looked into the quality of
25         Dr. Alaei's work as part of these non-renewal
```

BRUCE SZELEST                                    73

1          efforts reflected in this May 2, 2018 e-mail?

2     A.   I do not know.

3     Q.   Do you have any understanding of the quality of

4          Dr. Alaei's work as of this May 2, 2018 e-mail?

5     A.   No.

6     Q.   Did you ever inquire to try to find out?

7     A.   No.

8     Q.   Do you know if the President had any knowledge about

9          the quality of Dr. Alaei's work as of this May 2,

10         2018 e-mail?

11    A.   No.

12    Q.   You don't know?

13    A.   I do not.

14    Q.   Okay.  Is it typical in non-renewals for the

15         supervisor of the employee at issue to not recommend

16         non-renewal?

17    A.   I have no information to answer that question.

18    Q.   Okay.  If I can -- strike that.

19              Do you know who was directing that

20         Dr. Charles sign this recommendation to non-renew

21         Dr. Alaei?

22    A.   I do not know.

23    Q.   As reflected in this e-mail, do you know if the

24         Provost had decided at that time, as of May 2, 2018,

25         that Dr. Alaei be non-renewed?

BRUCE SZELEST                                    74

```
 1    A.    I do not know.
 2    Q.    Okay.  If I can refer you to Claimant's Exhibit B,
 3          sub 6.
 4                    B, sub 6 includes an e-mail from
 5          William Hedberg to Kamiar Alaei, includes
 6          James Stellar and Harvey Charles as CC recipients,
 7          dated May 14, 2018.
 8                    In this e-mail, Mr. Hedberg states
 9          that:  "The Provost has signed the form from
10          Dean Harvey Charles for non-renewal of your
11          appointment."
12                    Do you know the basis for the
13          Provost -- his decisions to approve non-renewal?
14    A.    I do not know his specific reason.
15    Q.    Okay.  This states, this e-mail, in part:  "The next
16          step in the process for the President to review the
17          file and make his decision.  Before the decision,
18          you have five working days to review the file and
19          submit a statement in response."
20                    Do you recall Dr. Alaei preparing a
21          statement in response?
22    A.    I think I do.  That second paragraph, I think, is by
23          the book, by the contract, by the book and the
24          notification process and appeal process -- or
25          response time.  It sounds like it's right out of the
```

```
 1        contract.
 2   Q.   Okay.  I'm going to further scroll down on
 3        Claimant's Exhibit B, sub 6, and there is a letter
 4        dated May 8, 2018, to William B. Hedberg.  I'm just
 5        going to scroll through it quickly so you can see
 6        it's signed by Dr. Kamiar Alaei.  Do you recall
 7        seeing this letter?
 8   A.   Vaguely, yes.
 9   Q.   Did you have any impression or understanding as to
10        the content of the letter when you reviewed it?
11   A.   It sounds like his reply to the non-renewal and
12        lists his accomplishments and achievements.
13   Q.   Did you have any discussions with anyone concerning
14        the content of this letter when you reviewed it?
15   A.   Not to my recollection.
16   Q.   Do you know if a determination had already been made
17        by the President to approve non-renewal of
18        Kamiar Alaei before Kamiar Alaei sent this letter?
19   A.   I'm unsure.  It depends where we are in the
20        progression of notification and such.  So I guess
21        the answer is:  I'm not sure.
22   Q.   So at -- This letter was submitted in response --
23        This May 8, 2018 letter was submitted in response
24        to -- Well, it must have been before then, but
25        there's a Provost e-mail dated May 14, 2018,
```

BRUCE SZELEST                                            76

```
 1        advising that the next step is for the President to
 2        review the file and make his decision, but it gave
 3        him five working days to submit a statement in
 4        response.
 5                    Do you know if the President had made
 6        a determination to approve the non-renewal of
 7        Dr. Kamiar Alaei before receiving Dr. Alaei's
 8        letter?
 9   A.   I do not know that.  I do not know.
10   Q.   Do you know if the President subsequently approved
11        non-renewal of Dr. -- non-renewal of Dr. Alaei?
12   A.   I assume he did, because either he or his designee
13        would have signed the final document, I believe, but
14        I'm not certain.
15   Q.   Do you know the President's basis or reasoning for
16        approving non-renewal?
17   A.   I think it would be consideration of the
18        recommendations and options put forth to him by the
19        University Counsel at the time.
20   Q.   So it would be based on what University Counsel
21        advised?
22   A.   That would inform the President's decision.  What
23        drove his final decision, you would have to ask him.
24   Q.   Okay.  Do you know if the President had considered
25        any information from Office of Human Resource
```

BRUCE SZELEST                                    77

1            Management or opinions by Randy Stark or

2            Brian Selchick?

3    A.    I do not know.

4    Q.    Do you recall the issue of non-renewal involving

5            Dr. Alaei, involving an issue about getting one year

6            of an additional employment versus two years?

7    A.    Yes, I believe.

8    Q.    Do you recall -- strike that.

9                    Do you know the term "evergreen

10            contract" or "evergreen appointment"?

11    A.    Yes.

12    Q.    What's your understanding of what an evergreen

13            contract or evergreen appointment is?

14    A.    That the appointment would be for a certain number

15            of years; one year, two years, three -- well, two

16            years, three years or more, and then each year, it

17            would get increased to be, again, two years,

18            three years, so that from the time of initiation of

19            being reappointed, it would continue to be for two

20            years or three years or whatever so that -- so

21            that's my understanding of it.

22    Q.    Okay.  If I can refer you to what's been previously

23            identified as Claimant's Exhibit E-2.

24                    If we can take a look at this letter.

25            Did you review -- Are you familiar with what this

BRUCE SZELEST                                              78

1          letter is?
2     A.   I believe so.
3     Q.   Can you explain to me your understanding what this
4          letter is?
5     A.   This looks like the initial appointment letter that
6          says that Dr. Alaei will have a three-year term and
7          then annually be reinstituted.
8     Q.   So this letter, the first paragraph, says:  "It is
9          my pleasure to offer you an appointment to the
10         University at Albany as a Research Associate
11         Professor and Lecturer in the Department of Public
12         Administration and Policy, Rockefeller College of
13         Public Affairs and Policy."
14                   So does that indicate that was the
15         appointment Dr. Alaei received as of April 16, 2014?
16    A.   Yes.
17    Q.   And is it fair to say this paragraph -- these two
18         paragraphs, the one that starts with:  "In this
19         appointment, you will report to the Chair of
20         Department of Public Administration and Policy and
21         the Dean of Rockefeller College.  You will be
22         responsible for teaching one course each fall and
23         spring semester, monitoring -- or mentoring students
24         contributing to the college's health policy group
25         and providing service in the areas related to the

BRUCE SZELEST                                          79

```
 1           intersection of GIHHR and the college."
 2                       Is it fair to say that identifies what
 3           his responsibilities and tasks were?
 4    A.     At the time of appointment, yes.
 5    Q.     And then in this next paragraph, it says:  "You will
 6           have three complementary, non-stipendiary
 7           appointments in addition to your professional
 8           appointment in Rockefeller College"?
 9    A.     Yep.
10    Q.     And then identifies he was to continue to serve as
11           director of GIHHR?
12    A.     Right.
13    Q.     So is it fair to say that Dr. Alaei's primary
14           appointment was to be a Research Associate Professor
15           and Lecturer in the Department of Public
16           Administration and Policy?
17    A.     At the time of that letter, yes.
18    Q.     Okay.  Did you help develop the matrix for
19           Dr. Alaei's initial 2014 appointment?
20    A.     I think you're referring to the 2020 MOU process, so
21           yes, in collaboration with the Provost at the time,
22           Dr. Susan Phillips.
23    Q.     So do you recall what the standards were that you
24           created or helped to create for Dr. Alaei?
25    A.     It wasn't necessary for Dr. Alaei.  It was with the
```

```
 1        Department of Public Administration.  In lieu of
 2        this hire, they would guarantee -- so in
 3        general -- I don't know the specifics of this one,
 4        but in general, they evolved around three areas,
 5        either enrollment growth, initial enrollments, head
 6        count enrollments, student credit hours or research
 7        grants, expenditures.
 8   Q.   So explain to --
 9   A.   So a combination of all three.
10   Q.   Can you explain to me research grants, expenditures
11        component?
12   A.   That would be new research awards generated by the
13        department.
14   Q.   So that would be a requirement for his job and the
15        standard to measure whether he was meeting the
16        standards for his job?
17   A.   No, it was for the department.
18   Q.   I'm sorry, for the department.  Okay.
19   A.   Yeah, so for the department.
20   Q.   So if the department was achieving those standards,
21        was meeting those metrics, that was an indication
22        the department was having success?
23   A.   Correct.
24   Q.   Concerning the one year versus two year issue, did
25        you consider the language in the second paragraph of
```

BRUCE SZELEST                                                    81

1          Claimant's Exhibit E-2 that says:  "To give you
2          security of at least two years of employment, the
3          appointment will be reviewed annually for possible
4          extension by another year"?
5     A.   Yes.
6     Q.   And your interpretation of that language was that it
7          was only to give Dr. Alaei only one year if he was
8          non-renewed by SUNY Albany?
9     A.   Unless he had a reappointment for two years, which I
10         do not think he did.  They said it would be renewed
11         annually.
12    Q.   Did you come across --
13    A.   For possible extension.
14    Q.   I'm sorry, can you say that again?
15    A.   Yes.  This says he would be renewed annually for
16         possible extension by another year.  I saw nothing
17         that indicated that he was reviewed annually and
18         given that second year in an appointment favor.
19    Q.   So your position is -- Your reading was the language
20         about giving you the security of at least two years
21         of employment, unless that was contained in some
22         other job -- or excuse me -- some other letter, the
23         appointment was rather just reviewed annually for a
24         possible extension by one year?
25    A.   Correct.

BRUCE SZELEST                                          82

```
 1   Q.   Did Randy Stark and Brian Selchick give you their
 2        opinion on the interpretation of this language?
 3   A.   I know we discussed it.  I think there was an
 4        opinion that it could go either way; that one could
 5        interpret it as being one or the other, potentially.
 6   Q.   If I can -- strike that.
 7                  Who made the final decision about
 8        whether it was one year versus two years for
 9        continued employment if Dr. Alaei was non-renewed?
10   A.   Whoever signed the final paper, I guess.
11   Q.   So if that final letter we're talking about -- and
12        I'll just go back to it here.  That would be
13        Claimant's Exhibit B-8.
14                  Claimant's Exhibit B-8, the August 10,
15        2018 letter from Dr. Alaei signed by Mr. Stark
16        reflecting SUNY Albany exercising its right to elect
17        to terminate the appointment effective August 10th.
18        And it says:  "The University will pay the balance
19        of salary remaining on your term appointment from
20        August 10, 2018 through August 9, 2019?"
21                  Your recollection is that it would
22        have been Randy Stark who made that decision about
23        giving one year -- or paying one year for the salary
24        remaining on the term appointment?
25   A.   I'm not certain, because I think that would have
```

```
 1            been discussed at a higher level.
 2    Q.    So as you sit here, you don't recall who made the
 3          final decision as to the University stating it would
 4          pay the balance of salary remaining on Dr. Alaei's
 5          term appointment for just one year, August 10
 6          through August 9, 2019?
 7    A.    That is my recollection.
 8    Q.    That you don't recall, is your recollection?
 9    A.    That I don't recall.
10    Q.    Okay.  Back to Dr. Alaei's -- Claimant's Exhibit --
11          Hold on a second.
12                      Claimant's Exhibit B-6, specifically
13          the letter from Dr. Alaei dated May 8, 2018, to
14          Will -- Bill Hedberg.  There's a paragraph on the
15          second page of that document, it starts with the
16          heading:  "With respect to funding," and it says,
17          "You can also find the projected funding required
18          for each of the two faculty lines ($185,500) in the
19          attached Excel sheet.  I've also included the actual
20          funding from 2015 to 2017 that I was able to get,
21          and there's the number of $3,916,342 identified,
22          despite the absence of the second faculty line.
23          This means I was able to reach over 21 times higher
24          than the target."
25                      Do you have any understanding of what
```

BRUCE SZELEST                                                84

```
 1          have Dr. Alaei's referring to there?
 2    A.    I think he looks like he is pointing to success and
 3          garnering external funding, but the word "potential
 4          funding" makes me wonder what exactly those numbers
 5          mean.
 6    Q.    Okay.  So would this relate to the metrics that you
 7          identified earlier as part of the goals for
 8          Dr. Alaei's appointment?
 9    A.    Yes, but I believe those metrics focus on research
10          expenditures earned, not potential funding or what
11          might come in.  So that's where I'm kind of
12          questioning what exactly those numbers are.
13    Q.    Okay.  This refers to an attached Excel sheet.  I'm
14          going to scroll down on Claimant's Exhibit B-6.  Do
15          you recall -- I know they are upside down.  Do these
16          Excel sheets look familiar to you at all?
17    A.    Yes, I, generally, remember what they are about.
18    Q.    Did you create these Excel sheets?  Not the
19          information on them, but the outline of the Excel
20          sheets?
21    A.    Yes.
22    Q.    Okay.  And this is Dr. Alaei's showing his
23          compliance with those Excel sheets; is that fair to
24          say?
25    A.    Yes, although it's hard to determine if the actual
```

1         columns are -- yeah.

2    Q.   Yeah, and I understand it's not a clear version in

3         this copy of the document.

4    A.   In general, I agree.

5    Q.   Okay.  In the prior appointment letter for

6         Dr. Alaei, that would be E-2, I bring you to Exhibit

7         E-2.  This letter, appointment letter, identifies

8         Provost Kevin Williams.  Do you know who he was in

9         2014 and, again 2018, his position with SUNY Albany?

10   A.   Yes.

11   Q.   Can you explain to me your understanding of

12        Kevin Williams' position?

13   A.   He's the Dean of Graduate Studies or was the Dean of

14        Graduate Studies and then later Vice Provost of Dean

15        of Graduate Studies.

16   Q.   Do you know if, in his job overview, he's

17        responsible, in part, for addressing contract issues

18        for people that are under his department

19        supervision?

20   A.   Can you restate that, please?

21   Q.   Sure.

22                  Do you know if part of his job

23        responsibilities includes overseeing contract issues

24        for employees that are under his department

25        supervision?

BRUCE SZELEST                                        86

1    A.    I do not know the answer to that.

2    Q.    Do you know if anyone consulted with

3          Kevin Williams about the meeting of Dr. Alaei's

4          appointment letter, in terms of one year versus two

5          years?

6    A.    I do not know the answer to that.

7    Q.    As of May 23, 2018, do you recall what the status of

8          the Title IX investigation was at that point?

9    A.    No.  I want to say that -- that they found

10         no -- nothing to pursue further.

11   Q.    What about for Randy Stark and Office of Human

12         Resource Management?

13   A.    I think there were some potential management issues,

14         but again, I think it was -- there was no unlawful

15         activity was discovered, to my knowledge.

16   Q.    If I can refer you to what's been identified as

17         Claimant's Exhibit D-2.  If you can take a look at

18         what's been identified as Claimant's Exhibit D-2?

19         It is an e-mail from Randy Stark, dated July 6,

20         2018, to several individuals and identifies

21         counseling memo for K.A.

22                     This e-mail states, in part, that

23         Randy Stark was attaching a counseling that he

24         worked on for Dr. Alaei.  It was a struggle writing

25         it, as there really wasn't anything to counsel him

```
 1          on, since the sexual misconduct allegations were
 2          unfounded.  "We plan on giving him policies on
 3          sexual harassment, workplace violence, et cetera,
 4          but for what purpose as we're going to non-renew him
 5          and buy him out."
 6                    Were you aware of Mr. Stark's findings
 7          as of this point, concerning the investigation
 8          regarding Dr. Alaei?
 9     A.   I think I probably was.
10     Q.   Do you know if Mr. Stark had made similar findings
11          at this point regarding the alleged two other Roman
12          Numeral points that were being investigated
13          by -- concerning Dr. Alaei?
14     A.   Could you remind me or show me what those other two
15          points are, please?
16     Q.   Yeah, that would be referring to Claimant's Exhibit
17          L-2, I believe.
18     A.   And could you repeat your question, please?
19     Q.   Sure.
20                    Are you aware of whether or not
21          Mr. Stark had made similar -- strike that.
22                    Are you aware of whether Mr. Stark had
23          made a similar determination about allegations being
24          unfounded concerning Roman Numerals I and II, in the
25          Claimant's Exhibit L that we just referred to, as
```

BRUCE SZELEST                                                    88

```
 1          part of his investigation conclusions?
 2   A.     Yeah, I believe so.
 3   Q.     And you had raised before, you know, concerns about
 4          management or a use of funds.  Are you aware of
 5          whether Mr. Stark determined that, you know, there
 6          was no basis to support any allegations regarding
 7          concerns there?
 8   A.     Not necessarily, because I believe there was
 9          mischarging -- there was, in fact, report of
10          mischarging on grants and the attribution of efforts
11          by certain staff of the GIHHR on some grants rather
12          than other grants which violated the contracts, so
13          to speak in terms of from a management perspective.
14   Q.     Do you know if SUNY Albany ever issued any statement
15          to Dr. Alaei regarding those issues or any findings
16          regarding those issues?
17   A.     I do not know.
18   Q.     If I could refer you to what had been previously
19          identified as Claimant's Exhibit C-3.
20                    Claimant's Exhibit C-3 is a copy of a
21          letter from Young Sommer to Randy Stark, dated
22          May 21, 2018.  In this letter, Young Sommer provides
23          information to Mr. Stark concerning funding for
24          GIHHR.  Are you aware of whether that was something
25          that Randy Stark had considered and made, you know,
```

BRUCE SZELEST                                          89

```
 1          his determination on regarding funding issues or
 2          grant issues?
 3    A.    I'm sorry, could you repeat the question?
 4    Q.    Sure.
 5                    Are you aware of whether Mr. Stark
 6          considered what's contained in Claimant's Exhibit
 7          C-3 in this letter from Young Sommer addressing
 8          funding and grant issues for GIHHR, if whether that
 9          was something Mr. Stark considered in his
10          investigation?
11    A.    I do not know.
12    Q.    Did you ever review this about use of funding or
13          grants?
14    A.    No.
15    Q.    I'll go back to this Claimant's Exhibit D-2.  Are
16          you aware if Mr. Stark had made any recommendations
17          to the President regarding Dr. Alaei's employment
18          based upon his findings here about allegations being
19          unfounded?
20    A.    No.
21    Q.    Okay.  If I can show you what's been previously
22          marked as Claimant's Exhibit I, sub 4.  Actually,
23          sorry, I hate to do this.  Let me go back to D-2.
24                    In Claimant's Exhibit D-2, Mr. Stark
25          refers to saying:  "We are going to non-renew him
```

```
 1            and buy him out."  Do you know what he's referring
 2            to when he says "buy him out"?
 3   A.       I believe that refers to -- I think if you -- Per
 4            the contract, if somebody is -- I think that means
 5            if you non-renew somebody, they are still engaged
 6            with the University for a year.  I think the term
 7            "buy him or her out" means that if the University,
 8            per the contract, pays that individual the balance
 9            of wage that they would have received during that
10            year, you can begin a separation immediately and
11            they would no longer be an employee of the
12            University, as opposed to being an employee for
13            another year.
14   Q.       Okay.  So at some point before January -- or July 4,
15            then -- or sorry, July 6, 2018, SUNY Albany had made
16            a determination not just to non-renew Dr. Alaei, but
17            they were going to buy him out; is that fair to say?
18   A.       That is Mr. Stark's statement.
19   Q.       Do you know if the President, as of July 6th or
20            before 2018, had approved a course of action of
21            buying Dr. Alaei out?
22   A.       I don't remember specifically, but as a matter of
23            practice, I believe the recommendation -- the
24            recommended actions would have been placed before
25            the President so that he was aware of what the
```

BRUCE SZELEST                                    91

```
 1        intended actions were.
 2   Q.   Okay.  If I can refer you to what had been
 3        previously identified as Claimant's Exhibit I, sub
 4        4.  Specifically, I'm referring to an e-mail from
 5        you to Randy Stark and others dated July 23, 2018.
 6        If you could take a look at this e-mail.
 7                    Do you recall sending this e-mail to
 8        Mr. Stark?
 9   A.   I don't recall sending it, but I did.
10   Q.   Do you recall what's at issue in this e-mail,
11        discussing "the President has okayed proceeding, as
12        we laid out last meeting, counseling meeting and
13        continuing" --
14   A.   Right.  So I think that is consistent with the
15        statement I just made a few minutes ago; that the
16        intended course of action and recommendation would
17        have been laid before the President for his
18        information, and then we would proceed as such,
19        unless there were differing instructions issued.
20   Q.   Okay.  So Dr. Alaei was subsequently bought out
21        on -- or notified as being bought out on August 10,
22        2018, as we've gone through.  And I can pull that
23        back up, Claimant's Exhibit B-8.
24                    And you had previously stated your,
25        you know, belief as to the reason for termination.
```

BRUCE SZELEST                                                        92

1           Was it decided that Dr. Alaei, apart from GIHHR, was

2           not able to continue with his actual appointment

3           position as a Research Associate Professor and

4           Lecturer in the Department of Public Administration

5           and Policy, Rockefeller College, and undertake the

6           responsibilities identified in his April 16, 2014

7           letter?

8   A.      I don't remember any discussions to that effect.

9   Q.      Is it fair to say the discussions were limited to

10          Dr. Alaei and GIHHR?

11  A.      I think so, yes.

12  Q.      Okay.  Since your time with SUNY Albany, have you

13          been involved in other alternative assignment or

14          disciplinary investigations?

15  A.      Yes.

16  Q.      Are you aware of any other alternative assignment or

17          disciplinary investigations that resulted in

18          non-renewal and buying out of the employee, even

19          though it was decided there was no just cause to

20          impose discipline against the employee?

21                  MR. ROTONDI:  I object to the form of

22              the question.  You can answer.

23  A.      Yes.  Maybe if -- Depending upon the particulars.

24  Q.      So you're saying that other employees have been

25          non-renewed and bought out that were subject to

BRUCE SZELEST                                    93

```
 1        alternative assignment or disciplinary
 2        investigations, even though it was ultimately
 3        determined there was no just cause to impose
 4        discipline against those employees?
 5                    MR. ROTONDI:  Object to the form.  You
 6             can answer.
 7   A.   I think the statement of determination of no just
 8        cause gives me pause.  I can't answer the question
 9        as phrased in such a way, so I would answer no.
10   Q.   Okay.  Let me ask it this way:  Have you been -- Are
11        you aware of other alternative assignments or
12        disciplinary investigations during your time where
13        that the person subject to the alternative
14        assignment or disciplinary investigation was
15        non-renewed and bought out, even though it was
16        decided there was no basis to impose discipline
17        against that employee?
18                    MR. ROTONDI:  Object to the form.  You
19             can answer.
20   A.   Yes.
21   Q.   Do you recall those situations where they were
22        bought out and non-renewed?
23   A.   Not specifically.
24   Q.   Do you have an idea of how many other alternative
25        assignments or disciplinary investigations were
```

BRUCE SZELEST                                               94

```
 1        conducted, as compared to situations where people
 2        were non-renewed and bought out, where there was no
 3        decision that discipline was appropriate?
 4   A.   I want to say maybe a couple here, one or two, but
 5        nothing springs to mind that that's the one.
 6   Q.   Okay.  And do you have any idea of how many
 7        alternative assignments or disciplinary
 8        investigations you have been involved in or aware of
 9        during your time with SUNY?
10   A.   Personally?  Oh, I would phrase it as "aware of"
11        rather than "involved in."  So I'm notified that
12        these things are going on, just as a matter of
13        protocol, without full involvement whatsoever.  But
14        I'm going to say fewer then ten.
15   Q.   Okay.  Was Arash Alaei bought out or non-renewed as
16        a result of a disciplinary investigation?
17   A.   I'm not sure of the answer to that question.
18   Q.   Okay.  Are you aware of, in any of these alternative
19        assignments or disciplinary investigations, any
20        non-Middle Eastern females that were bought out and
21        non-renewed, even though it was decided not to
22        impose discipline?
23   A.   Only one.
24   Q.   So there's one instance where a non-Middle Eastern
25        female, that was subject to alternative assignment
```

BRUCE SZELEST                                    95

```
 1        and disciplinary investigation, was non-renewed and
 2        bought out, even though it was determined discipline
 3        was not appropriate?
 4   A.   Again, the determination of discipline not
 5        appropriate, I don't -- that muddles my recollection
 6        of the event.  So I guess I would have to say no
 7        then.
 8   Q.   Are you aware of any alternative assignments or
 9        disciplinary investigations into non-Middle Eastern
10        males where it was determined discipline was not
11        appropriate but they were still bought out and
12        non-renewed?
13   A.   No, but I've never examined such cases on the basis
14        of race or ethnicity.
15                   MR. CASTIGLIONE:  Could we just take a
16           minute break and I'll finish up?  I just want
17           to go through my notes and make sure I didn't
18           miss anything.
19                   THE WITNESS:  Sure.
20                   (Whereupon, a recess is taken.)
21        BY MR. CASTIGLIONE:
22   Q.   Mr. Szelest, are you aware -- Did the President
23        overtake any action during the course of this
24        investigation concerning Dr. Alaei to make sure that
25        the investigation by Chantelle Cleary and Human
```

```
 1        Resources was being conducted in accordance with
 2        Dr. Alaei's rights under the UUP agreement?
 3   A.   That would be our expectation.  I'm unaware of any
 4        specific actions to verify that.
 5   Q.   So in other words, the President may have simply
 6        relied on Chantelle Cleary and Human Resources to
 7        conduct a proper investigation in accordance with
 8        the rights provided to Dr. Alaei under the UUP
 9        agreement?
10   A.   Correct.
11                  MR. CASTIGLIONE:  Okay.  I don't have
12              any other questions, Anthony.  Thank you for
13              your time.
14                  THE WITNESS:  My pleasure.
15                  MR. ROTONDI:  Thanks, Bruce.
16                  (Transcript requests are as follows.)
17                  MR. CASTIGLIONE:  Standard delivery,
18              E-mail only.
19                  (Whereupon, the above-titled matter
20              was concluded at 12:45 p.m.)
21
22
23
24
25
```

1                     I N D E X   P A G E

2

3        WITNESS:

4                  BRUCE SZELEST

5        EXAMINATION BY MR. CASTIGLIONE                    4

6

7

8                      E X H I B I T S

9        EXHIBIT        DESCRIPTION                    PAGE

10       (Whereupon, no exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2        STATE OF NEW YORK:
          COUNTY OF WARREN:
 3

 4              I, Deborah M. McByrne, do hereby certify
          that the foregoing testimony was duly sworn to;
 5        that I reported in machine shorthand the
          foregoing pages of the above-styled cause, and
 6        that they were prepared by computer-assisted
          transcription under my personal supervision and
 7        constitute a true and accurate record of the
          proceedings;
 8

 9

10              I further certify that I am not an attorney
          or counsel of any parties, nor a relative or
11        employee of any attorney or counsel connected
          with the action, nor financially interested in
12        the action.

13

14              WITNESS my hand in the City of Queensbury,
          County of Warren, State of New York
15

16

17        _____

18

19

20        DEBORAH M. McBYRNE

21        Court Reporter

22

23

24

25
```

BRUCE SZELEST                                    99

1      DECLARATION/WITNESS CERTIFICATION

2      Case:  Alaei v. State University of New York

3      Witness:  Bruce Szelest

4      Deposition Date:  April 12, 2021

5
           I declare under penalty of perjury that I
6      have read the entire transcript of my Deposition
       taken in the captioned matter or the same has
7      been read to me, and the same is true and
       accurate, save and except for changes and/or
8      corrections, if any, as indicated by me on the
       DEPOSITION ERRATA SHEET hereof, with the
9      understanding that I offer these changes as if
       still under oath.

10
                    _____
11                         BRUCE SZELEST

12     Sworn to before me, this _____ day
       of_____     20_____ .
13
       [                                    ](print)
14     Notary Public.

15     Registration No:  _____

16     State of_____

17     Qualified in_____County.

18     My commission expires_____.

19

20

21

22

23

24

25

1        DEPOSITION ERRATA SHEET

2        Case:  Alaei v. State University of New York
         Witness:  Bruce Szelest
3        Deposition Date:  April 12, 2021

4                        Reason Codes:
         1:  To clarify the record
5        2:  To conform to the facts
         3:  To correct transcription errors.

6
         PAGE/LINE             CORRECTION     REASON CODE
7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

1              DEPOSITION ERRATA SHEET

2      PAGE/LINE          CORRECTION      REASON CODE

3      _____

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____ Subject to the above changes, I certify

20     that the transcript is true and correct.

21     _____ No changes have been made.  I certify that

22     the transcript is true and correct.

23

24     _____

25                     BRUCE SZELEST

**$**

**$185,500 (1)** 83:18
**$3,916,342 (1)** 83:21

**A**

**A-1 (11)** 7:25;8:2,7;
9:14,24;16:18,20,22;
17:20;18:13,25
**A-11 (4)** 33:14,24,24;
36:1
**A-12 (1)** 39:10
**A-13 (2)** 39:25;40:1
**A-3 (2)** 20:17,19
**A-4 (2)** 22:18,19
**A-6 (3)** 28:20,21;
29:17
**A-7 (2)** 30:25;31:1
**ability (5)** 5:14,24;
60:6
**able (6)** 5:23;20:2;
26:6;83:20,23;92:2
**above (2)** 69:7;
101:19
**above-mentioned (1)**
53:15
**above-titled (1)** 96:19
**absence (1)** 83:22
**academic (1)** 34:11
**access (6)** 19:7,8,14;
20:3,13,13
**accessing (1)** 20:1
**accomplished (1)** 7:12
**accomplishments (1)**
75:12
**accordance (4)** 17:21;
59:20;96:1,7
**accounts (1)** 47:21
**accurate (1)** 5:7
**accurately (1)** 5:23
**accusations (1)** 26:7
**achievements (1)**
75:12
**achieving (1)** 80:20
**across (1)** 81:12
**acted (2)** 43:18;53:22
**acting (1)** 43:21
**action (9)** 11:24;22:7;
28:10;39:19;58:14;
60:8;90:20;91:16;
95:23
**actions (13)** 20:3,10;
43:25;44:15;45:6;
46:9,15,20;47:4,7;
90:24;91:1;96:4
**activities (2)** 53:11,12
**activity (1)** 86:15
**actual (3)** 83:19;
84:25;92:2
**Actually (7)** 20:18;
47:7;52:19;56:22;

57:1;67:3;89:22
**addition (3)** 43:14;
55:18;79:7
**additional (3)** 29:7;
66:14;77:6
**address (3)** 27:15;
28:10,16
**addressed (1)** 71:11
**addressing (2)** 85:17;
89:7
**adds (1)** 26:4
**administer (1)** 7:14
**administering (2)**
39:14,18
**administration (8)** 9:7;
70:1,6;78:12,20;
79:16;80:1;92:4
**administrative (5)**
7:14,15;9:6;16:1;
61:10
**admittedly (1)** 42:15
**advice (2)** 55:24;65:3
**advised (7)** 14:2,23;
52:10;57:21,25;
60:19;76:21
**advisement (1)** 38:20
**advising (5)** 36:22;
38:17;40:20;41:10;
76:1
**advisor (2)** 43:15,16
**advisory (5)** 15:23;
36:12,21;37:6,19;
41:4,4;61:12
**Affairs (1)** 78:13
**affidavit (3)** 43:14;
44:18,22
**affiliated (3)** 16:11,12;
30:20
**affiliation (2)** 16:15;
30:15
**again (8)** 6:1;21:3;
22:9;77:17;81:14;
85:9;86:14;95:4
**against (6)** 44:4;
45:16;56:24;92:20;
93:4,17
**aggressive (1)** 43:18
**ago (2)** 8:11;91:15
**agree (3)** 5:12;66:16;
85:4
**agreed (1)** 63:3
**agreement (15)**
16:22;17:4,10,13,14,
22;20:13;30:13;32:9;
49:15;52:4,11;59:21;
96:2,9
**ahead (1)** 23:22
**Alaei (156)** 4:9;8:9,
15,19;9:3;10:12;
11:10;12:1,8,22;13:7,
9,15,19,23;14:16,23;
18:14,17;19:6,7,13,
25;20:1,2;21:13;

22:15;23:19;25:19;
26:5;27:17;28:7,15;
29:3,8,10,19,23;30:3,
7,9,11,19;32:17;34:9,
13,23;35:19;38:1;
39:10,12,15,20;
40:22;44:4;45:11,15,
20;46:3,8,13;47:5,16;
49:13,21,24;50:4,18,
25;51:16,19,21,22;
52:7,13,16,19,24,24;
53:8,13,18,22,22,23;
54:5,7,8,19,20,22;
55:11,17,17;56:18,
24;57:9,10,15,18,19;
58:16,22;59:1,6,15;
19;60:1,20;62:4;63:1;
64:10,19,21;65:22;
66:12;67:10;68:3;
69:19;70:17;71:23;
72:14,15,20,22;73:21,
25;74:5,20;75:6,18,
18;76:7,11;77:5;78:6,
15;79:24,25;81:7;
82:9,15;83:13;85:6;
86:24;87:8,13;88:15;
90:16,21;91:20;92:1,
10;94:15;95:24;96:8
**Alaei's (42)** 4:12;
11:19;13:1;14:6,19;
15:5,16;16:2;17:21;
32:8;50:5;52:6;
54:21;60:4,18;61:1,6,
17,22;62:11;63:6;
64:4,23;65:7,9,15,24;
70:3;72:25;73:4,9;
76:7;79:13,19;83:4,
10;84:1,8,22;86:3;
89:17;96:2
**Alamos (1)** 29:5
**Albany (67)** 4:13,15,
16;6:23;7:5;8:8,14,
18;9:23;10:1;11:11;
14:5;27:12,22;30:4,6,
20;32:19,20;34:13;
37:15;38:19;39:13,
19;40:8,11,14;42:1;
43:25;45:11,21;
46:10,14,15,16,24;
47:3,13;49:21;50:1,6,
8,24;56:5,11;58:13,
24;59:7,18;60:3,17;
61:5;62:5,10;63:5;
64:3,9,11,17,22;
78:10;81:8;82:16;
85:9;88:14;90:15;
92:12
**Albany's (1)** 49:9
**Alexander (4)** 41:22;
42:4;44:17;45:6
**aligned (1)** 7:7
**allegations (12)** 9:4,
10;12:13;15:19;

45:22;49:5;56:24;
57:2;87:1,23;88:6;
89:18
**alleged (7)** 43:5,9,25;
45:16;52:10;54:4;
87:11
**alleges (1)** 49:12
**allowable (1)** 17:6
**allowed (3)** 18:18;
26:5;30:19
**allowing (2)** 56:2,5
**altered (1)** 42:15
**altering (1)** 42:18
**alternate (2)** 18:12;
19:3
**alternative (37)** 8:15;
19:22;20:14;21:22;
22:2;23:15,20;30:8,
11,14;31:21,23;32:5;
34:16,17,25;41:3;
47:1,16;50:5;52:8,16;
54:9,21;56:7,10,13;
92:13,16;93:1,11,13,
24;94:7,18,25;95:8
**although (1)** 84:25
**Ambassador (1)** 29:11
**amongst (1)** 61:9
**and/or (2)** 11:2;56:15
**announcement (1)**
37:25
**announcing (1)** 37:3
**annually (6)** 78:7;
81:3,11,15,17,23
**Anthony (2)** 48:4;
96:12
**anticipation (1)** 6:13
**apart (1)** 92:1
**Apparently (2)** 29:9;
71:5
**appeal (1)** 74:24
**appears (8)** 20:21,25;
21:6;38:10,14;44:19;
63:16;65:20
**Appellate (2)** 41:19;
45:2
**appoint (1)** 33:2
**appointed (6)** 33:10;
34:19;35:4;37:4;
38:21;70:17
**appointment (61)**
4:13;13:25;14:19,24;
15:6,16;16:2,11;
36:22;59:23;60:4,16,
19;61:1,6,17,22,23,
24;62:2,6,12;65:7,24;
68:6,16,17,17,19,22,
25;69:2,13,19,23;
70:2,3;74:11;77:10,
13,14;78:5,9,16,15;
79:4,8,14,19;81:3,18,
23;82:17,19,24;83:5;
84:8;85:5,7;86:4;92:2
**appointments (4)**

69:16,24;70:4;79:7
**appreciate (1)** 25:21
**appropriate (4)** 94:3;
95:3,5,11
**approval (2)** 33:7;
55:4
**approve (7)** 23:3,5;
33:10;65:14;74:13;
75:17;76:6
**approved (4)** 32:23;
56:5;76:10;90:20
**approving (1)** 76:16
**April (12)** 6:9;13:5;
53:12;64:3,19,24,25;
65:2,21;68:1;78:15;
92:6
**Arash (35)** 49:13,24;
50:4,5;51:19,22;52:6,
7,13,16,19,24,25;
53:2,8,13,18,23;54:7,
8,20,21,23,25;54:7,
11,13,17,17;56:1,2,6,
10,12;94:15
**area (1)** 16:16
**areas (2)** 78:25;80:4
**around (4)** 24:17;
40:21;65:10;80:4
**Article (1)** 59:20
**articulate (1)** 69:5
**Asian (1)** 35:13
**assault (1)** 43:6
**assignment (34)** 8:15;
18:12;19:3,22;20:14;
21:22;22:2;23:15,20;
30:8,11,14;31:21,23;
32:5;34:16,17;35:1;
41:3;47:1,16;50:5;
52:8,16;54:9,21;56:7,
10,13;92:13,16;93:1,
14;94:25
**assignments (5)**
93:11,25;94:7,19;
95:8
**Associate (10)** 44:13;
68:7,10;69:10,14;
70:3,18;78:10;79:14;
92:3
**associated (1)** 69:23
**assume (1)** 8:22;
10:2;14:20;17:23;
21:15;32:10;36:5;
56:19;66:6,17;76:12
**attached (2)** 83:19;
84:13
**attaching (1)** 86:23
**attachment (1)** 71:11
**attend (1)** 24:1
**attended (2)** 25:13;
26:12
**attendees (1)** 27:7
**attention (2)** 54:24;
67:14
**attorney (1)** 4:8

Case 1:21-cv-00377-BKS-TWD    Document 119-2    Filed 04/29/25    Page 105 of 113

DR. KAMIAR ALAEI v.                                                    BRUCE SZELEST
STATE UNIVERSITY OF NEW YORK, et al.                                   April 12, 2021

**attorneys (1)** 46:2
**attribution (1)** 88:10
**August (26)** 12:3;
  14:7,15,20,24;15:6,
  17;51:10;58:22;
  59:19,23;60:4,16;
  61:1,7;62:12,13,16;
  68:12;82:14,17,20,
  20;83:5,6;91:21
**author (1)** 24:14
**authority (3)** 13:12;
  51:22;52:1
**available (1)** 12:17
**averred (1)** 43:16
**awaiting (1)** 55:24
**awards (1)** 80:12
**aware (54)** 12:25;
  19:18,24,24;22:6;
  23:1;24:5;26:14;
  27:6;28:2,5;29:21;
  30:13;35:20;38:24;
  41:24;42:17;43:8,20;
  44:2,3;45:10,15;52:4,
  15;53:20;54:16,23;
  55:25;63:4;64:9,16;
  67:8,16;71:21;72:4,6,
  9,13;87:6,20,22;88:4,
  24;89:5,16;90:25;
  92:16;93:11;94:8,10,
  18;95:8,22

**B**

**B-1 (2)** 65:19,20
**B-3 (3)** 66:20,20;
  67:19
**B-4 (2)** 70:25,25
**B-6 (2)** 83:12;84:14
**B-8 (8)** 14:11,14;
  59:17,18;62:14;
  82:13,14;91:23
**back (18)** 16:17;
  17:20;36:15,23,25;
  48:21;54:3;56:25;
  63:3,7;64:8,11;70:24;
  82:12;83:10;89:15,
  23;91:23
**backtrack (1)** 62:18
**balance (3)** 82:18;
  83:4;90:8
**banned (1)** 26:22
**bargaining (1)** 17:4
**barred (1)** 39:13
**based (9)** 39:5;44:21;
  45:21;49:5;53:10;
  68:4;70:16;76:20;
  89:18
**bases (1)** 54:4
**basically (2)** 10:5;
  29:18
**basis (12)** 9:2;20:12;
  28:7;50:17;67:7,11;
  71:15;74:12;76:15;

**88:6;93:16;95:13**
**bathroom (1)** 5:17
**beforehand (1)** 32:15
**began (2)** 24:18;
  64:22
**begin (1)** 90:10
**beginning (1)** 46:16
**behalf (3)** 46:8;49:24;
  57:9
**behavior (3)** 45:7;
  68:8;70:19
**behind (1)** 41:6
**belief (1)** 91:25
**besides (1)** 16:3
**best (4)** 5:13,24;
  15:23;40:16
**beyond (1)** 65:25
**bias (2)** 42:15;44:3
**Bill (4)** 66:23;67:2;
  71:9;83:14
**bizarre (1)** 25:17
**blank (3)** 49:16;50:11,
  14
**board (10)** 15:23;
  24:16;36:12,21;37:6,
  13,19;41:4,4;61:12
**Boniadi (1)** 38:9
**B-O-N-I-A-D-I (1)**
  38:10
**book (2)** 74:23,23
**bordered (1)** 43:3
**both (5)** 5:10,12;
  35:14;47:14;71:10
**bothering (1)** 26:19
**bottom (1)** 69:22
**bought (10)** 91:20,21;
  92:25;93:15,22;94:2,
  15,20;95:2,11
**box (1)** 68:15
**break (5)** 5:16,20;
  47:25;48:3;95:16
**Brian (8)** 19:4;28:23;
  62:23;63:2,10,17;
  77:2;82:1
**bring (1)** 85:6
**brought (3)** 11:15;
  54:24;67:14
**BRUCE (5)** 4:1;6:3;
  40:18;96:15;101:25
**budget (1)** 7:17
**bureaucratic (1)** 16:1
**business (5)** 21:17;
  23:21;49:24;52:14;
  53:24
**buy (5)** 87:5;90:1,2,7,
  17
**buying (2)** 90:21;
  92:18
**bylaws (1)** 15:24

**C**

**C-3 (7)** 57:7,8;58:4,

**13;88:19,20;89:7**
**called (1)** 4:2
**came (1)** 9:6
**campus' (1)** 7:7
**can (73)** 5:9,16;6:1,7,
  16;7:3,25;16:17;17:3,
  8;18:24;20:16;22:17,
  22;23:9;24:8;25:7,12;
  27:20;28:19;29:19;
  33:13,23;34:20;38:7;
  39:24;40:3,24;42:3,
  11,22;45:24;47:22;
  48:2;49:1;52:22;54:2,
  2,3;55:8;57:6;58:18;
  59:17;62:19,23;
  63:13;66:19;67:7,22,
  23;70:24;71:14;
  73:18;74:2;75:5;
  77:22,24;78:3;80:10;
  81:14;82:6;83:17;
  85:11,20;86:16,17;
  89:21;90:10;91:2,22;
  92:22;93:6,19
**capable (1)** 62:4
**capacity (1)** 39:1
**card (3)** 19:6,8;20:2
**Carleo-Evangelist (1)**
  36:7
**case (2)** 38:5;44:19
**cases (1)** 95:13
**CASTIGLIONE (12)**
  4:6,7;46:5;48:2,6,9,
  13,16;95:15,21;
  96:11,17
**cause (6)** 59:14;60:1,
  21;92:19;93:3,8
**caused (1)** 58:13
**CC (1)** 74:6
**cease (1)** 40:10
**center (5)** 21:17;
  51:13;61:10,11,13
**certain (10)** 17:2;
  22:9;28:16;53:3;
  68:22;69:2;76:14;
  77:14;82:25;88:11
**certainly (3)** 25:21;
  26:10;27:4
**certify (2)** 101:19,21
**cetera (1)** 87:3
**chain (2)** 20:19;62:22
**Chair (2)** 68:5;78:19
**change (5)** 21:11,13;
  22:3;67:20;68:12
**changed (2)** 43:1,4
**changes (2)** 101:19,
  21
**changing (2)** 22:14;
  43:9
**Chantelle (10)** 10:17;
  40:1,4;41:22;44:17;
  56:23;62:22;63:10;
  95:25;96:6
**charge (1)** 15:24

**charged (3)** 9:18;
  11:9;17:18
**Charles (36)** 20:24;
  22:20;28:25;31:2;
  37:1,17;39:11;51:8,
  53:8;54:25;55:11,14,
  22;56:1,14;65:12,22;
  66:6,23;67:1,8;71:3,
  5,8,22;72:3,10,19;
  73:20;74:6,10
**Charles' (4)** 36:21,24;
  37:25;72:1
**chatting (1)** 36:18
**Chief (3)** 6:22;7:4;
  39:1
**chose (1)** 60:7
**citizen (3)** 26:1;29:20,
  24
**citizens (1)** 27:1
**Claimant's (95)** 7:24;
  8:2,7,9;14,24;14:11,
  14;16:18,20,22;17:9,
  20;18:13,25;20:17,
  18;22:18,19;24:9,10;
  25:9;28:20,21;29:16;
  30:25;31:1;33:14,23,
  24;36:1,25;38:7,8;
  39:9,25,25;41:17,17;
  44:22;45:25;46:1;
  47:23;48:18;50:21;
  52:23;53:7;55:6,8,9;
  57:7,8;58:4,19,20;
  59:17,18;62:13,20,21,
  21;63:11,14,15,20;
  65:19,19;66:20,20;
  67:19,24,25;70:24,25,
  25;74:2;75:3;77:23;
  81:1;82:13,14;83:10,
  12;84:14;86:17,18;
  87:16,25;88:19,20;
  89:6,15,22,24;91:3,23
**Claims (2)** 4:11,12
**classify (1)** 35:12
**clear (6)** 4:16;16:4,5;
  46:23;71:16;85:2
**Cleary (28)** 10:17,22;
  40:1,4,20;41:10,22,
  25;42:9,15,18,25;
  43:4,9,16,17,20,24;
  44:3,7,17;45:7,9;
  62:22;63:2,10;95:25;
  96:6
**Cleary's (4)** 42:23;
  44:8;49:3;56:23
**climate (1)** 27:4
**Clinical (6)** 68:7,10;
  69:10,14;70:3,18
**close (2)** 15:22;61:15
**closing (2)** 11:11;
  61:16
**code (2)** 43:7;101:2
**co-directors (5)** 33:3,

**11;37:5;52:24;53:4**
**coincidently (1)** 9:5
**collaboration (1)**
  79:21
**colleagues (2)** 60:13;
  70:8
**collective (1)** 17:4
**College (7)** 61:24;
  62:7;78:12,21;79:1,8;
  92:5
**college's (1)** 78:24
**columns (1)** 85:1
**combination (1)** 80:9
**comment (1)** 38:4
**common (1)** 18:21
**communicate (1)**
  52:19
**communicated (1)**
  27:11
**communicating (5)**
  35:24;36:9;37:12;
  39:13;54:20
**communication (3)**
  53:20;55:12,15
**communications (7)**
  52:18;53:23;54:16;
  55:1,5,19;56:6
**communities (1)** 27:1
**community (1)** 25:25
**compared (1)** 94:1
**compensation (4)**
  13:24,25;14:4;16:14
**complaint (1)** 42:5
**complementary (2)**
  70:4;79:6
**complete (2)** 53:14;
  71:19
**Compliance (2)**
  49:18;84:23
**complimentary (2)**
  62:2;69:24
**complying (1)** 56:12
**component (1)** 80:11
**concern (1)** 41:8
**concerned (1)** 25:11
**concerning (3)** 4:10,
  12;12:8;19:9;3;10:11;
  11:19,25;12:8,21;
  13:18;19:2;27:7,16;
  28:7,14;29:3;37:20;
  38:20;39:16;40:21;
  41:12,25;46:8;47:4;
  50:17,24;57:19;
  58:15;71:22;72:21;
  75:13;80:24;87:7,13,
  24;88:23;95:24
**concerns (20)** 24:15,
  23;26:14;27:6,8,12,
  15,24;28:6,17;30:2;
  37:13;39:6,17,20;
  42:17;43:8;72:1;88:3,
  7
**conclude (1)** 12:12

DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.

BRUCE SZELEST
April 12, 2021

**concluded (2)** 12:1; 96:20
**conclusion (3)** 12:6, 10,20
**conclusions (1)** 88:1
**conduct (11)** 8:18;9:5; 21:17;23:20;24:6; 26:15;27:16;49:24; 50:9;62:5;96:7
**conducted (5)** 12:11; 47:18;56:17;94:1; 96:1
**conducting (10)** 9:19; 12:7,12;27:9,23; 28:14;44:1;52:13; 53:24;58:15
**confirm (1)** 68:6
**congruence (1)** 32:13
**consider (1)** 80:25
**consideration (1)** 76:17
**considered (4)** 76:24; 88:25;89:6,9
**consistent (2)** 56:7; 91:14
**consultation (1)** 32:11
**consulted (1)** 86:2
**contact (6)** 21:17; 50:3;52:6,13;54:7,23
**contained (2)** 81:21; 89:6
**content (4)** 31:10,14; 75:10,14
**continue (4)** 62:5; 77:19;79:10;92:2
**continued (1)** 82:9
**continues (2)** 26:9,18
**continuing (3)** 65:11; 68:25;91:13
**contract (15)** 11:17; 17:7;32:14;60:5; 66:11,18;71:18; 74:23;75:1;77:10,13; 85:17,23;90:4,8
**contracts (1)** 88:12
**contributing (1)** 78:24
**convenient (1)** 48:8
**conversations (4)** 6:13;52:17;56:1; 65:10
**convey (1)** 45:19
**conveyed (1)** 59:25
**coordinate (1)** 7:6
**coordinated (1)** 49:10
**Coordinator (3)** 41:23; 42:1;44:1
**copy (2)** 85:3;88:20
**Cornell (1)** 40:13
**CORRECTION (1)** 101:2
**correspond (2)** 43:6, 10
**cost (1)** 69:23

**counsel (14)** 4:25;5:3, 16,21;6:8,12;11:22; 15:8;42:6;46:13; 65:4;76:19,20;86:25
**Counseling (5)** 58:21, 25;86:21,23;91:12
**count (1)** 80:6
**countries (1)** 27:2
**couple (3)** 38:24,25; 94:4
**course (7)** 16:10; 22:7;58:14;78:22; 90:20;91:16;95:23
**Court (4)** 4:11;41:19; 45:2,7
**courtesy (1)** 69:12
**Court's (1)** 43:2
**cover (1)** 17:11
**create (3)** 5:5;79:24; 84:18
**created (4)** 50:11,11; 66:5;79:24
**credentials (1)** 35:18
**credit (1)** 80:6
**cultural (4)** 26:23; 27:8,24;28:8
**current (4)** 6:16,20; 26:24;65:25
**currently (1)** 6:18

# D

**D-1 (3)** 62:21,21; 63:11
**D-2 (5)** 86:17,18; 89:15,23,24
**Dana (1)** 37:3
**date (11)** 14:8,20; 23:9;31:19;40:12; 41:2;49:16;60:11; 66:1;69:15,15
**dated (51)** 8:8;14:15; 19:2;20:19,24;21:2,5; 22:21;24:12,25; 28:22,25;29:1,4,9,15; 31:2,24;34:1;37:1; 38:10;39:11;40:2; 41:20;46:3,4,4,6; 53:8;55:11,14,17; 57:10;58:22;59:19; 62:23;63:16;65:20; 66:22,25;68:1,2;71:2, 5;74:7;75:4,25;83:13; 86:19;88:21;91:5
**day (7)** 23:12,14,16; 31:24;59:25;60:19; 61:3
**days (2)** 74:18;76:3
**dealing (1)** 27:25
**Dean (10)** 33:15,17; 51:13;65:22;68:5; 74:10;78:21;85:13, 13,14

**December (2)** 68:2; 70:15
**decided (13)** 18:17; 23:8;33:1;61:13,15; 62:10;64:10;71:17; 73:24;92:1,19;93:16; 94:21
**decision (19)** 11:10, 22;13:6;22:7;25:22; 33:1,2;40:15,16; 60:25;74:17,17;76:2, 22,23;82:7,22;83:3; 94:3
**decisions (3)** 11:18; 20:9;74:13
**declined (1)** 71:13
**defend (1)** 26:6
**defer (1)** 70:8
**definition (2)** 43:6; 60:14
**definitive (1)** 69:3
**delivery (1)** 96:17
**denying (1)** 43:2
**Department (20)** 41:20;45:2;68:5,7; 69:25;70:6,18;78:11, 20;79:15;80:1,13,17, 18,19,20,22;85:18,24; 92:4
**depending (2)** 41:2; 92:23
**Depends (2)** 23:9; 75:19
**deposed (1)** 7:21
**deposition (5)** 5:5;6:5, 14;63:18;101:1
**designee (1)** 76:12
**despite (1)** 83:22
**details (3)** 24:7;39:23; 49:9
**determination (29)** 13:8,10,14,18,22; 15:5,14,22;19:15; 22:12,14;29:22;33:5, 21;34:12,23;59:6,13; 60:18;63:5;64:2,16; 75:16;76:6;87:23; 89:1;90:16;93:7;95:4
**determinative (1)** 13:12
**determine (3)** 46:24; 47:6;84:25
**determined (8)** 14:6; 15:3;16:19;58:25; 88:5;93:3;95:2,10
**develop (1)** 79:18
**Dias (2)** 29:1,3
**difference (1)** 60:9
**differences (1)** 28:8
**different (2)** 42:24; 58:14
**differently (1)** 67:7
**differing (1)** 91:19

**Dina (1)** 35:10
**directed (3)** 5:2; 30:18;50:10
**directing (1)** 73:19
**direction (1)** 19:10
**directive (1)** 19:17
**director (14)** 16:3; 21:18;32:5;34:14,24; 35:1;52:3,25;53:2; 61:18,19;69:24;70:5; 79:11
**directors (8)** 33:22; 34:7,19;35:2,4,5; 36:23;38:21
**directorship (1)** 62:1
**disadvantage (2)** 26:25;42:9
**discharge (1)** 17:24
**disciplinary (21)** 8:18; 9:2;11:14;16:19; 17:19;18:1,9;39:3; 47:14;59:14;92:14, 17;93:1,12,14,25; 94:7,16,19;95:1,9
**discipline (13)** 11:12; 12:21;59:15;60:1,21; 92:20;93:4,16;94:3, 22;95:2,4,10
**discovered (1)** 86:15
**discovery (1)** 43:3
**discretion (1)** 14:1
**discuss (3)** 25:14; 29:12;51:2
**discussed (4)** 25:24; 53:9;82:3;83:1
**discussing (5)** 5:6; 37:11;62:25;64:21; 91:11
**discussion (4)** 13:23; 32:6,15;63:9
**discussions (8)** 13:17; 52:17;56:2;57:22; 58:1;75:13;92:8,9
**distance (1)** 53:18
**distinction (2)** 60:9,12
**Division (2)** 41:20; 45:2
**document (11)** 8:6; 14:15;29:16;44:24; 45:1;48:24;64:13; 65:3;76:13;83:15; 85:3
**documents (4)** 4:21; 6:4,10;66:21
**done (7)** 5:9;17:5; 32:11,11,17;41:14; 45:15
**down (10)** 15:10,22; 20:17;29:7;36:2; 42:22;53:13;75:2; 84:14,15
**Dr (184)** 4:9,12;8:9, 15,19;9:3;10:12;

11:10,19;12:1,8,22; 13:1,7,9,15,19,23; 14:6,16,19,23;15:5, 16;16:2;17:21;18:14, 17;19:6,7,13,25;20:1, 2;21:13;22:15;23:19; 25:1,5,19;26:5;27:17; 28:7,15;29:3,8,10,19, 23;30:3,7,9,11,19; 32:8,17;34:9,10,13, 23;35:19;36:21,24; 37:1,17,25;38:1; 39:10,12,15,20; 40:22;44:4;45:11,15, 20;46:3,8,13;47:5,16; 49:11,13,21,24;50:4, 18,25;51:21;54:5,7; 56:18,24;57:9,15,18, 19;58:16,22;59:1,6, 15,19;60:1,4,18,20; 61:1,6,17,22;62:4,11; 63:1,6;64:4,10,19,21, 23;65:7,9,15,22,24; 66:12;67:10;68:3; 69:19;70:3,17;71:22, 23;72:1,3,10,14,15, 20,22,25;73:4,9,20, 21,25;74:20;75:6; 76:7,7,11,11;77:5; 78:6,15;79:13,19,22, 24,25;81:7;82:9,15; 83:4,10,13;84:1,8,22; 85:6;86:3,24;87:8,13; 88:15;89:17;90:16, 21;91:20;92:1,10; 95:24;96:2,8
**drafted (1)** 31:18
**drove (1)** 76:23
**due (1)** 36:11
**duly (1)** 4:3
**duration (3)** 68:11,22; 69:16
**during (22)** 17:16; 20:14;21:15,21; 23:21;32:4;34:15,25; 42:9;43:21;45:12; 50:5;53:21;54:15,18, 20;57:22;63:17;90:9; 93:12;94:9;95:23
**duties (1)** 10:20
**dynamic (4)** 25:17,25; 26:24,24
**dynamics (2)** 27:8,24

# E

**E-1 (2)** 67:24,25
**E-2 (4)** 77:23;81:1; 85:6,7
**earlier (2)** 36:7;84:7
**earned (1)** 84:10
**ears (1)** 25:16
**Eastern (3)** 94:20,24;

95:9
**education (2)** 24:19; 51:14
**effect (3)** 14:9,9;92:8
**effected (4)** 14:18,24; 23:13;30:9
**effective (8)** 15:6,17; 59:23;60:4,11,16; 62:12;82:17
**effectively (3)** 33:20; 35:1;68:24
**efforts (9)** 12:25;13:1; 51:2;64:17;65:6,8,15; 73:1;88:10
**either (6)** 30:7;37:22; 56:14;76:12;80:5; 82:4
**elect (2)** 60:18;82:16
**elected (3)** 59:22; 60:3;61:6
**electing (1)** 60:10
**election (1)** 60:15
**Elizabeth (1)** 28:3
**else (1)** 27:11
**else's (1)** 38:15
**e-mail (98)** 19:1,5,13, 14;20:3,13,18,23; 21:1,1,4,8;22:19,23, 24;23:6,24;24:11,14, 16,24;25:2,4,4,7,10; 26:18,20;28:22,24; 29:1,2,15;31:1,6,8,10, 14,17;32:7,16,23; 33:4,25;34:2,3,5,20; 36:3,4,7,22,24;37:1,2, 17;38:9,11,14,16; 39:10;40:1,3,17;46:5; 53:8,25;55:2,5,13,16; 56:8;66:25;67:25; 71:1,4,7,8,21,23;72:2, 5,16;73:1,4,10,23; 74:4,8,15;75:25; 86:19,22;91:4,6,7,10; 96:18
**e-mails (12)** 20:19; 24:10;28:22;29:8; 38:19,23;54:24; 55:10;62:22,24,25; 66:22
**emerge (1)** 25:19
**emotional (1)** 26:20
**employed (2)** 6:18; 30:20
**employee (9)** 30:4; 41:2;60:10;73:15; 90:11,12;92:18,20; 93:17
**employees (3)** 85:24; 92:24;93:4
**employee's (2)** 21:20; 22:3
**employment (19)** 6:20;7:18;11:19;

13:1;14:7;30:15; 60:11;63:6;64:4,11, 23;65:9,16;66:14; 77:6;81:2,21;82:9; 89:17
**encompassed (1)** 34:11
**end (5)** 26:9;36:2; 53:11;64:13;69:15
**ends (1)** 42:22
**engaged (2)** 30:21; 90:5
**engagements (2)** 30:21,22
**engaging (1)** 50:9
**enrollment (1)** 80:5
**enrollments (2)** 80:5,6
**ensuring (2)** 32:12; 37:14
**entered (1)** 49:15
**Enterprise (1)** 44:14
**entirety (1)** 8:4
**entitled (2)** 13:24; 66:13
**environment (1)** 50:12
**equipped (1)** 35:21
**Equity (1)** 49:18
**ERRATA (1)** 101:1
**especially (1)** 27:1
**essentially (1)** 7:19
**establish (1)** 32:3
**et (1)** 87:3
**ethnicity (1)** 95:14
**evaluations (3)** 64:14, 18;72:14
**even (6)** 22:10;92:18; 93:2,15;94:21;95:2
**event (2)** 42:25;95:6
**events (2)** 29:24; 30:16
**evergreen (4)** 77:9,10, 12,13
**evolved (1)** 80:4
**exact (1)** 40:12
**exactly (2)** 84:4,12
**EXAMINATION (1)** 4:5
**examined (2)** 4:3; 95:13
**example (1)** 68:23
**Excel (6)** 83:19;84:13, 16,18,19,23
**excuse (5)** 7:24; 45:25;59:5;65:7; 81:22
**execute (1)** 60:8
**execution (1)** 10:19
**exercise (1)** 14:3
**exercising (3)** 44:3; 59:22;82:16
**Exhibit (98)** 7:25;8:2, 7;9:14,24;14:11,14; 16:18,20,22;17:9,20;

18:13,25;20:17,18; 22:18,19;24:9,10; 25:9;28:20,21;29:17; 30:25;31:1;33:14,23, 24;36:1,24;37:1;38:7, 8;39:10,25;40:1; 41:17,18;45:1;46:1,1; 47:23;48:18;50:21; 52:23;53:7;55:6,8,9; 57:7,8;58:4,13,19,20; 59:17,18;62:14,20,21, 21;63:11,14,15,20; 65:19,20;66:20,20; 67:19,24,25;70:24,25, 25;74:2;75:3;77:23; 81:1;82:13,14;83:10, 12;84:14;85:6;86:17, 18;87:16,25;88:19, 20;89:6,15,22,24; 91:3,23
**existing (1)** 32:4
**expect (1)** 17:23
**expectation (2)** 32:14; 96:3
**expenditures (3)** 80:7, 10;84:10
**experience (1)** 29:12
**explain (6)** 6:16,20; 7:3;23:18;40:25; 42:3;49:1;78:3;80:8, 10;85:11
**explains (1)** 44:19
**explanation (1)** 38:18
**express (1)** 45:9
**expresses (1)** 24:14
**extended (1)** 65:25
**extension (5)** 68:15; 81:4,13,16,24
**extent (2)** 13:21,21
**external (1)** 84:3
**eyes (1)** 25:16

### F

**F-1 (1)** 53:7
**F-2 (1)** 55:6
**facilitated (2)** 54:20,22
**facilitating (2)** 50:3; 54:7
**facilities (3)** 18:16,19; 20:1
**fact (1)** 88:9
**facts (5)** 42:15,19; 43:5,9,10
**faculty (5)** 61:24;62:6; 68:23;83:18,22
**fair (12)** 12:3;26:1; 39:7;41:15;50:20; 69:18;78:17;79:2,13; 84:23;90:17;92:9
**fall (1)** 78:22
**familiar (6)** 8:6;35:3; 48:23;66:3;77:25;

84:16
**far (7)** 19:18;30:12; 34:20;35:19;38:24; 45:10;56:16
**favor (1)** 81:18
**February (47)** 8:8,20, 24;9:14,23;10:12; 11:12,19;17:25;18:7, 10,12;19:2;20:20,24; 21:2,6;22:21,25; 23:14;24:12;25:1; 26:16;28:23,25;29:2, 4,9,15;31:2,20,24; 34:1;36:10;37:2; 38:10;39:11;46:3,4,4, 10,17;47:4,17;49:11; 51:9;53:11
**feel (2)** 26:23;67:5
**feeling (2)** 26:11;67:9
**feelings (1)** 71:22
**felt (2)** 41:12;42:8
**female (3)** 35:10,10; 94:25
**females (3)** 35:14,15; 94:20
**few (2)** 38:25;91:15
**fewer (1)** 94:14
**file (3)** 74:17,18;76:2
**final (15)** 11:22;22:12, 14;26:18;33:2,5,16, 21;51:7;76:13,23; 82:7,10,11;83:3
**financial (2)** 12:18; 47:20;61:10
**find (4)** 4:19;59:10; 73:6;83:17
**finding (1)** 59:5
**findings (7)** 45:1;51:2; 59:25;87:6,10;88:15; 89:18
**fine (5)** 12:5;13:11; 32:21;48:7,14
**finer (1)** 60:13
**finish (1)** 95:16
**firm (1)** 4:8
**first (20)** 4:2;5:8,19; 8:4,17;20:19;24:11; 26:3;28:22;29:16; 40:4,17;46:3;49:7; 53:9;60:9;62:10; 63:19;66:21;78:8
**five (3)** 6:25;74:18; 76:3
**five-minute (1)** 48:3
**focus (1)** 84:9
**focused (1)** 49:20
**focusing (1)** 60:15
**foggy (1)** 33:16
**folks (3)** 12:16;36:13; 38:2
**followed (1)** 46:15
**following (6)** 49:9,20; 53:16;66:1,7,16

**follows (2)** 4:4;96:16
**forget (1)** 42:5
**form (9)** 27:18;67:20; 68:13,14;69:20;74:9; 92:21;93:5,18
**formally (1)** 33:10
**former (1)** 41:22
**forth (2)** 36:15;76:18
**forward (1)** 17:14
**forwarding (1)** 24:13
**found (5)** 38:17;43:7; 45:7;72:13;86:9
**fourth (1)** 64:6
**Friday (5)** 22:22; 23:17;25:12;26:12,21
**full (2)** 5:8;94:13
**functions (1)** 7:15
**funding (10)** 83:16,17, 20;84:3,4,10;88:23; 89:1,8,12
**funds (1)** 88:4
**further (3)** 25:20;75:2; 86:10

### G

**garnering (1)** 84:3
**gave (1)** 76:2
**general (6)** 12:2;72:4, 7;80:3,4;85:4
**generally (3)** 24:3; 26:13;84:17
**generated (1)** 80:12
**GIHHR (45)** 16:3,5; 21:9,14;22:15;23:19; 24:16,17;25:15;31:4; 33:17;34:9,14;35:19; 36:9;37:2,6,13,18,19; 38:12;40:22;49:25; 50:4,10;51:15;52:6, 14,14,20,24;53:24,24; 54:8;56:2;62:1; 69:24;70:5;79:1,11; 88:11,24;89:8;92:1, 10
**GIHHR's (1)** 55:20
**GIHHR-wide (1)** 22:22
**Gina (2)** 35:10;37:4
**gist (1)** 42:10
**given (5)** 12:16; 15:18;16:15;55:4; 81:18
**gives (1)** 93:8
**giving (3)** 81:20; 82:23;87:2
**Global (2)** 16:6;51:14
**goal (2)** 64:7,10
**goals (1)** 84:7
**goes (1)** 39:15
**Good (3)** 4:7;12:23; 41:5
**governs (1)** 66:18

DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.

BRUCE SZELEST
April 12, 2021

**Graduate (3)** 85:13, 14,15
**grant (3)** 24:19;89:2,8
**grants (9)** 39:14,18, 21;80:7,10;88:10,11, 12;89:13
**Grey (3)** 28:3,5,11
**grounds (4)** 8:17;9:1; 30:12;60:25
**group (1)** 78:24
**growth (1)** 80:5
**guarantee (1)** 80:2
**guess (3)** 75:20; 82:10;95:6

**H**

**Haley (1)** 29:12
**handled (2)** 24:22; 67:7
**handwritten (4)** 63:16, 18;64:6,7
**happen (1)** 20:8
**happy (1)** 24:21
**harassment (8)** 9:4, 11;10:3;12:16;15:19; 49:4;50:9;87:3
**hard (1)** 84:25
**harm (1)** 30:5
**Harvey (30)** 20:24; 22:20;28:25;31:2; 39:11;51:8,12,15,18; 52:5,18;53:8;54:25; 55:11,14,22;56:1,14; 65:12,22;66:6,23; 67:1,8;71:3,5,8; 72:19;74:6,10
**Harvey's (1)** 24:16
**hate (1)** 89:23
**head (1)** 80:5
**heading (1)** 83:16
**Health (5)** 16:6,12; 68:8;70:19;78:24
**heard (2)** 24:15;25:15
**hearing (1)** 42:25
**Hedberg (8)** 66:23; 67:2;71:2,9;74:5,8; 75:4;83:14
**held (4)** 6:24;23:4,8; 57:18
**help (2)** 7:6;79:18
**helped (1)** 79:24
**helps (1)** 33:22
**herself (1)** 44:1
**higher (4)** 24:19; 35:18;83:1,23
**high-powered (1)** 36:13
**high-rank (1)** 25:18
**himself (3)** 26:6;30:4, 19
**hire (1)** 80:2
**hold (2)** 67:22;83:11

**holding (1)** 23:3
**hope (1)** 27:5
**hoping (1)** 27:2
**hours (1)** 80:6
**HR (1)** 55:23
**HRM-3 (6)** 67:20; 68:13,14;69:20; 71:10,18
**Human (35)** 9:15,17; 10:2,6,18;11:2,15; 16:6;17:1;19:11,18; 29:21;32:11;47:19; 49:19;51:3;56:15,17, 21;57:15,15;58:23; 59:4,13,24;60:13,22, 24;61:2,21;70:8; 76:25;86:11;95:25; 96:6

**I**

**idea (3)** 8:21;93:24; 94:6
**identified (43)** 7:24; 8:2,7,19;14:14;16:18, 20;17:9;18:25;19:1; 20:16,21;22:18;24:9; 25:9;28:20;30:4,25; 33:13;39:25;41:17, 18,21;45:25;47:23; 48:17,19;52:23; 58:21;62:13,20; 63:14;65:19;66:19; 67:24;77:23;83:21; 84:7;86:16,18;88:19; 91:3;92:6
**identifies (6)** 53:19; 55:20;79:2,10;85:7; 86:20
**identify (7)** 14:11; 24:25;30:14,19; 35:15;39:15;53:7
**identifying (1)** 58:3
**II (3)** 50:2;54:6;87:24
**III (1)** 50:7
**immediately (1)** 90:10
**implications (1)** 41:12
**implicit (1)** 26:23
**implicitly (1)** 26:8
**implied (1)** 25:22
**imply (1)** 32:17
**important (1)** 41:1
**impose (6)** 12:21; 60:21;92:20;93:3,16; 94:22
**impression (1)** 75:9
**improper (1)** 43:25
**improperly (1)** 53:23
**include (1)** 7:1
**included (4)** 9:25; 67:19;68:9;83:19
**includes (10)** 38:9; 66:21;67:25;68:2;

**71:1,3,4;74:4,5;85:23
**including (1)** 37:6
**inclusive (1)** 27:3
**incoherent' (1)** 43:3
**incorrect (1)** 70:23
**increased (1)** 77:17
**indicate (1)** 78:14
**indicated (1)** 81:17
**indication (1)** 80:21
**individual (5)** 9:11,12; 29:8;42:14;90:8
**individuals (14)** 22:20;28:24;29:1,2; 31:3,18;33:2;35:3,17; 36:14;37:18;39:16; 55:1;86:20
**inform (2)** 55:18; 76:22
**information (14)** 4:20, 21;22:4;36:18;38:1,6; 68:13;71:14,16; 73:17;76:25;84:19; 88:23;91:18
**informational (1)** 42:7
**initial (4)** 24:18;78:5; 79:19;80:5
**initiated (1)** 49:16
**initiation (1)** 77:18
**initiatives (1)** 7:11
**injure (1)** 36:16
**input (6)** 13:18,22; 15:2,13;31:10,13
**inquire (1)** 73:6
**inquired (1)** 55:23
**inquiry (1)** 49:17
**Insert (2)** 49:23;50:3
**instance (1)** 94:24
**instead (1)** 50:15
**institute (17)** 9:8; 15:11,19,22,23;16:6; 21:18,19;32:4;33:19; 52:3;61:14,15,16,18, 19,20
**institution (1)** 27:3
**instructions (1)** 91:19
**integrity (2)** 63:21,25
**intended (2)** 91:1,16
**interacting (1)** 49:14
**interactions (2)** 17:1; 36:12
**interim (8)** 33:3,11,21; 34:19;35:4;36:23; 37:5;38:20
**intern (1)** 50:10
**international (3)** 35:11,12;51:14
**internationally-prominent (1)** 36:14
**interns (8)** 52:20; 54:23;55:13,15,21; 56:3,6;61:9
**interpret (1)** 82:5
**interpretation (4)**

**70:16,21;81:6;82:2
**interrogation (7)** 56:18;57:14,17,22; 58:1,15;63:22
**intersection (1)** 79:1
**interviewed (3)** 12:17; 28:3;56:23
**interviews (1)** 47:18
**into (4)** 49:4,15; 72:24;95:9
**investigate (2)** 10:3; 57:2
**investigated (5)** 12:14;43:24;45:22; 50:24;87:12
**investigating (2)** 43:11;54:4
**investigation (66)** 8:18;9:2,19,22,24; 10:6,10,13,16,21,25; 11:1,4,7,25;12:7,9,11, 12;16:20;17:19; 27:16,23,25;28:8,14; 40:21;41:6,14;42:9; 43:22;44:4,20;45:12, 17;46:9,17;47:3,5,11, 14,15,15;49:4,17,19; 50:17;51:2,9;53:21; 54:1,16,18;56:20; 57:18;58:16;86:8; 87:7;88:1;89:10; 93:14;94:16;95:1,24, 25;96:7
**investigations (14)** 10:11;18:1,4,9;39:3; 59:1;92:14,17;93:2, 12,25;94:8,19;95:9
**Investigator (2)** 42:20; 44:10
**invitation (2)** 22:21; 29:5
**involve (1)** 13:21
**involved (19)** 11:18; 13:8,22;15:2,4;18:1, 4;22:11,13;24:18; 39:2;42:5;47:20;65:6, 8,12;92:13;94:8,11
**involvement (4)** 11:7; 39:5;52:6;94:13
**involves (1)** 7:16
**involving (2)** 77:4,5
**Iran (2)** 29:13;39:17
**issue (15)** 10:11; 17:19;20:18;28:11; 35:25;42:13;45:22; 59:2;67:13,17;73:15; 77:4,5;80:24;91:10
**issued (5)** 23:15;61:3, 4;88:14;91:19
**issues (21)** 9:6;19:25; 25:19;26:15;27:6; 28:6;43:11;44:16; 46:24;50:23;51:4;

**58:4;72:1;85:17,23; 86:13;88:15,16;89:1, 2,8
**item (1)** 42:7
**IX (25)** 9:25;10:4,7; 11:3;18:4;39:2;40:6, 7,10;41:23;42:1,5,19; 43:11,21;44:1,9; 45:16;47:15,19;51:3; 56:21,22;57:3;86:8

**J**

**James (11)** 24:12; 25:5;29:1,3;33:25; 49:11;52:5;65:21; 68:3;71:4;74:6
**January (1)** 90:14
**job (8)** 7:3;40:13; 51:24;80:14,16; 81:22;85:16,22
**Joe (1)** 4:7
**John (2)** 6:8;29:9
**joint (3)** 10:5;49:17; 56:20
**Jordan (1)** 36:7
**Joseph (1)** 46:5
**Judicial (1)** 41:20
**July (5)** 86:19;90:14, 15,19;91:5
**June (6)** 29:6;55:11, 14,17,23,25
**justify (1)** 11:11

**K**

**KA (3)** 19:2;21:11; 86:21
**Kamiar (35)** 4:9;8:15; 49:21;50:18,25; 51:16,21;52:3,24,25; 53:2,22,22;54:5,19, 22;56:18,24;57:10, 19;58:22;59:1;63:1; 65:22,24;68:3;71:10, 12,15;72:10;74:5; 75:6,18,18;76:7
**Kamiar's (1)** 71:17
**Karl (1)** 21:5
**Kaveh (1)** 38:16
**K-A-V-E-H (1)** 38:16
**Kevin (3)** 85:8,12; 86:3
**keys (4)** 19:7,8;20:2, 13
**Khoshnood (1)** 38:16
**K-H-O-S-H-N-O-O-D (1)** 38:17
**kind (4)** 7:14;15:25; 16:13;84:11
**knew (3)** 20:5;22:9,10
**knowledge (15)** 4:19; 11:17;19:12;27:13;

Case 1:21-cv-00377-BKS-TWD    Document 119-2    Filed 04/29/25    Page 109 of 113

DR. KAMIAR ALAEI v.                                                    BRUCE SZELEST
STATE UNIVERSITY OF NEW YORK, et al.                                   April 12, 2021

30:23;38:5;40:16;
45:8,13,18,23;56:9;
57:4;73:8;86:15
**Korean (1)** 29:11
**Kristin (2)** 20:20;21:2

## L

**L-2 (4)** 47:23;48:18;
54:3;87:17
**L-4 (3)** 63:14,15,20
**Laboratory (1)** 29:6
**laid (2)** 91:12,17
**language (5)** 66:17;
80:25;81:6,19;82:2
**last (2)** 34:20;91:12
**lasts (1)** 68:21
**later (2)** 13:11;85:14
**law (1)** 4:8
**lawsuit (1)** 4:9
**leadership (3)** 25:13,
14;32:3
**leaned (1)** 43:18
**learn (1)** 8:17
**learning (1)** 50:13
**least (3)** 32:14;81:2,
20
**leave (2)** 40:14,15
**Lecturer (3)** 78:11;
79:15;92:4
**led (2)** 9:7;10:17
**left (3)** 38:5;40:12;
54:22
**legal (1)** 6:12
**letter (63)** 8:3,8,20,24;
9:14,15,23;10:11;
11:13;13:3,25;14:15,
18,22;18:13;19:3;
23:15;31:23,25;57:8,
12,14;58:3,5,8,12,15,
20;59:18,19;62:13;
65:20;67:2;68:2;
70:15;71:11,13;75:3,
7,10,14,18,22,23;
76:8;77:24;78:1,4,5,
8;79:17;81:22;82:11,
15;83:13;85:5,7,7;
86:4;88:21,22;89:7;
92:7
**letters (3)** 46:2,7,14
**level (1)** 83:1
**liaison (1)** 7:9
**Liesl (1)** 68:1
**lieu (1)** 80:1
**light (1)** 9:7
**likely (2)** 33:5;37:12
**limited (1)** 92:9
**line (3)** 55:12;64:6;
83:22
**lines (1)** 83:18
**listed (1)** 53:10
**listing (1)** 65:4
**lists (1)** 75:12

**little (2)** 33:16;37:25
**LLC (2)** 46:2;57:9
**lock (1)** 17:6
**long (3)** 6:24;26:20;
53:18
**longer (1)** 90:11
**look (15)** 8:3,10,11;
21:9;22:23;31:5;
34:2;40:3;48:18;
62:24;66:24;77:24;
84:16;86:17;91:6
**looked (1)** 72:24
**looking (1)** 67:2
**looks (4)** 31:4;38:12;
78:5;84:2
**Los (1)** 29:5
**lot (2)** 37:23;38:23

## M

**maintain (1)** 63:21
**maintained (1)** 21:21
**maintaining (3)** 5:7;
39:6;63:24
**major (1)** 7:10
**makes (3)** 11:22;53:3;
84:4
**making (8)** 7:11;
11:18;15:4;17:18;
29:22;64:10;67:6,9
**males (1)** 95:10
**malfeasance (1)**
12:18
**Management (19)**
9:16,18;10:7;11:2;
19:11,19;29:22;
44:14;49:19;56:17;
59:5;61:11;68:8;
70:19;77:1;86:12,13;
88:4,13
**managing (1)** 7:17
**manner (3)** 25:22;
26:22;43:19
**many (2)** 93:24;94:6
**March (9)** 13:4;40:2,
21;46:6;53:9,11,21;
62:23;63:7
**marked (5)** 39:9;57:7;
58:18;63:15;89:22
**Marshall (2)** 20:20;
21:2
**M-A-R-S-H-A-L-L (1)**
20:21
**materials (2)** 8:11,12
**matrix (1)** 79:18
**matter (19)** 13:12;
25:11;30:12;37:20;
38:3;40:18;41:1,6,10,
21;44:5,16,17;45:6;
55:24;57:3;90:22;
94:12;96:19
**matters (3)** 6:9;18:22;
19:22

**may (30)** 9:25;25:19,
19;28:8;32:8;34:6;
36:11;53:12;57:10,
16,18,23;58:1;71:2,5,
7,23;72:15;73:1,4,9,
24;74:7;75:4,23,25;
83:13;86:7;88:22;
96:5
**maybe (3)** 4:19;
92:23;94:4
**mean (6)** 11:1;13:10;
16:13;32:18;70:11;
84:5
**means (5)** 68:21;
70:12;83:23;90:4,7
**meant (1)** 61:2
**measure (1)** 80:15
**meeting (25)** 22:22;
23:1,4,7,16,24;24:1,3,
6;25:13,16,21;26:6,
12,16,21,22;27:9;
34:6;63:19;80:15,21;
86:3;91:12,12
**meetings (2)** 43:16,17
**member (1)** 68:23
**Members (7)** 24:16;
25:25;37:6,13,19,22;
41:4
**memo (4)** 8:22;53:25;
65:20;86:21
**memorandum (5)**
41:18,24;42:12;
58:21;69:8
**mentoring (1)** 78:23
**merit (1)** 12:13
**metrics (3)** 80:21;
84:6,9
**middle (1)** 63:1
**might (8)** 4:21;16:11;
32:16;33:15;36:6;
47:19;53:4;84:11
**mind (1)** 94:5
**minority (1)** 26:25
**minute (2)** 66:24;
95:16
**minutes (3)** 48:5,6;
91:15
**mischarging (2)** 88:9,
10
**Misconduct (3)** 48:19;
50:22;87:1
**miss (1)** 95:18
**mistake (3)** 46:25;
47:1,6
**monitoring (1)** 78:23
**months (2)** 69:17,20
**more (2)** 9:11;77:16
**morning (1)** 4:7
**most (1)** 53:17
**motion (1)** 43:2
**MOU (1)** 79:20
**much (2)** 15:21;61:8
**muddles (1)** 95:5

**must (1)** 75:24

## N

**name (6)** 4:7;6:1;
16:13;34:4;37:14;
50:15
**named (2)** 28:3;29:8
**National (1)** 29:5
**nationally (1)** 36:14
**nature (1)** 50:10
**Naz (1)** 38:9
**necessarily (3)** 16:14;
72:4;88:8
**necessary (1)** 79:25
**need (10)** 5:16;21:10,
23;34:6;48:1;53:15,
16,17;55:18;61:19
**needed (1)** 21:12
**New (12)** 4:10,10,16;
16:23;17:15;34:6;
35:2,5;41:19,23;
69:15;80:12
**next (4)** 23:16;74:15;
76:1;79:5
**Nikki (1)** 29:12
**nine (2)** 69:17,20
**NOD (2)** 63:22;69:4
**non-Middle (3)** 94:20,
24;95:9
**non-paid (1)** 62:2
**non-renew (17)** 13:1,
6,8,14;60:6;64:23;
65:7,9,15;67:10;
72:15,20;73:20;87:4;
89:25;90:5,16
**non-renewal (24)**
23:12;30:8;31:22;
63:21,25;64:14,18,
21;66:2,8,17;67:3;
72:25;73:16;74:10,
13;75:11,17;76:6,11,
11,16;77:4;92:18
**non-renewals (2)**
66:18;73:14
**non-renewed (13)**
65:24;66:12;73:25;
81:8;82:9;92:25;
93:15,22;94:2,15,21;
95:1,12
**non-renewing (4)**
60:10;65:11;71:22;
72:21
**non-stipendiary (1)**
79:6
**Nope (1)** 58:2
**North (1)** 29:10
**note (1)** 63:19
**notes (6)** 18:13;63:16,
18;64:6,7;95:17
**notice (3)** 66:1,7,16
**notification (2)** 74:24;
75:20

**notified (2)** 91:21;
94:11
**November (3)** 41:21;
44:18;68:11
**number (9)** 22:20;
28:25;31:3;48:20;
49:22;50:2;68:15;
77:14;83:21
**numbers (2)** 84:4,12
**Numeral (6)** 49:22;
50:2,2,7;54:6;87:12
**Numerals (2)** 50:21;
87:24
**nutshell (1)** 61:8

## O

**oath (1)** 5:5
**Object (4)** 27:18;
92:21;93:5,18
**objecting (1)** 46:14
**objection (1)** 4:24
**objections (1)** 46:9
**obligation (1)** 18:14
**obviously (3)** 26:4,5;
35:14
**occurred (1)** 57:22
**off (2)** 5:12;15:21
**offer (1)** 78:9
**offhand (1)** 56:25
**office (27)** 7:15;9:15,
17,25;10:4,6,24;11:3,
6;19:10,11,17,18;
23:3;29:21;44:8,9,11;
49:18,18;56:17,23;
57:16;58:23;59:4;
76:25;86:11
**officer (3)** 40:6,7,10
**offices (1)** 9:17
**official (1)** 10:20
**OHRM (1)** 9:18
**okayed (1)** 91:11
**one (40)** 9:11,12;
13:24;20:19;26:22;
33:19;43:7;44:11;
54:3,4;55:16;61:12;
65:4;66:1,7,13,15,16,
21;67:21;68:15;77:5,
15;78:18,22;80:3,24;
81:7,24;82:4,5,8,23,
23;83:5;86:4;94:4,5,
23,24
**ones (1)** 60:24
**one's (1)** 10:20
**one-year (1)** 14:3
**only (9)** 16:13;17:11;
29:23;36:4;38:24;
81:7,7;94:23;96:18
**opening (1)** 14:12
**operation (1)** 16:1
**opinion (2)** 45:10;
62:5;82:2,4
**opinions (3)** 45:20;

72:21;77:1
**opportunities (1)**
24:20
**opposed (2)** 68:23;
90:12
**options (2)** 65:5;76:18
**order (6)** 41:18,25;
42:12;43:2;53:14;
71:18
**organized (3)** 25:13,
22;26:22
**origin (2)** 35:11,12
**others (5)** 24:21;34:1;
40:2;68:1;91:5
**otherwise (3)** 5:2,12;
70:15
**out (24)** 4:19;32:7;
61:15,16;73:6;74:25;
87:5;90:1,2,7,17,21;
91:12,20,21;92:18,
25;93:15,22;94:2,15,
20;95:2,11
**outline (1)** 84:19
**outlined (1)** 11:23
**over (5)** 11:7;42:18;
51:3,22;83:23
**overseeing (5)** 10:21,
24;11:1;56:12;85:23
**overtake (1)** 95:23
**Overview (2)** 49:8;
85:16
**own (3)** 15:21;40:15,
16

**P**

**page (9)** 17:11;25:9;
26:3,19;42:11,13;
43:13;50:21;83:15
**PAGE/LINE (1)** 101:2
**paid (1)** 70:20
**panel (2)** 29:10,19
**paper (1)** 82:10
**paperwork (2)** 14:9;
71:19
**paragraph (17)** 25:8,
10;26:3,10,18;42:13,
13,23;43:13;49:8;
53:9;74:22;78:8,17;
79:5;80:25;83:14
**paragraphs (1)** 78:18
**part (26)** 9:24;18:13;
27:15;30:16,20;36:6;
39:11;41:8;42:14,23;
43:13;51:24;53:14;
55:16;59:20;67:1;
68:4;69:8;71:7;
72:25;74:15;84:7;
85:17,22;86:22;87:4
**participants (1)** 39:17
**participate (6)** 10:9,
13;13:17;29:19,23;
30:3

**participated (1)** 10:15
**particular (1)** 71:25
**particulars (2)** 38:4;
92:23
**parties (1)** 33:19
**passed (1)** 11:4
**past (1)** 17:1
**path (1)** 15:10
**paths (1)** 11:23
**pause (1)** 93:8
**pay (2)** 82:18;83:4
**paying (1)** 82:23
**pays (1)** 90:8
**people (13)** 11:2;
12:11;21:16;27:9;
28:14;36:20;37:5;
53:16,19,24;55:20;
85:18;94:1
**Per (6)** 34:20;60:5;
71:19;72:5;90:3,8
**percent (1)** 53:3
**perform (1)** 41:6
**Performance (2)**
64:13,18
**performed (1)** 17:21
**period (1)** 60:6
**permission (1)** 24:13
**permitting (1)** 49:23
**perpetuity (1)** 68:25
**person (8)** 24:25;
25:18;28:2;30:13;
42:8;53:17;57:2;
93:13
**personally (2)** 37:21;
94:10
**personnel (8)** 26:16;
27:15;32:7,16;47:13;
58:13;64:17;72:13
**perspective (1)** 88:13
**pertains (1)** 66:10
**Petitioner (2)** 43:14,18
**Petitioner's (1)** 43:2
**Phillips (1)** 79:22
**phrase (1)** 94:10
**phrased (1)** 93:9
**phrasing (1)** 42:23
**physically (1)** 43:17
**place (4)** 17:16;
26:24;27:8;35:2
**placed (3)** 8:15;32:5;
90:24
**Plaintiff's (4)** 7:24;
29:16;45:25;58:12
**plan (2)** 7:8;87:2
**planned (1)** 53:12
**please (11)** 4:23;5:7,
13;21:24;23:10;
37:10;40:24;46:11;
85:20;87:15,18
**pleasure (3)** 68:5;
78:9;96:14
**pm (3)** 31:3;71:8;
96:20

**point (12)** 14:8;18:5;
21:13;34:13,18;
44:11;47:8;63:5;
86:8;87:7,11;90:14
**pointing (1)** 84:2
**points (2)** 87:12,15
**policies (8)** 11:11;
45:21;49:21;54:6;
59:7,11;60:3;87:2
**policy (14)** 45:12;
49:23;50:3,9;60:20;
68:8;70:1,6;78:12,13,
20,24;79:16;92:5
**political (1)** 27:4
**politically-at-risk (1)**
24:20
**portrays (1)** 42:24
**posed (1)** 5:18
**position (8)** 6:20,24;
51:22;52:1;81:19;
85:9,12;92:3
**positive (1)** 53:5
**possibility (1)** 42:14
**possible (10)** 4:11;
11:23;41:7,14;49:20;
54:5;81:3,13,16,24
**potential (4)** 9:5;84:3,
10;86:13
**potentially (3)** 35:13;
36:16;82:5
**practically (1)** 67:4
**practice (2)** 38:3;
90:23
**precluded (1)** 39:22
**predates (1)** 53:25
**preparation (1)** 8:12
**preparing (1)** 74:20
**presence (2)** 18:15,18
**present (1)** 43:15
**presented (4)** 4:24;
5:15,24;43:14
**preserving (1)** 4:25
**President (42)** 6:22;
7:4,16;11:21;14:2;
15:9;19:24;22:6,10,
13;24:5;30:18;31:13;
32:23;33:7,9,18;39:2;
44:13;45:10,14;
57:25;58:6;65:13,14;
67:16;72:6,9;73:8;
74:16;75:17;76:1,5,
10,24;89:17;90:19,
25;91:11,17;95:22;
96:5
**presidents (2)** 7:6,10
**President's (9)** 10:24;
11:3,6;19:10,17;23:3;
44:9;76:15,22
**prestigious (1)** 27:3
**pretty (1)** 15:21
**previously (30)** 7:23;
8:1,13;14:11,13;17:9;
18:25;22:18;24:8;

26:14;28:19;30:25;
39:24;41:16;45:24;
47:22;48:17;52:22;
53:6;57:6;58:18;
62:20;63:13;65:18;
67:24;77:22;88:18;
89:21;91:3,24
**primary (7)** 7:9;9:8,
18;53:10;61:23;79:13
**prior (4)** 8:21;36:21;
56:19;85:5
**priorities (2)** 7:7,8
**priority (3)** 40:19,22;
41:11
**prison (1)** 29:13
**private (3)** 29:20,24;
30:16
**Probably (3)** 8:21;
22:10;87:9
**probe (1)** 4:19
**problem (2)** 5:18;
48:13
**procedural (1)** 17:2
**proceed (1)** 91:18
**proceeding (1)** 91:11
**process (7)** 11:15;
25:23;46:15;74:16,
24,24;79:20
**profaned (1)** 27:2
**professional (3)**
16:15;35:18;79:7
**Professions (3)** 16:24;
17:5,15
**Professor (11)** 68:7,
10;69:10,14,25;70:3,
5,18;78:11;79:14;
92:3
**programs (4)** 39:14,
16,18,21
**progression (1)** 75:20
**prohibited (1)** 19:25
**projected (2)** 26:8;
83:17
**proper (1)** 96:7
**proposed (2)** 22:7;
23:2
**protect (1)** 37:14
**protecting (1)** 39:6
**protocol (2)** 57:1;
94:13
**provide (5)** 13:17,22;
15:2;16:14;61:2
**provided (3)** 24:19;
38:1;96:8
**provides (1)** 88:22
**providing (1)** 78:25
**provisions (1)** 59:15
**Provost (23)** 15:7;
33:6,18;34:10;36:17;
37:22;38:11,17;
51:13;65:12,21;67:4,
6;71:11,17,20;73:24;
74:9,13;75:25;79:21;

26:14;28:19;30:25;
85:8,14
**Public (10)** 16:12;
69:25;70:6,19;78:11,
13,20;79:15;80:1;
92:4
**pull (1)** 91:22
**purpose (2)** 23:23;
87:4
**purposes (2)** 4:25;5:6
**pursuant (2)** 11:12;
17:3
**pursue (2)** 65:5;86:10
**pursued (1)** 7:12
**put (3)** 35:2;47:16;
76:18

**Q**

**quality (4)** 35:18;
72:24;73:3,9
**quickly (2)** 48:21;75:5
**quite (2)** 25:15;26:21

**R**

**race (2)** 35:7;95:14
**racial (3)** 26:24;27:8,
24
**racism (1)** 27:15
**raised (20)** 9:1;26:14,
15;27:7;28:5,6,11;
30:2;37:13;39:20;
42:18;43:9,17;44:16;
45:6;50:23;58:4;
63:2;72:1;88:3
**raising (1)** 46:8
**ran (1)** 61:13
**Randy (19)** 9:16;
10:20;11:14;15:7;
17:24;46:6;57:10;
58:23;71:3,5;77:1;
82:1,22;86:11,19,23;
88:21,25;91:5
**rank (2)** 68:9;69:10
**rather (5)** 25:17;
26:20;81:23;88:11;
94:11
**rationale (1)** 61:3
**reach (1)** 83:23
**read (5)** 13:25;25:8;
37:24;49:7;58:8
**reading (4)** 22:24;
57:11;58:11;81:19
**really (3)** 34:4;57:24;
86:25
**reappointed (1)** 77:19
**reappointment (1)**
81:9
**re-ask (1)** 21:22
**reason (5)** 5:22;69:1;
74:14;91:25;101:2
**reasoning (1)** 76:15
**reassignment (1)**

Case 1:21-cv-00377-BKS-TWD    Document 119-2    Filed 04/29/25    Page 111 of 113

DR. KAMIAR ALAEI v.                                                    BRUCE SZELEST
STATE UNIVERSITY OF NEW YORK, et al.                                  April 12, 2021

21:16
**recall (51)** 8:14;9:1;
10:5;11:25;12:4,5,6,
20,25;13:13;14:5,14,
22;15:12,16;16:2;
20:9;22:24;23:25;
25:3;34:3;36:8,20;
40:20;46:13,19,23;
47:2;52:1;56:16;
57:11,21;58:24;59:9,
24;64:22;65:8;74:20;
75:6;77:4,8;79:23;
83:2,8,9;84:15;86:7;
91:7,9,10;93:21
**receive (1)** 37:18
**received (5)** 37:21;
38:23;49:10;78:15;
90:9
**receives (1)** 68:24
**receiving (5)** 25:3;
34:3;38:19;58:14;
76:7
**recess (2)** 48:15;
95:20
**recipient (6)** 20:22,25;
21:3,7;31:4;38:13
**recipients (1)** 74:6
**recollect (6)** 12:24;
23:18;42:2;46:18;
58:10,10
**recollection (12)**
19:20;23:23;31:8;
41:10;42:3;50:16;
57:17;75:15;82:21;
83:7,8;95:5
**recommend (3)** 65:23;
71:15;73:15
**recommendation (12)**
6:8;11:23;33:16;
65:3;67:3,6,10;68:4;
72:20;73:20;90:23;
91:16
**recommendations (3)**
15:8;76:18;89:16
**recommended (1)**
90:24
**recommending (2)**
71:12;72:10
**reconsidered (1)**
46:20
**record (7)** 5:1,7,11,12;
6:2;50:14;69:5
**recreate (2)** 64:15,17
**rectify (1)** 44:16
**refer (38)** 10:9;14:10;
16:17;17:8,13;18:24;
20:16;22:17;28:19;
30:24;33:13,23;38:7;
39:24;41:16;42:11;
45:24;47:22;52:22;
53:6;54:2,3;55:8;
57:6;58:18;59:17;
60:12;62:19;63:13;

66:19;67:22,23;
70:24;74:2;77:22;
86:16;88:18;91:2
**reference (3)** 4:14;
16:4;36:11
**references (6)** 21:11,
13,21;22:2,3,14
**referred (2)** 72:7;
87:25
**referring (22)** 4:15;
10:10;16:5,25;17:10,
14;21:9;23:16;25:8;
31:1;33:24;36:6,25;
55:10;63:24;66:9;
68:19;79:20;84:1;
87:16;90:1;91:4
**refers (9)** 16:22;19:5,
13;24:24;34:5;69:18;
84:13;89:25;90:3
**Refki (1)** 37:3
**R-E-F-K-I (1)** 37:3
**reflect (1)** 70:16
**reflected (11)** 9:22;
35:25;55:2,5;62:12;
63:11;69:19;71:23;
72:15;73:1,23
**reflecting (1)** 82:16
**reflects (2)** 57:14;69:2
**refresh (2)** 50:16;
57:16
**refugee (1)** 29:11
**regarding (18)** 12:13,
20;15:13;26:15;29:4;
36:9;37:2;51:4;52:5;
58:16;59:1;87:8,11;
88:6,15,16;89:1,17
**Reilly (1)** 6:8
**reinstituted (1)** 78:7
**relate (1)** 84:6
**related (1)** 78:25
**relied (1)** 96:6
**relieved (2)** 19:6,13
**re-looking (1)** 46:24
**remaining (4)** 14:19;
82:19,24;83:4
**remarks (1)** 69:22
**remember (5)** 8:10;
42:10;84:17;90:22;
92:8
**remind (1)** 87:14
**remove (3)** 20:13;
21:20;22:2
**removed (5)** 19:8;
20:2;34:14,24;35:1
**rendering (1)** 42:24
**renew (3)** 13:19;64:3;
71:17
**renewal (3)** 68:6,16;
69:15
**renewals (1)** 71:1
**renewed (5)** 71:13,15;
72:11;81:10,15
**repeat (4)** 37:10;

46:11;87:18;89:3
**rephrase (1)** 5:15
**replicate (1)** 27:4
**reply (1)** 75:11
**report (17)** 44:8,12;
48:20;49:3,7,8,9,10,
12,16;50:22;51:7;
55:12,15;56:19;
78:19;88:9
**reported (4)** 42:16,19;
43:10;49:13
**reporting (1)** 11:3
**reports (3)** 33:17,20;
44:13
**representative (2)**
29:20,25
**represented (1)** 33:3
**representing (1)** 30:10
**represents (1)** 4:9
**reputation (4)** 36:16;
37:14;39:7;41:13
**Request (2)** 67:20;
68:13
**requests (1)** 96:16
**require (1)** 25:19
**required (1)** 83:17
**requirement (1)** 80:14
**requirements (1)**
53:10
**research (11)** 33:18;
65:13;69:25;70:5;
78:10;79:14;80:6,10,
12;84:9;92:3
**Resource (11)** 9:15;
10:6;11:2;19:11,18;
29:22;49:19;56:17;
59:5;76:25;86:12
**Resources (24)** 9:17;
10:2,18;11:15;16:7;
17:2;32:11;47:19;
51:3;56:15,21;57:15,
16;58:23;59:13,25;
60:13,23,24;61:2,21;
70:9;96:1,6
**respect (1)** 83:16
**respond (2)** 5:13,23
**responding (2)** 36:21;
38:11
**responds (2)** 55:23;
67:1
**response (17)** 37:17;
39:20;43:1;45:6;
48:20;49:10;50:22;
55:22;63:1;69:6;
71:25;74:19,21,25;
75:22,23;76:4
**responses (1)** 37:19
**responsibilities (6)**
7:3,18;17:24;79:3;
85:23;92:6
**responsibility (4)** 9:19;
10:19;34:8,11
**responsible (5)** 32:12;

33:20;56:11;78:22;
85:17
**restate (1)** 85:20
**result (4)** 12:7,9;
63:19;94:16
**resulted (2)** 49:17;
92:17
**Rethemeyer (3)** 21:5,
8;33:15
**R-E-T-H-E-M-E-Y-E-R (1)**
21:5
**retire (1)** 69:1
**review (9)** 6:4,5,10;
46:7;74:16,18;76:2;
77:25;89:12
**reviewed (8)** 6:7;47:3;
58:5;75:10,14;81:3,
17,23
**reviewing (1)** 47:20
**right (6)** 48:3;59:22;
74:25;79:12;82:16;
91:14
**rights (4)** 17:21;32:8;
96:2,8
**Risk (1)** 44:14
**Rockefeller (7)** 33:17;
61:24;62:6;78:12,21;
79:8;92:5
**role (2)** 42:19;44:9
**Roman (7)** 49:22;
50:2,7,20;54:6;87:11,
24
**ROTONDI (7)** 27:18;
48:5,14;92:21;93:5,
18;96:15
**run (3)** 7:15;15:20;
61:11
**running (1)** 35:19

## S

**safe (1)** 26:11
**salary (3)** 82:19,23;
83:4
**same (4)** 5:10;7:19;
18:9;72:6
**saw (1)** 81:16
**saying (3)** 67:2;89:25;
92:24
**School (3)** 16:12,15;
20:1
**school's (1)** 41:13
**screen (1)** 7:25
**scroll (12)** 8:3;20:17;
23:9;29:7,14;36:2;
42:22;48:20;53:13;
75:2,5;84:14
**scrolling (1)** 49:6
**scrutiny (1)** 25:20
**se (1)** 72:5
**second (14)** 20:23;
24:24;25:8;42:12;
43:13;47:25;62:18;

67:23;74:22;80:25;
81:18;83:11,15,22
**security (2)** 81:2,20
**seeing (4)** 8:10;
57:11;72:5;75:7
**seek (2)** 14:3;64:22
**seeking (3)** 54:25;
71:16;72:14
**seem (1)** 26:1
**Selchick (12)** 19:4,5;
28:23;29:15,18;
62:23;63:2,10,17,24;
77:2;82:1
**S-E-L-C-H-I-C-K (1)**
19:4
**semester (1)** 78:23
**sending (4)** 25:10;
46:14;91:7,9
**sense (1)** 12:2
**sensed (1)** 24:15
**sent (52)** 31:2,11,14,
18,23;32:1,7,24;37:5;
46:7;71:9;75:18
**sentence (1)** 40:17
**sentiments (1)** 38:15
**separates (1)** 69:1
**separation (5)** 49:15,
25;50:6;54:11;90:10
**series (3)** 28:21;46:1;
66:22
**serve (1)** 79:10
**service (2)** 69:1;78:25
**session (2)** 25:17;
58:25
**set (1)** 34:6
**seven (1)** 43:13
**several (7)** 8:11;
24:15;29:2;49:12;
55:20;66:21;86:20
**sexual (13)** 9:4,10;
10:3;12:16;15:18;
43:6;48:19;49:4;50:8,
10,22;87:1,3
**sexually-hostile (1)**
50:12
**share (2)** 7:25;25:12
**shared (1)** 42:6
**sharing (1)** 36:18
**sheet (3)** 83:19;
84:13;101:1
**sheets (4)** 84:16,18,
20,23
**shipshape (1)** 61:11
**shocked (1)** 25:15
**short (1)** 25:23
**show (5)** 24:8;39:9;
65:18;87:14;89:21
**showed (2)** 49:5;
56:20
**showing (7)** 7:23;8:1;
14:13;17:11;48:17;
63:14;84:22
**shown (1)** 71:10

Case 1:21-cv-00377-BKS-TWD     Document 119-2     Filed 04/29/25     Page 112 of 113

DR. KAMIAR ALAEI v.                                                                    BRUCE SZELEST
STATE UNIVERSITY OF NEW YORK, et al.                                                    April 12, 2021

**side (5)** 10:18;25:20;
42:6;47:19,20
**sign (4)** 71:13,18;
72:19;73:20
**signed (5)** 74:9;75:6;
76:13;82:10,15
**significantly (1)** 42:24
**silo (1)** 15:20
**similar (4)** 26:21;
87:10,21,23
**simply (2)** 5:9;96:5
**sit (2)** 29:10;83:2
**situation (6)** 15:18;
34:21;36:19;67:5;
72:4,7
**situations (2)** 93:21;
94:1
**six (1)** 53:19
**Skype (1)** 55:19
**slowly (2)** 8:4;48:21
**sn (1)** 29:4
**so-called (1)** 27:2
**somebody (5)** 38:15;
48:12;60:6;90:4,5
**somehow (1)** 42:8
**sometime (1)** 8:23
**sometimes (1)** 8:23
**somewhere (1)** 70:14
**Sommer (6)** 4:8;46:2;
57:9;88:21,22;89:7
**soon (2)** 41:7,14
**sorry (14)** 6:1;23:22;
26:19;32:20;38:8;
45:4;47:2;51:6;69:4;
80:18;81:14;89:3,23;
90:15
**sort (1)** 30:5
**sounds (4)** 34:25;
69:12;74:25;75:11
**speak (3)** 5:20;29:5;
88:13
**speaking (4)** 26:13;
29:24;30:16,21
**specific (4)** 39:19;
41:9;74:14;96:4
**specifically (11)** 5:2;
9:16;42:12;49:12;
53:7;55:10;68:14;
83:12;90:22;91:4;
93:23
**specifics (2)** 66:10;
80:3
**spoke (1)** 28:13
**spring (2)** 13:2;78:23
**springs (1)** 94:5
**Staff (14)** 6:22;7:4,16;
20:4;23:18;32:19,20;
39:1;50:4;52:7,14,20;
54:8;88:11
**stage (1)** 47:11
**standard (4)** 57:1;
66:17;80:15;96:17
**standards (3)** 79:23;

80:16,20
**Stark (31)** 9:16;10:20,
22;11:14;15:7;17:24;
46:6;57:10;58:23;
71:3,5;77:1;82:1,15,
22;86:11,19,23;
87:10,21,22;88:5,21,
23,25;89:5,9,16,24;
91:5,8
**Stark's (2)** 87:6;90:18
**start (2)** 16:19;69:15
**started (1)** 44:20
**starting (3)** 13:4;26:4;
65:15
**starts (2)** 78:18;83:15
**State (9)** 4:10,11,15;
6:1;16:23;17:15;
41:19,23;70:14
**stated (2)** 63:17;91:24
**statement (8)** 41:15;
74:19,21;76:3;88:14;
90:18;91:15;93:7
**statements (1)** 45:19
**states (16)** 21:10;
24:13;29:18;39:12;
42:23;43:13;49:8;
53:14;55:17,20;
59:20;63:20;68:10;
74:8,15;86:22
**stating (2)** 68:3;83:3
**Status (3)** 67:20;
68:12;86:7
**stayed (1)** 32:13
**Stellar (19)** 24:12;
25:5;33:6,25;34:5;
35:24;36:8,17;37:12,
22;38:11,17;49:11;
52:5,10;65:21;68:3;
71:4;74:6
**Stellar's (2)** 34:8,10
**stenographer (1)** 5:4
**step (3)** 17:6;74:16;
76:1
**steps (3)** 17:2;27:14;
28:16
**still (6)** 27:20;30:11;
34:17;40:7;90:5;
95:11
**stipend (7)** 68:11;
69:7,9,11;70:7,11,17
**strategic (2)** 7:8,8
**streamline (1)** 15:25
**strike (15)** 6:17;15:3,
12;23:6,25;31:16;
33:8;41:8;44:7;
54:17;67:21;73:18;
77:8;82:6;87:21
**strong (1)** 26:23
**strongly (1)** 26:25
**struggle (1)** 86:24
**student (11)** 24:14,17,
25;25:2;26:4,9;42:4;
43:7;50:10;61:9;80:6

**students (13)** 23:19;
24:20;26:14,15;27:7;
49:13,14;50:4;52:7,
14;54:8;61:9;78:23
**student's (1)** 50:15
**Studies (4)** 51:14;
85:13,14,15
**sub (7)** 37:1;38:8;
74:3,4;75:3;89:22;
91:3
**subject (11)** 22:21;
31:3;55:12,14;57:2;
65:22;71:2;92:25;
93:13;94:25;101:19
**submit (2)** 74:19;76:3
**submitted (2)** 75:22,
23
**subordinate (2)** 53:1,2
**subsequently (2)**
76:10;91:20
**substantiated (1)**
12:15
**success (2)** 80:22;
84:2
**SUNY (72)** 4:13,14;
7:4;8:8,14,17;9:23;
10:1;11:11;14:5;
21:21;22:2;26:16;
27:12,14,22;30:4,5,
20;32:6,16,18,20;
34:13,23;37:14;
38:19;39:19;40:7,11,
14;42:1;43:25;45:5,
11,21;46:10,14,15,16,
19,23;47:3,13;50:24;
56:5,11;58:13,24;
59:7,18;60:2,3,17,20;
61:5;62:5,10;63:5;
64:3,9,11,17,22;
72:13;81:8;82:16;
85:9;88:14;90:15;
92:12;94:9
**supervising (1)** 7:16
**supervision (2)** 85:19,
25
**supervisor (3)** 51:15,
18;73:15
**supervisory (1)** 10:19
**support (3)** 64:14,18;
88:6
**supporting (1)** 38:14
**Supreme (3)** 41:19;
43:2;45:1
**sure (23)** 7:11;16:10;
17:18;21:25;23:11;
34:10,15;35:12;
37:11;46:12;48:13;
63:6;64:8,10;72:8;
75:21;85:21;87:19;
89:4;94:17;95:17,19,
24
**surprise (1)** 41:11
**surprised (3)** 40:23,

24,25
**Susan (1)** 79:22
**swear (1)** 5:4
**sworn (1)** 4:3
**SZELEST (10)** 4:1;
6:3,4;31:5,7;33:25;
48:23;66:25;95:22;
101:25

---

**T**

---

**talk (2)** 5:16;48:1
**talked (2)** 27:22;72:18
**talking (2)** 5:10;82:11
**target (1)** 83:24
**tasks (2)** 53:15;79:3
**taught (1)** 16:10
**teaching (1)** 78:22
**temp (1)** 68:16
**ten (1)** 94:14
**tenure (1)** 69:24
**term (14)** 68:16,17,20;
69:3,16,19;70:10;
71:1;77:9;78:6;82:19,
24;83:5;90:6
**terminate (12)** 14:6;
15:5;59:22;60:3,11,
16,18,25;61:6;62:11;
63:6;82:17
**terminated (3)** 14:23,
24;15:17
**terminating (1)** 61:17
**termination (4)** 14:19;
65:25;66:18;91:25
**terms (4)** 10:19;
56:12;86:4;88:13
**testified (1)** 4:3
**Thanks (1)** 96:15
**therefore (2)** 30:9;
38:2
**third (4)** 21:1;26:19;
41:20;45:2
**though (7)** 22:10;
34:22;92:19;93:2,15;
94:21;95:2
**thought (2)** 61:12;
63:3
**thoughts (1)** 72:21
**three (10)** 50:20,23;
51:4;77:15,16,18,20;
79:6;80:4,9
**three-year (1)** 78:6
**times (1)** 83:23
**Title (25)** 9:25;10:4,7;
11:3;18:4;39:2;40:6,
7,10;41:22;42:1,5,19;
43:11,21;44:1,9;
45:16;47:15,19;51:3;
56:21,22;57:3;86:8
**today (5)** 4:18;5:6,22;
6:4;8:12
**today's (1)** 6:14
**told (1)** 25:4

**took (4)** 28:10;44:15;
45:5;63:19
**top (5)** 23:10;40:19,
22;41:11;48:22
**totally (1)** 25:18
**touch (3)** 53:15,17,18
**toward (1)** 43:18
**towards (1)** 42:22
**tracking (1)** 7:10
**transactions (1)** 47:21
**transcript (4)** 5:5;
96:16;101:20,22
**transmittal (1)** 69:8
**transparently (1)**
25:24
**travel (1)** 26:21
**treatment (1)** 47:5
**true (1)** 101:20,22
**truthfully (1)** 5:23
**try (3)** 5:15;64:17;
73:6
**two (34)** 9:8;13:24;
16:11;24:10;26:3;
33:2;35:3,7,17;38:20;
48:5,6;66:13,15;
69:17,20,23;70:4;
77:6,15,15,17,19;
78:17;80:24;81:2,9,
20;82:8;83:18;86:4;
87:11,14;94:4
**type (4)** 5:10;68:17,
20;69:12
**types (6)** 18:21;19:21;
27:11;28:16;29:23;
38:19
**typical (4)** 19:21;
21:20;22:1;73:14

---

**U**

---

**ultimate (2)** 11:9;
13:18
**ultimately (6)** 11:21;
12:12;13:14;14:6;
58:25;93:2
**Umm-hmm (1)** 4:17
**UN (1)** 29:11
**unaware (1)** 96:3
**uncomfortable (2)**
67:5,9
**uncovered (1)** 12:18
**under (11)** 5:5;11:17;
17:22;32:9;41:2;
43:11;59:14;85:18,
24;96:2,8
**underlined (1)** 71:12
**understood (1)** 20:8
**undertake (1)** 92:5
**undertaken (1)** 20:4
**undertaking (1)** 46:21
**undertook (1)** 39:19
**unearthed (1)** 9:6
**unease (1)** 61:9

**Unfortunately (1)** 39:12
**unfounded (3)** 87:2, 24;89:19
**United (3)** 16:23;17:4, 15
**University (57)** 4:15, 16;6:8,23;7:10;11:17, 22;14:2;15:8;16:23; 17:3,5,15;18:15,19; 20:4;25:14,20;26:2, 11;29:21,25;30:10, 15;32:13,19;36:17; 37:23;38:4;39:12; 40:13;41:5,23;42:6; 44:15;49:9,16,21,25; 50:6,8;54:6,12;59:21; 60:5,7;61:13,14;65:4; 76:19,20;78:10; 82:18;83:3;90:6,7,12
**University's (1)** 39:7
**unlawful (1)** 86:14
**unless (5)** 5:1,11; 81:9,21;91:19
**unpaid (1)** 70:12
**unreasonable (1)** 43:4
**unrest (1)** 61:8
**unsatisfactory (1)** 38:18
**unsure (2)** 70:8;75:19
**unwelcome (1)** 50:9
**up (9)** 23:9,9;29:14; 34:6;48:21;60:7; 69:7;91:23;95:16
**update (1)** 38:12
**updates (1)** 36:9
**upon (4)** 39:5;53:10; 89:18;92:23
**upside (1)** 84:15
**use (2)** 88:4;89:12
**used (1)** 71:14
**usually (1)** 39:2
**UUP (13)** 17:13,22; 20:12;30:12,13;32:9, 13;59:14,21;66:10; 68:16;96:2,8

**V**

**vacuum (1)** 38:6
**vaguely (3)** 26:7;42:2; 75:8
**various (4)** 7:9;46:9; 55:1;68:13
**Ventura (1)** 29:9
**verify (1)** 96:4
**version (1)** 85:2
**versus (5)** 66:15;77:6; 80:24;82:8;86:4
**vice (7)** 7:6,9;33:18; 44:13;51:13;65:12; 85:14
**view (1)** 61:20

**violated (6)** 11:10; 32:8;45:11,21;59:10; 88:12
**violating (1)** 59:6
**violation (4)** 49:14; 50:8;60:2,20
**violations (4)** 49:20, 23;50:3;54:5
**violence (1)** 87:3
**vis-à-vis (1)** 26:7
**voice (1)** 43:17
**volunteer (1)** 69:23
**Volynsky (1)** 37:4
**V-O-L-Y-N-S-K-Y (1)** 37:4

**W**

**wage (1)** 90:9
**warrant (1)** 18:15
**way (6)** 15:20;25:24; 43:21;82:4;93:9,10
**website (4)** 21:10,14, 21;22:15
**weeks (2)** 8:11,21
**whatnot (2)** 36:17; 38:3
**what's (26)** 8:1;14:10, 13;18:24;25:9;28:19; 30:24;38:2;39:9; 41:16;45:24;48:17; 56:8;57:6;58:18; 63:15;65:18;66:19; 67:23;77:12,22; 86:16,18;89:6,21; 91:10
**whatsoever (1)** 94:13
**Whereupon (3)** 48:15; 95:20;96:19
**Whichever (1)** 33:19
**white (2)** 35:10,13
**William (3)** 71:2;74:5; 75:4
**Williams (5)** 24:11; 25:1,5;85:8;86:3
**Williams' (1)** 85:12
**wishes (1)** 71:19
**without (9)** 63:22; 67:6;68:10;69:9,11; 70:10,17,19;94:13
**witness (7)** 4:2,12; 47:24;48:8,11;95:19; 96:14
**women (1)** 35:7
**wonder (1)** 84:4
**wondering (1)** 25:12
**word (1)** 84:3
**wording (2)** 43:1,5
**words (2)** 43:1;96:5
**work (10)** 16:3,16; 35:6;41:25;43:22; 51:24;62:6;72:25; 73:4,9

**worked (1)** 86:24
**working (5)** 39:21,22; 50:12;74:18;76:3
**workplace (1)** 87:3
**works (1)** 48:9
**writing (4)** 41:5;65:23; 71:9;86:24
**wrong (3)** 32:17; 46:21;47:7
**wrongly (1)** 32:16

**Y**

**year (25)** 13:24;66:1, 7,13,15,15,16;77:5, 15,16;80:24,24;81:4, 7,16,18,24;82:8,23, 23;83:5;86:4;90:6,10, 13
**years (20)** 6:25;7:1; 13:24;66:13;69:17, 20;77:6,15,15,16,16, 17,18,20,20;81:2,9, 20;82:8;86:5
**Yep (1)** 79:9
**York (7)** 4:10,10,16; 16:23;17:16;41:19,23
**Young (6)** 4:8;46:2; 57:9;88:21,22;89:7

**Z**

**Zwicklbauer (1)** 68:1

**1**

**1 (2)** 25:9;50:21
**10 (22)** 6:9;14:7,15; 15:6,17;38:7,8;59:19, 23;60:4,16;61:1,7; 62:12,13;64:25;65:2; 68:11;82:14,20;83:5; 91:21
**100 (1)** 53:3
**10th (2)** 64:24;82:17
**11/10/2017 (1)** 69:15
**12:45 (1)** 96:20
**13 (2)** 55:14,17
**14 (6)** 24:12;25:1; 46:3;55:11;74:7; 75:25
**15 (1)** 38:10
**16 (3)** 46:4;78:15; 92:6
**18 (1)** 46:4
**18-013 (1)** 48:20

**2**

**2 (10)** 49:11;71:2,6,8, 23;72:15;73:1,4,9,24
**2/9 (2)** 22:22;23:17
**2014 (4)** 78:15;79:19;

85:9;92:6
**2015 (1)** 83:20
**2017 (18)** 7:1,19; 44:20;51:19;53:9,21, 25;54:21,25;55:11, 14,17,23,25;56:10; 68:11;70:15;83:20
**2018 (112)** 6:9;7:1, 19;8:8,20,24;9:15,23; 10:12;11:12,20;12:3; 13:2,5;14:7,16,20,25; 15:6,17;17:16,25; 18:7,10,12;19:2; 20:20,24;21:2,6; 22:21,25;23:14; 24:12;25:1;26:9; 28:23,25;29:2,4,6,9, 15;31:2,20,24;34:1; 36:10;37:2;38:10; 39:11;40:2,21;46:3,4, 4,6,10,17,21;47:4,17; 49:11;51:10,16; 54:19;57:11,16,23; 58:1,22;59:19,23; 60:4,17;61:1,7;62:13, 16,23;63:7;64:3,19, 25;65:2,21;68:1,2; 71:2,6,8,23;72:16; 73:1,4,10,24;74:7; 75:4,23,25;82:15,20; 83:13;85:9;86:7,20; 88:22;90:15,20;91:5, 22
**2019 (2)** 82:20;83:6
**2020 (4)** 41:21;44:18; 68:12;79:20
**21 (3)** 57:10;83:23; 88:22
**22 (2)** 34:1;36:10
**23 (2)** 86:7;91:5
**25 (1)** 41:21
**26 (2)** 62:23;63:7
**27 (2)** 39:11;65:21
**28 (2)** 53:9,21

**3**

**3 (2)** 64:3,19
**30-second (1)** 47:25
**31 (1)** 68:12
**32.3 (1)** 59:21

**4**

**4 (7)** 55:23;68:1,2; 70:15;89:22;90:14; 91:4
**4/28/2018 (2)** 66:22; 67:1
**4/3/2018 (2)** 63:17; 64:11
**45 (1)** 47:25

**5**

**5:00 (1)** 71:8

**6**

**6 (6)** 42:11;74:3,4; 75:3;86:19;90:15
**6:59 (1)** 31:3
**6th (1)** 90:19

**7**

**7 (3)** 36:24;37:1;46:6

**8**

**8 (27)** 8:8,20,24;9:15, 23;10:12;11:12,19; 17:25;18:7,10,12; 19:2;20:20,24;21:2,6; 22:21;23:14;28:25; 29:2,4;31:24;47:17; 75:4,23;83:13
**8/31/2020 (1)** 69:16

**9**

**9 (16)** 14:20,24; 26:16;28:23;29:15; 31:2,20;37:2;40:2; 57:16,23;58:1,22; 62:16;82:20;83:6