# EXHIBIT C

# In The Matter Of:

*DR. KAMIAR ALAEI v.*
*STATE UNIVERSITY OF NEW YORK, et al.*

---

*DR. HARVEY CHARLES*
*January 13, 2021*

---

COVERING ALL UPSTATE NEW YORK



M-F Reporting, Inc.

MFReportingNY.com

Office: 518-478-7220
Fax: 518-371-8517

Mail to: 5 Southside Dr., Suite 11
Clifton Park, NY 12065

*Min-U-Script® with Word Index*

```
 1      STATE OF NEW YORK

 2      COURT OF CLAIMS

 3      -------------------------------------------------:

 4      In the Matter of the Claim by

 5      DR. KAMIAR ALAEI,

 6                              Claimant,

 7

 8      - Against -                         Claim Number:

 9                                             132554

10      STATE UNIVERSITY OF NEW YORK,

11      STATE UNIVERSITY OF NEW YORK AT ALBANY,

12      and THE STATE OF NEW YORK,

13                              Respondents.

14      -------------------------------------------------:

15              DEPOSITION of:  DR. HARVEY CHARLES

16                   (Respondent Agent)

17

18            Wednesday, January 13, 2021

19              10:09 a.m. - 1:14 p.m.

20

21

22      HELD:  Via Zoom Video Conferencing

23

24      Reported by:  Deborah M. McByrne

25
```

DR. HARVEY CHARLES                                         2

```
1       APPEARANCES:

2

3       APPEARING FOR CLAIMANT:

4           YOUNG/SOMMER LLC

5                 Five Palisades Drive, Suite 300

6                 Albany, New York 12205

7                 (518) 438-9907

8           BY:   JOSEPH F. CASTIGLIONE, ESQ.

9                 Jcastiglione@youngsommer.com

10

11

12      APPEARING FOR RESPONDENTS:

13          NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

14                The Capitol

15                Albany, New York 12224

16                (518) 776-2576

17          BY:   ANTHONY ROTONDI, ESQ.

18                Anthony.Rotondi@ag.ny.gov

19

20

21      ALSO PRESENT:

22          DR. KAMIAR ALAEI, Claimant

23

24

25
```

DR. HARVEY CHARLES                                3

1              S T I P U L A T I O N S

2

3
              IT IS HEREBY STIPULATED, by and between the
4      attorneys hereto, that:

5
              All rights provided by the C.P.L.R, and
6      Part 221 of the Uniform Rules for the Conduct of
       Depositions, including the right to object to any
7      question, except as to form, or to move to strike
       any testimony at this examination is reserved; and
8      in addition, the failure to object to any question
       or to move to strike any testimony at this
9      examination shall not be a bar or waiver to make
       such motion at, and is reserved to, the trial of
10     this action.

11
              This deposition may be sworn to by the
12     witness being examined before a Notary Public other
       than the Notary Public before whom this examination
13     was begun, but the failure to do so or to return the
       original of this deposition to counsel, shall not be
14     deemed a waiver of the rights provided by Rule 3116
       of the C.P.L.R, and shall be controlled thereby.

15

16            The filing of the original of this
       deposition is waived.

17

18            IT IS FURTHER STIPULATED, that a copy of
       this examination shall be furnished to the attorney
19     for the witness being examined without charge.

20

21

22

23

24

25

```
 1                    DR. HARVEY CHARLES,
 2              was called as a witness, and having been first
 3              duly sworn, is examined and testified as
 4              follows:
 5      EXAMINATION BY
 6      MR. CASTIGLIONE:
 7   Q. Good morning.  And is it Dr. Charles?
 8   A. Dr. Charles is fine, absolutely.
 9   Q. Okay.  Good morning, Dr. Charles.  If you recall, my
10      name is Joe Castiglione.  I'm an attorney with the
11      law firm of Young/Sommer and we represent
12      Kamiar Alaei.
13                    You are here today as a possible
14      witness concerning Mr. Alaei's claims against New
15      York State concerning employment with SUNY Albany.
16      The point of this deposition is I'm going to ask you
17      some questions, probe what knowledge or information
18      you may have that's relevant to Dr. Alaei's claims.
19                    And during the course of my
20      questioning, just so you're aware, your attorney,
21      Anthony, may make an objection.  That's between the
22      attorneys for purposes of preserving the record.
23      You still have to answer the question unless you're
24      otherwise specifically directed not to answer the
25      question.
```

```
 1                      As you're aware, the stenographer is
 2            here, Debbie.  She sworn you in under oath.  She's
 3            here to create a transcript of what we're talking
 4            about today and the documents we'll be going
 5            through.  So as part of her job to type things up
 6            just so it's clear, let me ask my question first and
 7            let me finish it, and then you can answer, because
 8            she can't type us both communicating at the same
 9            time.
10                      And if an objection is made, also,
11            similarly, let it be made and then you can answer
12            unless specifically directed otherwise.  And
13            everything will be on the record with the
14            stenographer typing it, unless the attorneys agree
15            to go off the record, then we'll go off the record
16            and deal with what we have to and the stenographer
17            will stop typing.
18                      So if I ask you any questions, please
19            respond to the best of your ability.  If you don't
20            understand the question, you can certainly ask me to
21            rephrase and I'll try to do my best.  But otherwise,
22            I'll assume that you understand the question as
23            presented.
24      A.    Sure.
25      Q.    And if you can -- Have you ever been deposed before?
```

1   A.   Yes.

2   Q.   Okay.  So just to be clear, we need yes or no

3        responses, verbal responses.  It's just common in

4        communication, people nod their head or make a

5        noise.  So just to be clear, if you can, you know,

6        articulate your response.

7              If at any time you need to take a

8        break, use the bathroom, if you want to talk to your

9        counsel, just let us know.  We can do that.  You do

10       have to answer the question posed to you before you

11       can take a break to speak with your counsel, so just

12       to be aware of that.

13             And is there any reason today that you

14       can't respond truthfully or accurately to my

15       questions to the best of your ability?

16  A.   No reason that I can think of.

17  Q.   Okay.  Can you state, again, your name for the

18       record, please?

19  A.   Harvey Charles.

20  Q.   Okay.  And did you review any documents today in

21       advance of this deposition, Dr. Charles?

22  A.   Yes, I believe that I -- yes.

23  Q.   What documents did you review?

24  A.   I reviewed the -- I'm not sure how I should refer to

25       it, but effectively, the complaint filed against the

```
 1        University by Dr. Alaei.
 2   Q.   Okay.  So you mean the lawsuit papers, is that --
 3   A.   Yes, yes.
 4   Q.   Did you review anything else?
 5   A.   I did not.
 6   Q.   Did you have any conversations with anyone in
 7        advance of today's deposition to prepare for today's
 8        deposition?  And if you did speak to -- I'm sorry,
 9        if you did speak with your attorney, you can say
10        that, but you don't need to get into the discussion
11        you had with your attorney.
12   A.   Yes, I spoke with my attorney.
13   Q.   Okay.  Nobody else?
14   A.   No one else.
15   Q.   Can you state your current employment for me,
16        please?
17   A.   Yes, I am Professor of International Education at
18        the University at Albany.
19   Q.   And you said Professor of International
20        Communication?
21   A.   Education.
22   Q.   Education?
23   A.   Yes.
24   Q.   Okay.  And how long have you held that position?
25   A.   For about one year.
```

DR. HARVEY CHARLES                                        8

1   Q.   One year.  And can you explain to me briefly what
2        your job responsibilities include in that position?
3   A.   Sure.  I teach graduate and undergraduate courses.
4        I engage in scholarship research.  I sit on
5        departmental and school committees.  I advise
6        graduate students.
7   Q.   Okay.  And you said you've had that for about a
8        year?
9   A.   Yes.
10  Q.   Can you identify, if any, employment you had prior
11       to this position?
12  A.   Yes, I served as Dean for International Education
13       and Vice Provost for Global Strategy at the
14       University at Albany prior to this position.
15  Q.   And how long did you hold that position of Dean for
16       International Education and Vice Provost?
17  A.   For about four and a half years.
18  Q.   And so that would be during the entire year of 2018;
19       is that correct?
20  A.   Yes.
21  Q.   Now, can you explain to me your job responsibilities
22       in your position as Dean for International Education
23       and Vice Provost during 2018?
24  A.   Yes, I was responsible for providing
25       institution-wide leadership for international

1      education.  I was responsible for implementing a
2      range of initiatives to advance international
3      education on the campus.  I supervised a number of
4      professionals who had responsibilities for the
5      various offices within the Center for International
6      Education.  I managed a budget.  I reported directly
7      to the Provost and I supported the University's
8      efforts to raise its profile nationally and
9      internationally around issues having to do with
10     international education.
11  Q.  Just so you're aware, the questions I will be asking
12     you going forward are really just relevant to your
13     time and your responsibilities in that position as
14     Dean for International Education and Vice Provost in
15     2018.
16  A.  Sure.
17  Q.  Okay.  And just so you're aware, if I refer to
18     SUNY A or SUNY Albany, I'm referring to the State
19     University of New York at Albany; is that clear?
20  A.  Sure.
21  Q.  Okay.
22            MR. CASTIGLIONE:  Can I mark and
23        identify an exhibit for introduction, Debbie?
24            (Claimant Exhibit A-1 is marked for
25        identification.)

```
 1         BY MR. CASTIGLIONE:
 2    Q.   So Dr. Charles, if you can, are you -- can you take
 3         a look at this document?
 4                   MR. CASTIGLIONE:  And Debbie, if you
 5            could you scroll through it so he can -- the
 6            first few pages is fine.
 7    Q.   Dr. Charles, are you familiar with this document?
 8    A.   I believe I've seen it before.
 9    Q.   Okay.  And are you able to identify what this
10         document is?
11    A.   Yes.
12    Q.   Okay.  What's your understanding of what this
13         document is?
14    A.   I believe it is an articulation of the alternate
15         assignment that was given to Dr. Alaei on
16         February 8, 2018.
17    Q.   When did you first learn about the underlying basis
18         for SUNY Albany issuing this letter?
19    A.   I never learned about the underlying basis for SUNY
20         issuing this letter.
21    Q.   Okay.  Before this letter was issued, did anybody
22         consult you about the underlying concerns that
23         served as a basis for SUNY Albany issuing this
24         letter?
25    A.   No.
```

1  Q.    Are you aware of whether this letter triggered any
2        investigation by SUNY Albany concerning Dr. Alaei?
3  A.    I don't know for a fact.
4  Q.    When you say you don't know for a fact, you don't
5        know for a fact that an investigation was conducted;
6        is that what you mean?
7  A.    No, I don't know for a fact that this letter
8        triggered an investigation.
9  Q.    Okay.  So are you aware at or around the time of
10       this letter, I'll say, in February 2018, if SUNY
11       Albany undertook an investigation concerning
12       Dr. Alaei?
13 A.    I am aware that there was an investigation that was
14       led by the Title IX officer, but that is the extent
15       of the investigative work that I'm aware of.
16 Q.    Okay.  So do you know -- strike that.  I'm sorry.
17       When I say "strike that," it's for the stenographer
18       to strike the beginning of that question so I can
19       start over.
20                Did you participate between
21       February 2018 and August 2018 in an investigation by
22       the Title IX officer or other SUNY personnel
23       concerning Dr. Alaei?
24 A.    I did not.
25 Q.    Did anyone ever ask you about what knowledge or

1          information you might have related to the concerns
2          raised in the letter issued by SUNY Albany here
3          dated February 8, 2018?
4   A.     No.
5   Q.     Are you aware if SUNY Albany personnel ever tried to
6          discuss issues of concerns that served as the basis
7          of this letter, Exhibit A-1, with Kamiar Alaei to
8          try to resolve the underlying concerns at or around
9          the time this letter was issued by SUNY Albany?
10  A.     Could you repeat the question?
11  Q.     Sure.  I'm just asking if you are aware if any SUNY
12         Albany personnel, at or around the time this letter
13         was issued, tried to have a discussion with
14         Dr. Alaei to discuss or learn more about the
15         underlying concerns that served as the basis for
16         this letter?
17  A.     I don't know.
18  Q.     Okay.  Are you aware whether SUNY Albany made a
19         determination to not discipline Dr. Alaei related to
20         this letter in August 2018?
21  A.     Could you ask the question again?
22  Q.     Sure.  Are you aware whether or not SUNY Albany made
23         a determination not to discipline Dr. Alaei based on
24         their investigation related to this letter in
25         August 2018, that they made the determination in

DR. HARVEY CHARLES                                          13

 1       August 2018?
 2                    And I could break it down.  So are you
 3       aware that SUNY Albany -- the investigation you're
 4       aware of under Title IX, related to this letter;
 5       they ultimately made a determination in August 2018?
 6   A.  I was told by someone, and I don't exactly remember
 7       who, that such a determination was made, but
 8       I -- but that's pretty much all I heard.  I
 9       never -- I was not privy to a report, a written
10       report, and no one reported to me the full outcome
11       of this investigation.
12   Q.  Okay.  So nobody consulted with you from SUNY Albany
13       regarding any ultimate conclusion that SUNY Albany
14       made concerning the investigation reflected by this
15       February 2018 letter?
16   A.  No one consulted with me.
17   Q.  Are you aware that SUNY Albany terminated
18       Dr. Alaei's employment on or about August 9, 2018?
19   A.  Yes.
20   Q.  Did anyone consult with you regarding the
21       determination to terminate Dr. Alaei's employment?
22   A.  No.
23                    MR. ROTONDI:  I just want to object to
24            the form of the question.
25   Q.  Are you aware of any conversations or internal

```
 1        communications between SUNY personnel discussing
 2        their determination to terminate Dr. Alaei?
 3                    MR. ROTONDI:  Again, object to the
 4             form of the question.  You can answer.
 5                    THE WITNESS:  Am I supposed to answer?
 6                    MR. CASTIGLIONE:  Yes.
 7                    MR. ROTONDI:  You can answer.
 8                    MR. CASTIGLIONE:  Your attorney makes
 9             an objection for the record.  That's for the
10             attorneys to resolve later.  You still have to
11             answer the question as presented, unless your
12             attorney specifically directs you not to
13             answer.
14                    THE WITNESS:  Okay.  Could you ask the
15             question again?
16                    MR. CASTIGLIONE:  Sure.
17                    Actually, Debbie, can you read that
18             back?
19                    (The previous question is read back.)
20   A.   No, I am not.
21   Q.   Now, your roles and responsibilities in your
22        position in 2018 with SUNY Albany, did that include
23        overseeing the organization identified as the Global
24        Institute of Health and Human Rights?
25   A.   Yes.
```

DR. HARVEY CHARLES                        15

1   Q.   Just so it's clear, I might refer to that as GIHHR

2        going forward.  Is that clear?

3   A.   Yes.

4   Q.   Can you explain to me your responsibilities and

5        duties as to overseeing GIHHR operations in 2018?

6   A.   Sure.  The Director, Dr. Alaei, reported to me.  And

7        for all intents and purposes, it was one of the many

8        units that was part of the Center for International

9        Education and Global Strategy.

10  Q.   So you're saying Dr. Alaei reported to you.  Was

11       there anybody else that Dr. Alaei was required to

12       report to?

13  A.   For the purposes of the administrative functioning

14       of GIHHR, he reported to me.  For his teaching

15       responsibilities in the Rockefeller College, I

16       believe he reported to either the Dean,

17       Karl Rethemeyer, or someone in that college.

18  Q.   Did you have the opportunity, as part of your

19       responsibilities in overseeing Dr. Alaei, to review

20       the quality of his work and efforts on behalf of

21       GIHHR in 2018?

22  A.   Yes.

23  Q.   Did you have the same opportunity as to the quality

24       of his work in 2017?

25  A.   To the extent that he was part of CIEGS in 2017,

```
 1        yes.
 2   Q.   Do you have an opinion as to the quality of
 3        Dr. Alaei's work in 2017 and 2018, to the extent
 4        you're familiar with that work at that time?
 5   A.   Yes, I have an opinion.
 6   Q.   Can you please share your opinion with me?
 7   A.   Yes.  I was very impressed with the work of GIHHR.
 8        I was very impressed with the leadership of
 9        Dr. Alaei.  I believed that he brought much credit
10        to the institution as a result of the work that he
11        did with this organization.
12   Q.   So I want to go back to documents.
13                    MR. CASTIGLIONE:  If I can, Debbie,
14           introduce and identify Exhibit A-2, please.
15                    (Claimant Exhibit A-2 is marked for
16           identification.)
17        BY MR. CASTIGLIONE:
18   Q.   Dr. Charles, if you could take a look at that
19        document.  This document is identified as an e-mail
20        from Ryan Selchick, S-E-L-C-H-I-C-K, dated
21        February 8, 2018.  Do you recognize this document?
22   A.   Well, my name is there, so I believe I read it at
23        some point.
24   Q.   Okay.  In this document, it talks about an
25        alternative assignment being prepared for Dr. Alaei.
```

DR. HARVEY CHARLES                           17

```
 1          Is that -- let me strike that.
 2                    There's a reference in there for KA.
 3          At the beginning, it says "Alaei Kamiar."  Is it
 4          fair to say KA is referring to Kamiar Alaei?
 5     A.   Yes.
 6     Q.   Part of this e-mail, it says, in the middle:  "At
 7          which time we will also be relieving KA of his card
 8          access, keys and e-mail access."
 9                    In your experience and employment with
10          SUNY Albany, is that a typical course of action when
11          an alternative assignment is given to an employee?
12     A.   I do not know.  I don't have this sort of experience
13          with the University.
14     Q.   Did you make any determination to remove Dr. Alaei's
15          e-mail access when he was given this alternate
16          assignment?
17     A.   I did not.
18     Q.   Are you aware of anybody who made that
19          determination?
20     A.   I don't know who made the determination.
21     Q.   That e-mail also notes that SUNY Albany had arranged
22          for a plain clothed police officer from UPD to
23          accompany KA to his office if he needs to retrieve
24          anything.  Are you aware, in your experience with
25          SUNY Albany, if that's typical protocol when there's
```

```
 1        an alternative assignment given to an employee?
 2   A.   I'm not aware of that.  I don't have that
 3        experience.
 4                      MR. CASTIGLIONE:  If I could introduce
 5           document A-3, please.
 6                      (Claimant Exhibit A-3 is marked for
 7           identification.)
 8   BY MR. CASTIGLIONE:
 9   Q.   So Dr. Charles, to the extent you can, can you take
10        a look at this document and see if you recognize it?
11                      Just for the record, this document I'm
12        referring to is a part of Exhibit A-3, is the e-mail
13        from Karl Rethemeyer, R-E-T-H-E-M-E-Y-E-R, dated
14        February 8, 2018.
15                      MR. CASTIGLIONE:  And then, Debbie, if
16           you could scroll down to the next page.
17   Q.   And then the page -- there's an e-mail starting
18        with:  "Sorry to be late to this party.  A couple of
19        points."  Do you recognize this e-mail, Dr. Charles?
20   A.   Yes.
21   Q.   Okay.  In this e-mail we're looking at in Exhibit
22        A-3, and point -- what's identified as Point Number
23        1, and there's an underline in that paragraph that
24        says:  "We will also need to change all references
25        to KA," and it's referring to the GIHHR website?
```

1   A.   Yep.

2   Q.   Did you make a determination to remove references to

3        Kamiar Alaei at that time from the website?

4   A.   I'm trying to think back on that to try to give you

5        a --

6   Q.   I understand.

7   A.   You know, I don't want to guess, but I recall

8        receiving this e-mail and -- Yeah, I'm really trying

9        to remember here.

10                  Could you repeat your question again?

11       I want to be sure I --

12  Q.   Sure.  And just so you're clear, when I ask Debbie

13       to read it, it's because we have form and non-form

14       objections.  And so I'll ask her to read it because

15       it was a non-objected-to question and whatnot.

16                  MR. CASTIGLIONE:  So, Debbie, do you

17           mind reading back that question?

18                  (The previous question is read back.)

19  A.   What I remember doing was instructing the staff at

20       GIHHR to remove references to Dr. Alaei where he was

21       mentioned as Director of GIHHR.  My -- yeah, so.

22  Q.   Okay.  Was that your idea initially or was it

23       presented to you by somebody else?

24  A.   It was presented to me.

25  Q.   Okay.  So as reflected in this e-mail, is it fair to

```
 1        say that Karl Rethemeyer is the one who presented
 2        it?
 3   A.   Yes.
 4   Q.   Do you know why Mr. Rethemeyer, R-E-T-H-E-M-E-Y-E-R,
 5        raised changing the references to Dr. Alaei on the
 6        GIHHR website at that time?
 7   A.   I believe that this issue arose in the context of
 8        the decision made by the administration to have
 9        Dr. Alaei pivot to an alternate assignment and away
10        from his former position as Director of GIHHR.
11   Q.   So you just said "former position as Director of
12        GIHHR."  Are you aware of a determination being made
13        by SUNY Albany at that time that Dr. Alaei, is
14        it -- I'm sorry, let me strike that question.
15                  My understanding was it was always
16        Dr. Alaei.  If I'm pronouncing that wrong, Kamiar,
17        please correct me.
18                       MR. ALAEI:  Alaei.
19                       MR. CASTIGLIONE:  Alaei?
20                       MR. ALAEI:  Yes.  Thank you.
21                       MR. CASTIGLIONE:  I apologize.
22        BY MR. CASTIGLIONE:
23   Q.   Are you aware, Dr. Charles, if there was a
24        determination made by SUNY Albany at that point to
25        remove Dr. Alaei as Director of GIHHR?
```

```
 1   A.   I'm not aware of that.
 2                   MR. CASTIGLIONE:  Okay.  I want to now
 3            introduce a document identified as Exhibit A-4.
 4                   (Claimant Exhibit A-4 is marked for
 5            identification.)
 6   BY MR. CASTIGLIONE:
 7   Q.   Dr. Charles, do you recognize the document that's
 8        been introduced as identified as Exhibit A-4, which
 9        appears to be an e-mail from you to a number of
10        people, dated February 8, 2018?
11   A.   Yes, I do.
12   Q.   And can you identify for me what this document is?
13   A.   This document was intended to invite individuals
14        associated with GIHHR to a meeting to discuss issues
15        around the leadership of GIHHR.
16   Q.   And whose decision was it to send this e-mail?
17   A.   I was instructed by the Provost office to send this
18        e-mail.
19   Q.   Did the Provost office review this e-mail before you
20        sent it?
21   A.   I believe that the Director of Communications,
22        Jordan, I believe that he reviewed this e-mail
23        before it was sent.
24   Q.   And would that be Jordan Evangelo -- sorry,
25        Jordan Carleo, C-A-R-L-E-O dash E-V-A-N-G-E-L-I-S-T?
```

1   A.   Yes.

2   Q.   Okay.  Who is the Provost you were referring to?

3   A.   Jim Stellar.

4   Q.   I noticed in this e-mail there was some addresses

5        that were to Gmail addresses, and there's one that's

6        to a Virginia.edu.  Was this e-mail shared with

7        people outside of SUNY Albany?

8   A.   May I take a look at the top of the page where the

9        recipients are listed?

10  Q.   Well, first, for example, there's a

11       KMB2251@Columbia.edu.

12  A.   Yeah.

13  Q.   I see there's a few Gmail addresses in the middle of

14       the document.  And then if you scroll down again,

15       there is a HM5R@Virginia.edu?

16  A.   Yes, I see these e-mails.  And the only thing that I

17       could conclude, because at this point I don't know

18       for a fact, but the members of the advisory board to

19       GIHHR may have been included in this e-mail.

20  Q.   Okay.  I just want to backtrack, referring to A-1,

21       which was the February 8, 2018 letter from SUNY

22       Albany to Dr. Alaei about an alternative assignment.

23       Were you aware that SUNY Albany was making a

24       decision to place Dr. Alaei on an alternative

25       assignment before February 8, 2018?

```
 1   A.   Yes.
 2   Q.   Do you recall about when you first become aware?
 3   A.   I do not remember.
 4   Q.   Do you recall having a conversation with people a
 5        few days beforehand, before February 8, 2018, about
 6        the conference room -- excuse me -- about -- strike
 7        that.
 8                  Do you recall having a conversation
 9        with SUNY personnel a few days before February 8,
10        2018, about the University removing GIHHR from
11        offices?
12   A.   I am not sure that I understand your question.
13        Removing GIHHR from offices?
14   Q.   From University offices that they were occupying.
15        So did you have a conversation with SUNY Albany
16        personnel before, a few days before February 8,
17        2018, about discussing that GIHHR would be removed
18        from the offices they were occupying at that time?
19   A.   I don't recall having such a conversation.
20   Q.   Okay.  Back to Exhibit A-4 and the e-mail.  In the
21        e-mail it reflects there was going to be a meeting
22        on Friday afternoon at 3:00 p.m.  Do you recall that
23        meeting occurring?
24   A.   Yes.
25   Q.   And can you explain to me who spoke at that meeting
```

DR. HARVEY CHARLES                                    24

```
 1        and what they discussed, to the best of your
 2        recollection?
 3   A.   Yeah, I don't remember all who spoke at that
 4        meeting, but I remember that I made some
 5        introductory remarks as the Dean and Vice Provost.
 6        I believe that Chantelle Cleary, the Title IX
 7        Coordinator, was there and she spoke at the meeting
 8        as well.  I really can't remember who else might
 9        have spoken at that meeting.
10   Q.   So you made some just, basically, introductory
11        remarks?
12   A.   Yes.
13   Q.   Who attended that meeting?
14   A.   A number of the interns associated with GIHHR
15        attended the meeting.  I believe some of the
16        professional staff at GIHHR and maybe one or two or
17        three, I don't remember the numbers, but the
18        scholars associated with GIHHR.  I don't know how
19        many of them attended, but I recall at least one of
20        them attending.
21   Q.   And do you recall if the attendees asked questions
22        during that meeting?
23   A.   Yes.
24   Q.   Do you recall the overall substance of the questions
25        that were raised by attendees?
```

DR. HARVEY CHARLES                                    25

1    A.    Well, some attendees were asking questions to

2          determine whether the University would take the

3          allegations made against Dr. Alaei seriously.  There

4          were other attendees who were asking questions as to

5          whether the University would address, interfere, in

6          a responsible way, the implications for them as

7          scholars at the University, having been brought to

8          the University by Dr. Alaei.  And there were

9          questions about the fact that things were happening.

10         It seems as if the University -- let me start over.

11                     There were questions about -- There

12         were concerns about the fact that people were not

13         getting information, even though they kept asking

14         questions.

15   Q.    Okay.  Did any of the attendees raise questions

16         about whether or not the -- SUNY's concerns related

17         to improper conduct by Dr. Alaei?

18   A.    Could you ask the question again?

19   Q.    Sure.  Did any of the attendees raise questions

20         asking if SUNY Albany's concerns regarding Dr. Alaei

21         at the time were related to misconduct or

22         inappropriate action?

23   A.    You know, there's something about the phrasing of

24         that question that is really tripping me up.  So I

25         don't know if you can ask it in a different way.

1          Again, I want to answer truthfully, so.

2    Q.    Sure.  Did any of the attendees raise concerns that

3          the grounds for putting Dr. Alaei on alternate

4          assignment were based on improper conduct?

5    A.    Well, what I remember was -- The first thing I would

6          say is I am not sure if the decision to place

7          Dr. Alaei on alternate assignment had been made by

8          then.  And maybe I'll have to look at the date of

9          this e-mail to be sure of that.  So I am not certain

10         that that had happened.  Oh, that's July 2nd --

11   Q.    No, that's --

12   A.    February 8th.

13   Q.    Yeah.

14   A.    February 8th, okay.

15                   So, you know, that's dated the same

16         day as the day that the e-mail was sent to Dr. Alaei

17         about the alternate assignment, I recall from the

18         exhibit that you posted earlier.

19                   What I can tell you is that there were

20         attendees who were very concerned as to whether

21         their complaints to the University about Dr. Alaei

22         would be taken seriously, and there were attendees

23         who were very concerned about how Dr. Alaei was

24         being treated and the implications for their

25         positions at the University, either as employees or

1          as researchers.

2    Q.    You had mentioned you gave some introductory

3          remarks, Chantelle Cleary spoke.  Did anyone else

4          speak on behalf of SUNY Albany at that meeting?

5    A.    I really don't remember.

6    Q.    Okay.  And was this meeting limited for attendance,

7          in terms of only certain personnel were allowed to

8          attend, or was it open to anybody?

9    A.    No, it was limited only to the people to whom we

10         sent the e-mail.

11                    MR. CASTIGLIONE:  Okay.  If I can

12              introduce Exhibit A-5, please.

13                    (Claimant Exhibit A-5 is marked for

14              identification.)

15   BY MR. CASTIGLIONE:

16   Q.    Dr. Charles, I'll ask you if could you take a look

17         at what's been marked as Claimant's Exhibit 5?  Do

18         you recognize what this document is?

19   A.    Yes, I do.

20   Q.    This document appears to be an e-mail from you dated

21         February 8, 2018, to a number of people, including

22         Jordan Carleo-Evangelist and James Stellar, among

23         others.  This e-mail identifies in the body, in

24         part, that you wanted to give some consideration

25         about providing communication to the GIHHR advisory

DR. HARVEY CHARLES                                        28

```
 1        board.  "Many of the members are very influential
 2        people associated with prestigious universities and
 3        organizations."
 4                    Was this your original idea to provide
 5        notice to GIHHR advisory board or did somebody else
 6        present it to you?
 7   A.   I am not sure.
 8                    (Claimant Exhibit A-7 is marked for
 9            identification.)
10   Q.   If I can refer you to what's being identified as
11        Claimant Exhibit A-7.  I'll get back to 6 in a
12        second.
13                    Dr. Charles, do you recognize the
14        document that's identified as Claimant's A-7, which
15        appears to be an e-mail from you dated February 9,
16        2018?
17   A.   Yes, I do.
18   Q.   And is this the e-mail or the proposed e-mail or
19        communication you were referring to in your prior
20        e-mail that was identified as Exhibit A-5, about
21        communicating with the advisory board?
22   A.   No, I don't believe so.  I think that prior e-mail
23        had to do about inviting members of the advisory
24        board to the meeting on the afternoon of February
25        the 8th.
```

DR. HARVEY CHARLES                                    29

```
1   Q.   So as to this e-mail, can you explain to me your
2        understanding of the purpose of this e-mail?
3   A.   Yes.  The purpose of this e-mail was to inform GIHHR
4        advisory board members and supporters of the
5        temporary change in leadership of GIHHR.
6   Q.   Was it you that made the determination to name
7        Dina Refki, R-E-F-K-I, and Gina Volynsky,
8        V-O-L-Y-N-S-K-Y, as Interim Co-Directors of GIHHR?
9   A.   No, I did not make that determination.
10  Q.   Who did, if you know?
11  A.   I don't know.
12  Q.   Did anyone ever consult with you on who would be
13       named as Interim Co-Directors of GIHHR around this
14       time?
15  A.   I believe I may have had a conversation -- Well, I
16       need to be careful about not trying to make things
17       up that would seem sensible.  So let me -- let me
18       strike that and say that, in response to your
19       question, that I believe I was part of a meeting
20       where there was a conversation about who should
21       assume temporary leadership of GIHHR.  I was not the
22       one to make the -- to recommend these names, nor was
23       I the one to make the ultimate determination that
24       these two women would serve as temporary Directors
25       of GIHHR.
```

DR. HARVEY CHARLES                                          30

1    Q.    Do you know who made those decisions you just
2          identified?
3    A.    Because the Provost assumes response -- because the
4          Provost had responsibility for academic affairs and
5          by extension, the Center for International Education
6          and Global Strategy, as well as the Rockefeller
7          College.  And again, by extension, the leadership of
8          those two departments or divisions, I believe that
9          he made the final determination.
10   Q.    Did anyone -- This e-mail identified as Claimant's
11         Exhibit A-7, did anyone provide input on the content
12         of the e-mail, or was this your original draft?
13   A.    No, this was run through the Director of
14         Communications, Jordan Carleo-Evangelist.
15   Q.    Do you know if anybody else reviewed the content of
16         this e-mail before it was sent out?
17   A.    I don't know who else may have reviewed the content
18         of the e-mail.
19   Q.    Did anyone, as far as you're aware, raise any
20         concerns about privacy issues for Dr. Alaei as a
21         result of this e-mail being sent out or possibly
22         sent out to these GIHHR advisory board people?
23   A.    I don't recall such an issue being raised.
24   Q.    Was anyone concerned and did anyone raise an issue
25         before this e-mail went out that it might give the

```
 1        wrong message or wrong impression as against
 2        Dr. Alaei?
 3  A.    I don't recall such a concern being raised.
 4                    MR. CASTIGLIONE:  If I can introduce
 5            and mark Claimant's Exhibit A-6.
 6                    (Claimant Exhibit A-6 is marked for
 7            identification.)
 8        BY MR. CASTIGLIONE:
 9  Q.    So, Dr. Charles, my question to you is:  Do you
10        recognize the chain of e-mails that are identified
11        as Exhibit A-6, which the top e-mail is an e-mail
12        from Brian Selchick, dated February 9, 2018.  It
13        appears to be responding an e-mail inquiry from you,
14        dated February 8, 2018?
15  A.    Yes.
16  Q.    In this e-mail, is it fair to say Dr. Alaei had been
17        identified as a -- or solicited as a speaker for an
18        event and SUNY Albany was reviewing whether or not
19        he would be allowed to speak at that event; is that
20        a fair characterization?
21                    I can say this:  Whether he would be
22        allowed to speak at that event in his capacity as an
23        employee of SUNY Albany?
24  A.    That's right, yes.
25  Q.    Okay.  This reflects that Mr. Selchick ultimately
```

```
 1           determined that Mr. Alaei would be able to speak but
 2           in his personal capacity, private capacity and not
 3           as a representative of SUNY Albany; is that fair to
 4           say?
 5    A.     I believe so.
 6    Q.     What was the concern, if you were aware, being
 7           raised by SUNY Albany personnel with Dr. Alaei
 8           speaking at this event?
 9    A.     I believe that the concern was -- had to do with
10           whether Dr. Alaei would represent himself as
11           Director of GIHHR, if -- at a point where he was
12           temporarily removed from that position and placed in
13           an alternate assignment.  I think that that was the
14           concern.
15    Q.     So SUNY Albany personnel did not want Dr. Alaei to
16           speak at an event to represent himself as the
17           current Director of GIHHR; is that fair to say?
18    A.     That's right, assuming that it would happen at a
19           time when he did not occupy that position.
20                        MR. CASTIGLIONE:  Okay.  If I could
21               refer you to what I'm going to mark and
22               identify as Exhibit A-8.
23                        (Claimant Exhibit A-8 is marked for
24               identification.)
25           BY MR. CASTIGLIONE:
```

```
 1   Q.   Dr. Charles, can you take a look at this e-mail
 2        that's been identified as Exhibit A-8?  It appears
 3        to be an e-mail from you dated February 13, 2018, to
 4        Dr. Alaei.  Are you familiar with this e-mail?
 5   A.   Yes, I am.
 6   Q.   If I could point you to language in the middle of
 7        this e-mail where it starts, it says, in part, "I
 8        wanted to remind you that the terms of your
 9        alternative assignment preclude you from
10        participating in these events representing yourself
11        as Director of GIHHR or as associate dean for global
12        and interdisciplinary research."
13                  What was the basis of that statement?
14   A.   Well, there was a discussion in the Provost office
15        in response to information that had been brought to
16        the attention of the Provost that Dr. Alaei was
17        continuing to participate in various assignments off
18        campus, keynote speeches and whatever, and based on
19        the flyer, that he was being described as holding
20        the position that, at that particular time, he no
21        longer held.  And it was the sentiment of the
22        Provost office that he not continue to represent
23        himself with titles that, at that time, he did not
24        hold.
25   Q.   Similar if -- well, strike that.
```

```
 1                          Referring back to Exhibit A-6, and
 2           similar to what you just discussed, did SUNY Albany
 3           personnel determine they did not want Dr. Alaei
 4           representing himself as affiliated with SUNY Albany?
 5   A.      I don't believe that that was the objective.  They
 6           did not want him representing himself as Director Of
 7           GIHHR at that time, because he was not, at that
 8           time, Director of GIHHR.
 9   Q.      Okay.  If I could refer you back to Exhibit A-6.
10                          This e-mail that we went through,
11           Exhibit A-6, through Mr. Selchick, S-E-L-C-H-I-C-K,
12           states, in part:  "It is my opinion that you are
13           correct.  So long as he does so as a private citizen
14           and not as a representative of the University."
15                          Would that be indicative of what SUNY
16           personnel's determination was as to what capacity
17           Dr. Alaei could represent himself at these types of
18           matters?
19   A.      You know, I cannot say.  This e-mail was written by
20           Brian Selchick, who works in the office of human
21           resources, and I wouldn't propose to speak to him
22           about that.
23   Q.      Did you have any interaction with Mr. Selchick
24           between February 2018 and August 2018 regarding any
25           investigation into Dr. Alaei or his alternative
```

DR. HARVEY CHARLES                          35

```
 1        assignment?
 2   A.   I believe that my interactions with the office of
 3        human resources were typically not with
 4        Brian Selchick.  You are mentioning dates that, you
 5        know, I can't recall exactly what happened during
 6        that period of time.  However, I can say to you that
 7        there was a deposition in the office of human
 8        resources, and I believe that you and Dr. Alaei were
 9        there and Brian Selchick was present, so -- and I
10        was required to be part of that deposition, so I was
11        present as well.
12                    Other than that and this e-mail, I
13        can't recall any direct communications with him
14        about -- about issues having to do with the
15        investigation regarding Dr. Alaei.
16   Q.   What about communications with Randy Stark with
17        offices of human resources about the investigation
18        concerning Dr. Alaei?
19   A.   I believe that my communications with Randy Stark
20        would have been more likely.  I would have been more
21        inclined to speak to him.  But since none of the
22        information having to do with the investigation was
23        ever really shared with me, the report was never
24        shared with me or anything of the sort, I had no
25        reason to be in touch with Mr. Stark.
```

 1                    Now, if there might have been an issue
 2        with the alternative assignment from a human
 3        resource perspective, yes, I would consult with
 4        Mr. Stark.  But other than that, no.
 5   Q.   Okay.  If I could refer you to what's being marked
 6        as Exhibit A-10, which is a series of e-mails.
 7                    You want to take a quick five minute
 8        break?  I mean, it's been going for about an hour
 9        and ten minutes.  Is that okay with everybody?
10                         MR. ROTONDI:  Sure.
11                         MR. CASTIGLIONE:  We will see you back
12             at 13 after 11:00.
13                    (Whereupon, a recess is taken.)
14                    (Claimant Exhibit A-10 is marked for
15             identification.)
16   BY MR. CASTIGLIONE:
17   Q.   Dr. Charles, if you can look at what's been
18        identified or marked as Exhibit A-10.  It's starting
19        at the point of this exhibit where there's an e-mail
20        to Provost mail, dated February 15, 2018, update on
21        GIHHR.
22                    Dr. Charles, are you familiar with
23        this e-mail?
24   A.   Yes, I am.
25   Q.   Do you know who sent this e-mail?

1    A.    Well, it's signed by Jim Stellar, the Provost at

2          that time.

3    Q.    Okay.  And what was -- Are you aware of what

4          Mr. Stellar's responsibilities were in his job as

5          Provost at that time?

6    A.    Well, I couldn't recite the entire job description

7          to you, but part of his responsibility was to have

8          oversight of all of the units within academic

9          affairs, and the college of -- Rockefeller College,

10         as well as the Center for International Education

11         Global Strategy were units under his purview.

12   Q.    Do you know why Mr. Stellar sent this e-mail and to

13         who he sent it to?

14   A.    I'm wondering if you could kind of just scroll back

15         up a bit so I can take a look at recipients of the

16         e-mail.

17   Q.    I think if you scroll up --

18   A.    Okay.  I believe that he was writing to the GIHHR

19         advisory board about the developments in GIHHR at

20         that time and kind of wanted to give them a sense as

21         to what to expect or what to understand about the

22         University's position on the issue at that time.

23   Q.    Okay.  Did Mr. Stellar solicit your input on the

24         content of this e-mail before it was sent?

25   A.    I don't believe -- I can't remember.  I can't

DR. HARVEY CHARLES                                    38

```
 1        remember.  He may have sent it to me to take a look
 2        at it, a draft, but I can't remember.
 3   Q.   Okay.  Do you recall receiving any responses from
 4        any of these GIHHR advisory board members concerning
 5        this e-mail?
 6   A.   Could you scroll down a bit, please?
 7                  Okay.  Could you also -- could you
 8        still keeping scrolling, please?
 9                  Okay.  Could you ask the question
10        again, please?
11   Q.   Sure.  Do you recall receiving any responses from
12        GIHHR advisory board members in response to this
13        e-mail from the Provost?
14   A.   I don't recall receiving responses from them in
15        response to this e-mail.
16   Q.   Did you receive communications from GIHHR advisory
17        board members over time concerning the issue with
18        removing Dr. Alaei as Director of GIHHR?
19   A.   Yes.  A number of them, yes.
20   Q.   Are you able to generalize and provide me the
21        primary substance of the comments you received over
22        time?
23   A.   At the heart of the concern was the appropriateness
24        of what the University did with respect to removing
25        Dr. Alaei from the directorship of GIHHR and placing
```

DR. HARVEY CHARLES                                         39

```
 1         him in the alternate assignment, and secondly, the
 2         lack of communication, the fact that this was done
 3         and nothing was communicated to the advisory board
 4         about the rationale for this action.
 5    Q.   Are you aware if anybody on the GIHHR advisory board
 6         raised any concerns as to whether the actions by
 7         SUNY Albany were based upon alleged improper conduct
 8         by Dr. Alaei?
 9    A.   I am not aware of that.
10    Q.   If I can refer you to what's being identified as
11         Exhibit A-11?
12                   (Claimant Exhibit A-11 is marked
13            for identification.)
14    BY MR. CASTIGLIONE:
15    Q.   Dr. Charles, can you take a look at this e-mail and
16         tell me if you recognize what the document is?
17    A.   I think I do, yes.
18    Q.   Do you recall receiving a copy of this document
19         identified as A-11, which is an e-mail from
20         James Stellar to others, dated February 22, 2018?
21    A.   Well, I am not copied -- copied on it, so I'm not
22         sure that I received a copy of it.  But the
23         sentiments seem familiar to me.
24    Q.   Are you aware if Mr. Stellar was considering the two
25         women, who had been appointed to head GIHHR, as the
```

DR. HARVEY CHARLES                                          40

```
 1        new directors, consistent with what's reflected in
 2        this e-mail?
 3    A.  The question again, please?  Am I --
 4    Q.  Sure.
 5                    MR. CASTIGLIONE:  Deb can you read
 6            that back?
 7                    (The previous question is read back.)
 8    A.  Whether he was considering -- again, I'm not, you
 9        know, quite sure that language.  But if you're
10        asking if he -- if the reference were to the two new
11        directors appointed, I believe so, yes.
12    Q.  Okay.  And so are you aware of Mr. Stellar making a
13        determination at this time that he considered the
14        women who were appointed to head GIHHR as the new
15        directors?
16    A.  You know, I want to be very careful with the
17        language.  What I can say is that I believe that he
18        understood their position to be the ones -- the
19        individuals who were ultimately responsible for the
20        leadership of GIHHR, you know, if they are
21        being -- if they were referred to or thought of as
22        directors, then so be it.  But that would be my
23        response to you.
24    Q.  Did Mr. Stellar ever have any conversations with you
25        directly that he, in his determination, considered
```

```
 1            the two women to be the new directors of GIHHR at or

 2            around this time in this e-mail, February 22, 2018?

 3    A.      You know, certainly we had conversations about the

 4            new leadership of GIHHR.  You know, I want to be

 5            careful in responding to your question regarding the

 6            term "directors," and what that might imply.

 7                      What I would also state to you is that

 8            at the time that this e-mail was written, Dr. Alaei

 9            was on alternate assignment, which means that he was

10            in a temporary position.  And as far as I can

11            tell -- and again, I'm trying to respond to -- as

12            completely as I can to your question.  I'm not sure

13            whether you are implying that the term "director"

14            suggests a degree of permanence, but -- and if that

15            is what you're getting at, then I don't -- I don't

16            know.  All that I know is that the Provost

17            determined that GIHHR needed leadership in

18            Dr. Alaei's absence while he was on alternate

19            assignment, and these two women were appointed to

20            play that role.  And so that would be my response to

21            you.

22    Q.      If I can refer you to what's being identified as

23            Exhibit A-12.

24                      (Claimant Exhibit A-12 is marked for

25                identification.)
```

```
 1        BY MR. CASTIGLIONE:
 2   Q.   Dr. Charles, if you could take a look at the
 3        document that's been identified as Exhibit A-12?  Do
 4        you recognize this document?
 5   A.   Yes, I do.
 6   Q.   Can you just briefly identify for me what this
 7        document is?
 8   A.   Sure.  Could you scroll down a bit so I can keep
 9        reading the entirety of it?
10   Q.   Dr. Charles, do you recall what this document is?
11   A.   Yes.
12   Q.   Can you just briefly explain to me your
13        understanding of what this document is?
14   A.   Yes.  Dr. Alaei wrote this e-mail to me trying to
15        underscore the sensitivity of some of the grants
16        that he was working on at that time and, basically,
17        asking that some steps be taken to mitigate any
18        potential fallout as in the loss of those grants or
19        in the -- or fallout in terms of how the well-being
20        of some of the people working on the grant on the
21        ground might be compromised as a result of the
22        leadership issues of GIHHR at that time.
23   Q.   Can you explain to me what, if any, action you took
24        as a result of receiving this e-mail?
25   A.   Yes, I believe that I discussed this matter with
```

DR. HARVEY CHARLES                                43

```
 1        Karl Rethemeyer, who, along with me, were
 2        responsible for having oversight of the situation.
 3        I, personally, never really dealt directly with the
 4        grants, other than approving them, but I felt that
 5        Dr. Rethemeyer would be in a better position to talk
 6        with the Co-Directors, especially Dina Refki, who
 7        was the one being tasked with the grants, on the
 8        implications of -- the implications that Dr. Alaei
 9        had brought to our attention in this e-mail.
10   Q.   Okay.  And so is it fair to say that you had a
11        conversation with Karl Rethemeyer, then it was left
12        to Dr. Rethemeyer to take care of the situation?
13   A.   Yes.
14   Q.   Are you aware if anyone from these projects or
15        grants referred to in this e-mail contacted GIHHR
16        about why Dr. Alaei was no longer working with GIHHR
17        at that time?
18   A.   I don't recall.
19   Q.   If I can refer you to what's being identified and
20        marked as Claimant's Exhibit A-13.
21                    (Claimant Exhibit A-13 is marked for
22           identification.)
23        BY MR. CASTIGLIONE:
24   Q.   Dr. Charles, I'm showing you what's been marked as
25        Exhibit A-13.  It appears to be an e-mail from
```

DR. HARVEY CHARLES                                    44

```
 1        Chantelle, C-H-A-N-T-E-L-L-E, Cleary, dated March 9,
 2        2018, with the subject GIHHR investigation.  It's
 3        identified as having a flag status as flagged.  Have
 4        you ever seen this document before?
 5   A.   No, I haven't.
 6   Q.   Do you know who Chantelle Cleary is?
 7   A.   I believe that she was the Title IX investigator at
 8        that time.
 9   Q.   When you say she was, is she still employed with
10        SUNY Albany as far as you're aware?
11   A.   I don't believe so.  Things could have happened over
12        the past few days, but I don't believe so.
13   Q.   Okay.  Do you have any understanding of why she
14        might not work there anymore?
15   A.   No, I don't.
16   Q.   This e-mail has a statement at the beginning that
17        says:  "Hi all, I have been asked Bruce to make this
18        matter our top priority."
19                      Were you aware or did anyone
20        communicate to you around this time that SUNY
21        personnel had identified this GIHHR investigation as
22        being a top priority?
23   A.   No one had informed me about that.
24   Q.   There's a reference here to Bruce.  Would you have
25        any understanding of who she's referring to by
```

DR. HARVEY CHARLES                                        45

```
 1        Bruce?
 2   A.   Well, there is one Bruce I know at the University.
 3   Q.   Who is that?
 4   A.   That's Bruce Celeste.
 5   Q.   And who is that?
 6   A.   He is currently the Chief of Staff to the President.
 7        But I believe at that time he served as the Chief of
 8        Staff to the Provost, I think.
 9   Q.   Did you have occasion to work with Ms. Cleary over
10        time during your employment with SUNY Albany?
11   A.   I did not have occasion to work directly with her,
12        no, other than this case.  And in this case, there
13        was no working with her, because I was not part of
14        the investigation.
15   Q.   Are you aware of a recent New York State Supreme
16        Court Appellate Division Third Department decision
17        concerning activities by Ms. Cleary conducting other
18        investigations as part of her role as Title IX for
19        SUNY Albany?
20   A.   No, I'm not aware of that.
21   Q.   If I can introduce the document identified as
22        Exhibit J-1.
23                    (Claimant Exhibit J-1 is marked for
24             identification.)
25        BY MR. CASTIGLIONE:
```

1    Q.   Dr. Charles, this is a decision from the State of

2        New York Supreme Court Appellate Division Third

3        Judicial Department, dated November 25, 2020, in the

4        caption of:  In The Matter of Alexander M.,

5        Appellant Petitioner, the Chantelle Cleary, as

6        former Title IX Coordinator at the State University

7        of New York at Albany.

8                Is that the position you understood it

9        that Ms. Cleary held during the investigation by the

10       SUNY Albany personnel into Dr. Alaei?

11   A.   I believe that that was the title when she was

12       involved in this matter, but again, I never saw any

13       statement from HR indicating that this, in fact, is

14       the title of Chantelle Cleary so -- but I believe

15       that she handled Title X matters.

16              MR. CASTIGLIONE:  If I could have you

17          scroll down, Deb, to page 6 on this document.

18              Right there.

19   Q.   In the middle of this Exhibit J-1 on page 6 of the

20       actual document, itself, the second paragraph starts

21       with:  "As to the possibility of individual bias,

22       Cleary admittedly altered the facts as reported to

23       her."

24               Later on in this document, it says

25       Cleary's paraphrasing -- portrays -- or phrasing.

1          I'm sorry, "Cleary's phrasing portrays a

2          significantly different rendering of the event at

3          the hearing when Cleary was asked why she changed

4          the wording, her response is, in the words of the

5          Supreme Court's order denying Petitioner's motion

6          for discovery, 'bordered on the incoherent'."

7                     During your time working with SUNY

8          Albany, are you aware of any concerns being raised

9          or that were raised by SUNY Albany's personnel as to

10         Ms. Cleary showing bias in her investigations?

11    A.   No, I am not aware.

12    Q.   What about as to any concerns raised by SUNY Albany

13         personnel about Ms. Cleary altering wording as part

14         of her investigation?

15    A.   No, I am not aware.

16                     MR. CASTIGLIONE:  If I can scroll down

17              one more page, please.  Right there.

18    Q.   In the middle paragraph of what is identified as

19         page 7 of the document that is Exhibit J-1, it

20         states, in part:  "In addition, Petitioner presented

21         an affidavit from his advisor, who was present with

22         him in his meeting with Cleary.  The advisor averred

23         that at said meetings, Cleary raised her voice,

24         physically leaned toward Petitioner and acted in an

25         aggressive manner.  Perhaps more importantly, the

```
 1        advisor avers that Cleary exceeded her role as an
 2        investigator and acted as a factfinder."
 3                    Are you aware of any concerns raised
 4        by SUNY personnel during your time there as to
 5        Ms. Cleary engaging in such a behavior during
 6        investigations she was conducting for SUNY Albany?
 7   A.   No, I'm not aware.
 8   Q.   Okay.  If I could refer you to the documents
 9        identified as Exhibit B, or which are going to be
10        marked as Exhibit B.
11                    (Claimant Exhibit B-1 is marked for
12           identification.)
13        BY MR. CASTIGLIONE:
14   Q.   Dr. Charles, are you aware -- did there come a time
15        when SUNY Albany began to move forward with
16        non-renewal efforts as to Dr. Alaei's contract or
17        employment with SUNY Albany?
18   A.   Can you ask the question again?
19   Q.   Sure.  Are you aware or did there come a time when
20        SUNY Albany was pursuing non-renewal of Dr. Alaei's
21        employment?
22   A.   I believe that I may have been told about this maybe
23        a day or two before it happened.
24   Q.   Are you familiar with this document here that's
25        identified as Claimant's B-1?
```

DR. HARVEY CHARLES                                    49

```
 1   A.    No, I am not.
 2   Q.    Well, my next question was:  Did you prepare this
 3         document?
 4   A.    I did not prepare this document.
 5   Q.    If I can refer you to now what's being marked as
 6         Exhibit B-2.
 7                     (Claimant Exhibit B-2 is marked for
 8             identification.)
 9   BY MR. CASTIGLIONE:
10   Q.    Dr. Charles, do you recognize this document?
11   A.    No, I don't.
12   Q.    On this document, there's some handwritten notes
13         that appear to be initials.  Throughout it says BBS.
14         Do you have any understanding of who BBS might be?
15   A.    No.
16   Q.    Is it possibly referring to Brian Selchick?
17   A.    I really don't know.
18   Q.    In the first box there, it says:  "4/20, Friday,
19         issue notice of interrogation of KA on various
20         issues, Title IX, account management and grant
21         management and use of University funds for non-UA
22         personnel."
23                     Are you aware of what that's referring
24         to?
25   A.    No.
```

1    Q.    Did there come a time when you attended an

2          interrogation held by human resources with Dr. Alaei

3          in May 2018?

4    A.    Yes.

5    Q.    This document here, B-2, there's a date that says

6          4/26, Thursday, interrogate KA by Selchick with

7          Stark, Cleary and Charles present."

8                    Do you have any understanding about

9          why that date is 4/26 for interrogation of Dr. KA?

10   A.    I don't know, no.

11   Q.    If you scroll down for -- there's a notation 5/2,

12         Wednesday.  It says:  "Notice of discipline (NOD),

13         which keeps KA on alternative assignment while

14         investigation proceeds."

15                   Are you aware of what that reference

16         to issuing a notice of discipline as of 5/2 against

17         Dr. Alaei?

18   A.    No.

19   Q.    Now, on this document, if you scroll up, there's a

20         date entry 4 -- there's a date entry 4/23, Monday.

21         It says:  "Initiate non-renewal of KA."

22                   Did you participate or have any

23         understanding of a non-renewal being initiated for

24         KA as of 4/23?

25   A.    I don't recall.

DR. HARVEY CHARLES                                   51

```
 1   Q.   If I can refer you to what is being marked as B-3?
 2        This is a series of documents.  So if you can start
 3        at the bottom and scroll up.
 4                      (Claimant Exhibit B-3 is marked for
 5              identification.)
 6   BY MR. CASTIGLIONE:
 7   Q.   So, Dr. Charles, if you could take a look at the
 8        document identified as Exhibit B-3, and particularly
 9        the portion of that document that appears to be an
10        e-mail from you that says:  "Hello, Bill" and it
11        appears to be sent to a Hedberg, William, dated
12        April 28, 2018, at 3:21 p.m.?
13   A.   Yeah.
14   Q.   Do you recognize what this document is?
15   A.   Yes, I do.  I do.
16   Q.   Can you explain to me your understanding of what
17        this e-mail is?
18   A.   Yes.  William Hedberg, who is the Senior Associate
19        Vice Provost, contacted me to request that I sign an
20        HRM-3, which is the document at the bottom here, as
21        well as to sign a letter recommending that I -- a
22        letter that was written by someone, not by me,
23        recommending to the Provost that Dr. Alaei not be
24        renewed.  And I made it clear to Bill Hedberg that I
25        could not sign the letter because I had no basis to
```

```
 1          make such a recommendation to the Provost.
 2                    However, the HRM-3 was a personnel
 3          document that was not about a recommendation.  It
 4          was to take the action of non-renewal that the
 5          Provost or someone in the Provost office had already
 6          made a determination about.
 7                    And so as you would see a bit further
 8          down, I said to Bill, when he asked me to -- when he
 9          wrote to me about signing the non-renewal letter, I
10          said, "Yes, I am at home."  It was a weekend
11          actually, and I can come over to his house.  And
12          indeed, I went over to his house.  He lives two
13          blocks away from me.  And I picked up the document.
14                    When I returned home and I realized
15          that a letter was included, written on my behalf
16          with my name and a letter indicated that I,
17          Harvey Charles, am recommending to the Provost that
18          Dr. Alaei be non-renewed, I told Bill that I
19          couldn't sign that letter.  And, in fact, you know
20          in the previous exhibit, you showed a copy of the
21          letter and I couldn't remember it because, you know,
22          I know there was a letter, but, of course, I didn't
23          write that letter.  So, you know, it simply didn't
24          resonate with me.  But you would notice that it was
25          not initialed or signed by me.
```

DR. HARVEY CHARLES                                    53

```
1    Q.   Correct.
2    A.   And I was very intentional about not doing that,
3         because I felt as though I had no reason to make a
4         recommendation to the Provost that Kamiar be
5         non-renewed.
6    Q.   And that letter we had referred to just now dated
7         April 27, 2018, that wasn't signed, that's Exhibit
8         B-1, do you know who prepared that?
9    A.   I don't know.
10   Q.   But it was presented to you and asked that you
11        signed it?
12   A.   Yes.
13   Q.   At the top of this e-mail, there's an e-mail dated
14        Saturday, April 28, 2018, from William Hedberg to
15        you.  Do you recall receiving this e-mail?
16   A.   Yes.
17   Q.   How did you understand this e-mail when you received
18        it?
19   A.   What I understood was that the -- that the Provost
20        office had made a determination about Dr. Alaei's
21        employment, and that because I am the supervisor of
22        record, I am obligated to sign the HRM-3 in order to
23        allow the Provost office to follow through on the
24        decision it had made.
25   Q.   Okay.
```

DR. HARVEY CHARLES                                    54

```
 1   A.   And so -- yeah.
 2   Q.   Did anyone consult with you beforehand, before you
 3        received this request to sign a non-renewal for
 4        Dr. Alaei?
 5   A.   I do not recall.
 6   Q.   At that time you received this, did you have any
 7        basis to recommend that Dr. Alaei not be renewed on
 8        the merits of his work?
 9   A.   I had no basis at all.
10   Q.   Would you have otherwise made any recommendation
11        concerning renewal or non-renewal of Dr. Alaei at
12        that time?
13   A.   Based on what I knew about Dr. Alaei, if I were
14        asked to make a recommendation, I would have made a
15        recommendation that he be renewed based on what I
16        knew.
17   Q.   And that was based on, in part, the merits of his
18        work?
19   A.   Yes.
20   Q.   If can you scroll down on this Exhibit B-3.
21        Dr. Charles, this form, the last document that's
22        attached as part of Exhibit B-3, is this the form
23        you were referring to that you would sign?
24   A.   Yes, the HRM-3, yes.
25   Q.   Did you create this form?
```

DR. HARVEY CHARLES                                          55

```
 1   A.   I did not.
 2   Q.   If I can refer you to exhibit -- what's being marked
 3        as Exhibit B-4?
 4                  (Claimant Exhibit B-4 is marked for
 5           identification.)
 6   BY MR. CASTIGLIONE:
 7   Q.   Dr. Charles, can you take a look at the document
 8        identified as Exhibit B-4, which appears to be what
 9        I'm referring to, it looks like, an e-mail from you
10        to -- it says "To Randy," dated May 2, 2018?
11   A.   Yes.
12   Q.   Do you recall what this e-mail is?
13   A.   Yes.
14   Q.   Did you write this e-mail?
15   A.   I did.
16   Q.   This e-mail states, in part:  "I decline to sign
17        that letter because I have no information that can
18        be used as a basis to recommend that Kamiar not be
19        renewed.  I am not seeking such information, since
20        it is clear to me that the Provost had decided to
21        not renew Kamiar's contract.  I did sign the HRM-3
22        form, however, in order to complete the paperwork,
23        per the wishes of the Provost."
24                  Is that consistent with the testimony
25        you just gave about your lack of basis to offer a
```

```
 1           recommendation, but agreeing to sign the necessary
 2           form?
 3    A.     It is consistent.  And let me also add that the
 4           HRM-3, in my view, is not a recommendation.
 5    Q.     Correct.  Okay.  I understand that.  Just a form for
 6           paperwork processing.  Okay.
 7                      In your experience since working with
 8           SUNY Albany, is it the typical process that somebody
 9           else prepares a recommendation of non-renewal for
10           you to sign to recommend an employee not be -- not
11           renewed?
12    A.     I cannot say that it's typical, but it had never
13           happened to me before.
14    Q.     Can you explain to me, in your experience, what the
15           typical process is when there is a possibility of a
16           non-renewal for an employee?
17    A.     Well, I can't explain the typical process, but I had
18           one other instance of that in my office and I had
19           been working with -- very closely with human
20           resources about this particular employee.  And it
21           was certainly my -- it was the recommendation of my
22           director that this employee be non-renewed.  Based
23           on the merits of the case, I thought -- I agreed
24           with my director.  HR was in concurrence and, you
25           know, the paperwork process took over.  I'm not sure
```

DR. HARVEY CHARLES                                    57

```
 1        what is typical.  I could just talk about what my
 2        experience has been.
 3   Q.   Understood.
 4                   Are you aware of the Provost -- strike
 5        that.
 6                   I'm going to now mark and introduce
 7        Exhibit B-6.
 8                   (Claimant Exhibit B-6 is marked for
 9            identification.)
10   BY MR. CASTIGLIONE:
11   Q.   Dr. Charles, if you can review -- there's a series
12        of documents, but I'm asking you to review the first
13        one here which appears to be an e-mail from
14        William Hedberg to Kamiar Alaei.  You appear to be a
15        CC recipient, dated May 14, 2018.  That's part of
16        Exhibit B-6, if you could take a look at that?
17   A.   Yes.
18   Q.   Do you recall receiving this e-mail?
19   A.   Yes.
20   Q.   This indicates that the Provost has signed the form
21        from Dean Harvey Charles for non-renewal of
22        Dr. Alaei's appointment; is that fair to say?
23   A.   Well, that's certainly what the e-mail says.
24   Q.   Do you have any understanding why the Provost would
25        sign the form to recommend non-renewal of Dr. Alaei
```

DR. HARVEY CHARLES                                    58

```
 1        at that time?
 2   A.   I imagine that he made that decision based on
 3        information he had.
 4   Q.   But do you have any personal knowledge of why he
 5        made that decision?
 6   A.   No.
 7   Q.   This says the Provost has signed the form from
 8        Dean Harvey Charles.  Is that accurate, in your
 9        opinion, as to representation regarding
10        recommendation of non-renewal?
11   A.   Well, it is not accurate in terms of recommending a
12        non-renewal.  It is certainly accurate in the sense
13        that I was instructed to sign the HRM-3 form,
14        because that is what needed to be done in order for
15        the Provost office to pursue its wishes, and I acted
16        accordingly.
17                  As we indicated before, it was an
18        attached letter recommending -- supposedly from me
19        recommending that Dr. Alaei be non-renewed.  And I
20        specifically did not sign this letter.
21   Q.   This e-mail also says, in part, the next step in
22        this process is for the President to review the file
23        and make his decision.  Is that your understanding
24        of how this non-renewal process works, with the
25        President ultimately deciding?
```

DR. HARVEY CHARLES                                    59

```
 1   A.   I am not sure of what is typical in situations like
 2        this.
 3   Q.   Okay.  If you can keep scrolling down.
 4                    Dr. Charles, do you recognize what
 5        this document is?
 6   A.   Well, I recognize that the document is a recitation
 7        by Dr. Alaei of all of his accomplishments at the
 8        University and his consternation at the decision
 9        that was made to non-renew him.  That's what I
10        recognize about it.  And I'm saying that because I'm
11        not sure that I have read this document -- this
12        particular document or documents like it, but, you
13        know, the contents seem quite familiar.
14   Q.   Okay.  In this second paragraph that starts with "I
15        was very disappointed to receive the news," the last
16        sentence says:  "Since I started working for
17        UAlbany, I have" and it lists a number of matters
18        that Dr. Alaei identifies as accomplishments.
19                    Were you aware of these
20        accomplishments at the time non-renewal was being
21        recommended by SUNY personnel?
22   A.   I would say mostly, yes.
23   Q.   Are these accomplishments meaningful in any way, in
24        terms of Dr. Alaei's employment with SUNY Albany at
25        the time?
```

DR. HARVEY CHARLES                                    60

```
 1   A.   Yes, they are quite meaningful.
 2   Q.   The beginning of the paragraph under the "Identified
 3        accomplishments," it says, "I have never received a
 4        negative evaluation from Dean Karl Rethemeyer,
 5        Chair Victor Asal, Dr. Harvey Charles or any other
 6        member of the University administration and see no
 7        basis for the non-renewal decision."
 8                  Are you aware of whether Dr. Alaei
 9        ever received any negative evaluations during his
10        employment?
11   A.   I'm only aware that he never received a negative
12        evaluation from me.
13   Q.   Okay.
14   A.   Yeah.
15   Q.   Okay.
16   A.   I can't speak to anyone else.
17   Q.   Did you ever -- I know your statement was you never
18        gave a negative evaluation.  Did you give
19        evaluations to Dr. Alaei during his employment?
20   A.   I think I may have, as I would have done for all of
21        my other direct reports.
22   Q.   And do you have any recollection of what that may
23        have said?
24   A.   I think my evaluation of Dr. Alaei was quite
25        positive.  The only -- I think it may have included
```

```
 1          a reference to a request from the marketing
 2          department that he not use his self-designed seal or
 3          letterhead for GIHHR.  And I think I made reference
 4          to that and instructed him to stop using that
 5          letterhead and use a standard University letterhead.
 6                      But other than that -- and that was
 7          not even a reprimand really, it was just part of the
 8          information I wanted him to have in that letter that
 9          I prepared for him.  Other than that, it was
10          laudatory and complimentary and supportive.
11  Q.     During the investigation, did anyone ever raise with
12          you the possibility of recreating evaluations to
13          support a non-renewal?
14  A.     No.
15  Q.     If I could refer you to the next page of Dr. Alaei's
16          letter that's part of Exhibit B-6.
17                      On this page, in the middle, I'm going
18          to read you part of it.  It says, in part, "With
19          respect to funding, you can also find the projected
20          funding required for each of the two faculty lines,
21          ($185,500) in the attached Excel sheet.  I've also
22          included the actual funding from 2015-2017 that I
23          was able to get ($3,916,342), despite the absence of
24          the second faculty line.  This means I was able to
25          reach over 21 times higher than the target.  The
```

```
 1        details of funding are listed in the attached Word
 2        document."
 3                    Do you have any understanding about
 4        what Dr. Alaei was referencing there?
 5   A.   I believe that he was referencing expectations that
 6        would have been articulated to people other than me.
 7        And I say that because he's talking about his other
 8        role as a faculty member, and I did not assert
 9        supervisor responsibilities over him for those
10        responsibilities.
11   Q.   Are you aware of what he's referring to here about
12        raising over 21 times higher than the target?
13   A.   Well, I'm familiar with his grant writing experience
14        and success in the sense that he was awarded many
15        grants, and the grants amounted in the millions of
16        dollars.  So I am aware of that, yes.
17   Q.   As compared to other people in a similar position as
18        Dr. Alaei at the time, was his success greater or
19        less than other people in their efforts to, you
20        know, raise funding?
21   A.   What I can say to you is that this is -- this is
22        very impressive work for any faculty member.  I
23        can't say whether it is greater or lesser, but this
24        is very impressive work.
25   Q.   At the time of non-renewal that was being advocated
```

```
1          by SUNY personnel in the end of April 2018, are you
2          aware if there were other employees in similar
3          positions to Dr. Alaei that were being renewed at
4          the time that didn't have the same type of
5          credentials we just went through with Dr. Alaei?
6     A.   I am not aware.
7     Q.   Are you aware at all if there was anybody else
8          around that time that was recommended for renewal?
9     A.   I am not aware.
10    Q.   What about around the same time for recommendations
11         for non-renewal for other people?
12    A.   I am not aware.
13    Q.   If I can identify and mark for introduction Exhibit
14         B-8?
15                   (Claimant Exhibit B-8 is marked for
16              identification.)
17    BY MR. CASTIGLIONE:
18    Q.   Dr. Charles, if you could take a look at what's been
19         marked as Exhibit B-8, which is a letter from SUNY
20         Albany, dated August 10, 2018, to Dr. Alaei from
21         Randy Stark.  This letter states, in part:  "This
22         letter will also serve to notify you that your term
23         appointment as lecturer in the Global Institute for
24         Health and Human Rights will not be extended beyond
25         the present termination date close of business
```

DR. HARVEY CHARLES                                   64

```
 1          August 9, 2019."
 2                    It also says, in part, in the next
 3          paragraph:  "The University is exercising its right
 4          and has elected to terminate your appointment
 5          effective August 10, 2018."
 6                    Did you ever see this letter before?
 7     A.   I don't remember.
 8     Q.   Are you aware -- Did anyone consult with you about
 9          the contents of this letter?
10     A.   No.
11     Q.   If I can refer you to a document I'm going to
12          identify as C-2?
13                    (Claimant Exhibit C-2 is marked for
14             identification.)
15     BY MR. CASTIGLIONE:
16     Q.   Dr. Charles, are you aware -- and I'm showing you
17          what's been identified as Exhibit C-2 -- that
18          Dr. Alaei filed grievances with SUNY in accordance
19          with his union rights under the United University
20          Professions Agreement regarding SUNY's actions?
21     A.   I was not aware of that.
22     Q.   So it's fair to say you weren't given these
23          grievances as the process was going along at the
24          time?
25     A.   That's right.
```

DR. HARVEY CHARLES                              65

```
1   Q.   Okay.  Did anyone ever contact or discuss grievances
2        with you?
3   A.   No.
4   Q.   If I could refer you to what's being identified as
5        Exhibit E?
6                  (Claimant Exhibit E-1 is marked for
7             identification.)
8        BY MR. CASTIGLIONE:
9   Q.   Dr. Charles, if you could just take a look at this
10       e-mail which is being marked as Exhibit E-1?  It's
11       an e-mail from a Liesl, L-I-E-S-L, it looks like,
12       Zwicklbauer, Z-W-I-C-K-L-B-A-U-E-R, dated April 4,
13       2018, referring to Dr. Alaei, presumably?
14                 All right.  Have you ever seen this
15       e-mail?
16  A.   I don't recall ever seeing the e-mail, no.
17  Q.   Okay.  This e-mail references holding the title of
18       professional employee.  In your work and experience
19       with SUNY Albany, do you have any understanding what
20       that term "professional employee" refers to?
21  A.   Well, the only thing I can think of is management
22       confidential, and these are people who are in senior
23       administration, you know, vice presidents, vice
24       provost, deans, people like that.  And that is the
25       only context within which I would understand the
```

```
 1            term "professional."  I imagine it could -- Well, I
 2            shouldn't say that.  A non-faculty position, I
 3            think, would be a professional position, but I
 4            cannot say that I am familiar with the definitions
 5            to say, well, this is certainly X and that is Y.
 6     Q.     Okay.  This e-mail also references having a current
 7            performance program and evaluation before you can
 8            non-renew.
 9                        As to Dr. Alaei and SUNY Albany
10            pursuing non-renewal in April of 2018, are you aware
11            of whether at that time there was a current
12            performance program for Dr. Alaei?
13     A.     I recall that when he started with me, we had a
14            conversation about my expectations for his role as
15            Director of GIHHR, who would be reporting to me.
16            And I put that list of expectations in memo form and
17            shared it with him.  And from my perspective, that
18            effectively constituted the performance program.
19     Q.     And had that been updated since that time, as far as
20            you are aware?
21     A.     I don't remember.
22     Q.     And then it talks about an evaluation.  Do you
23            recall the last time you did an evaluation for
24            Dr. Alaei at that point?
25     A.     I believe I did one evaluation for him.  I don't
```

1        remember exactly when it was done, but.

2   Q.   Okay.  If you can scroll down to the next page of

3        Exhibit E-1.  So if you'd just take a look, this is

4        a letter from December 4th from James Stellar to

5        Dr. Alaei talking about a recommendation from a

6        department chair and dean, pleasure to confirm

7        renewal of his appointment as a clinical associate

8        professor.

9                     Do you recall if you ever saw this

10       letter?

11  A.   I don't recall seeing this letter.

12  Q.   If you can scroll to the next page, please.

13                    And Dr. Charles, if you can just

14       review this form as she's scrolling through it?

15                    Dr. Charles, do you have any

16       understanding of what this form is?  It's identified

17       as a change of status request form HRM-3.  It

18       appears to be for Dr. Alaei.  It appears to be

19       signed by two individuals on November 20th and 21st,

20       2017.

21  A.   Yeah, I never saw this form before.

22  Q.   Okay.

23  A.   I was not involved with it.

24  Q.   Do you have a general understanding of, you know,

25       what this form and the information depicted on this

```
 1          form is relevant to Dr. Alaei?  So, in other words,
 2          do you have an understanding what the information
 3          that's requested and identified on this form and
 4          what it means?
 5   A.     I think so.
 6   Q.     Okay.
 7   A.     The HRM-3 form, but, of course, you would notice
 8          that it had to do with his role as a faculty member,
 9          because the department referenced here is health
10          policy management and behavior, so.
11   Q.     Well, let me ask you on this form -- you see in the
12          middle of the page being shown, it says:  "Extension
13          of temporary appointment or renewal of UUP term
14          appointment" and then there's a box that says
15          "appointment type," and it says "term."
16                  Do you have any understanding of what
17          that's referring to when it says "appointment type,
18          term"?
19   A.     It seems to me that it would -- it would -- it means
20          the length of time for which he would be in the
21          employ of the institution.
22   Q.     And then if you move over to the right, there's a
23          box that says "duration" and then in parentheses it
24          says "term appointment."  And here, it says
25          other -- it appears to say "two years, nine months."
```

```
 1                    Do you have any understanding of what
 2        that's referring to?
 3   A.   I think it's referring to his appointment in health
 4        policy management and behavior.
 5   Q.   And the appointment would be for a term of two
 6        years, nine months; is that fair to say?
 7   A.   Well, that is what is written.
 8   Q.   If I can refer you to what's being marked as E-2,
 9        please?
10                    (Claimant Exhibit E-2 is marked for
11           identification.)
12        BY MR. CASTIGLIONE:
13   Q.   So Dr. Charles, the document identified as Exhibit
14        E-2 appears to be a letter from SUNY Albany, dated
15        April 16, 2004, making an appointment offer for
16        Dr. Alaei.  And at the beginning, it says:  "It is
17        my pleasure to offer you an employment to the
18        University at Albany as a research associate
19        professor and lecturer in the department of public
20        administration and policy, Rockefeller College of
21        Public Affairs and Policy."
22                    Do you have any understanding -- well,
23        strike that.
24                    In the first instance, are you
25        familiar with what this document is?
```

```
 1   A.   It seems to me that it's a letter of appointment.
 2   Q.   Have you seen documents similar to this for other
 3        SUNY employees?
 4   A.   Well, I -- I have seen a letter like this for me,
 5        for myself, when I was hired, yes.
 6   Q.   Can you explain to me your understanding of that
 7        first sentence about the appointment to the
 8        University at Albany as a research associate
 9        professor and lecturer in the department of public
10        administration and policy, Rockefeller College of
11        Public Affairs and Policy?
12   A.   You know, I don't believe that I can add to what it
13        says.
14   Q.   Is that the current -- strike that.
15                     Would that be the position that
16        Dr. Alaei held as of February 2018?
17   A.   I'm not sure.
18   Q.   Okay.
19   A.   I guess to be complete, I should add that I knew of
20        his position as Director of GIHHR and that is what I
21        can speak to.
22   Q.   Okay.
23   A.   Yeah.
24   Q.   If you scroll down, it says -- I'm referring to the
25        paragraph that says:  "You will have three
```

DR. HARVEY CHARLES                                        71

```
 1         complimentary non-stipend appointments in addition
 2         to your professional appointment in Rockefeller
 3         College."  And then it says:  "You will continue to
 4         serve as Director for the GIHHR, with responsibility
 5         for oversight, grants development, national outreach
 6         and programming.  In this role, you will report to
 7         the Vice President for Research."
 8                   Do you have an understanding of what
 9         that means, that language that I just read?
10    A.   Yes, I do have an understanding of that, yes.
11    Q.   Can you explain that to me?
12    A.   That he will have three complimentary non -- three
13         complimentary appointments for which he will not
14         receive stipends, in addition to his professional
15         appointment in Rockefeller College.  That's what's
16         referenced above.  That he would continue to serve
17         as Director of GIHHR with the responsibilities as
18         described, and in that role as Director of GIHHR,
19         that he would report to the Vice Provost for
20         research.
21    Q.   In 2018, who was the vice -- it says Vice President
22         for Research.  Who was that?
23    A.   Vice President for Research, yep.
24    Q.   Who was that in 2018?
25    A.   James Diaz.
```

DR. HARVEY CHARLES                                    72

```
1    Q.    Was Provost Stellar the supervisor for Dr. Diaz?
2    A.    Yes.
3    Q.    In 2018?
4    A.    Yes.  I am sorry.  Let me -- let me take that back.
5          This is a mistake.  I spoke in error.  James Diaz is
6          a Vice President, and all vice presidents report to
7          the President.  So let me correct myself and say
8          that Jim Diaz did not report to Jim Stellar, the
9          Provost, in 2018, but rather to the President.
10   Q.    Okay.  Did Jim Stellar report to James Diaz?
11   A.    No, he did not, as far as I know.
12   Q.    I want to ask you about your understanding as an
13         employee of SUNY Albany and overseeing other
14         employees.  The second paragraph in this letter, if
15         you don't mind scrolling up.
16               This paragraph I'm referring to, it
17         says, in part:  "Your initial appointment will be
18         for three years, commencing on May 1, 2014, to
19         coincide with the end date of your current
20         employment with SUNY Research Foundation."
21               It goes on to say in that paragraph:
22         "To give you the security of at least two years of
23         employment, the appointment will be renewed annually
24         for possible extension by another year.  Your
25         starting salary will be $92,630."
```

```
 1                    The language here as to your initial
 2          appointment term being three years and then to give
 3          you security of at least two years of employment, do
 4          you have any understanding of what that's referring
 5          to?
 6                    MR. ROTONDI:  Objection.
 7     A.   No --
 8                    MR. ROTONDI:  Hold on a second.  I was
 9            objecting to the form of the question.
10     BY MR. CASTIGLIONE:
11     Q.   Okay.  I'm sorry, Dr. Charles, what was your
12          response?
13     A.   No.
14     Q.   Are you familiar with the term "evergreen
15          employment" in the context of SUNY Albany
16          employment?
17     A.   I have heard the term before.  I cannot define it to
18          you.
19     Q.   Okay.  Were you aware of what the term of
20          Dr. Alaei's employment was with SUNY Albany based on
21          this April 16, 2014 letter?
22     A.   No.  And, of course, I was not at SUNY in April of
23          2014.  I was not involved in the drafting of this
24          letter or his initial appointment.
25     Q.   Do you have any understanding of what the term of
```

DR. HARVEY CHARLES                                    74

```
 1          his employment was as of 2018?
 2   A.     No --
 3                    MR. ROTONDI:  Object to the form of
 4              the question.
 5          BY MR. CASTIGLIONE:
 6   Q.     I'm sorry, Dr. Charles.  Go ahead.
 7   A.     Yeah, my answer is no.
 8   Q.     Okay.  If I can refer you to the document identified
 9          as Exhibit C-3?
10                    (Claimant Exhibit C-3 is marked for
11              identification.)
12          BY MR. CASTIGLIONE:
13   Q.     So Dr. Charles, in the first instance, I will say,
14          do you recall attending what was identified as an
15          interrogation with SUNY human resource personnel
16          with Dr. Alaei and myself on May 9, 2018, at the
17          offices of human resources?
18   A.     Yes.
19   Q.     This letter that is identified as Exhibit C-3 was a
20          letter I prepared on behalf of Dr. Alaei and sent to
21          Mr. Stark with human resources, dated May 21, 2018,
22          addressing some of the issues raised during that
23          interrogation.  Do you recall ever being provided a
24          copy of this letter, Exhibit C-3, after the
25          interrogation?
```

DR. HARVEY CHARLES                                        75

```
 1   A.   Yes, I have -- I have read this document.
 2   Q.   Okay.  In the first instance, why did you attend the
 3        interrogation on May 9, 2018 for Dr. Alaei?
 4   A.   I was told that I had to attend as his supervisor.
 5   Q.   In your role as supervisor, have you attended other
 6        interrogations for employees when there's been
 7        similar type of alternative assignment issues?
 8   A.   I have never been in a situation like that at
 9        UAlbany, as far as I can recall.
10   Q.   Okay.  Do you know who asked you to attend this
11        interrogation, or who directed you, I think you
12        said?
13   A.   The request came from the Provost.
14   Q.   Did you have any meetings or discussions with anyone
15        on behalf of SUNY Albany about the interrogation
16        before it was held on May 9, 2018?
17   A.   I did not.
18   Q.   Are you aware of whether anybody from SUNY Albany
19        tried to have any informal discussion or any
20        discussion, informal or not, any discussion with
21        Dr. Alaei about SUNY Albany's concerns before this
22        May 9, 2018 interrogation?
23   A.   I am not aware.
24   Q.   Do you recall -- And you read this letter before, it
25        sounds like, and I'm sure -- I'm not going to hold
```

```
 1         you to your memory to what's said in the letter.
 2         But do you recall, during the interrogation, the
 3         SUNY HR personnel being Brian Selchick and
 4         Randy Stark?
 5   A.    Yes, I recall that they were the personnel.
 6   Q.    All right.  And there was nobody else there,
 7         correct, just those two, you, Dr. Alaei and me?
 8   A.    Yes, that's what I recall.
 9   Q.    Do you recall during that interrogation, the SUNY HR
10         personnel asking questions about the structure of
11         GIHHR?
12   A.    I don't remember.
13   Q.    At the time of the interrogation, did you know what
14         the structure of GIHHR was?
15   A.    Yes, I was familiar with the structure of GIHHR at
16         that time, yes.
17   Q.    Okay.  My understanding was the structure of the
18         GIHHR at the time was that it was, basically, a
19         university-level organized research unit that would
20         report to the Vice President for Research with a
21         board of directors and an advisory board, and it
22         would be run by the executive directors for that
23         GIHHR; is that your understanding?
24   A.    No, that is not my understanding at the time of the
25         deposition.
```

DR. HARVEY CHARLES                                          77

1  Q.   Can you please explain to me what your understanding

2       was of the GIHHR structure at the time of the

3       depo -- at the time of the interrogation deposition

4       you just said?

5  A.   Yes, at that time, my understanding was that GIHHR

6       was an entity headed by Dr. Alaei and that this

7       entity reported to me as Dean and Vice Provost for

8       International Education.  The structure included a

9       number of -- mostly undergraduate interns.  It

10      included a number of researchers, many of whom came

11      from universities outside of UAlbany to engage in

12      research activity with Dr. Alaei, and there was some

13      full-time staff who I think their positions were

14      funded from revenues generated by the grants that

15      GIHHR brought in.

16                I was aware of the advisory board that

17      convened once or twice a year.  So those are the

18      things about the structure of GIHHR with which I was

19      familiar.

20  Q.   Okay.  At the time, did the executive directors for

21      GIHHR report to anybody else or have an obligation

22      to report to anybody else?

23  A.   Well, as far as I know, Dr. Alaei reported to either

24      the dean of the Rockefeller School or one of the

25      chairs of the department relative to his teaching

1           assignments in that college.
2     Q.    Okay.  Before that interrogation, did anybody from
3           human resources or anybody conducting the
4           investigation into Dr. Alaei ever reach out to you
5           to find out your understanding of the structure of
6           GIHHR?
7     A.    I don't recall any of that happening.
8     Q.    As to financial issues with GIHHR, do you recall
9           discussions during that interrogation on May 9, 2018
10          regarding how Dr. Alaei would be able to access and
11          use GIHHR monies, either it be grants or whatnot?
12    A.    I don't recall.
13    Q.    Did you have an understanding as of May 9, 2018, at
14          the interrogation, the protocol for the use and
15          spending of GIHHR related money, whether it be
16          grants or anything else?
17    A.    I think in very general terms, yes.
18    Q.    Okay.  Can you explain to me your understanding what
19          it was about that time regarding use or access to
20          funds that were GIHHR monies?
21    A.    Well, the accounting for GIHHR, much of it ran
22          through the Center for International Education, and
23          my Director of Business Operations worked closely
24          with Dr. Alaei on those kinds of issues.  So my
25          understanding was that if there was a need for

```
 1          expenditures, he would consult with my Director of
 2          Business Operations and the paperwork would happen.
 3          Invariably, the paperwork would require my
 4          signature, my approval, and so these kinds of things
 5          would come to me.
 6    Q.    At that time, you know, as part of the structure of
 7          GIHHR as to funding, would Dr. Alaei have been able
 8          to unilaterally access any amounts of GIHHR money
 9          and spend them however he wanted to?
10    A.    As far as I know, that would not have been possible,
11          but that's as far as I know.
12    Q.    In other words, somebody else would have to review
13          any expenditure of funds by Dr. Alaei before he
14          could expend them; is that fair to say?
15    A.    Well, that would be true for funds over which my
16          center had supervisory authority.  If Dr. Alaei had
17          had funds in some other part of the campus, like in
18          the foundation, for example, for which I had no
19          responsibility, I may not have been aware --
20    Q.    Okay.
21    A.    -- of the use of those funds.
22    Q.    But did anyone from human resources or anyone
23          conducting the investigation into Dr. Alaei at the
24          time reach out to you before May 9, 2018 to ask you
25          about your understanding about use and access to
```

1          funding, as far as you're aware, for GIHHR?

2     A.   I do not recall anybody doing.

3     Q.   At that interrogation, do you recall questioning by

4          SUNY HR personnel concerning Arash Alaei and his

5          separation with SUNY Albany and allegations of

6          contact with SUNY personnel after his separation?

7     A.   I can't -- I cannot remember if Arash Alaei came up

8          in that interrogation.

9     Q.   As to Arash Alaei, do you recall a time when he was

10         placed on alternative assignment?

11    A.   Yes, I think so.

12    Q.   Do you recall about when that was?

13    A.   I don't recall about when that was, no.

14    Q.   If I can show you what's being marked as Exhibit

15         F-1?

16              (Claimant Exhibit F-1 is marked for

17           identification.)

18    BY MR. CASTIGLIONE:

19    Q.   Dr. Charles, I understand that was probably a lot to

20         go through quickly, but my question is:  Does this

21         refresh your recollection as to whether or not

22         Arash Alaei had been placed on alternate assignment

23         at some point before March 28, 2017?

24    A.   Yes, I believe that he was placed on alternative

25         assignment.  It's taking me back a while, and I

DR. HARVEY CHARLES                                        81

```
 1          haven't been reflecting on these kinds of things,
 2          so, you know, I -- it's hard for me to remember some
 3          of this, but I believe that he was placed on
 4          alternative assignment.
 5   Q.     I completely understand.  And nobody is expecting
 6          you to sit there and research and review these
 7          things every day, so just do the best you can.  I
 8          get it.
 9                       As to Arash Alaei, were you his
10          supervisor before his alternative assignment was put
11          in place?
12   A.     Yes, I was.
13   Q.     And on his alternative assignment, were you also his
14          supervisor?
15   A.     I believe I was.  I believe.
16   Q.     For Exhibit F-1, and in particular the e-mail that's
17          on the screen right now, which it says:  "Subject
18          report and plan."  It's dated Tuesday, March 28,
19          2017.  It says it's from Arash Alaei to you,
20          Harvey Charles.
21                       Do you have any understanding of what
22          Mr. Alaei, Arash Alaei, is sending to you in this
23          e-mail?
24   A.     Yes, he is sending me a list of the activities in
25          which he was involved as a member of -- staff member
```

1           at CIEGS and as Co-Director of the GIHHR.

2    Q.    So if you scroll down.

3                      Now, on this same e-mail, March 28,

4           2017, included had as Exhibit F-1, Arash Alaei says:

5           "In order to complete the above-mentioned task, I

6           need to be in touch with the following people" and

7           then identifies six people.

8                      Do you recall who these people are

9           that are being identified as Number 1 through 6?

10   A.    Three of them, and I don't remember who the others

11          are.

12   Q.    Okay.  Can you identify the ones you do remember and

13          what employment position or position they had at the

14          time?

15   A.    Number 1, Kamiar Alaei, who was Co-Director of

16          GIHHR; Michelle DeOcampo, who was an employee of

17          GIHHR, I think in the role of an administrative

18          assistant or so; and then Mahnaz Alaei, who was

19          responsible for computer programming and

20          troubleshooting at GIHHR.

21   Q.    And you don't have a recollection as to who the

22          other three people are; is that --

23   A.    I don't remember, no.

24   Q.    Okay.  When Arash was on -- placed on alternative

25          assignment, do you recall telling Kamiar Alaei not

```
 1        to have any conversations with Arash Alaei about
 2        GIHHR matters?
 3   A.   In the spirit of trying to be complete in my
 4        response to you, no, I can't remember saying that to
 5        him, but I was instructed by the administration to
 6        advise Arash that he is not allowed to be in touch
 7        with staff at GIHHR as part of the conditions of
 8        this alternate assignment.
 9                   And so if I did say that to
10        Kamiar Alaei, it would have been within the context
11        of ensuring that he conduct himself consistent with
12        the expectations of his alternate assignment.
13   Q.   But do you have any specific recollection of having
14        that type of conversation with Kamiar Alaei?
15   A.   No specific recollection, no.
16   Q.   Okay.  As part of this, did you review your e-mails
17        for any documents that might be relevant to issues
18        in this lawsuit?  Did anyone at SUNY ask you to do
19        that?
20   A.   Well, I was required to submit all of the -- all of
21        the documents associated with Kamiar Alaei to the
22        general counsel's office.  So, yes, I submitted
23        those documents.
24   Q.   Do you recall coming across any e-mails or any
25        written communications from you to Dr. Kamiar Alaei
```

```
 1          concerning what he was allowed to do and not do, in
 2          terms of Arash Alaei's alternative assignment?
 3     A.   I don't recall.
 4     Q.   Okay.  Was Kamiar Alaei, at the time, a supervisor
 5          or sort of a -- somebody in a superior employment
 6          position to Arash Alaei while Arash was on his
 7          alternative assignment?
 8     A.   Could you ask the question again?
 9     Q.   Sure.  At the time of Arash's alternative
10          assignment, was Kamiar Alaei a supervisor or
11          somebody who had oversight over Arash Alaei at that
12          time?
13     A.   I don't believe so, no.
14     Q.   Do you recall Arash Alaei ever contacting you to
15          have -- to solicit permission to be able to discuss
16          his work while on alternative assignment with any
17          interns?
18     A.   Well, I mean, this e-mail that's on the screen is
19          precisely that.  I don't remember who the Numbers 3,
20          4 and 6 are, as to whether they were student interns
21          or whoever.  But yes, indeed, he did reach out to me
22          for permission to be in touch with these other
23          entities regarding his work.
24     Q.   Okay.  And that might have included interns at some
25          point?
```

DR. HARVEY CHARLES                                    85

1    A.    It might have included interns, yes.

2    Q.    If I can refer you to the document identified as

3          Exhibit F-2?

4                    (Claimant Exhibit F-2 is marked for

5             identification.)

6    BY MR. CASTIGLIONE:

7    Q.    Okay.  Dr. Charles, this document identified as

8          Exhibit F-2, do you recall having e-mail

9          communications with Arash Alaei in June 2017 that

10         might have included the title or subject line "My

11         report and communication with interns"?

12   A.    I don't recall.

13   Q.    Is it possible you did have an e-mail discussion

14         with Arash Alaei at the time about whether or not he

15         was able to communicate with interns for whatever

16         reason he was raising?

17   A.    Yes, I may have had that discussion.

18   Q.    Okay.  Do you know if you located an e-mail with

19         this title reflected on Exhibit F-2, dated 6/14/2017

20         as part of your reference looking at documents?

21   A.    I don't recall.

22         (REQUEST)    MR. CASTIGLIONE:  Just for the record,

23             to the extent we can do a search for an e-mail

24             on 6/4/17 with this title, we'd, you know,

25             reiterate that request as part of discovery,

```
 1              Anthony?
 2                   MR. ROTONDI:  That's been done, but
 3         I'll ask them to look again.
 4                   MR. CASTIGLIONE:  Okay.
 5    BY MR. CASTIGLIONE:
 6  Q.  Now, back to the May 9, 2018 interrogation, do you
 7        also recall there being discussions about GIHHR
 8        materials and Arash Alaei being identified then
 9        about a University of Beirut conference.
10  A.  I recall that mention was made or reference was made
11        to the University of Beirut conference in that
12        interrogation, but I don't recall the details about
13        that conversation.
14  Q.  Back to the issue of Arash Alaei, you know, having
15        discussions with interns or whether or not Kamiar
16        Alaei was directed not to talk about GIHHR matters
17        with Arash Alaei after he was on alternative
18        assignment, did anyone from SUNY personnel or HR
19        reach out to you before May 9, 2018 to find out what
20        knowledge or information you may have about those
21        issues?
22  A.  I don't recall.
23  Q.  At the interrogation on May 8, 2018, do you recall
24        disagreeing in any meaningful way with Dr. Alaei's
25        explanation as to how GIHHR was operating, including
```

```
 1              to how funds or grants were dealt with?
 2     A.   I don't recall.  In fact, I was mostly silent, if
 3          not completely silent during that interrogation, but
 4          I don't recall.
 5     Q.   And just to be clear, you don't recall having any
 6          kind of disagreement?  And I don't mean you
 7          vocalized it.  In listening to what he said, do you
 8          recall having any, you know, thoughts or feelings
 9          otherwise that you really disagreed with anything he
10          said about his explanation about how GIHHR was
11          operated and how funds were handled?
12     A.   Yeah, I really don't recall.
13     Q.   If I were to ask you the same question about
14          Dr. Alaei's explanation about issues raised
15          concerning the University of Beirut conference in
16          terms of the publication materials, would that be
17          the same answer?
18     A.   I don't recall.
19     Q.   You said you did read my letter dated May 21, 2018
20          that's identified as C-3, Exhibit C-3; is that
21          correct?
22     A.   Yes.
23     Q.   Do you recall, as you were reading it, having any
24          concerns or materially disagreeing with anything
25          represented in that letter?
```

```
 1                    MR. ROTONDI:  I'm going to object to
 2            the form of the question.  He hasn't read that
 3            letter in I don't know how long, so I'm going
 4            to direct him not to answer that question in
 5            that form.
 6      BY MR. CASTIGLIONE:
 7   Q.  Okay.  Do you recall when you read that letter in
 8       2018 or 2019 -- or I'm sorry, strike that.
 9                    Do you recall when you read my letter
10       of May 21, 2018, identified as Exhibit C-3, do you
11       recall, as you sit here today, whether you had any
12       opinion or feeling that issues raised in there were
13       not accurate?
14                    MR. ROTONDI:  Object to the form of
15            the question.  I'll let him answer, if we can
16            just move this along.
17   A.  I think that the one issue that was mentioned in the
18       letter that was surprising, was that Kamiar Alaei
19       seemed to be taking issue with my role as his
20       supervisor.  And it seemed to suggest that I wasn't
21       really his supervisor, and that came as a surprise
22       to me.  That was the one thing that I found
23       inconsistent with what I knew and assumed all along.
24   Q.  Understood.  So if I could refer you to -- actually,
25       strike that.
```

DR. HARVEY CHARLES                                89

```
 1                 Are you aware of whether any formal or
 2      informal complaint was filed against Dr. Alaei that
 3      served as the basis for the February 8, 2018 letter
 4      from SUNY Albany in the placement of him on
 5      alternative assignment?
 6  A.  I am not aware of a formal complaint.  What I heard
 7      was that there were allegations of inappropriate
 8      behavior with one or more intern -- interns in
 9      Beirut at the conference, and that was all that I
10      heard, and I heard it in an informal manner.
11  Q.  Okay.  Who did you hear it from, if at all?
12  A.  Well, I believe I heard it in the context of the
13      meeting that was convened, called by the Provost,
14      and I believe the Title IX Coordinator was there as
15      well where -- and the Director of Communications
16      where we were brought together to talk about changes
17      to the leadership in light of this complaint.
18  Q.  I want to introduce what's been identified as
19      Exhibit D, Number 1.
20                 (Claimant Exhibit D-1 is marked for
21          identification.)
22  BY MR. CASTIGLIONE:
23  Q.  Dr. Charles, I'm showing you what's been identified
24      as Defendant's -- or excuse me, Claimant's Exhibit
25      D-1, which is a series of e-mails dated March 26th,
```

```
 1        between Brian Selchick and Chantelle Cleary.  Do you
 2        have any understanding as to their roles in the
 3        investigation concerning Dr. Alaei in 2018 as of
 4        March 2018?
 5   A.   My understanding was that Chantelle Cleary, as the
 6        Title IX Coordinator, was involved in the -- in
 7        conducting an investigation and that Brian Selchick
 8        was acting in his capacity as an officer associated
 9        with the office of human resources.  That's about
10        all I know about their roles.
11   Q.   Okay.  No, that's fine.
12                   The first e-mail here at the bottom
13        from Brian Selchick, dated Monday, March 26, 2018 to
14        Chantelle Cleary, subject is "reporting parting
15        status."  It says:  "Hi, Chantelle.  Forgot to ask
16        you today about -- blank -- status.  Is she still at
17        the GIHHR or nearby?  Want to make sure I didn't
18        miss a safety/well-being/retaliation concern if and
19        when Kamiar comes back.  Thanks."
20                   There's a response e-mail from
21        Chantelle Cleary, dated Monday, March 26, 2018, to
22        Brian Selchick saying:  "I thought we agreed he
23        wasn't going to come back.  I'm confused."
24                   Are you aware or did anyone make you
25        aware at or around this time, March 26, 2018, that
```

```
 1          the HR personnel, Brian Selchick, and the Title IX
 2          Coordinator, Chantelle Cleary, had made a
 3          decision -- or made an agreement that Dr. Alaei
 4          wasn't coming back to SUNY Albany?
 5   A.     No.
 6   Q.     You never heard anybody discussing those types of
 7          issues around that time?
 8   A.     No.
 9   Q.     If I can refer you to Claimant's D-2 and just the
10          first page.
11                   (Claimant's Exhibit D-2 is marked for
12              identification.)
13          BY MR. CASTIGLIONE:
14   Q.     Dr. Charles, Claimant's Exhibit D-2 is an e-mail
15          from Randy Stark to others, dated July 6, 2018.  And
16          as we discussed, Randy Stark was one of the SUNY HR
17          peer personnel conducting the investigation into
18          Dr. Alaei; is that correct?
19   A.     I'm sorry, but could you repeat the question?
20   Q.     Sure.  Dr. -- or I'm sorry.  Randy Stark was one of
21          the SUNY HR personnel conducting the investigation
22          into Dr. Alaei into 2018; is that correct?
23   A.     I don't know if he was involved in conducting the
24          investigation, but I know that he was involved in
25          the issue, especially because of his role in the
```

```
 1           interrogation.
 2    Q.     Okay.  In this e-mail, Mr. Stark writes as follows:
 3           "I've attached a counseling that we worked on for
 4           Kamiar Alaei.  It was a struggle writing it, as
 5           there wasn't really anything to counsel him on,
 6           since the sexual misconduct allegations were
 7           unfounded.  We plan to give him policies on sexual
 8           harassment, workplace violence, et cetera, but for
 9           what purpose, as we are going to non-renew him and
10           buy him out.  After discussing the question does it
11           really serve any purpose to issue this memo, other
12           than it gives KA and his attorney more info for
13           their war chest?"
14                     This reference to non-renew and buy
15           him out, do you know who has the authority at SUNY
16           Albany to make a determination to not renew and buy
17           out an employee?
18    A.     I don't know.
19    Q.     Okay.  Would that be something anybody consulted
20           with you on at the time of this e-mail dated July 6,
21           2018?
22    A.     No, no one consulted with me about this.
23                     MR. CASTIGLIONE:  Can we just give
24                me -- let's take a five-minute break and then
25                I'll just look at my notes and then if I have
```

```
 1                    any follow-up questions; is that okay?
 2                         MR. ROTONDI:   Sure.   Okay by me.
 3                         (Whereupon, a recess is taken.)
 4         BY MR. CASTIGLIONE:
 5    Q.   Dr. Charles, just a couple of follow-up questions.
 6         As to Arash Alaei, do you recall the Beirut
 7         conference, if SUNY Albany paid for Arash Alaei's
 8         trip to that matter?
 9    A.   No, that -- I don't recollect ever knowing about
10         that.
11    Q.   Okay.   Is that something you would know or you would
12         not know?
13    A.   I was not always informed of the nature of the
14         conference that Arash attended.   However, to the
15         extent that I would know, it would be in line
16         with his responsibilities either at CIEGS or with
17         GIHHR and -- but I -- this does not ring a bell for
18         me at all.
19    Q.   Okay.   And if Arash, during his alternative
20         assignment, wanted to communicate with anybody, he
21         needed to contact you for approval first?
22    A.   I believe I would be one of the people he would need
23         to be in touch with, yes.
24    Q.   Are you able to identify who the other people might
25         be he would have to notify?
```

DR. HARVEY CHARLES                    94

```
 1   A.   Well, he could reach out to people in human
 2        resources as well.
 3   Q.   And during his alternative assignment, Arash Alaei
 4        was still identified as a Director of GIHHR; is that
 5        correct?
 6   A.   I don't remember.
 7                     MR. CASTIGLIONE:  That's it.  Thank
 8           you very much for your time.
 9                     (Transcript requests are as follows.)
10                     MR. CASTIGLIONE:  Standard delivery,
11           E-mail only with exhibits.
12                     MR. ROTONDI:  E-mail my copy.
13                     (Whereupon, the above-titled matter
14           was concluded at 1:14 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1                    I N D E X   P A G E

2

3          WITNESS:

4                    HARVEY CHARLES

5          EXAMINATION BY MR. CASTIGLIONE              4

6

7                    E X H I B I T S

8          (Exhibits attached.)

9          CLAIMANT      DESCRIPTION                   PAGE

10         EXHIBIT A-1   UAlbany 2/8/18 letter to      9
                         Alaei from Stark
11
           EXHIBIT A-2   6/24/19 E-mail from Selchick   16
12
           EXHIBIT A-3   2/8/18 E-mails                18
13
           EXHIBIT A-4   7/2/19 E-mail from Castiglione 21
14
           EXHIBIT A-5   2/8/18 E-mail from            27
15                       Carleo-Evangelist

16         EXHIBIT A-6   2/8/18 and 2/9/19 E-mails     31

17         EXHIBIT A-7   2/9/18 E-mail to/from         28
                         Charles Harvey
18
           EXHIBIT A-8   7/2/19 E-mail from Harvey to   32
19                       Alaei

20         EXHIBIT A-10  2/15/18 E-mails               36

21         EXHIBIT A-11  2/22/18 E-mails               39

22         EXHIBIT A-12  2/27/18 E-mail from Kam to    41
                         Charles
23
           EXHIBIT A-13  3/9/18 E-mail from Cleary     43
24
           EXHIBIT B-1   4/27/18, from Charles to Stellar  48
25

```
1               E X H I B I T S (continued.)

2     CLAIMANT        DESCRIPTION                      PAGE

3     EXHIBIT B-2     GIHHR timeline                    49

4     EXHIBIT B-3     4/28/18 and 4/30/18 E-mails       51

5     EXHIBIT B-4     5/2/18 E-mails                    55

6     EXHIBIT B-6     5/8/18 letter from Alaei and      57
                      5/14/18 E-mail and HRM-3
7
      EXHIBIT B-8     8/10/18 UAlbany letter from       63
8                     Stark to Alaei

9     EXHIBIT C-2     NYSUT letters                     64

10    EXHIBIT C-3     5/21/18 letter from Young/Sommer  74
                      to Stark
11
      EXHIBIT D-1     3/26/18 E-mails                   89
12
      EXHIBIT D-2     7/6/18, 7/9/18 and 7/10/18 E-mails 91
13
      EXHIBIT E-1     4/4/18 E-mail, 12/4/17 letter     65
14                    and HRM-3

15    EXHIBIT E-2     4/16/14 UAlbany letter from       69
                      Jones to Alaei
16
      EXHIBIT F-1     March 2017 E-mails                80
17
      EXHIBIT F-2     6/14/17 communication             85
18
      EXHIBIT J-1     Cleary Third Dept. Decision       45
19

20                       R E Q U E S T S

21    PAGE/LINE        DESCRIPTION

22    85/22            6/4/17 E-mail
23

24

25
```

DR. HARVEY CHARLES                                                    97

```
 1                    C E R T I F I C A T I O N

 2       STATE OF NEW YORK:
         COUNTY OF WARREN:
 3

 4              I, Deborah M. McByrne, do hereby certify
         that the foregoing testimony was duly sworn to;
 5       that I reported in machine shorthand the
         foregoing pages of the above-styled cause, and
 6       that they were prepared by computer-assisted
         transcription under my personal supervision and
 7       constitute a true and accurate record of the
         proceedings;
 8

 9

10          I further certify that I am not an attorney
         or counsel of any parties, nor a relative or
11       employee of any attorney or counsel connected
         with the action, nor financially interested in
12       the action.

13

14          WITNESS my hand in the City of Queensbury,
         County of Warren, State of New York

15

16

17

18       _____

19

20       DEBORAH M. McBYRNE

21       Court Reporter

22

23

24

25
```

1      DECLARATION/WITNESS CERTIFICATION

2      Case:  Alaei v. State University of New York

3      Witness:  Dr. Harvey Charles

4      Deposition Date:  January 13, 2021

5

           I declare under penalty of perjury that I
6      have read the entire transcript of my Deposition
       taken in the captioned matter or the same has
7      been read to me, and the same is true and
       accurate, save and except for changes and/or
8      corrections, if any, as indicated by me on the
       DEPOSITION ERRATA SHEET hereof, with the
9      understanding that I offer these changes as if
       still under oath.

10
                   _____
11                      DR. HARVEY CHARLES

12     Sworn to before me, this _____ day
       of_____      20_____ .
13
       [                                    ](print)
14     Notary Public.

15     Registration No:  _____

16     State of_____

17     Qualified in_____County.

18     My commission expires_____.

19

20

21

22

23

24

25

1    DEPOSITION ERRATA SHEET

2    Case:  Alaei v. State University of New York
     Witness:  Dr. Harvey Charles
3    Deposition Date:  January 13, 2021

4                    Reason Codes:
     1:  To clarify the record
5    2:  To conform to the facts
     3:  To correct transcription errors.

6
     PAGE/LINE              CORRECTION    REASON CODE
7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

```
 1                    DEPOSITION ERRATA SHEET

 2          PAGE/LINE              CORRECTION    REASON CODE

 3          _____

 4          _____

 5          _____

 6          _____

 7          _____

 8          _____

 9          _____

10          _____

11          _____

12          _____

13          _____

14          _____

15          _____

16          _____

17          _____

18          _____

19          _____ Subject to the above changes, I certify

20          that the transcript is true and correct.

21          _____ No changes have been made.  I certify that

22          the transcript is true and correct.

23

24            _____

25                       DR. HARVEY CHARLES
```

## $

**$185,500 (1)** 61:21
**$3,916,342 (1)** 61:23
**$92,630 (1)** 72:25

## A

**A-1 (3)** 9:24;12:7;
22:20
**A-10 (3)** 36:6,14,18
**A-11 (3)** 39:11,12,19
**A-12 (3)** 41:23,24;
42:3
**A-13 (3)** 43:20,21,25
**A-2 (2)** 16:14,15
**A-3 (4)** 18:5,6,12,22
**A-4 (4)** 21:3,4,8;23:20
**A-5 (3)** 27:12,13;
28:20
**A-6 (6)** 31:5,6,11;
34:1,9,11
**A-7 (4)** 28:8,11,14;
30:11
**A-8 (3)** 32:22,23;33:2
**ability (2)** 5:19;6:15
**able (10)** 10:9;32:1;
38:20;61:23,24;
78:10;79:7;84:15;
85:15;93:24
**above (2)** 71:16;
100:19
**above-mentioned (1)**
82:5
**above-titled (1)** 94:13
**absence (2)** 41:18;
61:23
**absolutely (1)** 4:8
**academic (2)** 30:4;
37:8
**access (7)** 17:8,8,15;
78:10,19;79:8,25
**accompany (1)** 17:23
**accomplishments (5)**
59:7,18,20,23;60:3
**accordance (1)** 64:18
**accordingly (1)** 58:16
**account (1)** 49:20
**accounting (1)** 78:21
**accurate (4)** 58:8,11,
12;88:13
**accurately (1)** 6:14
**across (1)** 83:24
**acted (3)** 47:24;48:2;
58:15
**acting (1)** 90:8
**action (5)** 17:10;
25:22;39:4;42:23;
52:4
**actions (2)** 39:6;64:20
**activities (2)** 45:17;
81:24

**activity (1)** 77:12
**actual (2)** 46:20;61:22
**Actually (3)** 14:17;
52:11;88:24
**add (3)** 56:3;70:12,19
**addition (3)** 47:20;
71:1,14
**address (1)** 25:5
**addresses (3)** 22:4,5,
13
**addressing (1)** 74:22
**administration (6)**
20:8;60:6;65:23;
69:20;70:10;83:5
**administrative (2)**
15:13;82:17
**admittedly (1)** 46:22
**advance (3)** 6:21;7:7;
9:2
**advise (2)** 8:5;83:6
**advisor (3)** 47:21,22;
48:1
**advisory (15)** 22:18;
27:25;28:5,21,23;
29:4;30:22;37:19;
38:4,12,16;39:3,5;
76:21;77:16
**advocated (1)** 62:25
**affairs (4)** 30:4;37:9;
69:21;70:11
**affidavit (1)** 47:21
**affiliated (1)** 34:4
**afternoon (2)** 23:22;
28:24
**again (17)** 6:17;
12:21;14:3,15;19:10;
22:14;25:18;26:1;
30:7;38:10;40:3,8;
41:11;46:12;48:18;
84:8;86:3
**against (6)** 4:14;6:25;
25:3;31:1;50:16;89:2
**aggressive (1)** 47:25
**agree (1)** 5:14
**agreed (2)** 56:23;
90:22
**agreeing (1)** 56:1
**Agreement (2)** 64:20;
91:3
**ahead (1)** 74:6
**Alaei (147)** 4:12;7:1;
10:15;11:2,12,23;
12:7,14,19,23;14:2;
15:6,10,11,19;16:9,
25;17:3,4;19:3,20;
20:5,9,13,16,18,18,
19,20,25;22:22,24;
25:3,8,17,20;26:3,7,
16,21,23;30:20;31:2,
16;32:1,7,10,15;33:4,
16;34:3,17,25;35:8,
15,18;38:18,25;39:8;
41:8;42:14;43:8,16;

**46:**10;50:2,17;51:23;
52:18;54:4,7,11,13;
57:14,25;58:19;59:7,
18;60:8,19,24;62:4,
18;63:3,5,20;64:18;
65:13;66:9,12,24;
67:5,18;68:1;69:16;
70:16;74:16,20;75:3,
21;76:7;77:6,12,23;
78:4,10,24;79:7,13,
16,23;80:4,7,9,22;
81:9,19,22,22;82:4,
15,18,25;83:1,10,14,
21,25;84:4,6,10,11,
14;85:9,14;86:8,14,
16,17;88:18;89:2;
90:3;91:3,18,22;92:4;
93:6;94:3
**Alaei's (18)** 4:14,18;
13:18,21;16:3;17:14;
41:18;48:16,20;
53:20;57:22;59:24;
61:15;73:20;84:2;
86:24;87:14;93:7
**Albany (67)** 4:15;
7:18;8:14;9:18,19;
10:18,23;11:2,11;
12:2,5,9,12,18,22;
13:3,12,13,17;14:22;
17:10,21,25;20:13,
24;22:7,22,23;23:15;
27:4;31:18,23;32:3,7,
15;34:2,4;39:7;44:10;
45:10,19;46:7,10;
47:8,12;48:6,15,17,
20;56:8;59:24;63:20;
65:19;66:9;69:14,18;
70:8;72:13;73:15,20;
75:15,18;80:5;89:4;
91:4;92:16;93:7
**Albany's (3)** 25:20;
47:9;75:21
**Alexander (1)** 46:4
**allegations (4)** 25:3;
80:5;89:7;92:6
**alleged (1)** 39:7
**allow (1)** 53:23
**allowed (5)** 27:7;
31:19,22;83:6;84:1
**along (4)** 43:1;64:23;
88:16,23
**altered (1)** 46:22
**altering (1)** 47:13
**alternate (13)** 10:14;
17:15;20:9;26:3,7,17;
32:13;39:1;41:9,18;
80:22;83:8,12
**alternative (24)** 16:25;
17:11;18:1;22:22,24;
33:9;34:25;36:2;
50:13;75:7;80:10,24;
84:2,7,9,16;86:17;

**89:**5;93:19;94:3
**always (2)** 20:15;
93:13
**among (1)** 27:22
**amounted (1)** 62:15
**amounts (1)** 79:8
**annually (1)** 72:23
**Anthony (2)** 4:21;86:1
**anymore (1)** 44:14
**apologize (1)** 20:21
**appear (2)** 49:13;
57:14
**appears (14)** 21:9;
27:20;28:15;31:13;
33:2;43:25;51:9,11;
55:8;57:13;67:18,18;
68:25;69:14
**Appellant (1)** 46:5
**Appellate (2)** 45:16;
46:2
**appointed (4)** 39:25;
40:11,14;41:19
**appointment (20)**
57:22;63:23;64:4;
67:7;68:13,14,15,17,
24;69:3,5,15;70:1,7;
71:2,15;72:17,23;
73:2,24
**appointments (2)**
71:1,13
**appropriateness (1)**
38:23
**approval (2)** 79:4;
93:21
**approving (1)** 43:4
**April (9)** 51:12;53:7,
14;63:1;65:12;66:10;
69:15;73:21,22
**Arash (26)** 80:4,7,9,
22;81:9,19,22;82:4,
24;83:1,6;84:2,6,6,11,
14;85:9,14;86:8,14,
17;93:6,7,14,19;94:3
**Arash's (1)** 84:9
**arose (1)** 20:7
**around (12)** 9:9;11:9;
12:8,12;21:15;29:13;
41:2;44:20;63:8,10;
90:25;91:7
**arranged (1)** 17:21
**articulate (1)** 6:6
**articulated (1)** 62:6
**articulation (1)** 10:14
**Asal (1)** 60:5
**assert (1)** 62:8
**assignment (37)**
10:15;16:25;17:11,
16;18:1;20:9;22:22,
25;26:4,7,17;32:13;
33:9;35:1;36:2;39:1;
41:9,19;50:13;75:7;
80:10,22,25;81:4,10,
13;82:25;83:8,12;

**84:**2,7,10,16;86:18;
89:5;93:20;94:3
**assignments (2)**
33:17;78:1
**assistant (1)** 82:18
**associate (5)** 33:11;
51:18;67:7;69:18;
70:8
**associated (6)** 21:14;
24:14,18;28:2;83:21;
90:8
**assume (2)** 5:22;
29:21
**assumed (1)** 88:23
**assumes (1)** 30:3
**assuming (1)** 32:18
**attached (5)** 54:22;
58:18;61:21;62:1;
92:3
**attend (4)** 27:8;75:2,4,
10
**attendance (1)** 27:6
**attended (6)** 24:13,15,
19;50:1;75:9;93:14
**attendees (9)** 24:21,
25;25:1,4,15,19;26:2,
20,22
**attending (2)** 24:20;
74:14
**attention (2)** 33:16;
43:9
**attorney (8)** 4:10,20;
7:9,11,12;14:8,12;
92:12
**attorneys (3)** 4:22;
5:14;14:10
**August (10)** 11:21;
12:20,25;13:1,5,18;
34:24;63:20;64:1,5
**authority (2)** 79:16;
92:15
**averred (1)** 47:22
**avers (1)** 48:1
**awarded (1)** 62:14
**aware (72)** 4:20;5:1;
6:12;9:11,17;11:1,9,
13,15;12:5,11,18,22;
13:3,4,17,25;17:18,
24;18:2;20:12,23;
21:1;22:23;23:2;
30:19;32:6;37:3;39:5,
9,24;40:12;43:14;
44:10,19;45:15,20;
47:8,11,15;48:3,7,14,
19;49:23;50:15;57:4;
59:19;60:8,11;62:11,
16;63:2,6,7,9,12;64:8,
16,21;66:10,20;
73:19;75:18,23;
77:16;79:19;80:1;
89:1,6;90:24,25
**away (2)** 20:9;52:13

## B

**B-1 (3)** 48:11,25;53:8
**B-2 (3)** 49:6,7;50:5
**B-3 (5)** 51:1,4,8;
54:20,22
**B-4 (3)** 55:3,4,8
**B-6 (4)** 57:7,8,16;
61:16
**B-8 (3)** 63:14,15,19
**back (21)** 14:18,19;
16:12;19:4,17,18;
23:20;28:11;34:1,9;
36:11;37:14;40:6,7;
72:4;80:25;86:6,14;
90:19,23;91:4
**backtrack (1)** 22:20
**based (10)** 12:23;
26:4;33:18;39:7;
54:13,15,17;56:22;
58:2;73:20
**basically (3)** 24:10;
42:16;76:18
**basis (13)** 10:17,19,
23;12:6,15;33:13;
51:25;54:7,9;55:18,
25;60:7;89:3
**bathroom (1)** 6:8
**BBS (2)** 49:13,14
**become (1)** 23:2
**beforehand (2)** 23:5;
54:2
**began (1)** 48:15
**beginning (5)** 11:18;
17:3;44:16;60:2;
69:16
**behalf (5)** 15:20;27:4;
52:15;74:20;75:15
**behavior (4)** 48:5;
68:10;69:4;89:8
**Beirut (5)** 86:9,11;
87:15;89:9;93:6
**bell (1)** 93:17
**best (5)** 5:19,21;6:15;
24:1;81:7
**better (1)** 43:5
**beyond (1)** 63:24
**bias (2)** 46:21;47:10
**Bill (4)** 51:10,24;52:8,
18
**bit (4)** 37:15;38:6;
42:8;52:7
**blank (1)** 90:16
**blocks (1)** 52:13
**board (16)** 22:18;
28:1,5,21,24;29:4;
30:22;37:19;38:4,12,
17;39:3,5;76:21,21;
77:16
**body (1)** 27:23
**bordered (1)** 47:6
**both (1)** 5:8

**bottom (3)** 51:3,20;
90:12
**box (3)** 49:18;68:14,
23
**break (5)** 6:8,11;13:2;
36:8;92:24
**Brian (11)** 31:12;
34:20;35:4,9;49:16;
76:3;90:1,7,13,22;
91:1
**briefly (3)** 8:1;42:6,12
**brought (6)** 16:9;25:7;
33:15;43:9;77:15;
89:16
**Bruce (5)** 44:17,24;
45:1,2,4
**budget (1)** 9:6
**business (3)** 63:25;
78:23;79:2
**buy (3)** 92:10,14,16

## C

**C-2 (3)** 64:12,13,17
**C-3 (7)** 74:9,10,19,24;
87:20,20;88:10
**called (2)** 4:2;89:13
**came (4)** 75:13;
77:10;80:7;88:21
**campus (3)** 9:3;33:18;
79:17
**can (93)** 5:7,11,20,25;
6:5,9,11,16,17;7:9,15;
8:1,10,21;9:22;10:2,
2,5;11:18;14:4,7,17;
15:4;16:6,13;18:9,9;
21:12;23:25;25:25;
26:19;27:11;28:10;
29:1;31:4,21;33:1;
35:6;36:17;37:15;
39:10,15;40:5,17;
41:10,12,22;42:6,8,
12,23;43:19;45:21;
47:16;48:18;49:5;
51:1,2,16;52:11;
54:20;55:2,7,17;
56:14;57:11;59:3;
61:19;62:21;63:13;
64:11;65:21;66:7;
67:2,12,13;69:8;70:6,
12,21;71:11;74:8;
75:9;77:1;78:18;
80:14;81:7;82:12;
85:2,23;88:15;91:9;
92:23
**capacity (5)** 31:22;
32:2,2;34:16;90:8
**caption (1)** 46:4
**card (1)** 17:7
**care (1)** 43:12
**careful (3)** 29:16;
40:16;41:5
**Carleo (1)** 21:25

**C-A-R-L-E-O (1)**
21:25
**Carleo-Evangelist (2)**
27:22;30:14
**case (3)** 45:12,12;
56:23
**CASTIGLIONE (58)**
4:6,10;9:22;10:1,4;
14:6,8,16;16:13,17;
18:4,8,15;19:16;
20:19,21,22;21:2,6;
27:11,15;31:4,8;
32:20,25;36:11,16;
39:14;40:5;42:1;
43:23;45:25;46:16;
47:16;48:13;49:9;
51:6;55:6;57:10;
63:17;64:15;65:8;
69:12;73:10;74:5,12;
80:18;85:6,22;86:4,5;
88:6;89:22;91:13;
92:23;93:4;94:7,10
**CC (1)** 57:15
**Celeste (1)** 45:4
**Center (6)** 9:5;15:8;
30:5;37:10;78:22;
79:16
**certain (2)** 26:9;27:7
**certainly (6)** 5:20;
41:3;56:21;57:23;
58:12;66:5
**certify (2)** 100:19,21
**cetera (1)** 92:8
**chain (1)** 31:10
**Chair (2)** 60:5;67:6
**chairs (1)** 77:25
**change (3)** 18:24;
29:5;67:17
**changed (1)** 47:3
**changes (3)** 89:16;
100:19,21
**changing (1)** 20:5
**Chantelle (12)** 24:6;
27:3;44:1,6;46:5,14;
90:1,5,14,15,21;91:2
**C-H-A-N-T-E-L-L-E (1)**
44:1
**characterization (1)**
31:20
**CHARLES (52)** 4:1,7,
8,9;6:19,21;10:2,7;
16:18;18:9,19;20:23;
21:7;27:16;28:13;
31:9;33:1;36:17,22;
39:15;42:2,10;43:24;
46:1;48:14;49:10;
50:7;51:7;52:17;
54:21;55:7;57:11,21;
58:8;59:4;60:5;
63:18;64:16;65:9;
67:13,15;69:13;
73:11;74:6,13;80:19;
81:20;85:7;89:23;

91:14;93:5;100:25
**chest (1)** 92:13
**Chief (2)** 45:6,7
**CIEGS (1)** 15:25;
82:1;93:16
**citizen (1)** 34:13
**Claimant (27)** 9:24;
16:15;18:6;21:4;
27:13;28:8,11;31:6;
32:23;36:14;39:12;
41:24;43:21;45:23;
48:11;49:7;51:4;
55:4;57:8;63:15;
64:13;65:6;69:10;
74:10;80:16;85:4;
89:20
**Claimant's (10)** 27:17;
28:14;30:10;31:5;
43:20;48:25;89:24;
91:9,11,14
**claims (2)** 4:14,18
**clear (10)** 5:6;6:2,5;
9:19;15:1,2;19:12;
51:24;55:20;87:5
**Cleary (23)** 24:6;27:3;
44:1,6;45:9,17;46:5,
9,14,22;47:3,10,13,
22,23;48:1,5;50:7;
90:1,5,14,21;91:2
**Cleary's (2)** 46:25;
47:1
**clinical (1)** 67:7
**close (1)** 63:25
**closely (2)** 56:19;
78:23
**clothed (1)** 17:22
**CODE (1)** 100:2
**Co-Director (2)** 82:1,
15
**Co-Directors (3)** 29:8,
13;43:6
**coincide (1)** 72:19
**College (10)** 15:15,
17;30:7;37:9,9;69:20;
70:10;71:3,15;78:1
**coming (2)** 83:24;91:4
**commencing (1)**
72:18
**comments (1)** 38:21
**committees (1)** 8:5
**common (1)** 6:3
**communicate (3)**
44:20;85:15;93:20
**communicated (1)**
39:3
**communicating (2)**
5:8;28:21
**communication (6)**
6:4;7:20;27:25;
28:19;39:2;85:11
**communications (10)**
14:1;21:21;30:14;
35:13,16,19;38:16;

83:25;85:9;89:15
**compared (1)** 62:17
**complaint (4)** 6:25;
89:2,6,17
**complaints (1)** 26:21
**complete (4)** 55:22;
70:19;82:5;83:3
**completely (3)** 41:12;
81:5;87:3
**complimentary (4)**
61:10;71:1,12,13
**compromised (1)**
42:21
**computer (1)** 82:19
**concern (6)** 31:3;32:6,
9,14;38:23;90:18
**concerned (2)** 26:20,
23;30:24
**concerning (15)** 4:14,
15;11:2,11,23;13:14;
35:18;38:4,17;45:17;
54:11;80:4;84:1;
87:15;90:3
**concerns (16)** 10:22;
12:1,6,8,15;25:12,16,
20;26:2;30:20;39:6;
47:8,12;48:3;75:21;
87:24
**conclude (1)** 22:17
**concluded (1)** 94:14
**conclusion (1)** 13:13
**concurrence (1)** 56:24
**conditions (1)** 83:7
**conduct (4)** 25:17;
26:4;39:7;83:11
**conducted (1)** 11:5
**conducting (8)** 45:17;
48:6;78:3;79:23;
90:7;91:17,21,23
**conference (7)** 23:6;
86:9,11;87:15;89:9;
93:7,14
**confidential (1)** 65:22
**confirm (1)** 67:6
**confused (1)** 90:23
**consideration (1)**
27:24
**considered (2)** 40:13,
25
**considering (2)** 39:24;
40:8
**consistent (4)** 40:1;
55:24;56:3;83:11
**consternation (1)** 59:8
**constituted (1)** 66:18
**consult (7)** 10:22;
13:20;29:12;36:3;
54:2;64:8;79:1
**consulted (4)** 13:12,
16;92:19,22
**contact (3)** 65:1;80:6;
93:21
**contacted (2)** 43:15;

51:19
**contacting (1)** 84:14
**content (4)** 30:11,15,
17;37:24
**contents (2)** 59:13;
64:9
**context (5)** 20:7;
65:25;73:15;83:10;
89:12
**continue (3)** 33:22;
71:3,16
**continuing (1)** 33:17
**contract (2)** 48:16;
55:21
**convened (2)** 77:17;
89:13
**conversation (10)**
23:4,8,15,19;29:15,
20;43:11;66:14;
83:14;86:13
**conversations (5)** 7:6;
13:25;40:24;41:3;
83:1
**Coordinator (5)** 24:7;
46:6;89:14;90:6;91:2
**copied (2)** 39:21,21
**copy (5)** 39:18,22;
52:20;74:24;94:12
**CORRECTION (1)**
100:2
**counsel (3)** 6:9,11;
92:5
**counseling (1)** 92:3
**counsel's (1)** 83:22
**couple (2)** 18:18;93:5
**course (5)** 4:19;
17:10;52:22;68:7;
73:22
**courses (1)** 8:3
**Court (2)** 45:16;46:2
**Court's (1)** 47:5
**create (2)** 5:3;54:25
**credentials (1)** 63:5
**credit (1)** 16:9
**current (6)** 7:15;
32:17;66:6,11;70:14;
72:19
**currently (1)** 45:6

## D

**D-1 (2)** 89:20,25
**D-2 (3)** 91:9,11,14
**dash (1)** 21:25
**date (7)** 26:8;50:5,9,
20,20;63:25;72:19
**dated (31)** 12:3;
16:20;18:13;21:10;
26:15;27:20;28:15;
31:12,14;33:3;36:20;
39:20;44:1;46:3;
51:11;53:6,13;55:10;
57:15;63:20;65:12;

69:14;74:21;81:18;
85:19;87:19;89:25;
90:13,21;91:15;92:20
**dates (1)** 35:4
**day (4)** 26:16,16;
48:23;81:7
**days (4)** 23:5,9,16;
44:12
**deal (1)** 5:16
**dealt (2)** 43:3;87:1
**Dean (13)** 8:12,15,22;
9:14;15:16;24:5;
33:11;57:21;58:8;
60:4;67:6;77:7,24
**deans (1)** 65:24
**Deb (2)** 40:5;46:17
**Debbie (8)** 5:2;9:23;
10:4;14:17;16:13;
18:15;19:12,16
**December (1)** 67:4
**decided (1)** 55:20
**deciding (1)** 58:25
**decision (13)** 20:8;
21:16;22:24;26:6;
45:16;46:1;53:24;
58:2,5,23;59:8;60:7;
91:3
**decisions (1)** 30:1
**decline (1)** 55:16
**Defendant's (1)** 89:24
**define (1)** 73:17
**definitions (1)** 66:4
**degree (1)** 41:14
**delivery (1)** 94:10
**denying (1)** 47:5
**DeOcampo (1)** 82:16
**Department (8)** 45:16;
46:3;61:2;67:6;68:9;
69:19;70:9;77:25
**departmental (1)** 8:5
**departments (1)** 30:8
**depicted (1)** 67:25
**depo (1)** 77:3
**deposed (1)** 5:25
**deposition (9)** 4:16;
6:21;7:7,8;35:7,10;
76:25;77:3;100:1
**described (2)** 33:19;
71:18
**description (1)** 37:6
**despite (1)** 61:23
**details (2)** 62:1;86:12
**determination (23)**
12:19,23,25;13:5,7,
21;14:2;17:14,19,20;
19:2;20:12,24;29:6,9,
23;30:9;34:16;40:13,
25;52:6;53:20;92:16
**determine (2)** 25:2;
34:3
**determined (2)** 32:1;
41:17
**development (1)** 71:5

**developments (1)**
37:19
**Diaz (5)** 71:25;72:1,5,
8,10
**different (2)** 25:25;
47:2
**Dina (2)** 29:7;43:6
**direct (3)** 35:13;
60:21;88:4
**directed (4)** 4:24;
5:12;75:11;86:16
**directly (4)** 9:6;40:25;
43:3;45:11
**Director (25)** 15:6;
19:21;20:10,11,25;
21:21;30:13;32:11,
17;33:11;34:6,8;
38:18;41:13;56:22,
24;66:15;70:20;71:4,
17,18;78:23;79:1;
89:15;94:4
**Directors (10)** 29:24;
40:1,11,15,22;41:1,6;
76:21,22;77:20
**directorship (1)** 38:25
**directs (1)** 14:12
**disagreed (1)** 87:9
**disagreeing (2)** 86:24;
87:24
**disagreement (1)** 87:6
**disappointed (1)**
59:15
**discipline (4)** 12:19,
23;50:12,16
**discovery (2)** 47:6;
85:25
**discuss (5)** 12:6,14;
21:14;65:1;84:15
**discussed (4)** 24:1;
34:2;42:25;91:16
**discussing (4)** 14:1;
23:17;91:6;92:10
**discussion (8)** 7:10;
12:13;33:14;75:19,
20,20;85:13,17
**discussions (4)** 75:14;
78:9;86:7,15
**Division (2)** 45:16;
46:2
**divisions (1)** 30:8
**document (59)** 10:3,7,
10,13;16:19,19,21,24;
18:5,10,11;21:3,7,12,
13;22:14;27:18,20;
28:14;39:16,18;42:3,
4,7,10,13;44:4;45:21;
46:17,20,24;47:19;
48:24;49:3,4,10,12;
50:5,19;51:8,9,14,20;
52:3,13;54:21;55:7;
59:5,6,11,12;62:2;
64:11;69:13,25;74:8;
75:1;85:2,7

**documents (13)** 5:4;
6:20,23;16:12;48:8;
51:2;57:12;59:12;
70:2;83:17,21,23;
85:20
**dollars (1)** 62:16
**done (5)** 39:2;58:14;
60:20;67:1;86:2
**down (14)** 13:2;
18:16;22:14;38:6;
42:8;46:17;47:16;
50:11;52:8;54:20;
59:3;67:2;70:24;82:2
**DR (171)** 4:1,7,8,9,18;
6:21;7:1;10:2,7,15;
11:2,12,23;12:14,19,
23;13:18,21;14:2;
15:6,10,11,19;16:3,9,
18,25;17:14;18:9,19;
19:20;20:5,9,13,16,
23,25;21:7;22:22,24;
25:3,8,17,20;26:3,7,
16,21,23;27:16;
28:13;30:20;31:2,9,
16;32:7,10,15;33:1,4,
16;34:3,17,25;35:8,
15,18;36:17,22;
38:18,25;39:8,15;
41:8,18;42:2,10,14;
43:5,8,12,16,24;46:1,
10;48:14,16,20;
49:10;50:2,9,17;51:7,
23;52:18;53:20;54:4,
7,11,13,21;55:7;
57:11,22,25;58:19;
59:4,7,18,24;60:5,8,
19,24;61:15;62:4,18;
63:3,5,18,20;64:16,
18;65:9,13;66:9,12,
24;67:5,13,15,18;
68:1;69:13,16;70:16;
72:1;73:11,20;74:6,
13,16,20;75:3,21;
76:7;77:6,12,23;78:4,
10,24;79:7,13,16,23;
80:19;83:25;85:7;
86:24;87:14;89:2,23;
90:3;91:3,14,18,20,
22;93:5;100:25
**draft (2)** 30:12;38:2
**drafting (1)** 73:23
**duly (1)** 4:3
**duration (1)** 68:23
**during (20)** 4:19;8:18,
23;24:22;35:5;45:10;
46:9;47:7;48:4,5;
60:9,19;61:11;74:22;
76:2,9;78:9;87:3;
93:19;94:3
**duties (1)** 15:5

## E

**E-1 (3)** 65:6,10;67:3
**E-2 (3)** 69:8,10,14
**earlier (1)** 26:18
**Education (16)** 7:17,
21,22;8:12,16,22;9:1,
3,6,10,14;15:9;30:5;
37:10;77:8;78:22
**effective (1)** 64:5
**effectively (2)** 6:25;
66:18
**efforts (1)** 9:8;15:20;
48:16;62:19
**either (5)** 15:16;
26:25;77:23;78:11;
93:16
**elected (1)** 64:4
**else (18)** 7:4,13,14;
15:11;19:23;24:8;
27:3;28:5;30:15,17;
56:9;60:16;63:7;
76:6;77:21,22;78:16;
79:12
**e-mail (106)** 16:19;
17:6,8,15,21;18:12,
17,19,21;19:8,25;
21:9,16,18,19,22;
22:4,6,19;23:20,21;
26:9,16;27:10,20,23;
28:15,18,18,20,22;
29:1,2,3;30:10,12,16,
18,21,25;31:11,11,13,
16;33:1,3,4,7;34:10,
19;35:12;36:19,23,
25;37:12,16,24;38:5,
13,15;39:15,19;40:2;
41:2,8;42:14,24;43:9,
15,25;44:16;51:10,
17;53:13,13,15,17;
55:9,12,14,16;57:13,
18,23;58:21;65:10,
11,15,16,17;66:6;
81:16,23;82:3;84:18;
85:8,13,18,23;90:12,
20;91:14;92:2,20;
94:11,12
**e-mails (6)** 22:16;
31:10;36:6;83:16,24;
89:25
**employ (1)** 68:21
**employed (1)** 44:9
**employee (12)** 17:11;
18:1;31:23;56:10,16,
20,22;65:18,20;
72:13;82:16;92:17
**employees (5)** 26:25;
63:2;70:3;72:14;75:6
**employment (23)**
4:15;7:15;8:10;
13:18,21;17:9;45:10;
48:17,21;53:21;
59:24;60:19;
69:17;72:20,23;73:3,
15,16,20;74:1;82:13;

Case 1:21-cv-00377-BKS-TWD    Document 119-3    Filed 04/29/25    Page 106 of 112
DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.
DR. HARVEY CHARLES
January 13, 2021

84:5
**end (2)** 63:1;72:19
**engage (2)** 8:4;77:11
**engaging (1)** 48:5
**ensuring (1)** 83:11
**entire (2)** 8:18;37:6
**entirety (1)** 42:9
**entities (1)** 84:23
**entity (2)** 77:6,7
**entry (2)** 50:20,20
**ERRATA (1)** 100:1
**error (1)** 72:5
**especially (2)** 43:6;
91:25
**et (1)** 92:8
**evaluation (8)** 60:4,
12,18,24;66:7,22,23,
25
**evaluations (3)** 60:9,
19;61:12
**E-V-A-N-G-E-L-I-S-T (1)**
21:25
**Evangelo (1)** 21:24
**even (2)** 25:13;61:7
**event (6)** 31:18,19,22;
32:8,16;47:2
**events (1)** 33:10
**evergreen (1)** 73:14
**everybody (1)** 36:9
**exactly (3)** 13:6;35:5;
67:1
**EXAMINATION (1)**
4:5
**examined (1)** 4:3
**example (2)** 22:10;
79:18
**exceeded (1)** 48:1
**Excel (1)** 61:21
**excuse (2)** 23:6;89:24
**executive (2)** 76:22;
77:20
**exercising (1)** 64:3
**exhibit (94)** 9:23,24;
12:7;16:14,15;18:6,
12,21;21:3,4,8;23:20;
26:18;27:12,13,17;
28:8,11,20;30:11;
31:5,6,11;32:22,23;
33:2;34:1,9,11;36:6,
14,18,19;39:11,12;
41:23,24;42:3;43:20,
21,25;45:22,23;
46:19;47:19;48:9,10,
11;49:6,7;51:4,8;
52:20;53:7;54:20,22;
55:2,3,4,8;57:7,8,16;
61:16;63:13,15,19;
64:13,17;65:5,6,10;
67:3;69:10,13;74:9,
10,19,24;80:14,16;
81:16;82:4;85:3,4,8,
19;87:20;88:10;
89:19,20,24;91:11,14

**exhibits (1)** 94:11
**expect (1)** 37:21
**expectations (4)** 62:5;
66:14,16;83:12
**expecting (1)** 81:5
**expend (1)** 79:14
**expenditure (1)** 79:13
**expenditures (1)** 79:1
**experience (9)** 17:9,
12,24;18:3;56:7,14;
57:2;62:13;65:18
**explain (14)** 8:1,21;
15:4;23:25;29:1;
42:12,23;51:16;
56:14,17;70:6;71:11;
77:1;78:18
**explanation (3)** 86:25;
87:10,14
**extended (1)** 63:24
**extension (4)** 30:5,7;
68:12;72:24
**extent (6)** 11:14;
15:25;16:3;18:9;
85:23;93:15

**F**

**F-1 (4)** 80:15,16;
81:16;82:4
**F-2 (4)** 85:3,4,8,19
**fact (11)** 11:3,4,5,7;
22:18;25:9,12;39:2;
46:13;52:19;87:2
**factfinder (1)** 48:2
**facts (1)** 46:22
**faculty (5)** 61:20,24;
62:8,22;68:8
**fair (11)** 17:4;19:25;
31:16,20;32:3,17;
43:10;57:22;64:22;
69:6;79:14
**fallout (2)** 42:18,19
**familiar (13)** 10:7;
16:4;33:4;36:22;
39:23;48:24;59:13;
62:13;66:4;69:25;
73:14;76:15;77:19
**far (10)** 30:19;41:10;
44:10;66:19;72:11;
75:9;77:23;79:10,11;
80:1
**February (27)** 10:16;
11:10,21;12:3;13:15;
16:21;18:14;21:10;
22:21,25;23:5,9,16;
26:12,14;27:21;
28:15,24;31:12,14;
33:3;34:24;36:20;
39:20;41:2;70:16;
89:3
**feeling (1)** 88:12
**feelings (1)** 87:8
**felt (2)** 43:4;53:3

**few (6)** 10:6;22:13;
23:5,9,16;44:12
**file (1)** 58:22
**filed (3)** 6:25;64:18;
89:2
**final (1)** 30:9
**financial (1)** 78:8
**find (3)** 61:19;78:5;
86:19
**fine (3)** 4:8;10:6;
90:11
**finish (1)** 5:7
**firm (1)** 4:11
**first (16)** 4:2;5:6;10:6,
17;22:10;23:2;26:5;
49:18;57:12;69:24;
70:7;74:13;75:2;
90:12;91:10;93:21
**five (1)** 36:7
**five-minute (1)** 92:24
**flag (1)** 44:3
**flagged (1)** 44:3
**flyer (1)** 33:19
**follow (1)** 53:23
**following (1)** 82:6
**follows (3)** 4:4;92:2;
94:9
**follow-up (2)** 93:1,5
**Forgot (1)** 90:15
**form (28)** 13:24;14:4;
19:13;54:21,22,25;
55:22;56:2,5;57:20,
25;58:7,13;66:16;
67:14,16,17,21,25;
68:1,3,7,11;73:9;
74:3;88:2,5,14
**formal (2)** 89:1,6
**former (2)** 20:10,11;
46:6
**forward (3)** 9:12;15:2;
48:15
**found (1)** 88:22
**Foundation (2)** 72:20;
79:18
**four (1)** 8:17
**Friday (2)** 23:22;
49:18
**full (1)** 13:10
**full-time (1)** 77:13
**functioning (1)** 15:13
**funded (1)** 77:14
**funding (7)** 61:19,20,
22;62:1,20;79:7;80:1
**funds (8)** 49:21;
78:20;79:13,15,17,
21;87:1,11
**further (1)** 52:7

**G**

**gave (3)** 27:2;55:25;
60:18
**general (3)** 67:24;

78:17;83:22
**generalize (1)** 38:20
**generated (1)** 77:14
**GIHHR (93)** 15:1,5,
14,21;16:7;18:25;
19:20,21;20:6,10,12,
25;21:14,15;22:19;
23:10,13,17;24:14,16,
18;27:25;28:5;29:3,5,
8,13,21,25;30:22;
32:11,17;33:11;34:7,
8;36:21;37:18,19;
38:4,12,16,18,25;
39:5,25;40:14,20;
41:1,4,17;42:22;
43:15,16;44:2,21;
61:3;66:15;70:20;
71:4,17,18;76:11,14,
15,18,23;77:2,5,15,
18,21;78:6,8,11,15,
20,21;79:7,8;80:1;
82:1,16,17,20;83:2,7;
86:7,16,25;87:10;
90:17;93:17;94:4
**Gina (1)** 29:7
**given (5)** 10:15;17:11,
15;18:1;64:22
**gives (1)** 92:12
**Global (7)** 8:13;
14:23;15:9;30:6;
33:11;37:11;63:23
**Gmail (2)** 22:5,13
**goes (1)** 72:21
**Good (2)** 4:7,9
**graduate (2)** 8:3,6
**grant (3)** 42:20;49:20;
62:13
**grants (12)** 42:15,18;
43:4,7,15;62:15,15;
71:5;77:14;78:11,16;
87:1
**greater (2)** 62:18,23
**grievances (3)** 64:18,
23;65:1
**ground (1)** 42:21
**grounds (1)** 26:3
**guess (2)** 19:7;70:19

**H**

**half (1)** 8:17
**handled (2)** 46:15;
87:11
**handwritten (1)** 49:12
**happen (2)** 32:18;
79:2
**happened (5)** 26:10;
35:5;44:11;48:23;
56:13
**happening (2)** 25:9;
78:7
**harassment (1)** 92:8
**hard (1)** 81:2

**HARVEY (8)** 4:1;6:19;
52:17;57:21;58:8;
60:5;81:20;100:25
**head (3)** 6:4;39:25;
40:14
**headed (1)** 77:6
**Health (4)** 14:24;
63:24;68:9;69:3
**hear (1)** 89:11
**heard (7)** 13:8;73:17;
89:6,10,10,12;91:6
**hearing (1)** 47:3
**heart (1)** 38:23
**Hedberg (5)** 51:11,18,
24;53:14;57:14
**held (6)** 7:24;33:21;
46:9;50:2;70:16;
75:16
**Hello (1)** 51:10
**Hi (2)** 44:17;90:15
**higher (2)** 61:25;
62:12
**himself (7)** 32:10,16;
33:23;34:4,6,17;
83:11
**hired (1)** 70:5
**HM5R@Virginiaedu (1)**
22:15
**hold (4)** 8:15;33:24;
73:8;75:25
**holding (2)** 33:19;
65:17
**home (4)** 52:10,14
**hour (1)** 36:8
**house (2)** 52:11,12
**HR (9)** 46:13;56:24;
76:3,9;80:4;86:18;
91:1,16,21
**HRM-3 (9)** 51:20;
52:2;53:22;54:24;
55:21;56:4;58:13;
67:17;68:7
**Human (16)** 14:24;
34:20;35:3,7,17;36:2;
50:2;56:19;63:24;
74:15,17,21;78:3;
79:22;90:9;94:1

**I**

**idea (2)** 19:22;28:4
**identification (27)**
9:25;16:16;18:7;
21:5;27:14;28:9;
31:7;32:24;36:15;
39:13;41:25;43:22;
45:24;48:12;49:8;
51:5;55:5;57:9;
63:16;64:14;65:7;
69:11;74:11;80:17;
85:5;89:21;91:12
**identified (45)** 14:23;
16:19;18:22;21:3,8;

Case 1:21-cv-00377-BKS-TWD    Document 119-3    Filed 04/29/25    Page 107 of 112
DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.
DR. HARVEY CHARLES
January 13, 2021

28:10,14,20;30:2,10;
31:10,17;33:2;36:18;
39:10,19;41:22;42:3;
43:19;44:3,21;45:21;
47:18;48:9,25;51:8;
55:8;60:2;64:17;
65:4;67:16;68:3;
69:13;74:8,14,19;
82:9;85:2,7;86:8;
87:20;88:10;89:18,
23;94:4
**identifies (3)** 27:23;
59:18;82:7
**identify (11)** 8:10;
9:23;10:9;16:14;
21:12;32:22;42:6;
63:13;64:12;82:12;
93:24
**imagine (2)** 58:2;66:1
**implementing (1)** 9:1
**implications (4)** 25:6;
26:24;43:8,8
**imply (1)** 41:6
**implying (1)** 41:13
**importantly (1)** 47:25
**impressed (2)** 16:7,8
**impression (1)** 31:1
**impressive (2)** 62:22,
24
**improper (3)** 25:17;
26:4;39:7
**inappropriate (2)**
25:22;89:7
**inclined (1)** 35:21
**include (2)** 8:2;14:22
**included (10)** 22:19;
52:15;60:25;61:22;
77:8,10;82:4;84:24;
85:1,10
**including (2)** 27:21;
86:25
**incoherent' (1)** 47:6
**inconsistent (1)** 88:23
**indeed (2)** 52:12;
84:21
**indicated (2)** 52:16;
58:17
**indicates (1)** 57:20
**indicating (1)** 46:13
**indicative (1)** 34:15
**individual (1)** 46:21
**individuals (3)** 21:13;
40:19;67:19
**influential (1)** 28:1
**info (1)** 92:12
**inform (1)** 29:3
**informal (4)** 75:19,20;
89:2,10
**information (12)** 4:17;
12:1;25:13;33:15;
35:22;55:17,19;58:3;
61:8;67:25;68:2;
86:20

**informed (2)** 44:23;
93:13
**initial (3)** 72:17;73:1,
24
**initialed (1)** 52:25
**initially (1)** 19:22
**initials (1)** 49:13
**Initiate (1)** 50:21
**initiated (1)** 50:23
**initiatives (1)** 9:2
**input (2)** 30:11;37:23
**inquiry (1)** 31:13
**instance (4)** 56:18;
69:24;74:13;75:2
**Institute (2)** 14:24;
63:23
**institution (2)** 16:10;
68:21
**institution-wide (1)**
8:25
**instructed (4)** 21:17;
58:13;61:4;83:5
**instructing (1)** 19:19
**intended (1)** 21:13
**intentional (1)** 53:2
**intents (1)** 15:7
**interaction (1)** 34:23
**interactions (1)** 35:2
**interdisciplinary (1)**
33:12
**interfere (1)** 25:5
**Interim (2)** 29:8,13
**intern (1)** 89:8
**internal (1)** 13:25
**International (15)**
7:17,19;8:12,16,22,
25;9:2,5,10,14;15:8;
30:5;37:10;77:8;
78:22
**internationally (1)** 9:9
**interns (10)** 24:14;
77:9;84:17,20,24;
85:1,11,15;86:15;
89:8
**interrogate (1)** 50:6
**interrogation (24)**
49:19;50:2,9;74:15,
23,25;75:3,11,15,22;
76:2,9,13;77:3;78:2,
9,14;80:3,8;86:6,12,
23;87:3;92:1
**interrogations (1)** 75:6
**into (8)** 7:10;34:25;
46:10;78:4;79:23;
91:17,22,22
**introduce (8)** 16:14;
18:4;21:3;27:12;
31:4;45:21;57:6;
89:18
**introduced (1)** 21:8
**introduction (2)** 9:23;
63:13
**introductory (3)** 24:5,

10;27:2
**Invariably (1)** 79:3
**investigation (28)**
11:2,5,8,11,13,21;
12:24;13:3,11,14;
34:25;35:15,17,22;
44:2,21;45:14;46:9;
47:14;50:14;61:11;
78:4;79:23;90:3,7;
91:17,21,24
**investigations (3)**
45:18;47:10;48:6
**investigative (1)** 11:15
**investigator (2)** 44:7;
48:2
**invite (1)** 21:13
**inviting (1)** 28:23
**involved (7)** 46:12;
67:23;73:23;81:25;
90:6;91:23,24
**issue (12)** 20:7;30:23,
24;36:1;37:22;38:17;
49:19;86:14;88:17,
19;91:25;92:11
**issued (4)** 10:21;12:2,
9,13
**issues (16)** 9:9;12:6;
21:14;30:20;35:14;
42:22;49:20;74:22;
75:7;78:8,24;83:17;
86:21;87:14;88:12;
91:7
**issuing (4)** 10:18,20,
23;50:16
**IX (11)** 11:14,22;13:4;
24:6;44:7;45:18;
46:6;49:20;89:14;
90:6;91:1

**J**

**J-1 (4)** 45:22,23;
46:19;47:19
**James (6)** 27:22;
39:20;67:4;71:25;
72:5,10
**Jim (5)** 22:3;37:1;
72:8,8,10
**job (5)** 5:5;8:2,21;
37:4,6
**Joe (1)** 4:10
**Jordan (5)** 21:22,24,
25;27:22;30:14
**Judicial (1)** 46:3
**July (3)** 26:10;91:15;
92:20
**June (1)** 85:9

**K**

**KA (12)** 17:2,4,7,23;
18:25;49:19;50:6,9,
13,21,24;92:12

**Kamiar (21)** 4:12;
12:7;17:3,4;19:3;
20:16;53:4;55:18;
57:14;82:15,25;
83:10,14,21,25;84:4,
10;86:15;88:18;
90:19;92:4
**Kamiar's (1)** 55:21
**Karl (6)** 15:17;18:13;
20:1;43:1,11;60:4
**keep (2)** 42:8;59:3
**keeping (1)** 38:8
**keeps (1)** 50:13
**kept (1)** 25:13
**keynote (1)** 33:18
**keys (1)** 17:8
**kind (3)** 37:14,20;87:6
**kinds (3)** 78:24;79:4;
81:1
**KMB2251@Columbiaedu (1)**
22:11
**knew (4)** 54:13,16;
70:19;88:23
**knowing (1)** 93:9
**knowledge (4)** 4:17;
11:25;58:4;86:20

**L**

**lack (2)** 39:2;55:25
**language (5)** 33:6;
40:9;17;71:9;73:1
**last (3)** 54:21;59:15;
66:23
**late (1)** 18:18
**later (2)** 14:10;46:24
**laudatory (1)** 61:10
**law (1)** 4:11
**lawsuit (2)** 7:2;83:18
**leadership (11)** 8:25;
16:8;21:15;29:5,21;
30:7;40:20;41:4,17;
42:22;89:17
**leaned (1)** 47:24
**learn (2)** 10:17;12:14
**learned (1)** 10:19
**least (3)** 24:19;72:22;
73:3
**lecturer (3)** 63:23;
69:19;70:9
**led (1)** 11:14
**left (1)** 43:11
**length (1)** 68:20
**less (1)** 62:19
**lesser (1)** 62:23
**letter (59)** 10:18,20,
21,24;11:1,7,10;12:2,
7,9,12,16,20,24;13:4,
15;22:21;51:21,22,
25;52:9,15,16,19,21,
22,23;53:6,55:17;
58:18,20;61:8,16;
63:19,21,22;64:6,9;

67:4,10,11;69:14;
70:1,4;72:14;73:21,
24;74:19,20,24;
75:24;76:1;87:19,25;
88:3,7,9,18;89:3
**letterhead (3)** 61:3,5,5
**Liesl (1)** 65:11
**L-I-E-S-L (1)** 65:11
**light (1)** 89:17
**likely (1)** 35:20
**limited (2)** 27:6,9
**line (3)** 61:24;85:10;
93:15
**lines (1)** 61:20
**list (2)** 66:16;81:24
**listed (2)** 22:9;62:1
**listening (1)** 87:7
**lists (1)** 59:17
**lives (1)** 52:12
**located (1)** 85:18
**long (4)** 7:24;8:15;
34:13;88:3
**longer (2)** 33:21;
43:16
**look (20)** 10:3;16:18;
18:10;22:8;26:8;
27:16;33:1;36:17;
37:15;38:1;39:15;
42:2;51:7;55:7;
57:16;63:18;65:9;
67:3;86:3;92:25
**looking (2)** 18:21;
85:20
**looks (2)** 55:9;65:11
**loss (1)** 42:18
**lot (1)** 80:19

**M**

**Mahnaz (1)** 82:18
**mail (1)** 36:20
**makes (1)** 14:8
**making (3)** 22:23;
40:12;69:15
**managed (1)** 9:6
**management (5)**
49:20,21;65:21;
68:10;69:4
**manner (2)** 47:25;
89:10
**many (5)** 15:7;24:19;
28:1;62:14;77:10
**March (9)** 44:1;80:23;
81:18;82:3;89:25;
90:4,13,21,25
**mark (5)** 9:22;31:5;
32:21;57:6;63:13
**marked (40)** 9:24;
16:15;18:6;21:4;
27:13,17;28:8;31:6;
32:23;36:5,14,18;
39:12;41:24;43:20,
21,24;45:23;48:10,

11;49:5,7;51:1,4;
55:2,4;57:8;63:15,19;
64:13;65:6,10;69:8,
10;74:10;80:14,16;
85:4;89:20;91:11
**marketing (1)** 61:1
**materially (1)** 87:24
**materials (2)** 86:8;
87:16
**matter (6)** 42:25;
44:18;46:4,12;93:8;
94:13
**matters (5)** 34:18;
46:15;59:17;83:2;
86:16
**may (31)** 4:18,21;
22:8,19;29:15;30:17;
38:1;48:22;50:3;
55:10;57:15;60:20,
22,25;72:18;74:16,
21;75:3,16,22;78:9,
13;79:19,24;85:17;
86:6,19,20,23;87:19;
88:10
**maybe (3)** 24:16;
26:8;48:22
**mean (5)** 7:2;11:6;
36:8;84:18;87:6
**meaningful (1)** 59:23;
60:1;86:24
**means (5)** 41:9;
61:24;68:4,19;71:9
**meeting (16)** 21:14;
23:21,23,25;24:4,7,9,
13,15,22;27:4,6;
28:24;29:19;47:22;
89:13
**meetings (2)** 47:23;
75:14
**member (6)** 60:6;
62:8,22;68:8;81:25,
25
**members (7)** 22:18;
28:1,23;29:4;38:4,12,
17
**memo (2)** 66:16;
92:11
**memory (1)** 76:1
**mention (1)** 86:10
**mentioned (3)** 19:21;
27:2;88:17
**mentioning (1)** 35:4
**merits (3)** 54:8,17;
56:23
**message (1)** 31:1
**Michelle (1)** 82:16
**middle (7)** 17:6;
22:13;33:6;46:19;
47:18;61:17;68:12
**might (14)** 12:1;15:1;
24:8;30:25;36:1;
41:6;42:21;44:14;
49:14;83:17;84:24;

85:1,10;93:24
**millions (1)** 62:15
**mind (2)** 19:17;72:15
**minute (1)** 36:7
**minutes (1)** 36:9
**misconduct (2)** 25:21;
92:6
**miss (1)** 90:18
**mistake (1)** 72:5
**mitigate (1)** 42:17
**Monday (3)** 50:20;
90:13,21
**money (2)** 78:15;79:8
**monies (2)** 78:11,20
**months (2)** 68:25;69:6
**more (7)** 12:14;35:20,
20;47:17,25;89:8;
92:12
**morning (2)** 4:7,9
**mostly (3)** 59:22;77:9;
87:2
**motion (1)** 47:5
**move (3)** 48:15;
68:22;88:16
**much (4)** 13:8;16:9;
78:21;94:8
**myself (3)** 70:5;72:7;
74:16

## N

**name (5)** 4:10;6:17;
16:22;29:6;52:16
**named (1)** 29:13
**names (1)** 29:22
**national (1)** 71:5
**nationally (1)** 9:8
**nature (1)** 93:13
**nearby (1)** 90:17
**necessary (1)** 56:1
**need (8)** 6:2,7;7:10;
18:24;29:16;78:25;
82:6;93:22
**needed (3)** 41:17;
58:14;93:21
**needs (1)** 17:21
**negative (4)** 60:4,9,
11,18
**New (10)** 4:14;9:19;
40:1,10,14;41:1,4;
45:15;46:2,7
**news (1)** 59:15
**next (7)** 18:16;49:2;
58:21;61:15;64:2;
67:2,12
**nine (2)** 68:25;69:6
**Nobody (4)** 7:13;
13:12;76:6;81:5
**nod (2)** 6:4;50:12
**noise (1)** 6:5
**non (1)** 71:12
**none (1)** 35:21
**non-faculty (1)** 66:2

**non-form (1)** 19:13
**non-objected-to (1)**
19:15
**non-renew (4)** 59:9;
66:8;92:9,14
**non-renewal (21)**
48:16,20;50:21,23;
52:4,9;54:3,11;56:9,
16;57:21,25;58:10,
12,24;59:20;60:7;
61:13;62:25;63:11;
66:10
**non-renewed (4)**
52:18;53:5;56:22;
58:19
**non-stipend (1)** 71:1
**non-UA (1)** 49:21
**nor (1)** 29:22
**notation (1)** 50:11
**notes (3)** 17:21;
49:12;92:25
**notice (6)** 28:5;49:19;
50:12,16;52:24;68:7
**noticed (1)** 22:4
**notify (2)** 63:22;93:25
**November (2)** 46:3;
67:19
**number (12)** 9:3;
18:22;21:9;24:14;
27:21;38:19;59:17;
77:9,10;82:9,15;
89:19
**numbers (2)** 24:17;
84:19

## O

**oath (1)** 5:2
**object (5)** 13:23;14:3;
74:3;88:1,14
**objecting (1)** 73:9
**objection (4)** 4:21;
5:10;14:9;73:6
**objections (1)** 19:14
**objective (1)** 34:5
**obligated (1)** 53:22
**obligation (1)** 77:21
**occasion (2)** 45:9,11
**occupy (1)** 32:19
**occupying (2)** 23:14,
18
**occurring (1)** 23:23
**off (3)** 5:15,15;33:17
**offer (3)** 55:25;69:15,
17
**office (15)** 17:23;
21:17,19;33:14,22;
34:20;35:2,7;52:5;
53:20,23;56:18;
58:15;83:22;90:9
**officer (4)** 11:14,22;
17:22;90:8
**offices (7)** 9:5;23:11,

13,14,18;35:17;74:17
**once (1)** 77:17
**one (27)** 7:14,25;8:1;
13:10,16;15:7;20:1;
22:5;24:16,19;29:22,
23;43:7;44:23;45:2;
47:17;56:18;57:13;
66:25;77:24;88:17,
22;89:8;91:16,20;
92:22;93:22
**ones (2)** 40:18;82:12
**only (8)** 22:16;27:7,9;
60:11,25;65:21,25;
94:11
**open (1)** 27:8
**operated (1)** 87:11
**operating (1)** 86:25
**operations (2)** 15:5;
78:23;79:2
**opinion (6)** 16:2,5,6;
34:12;58:9;88:12
**opportunity (2)** 15:18,
23
**order (5)** 47:5;53:22;
55:22;58:14;82:5
**organization (2)**
14:23;16:11
**organizations (1)** 28:3
**organized (1)** 76:19
**original (2)** 28:4;
30:12
**others (4)** 27:23;
39:20;82:10;91:15
**otherwise (5)** 4:24;
5:12,21;54:10;87:9
**out (14)** 30:16,21,22,
25;78:4,5;79:24;
84:21;86:19,19;
92:10,15,17;94:1
**outcome (1)** 13:10
**outreach (1)** 71:5
**outside (2)** 22:7;77:11
**over (15)** 11:19;
25:10;38:17,21;
44:11;45:9;52:11,12;
56:25;61:25;62:9,12;
68:22;79:15;84:11
**overall (1)** 24:24
**overseeing (4)** 14:23;
15:5,19;72:13
**oversight (4)** 37:8;
43:2;71:5;84:11

## P

**page (13)** 18:16,17;
22:8;46:17,19;47:17,
19;61:15,17;67:2,12;
68:12;91:10
**PAGE/LINE (1)** 100:2
**pages (1)** 10:6
**paid (1)** 93:7
**papers (1)** 7:2

**paperwork (5)** 55:22;
56:6,25;79:2,3
**paragraph (10)** 18:23;
46:20;47:18;59:14;
60:2;64:3;70:25;
72:14,16,21
**paraphrasing (1)**
46:25
**parentheses (1)** 68:23
**part (34)** 5:5;15:8,18,
25;17:6;18:12;27:24;
29:19;33:7;34:12;
35:10;37:7;45:13,18;
47:13,20;54:17,22;
55:16;57:15;58:21;
61:7,16,18,18;63:21;
64:2;72:17;79:6,17;
83:7,16;85:20,25
**participate (1)** 11:20;
33:17;50:22
**participating (1)** 33:10
**particular (4)** 33:20;
56:20;59:12;81:16
**particularly (1)** 51:8
**parting (1)** 90:14
**party (1)** 18:18
**past (1)** 44:12
**peer (1)** 91:17
**people (23)** 6:4;
21:10;22:7;23:4;
25:12;27:9,21;28:2;
30:22;42:20;62:6,17,
19;63:11;65:22,24;
82:6,7,8,22;93:22,24;
94:1
**per (1)** 55:23
**performance (2)** 66:7,
12,18
**Perhaps (1)** 47:25
**period (1)** 35:6
**permanence (1)** 41:14
**permission (2)** 84:15,
22
**personal (2)** 32:2;
58:4
**personally (1)** 43:3
**personnel (29)** 11:22;
12:5,12;14:1;23:9,16;
27:7;32:7,15;34:3;
44:21;46:10;47:9,13;
48:4;49:22;52:2;
59:21;63:1;74:15;
76:3,5,10;80:4,6;
86:18;91:1,17,21
**personnel's (1)** 34:16
**perspective (2)** 36:3;
66:17
**Petitioner (3)** 46:5;
47:20,24
**Petitioner's (1)** 47:5
**phrasing (3)** 25:23;
46:25;47:1
**physically (1)** 47:24

**picked (1)** 52:13
**pivot (1)** 20:9
**place (3)** 22:24;26:6;
81:11
**placed (6)** 32:12;
80:10,22,24;81:3;
82:24
**placement (1)** 89:4
**placing (1)** 38:25
**plain (1)** 17:22
**plan (2)** 81:18;92:7
**play (1)** 41:20
**please (16)** 5:18;
6:18;7:16;16:6,14;
18:5;20:17;27:12;
38:6,8,10;40:3;47:17;
67:12;69:9;77:1
**pleasure (2)** 67:6;
69:17
**pm (3)** 23:22;51:12;
94:14
**point (12)** 4:16;16:23;
18:22,22;20:24;
22:17;32:11;33:6;
36:19;66:24;80:23;
84:25
**points (1)** 18:19
**police (1)** 17:22
**policies (1)** 92:7
**policy (6)** 68:10;69:4,
20,21;70:10,11
**portion (1)** 51:9
**portrays (2)** 46:25;
47:1
**posed (1)** 6:10
**position (26)** 7:24;8:2,
11,14,15,22;9:13;
14:22;20:10,11;
32:12,19;33:20;
37:22;40:18;41:10;
43:5;46:8;62:17;66:2,
3;70:15,20;82:13,13;
84:6
**positions (3)** 26:25;
63:3;77:13
**positive (1)** 60:25
**possibility (3)** 46:21;
56:15;61:12
**possible (4)** 4:13;
72:24;79:10;85:13
**possibly (2)** 30:21;
49:16
**posted (1)** 26:18
**potential (1)** 42:18
**precisely (1)** 84:19
**preclude (1)** 33:9
**prepare (3)** 7:7;49:2,4
**prepared (4)** 16:25;
53:8;61:9;74:20
**prepares (1)** 56:9
**present (6)** 28:6;35:9,
11;47:21;50:7;63:25
**presented (7)** 5:23;

14:11;19:23,24;20:1;
47:20;53:10
**preserving (1)** 4:22
**President (10)** 45:6;
58:22,25;71:7,21,23;
72:6,7,9;76:20
**presidents (2)** 65:23;
72:6
**prestigious (1)** 28:2
**presumably (1)** 65:13
**pretty (1)** 13:8
**previous (4)** 14:19;
19:18;40:7;52:20
**primary (1)** 38:21
**prior (4)** 8:10,14;
28:19,22
**priority (2)** 44:18,22
**privacy (1)** 30:20
**private (2)** 32:2;34:13
**privy (1)** 13:9
**probably (1)** 80:19
**probe (1)** 4:17
**proceeds (1)** 50:14
**process (7)** 56:8,15,
17,25;58:22,24;64:23
**processing (1)** 56:6
**professional (7)**
24:16;65:18,20;66:1,
3;71:2,14
**professionals (1)** 9:4
**Professions (1)** 64:20
**Professor (5)** 7:17,19;
67:8;69:19;70:9
**profile (1)** 9:8
**program (3)** 66:7,12,
18
**programming (2)**
71:6;82:19
**projected (1)** 61:19
**projects (1)** 43:14
**pronouncing (1)** 20:16
**propose (1)** 34:21
**proposed (1)** 28:18
**protocol (2)** 17:25;
78:14
**provide (3)** 28:4;
30:11;38:20
**provided (1)** 74:23
**providing (2)** 8:24;
27:25
**Provost (43)** 8:13,16,
23;9:7,14;21:17,19;
22:2;24:5;30:3,4;
33:14,16,22;36:20;
37:1,5;38:13;41:16;
45:8;51:19,23;52:1,5,
5,17;53:4,19,23;
55:20,23;57:4,20,24;
58:7,15;65:24;71:19;
72:1,9;75:13;77:7;
89:13
**public (4)** 69:19,21;
70:9,11

**publication (1)** 87:16
**purpose (4)** 29:2,3;
92:9,11
**purposes (3)** 4:22;
15:7,13
**pursue (1)** 58:15
**pursuing (2)** 48:20;
66:10
**purview (1)** 37:11
**put (2)** 66:16;81:10
**putting (1)** 26:3

**Q**

**quality (3)** 15:20,23;
16:2
**quick (1)** 36:7
**quickly (1)** 80:20
**quite (4)** 40:9;59:13;
60:1,24

**R**

**raise (8)** 9:8;25:15,
19;26:2;30:19,24;
61:11;62:20
**raised (15)** 12:2;20:5;
24:25;30:23;31:3;
32:7;39:6;47:8,9,12,
23;48:3;74:22;87:14;
88:12
**raising (2)** 62:12;
85:16
**ran (1)** 78:21
**Randy (8)** 35:16,19;
55:10;63:21;76:4;
91:15,16,20
**range (1)** 9:2
**rather (1)** 72:9
**rationale (1)** 39:4
**reach (6)** 61:25;78:4;
79:24;84:21;86:19;
94:1
**read (17)** 14:17,19;
16:22;19:13,14,18;
40:5,7;59:11;61:18;
71:9;75:1,24;87:19;
88:2,7,9
**reading (3)** 19:17;
42:9;87:23
**realized (1)** 52:14
**really (14)** 9:12;19:8;
24:8;25:24;27:5;
35:23;43:3;49:17;
61:7;87:9,12;88:21;
92:5,11
**reason (6)** 6:13,16;
35:25;53:3;85:16;
100:2
**recall (71)** 4:9;19:7;
23:2,4,8,19,22;24:19,
21,24;26:17;30:23;
31:3;35:5,13;38:3,11,

14;39:18;42:10;
43:18;50:25;53:15;
54:5;55:12;57:18;
65:16;66:13,23;67:9,
11;74:14,23;75:9,24;
76:2,5,8,9;78:7,8,12;
80:2,3,9,12,13;82:8,
25;83:24;84:3,14;
85:8,12,21;86:7,10,
12,22,23;87:2,4,5,8,
12,18,23;88:7,9,11;
93:6
**receive (3)** 38:16;
59:15;71:14
**received (8)** 38:21;
39:22;53:17;54:3,6;
60:3,9,11
**receiving (8)** 19:8;
38:3,11,14;39:18;
42:24;53:15;57:18
**recent (1)** 45:15
**recess (2)** 36:13;93:3
**recipient (1)** 57:15
**recipients (2)** 22:9;
37:15
**recitation (1)** 59:6
**recite (1)** 37:6
**recognize (14)** 16:21;
18:10,19;21:7;27:18;
28:13;31:10;39:16;
42:4;49:10;51:14;
59:4,6,10
**recollect (1)** 93:9
**recollection (6)** 24:2;
60:22;80:21;82:21;
83:13,15
**recommend (5)** 29:22;
54:7;55:18;56:10;
57:25
**recommendation (12)**
52:1,3;53:4;54:10,
14,15;56:1,4,9,21;
58:10;67:5
**recommendations (1)**
63:10
**recommended (2)**
59:21;63:8
**recommending (6)**
51:21,23;52:17;
58:11,18,19
**record (9)** 4:22;5:13,
15,15;6:18;14:9;
18:11;53:22;85:22
**recreating (1)** 61:12
**refer (22)** 6:24;9:17;
15:1;28:10;32:21;
34:9;36:5;39:10;
41:22;43:19;48:8;
49:5;51:1;55:2;
61:15;64:11;65:4;
69:8;74:8;85:2;
88:24;91:9
**reference (9)** 17:2;

40:10;44:24;50:15;
61:1,3;85:20;86:10;
92:14
**referenced (2)** 68:9;
71:16
**references (6)** 18:24;
19:2,20;20:5;65:17;
66:6
**referencing (2)** 62:4,5
**referred (3)** 40:21;
43:15;53:6
**referring (21)** 9:18;
17:4;18:12,25;22:2,
20;28:19;34:1;44:25;
49:16,23;54:23;55:9;
62:11;65:13;68:17;
69:2,3;70:24;72:16;
73:4
**refers (1)** 65:20
**Refki (2)** 29:7;43:6
**R-E-F-K-I (1)** 29:7
**reflected (4)** 13:14;
19:25;40:1;85:19
**reflecting (1)** 81:1
**reflects (2)** 23:21;
31:25
**refresh (1)** 80:21
**regarding (14)** 13:13,
20;25:20;34:24;
35:15;41:5;58:9;
64:20;78:10,19;84:23
**reiterate (1)** 85:25
**related (7)** 12:1,19,24;
13:4;25:16,21;78:15
**relative (1)** 77:25
**relevant (4)** 4:18;
9:12;68:1;83:17
**relieving (1)** 17:7
**remarks (3)** 24:5,11;
27:3
**remember (26)** 13:6;
19:9,19;23:3;24:3,4,
8,17;26:5;27:5;37:25;
38:1,2;52:21;64:7;
66:21;67:1;76:12;
80:7;81:2;82:10,12,
23;83:4;84:19;94:6
**remind (1)** 33:8
**remove (4)** 17:14;
19:2,20;20:25
**removed (2)** 23:17;
32:12
**removing (4)** 23:10,
13;38:18,24
**rendering (1)** 47:2
**renew (2)** 55:21;
92:16
**renewal (4)** 54:11;
63:8;67:7;68:13
**renewed (4)** 51:24;
54:7;15;55:19;56:11;
63:3;72:23
**repeat (3)** 12:10;

19:10;91:19
**rephrase (1)** 5:21
**report (14)** 13:9,10;
  15:12;35:23;71:6,19;
  72:6,8,10;76:20;
  77:21,22;81:18;85:11
**reported (9)** 9:6;
  13:10;15:6,10,14,16;
  46:22;77:7,23
**reporting (2)** 66:15;
  90:14
**reports (1)** 60:21
**represent (5)** 4:11;
  32:10,16;33:22;34:17
**representation (1)**
  58:9
**representative (2)**
  32:3;34:14
**represented (1)** 87:25
**representing (3)**
  33:10;34:4,6
**reprimand (1)** 61:7
**request (7)** 51:19;
  54:3;61:1;67:17;
  75:13;85:22,25
**requested (1)** 68:3
**requests (1)** 94:9
**require (1)** 79:3
**required (4)** 15:11;
  35:10;61:20;83:20
**research (13)** 8:4;
  33:12;69:18;70:8;
  71:7,20,22,23;72:20;
  76:19,20;77:12;81:6
**researchers (2)** 27:1;
  77:10
**resolve (2)** 12:8;14:10
**resonate (1)** 52:24
**resource (2)** 36:3;
  74:15
**resources (12)** 34:21;
  35:3,8,17;50:2;56:20;
  74:17,21;78:3;79:22;
  90:9;94:2
**respect (2)** 38:24;
  61:19
**respond (3)** 5:19;
  6:14;41:11
**responding (2)** 31:13;
  41:5
**response (12)** 6:6;
  29:18;30:3;33:15;
  38:12,15;40:23;
  41:20;47:4;73:12;
  83:4;90:20
**responses (5)** 6:3,3;
  38:3,11,14
**responsibilities (13)**
  8:2,21;9:4,13;14:21;
  15:4,15,19;37:4;62:9,
  10;71:17;93:16
**responsibility (4)** 30:4;
  37:7;71:4;79:19

**responsible (6)** 8:24;
  9:1;25:6;40:19;43:2;
  82:19
**result (4)** 16:10;
  30:21;42:21,24
**Rethemeyer (9)**
  15:17;18:13;20:1,4;
  43:1,5,11,12;60:4
**R-E-T-H-E-M-E-Y-E-R (2)**
  18:13;20:4
**retrieve (1)** 17:23
**returned (1)** 52:14
**revenues (1)** 77:14
**review (12)** 6:20,23;
  7:4;15:19;21:19;
  57:11,12;58:22;
  67:14;79:12;81:6;
  83:16
**reviewed (4)** 6:24;
  21:22;30:15,17
**reviewing (1)** 31:18
**right (10)** 31:24;
  32:18;46:18;47:17;
  64:3,25;65:14;68:22;
  76:6;81:17
**Rights (1)** 14:24;
  63:24;64:19
**ring (1)** 93:17
**Rockefeller (8)** 15:15;
  30:6;37:9;69:20;
  70:10;71:2,15;77:24
**role (12)** 41:20;45:18;
  48:1;62:8;66:14;
  68:8;71:6,18;75:5;
  82:17;88:19;91:25
**roles (3)** 14:21;90:2,
  10
**room (1)** 23:6
**ROTONDI (12)** 13:23;
  14:3,7;36:10;73:6,8;
  74:3;86:2;88:1,14;
  93:2;94:12
**run (2)** 30:13;76:22
**Ryan (1)** 16:20

**S**

**safety/well-being/retaliation (1)**
  90:18
**salary (1)** 72:25
**same (5)** 5:8;15:23;
  26:15;63:4,10;82:3;
  87:13,17
**Saturday (1)** 53:14
**saw (3)** 46:12;67:9,21
**saying (4)** 15:10;
  59:10;83:4;90:22
**scholars (2)** 24:18;
  25:7
**scholarship (1)** 8:4
**school (2)** 8:5;77:24
**screen (2)** 81:17;
  84:18

**scroll (17)** 10:5;18:16;
  22:14;37:14,17;38:6;
  42:8;46:17;47:16;
  50:11,19;51:3;54:20;
  67:2,12;70:24;82:2
**scrolling (4)** 38:8;
  59:3;67:14;72:15
**seal (1)** 61:2
**search (1)** 85:23
**second (6)** 28:12;
  46:20;59:14;61:24;
  72:14;73:8
**secondly (1)** 39:1
**security (2)** 72:22;
  73:3
**seeing (2)** 65:16;
  67:11
**seeking (1)** 55:19
**seem (3)** 29:17;
  39:23;59:13
**seemed (2)** 88:19,20
**seems (3)** 25:10;
  68:19;70:1
**Selchick (16)** 16:20;
  31:12,25;34:11,20,
  23;35:4,9;49:16;50:6;
  76:3;90:1,7,13,22;
  91:1
**S-E-L-C-H-I-C-K (2)**
  16:20;34:11
**self-designed (1)** 61:2
**send (2)** 21:16,17
**sending (2)** 81:22,24
**Senior (2)** 51:18;
  65:22
**sense (3)** 37:20;
  58:12;62:14
**sensible (1)** 29:17
**sensitivity (1)** 42:15
**sent (14)** 21:20,23;
  26:16;27:10;30:16,
  21,22;36:25;37:12,
  13,24;38:1;51:11;
  74:20
**sentence (2)** 59:16;
  70:7
**sentiment (1)** 33:21
**sentiments (1)** 39:23
**separation (2)** 80:5,6
**series (4)** 36:6;51:2;
  57:11;89:25
**seriously (2)** 25:3;
  26:22
**serve (5)** 29:24;
  63:22;71:4,16;92:11
**served (6)** 8:12;
  10:23;12:6,15;45:7;
  89:3
**sexual (2)** 92:6,7
**share (1)** 16:6
**shared (4)** 22:6;
  35:23,24;66:17
**sheet (2)** 61:21;100:1

**show (1)** 80:14
**showed (1)** 52:20
**showing (4)** 43:24;
  47:10;64:16;89:23
**shown (1)** 68:12
**sign (14)** 51:19,21,25;
  52:19;53:22;54:3,23;
  55:16,21;56:1,10;
  57:25;58:13,20
**signature (1)** 79:4
**signed (7)** 37:1;
  52:25;53:7,11;57:20;
  58:7;67:19
**significantly (1)** 47:2
**signing (1)** 52:9
**silent (2)** 87:2,3
**Similar (6)** 33:25;
  34:2;62:17;63:2;
  70:2;75:7
**similarly (1)** 5:11
**simply (1)** 52:23
**sit (3)** 8:4;81:6;88:11
**situation (3)** 43:2,12;
  75:8
**situations (1)** 59:1
**six (1)** 82:7
**solicit (2)** 37:23;84:15
**solicited (1)** 31:17
**somebody (6)** 19:23;
  28:5;56:8;79:12;84:5,
  11
**someone (4)** 13:6;
  15:17;51:22;52:5
**sorry (12)** 7:8;11:16;
  18:18;20:14;21:24;
  47:1;72:4;73:11;
  74:6;88:8;91:19,20
**sort (3)** 17:12;35:24;
  84:5
**sounds (1)** 75:25
**speak (12)** 6:11;7:8,9;
  27:4;31:19,22;32:1,
  16;34:21;35:21;
  60:16;70:21
**speaker (1)** 31:17
**speaking (1)** 32:8
**specific (2)** 83:13,15
**specifically (4)** 4:24;
  5:12;14:12;58:20
**speeches (1)** 33:18
**spend (1)** 79:9
**spending (1)** 78:15
**spirit (1)** 83:3
**spoke (6)** 7:12;23:25;
  24:3,7;27:3;72:5
**spoken (1)** 24:9
**staff (7)** 19:19;24:16;
  45:6,8;77:13;81:25;
  83:7
**standard (2)** 61:5;
  94:10
**Stark (12)** 35:16,19,
  25;36:4;50:7;63:21;

74:21;76:4;91:15,16,
  20;92:2
**start (3)** 11:19;25:10;
  51:2
**started (2)** 59:16;
  66:13
**starting (3)** 18:17;
  36:18;72:25
**starts (3)** 33:7;46:20;
  59:14
**State (8)** 4:15;6:17;
  7:15;9:18;41:7;
  45:15;46:1,6
**statement (4)** 33:13;
  44:16;46:13;60:17
**states (4)** 34:12;
  47:20;55:16;63:21
**status (4)** 44:3;67:17;
  90:15,16
**Stellar (13)** 22:3;
  27:22;37:1,12,23;
  39:20,24;40:12,24;
  67:4;72:1,8,10
**Stellar's (1)** 37:4
**stenographer (4)** 5:1,
  14,16;11:17
**step (1)** 58:21
**steps (1)** 42:17
**still (6)** 4:23;14:10;
  38:8;44:9;90:16;94:4
**stipends (1)** 71:14
**stop (2)** 5:17;61:4
**Strategy (4)** 8:13;
  15:9;30:6;37:11
**strike (13)** 11:16,17,
  18;17:1;20:14;23:6;
  29:18;33:25;57:4;
  69:23;70:14;88:8,25
**structure (9)** 76:10,14,
  15,17;77:2,8,18;78:5;
  79:6
**struggle (1)** 92:4
**student (1)** 84:20
**students (1)** 8:6
**subject (5)** 44:2;
  81:17;85:10;90:14;
  100:19
**submit (1)** 83:20
**submitted (1)** 83:22
**substance (2)** 24:24;
  38:21
**success (2)** 62:14,18
**suggest (1)** 88:20
**suggests (1)** 41:14
**SUNY (87)** 4:15;9:18,
  18;10:18,19,23;11:2,
  10,22;12:2,5,9,11,18,
  22;13:3,12,13,17;
  14:1,22;17:10,21,25;
  20:13,24;22:7,21,23;
  23:9,15;25:20;27:4;
  31:18,23;32:3,7,15;
  34:2,4,15;39:7;44:10,

Case 1:21-cv-00377-BKS-TWD    Document 119-3    Filed 04/29/25    Page 111 of 112
DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.
DR. HARVEY CHARLES
January 13, 2021

20;45:10;19;46:10;
47:7,9,12;48:4,6,15,
17,20;56:8;59:21,24;
63:1,19;64:18;65:19;
66:9;69:14;70:3;
72:13,20;73:15,20,
22;74:15;75:15,18,
21;76:3,9;80:4,5,6;
83:18;86:18;89:4;
91:4,16,21;92:15;
93:7
**SUNY's (2)** 25:16;
64:20
**superior (1)** 84:5
**supervised (1)** 9:3
**supervisor (11)** 53:21;
62:9;72:1;75:4,5;
81:10,14;84:4,10;
88:20,21
**supervisory (1)** 79:16
**support (1)** 61:13
**supported (1)** 9:7
**supporters (1)** 29:4
**supportive (1)** 61:10
**supposed (1)** 14:5
**supposedly (1)** 58:18
**Supreme (3)** 45:15;
46:2;47:5
**Sure (34)** 5:24;6:24;
8:3;9:16,20;12:11,22;
14:16;15:6;19:11,12;
23:12;25:19;26:2,6,9;
28:7;36:10;38:11;
39:22;40:4,9;41:12;
42:8;48:19;56:25;
59:1,11;70:17;75:25;
84:9;90:17;91:20;
93:2
**surprise (1)** 88:21
**surprising (1)** 88:18
**sworn (2)** 4:3;5:2

### T

**talk (5)** 6:8;43:5;57:1;
86:16;89:16
**talking (3)** 5:3;62:7;
67:5
**talks (2)** 16:24;66:22
**target (2)** 61:25;62:12
**task (1)** 82:5
**tasked (1)** 43:7
**teach (1)** 8:3
**teaching (2)** 15:14;
77:25
**telling (1)** 82:25
**temporarily (1)** 32:12
**temporary (5)** 29:5,21,
24;41:10;68:13
**ten (1)** 36:9
**term (15)** 41:6,13;
63:22;65:20;66:1;
68:13,15,18,24;69:5;

73:2,14,17,19,25
**terminate (3)** 13:21;
14:2;64:4
**terminated (1)** 13:17
**termination (1)** 63:25
**terms (8)** 27:7;33:8;
42:19;58:11;59:24;
78:17;84:2;87:16
**testified (1)** 4:3
**testimony (1)** 55:24
**Thanks (1)** 90:19
**Third (2)** 45:16;46:2
**though (2)** 25:13;53:3
**thought (3)** 40:21;
56:23;90:22
**thoughts (1)** 87:8
**three (8)** 24:17;70:25;
71:12,12;72:18;73:2;
82:10,22
**Throughout (1)** 49:13
**Thursday (1)** 50:6
**times (2)** 61:25;62:12
**Title (18)** 11:14,22;
13:4;24:6;44:7;
45:18;46:6,11,14,15;
49:20;65:17;85:10,
19,24;89:14;90:6;
91:1
**titles (1)** 33:23
**today (6)** 4:13;5:4;
6:13,20;88:11;90:16
**today's (2)** 7:7,7
**together (1)** 89:16
**told (4)** 13:6;48:22;
52:18;75:4
**took (2)** 42:23;56:25
**top (5)** 22:8;31:11;
44:18,22;53:13
**touch (5)** 35:25;82:6;
83:6;84:22;93:23
**toward (1)** 47:14
**transcript (4)** 5:3;94:9;
100:20,22
**treated (1)** 26:24
**tried (3)** 12:5,13;
75:19
**triggered (2)** 11:1,8
**trip (1)** 93:8
**tripping (1)** 25:24
**troubleshooting (1)**
82:20
**true (3)** 79:15;100:20,
22
**truthfully (2)** 6:14;26:1
**try (3)** 5:21;12:8;19:4
**trying (6)** 19:4,8;
29:16;41:11;42:14;
83:3
**Tuesday (1)** 81:18
**twice (1)** 77:17
**two (16)** 24:16;29:24;
30:8;39:24;40:10;
41:1,19;48:23;52:12;

61:20;67:19;68:25;
69:5;72:22;73:3;76:7
**type (7)** 5:5,8;63:4;
68:15,17;75:7;83:14
**types (2)** 34:17;91:6
**typical (8)** 17:10,25;
56:8,12,15,17;57:1;
59:1
**typically (1)** 35:3
**typing (2)** 5:14,17

### U

**UAlbany (3)** 59:17;
75:9;77:11
**ultimate (2)** 13:13;
29:23
**ultimately (4)** 13:5;
31:25;40:19;58:25
**under (5)** 5:2;13:4;
37:11;60:2;64:19
**undergraduate (2)**
8:3;77:9
**underline (1)** 18:23
**underlying (5)** 10:17,
19,22;12:8,15
**underscore (1)** 42:15
**understood (5)** 40:18;
46:8;53:19;57:3;
88:24
**undertook (1)** 11:11
**unfounded (1)** 92:7
**unilaterally (1)** 79:8
**union (1)** 64:19
**unit (1)** 76:19
**United (1)** 64:19
**units (3)** 15:8;37:8,11
**universities (2)** 28:2;
77:11
**University (29)** 7:1,18;
8:14;9:19;17:13;
23:10,14;25:2,5,7,8,
10;26:21,25;34:14;
38:24;45:2;46:6;
49:21;59:8;60:6;
61:5;64:3,19;69:18;
70:8;86:9,11;87:15
**university-level (1)**
76:19
**University's (2)** 9:7;
37:22
**unless (4)** 4:23;5:12,
14;14:11
**up (10)** 5:5;25:24;
29:17;37:15,17;
50:19;51:3;52:13;
72:15;80:7
**UPD (1)** 17:22
**update (1)** 36:20
**updated (1)** 66:19
**upon (1)** 39:7
**use (9)** 6:8;49:21;
61:2,5;78:11,14,19;

79:21,25
**used (1)** 55:18
**using (1)** 61:4
**UUP (1)** 68:13

### V

**various (3)** 9:5;33:17;
49:19
**verbal (1)** 6:3
**Vice (17)** 8:13,16,23;
9:14;24:5;51:19;
65:23,23;71:7,19,21,
21,23;72:6,6;76:20;
77:7
**Victor (1)** 60:5
**view (1)** 56:4
**violence (1)** 92:8
**Virginiaedu (1)** 22:6
**vocalized (1)** 87:7
**voice (1)** 47:23
**Volynsky (1)** 29:7
**V-O-L-Y-N-S-K-Y (1)**
29:8

### W

**war (1)** 92:13
**way (4)** 25:6,25;
59:23;86:24
**website (3)** 18:25;
19:3;20:6
**Wednesday (1)** 50:12
**weekend (1)** 52:10
**well-being (1)** 42:19
**weren't (1)** 64:22
**whatnot (2)** 19:15;
78:11
**What's (22)** 10:12;
18:22;27:17;28:10;
36:5,17;39:10;40:1;
41:22;43:19,24;49:5;
55:2;63:18;64:17;
65:4;69:8;71:15;
76:1;80:14;89:18,23
**Whereupon (3)** 36:13;
93:3;94:13
**whose (1)** 21:16
**William (4)** 51:11,18;
53:14;57:14
**wishes (2)** 55:23;
58:15
**within (4)** 9:5;37:8;
65:25;83:10
**witness (4)** 4:2,14;
14:5,14
**women (5)** 29:24;
39:25;40:14;41:1,19
**wondering (1)** 37:14
**Word (1)** 62:1
**wording (2)** 47:4,13
**words (3)** 47:4;68:1;
79:12

**work (17)** 11:15;
15:20,24;16:3,4,7,10;
44:14;45:9,11;54:8,
18;62:22,24;65:18;
84:16,23
**worked (2)** 78:23;92:3
**working (8)** 42:16,20;
43:16;45:13;47:7;
56:7,19;59:16
**workplace (1)** 92:8
**works (2)** 34:20;58:24
**write (2)** 52:23;55:14
**writes (1)** 92:2
**writing (3)** 37:18;
62:13;92:4
**written (7)** 13:9;34:19;
41:8;51:22;52:15;
69:7;83:25
**wrong (3)** 20:16;31:1,
1
**wrote (2)** 42:14;52:9

### Y

**year (6)** 7:25;8:1,8,
18;72:24;77:17
**years (7)** 8:17;68:25;
69:6;72:18,22;73:2,3
**Yep (2)** 19:1;71:23
**York (5)** 4:15;9:19;
45:15;46:2,7
**Young/Sommer (1)**
4:11

### Z

**Zwicklbauer (1)** 65:12
**Z-W-I-C-K-L-B-A-U-E-R (1)**
65:12

### 1

**1 (5)** 18:23;72:18;
82:9,15;89:19
**1:14 (1)** 94:14
**10 (2)** 63:20;64:5
**11:00 (1)** 36:12
**13 (2)** 33:3;36:12
**14 (1)** 57:15
**15 (1)** 36:20
**16 (2)** 69:15;73:21

### 2

**2 (1)** 55:10
**2004 (1)** 69:15
**2014 (3)** 72:18;73:21,
23
**2015-2017 (1)** 61:22
**2017 (8)** 15:24,25;
16:3;67:20;80:23;
81:19;82:4;85:9
**2018 (77)** 8:18,23;

Case 1:21-cv-00377-BKS-TWD    Document 119-3    Filed 04/29/25    Page 112 of 112
DR. KAMIAR ALAEI v.                                    DR. HARVEY CHARLES
STATE UNIVERSITY OF NEW YORK, et al.                         January 13, 2021

9:15;10:16;11:10,21,
21;12:3,20,25;13:1,5,
15,18;14:22;15:5,21;
16:3,21;18:14;21:10;
22:21,25;23:5,10,17;
27:21;28:16;31:12,
14;33:3;34:24,24;
36:20;39:20;41:2;
44:2;50:3;51:12;53:7,
14;55:10;57:15;63:1,
20;64:5;65:13;66:10;
70:16;71:21,24;72:3,
9;74:1,16,21;75:3,16,
22;78:9,13;79:24;
86:6,19,23;87:19;
88:8,10;89:3;90:3,4,
13,21,25;91:15,22;
92:21
**2019 (2)** 64:1;88:8
**2020 (1)** 46:3
**20th (1)** 67:19
**21 (5)** 61:25;62:12;
74:21;87:19;88:10
**21st (1)** 67:19
**22 (2)** 39:20;41:2
**25 (1)** 46:3
**26 (3)** 90:13,21,25
**26th (1)** 89:25
**27 (1)** 53:7
**28 (5)** 51:12;53:14;
80:23;81:18;82:3
**2nd (1)** 26:10

---

### 3

**3 (1)** 84:19
**3:00 (1)** 23:22
**3:21 (1)** 51:12

---

### 4

**4 (3)** 50:20;65:12;
84:20
**4/20 (1)** 49:18
**4/23 (2)** 50:20,24
**4/26 (2)** 50:6,9
**4th (1)** 67:4

---

### 5

**5 (1)** 27:17
**5/2 (2)** 50:11,16

---

### 6

**6 (7)** 28:11;46:17,19;
82:9;84:20;91:15;
92:20
**6/14/2017 (1)** 85:19
**6/4/17 (1)** 85:24

---

### 7

**7 (1)** 47:19

---

### 8

**8 (14)** 10:16;12:3;
16:21;18:14;21:10;
22:21,25;23:5,9,16;
27:21;31:14;86:23;
89:3
**8th (3)** 26:12,14;
28:25

---

### 9

**9 (14)** 13:18;28:15;
31:12;44:1;64:1;
74:16;75:3,16,22;
78:9,13;79:24;86:6,
19