# EXHIBIT D

# In The Matter Of:

## *DR. KAMIAR ALAEI v.*
## *STATE UNIVERSITY OF NEW YORK, et al.*

---

## *HAVIDAN RODRIGUEZ*
## *April 12, 2021*

---

COVERING ALL UPSTATE NEW YORK



MFReportingNY.com

Office: 518-478-7220                    Mail to: 5 Southside Dr., Suite 11
Fax: 518-371-8517                       Clifton Park, NY 12065

*Min-U-Script® with Word Index*

```
 1      STATE OF NEW YORK
 2      COURT OF CLAIMS
 3      ----------------------------------------------------:
 4      In the Matter of the Claim by
 5      DR. KAMIAR ALAEI,
 6                             Claimant,
 7
 8      - Against -                          Claim Number:
 9                                              132554
10      STATE UNIVERSITY OF NEW YORK,
11      STATE UNIVERSITY OF NEW YORK AT ALBANY,
12      and THE STATE OF NEW YORK,
13                             Respondents.
14      ----------------------------------------------------:
15              DEPOSITION of:  HAVIDAN RODRIGUEZ
16                    (Respondent Agent)
17
18                 Monday, April 12, 2021
19                 1:02 p.m. - 3:30 p.m.
20
21
22      HELD:  Via Zoom Video Conferencing
23
24      Reported by:  Deborah M. McByrne
25
```

HAVIDAN RODRIGUEZ                                    2

```
1        APPEARANCES: (All via Zoom)

2

3        APPEARING FOR CLAIMANT:

4            YOUNG/SOMMER LLC

5                    Five Palisades Drive, Suite 300

6                    Albany, New York 12205

7                    (518) 438-9907

8            BY:   JOSEPH F. CASTIGLIONE, ESQ.

9                    Jcastiglione@youngsommer.com

10

11

12       APPEARING FOR RESPONDENTS:

13           NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

14                   The Capitol

15                   Albany, New York 12224

16                   (518) 776-2576

17           BY:   ANTHONY ROTONDI, ESQ.

18                   Assistant Attorney General

19                   Anthony.Rotondi@ag.ny.gov

20

21       ALSO PRESENT:

22           Dr. Kamiar Alaei

23

24

25
```

1                    S T I P U L A T I O N S

2

3            IT IS HEREBY STIPULATED, by and between the
4    attorneys hereto, that:

5            All rights provided by the C.P.L.R, and
6    Part 221 of the Uniform Rules for the Conduct of
     Depositions, including the right to object to any
7    question, except as to form, or to move to strike
     any testimony at this examination is reserved; and
8    in addition, the failure to object to any question
     or to move to strike any testimony at this
9    examination shall not be a bar or waiver to make
     such motion at, and is reserved to, the trial of
10   this action.

11
             This deposition may be sworn to by the
12   witness being examined before a Notary Public other
     than the Notary Public before whom this examination
13   was begun, but the failure to do so or to return the
     original of this deposition to counsel, shall not be
14   deemed a waiver of the rights provided by Rule 3116
     of the C.P.L.R, and shall be controlled thereby.

15

16           The filing of the original of this
     deposition is waived.

17

18           IT IS FURTHER STIPULATED, that a copy of
     this examination shall be furnished to the attorney
19   for the witness being examined without charge.

20

21

22

23

24

25

```
 1                    HAVIDAN RODRIGUEZ,
 2          was called as a witness, and having been first
 3          duly sworn, was examined and testified as
 4          follows:
 5     EXAMINATION BY
 6     MR. CASTIGLIONE:
 7  Q.  Good afternoon.  My name is Joe Castiglione.  I'm an
 8      attorney with the law firm of Young Sommer.  We
 9      represent Dr. Kamiar Alaei concerning claims he has
10      against the State of New York in the New York State
11      Court of Claims regarding his employment while with
12      the State University of New York at Albany.  Just
13      for clarification, when I reference SUNY Albany or
14      the University, I'm referring to the State
15      University of New York at Albany.
16                  I'm here to ask you questions to probe
17      your knowledge about what information you might
18      have, the documents you may have reviewed, what
19      understanding you might have about issues of concern
20      in the lawsuit.  Your attorney may place objections
21      during my questioning.  That's for purposes of
22      preserving legal objections for the record.  You
23      still have to answer the question, unless otherwise
24      directed not to.
25                  The stenographer is here to swear you
```

 1          under oath.  She's here to create a transcript of

 2          what we're talking about today.  Because she's

 3          creating a transcript, when I ask a question, let me

 4          ask my full question, then you can answer simply

 5          because she can't type both of us talking at the

 6          same time.

 7                    If you give an answer, please

 8          articulate your answer.  She can't record a nod or a

 9          sound, so, you know, please make sure you articulate

10          your response.  Everything is on the record, unless

11          we, otherwise, agree to both go off the record.

12                    If I ask a question, please respond to

13          the best of your ability.  If you don't understand a

14          question that's presented, please ask me and I can

15          rephrase it.  We'll try to work around it.

16                    If at any point you need to take a

17          break, let us know.  If you want to speak to your

18          counsel, let us know.  That's fine.  If a question

19          is posed to you first before a break, you have to

20          answer the question, then you can go on the break or

21          speak to your counsel.

22                    Is there any reason today that you

23          can't respond truthfully or accurately to the

24          questions presented to the best of your ability?

25     A.   There is no reason.

1  Q.   Okay.  Did you review any documents in advance of
2       today's deposition?
3  A.   There were a number of documents that I reviewed,
4       yes.
5  Q.   Were those documents -- strike that.
6                        What were those documents, if you
7       recall?
8  A.   There were a series of documents pertaining to this
9       case, actually, that I received from your office
10      in -- regarding a lawsuit presented by you and your
11      client.
12 Q.   Was there anything related to this matter that you
13      reviewed?
14 A.   Those -- Essentially, those documents that I
15      received.
16 Q.   Okay.  Did you have any conversations with anybody
17      in preparation for today's deposition?
18 A.   Besides my attorney's, no.
19 Q.   Correct.  Okay.
20                        Can you explain to me your current
21      employment?
22 A.   I'm the President here at the University at Albany
23      of the State University of New York.
24 Q.   And how long have you held that position?
25 A.   A little bit over three and half years, so about

 1          three and a half years.
 2     Q.   So would that be it starting -- or sorry.  Would
 3          that be in January 2018 forward; that would cover
 4          that time period?
 5     A.   It would cover that time period, yes.
 6     Q.   Okay.  Can you explain to me the responsibilities of
 7          your position?  As President, you don't have to
 8          identify everyone, but just give me the general
 9          responsibilities of your office.
10     A.   I oversee the entire University.  I'm the Chief
11          Executive Officer for the University at Albany,
12          which means that everything that happens under -- at
13          the University is under my purview.  Obviously, I
14          have an Executive Council, a Vice President and
15          others that report to me.  But essentially, as the
16          Chief Executive Officer, I am responsible for the
17          administrative and academic functionings of this
18          institution.
19     Q.   Okay.  If I can show you what's been
20          previously -- and I'm going to share the screen.
21          I'm going to show you what's been previously
22          identified as Claimant's Exhibit A-1.
23                    Claimant's Exhibit A-1 is a letter
24          from SUNY Albany to Dr. Kamiar Alaei, dated
25          February 8, 2018, from Randy Stark.  If you could

1         just take a look at this letter.  Are you familiar
2         with what this document is?
3    A.   Yes, I am.
4    Q.   Is it fair to say this is the document that conveyed
5         to Dr. Alaei that he was going to be on alternative
6         assignment, pending a disciplinary investigation?
7    A.   I haven't seen the rest of the document, but that
8         sounds right.
9    Q.   Okay.  I can scroll down slowly for your review.
10        That's fine.
11   A.   And the question again was, please?
12   Q.   Is it fair to say this is the document that advised
13        Kamiar Alaei that he was being put on alternative
14        assignment, pending a disciplinary investigation by
15        SUNY Albany?
16   A.   Yes, it is.
17   Q.   Okay.  When did you first learn about the grounds
18        raised for SUNY Albany to conduct this disciplinary
19        investigation and issue this letter?
20   A.   I couldn't tell you exactly when it was.  We have
21        a -- as you might imagine, as President of this
22        University, I oversee functions and operations
23        related to a little bit about -- roughly, around
24        22,000 people, including 17,700 students.  And so I
25        get notifications all the time regarding a variety

```
 1          of issues.  But obviously, it was prior to the date
 2          of this letter.
 3     Q.   All right.  So it was prior to the date of this
 4          letter, maybe around the time of this letter?
 5     A.   Probably before -- obviously, before this letter was
 6          issued.
 7     Q.   Okay.  Do you recall what the grounds were that led
 8          to SUNY invoking this disciplinary investigation and
 9          placing Dr. Alaei on alternative assignment?
10     A.   There was an investigation being conducted through
11          Title IX issues, as well as management of funds at
12          the University.
13     Q.   Okay.  So was it, essentially, a joint investigation
14          between Title IX office and Office of Human Resource
15          Management?
16     A.   I would say so.  And if it was related to finances,
17          research, it -- perhaps the Research Foundation was
18          involved as well.
19     Q.   Okay.  Did you participate in this investigation
20          concerning Dr. Alaei?
21     A.   This investigation, I did not.
22     Q.   Do you know who was charged with gathering
23          information and conducting the investigation?
24     A.   There were a number of offices that were charged.
25          Obviously, Human Resources, of course, legal counsel
```

```
 1        and, I believe, perhaps the Research Foundation, in
 2        terms of how funds were spent from the different
 3        accounts from the GIHHR.
 4    Q.  And yes, if I refer to GIHHR, just so it's clear,
 5        I'm referring to the Global Institute on Health and
 6        Human Resources; is that understood?
 7    A.  That's understood.
 8    Q.  Okay.  Was anybody overseeing the investigation
 9        conducted by these various offices, if it was Title
10        IX, if it was Human Resource Management and other
11        offices, was anyone overseeing that investigation?
12    A.  Overall, Human Resources was in charge of the
13        investigation.
14    Q.  Okay.  Did anyone report to your office, over time,
15        about the status of the investigation as it was
16        moving along?
17    A.  I was provided updates regarding the investigation,
18        particularly the outcomes of the investigation.
19    Q.  Okay.  And do you know whose -- strike that.
20                    Who was ultimately charged with the
21        decision about -- making the decision, I'm sorry,
22        about whether Dr. Alaei had violated any SUNY Albany
23        policies to justify imposing discipline?
24    A.  Can you repeat that again, please?
25    Q.  Sure.
```

```
 1                    Who was charged with the ultimate
 2         determination about whether Dr. Alaei had violated
 3         any SUNY Albany policies to justify imposing
 4         discipline?
 5    A.   I don't think the -- those who investigated make a
 6         determination.  They present the evidence, the data,
 7         it's reviewed, in this case by Human Resources,
 8         legal counsel, and then those findings are presented
 9         to me.
10    Q.   So you ultimately decide whether or not there's a
11         violation to justify imposing discipline; is that
12         fair to say?
13    A.   I base my -- I get information from the
14         corresponding parties, as I had mentioned before,
15         and get recommendations and I use those
16         recommendations to ultimately make a final
17         determination.
18    Q.   Okay.  Do you know who was involved in making
19         decisions about Dr. Alaei's employment after this
20         2018 February 8 letter?
21    A.   Regarding?
22    Q.   So not the investigation, about generally his
23         employment.
24    A.   There's a number of people.  He responds to a -- or
25         he was under the directional supervision of a Dean
```

```
 1        and, of course, the Provost of the University as

 2        well.

 3   Q.   And would that have been Dean Harvey Charles and

 4        Provost James Stellar?

 5   A.   That's correct.

 6   Q.   Okay.  Do you recall when the investigation

 7        concerning Dr. Alaei, identified in this Claimant's

 8        Exhibit A-1, this February 8, 2018 letter, when it

 9        concluded?

10   A.   I don't -- I can't give you exact dates.  No, I

11        cannot.

12   Q.   Okay.  Do you recall what the conclusion was as a

13        result of the investigation?

14   A.   I do.

15   Q.   What was that conclusion, as you recall?

16   A.   As I recall, and provided by legal counsel here at

17        the University, there were no findings regarding

18        mismanagement of funds; that is, everything seemed

19        to be under order.  And there were no specific

20        conclusions reached regarding Title IX issues,

21        because at the end of the day, we -- there were no

22        people that wanted to move forward with this

23        investigation.

24   Q.   So you're saying that there was -- nobody reached a

25        conclusion about whether or not the allegations
```

```
 1        under Title IX or being investigated by Title
 2        IX -- nobody reached a conclusion about whether
 3        there was any merit to those allegations?
 4   A.   At this point in time, there was no evidence to say
 5        that there were any merits to the investigation.
 6   Q.   Okay.  I understand.
 7                 Do you recall if Office of Human
 8        Resources Management concluded whether there was any
 9        basis to impose discipline against Dr. Alaei as a
10        result of the investigation?
11   A.   There were concerns regarding whether to impose
12        discipline or not, yes.
13   Q.   Well, do you recall if they had concluded whether
14        there was any basis to impose discipline?
15   A.   I don't recall that, no.
16   Q.   Okay.  Are you aware of efforts to pursue
17        non-renewal of Dr. Alaei's employment in the spring
18        of 2018?
19   A.   I am.
20   Q.   Did you have any involvement in those efforts?
21   A.   Again, as President of the University, when there is
22        a -- When there's recommendation or there is a plan
23        to non-renew someone or discontinue with a project
24        or center or an operation, those ultimately come to
25        me, yes.
```

1   Q.   Okay.  I'm going to refer you to what's been

2        previously identified as Claimant's Exhibit B-8.

3        Claimant's Exhibit B-8 is a letter from SUNY Albany

4        dated August 10, 2018, to Dr. Alaei.  If you could

5        just take a quick look at this.

6                        Do you recall a time,

7        President Rodriguez, when Dr. Alaei -- or there was

8        a determination by SUNY to terminate Dr. Alaei's

9        appointment effective August 10, 2018?

10  A.   Yes, that decision was made and I was aware of the

11       recommendation and final determination.

12  Q.   Did somebody make a recommendation to you about

13       whether or not to terminate Dr. Alaei's appointment

14       effective August 10, 2018?

15  A.   Yes, and it was -- and it was about making some

16       significant changes to the GIHHR, given the planning

17       of the University and our initiatives moving

18       forward.

19  Q.   Okay.  Did you ultimately make the determination to

20       elect to terminate Dr. Alaei's employment?

21  A.   At the end of the day, these recommendations come to

22       me.  And although I don't have a say in every single

23       personnel decision that's made at the University,

24       yes, ultimately, I'm responsible for these

25       decisions.

```
 1   Q.   Okay.  Do you -- Can you explain to me what the
 2        basis of the decision to elect to terminate
 3        Dr. Alaei's employment, effective August 10, 2018?
 4   A.   Like I stated previously, the University, especially
 5        since my arrival at the University at Albany, we've
 6        been make significant changes, administrative
 7        changes, structural changes.  What we saw that would
 8        align well with the priority of the institution and
 9        what did not.
10                  And so the decision was that we would
11        be closing the Global Institute for Health and Human
12        Rights, and this has occurred among a number of
13        other administrative changes and other processes and
14        decisions that were made in terms of the
15        reorganization of the University.  And as a
16        consequence, when we decided to close or do away
17        with the Global Institute of Health and Human
18        Rights, then we did not need a director of the
19        institute.
20   Q.   Okay.  Going back to Claimant's Exhibit A-1, are you
21        aware of who determined to start this disciplinary
22        investigation concerning Dr. Alaei?
23   A.   Who, specifically, started the investigation or who
24        made the recommendation to start investigation?
25   Q.   Yeah, who made the decision that the investigation
```

```
 1        needed to start concerning disciplinary
 2        investigation about Dr. Alaei?
 3   A.   I'm not exactly -- who exactly started the
 4        investigation.  There were some concerns that were
 5        raised with the University, whether they came first
 6        through Human Resources through Title IX, I cannot
 7        recall, but depending on the issue, it was either/or
 8        Title IX or Human Resources based on the information
 9        they received.  It was a coordinated effort, of
10        course.
11   Q.   Are you familiar with this Claimant's Exhibit A-1
12        refers to the agreement between the State of New
13        York and United University Professions?  Are you
14        familiar with that agreement?
15   A.   Yes, I am.
16   Q.   Okay.  And if -- I'll show you what had been
17        previously identified as Claimant's Exhibit K.  And
18        if you could take a look.  And it's identified as
19        the agreement between United University Professions
20        and the State of New York, this one for July 2011
21        and July 2016.  And this is the long document here.
22        It's a long, you know, overall document.
23                  But when I refer to UUP agreement, I'm
24        referring to this agreement, agreement between
25        United University Professions and the State of New
```

1        York for 2018; is that clear?

2   A.   Yes, it is.

3   Q.   Were you aware of the provisions of the UUP

4        agreement governing the disciplinary process at the

5        time in 2018?

6   A.   I'm, generally, aware of it, but as you can see in

7        your exhibit, this is a document of 130 pages.  So I

8        can't cite and quote and say that I'm familiar with

9        all the provisions.  But then again, we have staff

10       at the University and offices at the University that

11       are charged to manage the situations and ensure that

12       the University abides by the provisions provided in

13       this document.

14  Q.   Okay.  As far as you recall, for this investigation

15       concerning Dr. Alaei, who was charged with making

16       sure that the disciplinary investigation or the

17       Title IX investigation portion was done in

18       accordance with Dr. Alaei's rights under the UUP

19       agreement?

20  A.   There's also consultation with the corresponding

21       offices, in this case, Human Resources, the Title IX

22       office and legal counsel.  So it is their

23       responsibility to assure me that we are following

24       all the provisions stipulated in these types of

25       documents.

```
 1   Q.    Okay.  So for here, it would be Human Resource,
 2         Title IX, legal counsel, where the people you were
 3         relying on to ensure compliance with the UUP
 4         agreement?
 5   A.    That's correct.
 6   Q.    Okay.  At that time, how many of these disciplinary
 7         investigations or and/or alternative assignments had
 8         been involved with beforehand?
 9   A.    More broadly speaking, we have made -- since I
10         arrived here at the University, we have made a
11         variety of changes toward a number of units.  And
12         let me just mention a few so you put this into a
13         broader context of what's happening at the
14         University and the reorganization of the
15         institution.
16                   Some, like in this case, are leading
17         to this particular situation and the overwhelming
18         majority of others, were resolved without any issue.
19         So when I arrived here, we had a program called
20         Albany Promise that -- it's a collaborative
21         initiative between the University and the City of
22         Albany, which serviced some of our local schools.
23         That program was not operating effectively and we
24         decided to imbed that program within the school of
25         education.
```

1              Thus, we made some administrative

2      changes there, some of the people working in those

3      positions were released and Albany Promise in the

4      new form was embedded in the School of Education.

5              We also had the Center for

6      International Development.  Again, given the

7      priorities of the University, we decided to close

8      that center.  The Director of the center and other

9      staff that were at the Center, some were externally

10     funded, so they -- their employment ceased and I

11     think we're in the process of finalizing that entire

12     process.

13              When I came in, the Vice President for

14     information technology accepted a job elsewhere at

15     another institution of higher education.  So I

16     decided to take information technology, the entire

17     unit and imbed it within the Vice President for

18     finance and administration and we did away with the

19     Vice President position and that entity as well.

20              Also, we had some issues, in terms of

21     the operations of how the Office of Communications

22     and Marketing was functioning.  So we took that

23     entire unit.  We didn't need a Vice President for

24     that unit, so that person left the institution and

25     we embedded the Office of Communications and

```
 1          Marketing within the Division of Advancement.
 2                    Just recently, we did a careful
 3          analysis of our schools and colleges and we decided
 4          that the School of Criminal Justice would no longer
 5          operate as an independent identity; that it would be
 6          embedded within the College of -- Rockefeller
 7          College.  And so again, that Dean was removed from
 8          Dean of the School of Criminal Justice and now we
 9          have a Dean that oversees both units.
10                    And also, as I came in, we had a Vice
11          President for compliance.  Given my expertise in
12          disaster and emergency management, we decided that
13          we did not need that position and we created a whole
14          enterprise, if you will, which is the Office of
15          Enterprise Risk Management, which manages all our
16          issues with disasters, emergency preparedness and
17          things of that nature.
18                    So as you can see, this is part of a
19          broader sort of replanning or restructuring of the
20          University.  And as part of this, the GIHHR was part
21          of this determination.  So it was not that GIHHR was
22          selected exclusively for these changes, but this was
23          part of an overall restructuring of the University
24          which continues to date.
25     Q.   Okay.  In terms of disciplinary investigations that
```

```
 1         were being performed, how many have you participated
 2         in in your role as President over time?
 3   A.    I really can't answer that question.  I don't recall
 4         a number.  There's been a few.  And typically, when
 5         there are disciplinary actions that may result in
 6         termination of employment or separation from the
 7         University, obviously, the person needs to be
 8         engaged and informed about these decisions, but I
 9         can't remember how many have taken place since I've
10         been here.
11   Q.    Okay.  In this disciplinary letters, this
12         February -- I'm sorry, I'm going to refer back to
13         it.  It's the -- in here.  This alternative
14         assignment, it talks about Dr. Alaei.  It says:
15         "You will you have no professional obligations that
16         require or warrant your presence on University
17         facilities."
18                 Do you know why it was required that
19         Dr. Alaei not have presence at University facilities
20         as part of this alternative assignment?
21   A.    Just a couple of things.  And just one point of
22         clarification, because you're referring to this as a
23         disciplinary letter.  And this is not a disciplinary
24         letter.  It's a letter informing Dr. Alaei that
25         there's going to be a disciplinary investigation.
```

```
 1          And so there's a big difference between it being a
 2          disciplinary letter and a letter informing Dr. Alaei
 3          that there's going to be a disciplinary
 4          investigation.
 5                          And so typically, when we have
 6          concerns at a University of issues that might be
 7          sort of developing, we take certain measures.  And
 8          so this is not the first time that we do something
 9          similar to this.
10     Q.   Okay.  If I can refer you now to an e-mail which was
11          previously identified as Claimant's Exhibit A, sub
12          2.
13                          Claimant's Exhibit A, sub 2, is an
14          e-mail from Brian Selchick to others concerning the
15          alternative assignment and disciplinary
16          investigation.  It's dated February 8, 2018.  In
17          this letter, Mr. Selchick refers to relieving KA,
18          referring Dr. Alaei, of his card access and keys.
19          Do you know why that was required in this matter?
20     A.   Again, in terms of these types of investigations,
21          sometimes this is standard operating process and
22          procedure.  I can't say that in every case this
23          happens, but it is not out of the ordinary for this
24          to happen.
25     Q.   In terms of this e-mail here, Claimant's Exhibit
```

```
 1          A-2, it also refers to Dr. Alaei being relieved of
 2          his e-mail access.  Why was that decided?
 3   A.     Again, this is part of the decisions that are made
 4          within the University, and so there are
 5          recommendations made.  If we agree with the
 6          recommendations, then we proceed accordingly.
 7   Q.     Did somebody make that recommendation to you, that
 8          Dr. Alaei not have access to his e-mail while he was
 9          on alternative assignment?
10   A.     I can't recall that it was or that it wasn't.  But
11          all these things don't necessarily have to come to
12          the President for final approval.  Remember, you
13          know, we're running -- I'm running a University
14          that's equivalent a city of 21,000 people.  So not
15          everything that transpires needs to come to the
16          office the President, but in these types of
17          circumstances, yes, we are informed and we are
18          knowledgeable of what's going to transpire,
19          generally speaking.
20   Q.     Did your office direct Office of Human Resource
21          Management to take away Dr. Alaei's e-mail access?
22   A.     If there was a recommendation, we agreed with the
23          recommendation or not.  And so if this was the case,
24          I assume that it potentially came to my office and
25          we said we have no issues with it and Human
```

```
 1            Resources proceeded accordingly.
 2   Q.    And so as you recall, somebody would have made a
 3         recommendation to you that his e-mails be
 4         removed -- or his e-mail access be removed and you
 5         approved the recommendation versus you directing
 6         Human Resources to remove e-mail access; is that
 7         fair to say?
 8   A.    That is fair to say.  I won't -- I -- As President,
 9         I won't say "this needs to be done" or "that needs
10         to be done."  I obtain and I get recommendations and
11         I decide whether I agree with the recommendations or
12         not.
13   Q.    Okay.  Do you know what the -- strike that.
14                    Is it typical for people to have their
15         e-mail access removed while on alternative
16         assignment?
17   A.    I think it varies with the situation, but it's not
18         out of the ordinary.
19   Q.    Are you aware if there's any basis in the UUP
20         agreement to remove access keys or e-mail access?
21   A.    I did not understand that question.
22   Q.    Sure.  Are you aware of any basis in the UUP
23         agreement that allows for an employee on alternative
24         assignment to have his e-mail access removed or his
25         card access keys removed?
```

```
 1   A.   I can't -- I really can't answer that question.  I
 2        would have to review the entire UUP agreement to see
 3        if there's something in there.  But again, that's a
 4        University determination.
 5   Q.   I'm going to refer you to what's been previously
 6        marked as Claimant's Exhibit A-3.  I'm trying to
 7        refer to you A-3.
 8                  Okay.  Claimant's Exhibit A-3 includes
 9        a -- nope, that's not it.  That's A-2.
10                  Claimant's Exhibit A-3, I'm sorry,
11        includes an e-mail from Karl Rethemeyer,
12        R-E-T-H-E-M-E-Y-E-R, dated February 2018.  It
13        states, in part:  "Referring to the GIHHR website,
14        we will also need to change all references to KA,"
15        referring to Dr. Alaei.
16                  Do you know why there was a need to
17        change all references to KA while he was on
18        alternative assignment during this investigation?
19   A.   I'm not going to guess why that was stated there,
20        but if Dr. Alaei was -- appeared at the website as
21        Director of the GIHHR and things of that nature,
22        that would need to be removed because that was no
23        longer the case, I assume.
24   Q.   Okay.  Do you know if it's typical to remove
25        employee's references on SUNY Albany websites while
```

HAVIDAN RODRIGUEZ                                    26

1         they're on alternative assignment?

2    A.   It all depends what's on the website.  In one of the

3         changes that I referred to you, if there appears to

4         be a Dean of Criminal Justice and we just made the

5         change to the Dean of Criminal Justice, we would,

6         obviously, remove reference to the Dean of Criminal

7         Justice because now the School of Criminal Justice

8         would report to the Dean of Rockefeller College.

9                   So clearly, there have to be changes

10        and updates to the website to provide our audiences,

11        both internal and external the correct information.

12   Q.   In this case, is it the changes were needed, even

13        though the investigation was just starting and

14        hadn't concluded?

15   A.   If he's put on alternative assignment, the answer

16        would be yes.

17   Q.   Okay.  If I can refer you to what had been

18        identified as Claimant's Exhibit A-4.  Claimant's

19        A-4 includes an e-mail -- jeez, why is this doing

20        this?

21                  Claimant Exhibit A-4 includes an

22        e-mail from Harvey Charles, dated February 8, 2018,

23        Title:  "An invitation to a GIHHR-wide meeting

24        Friday, 2/9," sent to a number of individuals.

25                  In this E-mail, Dr. Charles is

```
 1           advising people there's going to be a meeting on
 2           Friday, February 9th, regarding leadership of the
 3           GIHHR.  Did you have any input on the content of
 4           this e-mail before it was sent?
 5   A.      I can't remember the e-mail, so I can't remember
 6           that I had any input into it.
 7   Q.      Okay.  Do you recall SUNY Albany personnel holding a
 8           meeting on February 9 to discuss the leadership of
 9           the institute, as reflected in this -- in this
10           e-mail?
11   A.      Well, there were multiple meetings regarding the
12           changes and the need to meet with constituent
13           groups, including students and others that were part
14           of the GIHHR.  So I know there were a number of
15           meetings, yes.
16   Q.      Do you recall, specifically, this first meeting on
17           February 9 with personnel regarding GIHHR?
18   A.      I wasn't at the meeting.  I didn't participate in
19           the meeting.  So I don't recall what transpired at
20           the meeting.
21   Q.      Are you aware of any concerns that were raised by
22           individuals that had attended the meeting regarding
23           conduct and statements that were made by SUNY
24           personnel at the meeting?
25   A.      I do not.
```

```
 1   Q.   I'm going to refer you to what has been marked as
 2        Claimant's Exhibit G.  Claimant's Exhibit G is two
 3        e-mails, really.  It's -- The first one is an e-mail
 4        from K. Williams to James Stellar, dated
 5        February 14, 2018.  My understanding is K. Williams
 6        is Kevin Williams, who is a Dean, I believe, with
 7        SUNY Albany.  Are you familiar with Kevin Williams?
 8   A.   I am.
 9   Q.   Okay.  This e-mail states:  "I am forwarding, with
10        permission from the author, this e-mail to you.
11        This student expresses several concerns that I have
12        also heard and sensed from GIHHR Board Members to
13        Harvey's e-mail.  This student has been around since
14        before GIHHR began.  She was involved in the initial
15        grant, for which I was PI, that provided higher
16        education opportunities for politically at-risk
17        students.  She and others are not happy with how
18        this is being handled.  I think you should know
19        their concerns."
20                  Were you aware of Dr. Williams sending
21        this e-mail from a student to Provost Stellar at the
22        time after this February 9 meeting?
23   A.   I can't recall that I have seen this message, no.
24   Q.   Okay.  I'm going to scroll down now to an e-mail
25        which we're going to identify as just "from
```

1          student," rather than give the name.  It's dated

2          February 14, 2018.  It's to Dr. Williams.  It says:

3          "Subject:  Concern regarding Dr. Alaei and beyond."

4          I'm going to refer you to the first par -- or the

5          second paragraph, I'm sorry, of this e-mail on page

6          1.

7                        This e-mail says:  "I am sending this

8          e-mail, as I am very concerned about another matter,

9          and I was wondering if I can share it with you.  On

10         Friday, I attended a meeting organized by the

11         leadership of the University to discuss the

12         leadership of GIHHR.  I was quite shocked about what

13         I heard at the meeting.  I could not believe my eyes

14         and ears.  The dynamic of the session was rather

15         bizarre.

16                        I totally understand that for a

17         high-rank person like Dr. Alaei issues may emerge

18         that may require further scrutiny on the side of the

19         University, and I would certainly appreciate it, but

20         the meeting was organized in a manner that implied

21         the decision had been made through a very short

22         process that, by the way, could not be transparently

23         discussed with other members in the community.  This

24         dynamic did not seem to be fair to me as a citizen

25         of the University."

```
 1                    Are you aware of concerns being raised
 2        by individuals that attended that meeting similar to
 3        what are identified in this student's e-mail?
 4   A.   I cannot say that I did.  I know there was some
 5        concerns about the meeting and some concerns that
 6        were put forward.  But, no, generally speaking,
 7        that's it.
 8   Q.   Okay.  This student, on the next page in the first
 9        full paragraph, states, in part:  "Moreover, I was
10        quite shocked to see that the organizers of the
11        meeting did not seem to be interested in the
12        inquiries of the students regarding the GIHHR
13        leadership.  Obviously, Dr. Alaei was not allowed in
14        the meeting.  He was not able to defend himself,
15        vis-à-vis, the accusations that were vaguely and
16        implicitly projected here and there."
17                    The student continues saying:  "I
18        certainly have not been feeling safe at the
19        University since after the meeting that I attended
20        on Friday."
21                    The student continues.  At the end of
22        her e-mail, she says:  "I'm so sorry for bothering
23        with you this long and rather emotional e-mail, but
24        the Friday meeting's quite similar to the travel ban
25        meeting in the manner it was organized.  One could
```

```
 1          feel a very strong, yet implicit cultural and racial
 2          dynamic in place.  The current dynamic of the U.S.
 3          is strongly to the disadvantage of the minority
 4          communities, especially those who are citizens of
 5          the so-called profaned countries.  We are hoping
 6          that this prestigious and inclusive institution does
 7          not replicate the political climate."
 8                    Were you aware of this student or
 9          others raising concerns about their own safety and
10          concerns with racial and cultural dynamics being in
11          place as part of this investigation and as part of
12          the efforts by SUNY personnel regarding GIHHR at the
13          time?
14    A.    In the context of this meeting, the answer is no.
15          And I wasn't at the meeting.  I don't know what was
16          said at the meeting.  I actually don't know who
17          attended the meeting.  But I can say that on behalf
18          of UAlbany, we have strong leadership and
19          very -- and leadership that's very concerned about
20          the well-being of this institution and the
21          well-being of our students at the University at
22          Albany.
23                    So if any issues or concerns were
24          raised of this matter, I'm quite confident that the
25          leadership of this institution and those that report
```

| | | |
|---|---|---|
| 1 | | to me would have taken concrete actions to address |
| 2 | | these issues. |
| 3 | Q. | Are you aware of somebody named Elizabeth Grey at or |
| 4 | | around the time of this e-mail, this February 2018 |
| 5 | | e-mail from this student relating Dr. Alaei |
| 6 | | investigation? |
| 7 | A. | I know who Elizabeth Grey is, yes. |
| 8 | Q. | Are you aware of whether Ms. Grey had raised |
| 9 | | concerns during an interview with Chantelle Cleary |
| 10 | | that some of the issues being raised by SUNY Albany |
| 11 | | to investigate Dr. Alaei may have been based on |
| 12 | | cultural differences? |
| 13 | A. | I have no idea of that or knowledge of that. |
| 14 | Q. | Do you know if anyone at SUNY took any steps -- SUNY |
| 15 | | Albany, I'm sorry -- anyone at SUNY Albany took any |
| 16 | | steps to address concerns of racism or cultural |
| 17 | | differences in play as part of this investigation? |
| 18 | A. | We have -- At the University at Albany, we have a |
| 19 | | very strong commitment to diversity, equity and |
| 20 | | inclusion.  And every and anytime that these issues |
| 21 | | are brought to the attention of the University, we |
| 22 | | address these issues in a very systematic manner. |
| 23 | | We put the offices in charge and the personnel in |
| 24 | | charge of these issues to systematically address |
| 25 | | these issues. |

```
 1                    And so if there are any concerns or
 2          there are any issues that are brought to our
 3          attention, we have an office of diversity, equity
 4          and inclusion.  We have student affairs.  We have
 5          the Dean of Students, among others that their
 6          responsibility is to investigate these issues,
 7          whether it be in this particular case -- and I'm not
 8          sure that this was raised as an issue or not, or in
 9          any other type of situation.  This University takes
10          these cases very, very seriously and ultimately
11          we're strongly, strongly committed to the health,
12          the safety and well-being of our campus community.
13   Q.     So what, specifically, did SUNY Albany do in
14          response to the student's e-mail about not feeling
15          safe and about having concerns with the
16          investigation and treatment of Dr. Alaei involving
17          racial dynamics and cultural differences?
18   A.     Like I said before, I don't know that this was
19          raised in any previous occasion, but I am confident
20          that if it was raised, that there were initiatives
21          to address these particular types of issues.  So I
22          don't know that the issue was raised and where it
23          was raised and what actions were taken, because
24          there's many, many actions that are taken here at
25          the University at Albany.
```

1                    And as part of this, as I said before,
2          and part of our commitment and mission and vision as
3          an institution is to ensure, as a diverse
4          institution of higher education, that we
5          systematically address these issues.
6     Q.   But for this specific e-mail with this student,
7          Claimant's Exhibit G, Kevin Williams had sent it to
8          James Stellar and raised the concern.  Do you know
9          if anyone at SUNY undertook any specific course of
10         action to address these concerns?
11    A.   I cannot answer the question, for the reasons I just
12         told you.  So I think this is a conversation you
13         need to have with Kevin Williams and
14         Provost Stellar.  I can tell you about the process
15         and I can tell you about the -- what the process
16         that we pursue in order to address these issues and
17         I am -- I assume that they were followed here by our
18         administrative staff and leadership at the
19         University.
20    Q.   So in other words, you would be relying on
21         additional staff or the offices conducting the
22         investigation to make sure they were addressing in a
23         proper manner concerns raised by people about racism
24         or cultural differences concerning the treatment of
25         Dr. Alaei as part of this investigation; is that

1        fair to say?

2   A.   That is fair to say.  As I said before, as an

3        institution of over 21,000 individuals, we have

4        processes, we have policies, guidelines, offices and

5        personnel in place to address these issues.  As you

6        might imagine, not all these issues come to the

7        office of the President.

8   Q.   Sure.

9                I want to refer you to what's been

10       identified as Claimant's Exhibit A-6.  Claimant's

11       Exhibit A-6 includes e-mails from Brian Selchick to

12       others, dated February 9, 2018.  The retitle is:

13       "Invitation to speak at Los Alamos National

14       Laboratory June 14th."

15               If you scroll down, there's e-mails

16       between Jon Ventura and Kamiar Alaei, dated

17       February 8, 2018, about a speaking engagement where

18       they were requesting that Dr. Alaei sit on a panel

19       with a North Korean refugee and U.S. Embassador to

20       the U.N., Nikki Haley, to give a presentation about

21       his experiences inside Iran while he was wrongfully

22       imprisoned there.

23               Dr. Alaei was asking James Dias for

24       permission.  It was sent along, apparently, to

25       Harvey Charles, and then it was sent along to

```
 1            Brian Selchick and ultimately, it was determined
 2            that Dr. Alaei was able to participate as a private
 3            citizen, but not as a representative of the
 4            University.
 5                      Are you aware of this prohibition on
 6            Dr. Alaei from participating in these private
 7            speaking engagements and identifying himself as an
 8            affiliate or representative of the University at the
 9            time?
10    A.     Again, I have to reiterate that the President
11            doesn't know the details of all these issues, and
12            all these issues do not come to the Office of the
13            President.  Again, if he is -- if he is no longer
14            serving in the capacity as Director of the center,
15            then he is no longer officially representing the
16            center, thus cannot speak on behalf of the center of
17            the University.  So again, this is not anything
18            that's out of the ordinary.
19    Q.     Would it be out of the ordinary to prohibit an
20            employee that's on alternative assignment from
21            identifying themselves as an employee of University
22            at Albany?
23    A.     I'm not sure if that was the case.
24    Q.     Okay.  But are you aware of whether that's usually
25            part of the alternative assignment process where the
```

HAVIDAN RODRIGUEZ                                    37

```
 1        person on alternative assignment is not able to
 2        participate in events and represent themselves as an
 3        employee or affiliated with SUNY Albany?
 4   A.   That can certainly be done, yes.
 5                      MR. ROTONDI:  Can we take that break
 6        now?
 7                      MR. CASTIGLIONE:  Yeah, that's no
 8        problem.  Sorry about that.
 9                      MR. ROTONDI:  Thank you.
10                      (Whereupon, a recess is taken.)
11   BY MR. CASTIGLIONE:
12   Q.   President Rodriguez, just to backtrack for a second,
13        in terms of Plaintiff -- or Claimant's Exhibit G in
14        this e-mail from a student raising concerns with the
15        treatment of Dr. Alaei, did your office receive
16        directly e-mails or letters from individuals raising
17        similar concerns?
18   A.   If I recall correctly, I think there might be some
19        e-mails from maybe a couple of people who
20        constituted Board members for the GIHHR, in
21        terms -- and I'm not exactly sure if they came
22        directly to the Office of the President or they went
23        to the Provost and then were forwarded to me.
24   Q.   Okay.  And do you recall taking any particular
25        course of action in response to those e-mails that
```

```
 1           were sent or letters that were sent directly to you?
 2   A.      If they were sent to me, I believe we sent out some
 3           responses to members of the Board saying the process
 4           and the changes that we were going to be making.
 5   Q.      Did you take any particular action concerning the
 6           actual investigation being conducted?
 7   A.      I'm not sure what you're referring to.  You're
 8           asking --
 9   Q.      Sure.  In response to those e-mails that your office
10           may have received, besides responding to them
11           directly, did you take any particular action
12           concerning the investigation to, you know, ensure it
13           was addressing any concerns that were being raised
14           about how the investigation was being conducted or
15           the treatment of Dr. Alaei?
16   A.      My request has always been, including in this case,
17           to Human Resources Title IX and legal counsel, to
18           make sure that we were following proper protocols,
19           institutional protocols, state guidelines, and
20           things of that nature to ensure we were abiding by
21           all the corresponding processes.
22   Q.      Okay.  But do you recall directing that or following
23           up with Human Resources or Title IX in response to
24           receiving those e-mails?
25   A.      The e-mails that I saw from the Board Members did
```

```
1          not require follow up with Human Resources.  They
2          were just concerned that Dr. Alaei would no longer
3          be director of the GIHHR.
4     Q.   And we had discussed, if you recall, someone -- I
5          believe it was Karl Rethemeyer -- raising --
6          changing all references on the website to KA,
7          Dr. Alaei.
8                    Are you aware of whether or not the
9          changes to the GIHHR website were simply to just
10         Dr. Alaei's position as Director of GIHHR or if they
11         removed him entirely from the website?
12    A.   I can't answer that question.  I don't know what the
13         answer to the question is.
14    Q.   Okay.  If I can refer you to what had been
15         previously identified as Claimant's Exhibit A-7.
16                   Claimant's Exhibit A-7, relevant for
17         this questioning, is an e-mail from Harvey Charles
18         dated February 9, 2018, to a number of individuals,
19         and the subject is GIHHR.  If you could just take a
20         minute to take a look at this.
21                   Do you recall Harvey Charles sending
22         an e-mail to GIHHR Advisory Board members?
23    A.   I assumed that he -- I assumed that he did.
24    Q.   Okay.  Did you have any input on that e-mail before
25         it was sent out by Harvey Charles to GIHHR Board
```

1          members?
2    A.    I literally get hundreds, if not thousands, of
3          e-mails and requests, and there is, just as you
4          might imagine, hundreds, if not thousands, of
5          letters that are written every day and every week
6          and every month across the institution.  I,
7          typically, would not get these types of letters, so
8          I can't say that I recall getting a copy of this
9          letter or having any input into it.
10   Q.    Do you know whether there was any discussion by SUNY
11         personnel concerning this e-mail, Claimant's Exhibit
12         A, sub 7, about whether there were any concerns that
13         it might wrongly violate Dr. Alaei's rights under
14         the UUP agreement?
15   A.    There were discussions that we needed to notify the
16         Board members and anybody working at the GIHHR what
17         their next steps would be in this proper.
18   Q.    Were there any discussions about whether or not this
19         e-mail would violate Dr. Alaei's rights under the
20         UUP agreement?
21   A.    I don't think anybody believed they would.
22   Q.    Okay.  Were there any discussions by SUNY personnel,
23         SUNY Albany personnel, that this e-mail might
24         wrongly imply that Dr. Alaei had done something
25         wrong?

```
1    A.    Not that I recall.
2    Q.    Okay.  Do you recall approving this e-mail before it
3          was sent out?
4    A.    Like I said, I receive hundreds, if not thousands,
5          of e-mails on a regular basis.  And so I can't
6          remember that I received this or edited it or made
7          any comments to it.
8    Q.    Okay.  This identifies naming two individuals as
9          interim co-directors.  Do you know who had the
10         ultimate decision or approval to identify and name
11         these two individuals as interim co-directors?
12   A.    I think this was a consultative process.  And
13         probably given this type of center, there
14         probably -- or institute, there were probably a few
15         people engaged, including the Dean of Rockefeller,
16         the Dean of the School of Public Health, Vice
17         President for Research, the Provost, among others.
18         There might have been people who should have had
19         some conversations about this and whether these were
20         the right people to occupy this position on an
21         interim basis.
22   Q.    These two individuals, did you know their academic
23         background before they were appointed as interim
24         directors?
25   A.    I know of them and have interacted with them, yes.
```

```
 1    Q.    Were they running institutions that had
 2          been -- strike that.
 3                      Were they running institutions or
 4          portions of programs that had been shut down by SUNY
 5          for not being successful?
 6    A.    At that time, not, although later on, we did begin
 7          the process of doing away with the Center for
 8          International Development.
 9    Q.    Okay.  These two individuals, they're, obviously,
10          females; is that fair to say?  Or identify as
11          females?
12    A.    Yes.
13    Q.    Do you know their race?
14    A.    I don't know what they identify as.
15    Q.    Okay.  At the time, do you know if they were better
16          qualified for the position of running GIHHR than
17          Dr. Alaei, as far as you're aware?
18    A.    I have not compared the CVs of the three
19          individuals.  So, obviously, they are well-qualified
20          and they were doing a good job at UAlbany and so I
21          assume that's one of the reasons they were selected.
22    Q.    Okay.  If I can refer you to what had been
23          previously identify as Claimant's Exhibit A, sub 11.
24                      A, sub 11, specifically, I'm referring
25          to an e-mail from James Stellar to Bruce Szelest,
```

```
 1          dated February 22, 2018.  In this e-mail,
 2          Mr. Stellar identifies:  "We may not need to set up
 3          a meeting of the new -- or with the new directors."
 4                    Do you know if there was a
 5          determination by SUNY Albany at that point that
 6          Dr. Alaei had been removed as Director of GIHHR?
 7    A.    I can't tell you what the timeline is.  Obviously,
 8          if Dr. Alaei was going to be removed as Director and
 9          we needed some interim leadership, those could have
10          occurred simultaneously or within the same timeline.
11    Q.    Okay.  Do you know why James Stellar was
12          communicating with Bruce Szelest on this issue about
13          GIHHR and Dr. Alaei?
14    A.    Sure.  There's many, many people across the
15          institution that communicate with Bruce Szelest as
16          the Chief of Staff to the President.  And so,
17          typically, they might come -- they might come
18          directly to me.  Or if not, they go through
19          Bruce Szelest for any issues that need presidential
20          review and approval.
21    Q.    Okay.  Is Bruce Szelest usually involved in Title IX
22          or disciplinary investigations?
23    A.    Bruce Szelest reports to me.  And when there are
24          investigations or there are concerns or there are
25          issues, typically they will keep Bruce Szelest
```

1         informed so that Bruce Szelest informs the

2         President.

3   Q.    And so that would typically involve Title IX or

4         disciplinary investigations?

5   A.    Not necessarily.  It all depends on the type of

6         investigation, the concerns and whether this is an

7         issue that rises to the level of the President.

8   Q.    Okay.  Dr. Alaei was administering certain grants

9         and programs at the time of his alternative

10        assignment and was prohibited from dealing with

11        those going forward.  Do you know if there was any

12        action -- strike that.

13                  Do you know what action was taken to

14        oversee those grants and programs when Dr. Alaei was

15        no longer able to oversee and administer those

16        grants and programs?

17  A.    I can't tell you what specific actions were taken,

18        but I assume that with the two new interim

19        directors, they would assume that responsibility.

20  Q.    Okay.  If I can refer you to what's been identified

21        previously as Claimant's Exhibit A-13, specifically

22        an e-mail from Chantelle Cleary to several

23        individuals, dated March 9, 2018.

24                  In this e-mail Chantelle says:  "I

25        have been asked Bruce to make this matter our top

```
 1        priority."
 2                         Are you aware of whether Bruce Szelest
 3        had conveyed to Chantelle Cleary that the
 4        investigation concerning Dr. Alaei and GIHHR was to
 5        be a top priority?
 6   A.   I don't know if he did or he did not.  But given the
 7        situation particularly when we are deciding to close
 8        down a center or take personnel actions, we
 9        certainly don't want these types of decisions taking
10        an extremely long time, so we want to be efficient
11        and expedient in these matters for the -- just to
12        make sure that all the processes are taken care of.
13        So I don't see that this did not get to that level.
14   Q.   Do you know how long usually a disciplinary
15        investigation takes?
16   A.   They vary significantly.  So it could be from a
17        matter of a few days to a few weeks to a few months,
18        if not longer.
19   Q.   Okay.  Chantelle Cleary, was she the head of the
20        Title IX office at the time?
21   A.   Yes, she was.
22   Q.   And how did Chantelle Cleary come to be employed by
23        SUNY Albany as Title IX Coordinator?
24   A.   That was before my time.
25   Q.   Okay.  Did you -- Did Chantelle Cleary report to you
```

1          clear directly in her role as Title IX Coordinator?

2    A.    Yes, she did.

3    Q.    Did you oversee Ms. Cleary's work as Title IX

4          Coordinator?

5    A.    She reported directly to me, yes.

6    Q.    Okay.  If I can refer you to what's been previously

7          identified as Claimant's Exhibit J.

8                        Claimant's Exhibit J is a memorandum

9          and order issued by the State of New York Supreme

10         Court Appellate Division, Third Judicial Department,

11         dated November 25, 2020.  It's identified as In the

12         Matter of Alexander M. v. Chantelle Cleary, as

13         former Title IX Coordinator at the State University

14         of New York.

15                        President Rodriguez, let me ask you

16         the first instance:  Are you familiar with a

17         decision issued by the Appellate Division, Third

18         Judicial Department in the New York State Supreme

19         Court related to the matter -- in the matter of

20         Alexander M. v. Chantelle Cleary?

21   A.    If I recall correctly, I believe the first time I

22         heard about this was through the newspaper.

23   Q.    Okay.  Do you recall Ms. Cleary being subject to a

24         lawsuit from an alleged investigation she was doing

25         in her capacity as Title IX Coordinator, which

HAVIDAN RODRIGUEZ                                    47

```
 1        apparently may have started in 2017?
 2   A.   This occurred after she left the University, thus
 3        she was no longer an employee at University at
 4        Albany, so we had nothing to do was this.
 5   Q.   So this decision states, in part:  "On Friday night,
 6        September 2018 (sic), petitioner, a student at
 7        respondent State University at Albany allegedly
 8        engaged in nonconsensual sexual conduct," et cetera,
 9        et cetera.
10                  It then goes on to discuss:  "Cleary
11        provided written notice to the petitioner she was
12        investigating the incident to determine whether he
13        engaged in sexual misconduct and other issues."
14                  So are you aware that the underlying
15        events at issue here occurred in 2017 while Cleary
16        was an employee of SUNY Albany in her capacity as
17        Title IX Coordinator?
18   A.   Again, the first time I heard about this was through
19        a local newspaper.  I have not read this document.
20        It did not occur while Chantelle -- or this review
21        did not occur while Chantelle was employed at the
22        University.  So I -- and I haven't read the
23        document, so I really don't have anything to add.
24   Q.   Okay.  Let me ask you a few questions about what the
25        court held in this case, if I can refer you to page
```

HAVIDAN RODRIGUEZ                                    48

1          6.   The first full paragraph on page 6 says:  "As to
2          the possibility of individual bias, Cleary
3          admittedly altered the facts as reported to her."
4                    Are you aware of any concerns or ever
5          being raised while Ms. Cleary was working at SUNY
6          Albany as Title IX Coordinator that she was biased
7          and altering facts that were reported to her in her
8          investigations?
9   A.    I do not know.  I have no knowledge of.  I have
10         never been involved in that.
11  Q.    Okay.  That paragraph continues -- and my mouse
12         arrow has start -- is over where the part where it
13         starts.  "Cleary's phrasing portrays a significantly
14         different reading of the events" -- or excuse me --
15         "different rendering of the event.
16                    "At the hearing, when Cleary was asked
17         why she changed the wording, her response, in the
18         words of the Supreme Court order, denying
19         Petitioner's Motion for Discovery 'bordered on the
20         incoherent.'
21                    "It is not unreasonable to question
22         whether Cleary changed the wording, and as such, the
23         alleged facts to correspond with the definition of
24         sexual assault one, as found in the student code."
25                    Are you aware of any concerns being

HAVIDAN RODRIGUEZ                                    49

1        raised during the time that Ms. Cleary was employed

2        by SUNY Albany as their Title IX Coordinator, that

3        she was changing wording or changing alleged facts

4        that were conveyed to her to correspond with the

5        punishment or violation she was investigating?

6    A.  Since I have been employed at the University at

7        Albany and during the time that her work at UAlbany

8        coincided with mine, no concerns were raised to me.

9    Q.  Okay.  This adds that:  "In addition" -- on page 7

10       -- "in addition, Petitioner presented an affidavit

11       from his advisor, who was present with him in his

12       meetings with Cleary.  The advisor averred that at

13       said meeting, Cleary raised her voice, physically

14       leaned toward Petitioner and acted in an aggressive

15       manner."

16               Are you aware of Ms. Cleary ever

17       acting in such a way as part of her working duties

18       and investigations as Title IX Coordinator for SUNY

19       Albany?

20   A.  During the time that we worked together at UAlbany,

21       I have no recollection or I never was informed of

22       such behavior.

23   Q.  Are you aware of whether SUNY Albany has looked into

24       this underlying issue involving Alexander M. and

25       Chantelle Cleary, concerning her investigation under

HAVIDAN RODRIGUEZ                                50

```
 1        Title IX regarding this specific matter?
 2   A.   Not that I know of.
 3   Q.   Okay.  During her investigation concerning
 4        Dr. Alaei, did Ms. Cleary ever express an opinion to
 5        you that she believed Dr. Alaei had violated any
 6        SUNY policy?
 7   A.   No, she did not.
 8   Q.   Did she ever tell you that she believed Dr. Alaei
 9        had done what was being alleged against him as to
10        the Title IX investigation?
11   A.   She did not.
12   Q.   During the course of the investigation in
13        February 2018, my office sent a number of letters to
14        SUNY Albany and Randy Stark concerning the
15        investigation at that point.  Did you ever review
16        those letters?
17   A.   I cannot say that I have.  I don't think so.
18   Q.   Okay.  Do you know if SUNY Albany considered, in
19        response to those letters, whether it had been doing
20        anything wrong at that point concerning the
21        treatment of Dr. Alaei?
22   A.   Again, our goal and responsibility was to make sure
23        that we abided by all guidelines and policies here
24        at the University at Albany, SUNY's guidelines and
25        New York State guidelines, as well as those of UUP.
```

1          So as far as I know, no, there were no concerns.

2    Q.    Okay.  I'm going to show you what's been previously

3          identified as Claimant's Exhibit L-2.  Claimant's

4          Exhibit L-2, if you can take a look, it's identified

5          as Sexual Misconduct Response Report Number 18-013.

6          And I can scroll through it, you know, quickly so

7          you can see the whole thing and then I have specific

8          questions about the beginning.

9                    So my first question is:  Are you

10         aware of or do you recognize what this document is,

11         generally?

12   A.    I can't remember that I have seen this document, but

13         I don't know.

14   Q.    Okay.  In this overview report, it talks

15         about -- well, it says:  "The following report

16         details the University at Albany's coordinated

17         response to a report received on February 2, 2018,

18         from Dr. James Stellar.  Specifically, the report

19         alleges that several students reported to him that

20         Dr. Arash Alaei has been interacting with students

21         in violation of the separation agreement entered

22         into with the University on blank date.

23                    "This report initiated an inquiry,

24         which resulted in a joint investigation by the

25         Office of Equity and Compliance and the Office of

HAVIDAN RODRIGUEZ                                    52

```
 1        Human Resources Management.  The investigation
 2        focused on the following possible violations of the
 3        University at Albany policies by Dr. Kamiar Alaei."
 4                   And then it identifies three Roman
 5        Numerals, three possible violations identified by
 6        SUNY Albany.
 7                   Do those -- If you read those three
 8        Roman Numeral identified possible violations, do
 9        those refresh your memory maybe as to what the
10        underlying basis was raised in the first instance as
11        to the investigation concerning Dr. Alaei?
12   A.   Yes, I know, generally, those were some of the
13        concerns, yes.
14   Q.   Do you know as to Dr. Arash Alaei, do you recall if
15        he was on alternative assignment at some point?
16   A.   I don't remember, no.
17   Q.   Okay.  In terms of Arash Alaei being --
18        communicating with GIHHR staff and students, do you
19        know if Dr. Arash Alaei was having correspondence
20        with Harvey Charles, soliciting permission to
21        communicate with individuals while he was on
22        alternative assignment?
23   A.   When is this letter date -- When is this document
24        dated?
25   Q.   I don't think it is dated.
```

```
 1              Yeah, I don't think there is an actual
 2       date.
 3              Yeah, I don't see any identifying date
 4       of when the document was issued.
 5              So my question was:  Do you have any
 6       recollection or understanding of whether
 7       Arash Alaei, while he was on alternative assignment,
 8       was communicating with Harvey Charles about seeking
 9       permission to have discussions with GIHHR staff and
10       interns?
11   A.   I believe that Arash Alaei was no longer an employee
12       at the University at Albany when I arrived, so this
13       probably all occurred prior to my arrival at
14       UAlbany.  So I can't comment on some things that
15       didn't happen when I was not President of the
16       University.
17   Q.   Okay.  Understood.
18              Let me refer you to what's previously
19       been identified as Claimant's Exhibit N.  Claimant's
20       Exhibit N, specifically, I'm referring to an e-mail
21       dated June 13, 2017, from Arash Alaei to
22       Charles Harvey and then a response from --
23       Harvey Charles, I'm sorry, to Arash Alaei, dated
24       June 14, 2017.
25              One of the issues identified was, you
```

HAVIDAN RODRIGUEZ                                          54

```
 1        know, whether Dr. Kamiar Alaei was having or
 2        facilitating contact while Arash was on alternative
 3        assignment with GIHHR students.  I just want to
 4        refer you to this paragraph of the June 13, 2017
 5        e-mail from Arash to Harvey Charles:  "In addition,
 6        I just want to inform you that I need to have said
 7        communication with" -- and then he identifies a few
 8        students.  It says:  "They are GIHHR's interns and I
 9        need to have Skype meeting with them to develop
10        grant proposals."
11                  Harvey Charles responds:  "I have
12        inquired of HR and am awaiting advice in this
13        matter."
14                  Do you recall if whether during the
15        investigation concerning Dr. Kamiar Alaei, whether
16        it was raised or whether this prior history of
17        discussions between Arash and Harvey Charles and HR
18        about communications was ever raised as the basis
19        for why Arash was having conversations with interns
20        that people were using as a grounds to look into
21        Kamiar Alaei?
22   A.   Again, this e-mail is dated June 2017.  Again,
23        that's before my time at the University at Albany,
24        so I don't know what the conversations were.
25   Q.   Okay.  Do you know who would have been responsible
```

```
 1         to see if Arash Alaei was complying with his
 2         alternative assignment terms?
 3    A.   There could have been at least a couple of people;
 4         his immediate supervisor and also in this case
 5         Charles Harvey, and then potentially Human Resources
 6         as well.
 7    Q.   Okay.  Do you recall a time when Office of Human
 8         Resource Management conducted an interrogation of
 9         Dr. Kamiar Alaei?
10    A.   Can you repeat that again?  I'm sorry.
11    Q.   Sure.
12                   Do you recall when there came a
13         time -- or strike that.
14                   Do you recall a time when Office of
15         Human Resource Management conducted an interrogation
16         of Dr. Kamiar Alaei?
17    A.   I don't know if there was an interrogation, but I
18         know that Human Resources did meet, I believe, with
19         Dr. Kamiar Alaei.
20    Q.   Do you know if Chantelle Cleary and Title IX ever
21         met with Dr. Alaei to go through any of the alleged
22         allegations against him?
23    A.   I do not know.
24    Q.   Would it be typical for Title IX to not interview
25         the person subject to the allegations as part of
```

HAVIDAN RODRIGUEZ                                    56

1           their investigation?

2      A.   I think it varies with the situation, but they could

3           or could not.  But I would assume so, but I don't

4           know that they did.

5      Q.   Okay.  If I could refer you to what was previously

6           identified as Claimant's Exhibit C-3.

7                      Claimant's Exhibit C-3 is a letter

8           from Young Sommer to Randy Stark, dated May 21,

9           2018.  For purposes of refreshing your recollection,

10          it identifies that there was an interrogation

11          between Human Resource Management and

12          Dr. Kamiar Alaei on May 9, 2018.

13                     Does that sound about accurate, as far

14          as you recall, that on May 9, 2018, Human Resources

15          met with Dr. Alaei for going through questioning

16          about the investigation issues?

17     A.   Again, the timeline, I don't know what the time

18          would have been, so I don't know.

19     Q.   Okay.  Were you told by Office of Human Resource

20          Management the results of the discussions they had

21          with Dr. Alaei that day?

22     A.   I know they met with Dr. Alaei.  I don't think that

23          I have information about what were the outcomes of

24          that conversation.

25     Q.   Okay.  What's on the screen here is Claimant's

1          Exhibit C-3, a letter dated May 21, 2018.  Do you

2          recall ever reading this letter?  And I could start

3          from the beginning and go slowly through.

4     A.   I don't recall seeing this letter, no.

5     Q.   Okay.  Do you recall if -- well, strike that.

6                    Do you know if after conducting or

7          having this meeting with Dr. Alaei, the

8          interrogation, whether the people conducting the

9          investigation uncovered any new information or

10         changed course in conduct, in terms of how they were

11         viewing the case?

12    A.   Again, I know there was a meeting.  I wouldn't

13         necessarily categorize it as an interrogation.  I

14         know there was a meeting and there were discussions

15         at that meeting.  What were the outcomes?  As I said

16         before, I don't know.  I think eventually we

17         received some recommendations in terms of what would

18         be the next steps.

19    Q.   Okay.  If I can refer you to what had been marked as

20         Claimant's Exhibit H?  Are you aware that there was

21         a counseling session at one point held by Office of

22         Human Resource Management and Dr. Alaei?

23    A.   I believe so.

24    Q.   Okay.  And are you aware of whether there was a

25         counseling memorandum issued by Office of Human

```
 1        Resource Management concerning the investigation
 2        regarding Dr. Alaei?
 3   A.   I would assume, as part of the process, there must
 4        have been one.
 5   Q.   I'm showing you what's been previously marked as
 6        Claimant's Exhibit H.  Do you recall seeing
 7        Claimant's Exhibit H at any point in time before it
 8        was issued on August 9, 2018?
 9   A.   If I did, I don't remember.  Again, I get tons of
10        documents in my office.  I can't remember all the
11        documents that I get.
12   Q.   Okay.  Do you have any understanding of the findings
13        made by Office of Human Resource Management in
14        determining whether the allegations concerning
15        Dr. Alaei justified imposing any discipline?
16   A.   I don't recall that, no.
17   Q.   Do you recall any determination by Human Resource
18        Management whether they made any findings
19        determining that Dr. Alaei had violated any policy
20        or not by SUNY Albany?
21   A.   I don't recall, no.
22   Q.   Okay.  If I can refer you to what was previously
23        marked as Claimant's Exhibit B-8.
24                   Claimant's Exhibit B-8 is a copy of a
25        letter from SUNY Albany dated August 10, 2018,
```

HAVIDAN RODRIGUEZ                                    59

```
 1          regarding notice of election to terminate
 2          Dr. Alaei's appointment.  So at this point, SUNY
 3          Albany had made a determination to terminate
 4          Dr. Alaei's appointment effective August 10, 2018.
 5          Do you recall when SUNY Albany first made that
 6          determination?
 7     A.   Again, if you're looking for exact date or timeline,
 8          no, I do not recall.
 9     Q.   Was it before this letter was issued on August 10,
10          2018?
11     A.   Well, if that was the letter to not renew, it must
12          have been before that letter.
13     Q.   Was it a month or two before this letter was issued
14          as far as you were aware?
15     A.   It could have been.  I can't give you a specific
16          timeline.
17     Q.   And did you ultimately make the final determination
18          to terminate Dr. Alaei's appointment effective
19          August 10, 2018?
20     A.   As the President of the University, I am consulted
21          on these matters, and if I have any issues or
22          concerns or objections, then we would move forward.
23          If I agree with the recommendation, then we would
24          move forward.
25     Q.   And it was then -- strike that.
```

```
 1                   So did someone make a recommendation
 2          to you to elect to terminate Dr. Alaei's
 3          appointment?
 4     A.   There were discussions about this, yes.  And as part
 5          of the process that I indicated before to you
 6          regarding the restructuring, reorganization of a
 7          number of offices and functions at the University,
 8          that was part of the overall discussion, yes.
 9     Q.   And so what were the grounds then?  You had
10          just -- you had talked about -- you had mentioned in
11          the past today, you know, reorganizing GIHHR,
12          getting rid of GIHHR.  Was that the reason that
13          Dr. Alaei was -- SUNY Albany elected to terminate
14          his appointment?
15     A.   As you may know, for these types of decisions, we
16          don't need a specific reason to discontinue
17          someone's employment at the University in this
18          regard.
19     Q.   But I'm asking you what the reason was.
20     A.   And I'm telling you we don't need a particular
21          reason to dismiss someone from the University.  I'm
22          also telling you that as part of this restructuring
23          process, this was a critical factor in determining
24          how we move forward with GIHHR, and the University
25          had already made a decision that we were going to be
```

HAVIDAN RODRIGUEZ                                    61

```
 1           doing away with GIHHR.
 2   Q.  So the determination was because SUNY Albany was
 3           getting rid of GIHHR, therefore, we're terminating
 4           Dr. Alaei's employment?
 5   A.  That's part of the factor, yes.
 6   Q.  Was there any -- What else was considered as part of
 7           that?
 8   A.  As far as I'm concerned, in terms of my
 9           determination, that was the factor.
10   Q.  Okay.  I want to backtrack here.  If I can refer you
11           to what had previously been identified as Claimant's
12           Exhibit D-1.  I'm trying to find my copy.
13                        Did anyone recommend Dr. Alaei's
14           termination?
15   A.  Did someone recommend the non-renewal of his
16           contract, you mean?
17   Q.  The decision to elect to terminate his appointment
18           effective August 10, 2018, that's what I'm referring
19           to in this August 10, 2018 letter, the election to
20           terminate his employment effective August 10, 2018.
21   A.  Right.  So, yes, there's a recommendation that's
22           made to my office and I decide whether I move
23           forward with that recommendation or not.
24   Q.  Who made the recommendation to your office?
25   A.  This has been in conversations with academic affairs
```

```
 1            because the center reported to academic affairs, the
 2            Provost.
 3    Q.      Okay.  So Provost Stellar; is that fair to say?
 4    A.      Right, yeah.
 5    Q.      If I can refer you to what had been previously
 6            identified as Claimant's Exhibit D-1.  Claimant's
 7            Exhibit D-1 includes e-mails between Brian Selchick,
 8            Chantelle Cleary, dated March 26, 2018.  Take a look
 9            at these e-mails.
10                      In the first e-mail at the bottom,
11            March 26, 2018, Brian Selchick is asking Chantelle
12            about certain information concerning Dr. Alaei.  In
13            response, Chantelle writes:  "I thought we agreed he
14            wasn't going to come back.  I am confused."
15                      Mr. Selchick responds:  "Right," and
16            then continues on with some information.
17                      Are you aware of a determination by
18            SUNY Albany as of March 26, 2018, or before that,
19            that there was an agreement by SUNY personnel that
20            Dr. Alaei was not going to come back to employment
21            with SUNY?
22    A.      It was in March or before March.  There was
23            somewhere -- sometime along those lines, yes, there
24            was a determination.
25    Q.      Okay.  So at some point in March, before this
```

```
 1            March 26th determination -- or March 26, 2018
 2            e-mail, there had been a determination that
 3            Dr. Alaei wasn't coming back?
 4     A.     Again, for me, it's almost impossible to tell you
 5            what the timeline was, but the decision is correct.
 6     Q.     And was the decision based on the same issue you had
 7            just raised about GIHHR not being -- not moving
 8            forward with GIHHR?
 9     A.     That's correct.
10     Q.     If I can refer you to what had been previously
11            identified as Claimant's Exhibit L-4.
12                        Claimant's Exhibit L-4, handwritten
13            notes.  Brian Selchick has stated at his deposition
14            these are his notes.  They were taken on 4/3/2018 at
15            a meeting.  The first sentence says:  "How do we
16            maintain the integrity of the non-renewal with or
17            without NOD interrogation?"  Then it says:  "Goal is
18            to make sure he does not come back."
19                        So would these statements by
20            Mr. Selchick from this meeting be consistent with
21            what you just said that there was a determination to
22            not bring Dr. Alaei back to employment at SUNY
23            Albany?
24     A.     Well, I haven't seen these notes previously, but
25            clearly, as I said before, there was a process in
```

```
 1          which we decided that we would not move forward with
 2          Dr. Alaei's contract.
 3    Q.    Okay.  Now, is there a distinction in your mind
 4          between terminating Dr. Alaei's contract effective
 5          August 10, 2018, and non-renewing Dr. Alaei's
 6          employment?
 7    A.    No.
 8    Q.    Okay.  If I can refer you to what's been previously
 9          identified as Claimant's Exhibit B-1.
10                         Claimant's Exhibit B-1.  Claimant's
11          Exhibit B-1 purports to be a letter dated April 27,
12          2018 to Provost James Stellar from
13          Dean Harvey Charles, subject:  Kamiar Alaei.  "I'm
14          writing to recommend that Dr. Kamiar Alaei's
15          appointment be non-renewed; that it be not extended
16          beyond its current termination date."
17                         Are you aware of this letter or did
18          you have any review of this letter at any point in
19          time before?
20    A.    I knew the letter was there, yes.
21    Q.    Okay.  Do you know if Dr. Charles wrote this letter?
22    A.    It's coming from him.
23    Q.    Do you know if he actually wrote this letter?
24    A.    I don't know who wrote the letter.
25    Q.    If I can refer you to what's been previously
```

```
 1            identified as Claimant's Exhibit B-3.
 2                      Claimant's Exhibit B-3 is a series of
 3            e-mails between Bill Hedberg and Harvey Charles
 4            dated 4/28/2018.  It appears that Mr. Hedberg was
 5            reaching out to Dr. Charles about signing a
 6            non-renewal for Kamiar Alaei?
 7                      Harvey Charles, however, advises
 8            William Hedberg as follows:  "I'm looking at the
 9            letter of non-renewal and it's actually a
10            recommendation from me to the Provost.  As you know,
11            I know practically nothing about this situation and
12            I feel uncomfortable making a recommendation to the
13            Provost without a basis to do so.  Could this be
14            handled differently?"
15                      Were you aware, at the time, of
16            Dr. Charles' position about not feeling comfortable
17            making a recommendation, as he had no basis to do
18            so?
19      A.    No, I was not.
20      Q.    If I can refer you to what's been previously marked
21            as Claimant's Exhibit B-4.  Claimant's Exhibit B-4
22            is a series of e-mails between William Hedberg,
23            Harvey Charles, Randy Stark, James Stellar.  In
24            this -- And I'm focusing on an e-mail from May 2,
25            2018, at 5:00 p.m. from Harvey Charles.  And it
```

HAVIDAN RODRIGUEZ                                    66

```
 1          says:  "I'm writing to let you know that
 2          Bill Hedberg sent me both the HRM-3 for Kamiar, as
 3          shown in this attachment, and a letter addressed to
 4          the Provost from me recommending," underlined, "that
 5          Kamiar not be renewed.  I declined to sign that
 6          letter because I have no information that can be
 7          used as a basis to recommend," underlined, "that
 8          Kamiar not be renewed.  I'm not seeking such
 9          information, since it is clear to me that the
10          Provost has decided to not renew Kamiar's contract."
11                    Are you aware that Dr. Charles'
12          feeling that he was not, you know, willing to
13          recommend that Kamiar not be renewed, but that he
14          was agreeing to do it because the Provost -- his
15          belief that the Provost was deciding not renew
16          Kamiar's contract?
17     A.   I have not had any conversations with either
18          Dr. Charles or Dr. Stellar regarding this matter.
19          So whatever conversations took between
20          them -- placed between them, I don't know about.
21     Q.   Okay.  According to this e-mail, Harvey Charles
22          believes that the Provost was deciding not to
23          non-renew.  Are you aware of the Provost supporting
24          the effort or ultimately pushing the effort to
25          non-renew Dr. Alaei?
```

```
 1   A.   This is, as I said -- stated before, this is
 2        academic affairs matter, because the center reports
 3        to academic affairs.  So clearly, Dr. Charles,
 4        Dr. Stellar had to be involved in this conversation.
 5   Q.   Okay.  Is it common, as far as you're aware, in your
 6        experience with non-renewal matters, that the
 7        Provost be pushing non-renewal and that -- when it's
 8        not supported by the supervisor of the employee,
 9        subject to the non-renewal?
10   A.   Well, I'm not sure if this was supported or not by
11        the supervisor, but yes, we make changes quite
12        frequently, and I enumerated a number of those
13        changes.  And those changes can emerge at different
14        levels, whether it be the unit, whether it be the
15        college, the school, or in this case, academic
16        affairs.
17   Q.   But is it typical in a non-renewal where, you know,
18        here, Harvey Charles was the direct supervisor of
19        Dr. Kamiar Alaei, but he was not recommending or
20        pushing non-renewal, but it was the Provost.  Is
21        that typical that non-renewal be sought when the
22        direct supervisor doesn't support or recommend
23        non-renewal?
24   A.   Again, I think in my career in higher education,
25        I've seen all sorts of different types of processes.
```

1          So is this any different?  No.  Can it happen?  Yes.

2          Can it happen a different way?  Of course.

3    Q.    If I can show you what's been previously identified

4          as Claimant's Exhibit B-6.

5                    Claimant's Exhibit B-6 is an e-mail

6          from William Hedberg to Kamiar Alaei, CCing

7          Harvey Charles and James Stellar.  Basically -- and

8          it's dated May 14, 2014, I'm sorry.

9                    Basically, this e-mail reflects that

10         Kamiar Alaei is being notified that the Provost

11         signed off on the form from Dr. Harvey Charles for

12         non-renewal.  It then says:  "The next step in this

13         process, for the President to review the file, make

14         a decision."  However, it's notifying Dr. Alaei he

15         has time to submit a statement in response.

16                    So do you know the basis for the

17         Provost to sign off on non-renewing Dr. Alaei?

18   A.    Again, I think you should have a conversation with

19         the Provost.  I'm not going to put words in

20         Dr. Stellar's mouth.

21   Q.    So he never communicated that decision to you, the

22         basis of his decision?

23   A.    Of course, we had a number of conversations about

24         this and other reorganizations in academic affairs,

25         but you are asking me specifically what did the

```
 1         Provost say.  I think that's a question for the
 2         Provost, not for the President.
 3    Q.   So as you sit here, you're not able to answer a
 4         question about what the Provost told you about his
 5         reason for signing non-renewal of Dr. Alaei?
 6    A.   There was a process.  There was a review process.
 7         The Provost and I had conversations about the
 8         organizational structure of GIHHR, whether GIHHR
 9         should move forward or not.  And then in terms of if
10         GIHHR was no longer going to exist as an institute,
11         then we would have to make some personnel decisions
12         as well.
13    Q.   Okay.  Attached to this letter -- and it's referred
14         to about Dr. Alaei having time to submit a
15         statement.  Attached as part of Claimant's Exhibit
16         B-6 is a letter dated May 8, 2018, to
17         William Hedberg.  And you can scroll through and see
18         it's from Dr. Alaei.
19                   Did you review this letter concerning
20         Dr. Alaei seeking to provide his response in terms
21         of the change of status form to non-renew his
22         University employment?
23    A.   It probably should have been in the documents that I
24         received with the entire case for my review, but I
25         just can't recollect that e-mail specifically.
```

| | | |
|---|---|---|
| 1 | Q. | Do you recall reading this letter before you decided |
| 2 | | whether or not to approve non-renewing Dr. Alaei's |
| 3 | | appointment? |
| 4 | A. | Again, I had a number of documents that should have |
| 5 | | been in my package, but can I tell you specifically |
| 6 | | that I read this letter?  I assume so, but I can't |
| 7 | | remember the details, particularly because we're |
| 8 | | scrolling down through it very quickly. |
| 9 | Q. | Okay.  I can go through it slowly, if you prefer. |
| 10 | | That's fine.  If you don't recall reading it, you |
| 11 | | don't recall.  If you want to go through it, that's |
| 12 | | fine, too. |
| 13 | A. | I don't think it's going to make a difference. |
| 14 | Q. | Okay.  Do you recall anything standing out from the |
| 15 | | letter, as you sit here, about reasons why you |
| 16 | | should seek to renew Dr. Alaei versus non-renew? |
| 17 | A. | No, I do not. |
| 18 | Q. | Okay.  Did you subsequently approve the non-renewal |
| 19 | | of Dr. Alaei? |
| 20 | A. | Yes. |
| 21 | Q. | Okay.  And what was your reasoning for approving the |
| 22 | | non-renewal again?  Was it the restructuring of |
| 23 | | GIHHR?  Is that really what it was the whole time? |
| 24 | A. | From my perspective, yes. |
| 25 | Q. | If I can refer you to what had been identified as |

```
 1          Claimant's Exhibit E-2.  Do you recall what
 2          Dr. Alaei's appointment was?
 3   A.     (No response.)
 4   Q.     President Rodriguez, do you recall what Dr. Alaei's
 5          appointment was?
 6   A.     He was director of GIHHR.
 7   Q.     I'm showing you what's been identified as Claimant's
 8          Exhibit E-2, which is a letter dated April 16, 2014,
 9          from SUNY Albany to Dr. Kamiar Alaei.
10                     I'm going to show you what's been
11          previously identified as Claimant's Exhibit E-1.
12          Claimant's Exhibit 1 includes a letter, dated
13          December 4, 2017, to Dr. Alaei from James Stellar.
14          It says:  "Based on a recommendation from your
15          Department Chair and Dean, it is my pleasure to
16          confirm the renewal of your appointment as a
17          Clinical Associate Professor to the Department of
18          Health Policy, Management and Behavior."
19                     If you scroll down, there is an HRM-3
20          letter or form, and there's handwritten notes that
21          say:  "Two other complementary appointments;
22          Director of GIHHR and Research Professor in the
23          Department of Public Health and Affairs."
24                     Do you recall what Dr. Alaei's main
25          appointment was?
```

1   A.    Well, if this is correct, he was Director of GIHHR

2         and then he had an appointment as a Professor,

3         Research Professor in Rockefeller College.

4   Q.    So he had, according to this, Director of GIHHR, but

5         Research Professor, Department of Administration and

6         Policy -- and if this comes up.  I'll come back to

7         it.  Sorry.  Hold on a second.

8                     Okay.  Do you recall when the issue of

9         non-renewal came up regarding Dr. Alaei, an issue of

10        getting one year versus two year of additional

11        employment time?

12  A.    There was that conversation, yes.

13  Q.    Okay.  Do you recall, ultimately, it was decided

14        that Dr. Alaei was only entitled to one year of

15        additional employment versus two?

16  A.    That's correct.

17  Q.    Do you recall the basis of that decision?

18  A.    It was reviewed, and it was reviewed by legal

19        counsel both at UAlbany and at SUNY, SUNY system,

20        and they said that would be a decision we could

21        uphold.

22  Q.    Do you recall if any opinions were issued by Office

23        of Human Resource Management about that issue?

24  A.    I can't recall.  I think that they were part of the

25        conversation, and I know that at the end of the day,

HAVIDAN RODRIGUEZ                                    73

```
 1        we ended up with one year, rather than two.
 2   Q.   Okay.  If I can refer you to what was previously
 3        identified as Claimant's Exhibit E-2.  And this is a
 4        letter from SUNY Albany, dated April 16, 2014, to
 5        Dr. Kamiar Alaei.
 6                    This letter says:  "It's my pleasure
 7        to offer you an appointment to the University at
 8        Albany as a Research Associate Professor and
 9        Lecturer in the Department of Public Administration
10        and Policy, Rockefeller College of Public Affairs
11        and Policy."
12                    It then continues and says:  "In this
13        appointment" -- no, I'm sorry.  It says:  "You will
14        have three complementary non-stipendiary
15        appointments in addition to your professional
16        appointment in Rockefeller College.  You'll continue
17        to serve as Director of GIHHR."  It talks about his
18        role.  "In addition, you will hold a courtesy
19        affiliation appointment in the School of Public
20        Health and the School of Criminal Justice."
21                    So based on this letter, is it fair to
22        say that his -- Dr. Alaei's appointment was actually
23        as an Associate Professor and Lecturer in the
24        Department of Public Administration and Policy at
25        the Rockefeller College?
```

```
 1   A.   In the quick review that I did of his letter, he has
 2        a Research Associate Professor appointment and a
 3        Lecturer in Rockefeller College and Director of
 4        GIHHR.
 5   Q.   Okay.  So when SUNY Albany ultimately determined to
 6        exercise its right to terminate his employment
 7        effective August 10, 2018, why wasn't Dr. Alaei able
 8        to continue on with his appointment as a
 9        Lecturer -- or sorry, as a Research Associate
10        Professor and Lecturer with Rockefeller College of
11        Public Affairs and Policy?
12   A.   Are you asking -- What are you asking again?  I'm
13        sorry.
14                  MR. CASTIGLIONE:  Can you read back
15             the question, please, Debbie?
16                  (The previous question was read back.)
17   A.   When we terminated his appointment and decided not
18        renew his appointment, he was terminated as an
19        employee of the University at Albany.
20   Q.   So the issue of restructuring GIHHR, that would have
21        prohibited Dr. Alaei from continuing on with his
22        appointment as a Research Associate Professor and
23        Lecturer with the Rockefeller College?
24   A.   Not necessarily, but in this case, it did.
25   Q.   Okay.  So why did SUNY Albany decide to not allow
```

HAVIDAN RODRIGUEZ                                75

```
 1        Dr. Alaei to continue as a Research Associate
 2        Professor and Lecturer with Rockefeller College,
 3        separate and apart from GIHHR responsibilities, if
 4        it was being canceled?
 5   A.   The decision was to terminate Dr. Alaei's contract
 6        with the University at Albany.
 7   Q.   Why?
 8   A.   I just explained -- I just went through the entire
 9        iteration of why we did this.
10   Q.   Was -- And I'm asking you.  You had said it was
11        based on SUNY decided to -- SUNY Albany decided to
12        terminate GIHHR.  And I was asking, well, couldn't
13        Dr. Alaei have continued as Research Associate
14        Professor and Lecturer?  And your response was:
15        SUNY Albany decided to terminate him?
16   A.   Right.
17   Q.   And I'm asking why did they decide to terminate him?
18   A.   For the very same reason that I explained to you.
19        We decided that we were not going to move forward
20        with his employment at the University at Albany,
21        generally speaking, and with the -- as Director of
22        GIHHR.
23   Q.   So you just made a determination, just we're
24        deciding to terminate Dr. Alaei, that's it, no
25        reason, just we're done?
```

1   A.   Based on the authority that we have, we don't need a

2        reason as an institution to give a reason for

3        termination.

4   Q.   Right.  But I'm asking in the context of this

5        lawsuit what the reasoning was.  And so I'm just

6        trying to get it on the record so it's clear.  If

7        the reasoning is just we decided he was not to

8        continue employment, that's the reasoning you're

9        giving, that's it?

10                  MR. ROTONDI:  Object to the form of

11           the question.  He's answered this question.

12                  MR. CASTIGLIONE:  It's just not been a

13           clear response.  So I'm fine with moving on.

14  BY MR. CASTIGLIONE:

15  Q.   As to the issue of one year versus two years, this

16       Claimant's Exhibit E-2, this April 16, 2014 letter,

17       it says:  "Your initial appointment will be for

18       three years, commencing May 1, 2014."  It talks

19       about 12-month full-time obligation.

20                  It then says:  "To give you the

21       security of at least two years of employment, the

22       employment will be reviewed annually for possible

23       extension by another year."

24                  Do you recall reviewing this language

25       as part of your decision about whether Dr. Alaei was

HAVIDAN RODRIGUEZ                                    77

```
 1        entitled to one year versus two years?
 2   A.   Yes, I believe this was part of the documents I
 3        reviewed.
 4   Q.   Okay.  And your reading of this language, this was
 5        the basis for saying he was only entitled to one
 6        year versus two years of continued employment?
 7   A.   We reached a determination after consultation with
 8        legal counsel at UAlbany and at SUNY system that one
 9        year would be what the University would offer
10        Dr. Alaei, yes.
11   Q.   Okay.  And you're aware that Dr. Alaei's affiliation
12        with GIHHR and that title was an unpaid affiliation?
13   A.   I can't say that I know that it was or it wasn't.  I
14        haven't reviewed his contract.
15   Q.   Okay.  If I can refer you to what's been previously
16        identified as Claimant's Exhibit D-2?
17                  Claimant Exhibit D-2 is an e-mail
18        between Randy Stark and others dated July 6, 2018.
19        If you could review this e-mail.
20                  This e-mail states, in part, that
21        Mr. Stark had made a determination that the sexual
22        misconduct allegations were unfounded.  Do you
23        recall Mr. Stark conveying that information or his
24        determination to you?
25   A.   As I indicated initially, after a report from legal
```

```
 1        counsel, that's what we found -- that's what legal
 2        counsel found in consultation with Human Resources,
 3        yes.
 4   Q.   Okay.  Mr. Stark identifies:  "But for what purpose,
 5        as we are going to non-renew him and buy him out."
 6                       So it seems to be a distinction
 7        between non-renewing and buying somebody out.  Are
 8        you familiar with what Mr. Stark is referring to
 9        here?
10   A.   I am.
11   Q.   Okay.  Had a determination been made already as of
12        July 6, 2018, that SUNY Albany was obviously
13        non-renewing, but also buying out Dr. Alaei?
14   A.   That was part of the conversations, yes.
15   Q.   Okay.  As to the one year versus two-year issue, do
16        you know -- we discussed earlier, you know
17        Kevin Williams is?
18   A.   Yes, I do.
19   Q.   Do you know if Mr. Williams has been an employee and
20        working at SUNY for 30 years or so?
21   A.   Yeah, he's been here a long time.
22   Q.   As part of your determination about whether
23        Dr. Alaei was entitled to one year versus two, did
24        you happen to review an e-mail from Dr. Williams,
25        dated May 31, 2017, which I'm about to show you as
```

```
 1        Claimant's Exhibit E-4, discussing the concept of
 2        evergreen appointment and what the terms of the
 3        contract were?
 4   A.   That's May 31, 2017.  I was not President here at
 5        the University as of yet.
 6   Q.   But in terms of the contract for Dr. Alaei, which
 7        was 2014, did anyone consult with Mr. -- or
 8        Provost Williams about, you know, what the terms of
 9        the contract meant?
10   A.   Dean Williams --
11   Q.   Dean Williams.
12   A.   He has -- He has no part in this process, right?
13        This is academic affairs.  This is Human Resources.
14        And they coordinate.  And whether Provost Stellar
15        consulted with Dr. Williams, you would have to ask
16        him.  But -- and so the decision-making process,
17        Dr. Williams really had -- plays no role.
18   Q.   Okay.  If I can refer you to what had been
19        identified as Exhibit I, sub 4.  I'm showing
20        you -- it's an e-mail from Bruce Szelest, dated
21        July 23, 2018, to several others.  It states:
22        "President has okayed proceeding as we laid out in
23        last meeting.  Counseling memo, counseling letter
24        and non-renewal and then buyout per UUP contract.
25        Update GIHHR website."
```

```
 1                    Do you recall the meeting at issue
 2          here in this July 23, 2018, e-mail?
 3  A.    What meeting are you referring to?
 4  Q.    In this e-mail, Bruce Szelest says:  "President has
 5          okayed proceeding as we laid out in last meeting"?
 6  A.    All right.  You mean my conversation with Bruce
 7          regarding the plan, in terms of how to move forward,
 8          right?
 9  Q.    Yes.
10  A.    Okay.
11  Q.    So the determination had been made and this was your
12          following through with it and this is what
13          was -- the course of conduct to finish this up,
14          there was going to be a counseling meeting and then
15          a counseling letter and then formal non-renewal and
16          whatnot?
17  A.    Those were the recommendations that were made to me.
18          I reviewed them and then we gave the okay to
19          proceed -- or I gave the okay to proceed, yes.
20  Q.    Are you aware of any other alternative assignments
21          or disciplinary investigations during your time at
22          SUNY that resulted in non-renewal and termination of
23          the employee, even though it was decided there was
24          no basis to impose discipline?
25  A.    We've been through a number of changes which have
```

1          resulted in alternative assignment.  So part of the
2          restructuring process that I mentioned to you
3          previously, when we decided that we were going to
4          establish the Office of Enterprise Risk Management,
5          we did not need a Vice President for compliance,
6          which we had.  That person was put on alternative
7          assignment and exited -- eventually exited the
8          University.
9                       When I decided that I was going to
10         integrate the Office of Communications and Marketing
11         into advancement, we no longer needed the
12         President -- the Vice President for Communications
13         and Marketing, so we put him in alternative
14         assignment and then he exited the University.  And
15         now we're in a similar process with another unit on
16         campus.
17                      So alternative assignments are not
18         unusual to allow people to transfer out of the
19         University, if that is the final decision that we've
20         made.
21    Q.   No, but my question is about disciplinary pro -- the
22         specific disciplinary investigations when somebody's
23         put on alternative assignment because of that.  Are
24         you -- Do you recall any instances where somebody
25         was on alternative assignment because of a

```
 1        disciplinary investigation and they were ultimately
 2        non-renewed and their employment terminated, even
 3        though it was decided there was no basis to impose
 4        discipline against those individuals?
 5   A.   I really would have to review because I don't know.
 6   Q.   You don't know?
 7   A.   Yeah.
 8   Q.   Do you know if there were any non-Middle Eastern
 9        females that were subject to alternative assignments
10        based on disciplinary investigations that were
11        subsequently non-renewed and terminated, even though
12        there was a decision that there was no basis to
13        impose discipline?
14   A.   Not that I recall.
15   Q.   What about the same for non-Middle Eastern males?
16   A.   I don't recall.  I don't know.  I mean, we would
17        have to go through the history of the University in
18        order to identify those cases.  There might be some
19        and there might not be.  I don't know what the
20        answer to that question is.
21                    MR. CASTIGLIONE:  Anthony, I'm just
22              going to need a minute or two to go through my
23              notes and then we can wrap up.
24                    MR. ROTONDI:  Yeah, that's fine.
25                    (Whereupon, a recess is taken.)
```

HAVIDAN RODRIGUEZ                                    83

1                    MR. CASTIGLIONE:  President Rodriguez,

2           I don't have anymore questions.  Thank you for

3           your time.

4                         (Transcript requests are as follows.)

5                    MR. CASTIGLIONE:  Standard delivery,

6           E-mail only.

7                         (Whereupon, the above-titled matter

8           was concluded at 3:30 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X   P A G E

2

3        WITNESS:

4                  HAVIDAN RODRIGUEZ

5        EXAMINATION BY MR. CASTIGLIONE              4

6

7

8                     E X H I B I T S

9        EXHIBIT      DESCRIPTION              PAGE

10        (Whereupon no exhibits were marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    C E R T I F I C A T I O N

2        STATE OF NEW YORK:
         COUNTY OF WARREN:
3

4             I, Deborah M. McByrne, do hereby certify
         that the foregoing testimony was duly sworn to;
5        that I reported in machine shorthand the
         foregoing pages of the above-styled cause, and
6        that they were prepared by computer-assisted
         transcription under my personal supervision and
7        constitute a true and accurate record of the
         proceedings;
8

9

10            I further certify that I am not an attorney
         or counsel of any parties, nor a relative or
11       employee of any attorney or counsel connected
         with the action, nor financially interested in
12       the action.

13

14            WITNESS my hand in the City of Queensbury,
         County of Warren, State of New York

15

16

17
         _____
18

19

20       DEBORAH M. McBYRNE

21       Court Reporter

22

23

24

25
```

```
1        DECLARATION/WITNESS CERTIFICATION

2        Case:  Alaei v. State University of New York

3        Witness:  Havidan Rodriguez

4        Deposition Date:  April 12, 2021

5
             I declare under penalty of perjury that I
6        have read the entire transcript of my Deposition
         taken in the captioned matter or the same has
7        been read to me, and the same is true and
         accurate, save and except for changes and/or
8        corrections, if any, as indicated by me on the
         DEPOSITION ERRATA SHEET hereof, with the
9        understanding that I offer these changes as if
         still under oath.

10
                    _____
11                      HAVIDAN RODRIGUEZ

12       Sworn to before me, this _____ day
         of_____    20_____ .
13
         [                               ](print)
14       Notary Public.

15       Registration No:  _____

16       State of_____

17       Qualified in_____County.

18       My commission expires_____.

19

20

21

22

23

24

25
```

```
 1      DEPOSITION ERRATA SHEET

 2      Case:  Alaei v. State University of New York
        Witness:  Havidan Rodriguez
 3      Deposition Date:  April 12, 2021

 4                    Reason Codes:
        1:  To clarify the record
 5      2:  To conform to the facts
        3:  To correct transcription errors.
 6
        PAGE/LINE            CORRECTION    REASON CODE
 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23      _____

24      _____

25      _____
```

```
 1                    DEPOSITION ERRATA SHEET

 2        PAGE/LINE            CORRECTION      REASON CODE

 3        _____

 4        _____

 5        _____

 6        _____

 7        _____

 8        _____

 9        _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____ Subject to the above changes, I certify

20        that the transcript is true and correct.

21        _____ No changes have been made.  I certify that

22        the transcript is true and correct.

23

24        _____

25                      HAVIDAN RODRIGUEZ
```

Case 1:21-cv-00377-BKS-TWD    Document 119-4    Filed 04/29/25    Page 91 of 100
DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.
HAVIDAN RODRIGUEZ
April 12, 2021

# A

**A-1 (5)** 7:22,23;12:8;
  15:20;16:11
**A-13 (1)** 44:21
**A-2 (2)** 23:1;25:9
**A-3 (4)** 25:6,7,8,10
**A-4 (3)** 26:18,19,21
**A-6 (2)** 35:10,11
**A-7 (2)** 39:15,16
**abided (1)** 50:23
**abides (1)** 17:12
**abiding (1)** 38:20
**ability (2)** 5:13,24
**able (6)** 30:14;36:2;
  37:1;44:15;69:3;74:7
**above (1)** 88:19
**above-titled (1)** 83:7
**academic (9)** 7:17;
  41:22;61:25;62:1;
  67:2,3,15;68:24;
  79:13
**accepted (1)** 19:14
**access (11)** 22:18;
  23:2,8,21;24:4,6,15,
  20,20,24,25
**accordance (1)** 17:18
**According (2)** 66:21;
  72:4
**accordingly (2)** 23:6;
  24:1
**accounts (1)** 10:3
**accurate (1)** 56:13
**accurately (1)** 5:23
**accusations (1)** 30:15
**across (2)** 40:6;43:14
**acted (1)** 49:14
**acting (1)** 49:17
**action (6)** 34:10;
  37:25;38:5,11;44:12,
  13
**actions (6)** 21:5;32:1;
  33:23,24;44:17;45:8
**actual (2)** 38:6;53:1
**actually (5)** 6:9;31:16;
  64:23;65:9;73:22
**add (1)** 47:23
**addition (5)** 49:9,10;
  54:5;73:15,18
**additional (3)** 34:21;
  72:10,15
**address (9)** 32:1,16,
  22,24;33:21;34:5,10,
  16;35:5
**addressed (1)** 66:3
**addressing (2)** 34:22;
  38:13
**adds (1)** 49:9
**administer (1)** 44:15
**administering (1)** 44:8
**administration (4)**
  19:18;72:5;73:9,24

**administrative (5)**
  7:17;15:6,13;19:1;
  34:18
**admittedly (1)** 48:3
**advance (1)** 6:1
**Advancement (2)**
  20:1;81:11
**advice (1)** 54:12
**advised (1)** 8:12
**advises (1)** 65:7
**advising (1)** 27:1
**advisor (2)** 49:11,12
**Advisory (1)** 39:22
**affairs (11)** 33:4;
  61:25;62:1;67:2,3,16;
  68:24;71:23;73:10;
  74:11;79:13
**affidavit (1)** 49:10
**affiliate (1)** 36:8
**affiliated (1)** 37:3
**affiliation (3)** 73:19;
  77:11,12
**afternoon (1)** 4:7
**again (27)** 8:11;
  10:24;13:21;17:9;
  19:6;20:7;22:20;
  23:3;25:3;36:10,13,
  17;47:18;50:22;
  54:22,22;55:10;
  56:17;57:12;58:9;
  59:7;63:4;67:24;
  68:18;70:4,22;74:12
**against (5)** 4:10;13:9;
  50:9;55:22;82:4
**aggressive (1)** 49:14
**agree (5)** 5:11;23:5;
  24:11;59:23
**agreed (2)** 23:22;
  62:13
**agreeing (1)** 66:14
**agreement (16)** 16:12,
  14,19,23,24,24;17:4,
  19;18:4;24:20,23;
  25:2;40:14,20;51:21;
  62:19
**Alaei (113)** 4:9;7:24;
  8:5,13;9:9,20;10:22;
  11:2;12:7;13:9;14:4,
  7;15:22;16:2;17:15;
  21:14,19,24;22:2,18;
  23:1,8;25:15,20;29:3,
  17;30:13;32:5,11;
  33:16;34:25;35:16,
  18,23;36:2,6;37:15;
  38:15;39:2,7;40:24;
  42:17;43:6,8,13;44:8,
  14;45:4;50:4,5,8,21;
  51:20;52:3,11,14,17,
  19;53:7,11,21,23;
  54:1,15,21;55:1,9,16,
  19,21;56:12,15,21,22;
  57:7,22;58:2,15,19;
  60:13;62:12,20;63:3,

  22;64:13;65:6;66:25;
  67:19;68:6,10,14,17;
  69:5,14,18,20;70:16,
  19;71:9,13;72:9,14;
  73:5;74:7,21;75:1,13,
  24;76:25;77:10;
  78:13,23;79:6
**Alaei's (28)** 11:19;
  13:17;14:8,13,20;
  15:3;17:18;23:21;
  39:10;40:13,19;59:2,
  4,18;60:2;61:4,13;
  64:2,4,5,14;70:2;
  71:2,4,24;73:22;75:5;
  77:11
**Alamos (1)** 35:13
**Albany (64)** 4:12,13,
  15;6:22;7:11,24;8:15,
  18;10:22;11:3;14:3;
  15:5;18:20,22;19:3;
  25:25;27:7;28:7;
  31:22;32:10,15,15,
  18;33:13,25;36:22;
  37:3;40:23;43:5;
  45:23;47:4,7,16;48:6;
  49:2,7,19,23;50:14,
  18,24;52:3,6;53:12;
  54:23;58:20,25;59:3,
  5;60:13;61:2;62:18;
  63:23;71:9;73:4,8;
  74:5,19,25;75:6,11,
  15,20;78:12
**Albany's (1)** 51:16
**Alexander (3)** 46:12,
  20;49:24
**align (1)** 15:8
**allegations (6)** 12:25;
  13:3;55:22,25;58:14;
  77:22
**alleged (5)** 46:24;
  48:23;49:3;50:9;
  55:21
**allegedly (1)** 47:7
**alleges (1)** 51:10
**allow (2)** 74:25;81:18
**allowed (1)** 30:13
**allows (1)** 24:23
**almost (1)** 63:4
**along (4)** 10:16;
  35:24,25;62:23
**altered (1)** 48:3
**altering (1)** 48:7
**alternative (30)** 8:5,
  13;9:9;18:7;21:13,20;
  22:15;23:9;24:15,23;
  25:18;26:1,15;36:20,
  25;37:1;44:9;52:15,
  22;53:7;54:2;55:2;
  80:20;81:1,6,13,17,
  23,25;82:9
**although (2)** 14:22;
  42:6
**always (1)** 38:16

**among (3)** 15:12;
  33:5;41:17
**analysis (1)** 20:3
**and/or (1)** 18:7
**annually (1)** 76:22
**answered (1)** 76:11
**Anthony (1)** 82:21
**anymore (1)** 83:2
**apart (1)** 75:3
**apparently (2)** 35:24;
  47:1
**appeared (1)** 25:20
**appears (2)** 26:3;65:4
**Appellate (2)** 46:10,17
**appointed (1)** 41:23
**appointment (27)**
  14:9;13;59:2,4,18;
  60:3,14;61:17;64:15;
  70:3;71:2,5,16,25;
  72:2;73:7,13,16,19,
  22;74:2,8,17,18,22;
  76:17;79:2
**appointments (2)**
  71:21;73:15
**appreciate (1)** 29:19
**approval (3)** 23:12;
  41:10;43:20
**approve (2)** 70:2,18
**approved (1)** 24:5
**approving (2)** 41:2;
  70:21
**April (4)** 64:11;71:8;
  73:4;76:16
**Arash (13)** 51:20;
  52:14,17,19;53:7,11,
  21,23;54:2,5,17,19;
  55:1
**around (5)** 5:15;8:23;
  9:4;28:13;32:4
**arrival (1)** 15:5;53:13
**arrived (3)** 18:10,19;
  53:12
**arrow (1)** 48:12
**articulate (2)** 5:8,9
**assault (1)** 48:24
**assignment (26)** 8:6,
  14;9:9;21:14,20;
  22:15;23:9;24:16,24;
  25:18;26:1,15;36:20,
  25;37:1;44:10;52:15,
  22;53:7;54:3;55:2;
  81:1,7,14,23,25
**assignments (4)** 18:7;
  80:20;81:17;82:9
**Associate (8)** 71:17;
  73:8,23;74:2,9,22;
  75:1,13
**assume (9)** 23:24;
  25:23;34:17;42:21;
  44:18,19;56:3;58:3;
  70:6
**assumed (2)** 39:23,23
**assure (1)** 17:23

**at-risk (1)** 28:16
**Attached (2)** 69:13,15
**attachment (1)** 66:3
**attended (5)** 27:22;
  29:10;30:2,19;31:17
**attention (2)** 32:21;
  33:3
**attorney (2)** 4:8,20
**attorney's (1)** 6:18
**audiences (1)** 26:10
**August (14)** 4:9,14;
  15:3;58:8,25;59:4,9,
  19;61:18,19,20;64:5;
  74:7
**author (1)** 28:10
**authority (1)** 76:1
**averred (1)** 49:12
**awaiting (1)** 54:12
**aware (35)** 13:16;
  14:10;15:21;17:3,6;
  24:19,22;27:21;
  28:20;30:1;31:8;32:3,
  8;36:5,24;39:8;42:17;
  45:2;47:14;48:4,25;
  49:16,23;51:10;
  57:20,24;59:14;
  62:17;64:17;65:15;
  66:11,23;67:5;77:11;
  80:20
**away (5)** 15:16;19:18;
  23:21;42:7;61:1

# B

**B-1 (3)** 64:9,10,11
**B-3 (2)** 65:1,2
**B-4 (2)** 65:21,21
**B-6 (3)** 68:4,5;69:16
**B-8 (4)** 14:2,3;58:23,
  24
**back (10)** 15:20;
  21:12;62:14,20;63:3,
  18,22;72:6;74:14,16
**background (1)** 41:23
**backtrack (2)** 37:12;
  61:10
**ban (1)** 30:24
**base (1)** 11:13
**based (8)** 16:8;32:11;
  63:6;71:14;73:21;
  75:11;76:1;82:10
**Basically (2)** 68:7,9
**basis (19)** 13:9,14;
  15:2;24:19,22;41:5,
  21;52:10;54:18;
  65:13,17;66:7;68:16,
  22;72:17;77:5;80:24;
  82:3,12
**beforehand (1)** 18:8
**began (1)** 28:14
**begin (1)** 42:6
**beginning (2)** 51:8;
  57:3

Case 1:21-cv-00377-BKS-TWD    Document 119-4    Filed 04/29/25    Page 92 of 100

DR. KAMIAR ALAEI v.                                    HAVIDAN RODRIGUEZ
STATE UNIVERSITY OF NEW YORK, et al.                        April 12, 2021

**behalf (2)** 31:17;
36:16
**behavior (2)** 49:22;
71:18
**belief (1)** 66:15
**believes (1)** 66:22
**Besides (2)** 6:18;
38:10
**best (2)** 5:13,24
**better (1)** 42:15
**beyond (2)** 29:3;
64:16
**bias (1)** 48:2
**biased (1)** 48:6
**big (1)** 22:1
**Bill (2)** 65:3;66:2
**bit (2)** 6:25;8:23
**bizarre (1)** 29:15
**blank (1)** 51:22
**Board (7)** 28:12;
37:20;38:3,25;39:22,
25;40:16
**bordered (1)** 48:19
**both (6)** 5:5,11;20:9;
26:11;66:2;72:19
**bothering (1)** 30:22
**bottom (1)** 62:10
**break (4)** 5:17,19,20;
37:5
**Brian (6)** 22:14;35:11;
36:1;62:7,11;63:13
**bring (1)** 63:22
**broader (2)** 18:13;
20:19
**broadly (1)** 18:9
**brought (2)** 32:21;
33:2
**Bruce (13)** 42:25;
43:12,15,19,21,23,25;
44:1,25;45:2;79:20;
80:4,6
**buy (1)** 78:5
**buying (2)** 78:7,13
**buyout (1)** 79:24

## C

**C-3 (3)** 56:6,7;57:1
**called (2)** 4:2;18:19
**came (7)** 16:5;19:13;
20:10;23:24;37:21;
55:12;72:9
**campus (2)** 33:12;
81:16
**can (50)** 5:4,14,20;
6:20;7:6,19;8:9;
10:24;15:1;17:6;
20:18;22:10;26:17;
29:9;31:17;34:14,15;
37:4,5;39:14;42:22;
44:20;46:6;47:25;
51:4,6,7;55:10;57:19;
58:22;61:10;62:5;

63:10;64:8,25;65:20;
66:6;67:13;68:1,2,3;
69:17;70:5,9,25;73:2;
74:14;77:15;79:18;
82:23
**canceled (1)** 75:4
**capacity (3)** 36:14;
46:25;47:16
**card (2)** 22:18;24:25
**care (1)** 45:12
**career (1)** 67:24
**careful (1)** 20:2
**case (17)** 6:9;11:7;
17:21;18:16;22:22;
23:23;25:23;26:12;
33:7;36:23;38:16;
47:25;55:4;57:11;
67:15;69:24;74:24
**cases (2)** 33:10;82:18
**CASTIGLIONE (10)**
4:6,7;37:7,11;74:14;
76:12,14;82:21;83:1,
5
**categorize (1)** 57:13
**CCing (1)** 68:6
**ceased (1)** 19:10
**center (13)** 13:24;
19:5,8,8,9;36:14,16,
16;41:13;42:7;45:8;
62:1;67:2
**certain (3)** 22:7;44:8;
62:12
**certainly (4)** 29:19;
30:18;37:4;45:9
**certify (2)** 88:19,21
**cetera (2)** 47:8,9
**Chair (1)** 71:15
**change (4)** 25:14,17;
26:5;69:21
**changed (3)** 48:17,22;
57:10
**changes (20)** 14:16;
15:6,7,7,13;18:11;
19:2;20:22;26:3,9,12;
27:12;38:4;39:9;
67:11,13,13;80:25;
88:19,21
**changing (3)** 39:6;
49:3,3
**Chantelle (16)** 32:9;
44:22,24;45:3,19,22,
25;46:12,20;47:20,
21;49:25;55:20;62:8,
11,13
**charge (3)** 10:12;
32:23,24
**charged (6)** 9:22,24;
10:20;11:1;17:11,15
**Charles (28)** 12:3;
26:22,25;35:25;
39:17,21,25;52:20;
53:8,22,23;54:5,11,
17;55:5;64:13,21;

65:3,5,7,23,25;66:18,
21;67:3,18;68:7,11
**Charles' (2)** 65:16;
66:11
**Chief (3)** 7:10,16;
43:16
**circumstances (1)**
23:17
**cite (1)** 17:8
**citizen (2)** 29:24;36:3
**citizens (1)** 31:4
**City (2)** 18:21;23:14
**Claimant (2)** 26:21;
77:17
**Claimant's (64)** 7:22,
23;12:7;14:2,3;15:20;
16:11,17;22:11,13,
25;25:6,8,10;26:18,
18;28:2,2;34:7;35:10,
10;37:13;39:15,16;
40:11;42:23;44:21;
46:7,8;51:3,3;53:19,
19;56:6,7,23,24;61:11;
62:6,6;63:11,12;64:9,
10,10;65:1,2,21,21;
68:4,5;69:15;71:1,7,
11,12;73:3;76:16;
77:16;79:1
**claims (2)** 4:9,11
**clarification (2)** 4:13;
21:22
**clear (6)** 10:4;17:1;
46:1;66:9;76:6,13
**clearly (3)** 26:9;63:25;
67:3
**Cleary (23)** 32:9;
44:22;45:3,19,22,25;
46:12,20,23;47:10,
15;48:2,5,16,22;49:1,
12,13,16,25;50:4;
55:20;62:8
**Cleary's (2)** 46:3;
48:13
**client (1)** 6:11
**climate (1)** 31:7
**Clinical (1)** 71:17
**close (3)** 15:16;19:7;
45:7
**closing (1)** 15:11
**code (2)** 48:24;88:2
**co-directors (2)** 41:9,
11
**coincided (1)** 49:8
**collaborative (1)**
18:20
**College (12)** 20:6,7;
26:8;67:15;72:3;
73:10,16,25;74:3,10,
23;75:2
**colleges (1)** 20:3
**comfortable (1)** 65:16
**coming (1)** 63:3;64:22

**commencing (1)**
76:18
**comment (1)** 53:14
**comments (1)** 41:7
**commitment (2)**
32:19;34:2
**committed (1)** 33:11
**common (1)** 67:5
**communicate (2)**
43:15;52:21
**communicated (1)**
68:21
**communicating (3)**
43:12;52:18;53:8
**communication (1)**
54:7
**Communications (5)**
19:21,25;54:18;
81:10,12
**communities (1)** 31:4
**community (2)** 29:23;
33:12
**compared (1)** 42:18
**complementary (2)**
71:21;73:14
**compliance (4)** 18:3;
20:11;51:25;81:5
**complying (1)** 55:1
**concept (1)** 79:1
**concern (3)** 4:19;
29:3;34:8
**concerned (4)** 29:8;
31:19;39:2;61:8
**concerning (22)** 4:9;
9:20;12:7;15:22;
16:1;17:15;22:14;
34:24;38:5,12;40:11;
45:4;49:25;50:3,14,
20;52:11;54:15;58:1,
14;62:12;69:19
**concerns (30)** 13:11;
16:4;22:6;27:21;
28:11,19;30:1,5,5;
31:9,10,23;32:9,16;
33:1,15;34:10,23;
37:14,17;38:13;
40:12;43:24;44:6;
48:4,25;49:8;51:1;
52:13;59:22
**concluded (5)** 12:9;
13:8,13;26:14;83:8
**conclusion (4)** 12:12,
15,25;13:2
**conclusions (1)** 12:20
**concrete (1)** 32:1
**conduct (5)** 8:18;
27:23;47:8;57:10;
80:13
**conducted (6)** 9:10;
10:9;38:6,14;55:8,15
**conducting (4)** 9:23;
34:21;57:6,8
**confident (2)** 31:24;

33:19
**confirm (1)** 71:16
**confused (1)** 62:14
**consequence (1)**
15:16
**considered (2)** 50:18;
61:6
**consistent (1)** 63:20
**constituent (1)** 27:12
**constituted (1)** 37:20
**consult (1)** 79:7
**consultation (3)**
17:20;77:7;78:2
**consultative (1)** 41:12
**consulted (2)** 59:20;
79:15
**contact (1)** 54:2
**content (1)** 27:3
**context (3)** 18:13;
31:14;76:4
**continue (4)** 73:16;
74:8;75:1;76:8
**continued (2)** 75:13;
77:6
**continues (6)** 20:24;
30:17,21;48:11;
62:16;73:12
**continuing (1)** 74:21
**contract (11)** 61:16;
64:2,4;66:10,16;75:5;
77:14;79:3,6,9,24
**conversation (7)**
34:12;56:24;67:4;
68:18;72:12,25;80:6
**conversations (10)**
6:16;41:19;54:19,24;
61:25;66:17,19;
68:23;69:7;78:14
**conveyed (3)** 8:4;
45:3;49:4
**conveying (1)** 77:23
**coordinate (1)** 79:14
**coordinated (2)** 16:9;
51:16
**Coordinator (9)** 45:23;
46:1,4,13,25;47:17;
48:6;49:2,18
**copy (3)** 40:8;58:24;
61:12
**CORRECTION (1)**
88:2
**correctly (2)** 37:18;
46:21
**correspond (2)** 48:23;
49:4
**correspondence (1)**
52:19
**corresponding (3)**
11:14;17:20;38:21
**Council (1)** 7:14
**counsel (12)** 5:18,21;
9:25;11:8;12:16;
17:22;18:2;38:17;

Case 1:21-cv-00377-BKS-TWD    Document 119-4    Filed 04/29/25    Page 93 of 100

DR. KAMIAR ALAEI v.                                    HAVIDAN RODRIGUEZ
STATE UNIVERSITY OF NEW YORK, et al.                        April 12, 2021

72:19;77:8;78:1,2
**counseling (6)** 57:21,
25;79:23,23;80:14,15
**countries (1)** 31:5
**couple (3)** 21:21;
37:19;55:3
**course (10)** 9:25;
12:1;16:10;34:9;
37:25;50:12;57:10;
68:2,23;80:13
**Court (5)** 4:11;46:10,
19;47:25;48:18
**courtesy (1)** 73:18
**cover (2)** 7:3,5
**create (1)** 5:1
**created (1)** 20:13
**creating (1)** 5:3
**Criminal (7)** 20:4,8;
26:4,5,6,7;73:20
**critical (1)** 60:23
**cultural (6)** 31:1,10;
32:12,16;33:17;34:24
**current (3)** 6:20;31:2;
64:16
**CVs (1)** 42:18

## D

**D-1 (3)** 61:12;62:6,7
**D-2 (2)** 77:16,17
**data (1)** 11:6
**date (9)** 9:1,3;20:24;
51:22;52:23;53:2,3;
59:7;64:16
**dated (32)** 7:24;14:4;
22:16;25:12;26:22;
28:4;29:1;35:12,16;
39:18;43:1;44:23;
46:11;52:24,25;
53:21,23;54:22;56:8;
57:1;58:25;62:8;
64:11;65:4;68:8;
69:16;71:8,12;73:4;
77:18;78:25;79:20
**dates (1)** 12:10
**day (5)** 12:21;14:21;
40:5;56:21;72:25
**days (1)** 45:17
**dealing (1)** 44:10
**Dean (17)** 11:25;
12:3;20:7,8,9;26:4,5,
6,8;28:6;33:5;41:15,
16;64:13;71:15;
79:10,11
**Debbie (1)** 74:15
**December (1)** 71:13
**decide (5)** 11:10;
24:11;61:22;74:25;
75:17
**decided (21)** 15:16;
18:24;19:7,16;20:3,
12;23:2;64:1;66:10;
70:1;72:13;74:17;

**directly (7)** 37:16,22;
38:1,11;43:18;46:1,5
**director (15)** 15:18;
19:8;25:21;36:14;
39:3,10;43:6,8;71:6,
22;72:1,4;73:17;74:3;
75:21
**directors (3)** 41:24;
43:3;44:19
**disadvantage (1)** 31:3
**disaster (1)** 20:12
**disasters (1)** 20:16
**disciplinary (26)** 8:6,
14,18;9:8;15:21;16:1;
17:4,16;18:6;20:25;
21:5,11,23,23,25;
22:2,3,15;43:22;44:4;
45:14;80:21;81:21,
22;82:1,10
**discipline (10)** 10:23;
11:4,11;13:9,12,14;
58:15;80:24;82:4,13
**discontinue (2)** 13:23;
60:16
**Discovery (1)** 48:19
**discuss (3)** 27:8;
29:11;47:10
**discussed (3)** 29:23;
39:4;78:16
**discussing (1)** 79:1
**discussion (2)** 40:10;
60:8
**discussions (8)** 40:15,
18,22;53:9;54:17;
56:20;57:14;60:4
**dismiss (1)** 60:21
**distinction (2)** 64:3;
78:6
**diverse (1)** 34:3
**diversity (2)** 32:19;
33:3
**Division (3)** 20:1;
46:10,17
**document (14)** 8:2,4,
7,12;16:21,22;17:7,
13;47:19,23;51:10,
12;52:23;53:4
**documents (13)** 4:18;
6:1,3,5,6,8,14;17:25;
58:10,11;69:23;70:4;
77:2
**done (7)** 17:17;24:9,
10;37:4;40:24;50:9;
75:25
**down (7)** 8:9;28:24;
35:15;42:4;45:8;
70:8;71:19
**Dr (145)** 4:9;7:24;8:5;
9:9,20;10:22;11:2,19;
12:7;13:9,17;14:4,7,
8,13,20;15:3,22;16:2;
17:15,18;21:14,19,
24;22:2,18;23:1,8,21;

25:15,20;26:25;
28:20;29:2,3,17;
30:13;32:5,11;33:16;
34:25;35:18,23;36:2,
6;37:15;38:15;39:2,7,
10;40:13,19,24;
42:17;43:6,8,13;44:8,
14;45:4;50:4,5,8,21;
51:18,20;52:3,11,14,
19;54:1,15;55:9,16,
19,21;56:12,15,21,22;
57:7,22;58:2,15,19;
59:2,4,18;60:2,13;
61:4,13;62:12,20;
63:3,22;64:2,4,5,14,
21;65:5,16;66:11,18,
18,25;67:3,4,19;
68:11,14,17,20;69:5,
14,18,20;70:2,16,19;
71:2,4,9,13,24;72:9,
14;73:5,22;74:7,21;
75:1,5,13,24;76:25;
77:10,11;78:13,23,
24;79:6,15,17
**duly (1)** 4:3
**during (10)** 4:21;
25:18;32:9;49:1,7,20;
50:3,12;54:14;80:21
**duties (1)** 49:17
**dynamic (4)** 29:14,24;
31:2,2
**dynamics (2)** 31:10;
33:17

## E

**E-1 (1)** 71:11
**E-2 (4)** 71:1,8;73:3;
76:16
**E-4 (1)** 79:1
**earlier (1)** 78:16
**ears (1)** 29:14
**Eastern (2)** 82:8,15
**edited (1)** 41:6
**education (6)** 18:25;
19:4,15;28:16;34:4;
67:24
**effective (9)** 14:9,14;
15:3;59:4,18;61:18,
20;64:4;74:7
**effectively (1)** 18:23
**efficient (1)** 45:10
**effort (3)** 16:9;66:24,
24
**efforts (3)** 13:16,20;
31:12
**either (1)** 66:17
**either/or (1)** 16:7
**elect (4)** 14:20;15:2;
60:2;61:17
**elected (1)** 60:13
**election (2)** 59:1;
61:19

25:15,20;26:25;
**Elizabeth (2)** 32:3,7
**else (1)** 61:6
**elsewhere (1)** 19:14
**e-mail (64)** 22:10,14,
25;23:2,8,21;24:4,6,
15,20,24;25:11;
26:19,22,25;27:4,5,
10;28:3,9,10,13,21,
24;29:5,7,8;30:3,22,
23;32:4,5;33:14;34:6;
37:14;39:17,22,24;
40:11,19,23;41:2;
42:25;43:1;44:2,24;
53:20;54:5,22;62:10;
63:2;65:24;66:21;
68:5,9;69:25;77:17,
19,20;78:24;79:20;
80:2,4;83:6
**e-mails (16)** 24:3;
28:3;35:11,15;37:16,
19,25;38:9,24,25;
40:3;41:5;62:7,9;
65:3,22
**Embassador (1)** 35:19
**embedded (3)** 19:4,
25;20:6
**emerge (2)** 29:17;
67:13
**emergency (2)** 20:12,
16
**emotional (1)** 30:23
**employed (4)** 45:22;
47:21;49:1,6
**employee (11)** 24:23;
36:20,21;37:3;47:3,
16;53:11;67:8;74:19;
78:19;80:23
**employee's (1)** 25:25
**employment (25)**
4:11;6:21;11:19,23;
13:17;14:20;15:3;
19:10;21:6;60:17;
61:4,20;62:20;63:22;
64:6;69:22;72:11,15;
74:6;75:20;76:8,21,
22;77:6;82:2
**end (4)** 12:21;14:21;
30:21;72:25
**ended (1)** 73:1
**engaged (4)** 21:8;
41:15;47:8,13
**engagement (1)** 35:17
**engagements (1)** 36:7
**ensure (5)** 17:11;
18:3;34:3;38:12,20
**entered (1)** 51:21
**enterprise (3)** 20:14,
15;81:4
**entire (7)** 7:10;19:11,
16,23;25:2;69:24;
75:8
**entirely (1)** 39:11
**entitled (4)** 72:14;

**75:11,11,15,19;76:7;
80:23;81:3,9;82:3
**deciding (4)** 45:7;
66:15,22;75:24
**decision (24)** 10:21,
21;14:10,23;15:2,10,
25;29:21;41:10;
46:17;47:5;60:25;
61:17;63:5,6;68:14,
21,22;72:17,20;75:5;
76:25;81:19;82:12
**decision-making (1)**
79:16
**decisions (8)** 11:19;
14:25;15:14;21:8;
23:3;45:9;60:15;
69:11
**declined (1)** 66:5
**defend (1)** 30:14
**definition (1)** 48:23
**delivery (1)** 83:5
**denying (1)** 48:18
**Department (8)** 46:10,
18;71:15,17,23;72:5;
73:9,24
**depending (1)** 16:7
**depends (2)** 26:2;
44:5
**deposition (4)** 6:2,17;
63:13;88:1
**details (3)** 36:11;
51:16;70:7
**determination (27)**
11:2,6,17;14:8,11,19;
20:21;25:4;43:5;
58:17;59:3,6,17;61:2,
9;62:17,24;63:1,2,21;
75:23;77:7,21,24;
78:11,22;80:11
**determine (1)** 47:12
**determined (3)** 15:21;
36:1;74:5
**determining (3)** 58:14,
19;60:23
**develop (1)** 54:9
**developing (1)** 22:7
**Development (2)**
19:6;42:8
**Dias (1)** 35:23
**difference (2)** 22:1;
70:13
**differences (4)** 32:12,
17;33:17;34:24
**different (7)** 10:2;
48:14,15;67:13,25;
68:1,2
**differently (1)** 65:14
**direct (3)** 23:20;67:18,
22
**directed (1)** 4:24
**directing (2)** 24:5;
38:22
**directional (1)** 11:25

77:1,5;78:23
**entity (1)** 19:19
**enumerated (1)** 67:12
**equity (3)** 32:19;33:3;
  51:25
**equivalent (1)** 23:14
**ERRATA (1)** 88:1
**especially (2)** 15:4;
  31:4
**Essentially (3)** 6:14;
  7:15;9:13
**establish (1)** 81:4
**et (2)** 47:8,9
**even (4)** 26:12;80:23;
  82:2,11
**event (1)** 48:15
**events (3)** 37:2;47:15;
  48:14
**eventually (2)** 57:16;
  81:7
**evergreen (1)** 79:2
**everyone (1)** 7:8
**evidence (2)** 11:6;
  13:4
**exact (2)** 12:10;59:7
**exactly (4)** 8:20;16:3,
  3;37:21
**EXAMINATION (1)**
  4:5
**examined (1)** 4:3
**exclusively (1)** 20:22
**excuse (1)** 48:14
**Executive (3)** 7:11,14,
  16
**exercise (1)** 74:6
**Exhibit (67)** 7:22,23;
  12:8;14:2,3;15:20;
  16:11,17;17:7;22:11,
  13,25;25:6,8,10;
  26:18,21;28:2,2;34:7;
  35:10,11;37:13;
  39:15,16;40:11;
  42:23;44:21;46:7,8;
  51:3,4;53:19,20;56:6,
  7;57:1,20;58:6,7,23,
  24;61:12;62:6,7;
  63:11,12;64:9,10,11;
  65:1,2,21,21;68:4,5;
  69:15;71:1,8,11,12;
  73:3;76:16;77:16,17;
  79:1,19
**exist (1)** 69:10
**exited (3)** 81:7,7,14
**expedient (1)** 45:11
**experience (1)** 67:6
**experiences (1)** 35:21
**expertise (1)** 20:11
**explain (3)** 6:20;7:6;
  15:1
**explained (2)** 75:8,18
**express (1)** 50:4
**expresses (1)** 28:11
**extended (1)** 64:15

**extension (1)** 76:23
**external (1)** 26:11
**externally (1)** 19:9
**extremely (1)** 45:10
**eyes (1)** 29:13

**F**

**facilitating (1)** 54:2
**facilities (2)** 21:17,19
**factor (3)** 60:23;61:5,9
**facts (4)** 48:3,7,23;
  49:3
**fair (11)** 8:4,12;11:12;
  24:7,8;29:24;35:1,2;
  42:10;62:3;73:21
**familiar (7)** 8:1;16:11,
  14;17:8;28:7;46:16;
  78:8
**far (7)** 17:14;42:17;
  51:1;56:13;59:14;
  61:8;67:5
**February (20)** 7:25;
  11:20;12:8;21:12;
  22:16;25:12;26:22;
  27:2,8,17;28:5,22;
  29:2;32:4;35:12,17;
  39:18;43:1;50:13;
  51:17
**feel (2)** 31:1;65:12
**feeling (4)** 30:18;
  33:14;65:16;66:12
**females (3)** 42:10,11;
  82:9
**few (8)** 18:12;21:4;
  41:14;45:17,17,17;
  47:24;54:7
**file (1)** 68:13
**final (5)** 11:16;14:11;
  23:12;59:17;81:19
**finalizing (1)** 19:11
**finance (1)** 19:18
**finances (1)** 9:16
**find (1)** 61:12
**findings (4)** 11:8;
  12:17;58:12,18
**fine (6)** 5:18;8:10;
  70:10,12;76:13;82:24
**finish (1)** 80:13
**firm (1)** 4:8
**first (18)** 4:2;5:19;
  8:17;16:5;22:8;
  27:16;28:3;29:4;
  30:8;46:16,21;47:18;
  48:1;51:9;52:10;
  59:5;62:10;63:15
**focused (1)** 52:2
**focusing (1)** 65:24
**follow (1)** 39:1
**followed (1)** 34:17
**following (6)** 17:23;
  38:18,22;51:15;52:2;
  80:12

**follows (3)** 4:4;65:8;
  83:4
**form (1)** 19:4;68:11;
  69:21;71:20;76:10
**formal (1)** 80:15
**former (1)** 46:13
**forward (14)** 7:3;
  12:22;14:18;30:6;
  44:11;59:22,24;
  60:24;61:23;63:8;
  64:1;69:9;75:19;80:7
**forwarded (1)** 37:23
**forwarding (1)** 28:9
**found (3)** 48:24;78:1,
  2
**Foundation (2)** 9:17;
  10:1
**frequently (1)** 67:12
**Friday (6)** 26:24;27:2;
  29:10;30:20,24;47:5
**full (3)** 5:4;30:9;48:1
**full-time (1)** 76:19
**functioning (1)** 19:22
**functionings (1)** 7:17
**functions (2)** 8:22;
  60:7
**funded (1)** 19:10
**funds (3)** 9:11;10:2;
  12:18
**further (1)** 29:18

**G**

**gathering (1)** 9:22
**gave (2)** 80:18,19
**general (1)** 7:8
**generally (7)** 11:22;
  17:6;23:19;30:6;
  51:11;52:12;75:21
**GIHHR (53)** 10:3,4;
  14:16;20:20,21;
  25:13,21;27:3,14,17;
  28:12,14;29:12;
  30:12;31:12;37:20;
  39:3,9,10,19,22,25;
  40:16;42:16;43:6,13;
  45:4;52:18;53:9;
  54:3;60:11,12,24;
  61:1,3,63:7,8;69:8,8,
  10;70:23;71:6,22;
  72:1,4;73:17;74:4,20;
  75:3,12,22;77:12;
  79:25
**GIHHR's (1)** 54:8
**GIHHR-wide (1)**
  26:23
**given (5)** 14:16;19:6;
  20:11;41:13;45:6
**giving (1)** 76:9
**Global (3)** 10:5;15:11,
  17
**goal (2)** 50:22;63:17
**goes (1)** 47:10

**Good (2)** 4:7;42:20
**governing (1)** 17:4
**grant (2)** 28:15;54:10
**grants (3)** 44:8,14,16
**Grey (3)** 32:3,7,8
**grounds (4)** 8:17;9:7;
  54:20;60:9
**groups (1)** 27:13
**guess (1)** 25:19
**guidelines (5)** 35:4;
  38:19;50:23,24,25

**H**

**Haley (1)** 35:20
**half (2)** 6:25;7:1
**handled (2)** 28:18;
  65:14
**handwritten (2)** 63:12;
  71:20
**happen (5)** 22:24;
  53:15;68:1,2;78:24
**happening (1)** 18:13
**happens (2)** 7:12;
  22:23
**happy (1)** 28:17
**Harvey (23)** 12:3;
  26:22;35:25;39:17,
  21,25;52:20;53:8,22,
  23;54:5,11,17;55:5;
  64:13;65:3,7,23,25;
  66:21;67:18;68:7,11
**Harvey's (1)** 28:13
**HAVIDAN (2)** 4:1;
  88:25
**head (1)** 45:19
**Health (8)** 10:5;15:11,
  17;33:11;41:16;
  71:18,23;73:20
**heard (4)** 28:12;
  29:13;46:22;47:18
**hearing (1)** 48:16
**Hedberg (7)** 65:3,4,8,
  22;66:2;68:6;69:17
**held (3)** 6:24;47:25;
  57:21
**higher (1)** 19:15;
  28:15;34:4;67:24
**high-rank (1)** 29:17
**himself (2)** 30:14;36:7
**history (2)** 54:16;
  82:17
**Hold (2)** 72:7;73:18
**holding (1)** 27:7
**hoping (1)** 31:5
**HR (2)** 54:12,17
**HRM-3 (2)** 66:2;71:19
**Human (34)** 9:14,25;
  10:6,10,12;11:7;13:7;
  15:11,17;16:6,8;
  17:21;18:1;23:20,25;
  24:6;38:17,23;39:1;
  52:1;55:5,7,15,18;

56:11,14,19;57:22,
  25;58:13,17;72:23;
  78:2;79:13
**hundreds (3)** 40:2,4;
  41:4

**I**

**idea (1)** 32:13
**identified (32)** 7:22;
  12:7;14:2;16:17,18;
  22:11;26:18;30:3;
  35:10;39:15;44:20;
  46:7,11;51:3,4;52:5,
  8;53:19,25;56:6;
  61:11;62:6;63:11;
  64:9;65:1;68:3;
  70:25;71:7,11;73:3;
  77:16;79:19
**identifies (6)** 41:8;
  43:2;52:4;54:7;
  56:10;78:4
**identify (7)** 7:8;28:25;
  41:10;42:10,14,23;
  82:18
**identifying (3)** 36:7,
  21;53:3
**identity (1)** 20:5
**imagine (3)** 8:21;
  35:6;40:4
**imbed (2)** 18:24;
  19:17
**immediate (1)** 55:4
**implicit (1)** 31:1
**implicitly (1)** 30:16
**implied (1)** 29:20
**imply (1)** 40:24
**impose (6)** 13:9,11,
  14;80:24;82:3,13
**imposing (1)** 10:23;
  11:3,11;58:15
**impossible (1)** 63:4
**imprisoned (1)** 35:22
**incident (1)** 47:12
**includes (7)** 25:8,11;
  26:19,21;35:11;62:7;
  71:12
**including (4)** 8:24;
  27:13;38:16;41:15
**inclusion (2)** 32:20;
  33:4
**inclusive (1)** 31:6
**incoherent' (1)** 48:20
**independent (1)** 20:5
**indicated (2)** 60:5;
  77:25
**individual (1)** 48:2
**individuals (14)**
  26:24;27:22;30:2;
  35:3;37:16;39:18;
  41:8,11,22;42:9,19;
  44:23;52:21;82:4
**inform (1)** 54:6

**information (14)** 4:17;
9:23;11:13;16:8;
19:14,16;26:11;
56:23;57:9;62:12,16;
66:6,9;77:23
**informed (4)** 21:8;
23:17;44:1;49:21
**informing (2)** 21:24;
22:2
**informs (1)** 44:1
**initial (2)** 28:14;76:17
**initially (1)** 77:25
**initiated (1)** 51:23
**initiative (1)** 18:21
**initiatives (2)** 14:17;
33:20
**input (4)** 27:3,6;
39:24;40:9
**inquired (1)** 54:12
**inquiries (1)** 30:12
**inquiry (1)** 51:23
**inside (1)** 35:21
**instance (2)** 46:16;
52:10
**instances (1)** 81:24
**Institute (7)** 10:5;
15:11,17,19;27:9;
41:14;69:10
**institution (7)** 7:18;
15:8;18:15;19:15,24;
31:6,20,25;34:3,4;
35:3;40:6;43:15;76:2
**institutional (1)** 38:19
**institutions (2)** 42:1,3
**integrate (1)** 81:10
**integrity (1)** 63:16
**interacted (1)** 41:25
**interacting (1)** 51:20
**interested (1)** 30:11
**interim (6)** 41:9,11,21,
23;43:9;44:18
**internal (1)** 26:11
**International (2)** 19:6;
42:8
**interns (3)** 53:10;54:8,
19
**interrogation (7)** 55:8,
15,17;56:10;57:8,13;
63:17
**interview (2)** 32:9;
55:24
**into (7)** 18:12;27:6;
40:9;49:23;51:22;
54:20;81:11
**investigate (2)** 32:11;
33:6
**investigated (2)** 11:5;
13:1
**investigating (2)**
47:12;49:5
**investigation (62)** 8:6,
14,19;9:8,10,13,19,
21,23;10:8,11,13,15,

17,18;11:22;12:6,13,
23;13:5,10;15:22,23,
24,25;16:2,4;17:14,
16,17;21:25;22:4,16;
25:18;26:13;31:11;
32:6,17;33:16;34:22,
25;38:6,12,14;44:6;
45:4,15;46:24;49:25;
50:3,10,12,15;51:24;
52:1,11;54:15;56:1,
16;57:9;58:1;82:1
**investigations (11)**
18:7;20:25;22:20;
43:22,24;44:4;48:8;
49:18;80:21;81:22;
82:10
**invitation (2)** 26:23;
35:13
**invoking (1)** 9:8
**involve (1)** 44:3
**involved (7)** 9:18;
11:18;18:8;28:14;
43:21;48:10;67:4
**involvement (1)** 13:20
**involving (2)** 33:16;
49:24
**Iran (1)** 35:21
**issue (17)** 8:19;16:7;
18:18;33:8,22;43:12;
44:7;47:15;49:24;
63:6;72:8,9,23;74:20;
76:15;78:15;80:1
**issued (9)** 9:6;46:9,
17;53:4;57:25;58:8;
59:9,13;72:22
**issues (31)** 4:19;9:1,
11;12:20;19:20;
20:16;22:6;23:25;
29:17;31:23;32:2,10,
20,22,24,25;33:2,6,
21;34:5,16;35:5,6;
36:11,12;43:19,25;
47:13;53:25;56:16;
59:21
**iteration (1)** 75:9
**IX (29)** 9:11,14;10:10;
12:20;13:1,2;16:6,8;
17:17,21;18:2;38:17,
23;43:21;44:3;45:20,
23;46:1,3,13,25;
47:17;48:6;49:2,18;
50:1,10;55:20,24

### J

**James (11)** 12:4;28:4;
34:8;35:23;42:25;
43:11;51:18;64:12;
65:23;68:7;71:13
**January (1)** 7:3
**jeez (1)** 26:19
**job (2)** 19:14;42:20
**Joe (1)** 4:7

**joint (2)** 9:13;51:24
**Jon (1)** 35:16
**Judicial (2)** 46:10,18
**July (6)** 16:20,21;
77:18;78:12;79:21;
80:2
**June (5)** 35:14;53:21,
24;54:4,22
**Justice (7)** 20:4,8;
26:4,5,7,7;73:20
**justified (1)** 58:15
**justify (3)** 10:23;11:3,
11

### K

**KA (4)** 22:17;25:14,
17;39:6
**Kamiar (24)** 4:9;7:24;
8:13;35:16;52:3;54:1,
15,21;55:9,16,19;
56:12;64:13,14;65:6;
66:2,5,8,13;67:19;
68:6,10;71:9;73:5
**Kamiar's (2)** 66:10,16
**Karl (2)** 25:11;39:5
**keep (1)** 43:25
**Kevin (5)** 28:6,7;34:7,
13;78:17
**keys (3)** 22:18;24:20,
25
**knew (1)** 64:20
**knowledge (3)** 4:17;
32:13;48:9
**knowledgeable (1)**
23:18
**Korean (1)** 35:19

### L

**L-2 (2)** 51:3,4
**L-4 (2)** 63:11,12
**Laboratory (1)** 35:14
**laid (1)** 79:22;80:5
**language (2)** 76:24;
77:4
**last (2)** 79:23;80:5
**later (1)** 42:6
**law (1)** 4:8
**lawsuit (4)** 4:20;6:10;
46:24;76:5
**leadership (10)** 27:2,
8;29:11,12;30:13;
31:18,19,25;34:18;
43:9
**leading (1)** 18:16
**leaned (1)** 49:14
**learn (1)** 8:17
**least (2)** 55:3;76:21
**Lecturer (8)** 73:9,23;
74:3,9,10,23;75:2,14
**led (1)** 9:7
**left (2)** 19:24;47:2

**legal (11)** 4:22;9:25;
11:8;12:16;17:22;
18:2;38:17;72:18;
77:8,25;78:1
**letter (54)** 7:23;8:1,
19;9:2,4,4,5;11:20;
12:8;14:3;21:23,24,
24;22:2,2,17;40:9;
52:23;56:7;57:1,2,4;
58:25;59:9,11,12,13;
61:19;64:11,17,18,20,
21,23,24;65:9;66:3,6;
69:13,16,19;70:1,6,
15;71:8,12,20;73:4,6,
21;74:1;76:16;79:23;
80:15
**letters (8)** 21:11;
37:16;38:1;40:5,7;
50:13,16,19
**level (2)** 44:7;45:13
**levels (1)** 67:14
**lines (1)** 62:23
**literally (1)** 40:2
**little (2)** 6:25;8:23
**local (2)** 18:22;47:19
**long (7)** 6:24;16:21,
22;30:23;45:10,14;
78:21
**longer (11)** 20:4;
25:23;36:13,15;39:2;
44:15;45:18;47:3;
53:11;69:10;81:11
**look (7)** 8:1;14:5;
16:18;39:20;51:4;
54:20;62:8
**looked (1)** 49:23
**looking (2)** 59:7;65:8
**Los (1)** 35:13

### M

**main (1)** 71:24
**maintain (1)** 63:16
**majority (1)** 18:18
**making (7)** 10:21;
11:18;14:15;17:15;
38:4;65:12,17
**males (1)** 82:15
**manage (1)** 17:11
**management (19)**
9:11,15;10:10;13:8;
20:12,15;23:21;52:1;
55:8,15;56:11,20;
57:22;58:1,13,18;
71:18;72:23;81:4
**manages (1)** 20:15
**manner (5)** 29:20;
30:25;32:22;34:23;
49:15
**many (7)** 18:6;21:1,9;
33:24,24;43:14,14
**March (9)** 44:23;62:8,
11,18,22,22,25;63:1,1

**marked (6)** 25:6;28:1;
57:19;58:5,23;65:20
**Marketing (4)** 19:22;
20:1;81:10,13
**matter (14)** 6:12;
22:19;29:8;31:24;
44:25;45:17;46:12,
19,19;50:1;54:13;
66:18;67:2;83:7
**matters (3)** 45:11;
59:21;67:6
**may (20)** 4:18,20;
21:5;29:17,18;32:11;
38:10;43:2;47:1;56:8,
12,14;57:1;60:15;
65:24;68:8;69:16;
76:18;78:25;79:4
**maybe (3)** 9:4;37:19;
52:9
**mean (3)** 61:16;80:6;
82:16
**means (1)** 7:12
**meant (1)** 79:9
**measures (1)** 22:7
**meet (2)** 27:12;55:18
**meeting (37)** 26:23;
27:1,8,16,18,19,20,
22,24;28:22;29:10,
13,20;30:2,5,11,14,
19,25;31:14,15,16,17;
43:3;49:13;54:9;57:7,
12,14,15;63:15,20;
79:23;80:1,3,5,14
**meetings (3)** 27:11,
15;49:12
**meeting's (1)** 30:24
**Members (8)** 28:12;
29:23;37:20;38:3,25;
39:22;40:1,16
**memo (1)** 79:23
**memorandum (2)**
46:8;57:25
**memory (1)** 52:9
**mention (1)** 18:12
**mentioned (3)** 11:14;
60:10;81:2
**merit (1)** 13:3
**merits (1)** 13:5
**message (1)** 28:23
**met (3)** 55:21;56:15,
22
**might (14)** 4:17,19;
8:21;22:6;35:6;
37:18;40:4,13,23;
41:18;43:17,17;
82:18,19
**mind (1)** 64:3
**mine (1)** 49:8
**minority (1)** 31:3
**minute (1)** 39:20;
82:22
**misconduct (3)** 47:13;
51:5;77:22

mismanagement (1)
12:18
mission (1) 34:2
month (2) 40:6;59:13
months (1) 45:17
More (1) 18:9
Moreover (1) 30:9
Motion (1) 48:19
mouse (1) 48:11
mouth (1) 68:20
move (9) 12:22;59:22,
24;60:24;61:22;64:1;
69:9;75:19;80:7
moving (4) 10:16;
14:17;63:7;76:13
multiple (1) 27:11
must (2) 58:3;59:11

**N**

name (3) 4:7;29:1;
41:10
named (1) 32:3
naming (1) 41:8
National (1) 35:13
nature (3) 20:17;
25:21;38:20
necessarily (4) 23:11;
44:5;57:13;74:24
need (18) 5:16;15:18;
19:23;20:13;25:14,
16,22;27:12;34:13;
43:2,19;54:6,9;60:16,
20;76:1;81:5;82:22
needed (5) 16:1;
26:12;40:15;43:9;
81:11
needs (4) 21:7;23:15;
24:9,9
New (17) 4:10,10,12,
15;6:23;16:12,20,25;
19:4;43:3,3;44:18;
46:9,14,18;50:25;
57:9
newspaper (2) 46:22;
47:19
next (4) 30:8;40:17;
57:18;68:12
night (1) 47:5
Nikki (1) 35:20
nobody (2) 12:24;
13:2
nod (2) 5:8;63:17
nonconsensual (1)
47:8
non-Middle (2) 82:8,
15
non-renew (6) 13:23;
66:23,25;69:21;
70:16;78:5
non-renewal (20)
13:17;61:15;63:16;
65:6,9;67:6,7,9,17,20,

21,23;68:12;69:5;
70:18,22;72:9;79:24;
80:15,22
non-renewed (3)
64:15;82:2,11
non-renewing (5)
64:5;68:17;70:2;
78:7,13
non-stipendiary (1)
73:14
nope (1) 25:9
North (1) 35:19
notes (5) 63:13,14,24;
71:20;82:23
notice (2) 47:11;59:1
notifications (1) 8:25
notified (1) 68:10
notify (1) 40:15
notifying (1) 68:14
November (1) 46:11
number (16) 6:3;9:24;
11:24;15:12;18:11;
21:4;26:24;27:14;
39:18;50:13;51:5;
60:7;67:12;68:23;
70:4;80:25
Numeral (1) 52:8
Numerals (1) 52:5

**O**

oath (1) 5:1
Object (1) 76:10
objections (3) 4:20,
22;59:22
obligation (1) 76:19
obligations (1) 21:15
obtain (1) 24:10
Obviously (11) 7:13;
9:1,5,25;21:7;26:6;
30:13;42:9,19;43:7;
78:12
occasion (1) 33:19
occupy (1) 41:20
occur (2) 47:20,21
occurred (5) 15:12;
43:10;47:2,15;53:13
off (3) 5:11;68:11,17
offer (2) 73:7;77:9
office (36) 6:9;7:9;
9:14,14;10:14;13:7;
17:22;19:21,25;
20:14;23:16,20,20,
24;33:3;35:7;36:12;
37:15,22;38:9;45:20;
50:13;51:25,25;55:7,
14;56:19;57:21,25;
58:10,13;61:22,24;
72:22;81:4,10
Officer (2) 7:11,16
offices (9) 9:24;10:9,
11;17:10,21;32:23;
34:21;35:4;60:7

officially (1) 36:15
okayed (2) 79:22;80:5
one (19) 16:20;21:21;
26:2;28:3;30:25;
42:21;48:24;53:25;
57:21;58:4;72:10,14;
73:1;76:15;77:1,5,8;
78:15,23
only (3) 72:14;77:5;
83:6
operate (1) 20:5
operating (2) 18:23;
22:21
operation (1) 13:24
operations (2) 8:22;
19:21
opinion (1) 50:4
opinions (1) 72:22
opportunities (1)
28:16
order (5) 12:19;34:16;
46:9;48:18;82:18
ordinary (4) 22:23;
24:18;36:18,19
organizational (1)
69:8
organized (3) 29:10,
20;30:25
organizers (1) 30:10
others (11) 7:15;
18:18;22:14;27:13;
28:17;31:9;33:5;
35:12;41:17;77:18;
79:21
otherwise (2) 4:23;
5:11
out (15) 22:23;24:18;
36:18,19;38:2;39:25;
41:3;65:5;70:14;78:5,
7,13;79:22;80:5;
81:18
outcomes (3) 10:18;
56:23;57:15
over (6) 6:25;10:14;
21:2;35:3;48:12
Overall (4) 10:12;
16:22;20:23;60:8
oversee (5) 7:10;
8:22;44:14,15;46:3
overseeing (2) 10:8,
11
oversees (1) 20:9
overview (1) 51:14
overwhelming (1)
18:17
own (1) 31:9

**P**

package (1) 70:5
page (5) 29:5;30:8;
47:25;48:1;49:9
PAGE/LINE (1) 88:2

pages (1) 17:7
panel (1) 35:18
par (1) 29:4
paragraph (5) 29:5;
30:9;48:1,11;54:4
part (35) 20:18,20,20,
23;21:20;23:3;25:13;
27:13;30:9;31:11,11;
32:17;34:1,2,25;
36:25;47:5;48:12;
49:17;55:25;58:3;
60:4,8,22;61:5,6;
69:15;72:24;76:25;
77:2,20;78:14,22;
79:12;81:1
participate (4) 9:19;
27:18;36:2;37:2
participated (1) 21:1
participating (1) 36:6
particular (7) 18:17;
33:7,21;37:24;38:5,
11;60:20
particularly (3) 10:18;
45:7;70:7
parties (1) 11:14
past (1) 60:11
pending (2) 8:6,14
people (18) 8:24;
11:24;12:22;18:2;
19:2;23:14;24:14;
27:1;34:23;37:19;
41:15,18,20;43:14;
54:20;55:3;57:8;
81:18
per (1) 79:24
performed (1) 21:1
perhaps (2) 9:17;10:1
period (2) 7:4,5
permission (4) 28:10;
35:24;52:20;53:9
person (6) 19:24;
21:7;29:17;37:1;
55:25;81:6
personnel (13) 14:23;
27:7,17,24;31:12;
32:23;35:5;40:11,22,
23;45:8;62:19;69:11
perspective (1) 70:24
pertaining (1) 6:8
petitioner (4) 47:6,11;
49:10,14
Petitioner's (1) 48:19
phrasing (1) 48:13
physically (1) 49:13
PI (1) 28:15
place (5) 4:20;21:9;
31:2,11;35:5
placed (1) 66:20
placing (1) 9:9
Plaintiff (1) 37:13
plan (2) 13:22;80:7
planning (1) 14:16
play (1) 32:17

plays (1) 79:17
please (7) 5:7,9,12,
14;8:11;10:24;74:15
pleasure (2) 71:15;
73:6
pm (2) 65:25;83:8
point (12) 5:16;13:4;
21:21;43:5;50:15,20;
52:15;57:21;58:7;
59:2;62:25;64:18
policies (5) 10:23;
11:3;35:4;50:23;52:3
policy (8) 50:6;58:19;
71:18;72:6;73:10,11,
24;74:11
political (1) 31:7
politically (1) 28:16
portion (1) 17:17
portions (1) 42:4
portrays (1) 48:13
posed (1) 5:19
position (8) 6:24;7:7;
19:19;20:13;39:10;
41:20;42:16;65:16
positions (1) 19:3
possibility (1) 48:2
possible (4) 52:2,5,8;
76:22
potentially (2) 23:24;
55:5
practically (1) 65:11
prefer (1) 70:9
preparation (1) 6:17
preparedness (1)
20:16
presence (2) 21:16,19
present (2) 11:6;
49:11
presentation (1) 35:20
presented (5) 5:14,24;
6:10;11:8;49:10
preserving (1) 4:22
President (37) 6:22;
7:7,14;8:21;13:21;
14:7;19:13,17,19,23;
20:11;21:2;23:12,16;
24:8;35:7;36:10,13;
37:12,22;41:17;
43:16;44:2,7;46:15;
53:15;59:20;68:13;
69:2;71:4;79:4,22;
80:4;81:5,12,12;83:1
presidential (1) 43:19
prestigious (1) 31:6
previous (2) 33:19;
74:16
previously (28) 7:20,
21;14:2;15:4;16:17;
22:11;25:5;39:15;
42:23;44:21;46:6;
51:2;53:18;56:5;58:5,
22;61:11;62:5;63:10,
24;64:8,25;65:20;

Case 1:21-cv-00377-BKS-TWD    Document 119-4    Filed 04/29/25    Page 97 of 100

DR. KAMIAR ALAEI v.                                    HAVIDAN RODRIGUEZ
STATE UNIVERSITY OF NEW YORK, et al.                      April 12, 2021

68:3;71:11;73:2;
77:15;81:3
**prior (4)** 9:1,3;53:13;
54:16
**priorities (1)** 19:7
**priority (3)** 15:8;45:1,5
**private (2)** 36:2,6
**pro (1)** 81:21
**Probably (6)** 9:5;
41:13,14,14;53:13;
69:23
**probe (1)** 4:16
**problem (1)** 37:8
**procedure (1)** 22:22
**proceed (3)** 23:6;
80:19,19
**proceeded (1)** 24:1
**proceeding (2)** 79:22;
80:5
**process (22)** 17:4;
19:11,12;22:21;
29:22;34:14,15;
36:25;38:3;41:12;
42:7;58:3;60:5,23;
63:25;68:13;69:6,6;
79:12,16;81:2,15
**processes (5)** 15:13;
35:4;38:21;45:12;
67:25
**profaned (1)** 31:5
**professional (2)**
21:15;73:15
**Professions (3)** 16:13,
19,25
**Professor (12)** 71:17,
22;72:2,3,5;73:8,23;
74:2,10,22;75:2,14
**program (3)** 18:19,23,
24
**programs (4)** 42:4;
44:9,14,16
**prohibit (1)** 36:19
**prohibited (2)** 44:10;
74:21
**prohibition (1)** 36:5
**project (1)** 13:23
**projected (1)** 30:16
**Promise (2)** 18:20;
19:3
**proper (3)** 34:23;
38:18;40:17
**proposals (1)** 54:10
**protocols (2)** 38:18,19
**provide (2)** 26:10;
69:20
**provided (5)** 10:17;
12:16;17:12;28:15;
47:11
**provisions (4)** 17:3,9,
12,24
**Provost (28)** 12:1,4;
28:21;34:14;37:23;
41:17;62:2,3;64:12;

65:10,13;66:4,10,14,
15,22,23;67:7,20;
68:10,17,19;69:1,2,4,
7;79:8,14
**Public (7)** 41:16;
71:23;73:9,10,19,24;
74:11
**punishment (1)** 49:5
**purports (1)** 64:11
**purpose (1)** 78:4
**purposes (2)** 4:21;
56:9
**pursue (2)** 13:16;
34:16
**purview (1)** 7:13
**pushing (3)** 66:24;
67:7,20
**put (9)** 8:13;18:12;
26:15;30:6;32:23;
68:19;81:6,13,23

## Q

**qualified (1)** 42:16
**quick (2)** 14:5;74:1
**quickly (2)** 51:6;70:8
**quite (5)** 29:12;30:10,
24;31:24;67:11
**quote (1)** 17:8

## R

**race (1)** 42:13
**racial (3)** 31:1,10;
33:17
**racism (2)** 32:16;
34:23
**raised (23)** 8:18;16:5;
27:21;30:1;31:24;
32:8,10;33:8,19,20,
22,23;34:8,23;38:13;
48:5;49:1,8,13;52:10;
54:16,18;63:7
**raising (4)** 31:9;37:14,
16;39:5
**Randy (5)** 7:25;50:14;
56:8;65:23;77:18
**rather (4)** 29:1,14;
30:23;73:1
**reached (4)** 12:20,24;
13:2;77:7
**reaching (1)** 65:5
**read (6)** 47:19,22;
52:7;70:6;74:14,16
**reading (5)** 48:14;
57:2;70:1,10;77:4
**really (7)** 21:3;25:1;
28:3;47:23;70:23;
79:17;82:5
**reason (12)** 5:22,25;
60:12,16,19,21;69:5;
75:18,25;76:2,2;88:2
**reasoning (4)** 70:21;

76:5,7,8
**reasons (3)** 34:11;
42:21;70:15
**recall (62)** 6:7;9:7;
12:6,12,15,16;13:7,
13,15;14:6;16:7;
17:14;21:3;23:10;
24:2;27:7,16,19;
28:23;37:18,24;
38:22;39:4,21;40:8;
41:1,2;46:21,23;
52:14;54:14;55:7,12,
14;56:14;57:2,4,5;
58:6,16,17,21;59:5,8;
70:1,10,11,14;71:1,4,
24;72:8,13,17,22,24;
76:24;77:23;80:1;
81:24;82:14,16
**receive (2)** 37:15;41:4
**received (8)** 6:9,15;
16:9;38:10;41:6;
51:17;57:17;69:24
**receiving (1)** 38:24
**recently (1)** 20:2
**recess (2)** 37:10;
82:25
**recognize (1)** 51:10
**recollect (1)** 69:25
**recollection (5)** 49:21;
53:6;56:9
**recommend (6)** 61:13,
15;64:14;66:7,13;
67:22
**recommendation (18)**
13:22;14:11,12;
15:24;23:7,22,23;
24:3,5;59:23;60:1;
61:21,23,24;65:10,12,
17;71:14
**recommendations (9)**
11:15,16;14:21;23:5,
6;24:10,11;57:17;
80:17
**recommending (2)**
66:4;67:19
**record (5)** 4:22;5:8,
10,11;76:6
**refer (31)** 10:4;14:1;
16:23;21:12;22:10;
25:5,7;26:17;28:1;
29:4;35:9;39:14;
42:22;44:20;46:6;
47:25;53:18;54:4;
56:5;57:19;58:22;
61:10;62:5;63:10;
64:8,25;65:20;70:25;
73:2;77:15;79:18
**reference (2)** 4:13;
26:6
**references (4)** 25:14,
17,25;39:6
**referred (2)** 26:3;
69:13

**referring (13)** 4:14;
10:5;16:24;21:22;
22:18;25:13,15;38:7;
42:24;53:20;61:18;
78:8;80:3
**refers (3)** 16:12;
22:17;23:1
**reflected (1)** 27:9
**reflects (1)** 68:9
**refresh (1)** 52:9
**refreshing (1)** 56:9
**refugee (1)** 35:19
**regard (1)** 60:18
**regarding (22)** 4:11;
6:10;8:25;10:17;
11:21;12:17,20;
13:11;27:2,11,17,22;
29:3;30:12;31:12;
50:1;58:2;59:1;60:6;
66:18;72:9;80:7
**regular (1)** 41:5
**reiterate (1)** 36:10
**related (4)** 6:12;8:23;
9:16;46:19
**relating (1)** 32:5
**released (1)** 19:3
**relevant (1)** 39:16
**relieved (1)** 23:1
**relieving (1)** 22:17
**relying (2)** 18:3;34:20
**remember (10)** 21:9;
23:12;27:5,5;41:6;
51:12;52:16;58:9,10;
70:7
**remove (4)** 24:6,20;
25:24;26:6
**removed (10)** 20:7;
24:4,4,15,24,25;
25:22;39:11;43:6,8
**rendering (1)** 48:15
**renew (5)** 59:11;
66:10,15;70:16;74:18
**renewal (1)** 71:16
**renewed (3)** 66:5,8,13
**reorganization (3)**
15:15;18:14;60:6
**reorganizations (1)**
68:24
**reorganizing (1)** 60:11
**repeat (2)** 10:24;
55:10
**rephrase (1)** 5:15
**replanning (1)** 20:19
**replicate (1)** 31:7
**report (12)** 7:15;
10:14;26:8;31:25;
45:25;51:5,14,15,17,
18,23;77:25
**reported (5)** 46:5;
48:3,7;51:19;62:1
**reports (2)** 43:23;67:2
**represent (2)** 4:9;37:2
**representative (2)**

36:3,8
**representing (1)** 36:15
**request (1)** 38:16
**requesting (1)** 35:18
**requests (2)** 40:3;83:4
**require (3)** 21:16;
29:18;39:1
**required (2)** 21:18;
22:19
**research (13)** 9:17,17;
10:1;41:17;71:22;
72:3,5;73:8;74:2,9,
22;75:1,13
**resolved (1)** 18:18
**Resource (13)** 9:14;
10:10;18:1;23:20;
55:8,15;56:11,19;
57:22;58:1,13,17;
72:23
**Resources (19)** 9:25;
10:6,12;11:7;13:8;
16:6,8;17:21;24:1,6;
38:17,23;39:1;52:1;
55:5,18;56:14;78:2;
79:13
**respond (2)** 5:12,23
**respondent (1)** 47:7
**responding (1)** 38:10
**responds (3)** 11:24;
54:11;62:15
**response (5)** 5:10;
33:14;37:25;38:9,23;
48:17;50:19;51:5,17;
53:22;62:13;68:15;
69:20;71:3;75:14;
76:13
**responses (1)** 38:3
**responsibilities (3)**
7:6,9;75:3
**responsibility (4)**
17:23;33:6;44:19;
50:22
**responsible (3)** 7:16;
14:24;54:25
**rest (1)** 8:7
**restructuring (7)**
20:19,23;60:6,22;
70:22;74:20;81:2
**result (3)** 12:13;
13:10;21:5
**resulted (3)** 51:24;
80:22;81:1
**results (1)** 56:20
**Rethemeyer (2)**
25:11;39:5
**R-E-T-H-E-M-E-Y-E-R (1)**
25:12
**retitle (1)** 35:12
**review (15)** 6:1;8:9;
25:2;43:20;47:20;
50:15;64:18;68:13;
69:6,19,24;74:1;
77:19;78:24;82:5

Case 1:21-cv-00377-BKS-TWD    Document 119-4    Filed 04/29/25    Page 98 of 100
DR. KAMIAR ALAEI v.                                                          HAVIDAN RODRIGUEZ
STATE UNIVERSITY OF NEW YORK, et al.                                              April 12, 2021

**reviewed (10)** 4:18;
6:3,13;11:7;72:18,18;
76:22;77:3,14;80:18
**reviewing (1)** 76:24
**rid (2)** 60:12;61:3
**right (12)** 8:8;9:3;
41:20;61:21;62:4,15;
74:6;75:16;76:4;
79:12;80:6,8
**Rights (5)** 15:12,18;
17:18;40:13,19
**rises (1)** 44:7
**Risk (2)** 20:15;81:4
**Rockefeller (11)** 20:6;
26:8;41:15;72:3;
73:10,16,25;74:3,10,
23;75:2
**RODRIGUEZ (7)** 4:1;
14:7;37:12;46:15;
71:4;83:1;88:25
**role (4)** 21:2;46:1;
73:18;79:17
**Roman (2)** 52:4,8
**ROTONDI (4)** 37:5,9;
76:10;82:24
**roughly (1)** 8:23
**running (5)** 23:13,13;
42:1,3,16

**S**

**safe (2)** 30:18;33:15
**safety (2)** 31:9;33:12
**same (5)** 5:6;43:10;
63:6;75:18;82:15
**saw (2)** 15:7;38:25
**saying (4)** 12:24;
30:17;38:3;77:5
**school (9)** 18:24;19:4;
20:4,8;26:7;41:16;
67:15;73:19,20
**schools (2)** 18:22;
20:3
**screen (2)** 7:20;56:25
**scroll (6)** 8:9;28:24;
35:15;51:6;69:17;
71:19
**scrolling (1)** 70:8
**scrutiny (1)** 29:18
**second (3)** 29:5;
37:12;72:7
**security (1)** 76:21
**seeing (2)** 57:4;58:6
**seek (1)** 70:16
**seeking (3)** 53:8;66:8;
69:20
**seem (2)** 29:24;30:11
**seemed (1)** 12:18
**seems (1)** 78:6
**Selchick (9)** 22:14,17;
35:11;36:1;62:7,11,
15;63:13,20
**selected (2)** 20:22;

42:21
**sending (3)** 28:20;
29:7;39:21
**sensed (1)** 28:12
**sent (13)** 26:24;27:4;
34:7;35:24,25;38:1,1,
2,2;39:25;41:3;50:13;
66:2
**sentence (1)** 63:15
**separate (1)** 75:3
**separation (2)** 21:6;
51:21
**September (1)** 47:6
**series (3)** 6:8;65:2,22
**seriously (1)** 33:10
**serve (1)** 73:17
**serviced (1)** 18:22
**serving (1)** 36:14
**session (2)** 29:14;
57:21
**set (1)** 43:2
**several (4)** 28:11;
44:22;51:19;79:21
**sexual (5)** 47:8,13;
48:24;51:5;77:21
**share (2)** 7:20;29:9
**SHEET (1)** 88:1
**shocked (2)** 29:12;
30:10
**short (1)** 29:21
**show (7)** 7:19,21;
16:16;51:2;68:3;
71:10;78:25
**showing (3)** 58:5;
71:7;79:19
**shown (1)** 66:3
**shut (1)** 42:4
**sic (1)** 47:6
**side (1)** 39:18
**sign (2)** 66:5;68:17
**signed (1)** 68:11
**significant (2)** 14:16;
15:6
**significantly (2)** 45:16;
48:13
**signing (2)** 65:5;69:5
**similar (5)** 22:9;30:2,
24;37:17;81:15
**simply (2)** 5:4;39:9
**simultaneously (1)**
43:10
**single (1)** 14:22
**sit (3)** 35:18;69:3;
70:15
**situation (6)** 18:17;
24:17;33:9;45:7;
56:2;65:11
**situations (1)** 17:11
**Skype (1)** 54:9
**slowly (3)** 8:9;57:3;
70:9
**so-called (1)** 31:5
**soliciting (1)** 52:20

**somebody (6)** 14:12;
23:7;24:2;32:3;78:7;
81:24
**somebody's (1)** 81:22
**someone (5)** 13:23;
39:4;60:1,21;61:15
**someone's (1)** 60:17
**sometime (1)** 62:23
**sometimes (1)** 22:21
**somewhere (1)** 62:23
**Sommer (2)** 4:8;56:8
**sorry (15)** 7:2;10:21;
21:12;25:10;29:5;
30:22;32:15;37:8;
53:23;55:10;68:8;
72:7;73:13;74:9,13
**sort (2)** 20:19;22:7
**sorts (1)** 67:25
**sought (1)** 67:21
**sound (2)** 5:9;56:13
**sounds (1)** 8:8
**speak (4)** 5:17,21;
35:13;36:16
**speaking (6)** 18:9;
23:19;30:6;35:17;
36:7;75:21
**specific (9)** 12:19;
34:6,9;44:17;50:1;
51:7;59:15;60:16;
81:22
**specifically (10)**
15:23;27:16;33:13;
42:24;44:21;51:18;
53:20;68:25;69:25;
70:5
**spent (1)** 10:2
**spring (1)** 13:17
**staff (7)** 17:9;19:9;
34:18,21;43:16;
52:18;53:9
**standard (2)** 22:21;
83:5
**standing (1)** 70:14
**Stark (9)** 7:25;50:14;
56:8;65:23;77:18,21,
23;78:4,8
**start (5)** 15:21,24;
16:1;48:12;57:2
**started (3)** 15:23;
16:3;47:1
**starting (2)** 7:2;26:13
**starts (1)** 48:13
**State (14)** 4:10,10,12,
14;6:23;16:12,20,25;
38:19;46:9,13,18;
47:7;50:25
**stated (4)** 15:4;25:19;
63:13;67:1
**statement (2)** 68:15;
69:15
**statements (2)** 27:23;
63:19
**states (6)** 25:13;28:9;

30:9;47:5;77:20;
79:21
**status (2)** 10:15;69:21
**Stellar (17)** 12:4;28:4,
21;34:8,14;42:25;
43:2,11;51:18;62:3;
64:12;65:23;66:18;
67:4;68:7;71:13;
79:14
**Stellar's (1)** 68:20
**stenographer (1)** 4:25
**step (1)** 68:12
**steps (4)** 32:14,16;
40:17;57:18
**still (1)** 4:23
**stipulated (1)** 17:24
**strike (8)** 6:5;10:19;
24:13;42:2;44:12;
55:13;57:5;59:25
**strong (3)** 31:1,18;
32:19
**strongly (3)** 31:3;
33:11,11
**structural (1)** 15:7
**structure (1)** 69:8
**student (28)** 11,13,
21;29:1;30:8,17,21;
31:8;32:5;33:4;34:6;
37:14;47:6;48:24
**students (11)** 8:24;
27:13;28:17;30:12;
31:21;33:5;51:19,20;
52:18;54:3,8
**student's (2)** 30:3;
33:14
**sub (6)** 22:11,13;
40:12;42:23,24;79:19
**Subject (8)** 29:3;
39:19;46:23;55:25;
64:13;67:9;82:9;
88:19
**submit (2)** 68:15;
69:14
**subsequently (2)**
70:18;82:11
**successful (1)** 42:5
**SUNY (59)** 4:13;7:24;
8:15,18;9:8;10:22;
11:3;14:3,8;25:25;
27:7,23;28:7;31:12;
32:10,14,14,15;
33:13;34:9;37:3;
40:10,22,23;42:4;
43:5;45:23;47:16;
48:5;49:2,18,23;50:6,
14,18;52:6;58:20,25;
59:2,5;60:13;61:2;
62:18,19,21;63:22;
71:9;72:19,19;73:4;
74:5,25;75:11,11,15;
77:8;78:12,20;80:22
**SUNY's (1)** 50:24
**supervision (1)** 11:25

**supervisor (2)** 55:4;
67:8,11,18,22
**support (1)** 67:22
**supported (2)** 67:8,10
**supporting (1)** 66:23
**Supreme (3)** 46:9,18;
48:18
**sure (18)** 5:9;10:25;
17:16;24:22;33:8;
34:22;35:8;36:23;
37:21;38:7,9,18;
43:14;45:12;50:22;
55:11;63:18;67:10
**swear (1)** 4:25
**sworn (1)** 4:3
**system (2)** 72:19;77:8
**systematic (1)** 32:22
**systematically (2)**
32:24;34:5
**Szelest (11)** 42:25;
43:12,15,19,21,23,25;
44:1;45:2;79:20;80:4

**T**

**talked (1)** 60:10
**talking (2)** 5:2,5
**talks (4)** 21:14;51:14;
73:17;76:18
**technology (2)** 19:14,
16
**telling (2)** 60:20,22
**terminate (17)** 14:8,
13,20;15:2;59:1,3,18;
60:2,13;61:17,20;
74:6;75:5,12,15,17,24
**terminated (4)** 74:17,
18;82:2,11
**terminating (1)** 61:3;
64:4
**termination (5)** 21:6;
61:14;64:16;76:3;
80:22
**terms (19)** 10:2;
15:14;19:20;20:25;
22:20,25;37:13,21;
52:17;55:2;57:10,17;
61:8;69:9,20;79:2,6,
8;80:7
**testified (1)** 4:3
**therefore (1)** 61:3
**Third (2)** 46:10,17
**though (4)** 26:13;
80:23;82:3,11
**thought (1)** 62:13
**thousands (3)** 40:2,4;
41:4
**three (8)** 6:25;7:1;
42:18;52:4,5,7;73:14;
76:18
**Thus (3)** 19:1;36:16;
47:2
**timeline (6)** 43:7,10;

Case 1:21-cv-00377-BKS-TWD    Document 119-4    Filed 04/29/25    Page 99 of 100

DR. KAMIAR ALAEI v.                                          HAVIDAN RODRIGUEZ
STATE UNIVERSITY OF NEW YORK, et al.                            April 12, 2021

56:17;59:7,16;63:5
**Title (31)** 9:11,14;
  10:9;12:20;13:1,1;
  16:6,8;17:17,21;18:2;
  26:23;38:17,23;
  43:21;44:3;45:20,23;
  46:1,3,13,25;47:17;
  48:6;49:2,18;50:1,10;
  55:20,24;77:12
**today (3)** 5:2,22;60:11
**today's (2)** 6:2,17
**together (1)** 49:20
**told (3)** 34:12;56:19;
  69:4
**tons (1)** 58:9
**took (4)** 19:22;32:14,
  15;66:19
**top (2)** 44:25;45:5
**totally (1)** 29:16
**toward (2)** 18:11;
  49:14
**transcript (5)** 5:1,3;
  83:4;88:20,22
**transfer (1)** 81:18
**transparently (1)**
  29:22
**transpire (1)** 23:18
**transpired (1)** 27:19
**transpires (1)** 23:15
**travel (1)** 30:24
**treatment (5)** 33:16;
  34:24;37:15;38:15;
  50:21
**true (2)** 88:20,22
**truthfully (1)** 5:23
**try (1)** 5:15
**trying (3)** 25:6;61:12;
  76:6
**two (17)** 28:2;41:8,11,
  22;42:9;44:18;59:13;
  71:21;72:10,15;73:1;
  76:15,21;77:1,6;
  78:23;82:22
**two-year (1)** 78:15
**type (4)** 5:5;33:9;
  41:13;44:5
**types (8)** 17:24;22:20;
  23:16;33:21;40:7;
  45:9;60:15;67:25
**typical (5)** 24:14;
  25:24;55:24;67:17,21
**typically (6)** 21:4;
  22:5;40:7;43:17,25;
  44:3

**U**

**UAlbany (7)** 31:18;
  42:20;49:7,20;53:14;
  72:19;77:8
**ultimate (2)** 11:1;
  41:10
**ultimately (13)** 10:20;

11:10,16;13:24;
  14:19,24;33:10;36:1;
  59:17;66:24;72:13;
  74:5;82:1
**UN (1)** 35:20
**uncomfortable (1)**
  65:12
**uncovered (1)** 57:9
**under (10)** 5:1;7:12,
  13;11:25;12:19;13:1;
  17:18;40:13,19;49:25
**underlined (2)** 66:4,7
**underlying (3)** 47:14;
  49:24;52:10
**understood (3)** 10:6,7;
  53:17
**undertook (1)** 34:9
**unfounded (1)** 77:22
**unit (5)** 19:17,23,24;
  67:14;81:15
**United (3)** 16:13,19,
  25
**units (2)** 18:11;20:9
**University (81)** 4:12,
  14,15;6:22,23;7:10,
  11,13;8:22;9:12;12:1,
  17;13:21;14:17,23;
  15:4,5,15;16:5,13,19,
  25;17:10,10,12;
  18:10,14,21;19:7;
  20:20,23;21:7,16,19;
  22:6;23:4,13;25:4;
  29:11,19,25;30:19;
  31:21;32:18,21;33:9,
  25;34:19;36:4,8,17,
  21;46:13;47:2,3,7,22;
  49:6;50:24;51:16,22;
  52:3;53:12,16;54:23;
  59:20;60:7,17,21,24;
  69:22;73:7;74:19;
  75:6,20;77:9;79:5;
  81:8,14,19;82:17
**unless (2)** 4:23;5:10
**unpaid (1)** 77:12
**unreasonable (1)**
  48:21
**unusual (1)** 81:18
**up (8)** 38:23;39:1;
  43:2;72:6,9;73:1;
  80:13;82:23
**Update (1)** 79:25
**updates (2)** 10:17;
  26:10
**uphold (1)** 72:21
**use (1)** 11:15
**used (1)** 66:7
**using (1)** 54:20
**usually (3)** 36:24;
  43:21;45:14
**UUP (11)** 16:23;17:3,
  18;18:3;24:19,22;
  25:2;40:14,20;50:25;
  79:24

**V**

**vaguely (1)** 30:15
**varies (2)** 24:17;56:2
**variety (2)** 8:25;18:11
**various (1)** 10:9
**vary (1)** 45:16
**Ventura (1)** 35:16
**versus (9)** 24:5;70:16;
  72:10,15;76:15;77:1,
  6;78:15,23
**Vice (9)** 7:14;19:13,
  17,19,23;20:10;
  41:16;81:5,12
**viewing (1)** 57:11
**violate (2)** 40:13,19
**violated (4)** 10:22;
  11:2;50:5;58:19
**violation (3)** 11:11;
  49:5;51:21
**violations (3)** 52:2,5,8
**vis-à-vis (1)** 30:15
**vision (1)** 34:2
**voice (1)** 49:13

**W**

**warrant (1)** 21:16
**way (3)** 29:22;49:17;
  68:2
**website (8)** 25:13,20;
  26:2,10;39:6,9,11;
  79:25
**websites (1)** 25:25
**week (1)** 40:5
**weeks (1)** 45:17
**well-being (3)** 31:20,
  21;33:12
**well-qualified (1)**
  42:19
**whatnot (1)** 80:16
**what's (21)** 7:19,21;
  14:1;18:13;23:18;
  25:5;26:2;35:9;
  44:20;46:6;51:2;
  53:18;56:25;58:5;
  64:8,25;65:20;68:3;
  71:7,10;77:15
**Whereupon (3)** 37:10;
  82:25;83:7
**whole (3)** 20:13;51:7;
  70:23
**whose (1)** 10:19
**William (4)** 65:8,22;
  68:6;69:17
**Williams (16)** 28:4,5,
  6,7,20;29:2;34:7,13;
  78:17,19,24;79:8,10,
  11,15,17
**willing (1)** 66:12
**within (6)** 18:24;
  19:17;20:1,6;23:4;

43:10
**without (3)** 18:18;
  63:17;65:13
**witness (1)** 4:2
**wondering (1)** 29:9
**wording (3)** 48:17,22;
  49:3
**words (3)** 34:20;
  48:18;68:19
**work (3)** 5:15;46:3;
  49:7
**worked (1)** 49:20
**working (5)** 19:2;
  40:16;48:5;49:17;
  78:20
**wrap (1)** 82:23
**writes (1)** 62:13
**writing (2)** 64:14;66:1
**written (2)** 40:5;47:11
**wrong (2)** 40:25;
  50:20
**wrongfully (1)** 35:21
**wrongly (2)** 40:13,24
**wrote (3)** 64:21,23,24

**Y**

**year (11)** 72:10,10,14;
  73:1;76:15,23;77:1,6,
  9;78:15,23
**years (6)** 6:25;7:1;
  76:15,18,21;77:1,6;
  78:20
**York (12)** 4:10,10,12,
  15;6:23;16:13,20;
  17:1;46:9,14,18;
  50:25
**Young (2)** 4:8;56:8

**1**

**1 (3)** 29:6;71:12;
  76:18
**10 (13)** 14:4,9,14;
  15:3;58:25;59:4,9,19;
  61:18,19,20;64:5;
  74:7
**11 (2)** 42:23,24
**12-month (1)** 76:19
**13 (2)** 53:21;54:4
**130 (1)** 17:7
**14 (4)** 28:5;29:2;
  53:24;68:8
**14th (1)** 35:14
**16 (3)** 71:8;73:4;
  76:16
**17,700 (1)** 8:24
**18-013 (1)** 51:5

**2**

**2 (4)** 22:12,13;51:17;
  65:24

**2/9 (1)** 26:24
**2011 (1)** 16:20
**2014 (6)** 68:8;71:8;
  73:4;76:16,18;79:7
**2016 (1)** 16:21
**2017 (9)** 47:1,15;
  53:21,24;54:4,22;
  71:13;78:25;79:4
**2018 (50)** 7:3,25;
  11:20;12:8;13:18;
  14:4,9,14;15:3;17:1,
  5,22;16:25;12;26:22;
  28:5;29:2;32:4;35:12,
  17;39:18;43:1;44:23;
  47:6;50:13;51:17;
  56:9,12,14;57:1;58:8,
  25;59:4,10,19;61:18,
  19,20;62:8,11,18;
  63:1;64:5,12;65:25;
  69:16;74:7;77:18;
  78:12;79:21;80:2
**2020 (1)** 46:11
**21 (2)** 56:8;57:1
**21,000 (2)** 23:14;35:3
**22 (1)** 43:1
**22,000 (1)** 8:24
**23 (2)** 79:21;80:2
**25 (1)** 46:11
**26 (4)** 62:8,11,18;
  63:1
**26th (1)** 63:11
**27 (1)** 64:11

**3**

**3:30 (1)** 83:8
**30 (1)** 78:20
**31 (2)** 78:25;79:4

**4**

**4 (2)** 71:13;79:19
**4/28/2018 (1)** 65:4
**4/3/2018 (1)** 63:14

**5**

**5:00 (1)** 65:25

**6**

**6 (4)** 48:1,1;77:18;
  78:12

**7**

**7 (2)** 40:12;49:9

**8**

**8 (7)** 7:25;11:20;12:8;
  22:16;26:22;35:17;
  69:16

**9**

**9 (9)** 27:8,17;28:22;
   35:12;39:18;44:23;
   56:12,14;58:8
**9th (1)** 27:2