**EXHIBIT E**

# In The Matter Of:

*DR. KAMIAR ALAEI v.*
*STATE UNIVERSITY OF NEW YORK, et al.*

---

*JAMES STELLAR*
*April 9, 2021*

---

COVERING ALL UPSTATE NEW YORK



MFReportingNY.com

Office: 518-478-7220        Mail to: 5 Southside Dr., Suite 11
Fax: 518-371-8517                      Clifton Park, NY 12065

*Min-U-Script® with Word Index*

JAMES STELLAR                                    1

```
 1      STATE OF NEW YORK

 2      COURT OF CLAIMS

 3      ---------------------------------------------------:

 4      In the Matter of the Claim by

 5      DR. KAMIAR ALAEI,

 6                              Claimant,

 7

 8      - Against -                        Claim Number:

 9                                         132554

10      STATE UNIVERSITY OF NEW YORK,

11      STATE UNIVERSITY OF NEW YORK AT ALBANY,

12      and THE STATE OF NEW YORK,

13                              Respondents.

14      ---------------------------------------------------:

15                  DEPOSITION of:  JAMES STELLAR

16                     (Respondent Agent)

17

18                  Friday, April 9, 2021

19                  1:35 p.m. - 4:17 p.m.

20

21

22      HELD:  Via Zoom Video Conferencing

23

24      Reported by:  Deborah M. McByrne

25
```

```
 1        APPEARANCES: (All via Zoom)

 2

 3        APPEARING FOR CLAIMANT:

 4            YOUNG/SOMMER LLC

 5                   Five Palisades Drive, Suite 300

 6                   Albany, New York 12205

 7                   (518) 438-9907

 8            BY:   JOSEPH F. CASTIGLIONE, ESQ.

 9                   Jcastiglione@youngsommer.com

10

11

12        APPEARING FOR RESPONDENTS:

13            NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL

14                   The Capitol

15                   Albany, New York 12224

16                   (518) 776-2576

17            BY:   ANTHONY ROTONDI, ESQ.

18                   Assistant Attorney General

19                   Anthony.Rotondi@ag.ny.gov

20

21        ALSO PRESENT:

22            Dr. Kamiar Alaei

23

24

25
```

JAMES STELLAR                                  3

1                        S T I P U L A T I O N S

2

3                        IT IS HEREBY STIPULATED, by and between the
4          attorneys hereto, that:

5                        All rights provided by the C.P.L.R, and
6          Part 221 of the Uniform Rules for the Conduct of
           Depositions, including the right to object to any
7          question, except as to form, or to move to strike
           any testimony at this examination is reserved; and
8          in addition, the failure to object to any question
           or to move to strike any testimony at this
9          examination shall not be a bar or waiver to make
           such motion at, and is reserved to, the trial of
10         this action.

11
                         This deposition may be sworn to by the
12         witness being examined before a Notary Public other
           than the Notary Public before whom this examination
13         was begun, but the failure to do so or to return the
           original of this deposition to counsel, shall not be
14         deemed a waiver of the rights provided by Rule 3116
           of the C.P.L.R, and shall be controlled thereby.
15

16                       The filing of the original of this
           deposition is waived.
17

18                       IT IS FURTHER STIPULATED, that a copy of
           this examination shall be furnished to the attorney
19         for the witness being examined without charge.

20

21

22

23

24

25

JAMES STELLAR                                        4

```
 1                    JAMES STELLAR,
 2          was called as a witness, and having been first
 3          duly sworn, was examined and testified as
 4          follows:
 5    EXAMINATION BY
 6    MR. CASTIGLIONE:
 7  Q.  Good afternoon, Mr. Stellar.  My name is
 8      Joe Castiglione.  I'm an attorney with the law firm
 9      of Young/Sommer.  We represent Dr. Kamiar Alaei in a
10      lawsuit concern -- or in a lawsuit with the State of
11      New York concerning claims Dr. Alaei has asserted
12      against the State relating to his employment with
13      SUNY Albany.
14                    I'm going to be asking you a number of
15      questions today to probe what knowledge or
16      information you might have that's relevant to the
17      lawsuit.  The defendant -- your counsel, I'm sorry,
18      might interpose an objection.  Those are for the
19      record.  You still have to answer the question.
20      Just let the counsel make the objection on the
21      record, let the stenographer record it and then you
22      can answer.
23                    The stenographer is here to swear you
24      in under oath.  She is here to create a transcript
25      of what we're discussing today.  For purposes of
```

JAMES STELLAR                                    5

```
1        maintaining the transcript, let me ask the full

2        question and finish before you answer, because she

3        can't type us both talking at the same time.

4                    If you can also respond verbally.

5        Some people might head nod or make a noise.  It's

6        common.  Just articulate your response so she can

7        write it down.

8                    And everything is going to be on the

9        record, unless we both agree to go off the record.

10       If I ask you a question, please respond to the best

11       of your ability.  If it's not clear or you don't

12       understand, you can let me know and I'll try to

13       rephrase.

14                   If you need to take a break or talk to

15       your attorney, that's fine.  If a question is posed

16       to you first, you have to answer the question before

17       we take a break or you speak with counsel.

18                   And otherwise, is there any reason you

19       can't respond truthfully or accurately today to the

20       best of your ability to the questions presented?

21   A.  There is no reason.  I'm ready to go.

22   Q.  Okay.  Did you review any documents in advance of

23       today's deposition for preparation?

24   A.  Yes, I was sent a PDF file which had e-mails and

25       other items in it --
```

JAMES STELLAR                                              6

```
 1                        (Phone ringing.)
 2   Q.   Sorry.  Okay.  Sorry about that.
 3   A.   So, yes, I reviewed a PDF file that was sent to me
 4        which had e-mails and other documents in it.
 5   Q.   Okay.  Was that provided by your counsel?
 6   A.   It was provided by my counsel.
 7   Q.   Other than counsel, did you have conversations with
 8        anyone in advance of your deposition today?
 9   A.   I did not.
10   Q.   Are you currently employed?
11   A.   I am.
12   Q.   What's your current employment position?
13   A.   I'm a Professor of Behavior Neuroscience in the
14        Department of Psychology at the University at
15        Albany.
16   Q.   And how long have you held that position?
17   A.   Since January of 2019, so two-year sum.
18   Q.   And your position is limited to just being a
19        professor and teaching classes and whatnot?
20   A.   That's correct.
21   Q.   Were you employed before January 2019?
22   A.   I was.
23   Q.   What was your immediate employment before
24        January 2019?
25   A.   Immediately before, I was the Provost under
```

JAMES STELLAR                                    7

```
 1        President Havidan Rodriguez.
 2   Q.   Could you explain to me what that position entailed?
 3   A.   The President is the Chief Academic Officer and
 4        Senior Vice President and the Deans report to the
 5        Provost who, in turn, reports to the President.
 6   Q.   So you reported directly to the President?
 7   A.   Yes.
 8   Q.   And how long did you hold that position?
 9   A.   I came in 2015 as Provost and also in January, but
10        during that period, I was one year the Interim
11        President.
12   Q.   In terms of the year 2018, what was your employment
13        with SUNY Albany?
14   A.   I believe -- let's see.  That's going to be hard for
15        me to figure out.  It's been a while ago.
16                     Jeez, you know, I don't really
17        remember authoritatively.  I was maybe President
18        then.  I think that might have been the case.  Maybe
19        I was back to being Provost.  I was back to being
20        Provost.  Let me say I remember.
21   Q.   Let me ask you this:  Hold on a second.
22                     Were you, at the time, Provost and
23        Senior Vice President for academic affairs?
24   A.   I believe that's correct.
25   Q.   And can you explain to me what your job
```

```
 1           responsibilities were as Provost and Senior Vice
 2           President for academic affairs?
 3    A.     I'd be happy to.  The Provost oversees the Deans who
 4           oversee the Department Chairs who oversee the
 5           faculty.  And the responsibilities include the
 6           students and their courses.  Also, at the time, it
 7           included the admissions.
 8                      And then the other side of the
 9           hierarchy is the faculties' research, and I was in
10           charge of the faculties' appointments.  There is a
11           Research Vice President, but I worked very closely
12           with him when it came to managing the appointments
13           of the faculty and their research.  So it's a
14           research and teaching supervision position.
15    Q.     Did you have any responsibilities related to
16           disciplinary investigations for employees under the
17           United University Professions agreement?
18    A.     Well, since I was the next report after the Deans,
19           yes, I would be involved in those operations.  But
20           it wasn't my primary responsibility to do
21           disciplinary actions.  That was for human resources.
22    Q.     Typically, what was the type of involvement you
23           would have in a disciplinary proceeding?
24    A.     Typically, the matter would come to my attention
25           either through human resources or through the chain
```

```
 1          of command that I just discussed.  If it came to me
 2          directly, I would refer to human resources.  If it
 3          came through human resources, then I would consult
 4          with them from the point of view of the appointment
 5          of the person involved, and this could include
 6          students.
 7    Q.    And if I could refer you to what has been previously
 8          identified -- and I want to share a screen --
 9          previously been identified as Claimant's Exhibit K.
10          I'll scroll down.
11                    Are you familiar with the agreement
12          between United University Professions and the State
13          of New York?  This one here being July 2011 to
14          July 2016.
15    A.    In general, I am.  It's a large document, so maybe
16          not so much in particulars.
17    Q.    Okay.  And just so you know, if I refer to the UUP
18          agreement, I'm referring to the document here on the
19          screen, agreement between United University
20          Professions and the State of New York?
21    A.    I understand.
22    Q.    And also, if I refer to SUNY or the University, I'm
23          referring to the State University of New York at
24          Albany.
25    A.    Got it.
```

JAMES STELLAR                                    10

```
 1   Q.   Okay.  I'm going to show you what had been
 2        previously identified as Claimant's Exhibit A-1.
 3                  If you could take a look at what's
 4        been identified as Claimant's Exhibit A-1.  It's a
 5        letter from SUNY Albany to Dr. Kamiar Alaei dated
 6        February 8, 2018.
 7   A.   Yep.
 8   Q.   Do you recognize this document?
 9   A.   I do.
10   Q.   Can you explain to me your understanding what this
11        document is?
12   A.   So this is a letter from the human resources vice
13        president to Dr. Alaei, advising him that he is on
14        alternate assignment, as described in the document
15        below.
16   Q.   Okay.  And did you ever learn of the grounds for
17        SUNY to conduct the disciplinary investigation
18        that's identified in this letter and to place
19        Dr. Alaei on alternative assignment?
20   A.   I was involved in the sense that the matter was
21        brought to my attention, so I guess the answer is
22        yes.
23   Q.   So when you say the matter was brought to your
24        attention, could you explain to me what was brought
25        to your attention?
```

JAMES STELLAR                                      11

1    A.    Yes, I will.  The -- An allegation was made by some
2          of the individuals in the center that came up
3          through Chantelle Cleary, who was the Title IX
4          Coordinator, who reports to the President, I
5          believe, but she kept me abreast of something that
6          was happening with one of my faculty.  So that's
7          when I first learned of it.
8    Q.    Okay.  So Ms. Cleary, Chantelle Cleary, brought
9          something to your attention and that's when you
10         first learned of it?
11   A.    As I remember, yes, that's correct.
12   Q.    Okay.  And do you recall when she brought that to
13         your attention?  Was that shortly before this
14         February 8, 2018, letter; is that fair to say?
15   A.    Yes, it was before.
16   Q.    Okay.  This letter discussed how human resources was
17         conducting a disciplinary investigation under the
18         agreement between the State of New York and United
19         University Professions.  Was Ms. Cleary also
20         conducting her own investigation under Title IX?
21   A.    I believe she was, but there's coordination between
22         units.  And so I'm not sure whether the human
23         resources vice president didn't subsume or take over
24         that investigation.  That, I just don't know.
25   Q.    Okay.  Did you participate in the investigation

1           concerning Dr. Alaei?

2    A.    Yes, I did.  I had some conversations with Cleary

3          and also conversations with Stark.  I did not do any

4          investigating myself.

5    Q.    Okay.  Did you have conversations with the

6          President's office at the time -- or strike that.

7                    Did you have conversations with the

8          President at that time about the investigation?

9    A.    Yes.  I would have reported immediately to him, in

10         my regular meeting, this activity, and then stayed

11         in touch with him to advise him about what the

12         ultimate decision might be as it developed.

13   Q.    Did you frequently communicate with the President

14         directly or did you have discussions with

15         Bruce Szelest or -- yeah, Szelest, as kind of an

16         intermediary?

17   A.    Both.  The President and I had weekly meetings,

18         roughly, and we also talked in between that as

19         needed.  And then I would talk to Bruce Szelest,

20         perhaps, twice as frequent as that on various

21         matters that seemed to be appropriate to bring the

22         President's attention through him.

23   Q.    Okay.  Was your office overseeing the investigation

24         concerning Dr. Alaei?

25   A.    I do not think so.  I say that because I'm the

```
 1        Senior Vice President, but it was Cleary and Stark
 2        who did the investigation.
 3   Q.   Were you involved in any employment decisions
 4        concerning Dr. Alaei after this February 8, 2018,
 5        letter?
 6   A.   Well, I would have been consulted on what the
 7        disposition was and briefed the President on any
 8        opinions I had.  So in that sense, I was involved.
 9   Q.   Okay.  Do you recall when the disciplinary
10        investigation identified in this February 8, 2018
11        letter came to an end?
12   A.   I think it came to end -- in an end with he was
13        terminated, but I could be wrong about that.
14   Q.   Okay.  Are you aware about any efforts -- strike
15        that.
16                    Are you aware of any efforts by SUNY
17        Albany to non-renew Dr. Alaei's employment beginning
18        in the spring of 2018?
19   A.   Well, he was non-renewed and I believe it was about
20        then.  So the answer's yes.
21   Q.   Did you have any involvement with those efforts?
22   A.   It would have been the involvement as described,
23        looking at the investigations and talking to the
24        President and to Bruce Szelest about any opinions I
25        had, since that was a natural reporting function.
```

1    Q.    So more of consultation and discussion of your
2          opinion?
3    A.    Correct.
4    Q.    I'm going to show you what has been previously
5          identified as Claimant's Exhibit B-8.  If you can
6          take a look at this document.  It's a letter from
7          SUNY Albany to Dr. Alaei dated August 10, 2018.
8    A.    Okay.
9    Q.    Is it fair to say this letter reflects a
10         determination by SUNY Albany to terminate -- elect
11         to terminate Dr. Alaei's employment effective
12         August 10, 2018?
13   A.    Yes.
14   Q.    Were you involved with that determination?
15   A.    Yes, as I described previously, I would receive
16         briefings from the investigators and be involved in
17         discussions with the President and the President's
18         office through Bruce Szelest.
19   Q.    Do you know why Dr. Alaei's employment was
20         terminated by SUNY, as reflected in this letter?
21   A.    I do.
22   Q.    Can you please explain it to me?
23   A.    So this goes back to a case previously against his
24         brother where there was a formulation reached that
25         Dr. Alaei would continue to run the center, but keep

```
 1           his brother, Arash, from participating in
 2           activities.  And as part of the investigation, I was
 3           told that that did not happen and that there was
 4           involvement of Arash with the staff and the students
 5           of the center.  So that was what I remember led to
 6           the agreement -- the termination.
 7    Q.     Was there an agreement between Dr. Kamiar Alaei and
 8           SUNY that he would not allow Arash Alaei to be
 9           involved in GIHHR matters after Arash Alaei left
10           SUNY Albany?
11    A.     I believe that was the clear understanding that the
12           administration had with Kamiar and with Arash.
13    Q.     Is that reflected in any document, as far as you're
14           aware; any e-mails or any letters or any contract?
15    A.     That's a good question.  I know that his direct
16           supervisor, Vice Provost Harvey Charles, was charged
17           with overseeing the center and that we appointed,
18           ultimately, two directors to take over Kamiar's
19           function when this arrangement came through.
20                   So Dr. Charles, Vice Provost Charles,
21           had the authority, and my clear understanding with
22           him was that this was the arrangement.  He reported
23           directly to me.  That's why I had that
24           understanding.  I don't believe I ever discussed
25           this with either of the Alaei brothers.
```

```
 1   Q.   Okay.  So you had a discussion with Dr. Charles that
 2        Dr. Kamiar Alaei was not to allow Arash Alaei to
 3        have any involvement with GIHHR after Arash Alaei
 4        left SUNY Albany?
 5   A.   That is correct.
 6   Q.   But you did not ever have that discussion with
 7        Dr. Kamiar Alaei?
 8   A.   As I recall, that is correct.
 9   Q.   So Dr. Charles -- was this conversation reflected in
10        an e-mail or any writing or was it verbal?
11   A.   I don't know if we put it in an e-mail, but we met
12        regularly in the same way that I met with the
13        President.  He was -- he reported to me and these
14        would happen and many things would be discussed in
15        those conversations, and this was one of them, as I
16        recall, and it was very clear that that was the
17        arrangement, at least from my perspective to
18        Dr. Charles.
19   Q.   Do you recall Arash Alaei being on alternative
20        assignment at some point in time?
21   A.   I believe that's the case.  I haven't reviewed that
22        information, but I believe he was placed on
23        alternative assignment before the settlement was
24        reached.
25   Q.   And was this -- sure.
```

```
 1                    And was this agreement between you and
 2        Dr. Charles about Arash Alaei not having any
 3        communication or interaction with GIHHR, did that
 4        apply during the alternative assignment?
 5   A.   During Kamiar's alternative assignment.  Is that the
 6        question?
 7   Q.   No, during Arash Alaei's.  So I'll strike that.
 8                    You had just discussed that you had an
 9        agreement and discussions with Dr. Charles about
10        Arash Alaei not having any involvement with GIHHR;
11        is that fair to say?
12   A.   Yes, that's fair.
13   Q.   Okay.  And did that agreement -- Did that apply
14        during the time that Arash Alaei was on alternative
15        assignment?
16   A.   So I'm going to have to say that I believe it did,
17        but I haven't reviewed any notations from long ago
18        to say that with definitive yes that that was the
19        case.  So let me just restate that I believe that
20        that's the case.
21   Q.   Okay.  Did you ever advise -- strike that.
22                    Do you know who Randy Stark is?
23   A.   I do.
24   Q.   Do you know who Brian Selchick is?
25   A.   I do.
```

JAMES STELLAR                    18

1  Q.   Did you ever advise them about this agreement you
2       had with Dr. Charles about Arash Alaei not
3       communicating with GIHHR?
4  A.   I believe we discussed it in our meetings, so the
5       answer would be yes.
6  Q.   But you never had that conversation with
7       Kamiar Alaei?
8  A.   As I recall, I never had that conversation with
9       Kamiar.
10 Q.   If I can backtrack here, I'm just going to go back
11      to Claimant's Exhibit A-1.
12                  Claimant's Exhibit A-1 is the
13      February 8, 2018 alternative assignment letter.  Do
14      you know who decided to start this disciplinary
15      investigation?
16 A.   Well, the disciplinary investigation would have come
17      out of the hierarchy, which would include the
18      Investigators Cleary and Stark.  It would have
19      involved Charles as the direct supervisor.  It would
20      have involved me and the President and
21      Bruce Szelest.  So the hierarchy would have been in
22      natural consultation with each other as this
23      emerged.
24 Q.   How many of these types of investigations have you
25      been involved with or participated in before this

JAMES STELLAR                                    19

```
1          February 8, 2018, investigation?
2     A.   This is my first one, I believe, as I remember, at
3          SUNY Albany.
4     Q.   And how long had you been with SUNY Albany before
5          February 8, 2018?
6     A.   I arrived in January of 2015 into the position of
7          Provost.
8     Q.   Okay.  Did you have any input into the drafting and
9          content of this letter, this Claimant's Exhibit A-1,
10         February 8, 2018 letter?
11    A.   Yes, as part of the natural consultation process
12         that I mentioned earlier, we would have shared the
13         draft.  No, I don't have a specific recollection of
14         something, but I'm going on general principle that
15         something like this would have been shared with the
16         aforementioned group and I would have seen it.
17    Q.   Do you have an understanding of whether these terms
18         are typical or if they were specifically created for
19         Dr. Alaei's situation?
20    A.   I don't know.
21    Q.   I'm going to refer you to what's been identified as
22         Claimant's Exhibit A-2.  Claimant's Exhibit A-2 is
23         an e-mail dated February 8, 2018, from
24         Brian Selchick to a number of individuals.  In this
25         e-mail, Mr. Selchick discusses relieving KA of his
```

JAMES STELLAR                              20

1            card access keys and e-mail access.

2                      Do you know why it was decided to have

3            Dr. Alaei have his card access and keys removed?

4    A.    My understanding is that it was part of the

5            separation of him from the University during the

6            alternative assignment.

7    Q.    Was that a direction from your office -- or strike

8            that.

9                      Was that a direction from you?

10   A.    It was not a direction from me.

11   Q.    Was it a direction from the President's office?

12   A.    This is a good question.  I think we were following

13           what I assumed was standard practice, and that would

14           have been probably produced for us by human

15           resources, which has much experience in matters like

16           this.

17   Q.    Okay.  This February 8, 2018 e-mail from

18           Brian Selchick also discusses relieving Dr. Alaei

19           from e-mail access.  Is it your understanding that

20           was part of standard practice at the time?

21   A.    It is or was.

22   Q.    So that was not a specific direction from you?

23   A.    It's not a specific direction from me.

24   Q.    Are you aware of whether the President issued that

25           specific direction?

JAMES STELLAR                                   21

```
 1   A.   I don't know because the part of the connectivity of
 2        the administration in arriving at these things,
 3        there were independent conversations between the
 4        President's office and Randy Stark's office.  But
 5        certainly, this was something that we would have
 6        understood in some way or another before it was
 7        issued.
 8   Q.   Was the President aware of these actions and the
 9        two -- the February 8th alternative assignment
10        letter before they were made by SUNY Albany?
11   A.   Again, I'd have to trust Bruce Szelest in terms of
12        the exact timing, but I believe the answer is yes.
13   Q.   Okay.  Do you know if there's any basis in the UUP
14        agreement for removing access to someone's e-mail
15        while they're on alternative assignment?
16   A.   I do not.
17   Q.   Do you know if anybody considered that issue at the
18        time?
19   A.   I do not.  I assumed that human resources did its
20        usual thorough job of making sure that we were
21        following standard practice.
22   Q.   If I can refer you to what had been previously
23        marked as Claimant's Exhibit A-3.
24                  Plaintiff's Exhibit A-3 contains a
25        series of e-mails, but the relevant one here is an
```

1          e-mail from Karl Rethemeyer, R-E-T-H-E-M-E-Y-E-R,

2          dated February 8, 2018, to a number of people.  It

3          looks like you were a recipient --

4     A.   Yes.

5     Q.   -- of this e-mail?

6     A.   Yep.

7     Q.   In this e-mail, Mr. Rethemeyer identifies someone

8          needing to pay attention to the GIHHR website.  He

9          then says:  "We will also need to change all

10         references to KA."

11                   Do you have any understanding of why

12         that was needed?

13    A.   So the University maintains websites on all of its

14         centers and departments and so on.  It's quite a

15         large collection of websites.  And after this

16         e-mail, it was brought to my attention that the

17         website did not comport with the alternate

18         assignment.  It was something that needed to be

19         updated in there.

20    Q.   So can you explain that to me when you say "didn't

21         comport with the alternative assignment"?

22    A.   So I can't give you a specific reference because I

23         don't recall, but it would have been something like

24         he would have been, perhaps, listed as the director

25         on the website when that was no longer the case

```
 1          because he was on alternative assignment.
 2   Q.     Is that typical, the change information about an
 3          employee while they're on alternative assignment?
 4   A.     Yes, it is, if there are misleading, therefore,
 5          information, such as someone thinks this person is
 6          the Director when they're on alternative assignment
 7          and are, technically, not the Director.
 8                     So, yes, we would try to get the
 9          website in line with what was happening, and it
10          looks like here, we were behind a bit.
11   Q.     Okay.  If I can refer you to what's been marked as
12          Claimant's Exhibit A-4.
13                     Claimant's Exhibit A-4, specifically,
14          I'm referring to an e-mail from Harvey Charles dated
15          February 8, 2018.  Subject line is:  "Invitation to
16          a GIHHR-wide meeting Friday, 2/9."  And then it
17          appears that you're a recipient at the bottom.
18                     If you can just read through this
19          e-mail quickly or take your time, whatever you need
20          to do.
21   A.     Okay.  I'm ready.
22   Q.     Okay.  Do you recall this e-mail?
23   A.     I do.
24   Q.     Why was this e-mail drafted?
25   A.     Well, Harvey Charles is the direct supervisor of
```

JAMES STELLAR                               24

```
 1         GIHHR and had been for some time.  And it was
 2         thought by the University which I think would be the
 3         President, the Provost, the HR Vice President, et
 4         cetera, that we should inform, as best we could, the
 5         staff and students of what the state was.  So there
 6         is just natural sharing of information in the
 7         university about goings on.
 8    Q.   Okay.  Did you review this e-mail personally before
 9         it was sent out?
10    A.   I do not believe I did.
11    Q.   Do you recall if you had any input on this e-mail at
12         any time?
13    A.   I might have, because, again, there was a bit of a
14         team effort here, Carlos (sic) Evangelist -- or
15         Jordan Carlos-Evangelist -- excuse me -- was very
16         instrumental in helping us produce clear
17         communications.  He is the University spokesperson.
18         And so it's entirely possible that he showed it to
19         me in a draft form as he was drafting it for
20         Harvey Charles.
21    Q.   Okay.  Do you know if the President was aware of
22         this e-mail before it was sent out?
23    A.   That, I do not know.
24    Q.   Do you know why, if you look on this page, I'm
25         pointing on the first page of this e-mail,
```

```
 1          Plaintiff's Exhibit A-4, or Plaintiff's Exhibit,
 2          there's an address here, it's @virginia.edu.
 3          There's another one @union.edu, @columbia.edu.
 4                    Do you know why this e-mail was sent
 5          to other universities or outside SUNY Albany
 6          addresses?
 7   A.     I assumed that it was sent to them because these are
 8          the addresses that people that are identified with
 9          the center use.
10   Q.     Okay.
11   A.     And I notice some of them, for example, are Gmail
12          addresses.  And those people that I see with some
13          Gmail addresses might have had U Albany addresses as
14          well.  So this was something that Charles would have
15          pulled together, a list of the people in the center.
16   Q.     Okay.  Do you recall what was said at this
17          February -- or strike that.
18                    Did you attend the February 9, 2018
19          meeting referred to in Dr. Charles' e-mail at issue
20          here the February 8, 2018, e-mail?
21   A.     That's a good question.  I really do not recall if I
22          was there and that -- I'm sorry about that, but
23          there were many things going on and I can't
24          specifically say that I attended.  I may have.
25   Q.     Okay.  So if I were to ask you do you have any
```

```
 1        recollection of what was said at the meeting, I
 2        would assume your response would be "I don't have
 3        any recollection"?
 4   A.   Yes, that's my response.
 5   Q.   Does the University have any policy on sending
 6        University-related matters to outside e-mail
 7        addresses?  I mean, non-Albany.edu addresses?
 8   A.   They don't, because the University's work often
 9        involves people who have multiple appointments and
10        they might have one at another institution, and also
11        some people prefer the Gmail addresses.  So I
12        believe at this time at least, and I don't know
13        about now, we did not have a policy that said you
14        would have to send it only to inside people --
15        e-mail addressees, excuse me.
16   Q.   Okay.  If I can refer you to Claimant's Exhibit G.
17        Claimant's Exhibit G, the first document, is an
18        e-mail from K. Williams dated February 14, 2018,
19        which appears to be directly to you.  The subject is
20        a forward.  It says:  "Concern regarding Dr. Alaei
21        and beyond."  If you could just take a look at this
22        e-mail.
23   A.   Okay.
24   Q.   Do you know who K. Williams is?
25   A.   I do.  He was my Vice Provost.  He was in charge of
```

JAMES STELLAR                                        27

1          graduate affairs, a longtime member of the U Albany

2          community and invaluable advisor to me on many

3          matters, including graduate, but going beyond.

4    Q.    The continuation -- Do you recall receiving this

5          e-mail?

6    A.    I do.  On prompt from the document package that I

7          got.

8    Q.    Okay.  This e-mail from Mr. Williams -- or

9          Dr. Williams was forwarding an e-mail from a student

10         that he had received.  And I'll just let you read

11         through it.

12   A.    Okay.  Can you scroll down just a bit?  And is there

13         more?  Thank you.

14                    Okay.  I think I've seen enough.

15   Q.    Okay.  Do you recall the content of this e-mail and

16         the concerns or issues -- I won't say concerns.

17         Strike that.

18                    Do you recall the issues being raised

19         by this student in this e-mail?

20   A.    I do.

21   Q.    Okay.  In the first instance, the student is

22         discussing, obviously, Dr. Alaei was not allowed in

23         the meeting.  He was not able to defend himself

24         vis-à-vis the accusations that were vaguely and

25         implicitly projected here and there.

JAMES STELLAR                                    28

```
1              When you received this e-mail, did you
2       take any action in response to the concerns or
3       issues raised by this student?
4   A.  Well, there were a number of concerns and questions
5       from students and people affiliated with GIHHR and
6       most of those were referred to Dr. Charles, the
7       immediate supervisor, in order to have one point of
8       contact.
9              So, yes, I am familiar with it in a
10      general way.  In the specific case of this
11      individual student, I would say I'm not familiar, I
12      don't remember it, but there were a number of such
13      concerns raised by the community.
14  Q.  Okay.  This e-mail, I'm pointing to it here, towards
15      the end, the student says:  "One could feel a very
16      strong, yet implicit, cultural and racial dynamic in
17      place."
18             When reading that, did you have any
19      concerns with how the meeting was conducted on
20      February 9, 2018?
21  A.  Well, I knew from the planning of it that it would
22      be a meeting that would have to balance trying to be
23      transparent on the one hand and tell people what was
24      happening with the need for privacy on the other and
25      to protect both University and Kamiar from revealing
```

JAMES STELLAR                                                    29

```
 1          things that were not determined yet.  So that was

 2          why there was an alternate assignment.  And I'm not

 3          sure that we ever could reveal some of the things

 4          that are said, but this created a situation that

 5          maybe I could positively describe as balance and it

 6          appears this person saw that situation as

 7          unbalanced.  And I also see in there a strong

 8          allegiance to Kamiar and the GIHHR.

 9    Q.    In the beginning of Dr. Williams' e-mail, he

10          identifies that "she and others are not happy with

11          how this is being handled."

12                    Did you have any response to

13          Dr. Williams' statement?

14    A.    Well, I would have brought him in and talked to him

15          since his office was literally feet from my own, and

16          that would probably be where we would have talked it

17          out.  But the parameters were, as I said, we felt we

18          had to take action as an administration, but we were

19          limited in what we could say.  And then we wanted to

20          say something to the people, at least appear before

21          them and not simply be silent, which we thought was

22          even worse than having to balance these two

23          objectives.

24    Q.    And in terms of the people conducting the

25          investigation, that would be Chantelle Cleary,
```

JAMES STELLAR                                      30

```
 1        Randy Stark, Brian Selchick?
 2   A.   Correct.
 3   Q.   Okay.  In response to these issues being raised by
 4        Mr. Williams and this student, did you reach out to
 5        those individuals with any concerns about how they
 6        were conducting the investigation at that time?
 7   A.   So we would have talked again as a team about the
 8        investigation updates, et cetera, and this would
 9        have certainly been an important update about how
10        was the community perceiving our actions.  And this
11        balance, as I've discussed several times, between
12        being confidential and trying to be transparent
13        would have played out much the same way it did here,
14        especially among people who really felt attached to
15        GIHHR.
16   Q.   In this e-mail, the student's, you know, raising
17        cultural and racial dynamic in place.  Did you,
18        specifically, have any discussions with the people
19        conducting the investigation to say, "Look, people
20        are concerned that there's racist, cultural, you
21        know, issues being raised and that they're not being
22        addressed properly; we need to change something"?
23   A.   So I don't believe that we discussed it directly,
24        but given the general dynamic of the University as a
25        place which has diversity at its core, these issues
```

JAMES STELLAR                                    31

```
1          would have been discussed to try to make sure that
2          we were doing everything we could to get the
3          audience to understand that we were behaving in good
4          faith and not succumbing to racist tendencies and
5          that would have been an anathema to our general
6          operation and it's even in our strategic plan, so.
7    Q.    I'm sorry.  Go ahead?
8    A.    No, I'm done.  Thank you.
9    Q.    Okay.  Are you familiar with who Elizabeth Grey was
10         at the time?
11   A.    Yes, Elizabeth Grey was someone who I knew in the
12         University and -- yes, yeah.
13   Q.    Do you recall if whether or not Ms. Grey had raised,
14         in an interview with Chantelle Cleary, whether she
15         felt there was cultural differences at issue that
16         might be a source of confusion or concern regarding
17         the underlying issues being raised that prompted the
18         investigation for Dr. Alaei?
19   A.    I know that Elizabeth is very sensitive to these
20         kinds of issues and in a way that's not only
21         appropriate but healthy.  And so I think she would
22         have raised it.  If she didn't raise these kinds of
23         questions, it would have been a surprise to me
24         because she, generally, positioned herself as
25         someone who tried to make sure that we were living
```

JAMES STELLAR                                      32

```
 1          up to the standards that we set for ourselves in
 2          regard of race, ethnicity, gender, poverty, et
 3          cetera.
 4    Q.    Do you know if Ms. Grey had raised concerns about
 5          cultural differences, if there was any specific
 6          response or change in conduct by the people doing
 7          the investigation concerning Dr. Alaei?
 8    A.    That's a good question, and I'm going to have to
 9          answer it in a general way because the short answer
10          is that I don't have any specific information.  But
11          I trusted Chantelle Cleary and certainly trusted
12          Randy Stark to follow the basic premises of the
13          University, as I mentioned, as outlined in the
14          strategic plan, to be inclusive and to not carry
15          implicit bias or other forms of discrimination into
16          any investigation.  So everybody --
17    Q.    Sorry.  Go ahead.
18    A.    No, I'm through.
19    Q.    Okay.  So when you say you trusted Ms. Cleary,
20          sorry, did you undertake any specific actions to
21          make sure they were comporting with those University
22          standards?
23    A.    I did not.  I thought that they were doing it
24          anyway, from what I could tell from general
25          observation.
```

| | |
|---|---|
| 1 | Q. If I could refer you to what had been marked as |
| 2 | Claimant's Exhibit A -- sorry A-6. |
| 3 | Claimant's Exhibit A-6 is a series of |
| 4 | e-mail, the first one being an e-mail from |
| 5 | Brian Selchick dated February 9, 2018, to several |
| 6 | individuals. I'll scroll through this so you can |
| 7 | read it. |
| 8 | A. Okay. I think that's the end of it. |
| 9 | Q. Yeah, for purposes of my question, as Mr. Selchick |
| 10 | had stated here that Mr. Alaei was not able to |
| 11 | attend speaking events as a representative of the |
| 12 | University, did you have any input on that decision? |
| 13 | A. That would have been part of the general package as |
| 14 | presented to us by HR with the alternate assignment |
| 15 | plan. So I would have had general input into it. |
| 16 | In this case, I'm not sure that we specifically |
| 17 | detailed, maybe we did, what happens if you give a |
| 18 | talk and get an honorarium. |
| 19 | Q. The issue about not identifying himself as a |
| 20 | representative of the University, was that something |
| 21 | specifically designed for this situation with |
| 22 | Dr. Alaei? |
| 23 | A. Well, it would have been part of any separation |
| 24 | alternate assignment arrangement where you're no |
| 25 | longer performing your fundamental duties as |

JAMES STELLAR                                    34

```
1          director of something, the center of GIHHR.  And so
2          this was the standard, I would think, from human
3          resources that you cannot say that you are the
4          director when you are on alternate assignment.  That
5          was the same issue as the website.
6    Q.    So if somebody's on an alternative assignment and
7          they do a private speaking engagement, they're
8          prohibited from identifying themselves as an
9          employee of SUNY Albany?
10   A.    So that's another question.  And I don't know if
11         they're prohibited from their general employment
12         status.  Because my understanding is that
13         alternative assignment is not termination, it's an
14         alternative assignment.  But I think what we would
15         not want him to do in general, and seeing it here in
16         this specific exhibit, is identify himself as the
17         director of the center.
18   Q.    Do you know if there's other instances where people
19         on alternative assignment would not allow themselves
20         to be identified as affiliated with SUNY Albany?
21   A.    I do not have a specific other incident in mind, but
22         my understanding is that it was general practice.
23   Q.    Do you know if any specific concerns were raised at
24         that time about Dr. Alaei speaking at this type of
25         engagement and identifying himself as affiliated or
```

JAMES STELLAR                                    35

```
 1        employed by SUNY Albany?
 2   A.   I do not know.  I'm not sure how we came to know
 3        this, except that he wrote to me and I referred it
 4        to other people.  And at the bottom of this e-mail
 5        as I read it, it looks like Kamiar was seeking
 6        guidance, and I referred him to HR.
 7   Q.   Is that actually James Dias, Dias?
 8   A.   Yes.  Maybe it was Jim Dias.  Maybe it wasn't me.
 9        Was it Jim Dias?
10   Q.   I think that's the chain here.
11   A.   Yeah, okay.  That's James Dias, not me.  Wrong Jim.
12        I apologize.
13   Q.   No problem.
14                  If I can show you what was marked as
15        Claimant's Exhibit A-7.  And I'm referring to the
16        e-mail from Harvey Charles dated February 9, 2018,
17        to a number of individuals, which it looks like you
18        were included.  Subject is GIHHR and you can read
19        the --
20   A.   Yep.  I do recall this e-mail.
21   Q.   Okay.  Why was this e-mail sent?
22   A.   So the absence of Kamiar meant that we now had no
23        director for GIHHR and its oversight would fall
24        naturally to Harvey Charles.  Harvey Charles was a
25        busy man with many priorities, so it was
```

1           determined -- and this decision was made by all of
2           us, as I remember, to get a few other people who
3           were faculty members to agree to step up and as an
4           interim lead GIHHR, so that it was not without
5           immediate supervision.  And this was to try to not
6           damage individuals that had things that they needed
7           done.  Like, for example, one undergraduate who had
8           a directed study course they were taking that could
9           now be signed off on or anything else that was the
10          business of the GIHHR.
11   Q.     Did you have any involvement in preparing the
12          content of this e-mail?
13   A.     So I believe I would have seen it in the same way
14          that I was briefed, among other things, or I might
15          have played a slightly larger role in the
16          discussions with the Deans over the selection of
17          these people.  Because I was Provost, I would not
18          want to name someone out of a faculty to a position
19          directing a center without having the understanding
20          and support of the Dean.  And that would likely have
21          been my role to let the Dean know.
22                    Now, the original selections of these
23          people would have likely very much involved me.  But
24          then when it came to the writing of the letter, the
25          words chosen, I believe I would have seen it as part

JAMES STELLAR                                    37

1              of the normal course of sharing, but not drafted it.
2    Q.   So did you select and make the decision to identify
3         these two individuals as interim co-directors of
4         GIHHR?
5    A.   So given the collegial nature of the management, I
6         would say that I approved it and did not necessarily
7         select them, because this is not my area of
8         professorial expertise.  So I would have relied on
9         the expert advice of the Deans and other people.
10        But once it was decided that these would be the
11        recommendations, I am sure that I would have been
12        asked to approve, and I said yes.
13   Q.   So do you know or do you recall who was the one that
14        presented these names to you to be appointed as the
15        interim co-directors?
16   A.   That's a good question, and I don't really -- there
17        were a number of us involved sort of working
18        together.  So it could have been Bruce Szelest, who
19        had a longer history at U Albany than I did.  It
20        could have been some of the Deans who had gotten
21        wind of what was going.  I remember Karl Rethemeyer
22        wrote a letter and asked us to please check the
23        website.
24              So these people would have been,
25        potentially, the ones that suggested it.  Most

```
 1              likely, it would have come from Harvey Charles or a
 2              fellow we haven't mentioned yet, Bill Hedberg, who
 3              was also a Vice Provost and in charge of many
 4              operations and worked with Harvey.  So somewhere in
 5              that mix, these names would have come to me.
 6    Q.   Okay.
 7    A.   And then I would have said, "They look good.  Let's
 8              good with it."  And that would have been the
 9              official blessing that we would have, I'm sure,
10              presented to the President.
11    Q.   Okay.  Were there any concerns before this e-mail
12              went out that it could have violated Dr. Alaei's
13              rights under the UUP agreement?
14    A.   That's another good question.  I did not have those
15              concerns.  I was taking my lead from HR, who knows
16              that document much better than I do.  And under the
17              need, as expressed by Harvey Charles, for us to have
18              someone who is responsible other than him.
19    Q.   So as you recall, this e-mail dated February 9,
20              2018, was something that might have been prepared by
21              HR?
22    A.   That's another good question.  I think it looks like
23              it was probably prepared by academics, so I would
24              say Harvey Charles and other people that I've
25              mentioned who are on the academic management side.
```

```
 1        I'm sure it would -- we would have consulted

 2        extensively with HR, but I bet ya this was written

 3        by us.  The second paragraph, the combination of

 4        Dina's experience as Executive Director of the

 5        Center of Women in Government, these are kind of

 6        content specific things suggesting it came out of

 7        the academic side.

 8   Q.   And I see Mr. Szelest is cc'd on this e-mail?

 9   A.   Right.

10   Q.   Does that -- strike that.

11             Would the President have approved this

12        e-mail before it was sent out?

13   A.   Another good question.  I just don't know, but.

14             MR. ROTONDI:  That's the answer then.

15        If you don't know, that's the answer.

16   A.   Good.

17   Q.   If I can refer you to what's been identified as

18        Exhibit A-11.  Actually, no, it's A-7.

19             A-7 includes a response of somebody

20        David O. Carpenter, M.D., a Collaborating Centre of

21        the World Health Organization, University at Albany,

22        responding to Dr. Charles' prior e-mail.

23             Did you receive any responses from

24        these people who received Dr. Charles' e-mail with

25        concerns about the treatment of Dr. Alaei in this
```

```
 1        matter?
 2   A.   I believe I did.  I was cc'd on this one, I see, and
 3        I was aware that there were concerns from the Board,
 4        as well as from the students.
 5   Q.   Was there any particular action taken in response to
 6        the concerns being expressed by people like
 7        Mr. O. Carpenter or David O. Carpenter?
 8   A.   So the same dynamic of balancing, being careful
 9        about the sharing of information with trying to be
10        transparent, what I obtained here, with these people
11        who are now good strong supporters of the GIHHR, but
12        outside the University in many cases.  So I'm not
13        aware of any particular action.
14   Q.   These two individuals that were appointed as interim
15        co-directors, do you know their race?
16   A.   I believe -- I don't know Dina's race.  I believe
17        Gina is Caucasian.
18   Q.   And they are both female, obviously?
19   A.   Yep.
20   Q.   Or identified as female, sorry.
21             The professional qualifications of
22        these two individuals, were they greater than the
23        qualifications that Dr. Alaei had at the time?
24   A.   I would say that they were equal to but different.
25        The GIHHR was formed around an idea, an intellectual
```

```
 1         field, and Dr. Alaei was in that field.  Dina and
 2         Gina were in closely-associated fields.  But I think
 3         their qualifications were outstanding.
 4    Q.   Did they have any academic titles at the time they
 5         were appointed as interim co-directors?
 6    A.   Gina was running a center and Dina was in some kind
 7         of a center, and I don't really recall.  So I would
 8         have to say I don't recall with regard to her.  They
 9         are both Ph.D.s.
10    Q.   So that brings me to 11.  So I'm referring you to an
11         e-mail dated February 22, 2018, that's part of A,
12         sub 11.  It's an e-mail from you to Bruce Szelest.
13         In this e-mail, it says, in part:  "We may not need
14         to set up a meeting up with the new directors,
15         Harvey and me."
16                   Had there been a determination by SUNY
17         Albany at that time that Dr. Alaei had been removed
18         as director of GIHHR?
19    A.   I don't believe so.  This is dated in February and I
20         believe he was on alternate assignment at this time.
21    Q.   So your reference, you wrote "new directors."  Can
22         you explain to me why you wrote "new directors"?
23    A.   That's probably a mistake.  It should have said
24         "interim directors."  They, of course, are new, but
25         their thing was interim.
```

JAMES STELLAR                                    42

1    Q.   Did you ever send a retraction e-mail saying, "I
2         apologize, they're interim directors"?
3    A.   I did not.  And, in fact, it isn't until you brought
4         it to my attention at this moment that I reached the
5         conclusion that it was probably better worded as
6         interim directors.
7    Q.   Why were you communicating with Bruce Szelest on
8         this e-mail?
9    A.   It was part of a general issue about how the
10        University presents itself to people who are
11        interested in what's happening here, striking that
12        balance that I referred to before several times.
13   Q.   Okay.  Was it typical at that time for Mr. Szelest
14        to oversee these type of issues?
15   A.   Mr. Szelest was a very effective senior staff member
16        to the President.  The President trusted him.  I
17        trusted him.  So we would involve him in things like
18        this.  So I think the short answer is yes.
19   Q.   Okay.  If I can refer you to what's been previously
20        referred to as Claimant's Exhibit A-12, and this is
21        an e-mail from Dr. Alaei to Harvey Charles dated
22        February 27, 2018?
23   A.   Okay.
24   Q.   Do you know if the University undertook any actions
25        to respond to the issues raised by Dr. Alaei

```
 1              concerning his oversight or the needed oversight for
 2              these grants and other matters that Dr. Alaei had
 3              been working on as referenced in his February 27,
 4              2018 e-mail?
 5       A.     That's another good question.  I don't really know
 6              of any specific, but I do know that we had
 7              discussed, in general, the same pattern of balance
 8              between, as I said earlier, being careful with
 9              personal information, but trying to be transparent,
10              that manifested itself in the previous two meetings
11              we discussed.  This is another example in my mind of
12              the same balance.
13       Q.     Do you know if -- strike that.
14                        Do you know what happened to the
15              oversight of these grants and programs that were
16              identified?
17       A.     I do not.  Grant oversight would have fallen under
18              Jim Dias, who had been involved in this, as you saw
19              earlier.
20       Q.     If I could refer you to what had been previously
21              been identified as Claimant's Exhibit A-13.  This is
22              an e-mail from Chantelle Cleary dated March 9, 2018,
23              to several individuals.  Have you ever seen this
24              e-mail before?
25       A.     I believe I have.
```

JAMES STELLAR                                    44

1    Q.    Did you see it around the time it was sent in
2          March 2018?
3    A.    I don't recall specifically the date, but I'll
4          accept that that's when I saw it.
5    Q.    Okay.  In this, Ms. Cleary says:  "I have been asked
6          Bruce to make this matter our top priority."
7                    Do you have any understanding of
8          whether Mr. Szelest or Ms. Cleary had specifically
9          identified this matter concerning Dr. Alaei as being
10         a top priority?
11   A.    I don't believe they had identified it as a top
12         priority for all of the University, which is a large
13         operation; it has many priorities.  So I guess the
14         answer is:  I don't know.
15   Q.    So the reference to top priority, you don't have any
16         understanding what that's referring to?
17   A.    Well, I think what it means is Chantelle, who is the
18         author of this e-mail, wants to make sure that we
19         are paying attention to this matter, which is in her
20         domain.  That's how I construe the meanings, "our
21         top priority."
22   Q.    Okay.  But otherwise, you don't have any direct
23         knowledge of what she's referring to?
24   A.    That's correct.
25   Q.    Okay.  Back to the grants and programs that

1           Dr. Alaei had raised concerns about.  Do you know if
2           the two interim directors were dealing with those?
3     A.    That was their charge.  They were responsible for
4           all things GIHHR, and that would have included these
5           grants.
6     Q.    Do you know if there was a need to speak Farsi to
7           work with those grants as part of overseeing them
8           based on the grant -- the people working with the
9           grants on the other end?  Strike that.  Let me say
10          that again.
11                Do you know if those grants required
12          that people from SUNY overseeing the grants, working
13          with the recipients of the grant funding and the
14          subjects who were, you know, working with the
15          program in Iran and these other areas, as identified
16          in that e-mail from Dr. Alaei, if there was a need
17          to speak Farsi?
18    A.    I do not know.  I don't know the languages of the
19          people who are on the receiving end of this grant's
20          management.
21    Q.    Ms. Cleary, can you explain to me your understanding
22          of her role while at SUNY Albany?
23    A.    Right.  She was hired as the Title IX Coordinator
24          who had responsibilities for investigations and also
25          had a charge to help the University develop a better

```
 1            profile, improve our profile for issues with gender.
 2            For example, she started the bystander intervention
 3            program.  So it was a dual investigation, slash,
 4            program promotion function, as I understood it.
 5     Q.     Are you aware of any concerns ever raised during
 6            your time while Ms. Cleary was employed there about
 7            her violating the responsibilities of her office?
 8     A.     I was not.
 9     Q.     No?  Okay.
10                     Sorry, I'm trying to find an exhibit.
11                     I'm showing you what's been previously
12            identified as Claimant's Exhibit J.
13                     Claimant's Exhibit J is identified as
14            a memorandum and order by the State of New York
15            Supreme Court, Appellate Division, Third Judicial
16            Department decided and entered November 25, 2020,
17            identified as being in the matter of Alexander M. v.
18            Chantelle Cleary, as former Title IX Coordinator at
19            the State University of New York at Albany.
20                     Are you aware of a decision by a court
21            reflective of this Exhibit J concerning Ms. Cleary's
22            work while at SUNY Albany?
23     A.     I am not aware of it.  I did see it in the document
24            package that was circulated to me.
25     Q.     At page 6 of this decision, and I'm scrolling down,
```

1          the court makes the following statement:  "As to the
2          possibility of individual bias, Cleary admittedly
3          altered the facts as reported to her."
4                        Are you aware of any concerns being
5          raised during the time that Ms. Cleary was working
6          at SUNY Albany in conducting investigations that she
7          was altering facts reported to her?
8    A.    I was not aware of anything like that.
9    Q.    And bottom of page 6, the court finds -- or excuse
10         me, the court states:  "Cleary's phrasing portrays a
11         significantly different rendering of the events.  At
12         the hearing when Cleary was asked why she had
13         changed the wording, her response, 'In the words of
14         the Supreme Court's order denying Petitioner's
15         motion for discovery, bordered on the incoherent.'
16         It is not unreasonable to question whether Cleary
17         changed the wording (as such the alleged facts) to
18         correspond with the definition of sexual assault
19         one, as found in the student code."
20                        Are you aware of any concerns ever
21         being raised regarding Ms. Cleary and her work while
22         at SUNY Albany as to trying to alter facts reported
23         to her to fit the matters she was investigating?
24   A.    I am not aware of it.  The first I saw it was when I
25         reviewed the document package which contained this

```
 1        exhibit.
 2   Q.   Okay.  This decision also notes, on page 7:  "In
 3        addition, petitioner presents an affidavit from his
 4        advisor, who was present with him in his meetings
 5        with Cleary.  The advisor averred that, at said
 6        meetings, Cleary raised her voice, physically leaned
 7        toward petitioner and acted in an aggressive
 8        manner."
 9                    Are you aware of any concerns ever
10        being raised about Ms. Cleary ever acting in such a
11        manner during the time of her employment with SUNY
12        Albany?
13   A.   Again, my answer is no.
14   Q.   Did Ms. Cleary ever express an opinion to you that
15        she believed Dr. Alaei was guilty of violating any
16        SUNY policies during the investigation?
17   A.   So Ms. Cleary was, in my presence, very professional
18        and stated the facts.  I think we, in the
19        administration, had hoped her inquiry would go
20        faster.  This is a natural thing for an
21        administrator who wants to get resolution.  But at
22        all times in my interactions with her and what I saw
23        of her interactions with others, she was
24        professional.
25   Q.   Did she ever express an opinion to you that she
```

```
 1          believed Dr. Alaei was guilty of violating any SUNY
 2          policies during her investigation?
 3    A.    I don't recall her expressing such an opinion, and
 4          it would be inconsistent with my view of her as a
 5          professional.
 6    Q.    If I can refer you to what had been identified as
 7          Claimant's Exhibit M?
 8                         Are you aware of the law office of
 9          Young/Sommers submitting letters to SUNY Albany
10          around the time the investigation of Dr. Alaei
11          commenced, objecting to the conduct in the
12          investigation as it was going on at the time?
13    A.    I don't really remember them, but I'm sure
14          that -- well, I may have well have seen them.
15    Q.    Okay.  And I'm just scrolling through some of these.
16          This is Claimant's Exhibit M.  There's a letter
17          dated February 14, 2018; a letter dated February 16,
18          2018; a letter dated February 28, 2018; and then an
19          e-mail dated March 7, 2018.
20                         Do you recall if SUNY ever, in
21          response to letters received from counsel for
22          Dr. Alaei, if SUNY ever reviewed those letters to
23          determine if they had made a mistake as to any
24          course of action up to that point?
25    A.    I am not.  I don't know if they did or did not.  I
```

JAMES STELLAR                                    50

```
 1        assume that would have taken place in HR, but I'm
 2        not aware.
 3   Q.   Okay.  I'm going to show you what's been previously
 4        identified as Claimant's Exhibit L-2.  If you could
 5        take a look at the document in front of you that's
 6        identified as Claimant's Exhibit L-2?  At the top of
 7        it, it says:  "Sexual misconduct response report
 8        Number 18-013."  Do you know what this document is,
 9        as I scroll through it?
10   A.   I believe this is the first time I'm seeing it.  Of
11        course, I perhaps saw it long ago, but I don't
12        remember seeing it recently.
13   Q.   Okay.  So as you sit here, you're not able to
14        specifically identify it with direct recollection
15        about what it is; is that fair to say?
16   A.   Yes, that's fair to say.  If you leave it there for
17        just a second, maybe I could read it?
18   Q.   Sure.
19   A.   So I don't really remember this document.  I've just
20        read the section here and I'm happy to answer
21        questions about it.
22   Q.   All right.  And the first paragraph here, it says:
23        "The following report details the University at
24        Albany's coordinator response to a report received
25        on February 2, 2018, from Dr. James Stellar,
```

1          specifically, the report alleges that several

2          students reported to him that Dr. Arash Alaei has

3          been interacting with students in violation of a

4          separation agreement entered into with the

5          University on blank date.  This report initiated an

6          inquiry which resulted in a joint investigation by

7          the Office of Equity and Compliance and the Office

8          of Human Resources Management.  The investigation

9          focused on the following possible violations of the

10         University at Albany policies by Dr. Kamiar Alaei."

11         And then it identifies three different alleged

12         possible violations.

13    A.   Yes.

14    Q.   Do you recall, now reading this, did this

15         investigation concerning Dr. Alaei arise because

16         someone had reported to you about Dr. Arash Alaei

17         interacting with students?

18    A.   Someone did report to me, and I don't -- what I'm

19         not sure of is this document in front of me.  But

20         certainly I remember the meeting.

21    Q.   In reviewing these three identified possible

22         violations; one, two and three, do you have any

23         recollection if those were the three issues raised

24         that served as the basis for the investigation

25         concerning Dr. Alaei?

JAMES STELLAR                                      52

```
 1   A.   Issues raised by who?  By the students?
 2   Q.   Issues raised by SUNY Albany.
 3   A.   Okay.  That, I would not know about because I'm not
 4        familiar with this document.
 5   Q.   Okay.
 6   A.   Although, I may have well have seen it since we
 7        shared tons of documents.
 8   Q.   Okay.  So, maybe let me just rephrase.  My question
 9        is:  The underlining concerns that were raised that
10        prompted SUNY Albany to place Dr. Alaei on
11        alternative assignment, as reflected in that
12        February 8, 2018 letter, would these three
13        identified Roman Numeral points be the basis of why
14        SUNY Albany put Dr. Alaei on alternative assignment?
15   A.   Okay.  So let me take a look at them.
16               "Dr. Arash Alaei to conduct business
17        on behalf of GIHHR after separation from the
18        University."  So that's correct.
19               "Facilitating contact between Arash,
20        GIHHR staff and students."  That's correct.
21               "Violation of the University's sexual
22        harassment policy for engaging in unwelcome conduct
23        of a sexual nature directed at GIHHR student intern
24        created a sexually hostile environment for working
25        and learning."
```

JAMES STELLAR                                          53

```
 1                    That third one was not part of my
 2          conversation with students as I recall.
 3   Q.     Okay.
 4   A.     The first two were.
 5   Q.     The first two -- okay.  Understood.
 6                    This document identifies, on this
 7          second page, individuals interviewed and then
 8          there's a number one through 43.  Are you aware of
 9          Chantelle Cleary and/or the human resource office,
10          being Mr. Stark and Mr. Cleary -- or sorry,
11          Mr. Stark and Mr. Selchick, interviewing 43 people
12          as part of their investigation?
13   A.     I can't testify to the number 43, but I do think
14          they interviewed a number of students.  So the
15          answer is a qualified yes.
16   Q.     As to facilitating contact between Dr. Arash Alaei
17          and GIHHR staff and students during Arash Alaei's
18          alternative assignment after separation, did you
19          have any -- did you ever have any discussions with
20          Harvey Charles about that issue?
21   A.     We would have discussed it because that was
22          pertinent to the issue of alternate assignments for
23          Kamiar.  I don't have a specific recollection of it,
24          but there was many meetings in which the status of
25          GIHHR and how we were doing on the other actions
```

JAMES STELLAR                                    54

```
 1        were discussed.
 2   Q.   Okay.  I'm going to show you what's been previously
 3        identified as Claimant's Exhibit F, sub 1.
 4                   Claimant's Exhibit F-1 includes a
 5        number of e-mails.  The first e-mail I am going to
 6        refer you to is dated March 2, 2019 -- or
 7        2017 -- sorry.  It is dated March 22, 2017, at 11:53
 8        a.m. from Arash Alaei to Harvey Charles.  The
 9        subject is GIHHR Advisory Board Meeting.
10                   If you could just take a look at this
11        e-mail?
12   A.   Got it.
13   Q.   By this e-mail, Arash Alaei is asking permission
14        from Dr. Charles to go to the main campus to join a
15        meeting; is that fair to say?
16   A.   Yes.
17   Q.   And then there's an e-mail from Harvey Charles dated
18        Wednesday, March 29, 2017, responding -- and this is
19        Dr. Charles responding:  "No, you don't have
20        permission"?
21   A.   Correct.
22   Q.   Is that fair to say?
23   A.   Yes.
24   Q.   Are you aware of Dr. Charles and Arash Alaei having
25        discussions about whether or not Arash Alaei was
```

1        able to go onto campus?

2   A.   I'm not aware of a specific conversation, but this

3        was part of the supervisor's responsibility to try

4        to enforce the agreement with Arash.

5   Q.   As of these e-mails, March 29, 2000 -- I'm sorry.

6        These March 22, 2017 and then March 29, 2017

7        e-mails, do you recall was Arash Alaei on

8        alternative assignment at that point?

9   A.   So that's something I'm going to have to say I don't

10       remember.  It seems close, but I don't remember,

11       specifically, when the alternative assignment was

12       ordered.

13  Q.   Okay.  I'm going to show you now what's part of

14       Exhibit F, sub 1.  It's an e-mail.  It says:

15       "Report and plan," dated March 28, 2017, from

16       Arash Alaei to Harvey Charles.

17                   And I'm going to scroll down.  First

18       paragraph is Arash identifying his primary

19       activities and planned activities.

20                   I'm going to scroll down to this

21       paragraph that starts with:  "In order to complete

22       the above-mentioned tasks," if you could just read

23       through that.

24  A.   Okay.

25  Q.   In this part of the e-mail, Arash is saying he needs

```
 1          to be in touch in person.  Some he will need to be
 2          in touch with, for most just in touch in long
 3          distance, and then he identifies six people.
 4                    Are you aware of who these six people
 5          are?
 6   A.     Well, I recognize the first one is Kamiar.  The
 7          others, I'm less familiar with.  So yes and no.
 8   Q.     Okay.  At the time of this e-mail, Harvey Charles
 9          was Arash Alaei's supervisor; is that fair to say?
10   A.     Yes.
11   Q.     Do you know if Dr. Harvey Charles had approved this
12          request by Arash Alaei to contact those six
13          individuals as part of his work?
14   A.     I do not know.
15   Q.     Is this something you ever discussed with
16          Dr. Charles as part of your discussions about your
17          agreement and Kamiar Alaei not allowing Harvey -- or
18          Arash Alaei to have interactions with people who are
19          work with GIHHR during his alternative assignment
20          after he separated?
21   A.     I don't believe I ever discussed this specific
22          e-mail with Harvey Charles, but it certainly was
23          part of the general understanding that I had with
24          Harvey Charles if he would enforce the agreements
25          ultimately.
```

JAMES STELLAR                                          57

```
 1   Q.   Do you know if Arash Alaei had communications with
 2        these people?
 3   A.   I don't know from firsthand experience.
 4   Q.   Okay.  If I can show you what had been previously
 5        been identified as Claimant's Exhibit F-4.  First is
 6        the series of e-mails Harvey Charles to Arash Alaei,
 7        dated June 14, 2017, at 3:00 p.m.  The title is:
 8        "My report and communications with interns."  Then
 9        there's an e-mail preceding that from Arash Alaei to
10        Harvey Charles, dated June 13, 2017, at 11:48 p.m.
11        Subject is:  "My report communication with interns."
12        If you could just read this e-mail?
13   A.   Okay.
14   Q.   In this e-mail from Arash Alaei dated June 13, 2017
15        to Harvey Charles, he talks about he's been assigned
16        to work remotely.  Would that be reflective of being
17        on an alternative assignment?
18   A.   Yes, it would.
19   Q.   And in the second paragraph, Arash inquires of
20        Dr. Charles:  "I just want to inform you because I
21        need to have Skype communications with" -- and he
22        identifies one, two, three, four individuals.  He
23        notes that they are GIHHR's interns and "I need to
24        have Skype meeting with them to develop grant
25        proposals."
```

```
 1                    Were you aware as of June 2017,
 2        Arash Alaei was soliciting that type of approval to
 3        communicate with GIHHR interns from Dr. Charles?
 4   A.   I was not.
 5   Q.   And if I could refer you to this e-mail dated
 6        June 14, 2017?
 7                    Okay.  Dr. Charles is responding to
 8        Arash saying:  "I've inquired of HR and awaiting
 9        their advice on the matter"?
10   A.   Right.
11   Q.   Do you know if Dr. Charles approved this request by
12        Arash to have communication with GIHHR interns as
13        requested?
14   A.   I do not know.
15   Q.   Do you know if there would be any records from HR
16        approving such a request by Harvey Charles?
17   A.   I do not know.
18   Q.   Okay.  Would this be consistent with your
19        understanding about your agreement with
20        Harvey Charles?
21   A.   That he was asked?  Yes.  And my understanding is
22        that he would say, "You can't do that."
23   Q.   Okay.  So your understanding, this should be -- this
24        should have been denied?
25   A.   That's my understanding.
```

JAMES STELLAR                                    59

1    Q.    But you don't know if it was denied?

2    A.    I don't know if it was denied.

3    Q.    Was Kamiar Alaei Arash Alaei's supervisor in

4          June 2017?

5    A.    That's a good question.  My understanding was that

6          when Arash went on leave, he was working with his

7          brother in order to fulfill the terms of the

8          agreement to not be in contact at the campus.  And I

9          assumed that if he needed to contact the campus, he

10         would go through his brother.  Now, I don't know if

11         that makes him supervisor or just a colleague, so I

12         don't have an answer.

13   Q.    Okay.  Under this alternative assignment, did

14         Kamiar Alaei have any an authority over Arash Alaei?

15   A.    Again, I don't know.  I mentioned the circumstance

16         earlier where I believed that Kamiar would be the

17         go-between if there was something that Arash needed

18         with the campus, but I can't say whether that

19         constitutes authority.

20   Q.    Okay.  Do you know if the written alternative

21         assignment for Arash would layout whether or not if

22         he needed to work with students, he should ask

23         Dr. Charles?

24   A.    I would assume that he would do that because the

25         alternative assignment said you're not supposed to

```
 1            work with students.  And I think he would then go to
 2            his supervisor, which would be Harvey Charles, and
 3            ask him for permission.
 4      Q.    Do you know if anyone with supervisory capacity over
 5            Dr. Kamiar Alaei ever advised him directly that
 6            Arash Alaei was to not have communications with
 7            interns or anyone associated with GIHHR?
 8      A.    I do not have firsthand knowledge of that, but my
 9            understanding is that that was the widely understood
10            plan among Kamiar, Arash, Harvey Charles,
11            Randy Stark, et cetera.
12      Q.    So your understanding, that was the plan, but you
13            don't know directly if that was ever communicated to
14            Kamiar?
15      A.    That is correct.
16      Q.    If I can refer you to Exhibit L-1?
17                        L-1 I'm showing you, if you could just
18            take a look.  Do you recognize what this document
19            is?  I could scroll through it slowly so you could
20            see the whole thing and I'll go back up.
21      A.    Yep, you'll have to do that.
22      Q.    Sure.
23                        So you can see the overview -- I'll
24            scroll through it slowly first and then I'll go back
25            to the top and come back down.
```

```
 1   A.    Okay.

 2                   Okay.  I'm done with that page.  Thank

 3         you.  Okay.  Just scroll down just a little bit

 4         more.  No the other way.  Thank you.  That's good.

 5                   All right.  I've read it.

 6   Q.    Okay.  Do you know what this document is?

 7   A.    It looks familiar.  This is the first I've seen it.

 8         It's a document to the University from the students

 9         below, listing points that are then commented on in

10         the bullet sections.

11   Q.    Do you know if these bullet sections were ever

12         communicated to the students?

13   A.    I do not know.

14   Q.    Were you involved or did you have any involvement

15         with the interrogation of Dr. Alaei that occurred in

16         May 2018?

17   A.    No.

18   Q.    Do you recall reading any letters sent to human

19         resources on behalf of Dr. Alaei as a follow up to

20         the interrogation that was conducted?

21   A.    I'm not sure about that one, because there was much

22         communication.  So I'll have to say I don't know.

23   Q.    Let me refer you to what's been previously marked as

24         Claimant's Exhibit C-3.

25                   Okay.  Do you recall being provided a
```

JAMES STELLAR                                               62

```
 1          copy of this letter at or around May 21, 2018?
 2     A.   I believe I was.  It was also in my briefing
 3          documents.
 4     Q.   When you initially read this letter, did you read
 5          this letter around May 21, 2018, when it was
 6          provided to you?
 7     A.   That is not clear, but I would have read it within a
 8          few days or so of it.
 9     Q.   Okay.  Okay.  So you did read it at some point
10          around the time from May 21, 2018?
11     A.   Let me say:  I believe I read it.
12     Q.   As you sit here, do you have any recollection of a
13          response to issues raised in this letter at the time
14          you read it?
15     A.   My recollection of a response was that this is part
16          of that balance that I talked about many times in
17          this deposition where we want to respect the
18          confidentiality of the process, but also be
19          transparent.  And that was a lot of specific
20          information in here that goes beyond that.  But I
21          saw that as a consistent issue for this situation,
22          keeping that balance, having a balance.
23     Q.   If I can refer you back to Claimant's Exhibit
24          B-8 -- I'm sorry, not B-8.
25                     If I can show you what's been
```

1          previously marked as Claimant's Exhibit H?

2                    Do you recognize this letter that's

3          been identified as Claimant's Exhibit H?

4     A.   Again, I think I've seen it before.  It wouldn't

5          surprise me that I was cc'd on it.

6     Q.   Do you recall a time where SUNY Albany and the

7          Office of Human Resources made a determination that

8          Dr. Alaei did not violate any SUNY policies at the

9          conclusion of its investigation?

10    A.   That, I don't remember.  I'm sorry, I just don't

11         remember that determination.

12    Q.   Sure.

13                   Do you recall a time where the Office

14         of Human Resources made a determination that there

15         was no just cause to impose discipline against

16         Dr. Alaei?

17    A.   Again, I don't have a specific recollection of that,

18         so I'll have to say I don't know.  Sorry.

19    Q.   Okay.  Do you know if you were -- strike that.

20                   Do you know if you were consulted

21         before -- or consulted with before this counseling

22         memorandum dated August 9, 2018 was issued?

23    A.   So, again, a lot of things were brought up as part

24         of the normal discourse of conversation between the

25         people that felt that they had to manage this,

JAMES STELLAR                                                        64

```
 1          including my office.  So I believe that I had heard
 2          of the operation, but I don't have specific
 3          recollection of defined actions, as I discussed a
 4          second ago.
 5   Q.     So if I can refer you to what had been previously
 6          marked as Defendant's -- or excuse me, Claimant's
 7          Exhibit D-1.
 8                      Claimant's Exhibit D-1 is a series of
 9          e-mails between Brian Selchick and Chantelle Cleary
10          dated March 26, 2018.  In these e-mails, there's an
11          e-mail here where Mr. Selchick is inquiring of
12          Ms. Cleary about certain information.  Ms. Cleary
13          responds:  "I thought we agreed he wasn't going to
14          come back.  I'm confused."
15                      Do you recall, as of March 26, 2018,
16          whether there was a determination to terminate
17          Dr. Alaei's appointment and non-renew his
18          appointment?
19   A.     So I don't remember, again, exactly when that
20          determination was made.  And this is Kamiar Alaei
21          we're talking about, correct?
22   Q.     Yes.
23   A.     And -- but I know that this was -- part of the
24          conversation was about whether that should happen or
25          not.  But I can't speak to the date of whether that
```

JAMES STELLAR                                    65

```
1          March 26th was -- a decision was made.
2  Q.   Okay.  I want to refer you to what's been previously
3          marked as Claimant's Exhibit L-4.
4                    Claimant's Exhibit L-4 has been
5          identified as handwritten notes from 4/13/18 by
6          Brian Selchick at a certain meeting.  The first
7          sentence here says:  "How do we maintain the
8          integrity of the non-renewal with or without the NOD
9          interrogation?"
10                   As far as you know, has the April 3,
11         2018 -- had there been a determination by SUNY
12         Albany to non-renew Dr. Alaei?
13  A.   Kamiar again, correct?
14  Q.   Yes, Kamiar.
15  A.   I don't think so, but I can't say for sure.  This is
16         a while ago and I know that the discussion was
17         ongoing.
18  Q.   Okay.  As you scroll down further, and I'm pointing
19         out with my mouse arrow over it.  It says:  "Goal is
20         to make sure he does not come back."
21                   Are you aware of an articulated goal
22         by SUNY personnel as of April 3, 2018, that
23         Dr. Alaei, Kamiar Alaei, not come back to work at
24         SUNY Albany?
25  A.   So, I don't remember exactly when that determination
```

```
 1            was made.  I would have thought it would have been
 2            made closer to the actual issuance of the
 3            non-renewal.
 4     Q.     Okay.  I'm showing you what's been previously marked
 5            as Claimant's Exhibit E-1.
 6                        Claimant's Exhibit E-1 is an e-mail
 7            dated April 4, 2018, from Liesl, L-I-E-S-L,
 8            Zwicklbauer, Z-W-I-C-K-L-B-A-U-E-R, to several
 9            individuals, dated April 4, 2018.  If you could just
10            take a look at this e-mail?
11     A.     Okay.
12     Q.     Based on this e-mail, do you have any recollection
13            of whether there had been a determination to
14            non-renew Dr. Alaei's employment as of April 4,
15            2018?
16     A.     I don't believe so.  I think this was trying to see
17            what the options are and involving SUNY, of course.
18     Q.     And do you know what a performance program is?
19     A.     Generally, a performance program is some kind of
20            activity that someone is assigned to, executing
21            duties.  And that was, I think, specified in the
22            alternate assignment, unless I'm mistaken.
23     Q.     And this refers to an evaluation.  Do you know if
24            Dr. Kamiar Alaei had any evaluations as of April 4,
25            2018?
```

JAMES STELLAR                                    67

```
 1   A.   Well, the whole process was under continuous
 2        scrutiny by the administration, and particularly by
 3        Harvey Charles.  So in terms of a formal evaluation,
 4        I just don't know.
 5   Q.   Included with this e-mail, Claimant's Exhibit E-1,
 6        there's a letter dated December 4, 2017, for
 7        Dr. Alaei.  It looks like to be a renewal of an
 8        appointment.  This is from you?
 9   A.   Yep.
10   Q.   Do you recall writing this letter?
11   A.   Well, I would issue hundreds of those letters, so I
12        don't recall this specific one, but it's completely
13        consistent with how I would renew appointments.
14   Q.   Okay.  And included with Exhibit E-1 is the form,
15        change of status form, HRM-3.
16   A.   Yes.
17   Q.   In the box identified as "Number 1, extension of
18        temp appointment or renewal of UUP term
19        appointment," there's a sub box that says
20        "appointment type, term."  Do you have any
21        understanding of what that appointment type, term,
22        is referring to?
23   A.   It refers to a period of time during which the
24        person's appointment would be operative.
25   Q.   So here it says "appointment term" and then there's
```

JAMES STELLAR                                    68

```
 1        a box that says:  "Duration, term appointments,
 2        other, two years, nine months"?
 3   A.   Yep.
 4   Q.   Do you have any understanding of what that means in
 5        the context of this appointment for
 6        Dr. Kamiar Alaei?
 7   A.   Well, it would mean that the appointment would be
 8        for two years and nine months and would have to be
 9        renewed at that point in time or actually slightly
10        before.
11   Q.   Okay.
12                  MR. ROTONDI:  Can we take five?
13                  MR. CASTIGLIONE:  Sure.
14                  MR. ROTONDI:  Thanks.
15                  MR. CASTIGLIONE:  No problem.
16              (Whereupon, a recess is taken.)
17   BY MR. CASTIGLIONE:
18   Q.   Okay.  If I can refer you to what had been
19        identified as Claimant's Exhibit B-1.
20                  If you could take a look at what had
21        been identified as Claimant's Exhibit B-1?
22   A.   Right.
23   Q.   Do you recognize this document?
24   A.   Yes.
25   Q.   Can you explain to me what this document is?
```

JAMES STELLAR                                                    69

```
 1   A.   This is a letter or an e-mail or a note from
 2        Harvey Charles, the supervisor to me, his
 3        supervisor, recommending that Kamiar Alaei's
 4        appointment be not renewed.
 5   Q.   Is it your recollection that Dr. Charles felt that
 6        Dr. Alaei's appointment not be renewed?
 7   A.   Yes, it is.
 8   Q.   If I can refer you to -- And I'm sorry, before I get
 9        there, is that based on conversations you had with
10        Dr. Charles?
11   A.   Yes.  Remember, Dr. Charles and I were in, you know,
12        weekly or so contact, and this was an important
13        item, so we were discussing it over and over again.
14   Q.   Okay.  So it was something you had discussed a few
15        times?
16   A.   Yes.
17   Q.   If I could refer you to what has been marked as
18        Claimant's B-3, which is a series of e-mails dated
19        April 28, 2018, between William Hedberg and Harvey
20        Charles?
21   A.   Right.
22   Q.   If you could just take a look from the bottom up?
23   A.   Okay.  "Harvey, are you available to sign a
24        non-renewal letter?"  Right, yes.  Okay.
25   Q.   Were you aware that Dr. Charles felt uncomfortable
```

JAMES STELLAR                                70

```
 1          making a recommendation to the Provost without a
 2          basis to do so, as reflected in this e-mail?
 3    A.    I was aware that he was uncomfortable in making a
 4          recommendation.  I, personally, believed he had a
 5          basis to do so.
 6    Q.    You just said he, personally, may have had a basis
 7          to do so.  What was the basis, in your opinion?
 8    A.    The shared information from the investigations by
 9          Randy Stark and Chantelle Cleary.
10    Q.    What is the -- What information are you talking
11          about?
12    A.    Well, we had conversations from Harvey through my
13          office, which included Hedberg and some of the other
14          people mentioned and the President's office,
15          including Bruce Szelest, and these conversations
16          evaluated and discussed implications of the emerging
17          evidence from the Chantelle Cleary and Randy Stark
18          investigations.  So my understanding was that
19          Harvey Charles had the same access to that
20          information, as did I.
21    Q.    When you say that -- When you say the same evidence,
22          what exactly are you talking about?
23    A.    Well, my -- Most of it is conversation.  There's
24          documents that -- much of which have been presented
25          here that talk about what happened.  So, for
```

```
 1        example, Harvey's briefing of the GIHHR staff and
 2        students, which was preceded by conversations
 3        between him and Chantelle and Randy Stark about what
 4        could be said and what should be said and what was
 5        the state of affairs.  So those kinds of things were
 6        happening over and over again, but I -- I have to
 7        leave it at that because that's the best I can do in
 8        describing it.
 9   Q.   If I can refer you back to Claimant's Exhibit
10        L-2 -- no, that's not L-2, that's B.  I'm referring
11        you back to Claimant's Exhibit L-2, the first page
12        of what's identified as sexual misconduct response
13        report.
14                   I had asked you questions and you
15        submitted, you know, answers/statements regarding
16        those Roman Numerals I, II and III.
17   A.   Yes.
18   Q.   When you just stated that you felt Dr. Charles had a
19        basis to support a non-renewal based on the findings
20        or what was going on in investigations, was that
21        related to findings and what was going on in those
22        investigations related to these three issues, these
23        three Roman Numerals?
24   A.   Well, these three issues are the issues, as far as I
25        can tell now, but -- so I would say the answer to
```

```
1         that is a qualified yes, because there could be
2         other information.
3   Q.    So you felt there was information to support these
4         three issues to justify Dr. Charles recommending to
5         non-renew Dr. Alaei?
6   A.    Well, I know that items one and two, we discussed.
7         Item three, there would be an information basis for
8         that, which we've also discussed.  And the
9         information basis is a little different in each of
10        them.  So in general, the answer's yes, but I'm most
11        comfortable with points one and two.
12  Q.    So you're most comfortable with saying there was
13        sufficient evidence to support points one and two to
14        give Dr. Charles basis to recommend to not to renew
15        Dr. Alaei?
16  A.    Yes.
17  Q.    Okay.  And in terms of your recollection for point
18        one about permitting Dr. Arash Alaei to conduct
19        business on behalf of GIHHR after a separation, do
20        you recall what the evidence was?
21  A.    Not specifically.  Not now.  It was a while ago, but
22        I remember my understanding at the time that we had
23        documented that, but I can't speak to the specific
24        reasons for that documentation because of the time.
25        It was a long time ago.
```

```
 1   Q.   And as to Roman Numeral II on Claimant's Exhibit
 2        L-2, do you recall what the specific evidence would
 3        be to support that allegation about facilitating
 4        contact between Arash Alaei and GIHHR staff and
 5        students during Arash's alternative assignment and
 6        after his separation?
 7   A.   Again, I believe this information was in the reports
 8        that we were receiving, both written and verbal, on
 9        the progress of the investigation, something of
10        interest to the administration.  And also we
11        discussed the meeting that I had with the students
12        where both of these points were raised by them
13        directly to me.
14   Q.   Okay.  Do you know if there was any policies SUNY
15        Albany had in place or writings relevant to number
16        one and two?
17   A.   I believed that the policy was in the agreement that
18        we had -- of the first agreement with Arash, which
19        was the settlement and then the second agreement we
20        had with Kamiar, which described the terms of his
21        alternate assignment.
22                  In terms of general policies, I would
23        have to just refer to the general issues in the
24        University about fulfilling your obligations to
25        arrangements like -- arrangement that Kamiar was
```

1           under at the time and also general policies about

2           how to handle students and staff, et cetera.  But in

3           terms of specific languages, I don't have anything.

4    Q.    So was there a specific contract that Kamiar Alaei

5           signed or that was given to him prohibiting him from

6           participating or allowing contact between

7           Dr. Arash Alaei and GIHHR staff and students?

8    A.    My understanding, not from direct contact with

9           Kamiar, was that this was made clear to him that

10          this was part of the reason for the alternate

11          assignment; that these are things that had happened.

12          And so that they came out of the first arrangement

13          with Arash, which was clear.

14                     In terms of what Arash's behavior was

15          and what the expectations of GIHHR staff and

16          students were and, therefore, how Kamiar, as the

17          manager, would handle that.

18   Q.    Do you know if Kamiar was ever specifically told

19          that?

20   A.    I wasn't in the meetings with him directly, so I

21          can't say that I knew he was specifically told that,

22          but I assumed he was.

23   Q.    If I can refer you back to -- if I can refer you to

24          what had previously been identified as Claimant's

25          Exhibit B-4, which is e-mails between

1          William Hedberg, Harvey Charles, Randy Stark and
2          yourself on May 2, 2018?
3                         As part of Mr. Stark's e-mail --
4          strike that.
5                         Do you recall reading this at around
6          May 2, 2018?
7    A.    I recall reading it and I'm going to assume it was
8          around May 2nd.
9    Q.    Okay.  In this, Mr. Charles -- or Dr. Charles says
10         he declined to sign the letter because he has no
11         information that can be used as a basis to recommend
12         that Kamiar not be renewed.  He's not seeking such
13         information since it's clear to him that Provost has
14         decided to not renew Kamiar's contract.  Had you
15         made a decision at that time to not renew Kamiar's
16         contract?
17   A.    So I believe the decision to not renew was something
18         that came out fairly close to the non-renewal,
19         itself.  And the reason for that is that the
20         investigation was proceeding and various people were
21         talking.  So it would be natural to make the
22         decision when all the evidence was on the table
23         close to the time.  So this is an inference by
24         Harvey Charles, not a decision by me.
25   Q.    Did you ever talk to him about the sentiments he

```
1              conveyed in this e-mail about you having decided not
2              to renew Kamiar's contract?
3    A.    Not at that moment.  Because we were in the busy
4              time of year.  That's when May comes up, it's near
5              graduation, there's many, many things to work on.
6              And I thought that it wasn't necessary for me to
7              talk to Harvey Charles about it right away.  Later
8              on, I did have a conversation with Kamiar.
9    Q.    What did you discuss?
10   A.    I can't recall exactly -- I can't recall exactly
11             what we discussed, but I think what I said is, you
12             know, "Why did you think that?"  And he would have
13             probably given me his explanation.
14                          Whatever the outcome of that
15             conversation, I know that I was satisfied with
16             Harvey Charles' answer because he remained in his
17             position.
18   Q.    Were you advocating at this time that Harvey Charles
19             sign the recommendation to not renew Kamiar Alaei's
20             contract?
21   A.    I was, because it was thought to be by HR the
22             standard procedure for having direct supervisor
23             afford the recommendation up.  Now, ultimately, it
24             depends upon the President because the President is
25             in charge of everything.  But the answer -- the
```

```
 1        short answer is yes.
 2   Q.   Is it typical to pursue non-renewal where the
 3        supervisor of the faculty or employee declines to
 4        make a recommendation for non-renewal?
 5   A.   Well, I've only done this here, so I can't
 6        use -- speak to the word "typical," but I was
 7        expecting that Harvey Charles would forward the
 8        recommendation because I thought that was the
 9        consensus decision of the administration, including
10        him.
11   Q.   Okay.  If I could refer you to what's been
12        identified as Exhibit B-6.  Exhibit B-6 includes an
13        e-mail from William Hedberg to Kamiar Alaei.  It
14        includes you and Harvey Charles.  It's dated May 14,
15        2018, if you could take a look at this?
16                    This e-mail reflects that you had
17        signed off on the form for non-renewal.  What was
18        the basis for your -- I'm sorry?
19   A.   Nope.  Go ahead.
20   Q.   Oh, okay.  What was the basis for your decision to
21        sign off on the form for non-renewal of Dr. Alaei's
22        appointment?
23                    MR. ROTONDI:  Object to the form.  You
24            can answer.
25                    THE WITNESS:  I'm sorry?
```

JAMES STELLAR                                    78

1    Q.    He said you can answer.

2    A.    Sure.  The process was continuing through the

3          conversations of which I've referred a number of

4          times.  And we were coming to the conclusion that

5          non-renewal was the decision.  So on the basis of

6          the evidence I had -- was building up inside me and

7          the conversations I had with other people, guidance

8          from them, I did make the decision that I would

9          recommend to the President that he be non-renewed.

10   Q.    So you were making a determination in your own mind

11         based upon your review of the evidence and

12         conversations concerning the investigations at that

13         point?

14   A.    Yes.

15   Q.    This letter refers to the next step in the process

16         is for the President to review the file and make his

17         decision.  And it identifies giving Dr. Alaei five

18         working days to submit a reply response.  Do you

19         recall reading a reply response from Dr. Alaei

20         concerning the non-renewal?

21   A.    I do not recall, at this point, reading one.

22   Q.    Okay.  If I can -- I'm going to scroll down to

23         what's been previously identified as Claimant's

24         Exhibit B, sub 6, and there's a letter dated May 8,

25         2018, to William Hedberg -- and I'm just going to

1          scroll through quickly -- from Kamiar Alaei.  And do

2          you recall reading this letter?

3    A.    Now that I see it, it does stipulate my

4          recollection, and I trust the date on it is correct.

5          And it does -- It is a response to Hedberg's inquiry

6          or memo.

7    Q.    Okay.  In this letter, and I'm identifying the

8          paragraph, it's on the second page of this May 8,

9          2018 letter.  It says:  "With respect to funding,

10         you can also find the projected funding required for

11         each of the two faculty lines, $185,500, in the

12         attached Excel sheet.  I've also included the actual

13         funding from 2015 to 2017 that I was able to get

14         that identified 3,916,342.  Despite the absence of

15         the second faculty line, this means I was able to

16         reach over 21 times higher than the target.  The

17         details of funding are listed in the attached Word

18         document."

19                        As you read that, are you familiar

20         with what Dr. Alaei is referring on that matter?

21   A.    So there was some general principles that

22         Bruce Szelest and I developed when he was my chief

23         of staff when I was first Provost that referred to

24         how faculty lines might be allocated.  It wasn't a

25         rigid formula, but it talks about things like how

JAMES STELLAR                                                80

```
 1          much money they would bring in in grants, how many
 2          tuition dollars they would teach in each department,
 3          and it applied also to centers.
 4                    So he is using that document to make a
 5          case that he was highly productive.  That's how I
 6          read that document.
 7   Q.     The raising over 21 times higher than the target, is
 8          that a meaningful achievement for somebody in
 9          Dr. Alaei's position at the time?
10   A.     Well, the GIHHR, in general, was seen by me,
11          especially when I first became aware of them when I
12          was first appointed, as a fairly successful center,
13          in terms of many metrics, undergraduate research,
14          grants and the social mission that they were
15          involved in.  So this goes back to that point.
16   Q.     But is that a meaningful number, in terms of
17          achieving 21 times higher than a target as compared
18          to other employees in a similar position of
19          Dr. Alaei?
20   A.     Well, that depends on the details, which are not
21          contained here and I do not recall.  For example,
22          what was the funding source?  Was it one grant or
23          several?  And who else was around to help produce
24          that?  They point out the second faculty line was
25          not present, so I can't really answer that question.
```

JAMES STELLAR                                      81

```
 1          But, obviously, he included it because he thinks
 2          it's impressive.  And I'm impressed, but before I
 3          give it an evaluation, I would need to dig into the
 4          details, which is what this whole process was all
 5          about, getting a good conversation going between the
 6          Dean and/or Harvey Charles in this case and the
 7          center and then having that conversation reflected
 8          back up to my level where budget allocations were
 9          decided.
10                    So it would be quite a long process to
11          really get behind that number and answer your
12          question.
13    Q.    So at the time -- at the time you signed the
14          non-renewal, did you have that information or look
15          into the information that was being raised by
16          Dr. Alaei in this matter?
17    A.    I did not look into the information.  I didn't
18          dispute it, as I think I've stipulated.  But it was
19          his ability to get grants was sort of not in the
20          conversation about whether he should be non-renewed
21          or terminated.  These were dependent upon other
22          aspects that we've discussed in this deposition.
23    Q.    Okay.  Before you signed the letter for non-renewal,
24          did you have any discussions with Randy Stark or
25          Brian Selchick?
```

```
1   A.   So, again, I'm going to have to just rely on the
2        general method of operation, which was to have
3        fairly consistent discussions over time and touch
4        base with each other either directly or through
5        intermediaries, like Bill Hedberg and
6        Harvey Charles, Bruce Szelest.
7                    So I think I had many conversations,
8        but I can't recall a specific one in -- at this
9        particular time.  They were ongoing.
10  Q.   Do you recall, before you signed off on this
11       non-renewal, whether you had conversations with them
12       specifically about the interrogation of Dr. Alaei?
13  A.   Well, I believe I talked about everything that was
14       on the table.  And the interrogation would have been
15       part of that, but I can't recall whether I
16       specifically discussed the interrogation at what
17       point.  So I'm making an inference here that I must
18       have, but I can't say for sure that, yes, I
19       discussed the interrogation on this day.
20  Q.   Okay.  So in terms of your determination to agree
21       and approve non-renewal, you don't recall if you
22       considered issues raised during Dr. Alaei's
23       interrogation?
24  A.   Well, I did because it was part of the general
25       report.  What I'm saying is that if the report had
```

```
 1        nine sections in it, for example, hypothetically, I
 2        might not, at this point in time, two years later,
 3        remember section two.  But certainly, I was
 4        determined to do a thorough job in reaching my
 5        decision, taking in all the information that was
 6        available to me, and I believe the interrogation
 7        results were available to me.
 8   Q.   Did there come a time when the President approved
 9        the non-renewal of Dr. Alaei?
10   A.   It had to.  It required the President's approval.
11   Q.   Okay.  Do you -- Did the -- strike that.
12             Did the President ever explain to you
13        why he approved non-renewal of Dr. Alaei?
14   A.   I recall us having conversations.  Again, many
15        conversations, but not as many as with the other
16        people, because the job of the Vice President is to
17        collect information and then present it in an
18        efficient way to the President.  It's the same job
19        as Randy Stark.
20             So we did discuss this many times
21        and -- but I don't know that he ever gave me an
22        analysis of his thinking.  I do know what he
23        concluded.
24   Q.   Okay.  And his conclusion was just he approved
25        non-renewal?
```

JAMES STELLAR                                    84

```
 1    A.    Correct.
 2    Q.    Do you recall a time where an issue as part of the
 3          renewal was whether Dr. Alaei was entitled one year
 4          versus two years of employment as part of any
 5          non-renewal?
 6    A.    That was something that I would have left to HR,
 7          because it wasn't necessarily part of the academic
 8          management decision.  So I think there was
 9          discussion of that, but I don't think I had a
10          position because I -- it was not in my purview.
11    Q.    Okay.  So in other words, in terms of your
12          participation, you would have deferred to whatever
13          HR felt was appropriate for the one year versus two
14          years?
15    A.    HR and, of course, the President.
16    Q.    Okay.  Do you recall what HR's position was on that
17          one year versus two-year issue?
18    A.    I don't recall.  Sorry.
19    Q.    Okay.  Do you know, would Kevin Williams have any
20          understanding about whether or not an employee, such
21          as Dr. Alaei, was entitled to one or two years of
22          employment based upon Dr. Williams' experience?
23    A.    Well, he was a senior member of the administration
24          as a Vice Provost and a long-time member of the
25          University community.  So on those bases, I would
```

JAMES STELLAR                                85

```
 1         assume he would.  But his portfolio wasn't really
 2         this area.  His portfolio was management of the
 3         graduate school.
 4                   So many of the senior staff would come
 5         in to help us make decisions and use their
 6         collective wisdom.  So the answer is that he might
 7         have some expertise, but I wouldn't be aware of what
 8         it would be because it would be part of his general
 9         knowledge of how the University works.
10    Q.   Are you familiar with the term "evergreen contract"
11         or "evergreen appointment"?
12    A.   Yes.
13    Q.   Do you have any understanding -- or strike that.
14                   Can you explain to me what your
15         understanding is of the term "evergreen contract" or
16         appointment?
17    A.   So my understanding was it was a way to give someone
18         a multi-year appointment and then renew them before
19         the contract comes up at the end, and that would
20         convey to the person a certain security.  Not quite
21         like having tenure, but you wouldn't have to worry
22         as much, hence the term "evergreen."
23    Q.   Okay.  And do you know, from Dr. Alaei, whether he
24         was given any metrics as part of an evergreen
25         appointment that he possibly received?
```

JAMES STELLAR                                          86

```
 1   A.    I would have to look at the documentation around
 2         appointment for that, and I was pushing the
 3         University to become more quantitative in some of
 4         these things, so I don't recall where we were with
 5         him at that time.
 6   Q.    After Dr. Alaei's interrogation in May 2018, are you
 7         aware of the status of the various -- let me strike
 8         that.
 9                     After Dr. Alaei's interrogation in
10         May 2018, are you -- were you aware of the status of
11         the investigation being conducted by Title IX at
12         that point?
13   A.    Could you repeat the question, please?
14   Q.    Sure.
15                     After Dr. Alaei's interrogation in
16         May 2018, did you have any understanding about the
17         status of the Title IX investigation at that point?
18   A.    We were getting close to the decision point, as I
19         recall, so I believe the Title IX investigation was
20         wrapping up.
21   Q.    Okay.  What about at the investigation by human
22         resources and Mr. Stark and Mr. Selchick?
23   A.    I think that was in a similar state, although I'm
24         not sure as much about that because they had this
25         event that you just referred to, interrogation.
```

JAMES STELLAR                                87

```
 1   Q.    If I could refer you to what had been previously
 2         identified as Claimant's Exhibit D?
 3                       As to Dr. Alaei's response letter
 4         concerning the non-renewal, did he provide a
 5         quantitative metric for his appointment for
 6         your -- or for review by the President?
 7   A.    There's some quantitation in the response that you
 8         just read, the 21 times higher, and I think so
 9         that's -- the answer to that would be, yes, in this
10         way.  Just leave it at that.
11   Q.    I'm showing you what's been previously marked as
12         Claimant's Exhibit D-2.  This is an e-mail from
13         Randy Stark to Valerie Ayers and others, dated
14         July 6, 2015.  If you could take a second or few
15         minutes, whatever, to read this one?  Sorry.
16   A.    Okay.
17   Q.    In this e-mail, Mr. Stark identifies his opinion
18         that the misconduct allegations were unfounded
19         concerning Dr. Alaei.  Did Mr. Stark ever convey
20         that to you?
21   A.    I believe we discussed this towards the end.  This
22         is why we wanted to wait for the investigations to
23         play out.  So whether Mr. Stark conveyed it to me or
24         someone else did, I can't say.  But I do think that
25         I knew about this.
```

JAMES STELLAR                                        88

```
 1   Q.   When you learned about this, did it cause you to
 2        have any second thoughts or reconsider the issue of
 3        non-renewing, Dr. Alaei?
 4   A.   Well, the basis for my non-renewal was captured well
 5        in your earlier memo where we discussed the three
 6        Roman Numerals and I was really keying off of
 7        numbers one and two.
 8   Q.   So that would be --
 9   A.   And so the answer would be no because of numbers one
10        and two.
11   Q.   Okay.  So referring back to Claimant's Exhibit L-2,
12        you're referring to Roman Numerals I and II on this
13        first page of L-2?
14   A.   Right.
15   Q.   Okay.
16   A.   Particularly, number two.  Arash, GIHHR staff and
17        students, facilitated contact after separation.
18   Q.   Do you know whether Mr. Stark and Mr. Selchick
19        determined that there was no support for those
20        allegations, Roman Numeral I and II?
21   A.   Well, I believe that we had decided that that was
22        the issue, so I assumed there was support.  What I
23        can't recall now is any specific documentation from
24        Stark or others that said that.  It was the
25        consensus of the management team that that was the
```

```
 1            issue.  So I'm sorry, it's been a while.  I just
 2            can't recall a specific example.
 3    Q.    In this Exhibit D-2, Mr. Stark refers to:  "We are
 4            going to non-renew him and buy him out."
 5                      So non-renewal is referring to your
 6            approval and the President's approval, as we've gone
 7            through already, in terms of not renewing
 8            Dr. Alaei's employment term?
 9    A.    Correct.
10    Q.    Okay.  And then what is buying him out?
11    A.    So there's a contract and the contract specifies
12            that there is money in it.  So this would be a
13            decision that I would probably not be involved in,
14            because it's really HR and finance and wouldn't be
15            in my purview.  My purview would finish with whether
16            the appointment should be non-renewed or not.
17    Q.    So you had no involvement in the decision to buy out
18            Dr. Alaei?
19    A.    Yes, that's correct, I had no involvement in that
20            decision, at least as far as I recall.
21    Q.    I can show you what was previously marked as
22            Claimant's Exhibit I-4.
23                      Claimant's Exhibit I-4 includes an
24            e-mail from Bruce Szelest, dated July 23, 2018, to a
25            number of individuals.  It looks like Mr. Stellar,
```

JAMES STELLAR                                  90

```
 1        you are included as a cc'd recipient.  Just take a
 2        look at this.
 3   A.   Right.
 4   Q.   Do you recall this e-mail?
 5   A.   Yes.
 6   Q.   This e-mail refers to a meeting.  Do you recall the
 7        meeting referred to?
 8   A.   There was so many meetings, I can't recall this
 9        specific one, but I'm sure it's correct that there
10        was one.
11   Q.   And this reflects that the President was approving a
12        course of action, including non-renewal and buying
13        out?
14   A.   That's what it says.
15   Q.   Okay.  Was there any discussion at this meeting
16        about the findings by Mr. Stark and Mr. Selchick as
17        to what their opinions were as to the allegations as
18        to Roman Numerals I, II and III from the Claimant's
19        Exhibit L-2, which was the sexual misconduct
20        response report?
21   A.   So that's a very specific question, and I'm not sure
22        that I can recall whether it was discussed in that
23        meeting.  But these kinds of things were discussed
24        in every meeting, and so my suggestion is -- or my
25        thought is if it wasn't discussed, then it was
```

JAMES STELLAR                                    91

```
1            assumed because it was discussed in a previous
2            meeting.
3   Q.   Okay.  And ultimately, you determined to terminate
4            Dr. Alaei's employment and buy him out?
5   A.   Right.
6   Q.   In August; is that correct?
7   A.   I believe that's correct.
8   Q.   I'm showing you what has been previously marked as
9            Plaintiff's Exhibit B-8.  And this document, this
10           April 10, 2018 letter, is reflective of that?
11  A.   Yes.
12  Q.   And was the -- did you have -- strike that.
13                    Did you have any conversations with
14           the President that the President was agreeing to
15           this or approving this based on a determination
16           about Roman Numerals I and II from that sexual
17           conduct report being substantiated?
18  A.   Well, the President was briefed by a number of
19           people, including Randy Stark.  And I'm not sure
20           that I was in every meeting with him, so it's hard
21           for me to say what he based his decisions on.
22                    I would have strongly recommended that
23           I and II were sufficient, so I don't know what else
24           he used in his making this decision.  But I -- I
25           don't recall us going over one, two, three like we
```

JAMES STELLAR                              92

```
 1          just did here.  It was more of an ongoing general
 2          discussion evidence based over many months.
 3   Q.     During your time with SUNY, did you ever deal with
 4          any other non-renewal efforts for faculty?
 5   A.     So this is another good question.  There are
 6          literally hundreds of faculty; 600 or so tenured and
 7          another 7,800 adjuncts.  And I'm reluctant to say
 8          that I hadn't, because I'm sure I did, but I just do
 9          not recall at this moment dealing with a
10          non-renewal, and certainly not at this level.
11   Q.     Do you recall any instances where an employee was
12          subject to a disciplinary investigation during your
13          time and human resources determined not to impose
14          discipline, but otherwise that employee was then
15          terminated?
16   A.     So this is, again, something that I can't really
17          speak to because I stayed within my zone, which was
18          to manage the academic affairs.  And once things
19          would come up where there would be disciplinary
20          matters, I would be informed.  And if anybody from
21          the academic side discovered something like this, it
22          would be immediately referred to the appropriate
23          office, say, Title IX or HR.
24                    So I really wasn't involved in these
25          things.  I would be consulted because this would be
```

```
1          a position in the University which would have
2          to -- we would have to make a decision about whether
3          to fill it.  So I would come in sort of more or less
4          after the matter, and that's, I think, weakening my
5          recollection, because I really don't recall.
6    Q.    And would you say your extent of involvement in this
7          disciplinary investigation concerning Dr. Alaei was
8          more -- was not as typical as your other involvement
9          in -- strike that.
10                        Would you characterize your
11         involvement in this disciplinary investigation
12         concerning Dr. Alaei as unusual as compared to other
13         disciplinary investigations during your time?
14   A.    I would say yes, because it was high profile and,
15         therefore, I was a bit more involved than I would
16         have been in other activities like that.
17   Q.    When you say "high profile," what are you referring
18         to?
19   A.    The two brothers were brought here with great
20         promise and delivered on that in the very beginning
21         of their time here.  As I mentioned earlier in my
22         deposition, they were good with undergraduates,
23         promoting their research and so on.  They were good
24         with grants.  They were fulfilling the social
25         mission.
```

JAMES STELLAR                    94

1                    So this was an important center and

2        Jim Dias and I visited it a few times, for example,

3        to show our support for it.  So, therefore, it was,

4        by my definition by that, high profile.

5                         MR. CASTIGLIONE:  Okay.  Can we just

6            take a minute or two break and then I'll wrap

7            it up?

8                         (Whereupon, a recess is taken.)

9                         MR. CASTIGLIONE:  Okay.  I don't have

10           any other questions, so we can stop at 4:17.

11                        (Transcript requests are as follows.)

12                        MR. CASTIGLIONE:  Standard delivery,

13           E-mail only.

14                        (Whereupon, the above-titled matter

15           was concluded at 4:17 p.m.)

16

17

18

19

20

21

22

23

24

25

JAMES STELLAR                                                95

1                    I N D E X   P A G E

2

3        WITNESS:

4                 JAMES STELLAR

5        EXAMINATION BY MR. CASTIGLIONE                4

6

7

8

9                    E X H I B I T S

10       NAME            DESCRIPTION                 PAGE

11       (Whereupon, no exhibits were marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2        STATE OF NEW YORK:
         COUNTY OF WARREN:

3

4             I, Deborah M. McByrne, do hereby certify
         that the foregoing testimony was duly sworn to;
5        that I reported in machine shorthand the
         foregoing pages of the above-styled cause, and
6        that they were prepared by computer-assisted
         transcription under my personal supervision and
7        constitute a true and accurate record of the
         proceedings;

8

9

10            I further certify that I am not an attorney
         or counsel of any parties, nor a relative or
11       employee of any attorney or counsel connected
         with the action, nor financially interested in
12       the action.

13

14            WITNESS my hand in the City of Queensbury,
         County of Warren, State of New York

15

16

17

18       _____

19

20       DEBORAH M. McBYRNE

21       Court Reporter

22

23

24

25

```
 1        DECLARATION/WITNESS CERTIFICATION

 2        Case:  Alaei v. State University of New York

 3        Witness:  James Stellar

 4        Deposition Date:  April 9, 2021

 5
              I declare under penalty of perjury that I
 6        have read the entire transcript of my Deposition
          taken in the captioned matter or the same has
 7        been read to me, and the same is true and
          accurate, save and except for changes and/or
 8        corrections, if any, as indicated by me on the
          DEPOSITION ERRATA SHEET hereof, with the
 9        understanding that I offer these changes as if
          still under oath.

10
                    _____
11                         JAMES STELLAR

12        Sworn to before me, this _____ day
          of_____     20_____ .
13
          [                                    ](print)
14        Notary Public.

15        Registration No:  _____

16        State of_____

17        Qualified in_____County.

18        My commission expires_____.

19

20

21

22

23

24

25
```

1        DEPOSITION ERRATA SHEET

2        Case:  Alaei v. State University of New York
         Witness:  James Stellar
3        Deposition Date:  April 9, 2021

4                    Reason Codes:
         1:  To clarify the record
5        2:  To conform to the facts
         3:  To correct transcription errors.

6
         PAGE/LINE            CORRECTION    REASON CODE
7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19       _____

20       _____

21       _____

22       _____

23       _____

24       _____

25       _____

```
 1                    DEPOSITION ERRATA SHEET

 2        PAGE/LINE          CORRECTION     REASON CODE

 3        _____

 4        _____

 5        _____

 6        _____

 7        _____

 8        _____

 9        _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17        _____

18        _____

19        _____ Subject to the above changes, I certify

20        that the transcript is true and correct.

21        _____ No changes have been made.  I certify that

22        the transcript is true and correct.

23

24        _____

25                        JAMES STELLAR
```

DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.

JAMES STELLAR
April 9, 2021

**$**

**$185,500 (1)** 79:11

**@**

**@columbiaedu (1)** 25:3
**@unionedu (1)** 25:3
**@virginiaedu (1)** 25:2

**A**

**A-1 (5)** 10:2,4;18:11, 12;19:9
**A-11 (1)** 39:18
**A-12 (1)** 42:20
**A-13 (1)** 43:21
**A-2 (2)** 19:22,22
**A-3 (2)** 21:23,24
**A-4 (3)** 23:12,13;25:1
**A-6 (2)** 33:2,3
**A-7 (3)** 35:15;39:18, 19
**ability (3)** 5:11,20; 81:19
**able (6)** 27:23;33:10; 50:13;55:1;79:13,15
**above (1)** 99:19
**above-mentioned (1)** 55:22
**above-titled (1)** 94:14
**abreast (1)** 11:5
**absence (2)** 35:22; 79:14
**Academic (9)** 7:3,23; 8:2;38:25;39:7;41:4; 84:7;92:18,21
**academics (1)** 38:23
**accept (1)** 44:4
**access (6)** 20:1,1,3, 19;21:14;70:19
**accurately (1)** 5:19
**accusations (1)** 27:24
**achievement (1)** 80:8
**achieving (1)** 80:17
**acted (1)** 48:7
**acting (1)** 48:10
**action (6)** 28:2;29:18; 40:5,13;49:24;90:12
**actions (7)** 8:21;21:8; 30:10;32:20;42:24; 53:25;64:3
**activities (4)** 15:2; 55:19,19;93:16
**activity (2)** 12:10; 66:20
**actual (2)** 66:2;79:12
**actually (3)** 35:7; 39:18;68:9
**addition (1)** 48:3
**address (1)** 25:2

**addressed (1)** 30:22
**addressees (1)** 26:15
**addresses (8)** 25:6,8, 12,13,13;26:7,7,11
**adjuncts (1)** 92:7
**administration (8)** 15:12;21:2;29:18; 48:19;67:2;73:10; 77:9;84:23
**administrator (1)** 48:21
**admissions (1)** 8:7
**admittedly (1)** 47:2
**advance (2)** 5:22;6:8
**advice (2)** 37:9;58:9
**advise (3)** 12:11; 17:21;18:1
**advised (1)** 60:5
**advising (1)** 10:13
**advisor (3)** 27:2;48:4, 5
**Advisory (1)** 54:9
**advocating (1)** 76:18
**affairs (5)** 7:23;8:2; 27:1;71:5;92:18
**affidavit (1)** 48:3
**affiliated (3)** 28:5; 34:20,25
**afford (1)** 76:23
**aforementioned (1)** 19:16
**afternoon (1)** 4:7
**Again (17)** 21:11; 24:13;30:7;45:10; 48:13;59:15;63:4,17, 23;64:19;65:13; 69:13;71:6;73:7; 82:1;83:14;92:16
**against (3)** 4:12; 14:23;63:15
**aggressive (1)** 48:7
**ago (7)** 7:15;17:17; 50:11;64:4;65:16; 72:21,25
**agree (3)** 5:9;36:3; 82:20
**agreed (1)** 64:13
**agreeing (1)** 91:14
**agreement (21)** 8:17; 9:11,18,19;11:18; 15:6,7;17:1,9,13; 18:1;21:14;38:13; 51:4;55:4;56:17; 58:19;59:8;73:17,18, 19
**agreements (1)** 56:24
**ahead (3)** 31:7;32:17; 77:19
**Alaei (110)** 4:9,11; 10:5,13,19;12:1,24; 13:4;14:7,25;15:7,8, 9,25;16:2,2,3,7,19; 17:2,10,14;18:2,7;

20:3,18;26:20;27:22; 31:18;32:7;33:10,22; 34:24;39:25;40:23; 41:1,17;42:21,25; 43:2;44:9;45:1,16; 48:15;49:1,10,22; 51:2,10,15,16,25; 52:10,14,16;53:16; 54:8,13,24,25;55:7, 16;56:12,17,18;57:1, 6,9,14;58:2;59:3,14, 14;60:5,6;61:15,19; 63:8,16;64:20;65:12, 23,23;66:24;67:7; 68:6;72:5,15,18;73:4; 74:4,7;77:13;78:17, 19;79:1,20;80:19; 81:16;82:12;83:9,13; 84:3,21;85:23;87:19; 88:3;89:18;93:7,12
**Alaei's (23)** 13:17; 14:11,19;17:7;19:19; 38:12;53:17;56:9; 59:3;64:17;66:14; 69:3,6;76:19;77:21; 80:9;82:22;86:6,9,15; 87:3;89:8;91:4
**Albany (37)** 4:13; 6:15;7:13;9:24;10:5; 13:17;14:7,10;15:10; 16:4;19:3,4;21:10; 25:5,13;27:1;34:9,20; 35:1;37:19;39:21; 41:17;45:22;46:19, 22;47:6,22;48:12; 49:9;51:10;52:2,10, 14;63:6;65:12,24; 73:15
**Albany's (1)** 50:24
**Alexander (1)** 46:17
**allegation (2)** 11:1; 73:3
**allegations (3)** 87:18; 88:20;90:17
**alleged (2)** 47:17; 51:11
**alleges (1)** 51:1
**allegiance (1)** 29:8
**allocated (1)** 79:24
**allocations (1)** 81:8
**allow (3)** 15:8;16:2; 34:19
**allowed (1)** 27:22
**allowing (2)** 56:17; 74:6
**alter (1)** 47:22
**altered (1)** 47:3
**altering (1)** 47:7
**alternate (11)** 10:14; 22:17;29:2;33:14,24; 34:4;41:20;53:22; 66:22;73:21;74:10
**alternative (29)** 10:19;

16:19,23;17:4,5,14; 18:13;20:6;21:9,15; 22:21;23:1,3,6;34:6, 13,14,19;52:11,14; 53:18;55:8,11;56:19; 57:17;59:13,20,25; 73:5
**Although (2)** 52:6; 86:23
**among (3)** 30:14; 36:14;60:10
**analysis (1)** 83:22
**anathema (1)** 31:5
**and/or (2)** 53:9;81:6
**answer's (2)** 13:20; 72:10
**answers/statements (1)** 71:15
**apologize (2)** 35:12; 42:2
**appear (1)** 29:20
**appears (3)** 23:17; 26:19;29:6
**Appellate (1)** 46:15
**applied (1)** 80:3
**apply (2)** 17:4,13
**appointed (5)** 15:17; 37:14;40:14;41:5; 80:12
**appointment (22)** 9:4; 64:17,18;67:8,18,19, 20,21,24,25;68:5,7; 69:4,6;77:22;85:11, 16,18,25;86:2;87:5; 89:16
**appointments (5)** 8:10,12;26:9;67:13; 68:1
**appropriate (4)** 12:21; 31:21;84:13;92:22
**approval (4)** 58:2; 83:10;89:6,6
**approve (2)** 37:12; 82:21
**approved (7)** 37:6; 39:11;56:11;58:11; 83:8,13,24
**approving (3)** 58:16; 90:11;91:15
**April (8)** 65:10,22; 66:7,9,14,24;69:19; 91:10
**Arash (52)** 15:1,4,8,9, 12;16:2,3,19;17:2,7, 10,14;18:2;51:2,16; 52:16,19;53:16,16,17; 54:8,13,24,25;55:4,7, 16,18,25;56:9,12,18; 57:1,6,9,14,19;58:2,8, 12;59:3,6,14,17,21; 60:6,10;72:18;73:4, 18;74:7;73:88:16
**Arash's (2)** 73:5;74:14

**area (2)** 37:7;85:2
**areas (1)** 45:15
**arise (1)** 51:15
**around (10)** 40:25; 44:1;49:10;62:1,5,10; 75:5,8;80:23;86:1
**arrangement (6)** 15:19,22;16:17; 33:24;73:25;74:12
**arrangements (1)** 73:25
**arrived (1)** 19:6
**arriving (1)** 21:2
**arrow (1)** 65:19
**articulate (1)** 5:6
**articulated (1)** 65:21
**aspects (1)** 81:22
**assault (1)** 47:18
**asserted (1)** 4:11
**assigned (2)** 57:15; 66:20
**assignment (39)** 10:14,19;16:20,23; 17:4,5,15;18:13;20:6; 21:9,15;22:18,21; 23:1,3,6;29:2;33:14, 24;34:4,6,13,14,19; 41:20;52:11,14; 53:18;55:8,11;56:19; 57:17;59:13,21,25; 66:22;73:5,21;74:11
**assignments (1)** 53:22
**associated (1)** 60:7
**assume (5)** 26:2;50:1; 59:24;75:7;85:1
**assumed (7)** 20:13; 21:19;25:7;59:9; 74:22;88:22;91:1
**attached (3)** 30:14; 79:12,17
**attend (2)** 25:18; 33:11
**attended (1)** 25:24
**attention (11)** 8:24; 10:21,24,25;11:9,13; 12:22;22:8,16;42:4; 44:19
**attorney (2)** 4:8;5:15
**audience (1)** 31:3
**August (4)** 14:7,12; 63:22;91:6
**author (1)** 44:18
**authoritatively (1)** 7:17
**authority (3)** 15:21; 59:14,19
**available (3)** 69:23; 83:6,7
**averred (1)** 48:5
**awaiting (1)** 58:8
**aware (30)** 13:14,16; 15:14;20:24;21:8; 24:21;40:3,13;46:5, 20,23;47:4,8,20,24;

48:9;49:8;50:2;53:8;
54:24;55:2;56:4;
58:1;65:21;69:25;
70:3;80:11;85:7;86:7,
10
**away (1)** 76:7
**Ayers (1)** 87:13

## B

**B-1 (2)** 68:19,21
**B-3 (1)** 69:18
**B-4 (1)** 74:25
**B-6 (2)** 77:12,12
**B-8 (4)** 14:5;62:24,24;
91:9
**back (18)** 7:19,19;
14:23;18:10;44:25;
60:20,24,25;62:23;
64:14;65:20,23;71:9,
11;74:23;80:15;81:8;
88:11
**backtrack (1)** 18:10
**balance (10)** 28:22;
29:5,22;30:11;42:12;
43:7,12;62:16,22,22
**balancing (1)** 40:8
**base (1)** 82:4
**based (9)** 45:8;66:12;
69:9;71:19;78:11;
84:22;91:15,21;92:2
**bases (1)** 84:25
**basic (1)** 32:12
**basis (16)** 21:13;
51:24;52:13;70:2,5,6,
7;71:19;72:7,9,14;
75:11;77:18,20;78:5;
88:4
**became (1)** 80:11
**become (1)** 86:3
**beginning (3)** 13:17;
29:9;93:20
**behalf (3)** 52:17;
61:19;72:19
**behaving (1)** 31:3
**Behavior (2)** 6:13;
74:14
**behind (2)** 23:10;
81:11
**below (2)** 10:15;61:9
**best (4)** 5:10,20;24:4;
71:7
**bet (1)** 39:2
**better (3)** 38:16;42:5;
45:25
**beyond (3)** 26:21;
27:3;62:20
**bias (2)** 32:15;47:2
**Bill (2)** 38:2;82:5
**bit (5)** 23:10;24:13;
27:12;61:3;93:15
**blank (1)** 51:5
**blessing (1)** 38:9

**Board (2)** 40:3;54:9
**bordered (1)** 47:15
**both (8)** 5:3,9;12:17;
28:25;40:18;41:9;
73:8,12
**bottom (4)** 23:17;
35:4;47:9;69:22
**box (3)** 67:17,19;68:1
**break (3)** 5:14,17;
94:6
**Brian (8)** 17:24;19:24;
20:18;30:1;33:5;
64:9;65:6;81:25
**briefed (3)** 13:7;
36:14;91:18
**briefing (2)** 62:2;71:1
**briefings (1)** 14:16
**bring (2)** 12:21;80:1
**brings (1)** 41:10
**brother (4)** 14:24;
15:1;59:7,10
**brothers (2)** 15:25;
93:19
**brought (10)** 10:21,23,
24;11:8,12;22:16;
29:14;42:3;63:23;
93:19
**Bruce (14)** 12:15,19;
13:24;14:18;18:21;
21:11;37:18;41:12;
42:7;44:6;70:15;
79:22;82:6;89:24
**budget (1)** 81:8
**building (1)** 78:6
**bullet (2)** 61:10,11
**business (3)** 36:10;
52:16;72:19
**busy (2)** 35:25;76:3
**buy (3)** 89:4,17;91:4
**buying (2)** 89:10;
90:12
**bystander (1)** 46:2

## C

**C-3 (1)** 61:24
**called (1)** 4:2
**came (13)** 7:9;8:12;
9:1,3;11:2;13:11,12;
15:19;35:2;36:24;
39:6;74:12;75:18
**campus (5)** 54:14;
55:1;59:8,9,18
**can (48)** 4:22;5:4,6,
12;7:25;10:10;14:5,
22;18:10;21:22;
22:20;23:11,18;
26:16;27:12;33:6;
35:14,18;39:17;
41:21;42:19;45:21;
49:6;57:4;60:16,23;
62:23,25;64:5;68:12,
18,25;69:8;71:7,9,25;

74:23,23;75:11;
77:24;78:1,22;79:10;
85:14;89:21;90:22;
94:5,10
**capacity (1)** 60:4
**captured (1)** 88:4
**card (2)** 20:1,3
**careful (2)** 40:8;43:8
**Carlos (1)** 24:14
**Carlos-Evangelist (1)**
24:15
**Carpenter (3)** 39:20;
40:7,7
**carry (1)** 32:14
**case (10)** 7:18;14:23;
16:21;17:19,20;
22:25;28:10;33:16;
80:5;81:6
**cases (1)** 40:12
**CASTIGLIONE (8)**
4:6,8;68:13,15,17;
94:5,9,12
**Caucasian (1)** 40:17
**cause (2)** 63:15;88:1
**cc'd (4)** 39:8;40:2;
63:5;90:1
**center (15)** 11:2;
14:25;15:5,17;25:9,
15;34:1,17;36:19;
39:5;41:6,7;80:12;
81:7;94:1
**centers (2)** 22:14;80:3
**Centre (1)** 39:20
**certain (3)** 64:12;
65:6;85:20
**certainly (7)** 21:5;
30:9;32:11;51:20;
56:22;83:3;92:10
**certify (2)** 99:19,21
**cetera (5)** 24:4;30:8;
32:3;60:11;74:2
**chain (2)** 8:25;35:10
**Chairs (1)** 8:4
**change (5)** 22:9;23:2;
30:22;32:6;67:15
**changed (2)** 47:13,17
**changes (2)** 99:19,21
**Chantelle (13)** 11:3,8;
29:25;31:14;32:11;
43:22;44:17;46:18;
53:9;64:9;70:9,17;
71:3
**characterize (1)** 93:10
**charge (6)** 8:10;
26:25;38:3;45:3,25;
76:25
**charged (1)** 15:16
**Charles (67)** 15:16,
20,20;16:1,9,18;17:2,
9;18:2,19;23:14,25;
24:20;25:14;28:6;
35:16,24,24;38:1,17,
24;42:21;53:20;54:8,

14,17,19,24;55:16;
56:8,11,16,22,24;
57:6,10,15,20;58:3,7,
11,16,20;59:23;60:2,
10;67:3;69:2,5,10,11,
20,25;70:19;71:18;
72:4,14;75:1,9,9,24;
76:7,18;77:7,14;81:6;
82:6
**Charles' (4)** 25:19;
39:22,24;76:16
**check (1)** 37:22
**Chief (2)** 7:3;79:22
**chosen (1)** 36:25
**circulated (1)** 46:24
**circumstance (1)**
59:15
**Claimant's (53)** 9:9;
10:2,4;14:5;18:11,12;
19:9,22,22;21:23;
23:12,13;26:16,17;
33:2,3;35:15;42:20;
43:21;46:12,13;49:7,
16;50:4,6;54:3,4;
57:5;61:24;62:23;
63:1,3;64:6,8;65:3,4;
66:5,6;67:5;68:19,21;
69:18;71:9,11;73:1;
74:24;78:23;87:2,12;
88:11;89:22,23;90:18
**claims (1)** 4:11
**classes (1)** 6:19
**clear (9)** 5:11;15:11,
21;16:16;24:16;62:7;
74:9,13;75:13
**Cleary (34)** 11:3,8,8,
19;12:2;13:1;18:18;
29:25;31:14;32:11,
19;43:22;44:5,8;
45:21;46:6,18;47:2,5,
12,16,21;48:5,6,10,
14,17;53:9,10;64:9,
12,12;70:9,17
**Cleary's (2)** 46:21;
47:10
**close (4)** 55:10;75:18,
23;86:18
**closely (1)** 8:11
**closely-associated (1)**
41:2
**closer (1)** 66:2
**code (2)** 47:19;99:2
**co-directors (4)** 37:3,
15;40:15;41:5
**Collaborating (1)**
39:20
**colleague (1)** 59:11
**collect (1)** 83:17
**collection (1)** 22:15
**collective (1)** 85:6
**collegial (1)** 37:5
**combination (1)** 39:3
**comfortable (2)** 72:11,

12
**coming (1)** 78:4
**command (1)** 9:1
**commenced (1)** 49:11
**commented (1)** 61:9
**common (1)** 5:6
**communicate (2)**
12:13;58:3
**communicated (2)**
60:13;61:12
**communicating (2)**
18:3;42:7
**communication (4)**
17:3;57:11;58:12;
61:22
**communications (5)**
24:17;57:1,8,21;60:6
**community (4)** 27:2;
28:13;30:10;84:25
**compared (2)** 80:17;
93:12
**complete (1)** 55:21
**completely (1)** 67:12
**Compliance (1)** 51:7
**comport (2)** 22:17,21
**comporting (1)** 32:21
**concern (3)** 4:10;
26:20;31:16
**concerned (1)** 30:20
**concerning (16)** 4:11;
12:1,24;13:4;32:7;
43:1;44:9;46:21;
51:15,25;78:12,20;
87:4,19;93:7,12
**concerns (20)** 27:16,
16;28:2,4,13,19;30:5;
32:4;34:23;38:11,15;
39:25;40:3,6;45:1;
46:5;47:4,20;48:9;
52:9
**concluded (2)** 83:23;
94:15
**conclusion (4)** 42:5;
63:9;78:4;83:24
**conduct (7)** 10:17;
32:6;49:11;52:16,22;
72:18;91:17
**conducted (3)** 28:19;
61:20;86:11
**conducting (6)** 11:17,
20;29:24;30:6,19;
47:6
**confidential (1)** 30:12
**confidentiality (1)**
62:18
**confused (1)** 64:14
**confusion (1)** 31:16
**connectivity (1)** 21:1
**consensus (2)** 77:9;
88:25
**considered (2)** 21:17;
82:22
**consistent (4)** 58:18;

Case 1:21-cv-00377-BKS-TWD    Document 119-5    Filed 04/29/25    Page 104 of 111
DR. KAMIAR ALAEI v.                                                    JAMES STELLAR
STATE UNIVERSITY OF NEW YORK, et al.                                   April 9, 2021

62:21;67:13;82:3
**constitutes (1)** 59:19
**construe (1)** 44:20
**consult (1)** 9:3
**consultation (3)** 14:1;
18:22;19:11
**consulted (5)** 13:6;
39:1;63:20,21;92:25
**contact (11)** 28:8;
52:19;53:16;56:12;
59:8,9;69:12;73:4;
74:6,8;88:17
**contained (2)** 47:25;
80:21
**contains (1)** 21:24
**content (4)** 19:9;
27:15;36:12;39:6
**context (1)** 68:5
**continuation (1)** 27:4
**continue (1)** 14:25
**continuing (1)** 78:2
**continuous (1)** 67:1
**contract (11)** 15:14;
74:4;75:14,16;76:2,
20;85:10,15,19;
89:11,11
**conversation (13)**
16:9;18:6;8;53:2;
55:2;63:24;64:24;
70:23;76:8,15;81:5,7,
20
**conversations (19)**
6:7;12:2,3,5,7;16:15;
21:3;69:9;70:12,15;
71:2;78:3,7,12;82:7,
11;83:14,15;91:13
**convey (2)** 85:20;
87:19
**conveyed (2)** 76:1;
87:23
**coordination (1)** 11:21
**Coordinator (4)** 11:4;
45:23;46:18;50:24
**copy (1)** 62:1
**core (1)** 30:25
**CORRECTION (1)**
99:2
**correspond (1)** 47:18
**counsel (7)** 4:17,20;
5:17;6:5,6,7;49:21
**counseling (1)** 63:21
**course (8)** 36:8;37:1;
41:24;49:24;50:11;
66:17;84:15;90:12
**courses (1)** 8:6
**Court (5)** 46:15,20;
47:1,9,10
**Court's (1)** 47:14
**create (1)** 4:24
**created (3)** 19:18;
29:4;52:24
**cultural (5)** 28:16;
30:17,20;31:15;32:5

**current (1)** 6:12
**currently (1)** 6:10

## D

**D-1 (2)** 64:7,8
**D-2 (2)** 87:12;89:3
**damage (1)** 36:6
**date (4)** 44:3;51:5;
64:25;79:4
**dated (35)** 10:5;14:7;
19:23;22:2;23:14;
26:18;33:5;35:16;
38:19;41:11,19;
42:21;43:22;49:17,
17,18,19;54:6,7,17;
55:15;57:7,10,14;
58:5;63:22;64:10;
66:7,9;67:6;69:18;
77:14;78:24;87:13;
89:24
**David (2)** 39:20;40:7
**day (1)** 82:19
**days (2)** 62:8;78:18
**deal (1)** 92:3
**dealing (2)** 45:2;92:9
**Dean (3)** 36:20,21;
81:6
**Deans (6)** 7:4;8:3,18;
36:16;37:9,20
**December (1)** 67:6
**decided (8)** 18:14;
20:2;37:10;46:16;
75:14;76:1;81:9;
88:21
**decision (25)** 12:12;
33:12;36:1;37:2;
46:20,25;48:2;65:1;
75:15,17,22,24;77:9,
20;78:5,8,17;83:5;
84:8;86:18;89:13,17,
20;91:24;93:2
**decisions (3)** 13:3;
85:5;91:21
**declined (1)** 75:10
**declines (1)** 77:3
**defend (1)** 27:23
**defendant (1)** 4:17
**Defendant's (1)** 64:6
**deferred (1)** 84:12
**defined (1)** 64:3
**definition (2)** 47:18;
94:4
**definitive (1)** 17:18
**delivered (1)** 93:20
**delivery (1)** 94:12
**denied (3)** 58:24;
59:1,2
**denying (1)** 47:14
**Department (4)** 6:14;
8:4;46:16;80:2
**departments (1)** 22:14
**dependent (1)** 81:21

**depends (2)** 76:24;
80:20
**deposition (6)** 5:23;
6:8;62:17;81:22;
93:22;99:1
**describe (1)** 29:5
**described (4)** 10:14;
13:22;14:15;73:20
**describing (1)** 71:8
**designed (1)** 33:21
**Despite (1)** 79:14
**detailed (1)** 33:17
**details (4)** 50:23;
79:17;80:20;81:4
**determination (14)**
14:10,14;41:16;63:7,
11,14;64:16,20;
65:11,25;66:13;
78:10;82:20;91:15
**determine (1)** 49:23
**determined (6)** 29:1;
36:1;83:4;88:19;
91:3;92:13
**develop (2)** 45:25;
57:24
**developed (2)** 12:12;
79:22
**Dias (7)** 35:7,7,8,9,11;
43:18;94:2
**differences (2)** 31:15;
32:5
**different (4)** 40:24;
47:11;51:11;72:9
**dig (1)** 81:3
**Dina (2)** 41:1,6
**Dina's (2)** 39:4;40:16
**direct (7)** 15:15;
18:19;23:25;44:22;
50:14;74:8;76:22
**directed (2)** 36:8;
52:23
**directing (1)** 36:19
**direction (7)** 20:7,9,
10,11,22,23,25
**directly (11)** 7:6;9:2;
12:14;15:23;26:19;
30:23;60:5,13;73:13;
74:20;82:4
**director (9)** 22:24;
23:6,7;34:1,4,17;
35:23;39:4;41:18
**directors (8)** 15:18;
41:14,21,22,24;42:2,
6;45:2
**disciplinary (13)** 8:16,
21,23;10:17;11:17;
13:9;18:14,16;92:12,
19;93:7,11,13
**discipline (2)** 63:15;
92:14
**discourse (1)** 63:24
**discovered (1)** 92:21
**discovery (1)** 47:15

**discrimination (1)**
32:15
**discuss (2)** 76:9;
83:20
**discussed (31)** 9:1;
11:16;15:24;16:14;
17:8;18:4;30:11,23;
31:1;43:7,11;53:21;
54:1;56:15,21;64:3;
69:14;70:16;72:6,8;
73:11;76:11;81:22;
82:16,19;87:21;88:5;
90:22,23,25;91:1
**discusses (2)** 19:25;
20:18
**discussing (3)** 4:25;
27:22;69:13
**discussion (7)** 14:1;
16:1,6;65:16;84:9;
90:15;92:2
**discussions (10)**
12:14;14:17;17:9;
30:18;36:16;53:19;
54:25;56:16;81:24;
82:3
**disposition (1)** 13:7
**dispute (1)** 81:18
**distance (1)** 56:3
**diversity (1)** 30:25
**Division (1)** 46:15
**document (27)** 9:15,
18;10:8,11,14;14:6;
15:13;26:17;27:6;
38:16;46:23;47:25;
50:5,8,19;51:19;52:4;
53:6;60:18;61:6,8;
68:23,25;79:18;80:4,
6;91:9
**documentation (3)**
72:24;86:1;88:23
**documented (1)** 72:23
**documents (5)** 5:22;
6:4;52:7;62:3;70:24
**dollars (1)** 80:2
**domain (1)** 44:20
**done (4)** 31:8;36:7;
61:2;77:5
**down (10)** 5:7;9:10;
27:12;46:25;55:17,
20;60:25;61:3;65:18;
78:22
**Dr (125)** 4:9,11;10:5,
13,19;12:1,24;13:4,
17;14:7,11,19,25;
15:7,20;16:1,2,7,9,18;
17:2,9;18:2;19:19;
20:3,18;25:19;26:20;
27:9,22;28:6;29:9,13;
31:18;32:7;33:22;
34:24;38:12;39:22,
24,25;40:23;41:1,17;
42:21,25;43:2;44:9;
45:1,16;48:15;49:1,

10,22;50:25;51:2,10,
15,16,25;52:10,14,16;
53:16;54:14,19,24;
56:11,16;57:20;58:3,
7,11;59:23;60:5;
61:15,19;63:8,16;
64:17;65:12,23;
66:14,24;67:7;68:6;
69:5,6,10,11,25;
71:18;72:4,5,14,15,
18;74:7;75:9;77:21;
78:17,19;79:20;80:9,
19;81:16;82:12,22;
83:9,13;84:3,21,22;
85:23;86:6,9,15;87:3,
19;88:3;89:8,18;91:4;
93:7,12
**draft (2)** 19:13;24:19
**drafted (2)** 23:24;37:1
**drafting (2)** 19:8;
24:19
**dual (1)** 46:3
**duly (1)** 4:3
**Duration (1)** 68:1
**during (19)** 7:10;17:4,
5,7,14;20:5;46:5;
47:5;48:11,16;49:2;
53:17;56:19;67:23;
73:5;82:22;92:3,12;
93:13
**duties (2)** 33:25;66:21
**dynamic (4)** 28:16;
30:17,24;40:8

## E

**E-1 (4)** 66:5,6;67:5,14
**earlier (6)** 19:12;43:8,
19;59:16;88:5;93:21
**effective (2)** 14:11;
42:15
**efficient (1)** 83:18
**effort (1)** 24:14
**efforts (4)** 13:14,16,
21;92:4
**either (8)** 8:25;15:25;
82:4
**elect (1)** 14:10
**Elizabeth (3)** 31:9,11,
19
**else (4)** 36:9;80:23;
87:24;91:23
**e-mail (90)** 16:10,11;
19:23,25;20:1,17,19;
21:14;22:1,5,7,16;
23:14,19,22,24;24:8,
11,22,25;25:4,19,20;
26:6,15,18,22;27:5,8,
9,15,19;28:1,14;29:9;
30:16;33:4,4;35:4,16,
20,21;36:12;38:11,
19;39:8,12,22,24;
41:11,12,13;42:1,8,

Case 1:21-cv-00377-BKS-TWD    Document 119-5    Filed 04/29/25    Page 105 of 111

DR. KAMIAR ALAEI v.                                                JAMES STELLAR
STATE UNIVERSITY OF NEW YORK, et al.                                April 9, 2021

21;43:4,22,24;44:18;
45:16;49:19;54:5,11,
13,17;55:14,25;56:8,
22;57:9,12,14;58:5;
64:11;66:6,10,12;
67:5;69:1;70:2;75:3;
76:1;77:13,16;87:12,
17;89:24;90:4,6;
94:13
**e-mails (12)** 5:24;6:4;
15:14;21:25;54:5;
55:5,7;57:6;64:9,10;
69:18;74:25
**emerged (1)** 18:23
**emerging (1)** 70:16
**employed (4)** 6:10,21;
35:1;46:6
**employee (6)** 23:3;
34:9;77:3;84:20;
92:11,14
**employees (2)** 8:16;
80:18
**employment (15)**
4:12;6:12,23;7:12;
13:3,17;14:11,19;
34:11;48:11;66:14;
84:4,22;89:8;91:4
**end (9)** 13:11,12,12;
28:15;33:8;45:9,19;
85:19;87:21
**enforce (2)** 55:4;
56:24
**engagement (2)** 34:7,
25
**engaging (1)** 52:22
**enough (1)** 27:14
**entailed (1)** 7:2
**entered (2)** 46:16;
51:4
**entirely (1)** 24:18
**entitled (2)** 84:3,21
**environment (1)** 52:24
**equal (1)** 40:24
**Equity (1)** 51:7
**ERRATA (1)** 99:1
**especially (2)** 30:14;
80:11
**et (5)** 24:3;30:8;32:2;
60:11;74:2
**ethnicity (1)** 32:2
**evaluated (1)** 70:16
**evaluation (3)** 66:23;
67:3;81:3
**evaluations (1)** 66:24
**Evangelist (1)** 24:14
**even (2)** 29:22;31:6
**event (1)** 86:25
**events (2)** 33:11;
47:11
**evergreen (5)** 85:10,
11,15,22,24
**everybody (1)** 32:16
**evidence (9)** 70:17,

21;72:13,20;73:2;
75:22;78:6,11;92:2
**exact (1)** 21:12
**exactly (5)** 64:19;
65:25;70:22;76:10,10
**EXAMINATION (1)**
4:5
**examined (1)** 4:3
**example (9)** 25:11;
36:7;43:11;46:2;
71:1;80:21;83:1;
89:2;94:2
**Excel (1)** 79:12
**except (1)** 35:3
**excuse (4)** 24:15;
26:15;47:9;64:6
**executing (1)** 66:20
**Executive (1)** 39:4
**Exhibit (67)** 9:9;10:2,
4;14:5;18:11,12;19:9,
22,22;21:23,24;
23:12,13;25:1,1;
26:16,17;33:2,3;
34:16;35:15;39:18;
42:20;43:21;46:10,
12,13,21;48:1;49:7,
16;50:4,6;54:3,4;
55:14;57:5;60:16;
61:24;62:23;63:1,3;
64:7,8;65:3,4;66:5,6;
67:5,14;68:19,21;
71:9,11;73:1;74:25;
77:12,12;78:24;87:2,
12;88:11;89:3,22,23;
90:19;91:9
**expectations (1)** 74:15
**expecting (1)** 77:7
**experience (4)** 20:15;
39:4;57:3;84:22
**expert (1)** 37:9
**expertise (2)** 37:8;
85:7
**explain (11)** 7:2,25;
10:10,24;14:22;
22:20;41:22;45:21;
68:25;83:12;85:14
**explanation (1)** 76:13
**express (2)** 48:14,25
**expressed (2)** 38:17;
40:6
**expressing (1)** 49:3
**extension (1)** 67:17
**extensively (1)** 39:2
**extent (1)** 93:6

**F**

**F-1 (1)** 54:4
**F-4 (1)** 57:5
**facilitated (1)** 88:17
**Facilitating (3)** 52:19;
53:16;73:3
**fact (1)** 42:3

**facts (5)** 47:3,7,17,22;
48:18
**faculties' (1)** 8:9,10
**faculty (12)** 8:5,13;
11:6;36:3,18;77:3;
79:11,15,24;80:24;
92:4,6
**fair (9)** 11:14;14:9;
17:11,12;50:15,16;
54:15,22;56:9
**fairly (3)** 75:18;80:12;
82:3
**faith (1)** 31:4
**fall (1)** 35:23
**fallen (1)** 43:17
**familiar (9)** 9:11;28:9,
11;31:9;52:4;56:7;
61:7;79:19;85:10
**far (4)** 15:13;65:10;
71:24;89:20
**Farsi (2)** 45:6,17
**faster (1)** 48:20
**February (30)** 10:6;
11:14;13:4,10;18:13;
19:1,5,10,23;20:17;
21:9;22:2;23:15;
25:17,18,20;26:18;
28:20;33:5;35:16;
38:19;41:11,19;
42:22;43:3;49:17,17,
18;50:25;52:12
**feel (1)** 28:15
**feet (1)** 29:15
**fellow (1)** 38:2
**felt (9)** 29:17;30:14;
31:15;63:25;69:5,25;
71:18;72:3;84:13
**female (2)** 40:18,20
**few (5)** 36:2;62:8;
69:14;87:14;94:2
**field (2)** 41:1,1
**fields (1)** 41:2
**figure (1)** 7:15
**file (3)** 5:24;6:3;78:16
**fill (1)** 93:3
**finance (1)** 89:14
**find (2)** 46:10;79:10
**findings (3)** 71:19,21;
90:16
**finds (1)** 47:9
**fine (1)** 5:15
**finish (2)** 5:2;89:15
**firm (1)** 4:8
**first (28)** 4:2;5:16;
11:7,10;19:2;24:25;
26:17;27:21;33:4;
47:24;50:10,22;53:4,
5;54:5;55:17;56:6;
57:5;60:24;61:7;
65:6;71:11;73:18;
74:12;79:23;80:11,
12;88:13
**firsthand (2)** 57:3;60:8

**fit (1)** 47:23
**five (2)** 68:12;78:17
**focused (1)** 51:9
**follow (2)** 32:12;61:19
**following (5)** 20:12;
21:21;47:1;50:23;
51:9
**follows (2)** 4:4;94:11
**form (6)** 24:19;67:14,
15;77:17,21,23
**formal (1)** 67:3
**formed (1)** 40:25
**former (1)** 46:18
**forms (1)** 32:15
**formula (1)** 79:25
**formulation (1)** 14:24
**forward (2)** 26:20;
77:7
**forwarding (1)** 27:9
**found (1)** 47:19
**four (1)** 57:22
**frequent (1)** 12:20
**frequently (1)** 12:13
**Friday (1)** 23:16
**front (2)** 50:5;51:19
**fulfill (1)** 59:7
**fulfilling (2)** 73:24;
93:24
**full (1)** 5:1
**function (3)** 13:25;
15:19;46:4
**fundamental (1)** 33:25
**funding (6)** 45:13;
79:9,10,13,17;80:22
**further (1)** 65:18

**G**

**gave (1)** 83:21
**gender (2)** 32:2;46:1
**general (25)** 9:15;
19:14;28:10;30:24;
31:5;32:9,24;33:13,
15;34:11,15,22;42:9;
43:7;56:23;72:10;
73:22,23;74:1;79:21;
80:10;82:2,24;85:8;
92:1
**generally (2)** 31:24;
66:19
**GIHHR (37)** 15:9;
16:3;17:3,10;18:3;
22:8;24:1;28:5;29:8;
30:15;34:1;35:18,23;
36:4,10;37:4;40:11,
25;41:18;45:4;52:17,
20,23;53:17,25;54:9;
56:19;58:3,12;60:7;
71:1;72:19;73:4;74:7,
15;80:10;88:16
**GIHHR's (1)** 57:23
**GIHHR-wide (1)**
23:16

**Gina (3)** 40:17;41:2,6
**given (5)** 30:24;37:5;
74:5;76:13;85:24
**giving (1)** 78:17
**Gmail (3)** 25:11,13;
26:11
**Goal (2)** 65:19,21
**go-between (1)** 59:17
**goes (3)** 14:23;62:20;
80:15
**goings (1)** 24:7
**Good (21)** 4:7;15:15;
20:12;25:21;31:3;
32:8;37:16;38:7,8,14,
22;39:13,16;40:11;
43:5;59:5;61:4;81:5;
92:5;93:22,23
**Government (1)** 39:5
**graduate (3)** 27:1,3;
85:3
**graduation (1)** 76:5
**Grant (5)** 43:17;45:8,
13;57:24;80:22
**grants (12)** 43:2,15;
44:25;45:5,7,9,11,12;
80:1,14;81:19;93:24
**grant's (1)** 45:19
**great (1)** 93:19
**greater (1)** 40:22
**Grey (4)** 31:9,11,13;
32:4
**grounds (1)** 10:16
**group (1)** 19:16
**guess (2)** 10:21;44:13
**guidance (2)** 35:6;
78:7
**guilty (2)** 48:15;49:1

**H**

**hand (1)** 28:23
**handle (2)** 74:2,17
**handled (1)** 29:11
**handwritten (1)** 65:5
**happen (3)** 15:3;
16:14;64:24
**happened (3)** 43:14;
70:25;74:11
**happening (5)** 11:6;
23:9;28:24;42:11;
71:6
**happens (1)** 33:17
**happy (3)** 8:3;29:10;
50:20
**harassment (1)** 52:22
**hard (2)** 7:14;91:20
**Harvey (44)** 15:16;
23:14,25;24:20;
35:16,24,24;38:1,4,
17,24;41:15;42:21;
53:20;54:8,17;55:16;
56:8,11,17,22,24;
57:6,10,15;58:16,20;

Case 1:21-cv-00377-BKS-TWD    Document 119-5    Filed 04/29/25    Page 106 of 111
DR. KAMIAR ALAEI v.                                                        JAMES STELLAR
STATE UNIVERSITY OF NEW YORK, et al.                                         April 9, 2021

60:2,10;67:3;69:2,19,
23;70:12,19;75:1,24;
76:7,16,18;77:7,14;
81:6;82:6
**Harvey's (1)** 71:1
**Havidan (1)** 7:1
**head (1)** 5:5
**Health (1)** 39:21
**healthy (1)** 31:21
**heard (1)** 64:1
**hearing (1)** 47:12
**Hedberg (7)** 38:2;
69:19;70:13;75:1;
77:13;78:25;82:5
**Hedberg's (1)** 79:5
**held (1)** 6:16
**help (3)** 45:25;80:23;
85:5
**helping (1)** 24:16
**hence (1)** 85:22
**herself (1)** 31:24
**hierarchy (3)** 8:9;
18:17,21
**high (3)** 93:14,17;
94:4
**higher (4)** 79:16;80:7,
17;87:8
**highly (1)** 80:5
**himself (4)** 27:23;
33:19;34:16,25
**hired (1)** 45:23
**history (1)** 37:19
**hold (2)** 7:8,21
**honorarium (1)** 33:18
**hoped (1)** 48:19
**hostile (1)** 52:24
**HR (15)** 24:3;33:14;
35:6;38:15,21;39:2;
50:1;58:8,15;76:21;
84:6,13,15;89:14;
92:23
**HRM-3 (1)** 67:15
**HR's (1)** 84:16
**human (17)** 8:21,25;
9:2,3;10:12;11:16,22;
20:14;21:19;34:2;
51:8;53:9;61:18;63:7,
14;86:21;92:13
**hundreds (2)** 67:11;
92:6
**hypothetically (1)** 83:1

**I**

**I-4 (2)** 89:22,23
**idea (1)** 40:25
**identified (38)** 9:8,9;
10:2,4,18;13:10;14:5;
19:21;25:8;34:20;
39:17;40:20;43:16,
21;44:9,11;45:15;
46:12,13,17;49:6;
50:4,6;51:21;52:13;

54:3;57:5;63:3;65:5;
67:17;68:19,21;
71:12;74:24;77:12;
78:23;79:14;87:2
**identifies (8)** 22:7;
29:10;51:11;53:6;
56:3;57:22;78:17;
87:17
**identify (3)** 34:16;
37:2;50:14
**identifying (5)** 33:19;
34:8,25;55:18;79:7
**II (7)** 71:16;73:1;
88:12,20;90:18;
91:16,23
**III (2)** 71:16;90:18
**immediate (3)** 6:23;
28:7;36:5
**Immediately (3)** 6:25;
12:9;92:22
**implications (1)** 70:16
**implicit (2)** 28:16;
32:15
**implicitly (1)** 27:25
**important (3)** 30:9;
69:12;94:1
**impose (2)** 63:15;
92:13
**impressed (1)** 81:2
**impressive (1)** 81:2
**improve (1)** 46:1
**incident (1)** 34:21
**include (3)** 8:5;9:5;
18:17
**included (9)** 8:7;
35:18;45:4;67:5,14;
70:13;79:12;81:1;
90:1
**includes (5)** 39:19;
54:4;77:12,14;89:23
**including (6)** 27:3;
64:1;70:15;77:9;
90:12;91:19
**inclusive (1)** 32:14
**incoherent' (1)** 47:15
**inconsistent (1)** 49:4
**independent (1)** 21:3
**individual (2)** 28:11;
47:2
**individuals (15)** 11:2;
19:24;30:5;33:6;
35:17;36:6;37:3;
40:14,22;43:23;53:7;
56:13;57:22;66:9;
89:25
**inference (2)** 75:23;
82:17
**inform (2)** 24:4;57:20
**information (25)** 4:16;
16:22;23:2,5;24:6;
32:10;40:9;43:9;
62:20;64:12;70:8,10,
20;72:2,3,7,9;73:7;

75:11,13;81:14,15,
17;83:5,17
**informed (1)** 92:20
**initially (1)** 62:4
**initiated (1)** 51:5
**input (4)** 19:8;24:11;
33:12,15
**inquired (1)** 58:8
**inquires (1)** 57:19
**inquiring (1)** 64:11
**inquiry (3)** 48:19;
51:6;79:5
**inside (2)** 26:14;78:6
**instance (1)** 27:21
**instances (2)** 34:18;
92:11
**institution (1)** 26:10
**instrumental (1)** 24:16
**integrity (1)** 65:8
**intellectual (1)** 40:25
**interacting (2)** 51:3,17
**interaction (1)** 17:3
**interactions (3)** 48:22,
23;56:18
**interest (1)** 73:10
**interested (1)** 42:11
**Interim (11)** 7:10;
36:4;37:3,15;40:14;
41:5,24,25;42:2,6;
45:2
**intermediaries (1)**
82:5
**intermediary (1)** 12:16
**intermediary (1)** 52:23
**interns (6)** 57:8,11,23;
58:3,12;60:7
**interpose (1)** 4:18
**interrogation (13)**
61:15,20;65:9;82:12,
14,16,19,23;83:6;
86:6,9,15,25
**intervention (1)** 46:2
**interview (1)** 31:14
**interviewed (3)** 53:7,
14
**interviewing (1)** 53:11
**into (8)** 19:6,8;32:15;
33:15;51:4;81:3,15,
17
**invaluable (1)** 27:2
**investigating (2)** 12:4;
47:23
**investigation (40)**
10:17;11:17,20,24,
25;12:8,23;13:2,10;
15:2;18:15,16;19:1;
29:25;30:6,8,19;
31:18;32:7,16;46:3;
48:16;49:2,10,12;
51:6,8,15,24;53:12;
63:9;73:9;75:20;
86:11,17,19,21;
92:12;93:7,11

**investigations (12)**
8:16;13:23;18:24;
45:24;47:6;70:8,18;
71:20,22;78:12;
87:22;93:13
**investigators (2)**
14:16;18:18
**Invitation (1)** 23:15
**involve (1)** 42:17
**involved (19)** 8:19;
9:5;10:20;13:3,8;
14:14,16;15:9;18:19,
20,25;36:23;37:17;
43:18;61:14;80:15;
89:13;92:24;93:15
**involvement (13)**
8:22;13:21,22;15:4;
16:3;17:10;36:11;
61:14;89:17,19;93:6,
8,11
**involves (1)** 26:9
**involving (1)** 66:17
**Iran (1)** 45:15
**issuance (1)** 66:2
**issue (15)** 21:17;
25:19;31:15;33:19;
34:5;42:9;53:20,22;
62:21;67:11;84:2,17;
88:2,22;89:1
**issued (3)** 20:24;21:7;
63:22
**issues (21)** 27:16,18;
28:3;30:3,21,25;
31:17,20;42:14,25;
46:1;51:23;52:1,2;
62:13;71:22,24,24;
72:4;73:23;82:22
**item (2)** 69:13;72:7
**items (2)** 5:25;72:6
**IX (8)** 11:3,20;45:23;
46:18;86:11,17,19;
92:23

**J**

**JAMES (5)** 4:1;35:7,
11;50:25;99:25
**January (5)** 6:17,21,
24;7:9;19:6
**Jeez (1)** 7:16
**Jim (5)** 35:8,9,11;
43:18;94:2
**job (5)** 7:25;21:20;
83:4,16,18
**Joe (1)** 4:8
**join (1)** 54:14
**joint (1)** 51:6
**Jordan (1)** 24:15
**Judicial (1)** 46:15
**July (4)** 9:13,14;
87:14;89:24
**June (6)** 57:7,10,14;
58:1,6;59:4

**justify (1)** 72:4

**K**

**KA (2)** 19:25;22:10
**Kamiar (40)** 4:9;10:5;
15:7,12;16:2,7;18:7,
9;28:25;29:8;35:5,22;
51:10;53:23;56:6,17;
59:3,14,16;60:5,10,
14;64:20;65:13,14,
23;66:24;68:6;69:3;
73:20,25;74:4,9,16,
18;75:12;76:8,19;
77:13;79:1
**Kamiar's (5)** 15:18;
17:5;75:14,15;76:2
**Karl (2)** 22:1;37:21
**keep (1)** 14:25
**keeping (1)** 62:22
**kept (1)** 11:5
**Kevin (1)** 84:19
**keying (1)** 88:6
**keys (2)** 20:1,3
**kind (2)** 12:15;39:5;
41:6;66:19
**kinds (4)** 31:20,22;
71:5;90:23
**knew (4)** 28:21;31:11;
74:21;87:25
**knowledge (4)** 4:15;
44:23;60:8;85:9
**knows (1)** 38:15

**L**

**L-1 (2)** 60:16,17
**L-2 (9)** 50:4,6;71:10,
10,11;73:2;88:11,13;
90:19
**L-4 (2)** 65:3,4
**languages (2)** 45:18;
74:3
**large (3)** 9:15;22:15;
44:12
**larger (1)** 36:15
**Later (2)** 76:7;83:2
**law (2)** 4:8;49:8
**lawsuit (3)** 4:10,10,17
**layout (1)** 59:21
**lead (2)** 36:4;38:15
**leaned (1)** 48:6
**learn (1)** 10:16
**learned (3)** 11:7,10;
88:1
**learning (1)** 52:25
**least (4)** 16:17;26:12;
29:20;89:20
**leave (4)** 50:16;59:6;
71:7;87:10
**led (1)** 15:5
**left (3)** 15:9;16:4;84:6
**less (2)** 56:7;93:3

Case 1:21-cv-00377-BKS-TWD    Document 119-5    Filed 04/29/25    Page 107 of 111

DR. KAMIAR ALAEI v.                                        JAMES STELLAR
STATE UNIVERSITY OF NEW YORK, et al.                        April 9, 2021

**letter (38)** 10:5,12,18;
11:14,16;13:5,11;
14:6,9,20;18:13;19:9,
10;21:10;36:24;
37:22;49:16,17,18;
52:12;62:1,4,5,13;
63:2;67:6,10;69:1,24;
75:10;78:15,24;79:2,
7,9;81:23;87:3;91:10
**letters (6)** 15:14;49:9,
21,22;61:18;67:11
**level (2)** 81:8;92:10
**Liesl (1)** 66:7
**L-I-E-S-L (1)** 66:7
**likely (3)** 36:20,23;
38:1
**limited (2)** 6:18;29:19
**line (4)** 23:9,15;
79:15;80:24
**lines (2)** 79:11,24
**list (1)** 25:15
**listed (2)** 22:24;79:17
**listing (1)** 61:9
**literally (2)** 29:15;92:6
**little (2)** 61:3;72:9
**living (1)** 31:25
**long (8)** 6:16;7:8;
17:17;19:4;50:11;
56:2;72:25;81:10
**longer (3)** 22:25;
33:25;37:19
**longtime (1)** 27:1
**long-time (1)** 84:24
**look (18)** 10:3;14:6;
24:24;26:21;30:19;
38:7;50:5;52:15;
54:10;60:18;66:10;
68:20;69:22;77:15;
81:14,17;86:1;90:2
**looking (1)** 13:23
**looks (8)** 22:3;23:10;
35:5,17;38:22;61:7;
67:7;89:25
**lot (2)** 62:19;63:23

**M**

**main (1)** 54:14
**maintain (1)** 65:7
**maintaining (1)** 5:1
**maintains (1)** 22:13
**makes (2)** 47:1;59:11
**making (6)** 21:20;
70:1,3;78:10;82:17;
91:24
**man (1)** 35:25
**manage (2)** 63:25;
92:18
**management (7)** 37:5;
38:25;45:20;51:8;
84:8;85:2;88:25
**manager (1)** 74:17
**managing (1)** 8:12

**manifested (1)** 43:10
**manner (2)** 48:8,11
**many (21)** 16:14;
18:24;25:23;27:2;
35:25;38:3;40:12;
44:13;53:24;62:16;
76:5,5;80:1,13;82:7;
83:14,15,20;85:4;
90:8;92:2
**March (13)** 43:22;
44:2;49:19;54:6,7,18;
55:5,6,6,15;64:10,15;
65:1
**marked (13)** 21:23;
23:11;33:1;35:14;
61:23;63:1;64:6;
65:3;66:4;69:17;
87:11;89:21;91:8
**matter (13)** 8:24;
10:20,23;40:1;44:6,9,
19;46:17;58:9;79:20;
81:16;93:4;94:14
**matters (8)** 12:21;
15:9;20:15;26:6;
27:3;43:2;47:23;
92:20
**may (19)** 25:24;
41:13;49:14;52:6;
61:16;62:1,5,10;70:6;
75:2,6,8;76:4;77:14;
78:24;79:8;86:6,10,
16
**maybe (9)** 7:17,18;
9:15;29:5;33:17;35:8,
8;50:17;52:8
**MD (1)** 39:20
**mean (2)** 26:7;68:7
**meaningful (2)** 80:8,
16
**meanings (1)** 44:20
**means (3)** 44:17;
68:4;79:15
**meant (1)** 35:22
**meeting (21)** 12:10;
23:16;25:19;26:1;
27:23;28:19,22;
41:14;51:20;54:9,15;
57:24;65:6;73:11;
90:6,7,15,23,24;91:2,
20
**meetings (8)** 12:17;
18:4;43:10;48:4,6;
53:24;74:20;90:8
**member (4)** 27:1;
42:15;84:23,24
**members (1)** 36:3
**memo (2)** 79:6;88:5
**memorandum (2)**
46:14;63:22
**mentioned (7)** 19:12;
32:13;38:2,25;59:15;
70:14;93:21
**met (2)** 16:11,12

**method (1)** 82:2
**metric (1)** 87:5
**metrics (2)** 80:13;
85:24
**might (14)** 4:16,18;
5:5;7:18;12:12;
24:13;25:13;26:10;
31:16;36:14;38:20;
79:24;83:2;85:6
**mind (3)** 34:21;43:11;
78:10
**minute (1)** 94:6
**minutes (1)** 87:15
**misconduct (4)** 50:7;
71:12;87:18;90:19
**misleading (1)** 23:4
**mission (2)** 80:14;
93:25
**mistake (2)** 41:23;
49:23
**mistaken (1)** 66:22
**mix (1)** 38:5
**moment (2)** 42:4;
76:3;92:9
**money (2)** 80:1;89:12
**months (3)** 68:2,8;
92:2
**more (8)** 14:1;27:13;
61:4;86:3;92:1;93:3,
8,15
**most (6)** 28:6;37:25;
56:2;70:23;72:10,12
**motion (1)** 47:15
**mouse (1)** 65:19
**much (9)** 9:16;
20:15;30:13;36:23;
38:16;61:21;70:24;
80:1;85:22;86:24
**multiple (1)** 26:9
**multi-year (1)** 85:18
**must (1)** 82:17
**myself (1)** 12:4

**N**

**name (2)** 4:7;36:18
**names (2)** 37:14;38:5
**natural (6)** 13:25;
18:22;19:11;24:6;
48:20;75:21
**naturally (1)** 35:24
**nature (3)** 37:5;52:23
**near (1)** 76:4
**necessarily (2)** 37:6;
84:7
**necessary (1)** 76:6
**need (13)** 5:14;22:9;
23:19;28:24;30:22;
38:17;41:13;45:6,16;
56:1;57:21,23;81:3
**needed (8)** 12:19;
22:12,18;36:6;43:1;
59:9,17,22

**needing (1)** 22:8
**needs (1)** 55:25
**Neuroscience (1)** 6:13
**New (11)** 4:11;9:13,
20,23;11:18;41:14,
21,22,24;46:14,19
**next (2)** 8:18;78:15
**nine (3)** 68:2,8;83:1
**nod (2)** 5:5;65:8
**noise (1)** 5:5
**non-Albanyedu (1)**
26:7
**non-renew (3)** 13:17;
64:17;65:12;66:14;
72:5;89:4
**non-renewal (25)**
65:8;66:3;69:24;
71:19;75:18;77:2,4,
17,21;78:5,20;81:14,
23;82:11,21;83:9,13,
25;84:5;87:4;88:4;
89:5;90:12;92:4,10
**non-renewed (4)**
13:19;78:9;81:20;
89:16
**non-renewing (1)** 88:3
**Nope (1)** 77:19
**normal (2)** 37:1;63:24
**notations (1)** 17:17
**note (1)** 69:1
**notes (3)** 48:2;57:23;
65:5
**notice (1)** 25:11
**November (1)** 46:16
**number (20)** 4:14;
19:24;22:2;28:4,12;
35:17;37:17;50:8;
53:8,13,14;54:5;
67:17;73:15;78:3;
80:16;81:11;88:16;
89:25;91:18
**numbers (2)** 88:7,9
**Numeral (3)** 52:13;
73:1;88:20
**Numerals (6)** 71:16,
23;88:6,12;90:18;
91:16

**O**

**oath (1)** 4:24
**Object (1)** 77:23
**objecting (1)** 49:11
**objection (2)** 4:18,20
**objectives (1)** 29:23
**obligations (1)** 73:24
**observation (1)** 32:25
**obtained (1)** 40:10
**obviously (3)** 27:22;
40:18;81:1
**occurred (1)** 61:15
**off (6)** 5:9;36:9;77:17,
21;82:10;88:6

**office (19)** 12:6,23;
14:18;20:7;11;21:4,4;
29:15;46:7;49:8;51:7,
7;53:9;63:7,13;64:1;
70:13,14;92:23
**Officer (1)** 7:3
**official (1)** 38:9
**often (1)** 26:8
**once (2)** 37:10;92:18
**one (41)** 7:10;9:13;
11:6;16:15;19:2;
21:25;25:3;26:10;
28:7,15,23;33:4;36:7;
37:13;40:2;47:19;
51:22;53:1,8;56:6;
57:22;61:21;67:12;
72:6,11,13,18;73:16;
78:21;80:22;82:8;
84:3,13,17,21;87:15;
88:7,9;90:9,10;91:25
**ones (1)** 37:25
**ongoing (3)** 65:17;
82:9;92:1
**only (4)** 26:14;31:20;
77:5;94:13
**onto (1)** 55:1
**operation (4)** 31:6;
44:13;64:2;82:2
**operations (2)** 8:19;
38:4
**operative (1)** 67:24
**opinion (6)** 14:2;
48:14,25;49:3;70:7;
87:17
**opinions (3)** 13:8,24;
90:17
**options (1)** 66:17
**order (5)** 28:7;46:14;
47:14;55:21;59:7
**ordered (1)** 55:12
**Organization (1)**
39:21
**original (1)** 36:22
**others (5)** 29:10;
48:23;56:7;87:13;
88:24
**otherwise (3)** 5:18;
44:22;92:14
**ourselves (1)** 32:1
**out (21)** 7:15;18:17;
24:9,22;29:17;30:4,
13;36:18;38:12;39:6,
12;65:19;74:12;
75:18;80:24;87:23;
89:4,10,17;90:13;
91:4
**outcome (1)** 76:14
**outlined (1)** 32:13
**outside (3)** 25:5;26:6;
40:12
**outstanding (1)** 41:3
**over (15)** 11:23;
15:18;36:16;59:14;

Case 1:21-cv-00377-BKS-TWD    Document 119-5    Filed 04/29/25    Page 108 of 111
DR. KAMIAR ALAEI v.                                                                    JAMES STELLAR
STATE UNIVERSITY OF NEW YORK, et al.                                                    April 9, 2021

60:4;65:19;69:13,13;
71:6,6;79:16;80:7;
82:3;91:25;92:2
**oversee (3)** 8:4,4;
42:14
**overseeing (4)** 12:23;
15:17;45:7,12
**oversees (1)** 8:3
**oversight (5)** 35:23;
43:1,1,15,17
**overview (1)** 60:23
**own (3)** 11:20;29:15;
78:10

## P

**package (4)** 27:6;
33:13;46:24;47:25
**page (10)** 24:24,25;
46:25;47:9;48:2;
53:7;61:2;71:11;
79:8;88:13
**PAGE/LINE (1)** 99:2
**paragraph (6)** 39:3;
50:22;55:18,21;
57:19;79:8
**parameters (1)** 29:17
**part (32)** 15:2;19:11;
20:4;20;21:1;33:13,
23;36:25;41:11,13;
42:9;45:7;53:1,12;
55:3,13,25;56:13,16,
23;62:15;63:23;
64:23;74:10;75:3;
82:15,24;84:2,4,7;
85:8,24
**participate (1)** 11:25
**participated (1)** 18:25
**participating (2)** 15:1;
74:6
**participation (1)** 84:12
**particular (3)** 40:5,13;
82:9
**particularly (2)** 67:2;
88:16
**particulars (1)** 9:16
**pattern (1)** 43:7
**pay (1)** 22:8
**paying (1)** 44:19
**PDF (2)** 5:24;6:3
**people (42)** 5:5;22:2;
25:8,12,15;26:9,11,
14;28:5,23;29:20,24;
30:14,18,19;32:6;
34:18;35:4;36:2,17,
23;37:9,24;38:24;
39:24;40:6,10;42:10;
45:8,12,19;53:11;
56:3,4,18;57:2;63:25;
70:14;75:20;78:7;
83:16;91:19
**perceiving (1)** 30:10
**performance (2)**

66:18,19
**performing (1)** 33:25
**perhaps (1)** 12:20;
22:24;50:11
**period (2)** 7:10;67:23
**permission (3)** 54:13,
20;60:3
**permitting (1)** 72:18
**person (5)** 9:5;23:5;
29:6;56:1;85:20
**personal (1)** 43:9
**personally (2)** 24:8;
70:4,6
**personnel (1)** 65:22
**person's (1)** 67:24
**perspective (1)** 16:17
**pertinent (1)** 53:22
**petitioner (2)** 48:3,7
**Petitioner's (1)** 47:14
**PhDs (1)** 41:9
**Phone (1)** 6:1
**phrasing (1)** 47:10
**physically (1)** 48:6
**place (7)** 10:18;
28:17;30:17,25;50:1;
52:10;73:15
**placed (1)** 16:22
**Plaintiff's (4)** 21:24;
25:1,1;91:9
**plan (6)** 31:6;32:14;
33:15;55:15;60:10,12
**planned (1)** 55:19
**planning (1)** 28:21
**play (1)** 87:23
**played (2)** 30:13;
36:15
**please (4)** 5:10;
14:22;37:22;86:13
**pm (3)** 57:7,10;94:15
**point (17)** 9:4;16:20;
28:7;49:24;55:8;
62:9;68:9;72:17;
78:13,21;80:15,24;
82:17;83:2;86:12,17,
18
**pointing (3)** 24:25;
28:14;65:18
**points (5)** 52:13;61:9;
72:11,13;73:12
**policies (7)** 48:16;
49:2;51:10;63:8;
73:14,22;74:1
**policy (4)** 26:5,13;
52:22;73:17
**portfolio (2)** 85:1,2
**portrays (1)** 47:10
**posed (1)** 5:15
**position (14)** 6:12,16,
18;7:2,8;8:14;19:6;
36:18;76:17;80:9,18;
84:10,16;93:1
**positioned (1)** 31:24
**positively (1)** 29:5

**possibility (1)** 47:2
**possible (4)** 24:18;
51:9,12,21
**possibly (1)** 85:25
**potentially (1)** 37:25
**poverty (1)** 32:2
**practice (4)** 20:13,20;
21:21;34:22
**preceded (1)** 71:2
**preceding (1)** 57:9
**prefer (1)** 26:11
**premises (1)** 32:12
**preparation (1)** 5:23
**prepared (2)** 38:20,23
**preparing (1)** 36:11
**presence (1)** 48:17
**present (3)** 48:4;
80:25;83:17
**presented (5)** 5:20;
33:14;37:14;38:10;
70:24
**presents (2)** 42:10;
48:3
**President (45)** 7:1,3,4,
5,6,11,17,23;8:2,11;
10:13;11:4,23;12:8,
13,17;13:1,7,24;
14:17;16:13;18:20;
20:24;21:8;24:3,3,21;
38:10;39:11;42:16,
16;76:24,24;78:9,16;
83:8,12,16,18;84:15;
87:6;90:11;91:14,14,
18
**President's (8)** 12:6,
22;14:17;20:11;21:4;
70:14;83:10;89:6
**previous (2)** 43:10;
91:1
**previously (24)** 9:7,9;
10:2;14:4,15,23;
21:22;42:19;43:20;
46:11;50:3;54:2;
57:4;61:23;63:1;
64:5;65:2;66:4;
74:24;78:23;87:1,11;
89:21;91:8
**primary (2)** 8:20;
55:18
**principle (1)** 19:14
**principles (1)** 79:21
**prior (1)** 39:22
**priorities (2)** 35:25;
44:13
**priority (5)** 44:6,10,12,
15,21
**privacy (1)** 28:24
**private (1)** 34:7
**probably (7)** 20:14;
29:16;38:23;41:23;
42:5;76:13;89:13
**probe (1)** 4:15
**problem (2)** 35:13;

68:15
**procedure (1)** 76:22
**proceeding (2)** 8:23;
75:20
**process (7)** 19:11;
62:18;67:1;78:2,15;
81:4,10
**produce (2)** 24:16;
80:23
**produced (1)** 20:14
**productive (1)** 80:5
**professional (4)**
40:21;48:17,24;49:5
**Professions (4)** 8:17;
9:12,20;11:19
**Professor (2)** 6:13,19
**professorial (1)** 37:8
**profile (5)** 46:1,1;
93:14,17;94:4
**program (5)** 45:15;
46:3,4;66:18,19
**programs (2)** 43:15;
44:25
**progress (1)** 73:9
**prohibited (2)** 34:8,11
**prohibiting (1)** 74:5
**projected (2)** 27:25;
79:10
**promise (1)** 93:20
**promoting (1)** 93:23
**promotion (1)** 46:4
**prompt (1)** 27:6
**prompted (2)** 31:17;
52:10
**properly (1)** 30:22
**proposals (1)** 57:25
**protect (1)** 28:25
**provide (1)** 87:4
**provided (4)** 6:5,6;
61:25;62:6
**Provost (19)** 6:25;7:5,
9,19,20,22;8:1,3;
15:16,20;19:7;24:3;
26:25;36:17;38:3;
70:1;75:13;79:23;
84:24
**Psychology (1)** 6:14
**pulled (1)** 25:15
**purposes (2)** 4:25;
33:9
**pursue (1)** 77:2
**purview (3)** 84:10;
89:15,15
**pushing (1)** 86:2
**put (2)** 16:11;52:14

## Q

**qualifications (3)**
40:21,23;41:3
**qualified (2)** 53:15;
72:1
**quantitation (1)** 87:7

**quantitative (2)** 86:3;
87:5
**quickly (2)** 23:19;79:1
**quite (2)** 22:14;81:10;
85:20

## R

**race (3)** 32:2;40:15,
16
**racial (2)** 28:16;30:17
**racist (2)** 30:20;31:4
**raise (1)** 31:22
**raised (25)** 27:18;
28:3,13;30:3,21;
31:13,17,22;32:4;
34:23;42:25;45:1;
46:5;47:5,21;48:6,10;
51:23;52:1,2,9;62:13;
73:12;81:15;82:22
**raising (2)** 30:16;80:7
**Randy (13)** 17:22;
21:4;30:1;32:12;
60:11;70:9,17;71:3;
75:1;81:24;83:19;
87:13;91:19
**reach (2)** 30:4;79:16
**reached (3)** 14:24;
16:24;42:4
**reaching (1)** 83:4
**read (20)** 23:18;
27:10;33:7;35:5,18;
50:17,20;55:22;
57:12;61:5;62:4,4,7,
9,11,14;79:19;80:6;
87:8,15
**reading (8)** 28:18;
51:14;61:18;75:5,7;
78:19,21;79:2
**ready (5)** 5:21;23:21
**really (16)** 7:16;
25:21;30:14;37:16;
41:7;43:5;49:13;
50:19;80:25;81:11;
85:1;88:6;89:14;
92:16,24;93:5
**reason (5)** 5:18,21;
74:10;75:19;99:2
**reasons (1)** 72:24
**recall (64)** 11:12;
13:9;16:8,16,19;18:8;
22:23;23:22;24:11;
25:16,21;27:4,15,18;
31:13;35:20;37:13;
38:19;41:7,8;44:3;
49:3,20;51:14;53:2;
55:7;61:18,25;63:6,
13;64:15;67:10,12;
72:20;73:2;75:5,7;
76:10,10;78:19,21;
79:2;80:21;82:8,10,
15,21;83:14;84:2,16,
18;86:4,19;88:23;

DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.

JAMES STELLAR
April 9, 2021

89:2,20;90:4,6,8,22;
91:25;92:9,11;93:5
**receive (2)** 14:15;
39:23
**received (6)** 27:10;
28:1;39:24;49:21;
50:24;85:25
**receiving (3)** 27:4;
45:19;73:8
**recently (1)** 50:12
**recess (2)** 68:16;94:8
**recipient (3)** 22:3;
23:17;90:1
**recipients (1)** 45:13
**recognize (5)** 10:8;
56:6;60:18;63:2;
68:23
**recollection (15)**
19:13;26:1,3;50:14;
51:23;53:23;62:12,
15;63:17;64:3;66:12;
69:5;72:17;79:4;93:5
**recommend (3)** 72:14;
75:11;78:9
**recommendation (6)**
70:1,4;76:19,23;
77:4,8
**recommendations (1)**
37:11
**recommended (1)**
91:22
**recommending (2)**
69:3;72:4
**reconsider (1)** 88:2
**record (5)** 4:19,21,21;
5:9,9
**records (1)** 58:15
**refer (29)** 9:2,7,17,22;
19:21;21:22;23:11;
26:16;33:1;39:17;
42:19;43:20;49:6;
54:6;58:5;60:16;
61:23;62:23;64:5;
65:2;68:18;69:8,17;
71:9;73:23;74:23,23;
77:11;87:1
**reference (3)** 22:22;
41:21;44:15
**referenced (1)** 43:3
**references (1)** 22:10
**referred (11)** 25:19;
28:6;35:3,6;42:12,20;
78:3;79:23;86:25;
90:7;92:22
**referring (14)** 9:18,23;
23:14;35:15;41:10;
44:16,23;67:22;
71:10;79:20;88:11,
12;89:5;93:17
**refers (5)** 66:23;
67:23;78:15;89:3;
90:6
**reflected (6)** 14:20;

15:13;16:9;52:11;
70:2;81:7
**reflective (3)** 46:21;
57:16;91:10
**reflects (3)** 14:9;
77:16;90:11
**regard (2)** 32:2;41:8
**regarding (4)** 26:20;
31:16;47:21;71:15
**regular (1)** 12:10
**regularly (1)** 16:12
**related (3)** 8:15;
71:21,22
**relating (1)** 4:12
**relevant (3)** 4:16;
21:25;73:15
**relied (1)** 37:8
**relieving (2)** 19:25;
20:18
**reluctant (1)** 92:7
**rely (1)** 82:1
**remained (1)** 76:16
**remember (21)** 7:17,
20;11:11;15:5;19:2;
28:12;36:2;37:21;
49:13;50:12,19;
51:20;55:10,10;
63:10,11;64:19;
65:25;69:11;72:22;
83:3
**remotely (1)** 57:16
**removed (2)** 20:3;
41:17
**removing (1)** 21:14
**rendering (1)** 47:11
**renew (8)** 67:13;
72:14;75:14,15,17;
76:2,19;85:18
**renewal (3)** 67:7,18;
84:3
**renewed (4)** 68:9;
69:4,6;75:12
**renewing (1)** 89:7
**repeat (1)** 86:13
**rephrase (2)** 5:13;
52:8
**reply (2)** 78:18,19
**report (16)** 7:4;8:18;
50:7,23,24;51:1,5,18;
55:15;57:8,11;71:13;
82:25,25;90:20;91:17
**reported (9)** 7:6;12:9;
15:22;16:13;47:3,7,
22;51:2,16
**reporting (1)** 13:25
**reports (3)** 7:5;11:4;
73:7
**represent (1)** 4:9
**representative (2)**
33:11,20
**request (3)** 56:12;
58:11,16
**requested (1)** 58:13

**requests (1)** 94:11
**required (3)** 45:11;
79:10;83:10
**research (6)** 8:9,11,
13,14;80:13;93:23
**resolution (1)** 48:21
**resource (1)** 53:9
**resources (16)** 8:21;
25:9;2,3;10:12;11:16,
23;20:15;21:19;34:3;
51:8;61:19;63:7,14;
86:22;92:13
**respect (2)** 62:17;79:9
**respond (4)** 5:4,10,19;
42:25
**responding (4)** 39:22;
54:18,19;58:7
**responds (1)** 64:13
**response (22)** 5:6;
26:2,4;28:2;29:12;
30:3;32:6;39:19;
40:5;47:13;49:21;
50:7,24;62:13,15;
71:12;78:18,19;79:5;
87:3,7;90:20
**responses (1)** 39:23
**responsibilities (5)**
8:1,5,15;45:24;46:7
**responsibility (2)** 8:20;
55:3
**responsible (2)** 38:18;
45:3
**restate (1)** 17:19
**resulted (1)** 51:6
**results (1)** 83:7
**Rethemeyer (3)** 22:1,
7;37:21
**R-E-T-H-E-M-E-Y-E-R (1)**
22:1
**retraction (1)** 42:1
**reveal (1)** 29:3
**revealing (1)** 28:25
**review (5)** 5:22;24:8;
78:11,16;87:6
**reviewed (5)** 6:3;
16:21;17:17;47:25;
49:22
**reviewing (1)** 51:21
**Right (12)** 39:9;45:23;
50:22;58:10;61:5;
68:22;69:21,24;76:7;
88:14;90:3;91:5
**rights (1)** 38:13
**rigid (1)** 79:25
**ringing (1)** 6:1
**Rodriguez (1)** 7:1
**role (3)** 36:15,21;
45:22
**Roman (9)** 52:13;
71:16,23;73:1;88:6,
12,20;90:18;91:16
**ROTONDI (4)** 39:14;
68:12,14;77:23

**roughly (1)** 12:18
**run (1)** 14:25
**running (1)** 41:6

## S

**same (11)** 5:3;16:12;
30:13;34:5;36:13;
40:8;43:7,12;70:19,
21;83:18
**satisfied (1)** 76:15
**saw (7)** 29:6;43:18;
44:4;47:24;48:22;
50:11;62:21
**saying (5)** 42:1;55:25;
58:8;72:12;82:25
**school (1)** 85:3
**screen (2)** 9:8,19
**scroll (12)** 9:10;27:12;
33:6;50:9;55:17,20;
60:19,24;61:3;65:18;
78:22;79:1
**scrolling (2)** 46:25;
49:15
**scrutiny (1)** 67:2
**second (12)** 7:21;
39:3;50:17;53:7;
57:19;64:4;73:19;
79:8,15;80:24;87:14;
88:2
**section (2)** 50:20;83:3
**sections (3)** 61:10,11;
83:1
**security (1)** 85:20
**seeing (3)** 34:15;
50:10,12
**seeking (2)** 35:5;
75:12
**seemed (1)** 12:21
**seems (1)** 55:10
**Selchick (15)** 17:24;
19:24,25;20:18;30:1;
33:5,9;53:11;64:9,11;
65:6;81:25;86:22;
88:18;90:16
**select (2)** 37:2,7
**selection (1)** 36:16
**selections (1)** 36:22
**send (2)** 26:14;42:1
**sending (1)** 26:5
**Senior (7)** 7:4,23;8:1;
13:1;42:15;84:23;
85:4
**sense (2)** 10:20;13:8
**sensitive (1)** 31:19
**sent (16)** 5:24;6:3;
24:9;22;25:4,7;35:21;
39:12;44:1;61:18
**sentence (1)** 65:7
**sentiments (1)** 75:25
**separated (1)** 56:20
**separation (8)** 20:5;
33:23;51:4;52:17;

53:18;72:19;73:6;
88:17
**series (3)** 21:25;33:3;
57:6;64:8;69:18
**served (1)** 51:24
**set (2)** 32:1;41:14
**settlement (2)** 16:23;
73:19
**several (7)** 30:11;
33:5;42:12;43:23;
51:1;66:8;80:23
**sexual (7)** 47:18;50:7;
52:21,23;71:12;
90:19;91:16
**sexually (1)** 52:24
**share (1)** 9:8
**shared (4)** 19:12,15;
52:7;70:8
**sharing (3)** 24:6;37:1;
40:9
**sheet (2)** 79:12;99:1
**short (3)** 32:9;42:18;
77:1
**shortly (1)** 11:13
**show (10)** 10:1;14:4;
35:14;50:3;54:2;
55:13;57:4;62:25;
89:21;94:3
**showed (1)** 24:18
**showing (5)** 46:11;
60:17;66:4;87:11;
91:8
**sic (1)** 24:14
**side (4)** 8:8;38:25;
39:7;92:21
**sign (4)** 69:23;75:10;
76:19;77:21
**signed (6)** 36:9;74:5;
77:17;81:13,23;82:10
**significantly (1)** 47:11
**silent (1)** 29:21
**similar (2)** 80:18;
86:23
**simply (1)** 29:21
**sit (2)** 50:13;62:12
**situation (5)** 19:19;
29:4,6;33:21;62:21
**six (3)** 56:3,4,12
**Skype (2)** 57:21,24
**slash (1)** 46:3
**slightly (2)** 36:15;68:9
**slowly (2)** 60:19,24
**social (2)** 80:14;93:24
**soliciting (1)** 58:2
**somebody (2)** 39:19;
80:8
**somebody's (1)** 34:6
**someone (11)** 22:7;
23:5;31:11,25;36:18;
38:18;51:16,18;
66:20;85:17;87:24
**someone's (1)** 21:14
**somewhere (1)** 38:4

Case 1:21-cv-00377-BKS-TWD    Document 119-5    Filed 04/29/25    Page 110 of 111

DR. KAMIAR ALAEI v.                                                    JAMES STELLAR
STATE UNIVERSITY OF NEW YORK, et al.                                   April 9, 2021

**sorry (22)** 4:17;6:2,2;
25:22;31:7;32:17,20;
33:2;40:20;46:10;
53:10;54:7;55:5;
62:24;63:10,18;69:8;
77:18,25;84:18;
87:15;89:1
**sort (3)** 37:17;81:19;
93:3
**source (2)** 31:16;
80:22
**speak (7)** 5:17;45:6,
17;64:25;72:23;77:6;
92:17
**speaking (3)** 33:11;
34:7,24
**specific (30)** 19:13;
20:22,23,25;22:22;
28:10;32:5,10,20;
34:16,21,23;39:6;
43:6;53:23;55:2;
56:21;62:19;63:17;
64:2;67:12;72:23;
73:2;74:3,4;82:8;
88:23;89:2;90:9,21
**specifically (16)**
19:18;23:13;25:24;
30:18;33:16,21;44:3,
8;50:14;51:1;55:11;
72:21;74:18,21;
82:12,16
**specified (1)** 66:21
**specifies (1)** 89:11
**spokesperson (1)**
24:17
**spring (1)** 13:18
**staff (13)** 15:4;24:5;
42:15;52:20;53:17;
71:1;73:4;74:2,7,15;
79:23;85:4;88:16
**standard (6)** 20:13,20;
21:21;34:2;76:22;
94:12
**standards (2)** 32:1,22
**Stark (25)** 12:3;13:1;
17:22;18:18;30:1;
32:12;53:10,11;
60:11;70:9,17;71:3;
75:1;81:24;83:19;
86:22;87:13,17,19,
23;88:18,24;89:3;
90:16;91:19
**Stark's (2)** 21:4;75:3
**start (1)** 18:14
**started (1)** 46:2
**starts (1)** 55:21
**State (11)** 4:10,12;
9:12,20,23;11:18;
24:5;46:14,19;71:5;
86:23
**stated (3)** 33:10;
48:18;71:18
**statement (2)** 29:13;

47:1
**states (1)** 47:10
**status (6)** 34:12;
53:24;67:15;86:7,10,
17
**stayed (2)** 12:10;
92:17
**STELLAR (5)** 4:1,7;
50:25;89:25;99:25
**stenographer (2)** 4:21,
23
**step (2)** 36:3;78:15
**still (1)** 4:19
**stipulate (1)** 79:3
**stipulated (1)** 81:18
**stop (1)** 94:10
**strategic (2)** 31:6;
32:14
**strike (17)** 12:6;13:14;
17:7,21;20:7;25:17;
27:17;39:10;43:13;
45:9;63:19;75:4;
83:11;85:13;86:7;
91:12;93:9
**striking (1)** 42:11
**strong (3)** 28:16;29:7;
40:11
**strongly (1)** 91:22
**student (9)** 27:9,19,
21;28:3,11,15;30:4;
47:19;52:23
**students (25)** 8:6;9:6;
15:4;24:5;28:5;40:4;
51:2,3,17;52:1,20;
53:2,14,17;59:22;
60:1;61:8,12;71:2;
73:5,11;74:2,7,16;
88:17
**student's (1)** 30:16
**study (1)** 36:8
**sub (5)** 41:12;54:3;
55:14;67:19;78:24
**Subject (7)** 23:15;
26:19;35:18;54:9;
57:11;92:12;99:19
**subjects (1)** 45:14
**submit (1)** 78:18
**submitted (1)** 71:15
**submitting (1)** 49:9
**substantiated (1)**
91:17
**subsume (1)** 11:23
**successful (1)** 80:12
**succumbing (1)** 31:4
**sufficient (2)** 72:13;
91:23
**suggested (1)** 37:25
**suggesting (1)** 39:6
**suggestion (1)** 90:24
**sum (1)** 6:17
**SUNY (42)** 4:13;7:13;
9:22;10:5,17;13:16;
14:7,10,20;15:8,10;

16:4;19:3,4;21:10;
25:5;34:9,20;35:1;
41:16;45:12,22;
46:22;47:6,22;48:11,
16;49:1,9,20,22;52:2,
10,14;63:6,8;65:11,
22,24;66:17;73:14;
92:3
**supervision (2)** 8:14;
36:5
**supervisor (12)** 15:16;
18:19;23:25;28:7;
56:9;59:3,11;60:2;
69:2,3;76:22;77:3
**supervisor's (1)** 55:3
**supervisory (1)** 60:4
**support (8)** 36:20;
71:19;72:3,13;73:3;
88:19,22;94:3
**supporters (1)** 40:11
**supposed (1)** 59:25
**Supreme (2)** 46:15;
47:14
**sure (30)** 11:22;
16:25;21:20;29:3;
31:1,25;32:21;33:16;
35:2;37:11;38:9;
39:1;44:18;49:13;
50:18;51:19;60:22;
61:21;63:12;65:15,
20;68:13;78:2;82:18;
86:14,24;90:9,21;
91:19;92:8
**surprise (2)** 31:23;
63:5
**swear (1)** 4:23
**sworn (1)** 4:3
**Szelest (18)** 12:15,15,
19;13:24;14:18;
18:21;21:11;37:18;
39:8;41:12;42:7,13,
15;44:8;70:15;79:22;
82:6;89:24

---

**T**

**table (2)** 75:22;82:14
**talk (6)** 5:14;12:19;
33:18;70:25;75:25;
76:7
**talked (6)** 12:18;
29:14,16;30:7;62:16;
82:13
**talking (6)** 5:3;13:23;
64:21;70:10,22;75:21
**talks (2)** 57:15;79:25
**target (3)** 79:16;80:7,
17
**tasks (1)** 55:22
**teach (1)** 80:2
**teaching (2)** 6:19;8:14
**team (3)** 24:14;30:7;
88:25

**technically (1)** 23:7
**temp (1)** 67:18
**tendencies (1)** 31:4
**tenure (1)** 85:21
**tenured (1)** 92:6
**term (9)** 67:18,20,21,
25;68:1;85:10,15,22;
89:8
**terminate (4)** 14:10,
11;64:16;91:3
**terminated (4)** 13:13;
14:20;81:21;92:15
**termination (2)** 15:6;
34:13
**terms (16)** 7:12;
19:17;21:11;29:24;
59:7;67:3;72:17;
73:20,22;74:3,14;
80:13,16;82:20;
84:11;89:7
**testified (1)** 4:3
**testify (1)** 53:13
**Thanks (1)** 68:14
**therefore (4)** 23:4;
74:16;93:15;94:3
**thinking (1)** 83:22
**Third (2)** 46:15;53:1
**thorough (2)** 21:20;
83:4
**thought (9)** 24:2;
29:21;32:23;64:13;
66:1;76:6,21;77:8;
90:25
**thoughts (1)** 88:2
**three (13)** 51:11,21,
22,23;52:12;57:22;
71:22,23,24;72:4,7;
88:5;91:25
**times (12)** 30:11;
42:12;48:22;62:16;
69:15;78:4;79:16;
80:7,17;83:20;87:8;
94:2
**timing (1)** 21:12
**Title (9)** 11:3,20;
45:23;46:18;57:7;
86:11,17,19;92:23
**titles (1)** 41:4
**today (4)** 4:15,25;
5:19;6:8
**today's (1)** 5:23
**together (2)** 25:15;
37:18
**told (3)** 15:3;74:18,21
**tons (1)** 52:7
**top (7)** 44:6,10,11,15,
21;50:6;60:25
**touch (5)** 12:11;56:1,
2,2;82:3
**toward (1)** 48:7
**towards (2)** 28:14;
87:21
**transcript (5)** 4:24;5:1;

94:11;99:20,22
**transparent (5)** 28:23;
30:12;40:10;43:9;
62:19
**treatment (1)** 39:25
**tried (1)** 31:25
**true (2)** 99:20,22
**trust (2)** 21:11;79:4
**trusted (5)** 32:11,11,
19;42:16,17
**truthfully (1)** 5:19
**try (5)** 5:12;23:8;31:1;
36:5;55:3
**trying (7)** 28:22;
30:12;40:9;43:9;
46:10;47:22;66:16
**tuition (1)** 80:2
**turn (1)** 7:5
**twice (1)** 12:20
**two (30)** 15:18;21:9;
29:22;37:3;40:14,22;
43:10;45:2;51:22;
53:4,5;57:22;68:2,8;
72:6,11,13;73:16;
79:11;83:2,3;84:4,13,
21;88:7,10,16;91:25;
93:19;94:6
**two-year (2)** 6:17;
84:17
**type (7)** 5:3;8:22;
34:24;42:14;58:2;
67:20,21
**types (1)** 18:24
**typical (6)** 19:18;23:2;
42:13;77:2,6;93:8
**Typically (2)** 8:22,24

---

**U**

**ultimate (1)** 12:12
**ultimately (4)** 15:18;
56:25;76:23;91:3
**unbalanced (1)** 29:7
**uncomfortable (2)**
69:25;70:3
**under (11)** 4:24;6:25;
8:16;11:17,20;38:13,
16;43:17;59:13;67:1;
74:1
**undergraduate (2)**
36:7;80:13
**undergraduates (1)**
93:22
**underlining (1)** 52:9
**underlying (1)** 31:17
**understood (21)** 21:6;
46:4;53:5;60:9
**undertake (1)** 32:20
**undertook (1)** 42:24
**unfounded (1)** 87:18
**United (4)** 8:17;9:12,
19;11:18
**units (1)** 11:22

DR. KAMIAR ALAEI v.
STATE UNIVERSITY OF NEW YORK, et al.

JAMES STELLAR
April 9, 2021

**universities (1)** 25:5
**University (37)** 6:14;
8:17;9:12,19,22,23;
11:19;20:5;22:13;
24:2,7,17;26:5;28:25;
30:24;31:12;32:13,
21;33:13;20,39:21;
40:12;42:10,24;
44:12;45:25;46:19;
50:23;51:5,10;52:18;
61:8;73:24;84:25;
85:9;86:3;93:1
**University-related (1)**
26:6
**University's (2)** 26:8;
52:21
**unless (2)** 5:9;66:22
**unreasonable (1)**
47:16
**unusual (1)** 93:12
**unwelcome (1)** 52:22
**up (18)** 11:2;32:1;
36:3;41:14,14;49:24;
60:20;61:19;63:23;
69:22;76:4,23;78:6;
81:8;85:19;86:20;
92:19;94:7
**update (1)** 30:9
**updated (1)** 22:19
**updates (1)** 30:8
**upon (4)** 76:24;78:11;
81:21;84:22
**use (3)** 25:9;77:6;
85:5
**used (2)** 75:11;91:24
**using (1)** 80:4
**usual (1)** 21:20
**UUP (4)** 9:17;21:13;
38:13;67:18

**V**

**vaguely (1)** 27:24
**Valerie (1)** 87:13
**various (3)** 12:20;
75:20;86:7
**verbal (2)** 16:10;73:8
**verbally (1)** 5:4
**versus (3)** 84:4,13,17
**Vice (14)** 7:4,23;8:1,
11;10:12;11:23;13:1;
15:16,20;24:3;26:25;
38:3;83:16;84:24
**view (2)** 9:4;49:4
**violate (1)** 63:8
**violated (1)** 38:12
**violating (3)** 46:7;
48:15;49:1
**violation (2)** 51:3;
52:21
**violations (3)** 51:9,12,
22
**vis-à-vis (1)** 27:24

**visited (1)** 94:2
**voice (1)** 48:6

**W**

**wait (1)** 87:22
**wants (2)** 44:18;48:21
**way (11)** 16:12;21:6;
28:10;30:13;31:20;
32:9;36:13;61:4;
83:18;85:17;87:10
**weakening (1)** 93:4
**website (6)** 22:8,17,
25;23:9;34:5;37:23
**websites (2)** 22:13,15
**Wednesday (1)** 54:18
**weekly (2)** 12:17;
69:12
**whatnot (1)** 6:19
**What's (19)** 6:12;
10:3;19:21;23:11;
39:17;42:11,19;
46:11;50:3;54:2;
55:13;61:23;62:25;
65:2;66:4;71:12;
77:11;78:23;87:11
**Whereupon (3)** 68:16;
94:8,14
**whole (3)** 60:20;67:1;
81:4
**widely (1)** 60:9
**William (4)** 69:19;
75:1;77:13;78:25
**Williams (6)** 26:18,24;
27:8,9;30:4;84:19
**Williams' (3)** 29:9,13;
84:22
**wind (1)** 37:21
**wisdom (1)** 85:6
**within (2)** 62:7;92:17
**without (4)** 36:4,19;
65:8;70:1
**witness (2)** 4:2;77:25
**Women (1)** 39:5
**word (2)** 77:6;79:17
**worded (1)** 42:5
**wording (2)** 47:13,17
**words (3)** 36:25;
47:13;84:11
**work (11)** 26:8;45:7;
46:22;47:21;56:13,
19;57:16;59:22;60:1;
65:23;76:5
**worked (2)** 8:11;38:4
**working (9)** 37:17;
43:3;45:8,12,14;47:5;
52:24;59:6;78:18
**works (1)** 85:9
**World (1)** 39:21
**worry (1)** 85:21
**worse (1)** 29:22
**wrap (1)** 94:6
**wrapping (1)** 86:20

**write (1)** 5:7
**writing (3)** 16:10;
36:24;67:10
**writings (1)** 73:15
**written (3)** 39:2;59:20;
73:8
**wrong (2)** 13:13;
35:11
**wrote (4)** 35:3;37:22;
41:21,22

**Y**

**ya (1)** 39:2
**year (6)** 7:10,12;76:4;
84:3,13,17
**years (6)** 68:2,8;83:2;
84:4,14,21
**Yep (7)** 10:7;22:6;
35:20;40:19;60:21;
67:9;68:3
**York (7)** 4:11;9:13,20,
23;11:18;46:14,19
**Young/Sommer (1)**
4:9
**Young/Sommers (1)**
49:9

**Z**

**zone (1)** 92:17
**Zwicklbauer (1)** 66:8
**Z-W-I-C-K-L-B-A-U-E-R (1)**
66:8

**1**

**1 (3)** 54:3;55:14;
67:17
**10 (3)** 14:7,12;91:10
**11 (2)** 41:10,12
**11:48 (1)** 57:10
**11:53 (1)** 54:7
**13 (2)** 57:10,14
**14 (5)** 26:18;49:17;
57:7;58:6;77:14
**16 (1)** 49:17
**18-013 (1)** 50:8

**2**

**2 (4)** 50:25;54:6;75:2,
6
**2/9 (1)** 23:16
**2000 (1)** 55:5
**2011 (1)** 9:13
**2015 (4)** 7:9;19:6;
79:13;87:14
**2016 (1)** 9:14
**2017 (14)** 54:7,7,18;
55:6,6,15;57:7,10,14;
58:1,6;59:4;67:6;
79:13

**2018 (58)** 7:12;10:6;
11:14;13:4,10,18;
14:7,12;18:13;19:1,5,
10,23;20:17;22:2;
23:15;25:18,20;
26:18;28:20;33:5;
35:16;38:20;41:11;
42:22;43:4,22;44:2;
49:17,18,18,19;
50:25;52:12;61:16;
62:1,5,10;63:22;
64:10,15;65:11,22;
66:7,9,15,25;69:19;
75:2,6;77:15;78:25;
79:9;86:6,10,16;
89:24;91:10
**2019 (4)** 6:17,21,24;
54:6
**2020 (1)** 46:16
**21 (7)** 62:1,5,10;
79:16;80:7,17;87:8
**22 (3)** 41:11;54:7;
55:6
**23 (1)** 89:24
**25 (1)** 46:16
**26 (2)** 64:10,15
**26th (1)** 65:1
**27 (2)** 42:22;43:3
**28 (3)** 49:18;55:15;
69:19
**29 (3)** 54:18;55:5,6
**2nd (1)** 75:8

**3**

**3 (2)** 65:10,22
**3,916,342 (1)** 79:14
**3:00 (1)** 57:7

**4**

**4 (5)** 66:7,9,14,24;
67:6
**4/13/18 (1)** 65:5
**4:17 (2)** 94:10,15
**43 (3)** 53:8,11,13

**6**

**6 (4)** 46:25;47:9;
78:24;87:14
**600 (1)** 92:6

**7**

**7 (2)** 48:2;49:19
**7,800 (1)** 92:7

**8**

**8 (16)** 10:6;11:14;
13:4,10;18:13;19:1,5,
10,23;20:17;22:2;

23:15;25:20;52:12;
78:24;79:8
**8th (1)** 21:9

**9**

**9 (7)** 25:18;28:20;
33:5;35:16;38:19;
43:22;63:22