**EXHIBIT G**

**In The Matter Of:**

*DR. KAMIAR ALAEI v.*
*STATE UNIVERSITY OF NEW YORK, et al.*

---

*RANDY STARK*
*March 24, 2021*

---

COVERING ALL UPSTATE NEW YORK



MFReportingNY.com

Office: 518-478-7220
Fax: 518-371-8517

Mail to: 5 Southside Dr., Suite 11
Clifton Park, NY 12065

*Min-U-Script® with Word Index*

RANDY STARK                                    1

```
 1   STATE OF NEW YORK
     COURT OF CLAIMS
 2   _____

 3   In the Matter of the Claim by

 4   DR. KAMIAR ALAEI,

 5                         Claimant,      Claim No:
                                          132554
 6       -against-                        Hon. Francis T. Collins

 7   STATE UNIVERSITY OF NEW YORK,
     STATE UNIVERSITY OF NEW YORK AT ALBANY,
 8   and THE STATE OF NEW YORK

 9                         Respondents.
     _____
10
     Deposition of:      RANDY STARK
11

12

13   DATE:          March 24, 2021

14   TIME:          12:05 p.m. - 3:50 p.m.

15   HELD:          Via Videoconference

16

17

18   BEFORE:        Stephanie Picozzi, CRR, RPR
                    Certified Realtime Reporter and
19                  Notary Public in and for the
                    State of New York
20

21

22

23

24

25
```

```
 1   A P P E A R A N C E S:

 2   APPEARING FOR THE CLAIMANT:

 3        YOUNG/SOMMER LLC
          Five Palisades Drive, Suite 300
 4        Albany, New York 12205
          (518) 438-9907
 5        BY:  JOSEPH F. CASTIGLIONE, ESQ.
               jcastiglione@youngsommer.com
 6

 7
     APPEARING FOR THE RESPONDENTS:
 8
          NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
 9        The Capitol
          Albany, New York 12224
10        (518) 776-2576
          BY:  ANTHONY ROTONDI, ESQ.
11             anthony.rotondi@ag.ny.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    S T I P U L A T I O N S
2
3       IT IS HEREBY STIPULATED, by and between the
    attorneys for the respective parties hereto,
4   that:
5
6       All rights provided by the C.P.L.R., and
    Part 221 of the Uniform Rules for the Conduct of
7   Depositions, including the right to object to
    any question, except as to form, or to move to
8   strike any testimony at this examination is
    reserved; and in addition, the failure to object
9   to any question or to move to strike any
    testimony at this examination shall not be a bar
10  or waiver to make such motion at, and is
    reserved to, the trial of this action.
11
12
        This deposition may be sworn to by the
13  witness being examined before a Notary Public
    other than the Notary Public before whom this
14  examination was begun, but the failure to do so
    or to return the original of this deposition to
15  counsel, shall not be deemed a waiver of the
    rights provided by Rule 3116 of the C.P.L.R.,
16  and shall be controlled thereby.
17
18      The filing of the original of this
    deposition is waived.
19
20
        IT IS FURTHER STIPULATED, that a copy of
21  this examination shall be furnished to the
    attorney for the witness being examined without
22  charge.
23
24
25
```

RANDY STARK                                                4

```
 1                    RANDY STARK,
 2    called as the witness, hereinbefore named, being
 3    first duly cautioned and sworn or affirmed by
 4    STEPHANIE PICOZZI, a Certified Shorthand Reporter and
 5    Notary Public in and for the State of New York,
 6    qualified in Saratoga County, herein to tell the
 7    truth, the whole truth, and nothing but the truth,
 8    was examined and testified as follows:
 9    EXAMINATION BY
10    MR. CASTIGLIONE:
11    Q.   Good morning, Mr. Stark.  My name is Joe
12         Castiglione.  I'm an attorney with the law firm
13         of Young/Sommer.  We represent Dr. Alaei in this
14         matter.
15              You are here as a possible witness
16         concerning claims Dr. Alaei has against New York
17         State regarding his employment with SUNY Albany.
18         I'm going to ask you questions today probing
19         your knowledge ad any information you might have
20         or any documents you might have reviewed.
21              The attorney for the State, Mr. Rotondi,
22         might put up an objection; that's for the
23         record.  You still have to answer the question
24         unless he specifically directs you not to answer
25         the question.
```

RANDY STARK                                             5

```
 1              The stenographer is here to swear you under
 2         oath.  We are creating a transcript that can be
 3         used in later court proceedings.  Because we are
 4         keeping the transcript, we want to keep it
 5         clear.  Let me ask you a question, wait until
 6         I'm done, then you can answer.  She can't type
 7         us both talking at the same time.
 8              If you provide a response, please provide a
 9         verbal response, some people tend to nod or
10         shake their head, so it's clear for the record.
11         And if an objection is made, let it be made,
12         then you can answer.
13              Everything is on the record unless we agree
14         to go off the record.  If I ask you a question,
15         please respond to the best of your ability.  If
16         you don't understand a question, let me know.
17              If you need to take a break at any point,
18         let us know.  If you want to consult with your
19         counsel, that's fine.  If there is a question
20         posed, you have to first answer the question
21         before you can consult with your counsel.
22              Is there any reason today that you can't
23         accurately or truthfully respond to the best of
24         your ability to questions presented?
25    A.    No.
```

RANDY STARK                                                6

```
 1   Q.   Can you state your name for the record?
 2   A.   It's Randy Stark.
 3   Q.   Mr. Stark, did you review any documents in
 4        advance of your deposition today for
 5        preparation?
 6   A.   Yes, I did.
 7   Q.   Can you identify for me what you reviewed?
 8   A.   There were documents that Mr. Rotondi provided
 9        me.
10   Q.   Did you have any conversations with anyone in
11        advance of your deposition today?
12   A.   No.
13   Q.   If you had conversations with your attorney,
14        that's fine, you don't have to tell me the
15        content.  I'm looking for anybody else.
16             MR. ROTONDI:  Joe, sorry to interrupt,
17        I sent him some of the exhibits from the
18        prior EBT.  They are not marked as Exhibit
19        1, 2, 3.  I had to reformat them.  I wasn't
20        able to copy them over so you know.  Sorry
21        to interrupt.
22             MR. CASTIGLIONE:  No problem.  Thank
23        you for clarifying.
24   Q.   Are you currently employed, Mr. Stark?
25   A.   No, I'm not.
```

RANDY STARK                                                        7

```
 1   Q.   When was your last employment position?
 2   A.   It was Senior HR Consultant with Pinnacle HR.
 3   Q.   When was that?
 4   A.   That was the period August 2020 to January 2021.
 5   Q.   Before August 2020, did you have any employment?
 6   A.   Yes, I did.
 7   Q.   What was your employment before August 2020?
 8   A.   The University at Albany, SUNY.
 9   Q.   What was the position you held at that time?
10   A.   Associate Vice President Human Resources.
11   Q.   How long did you hold that position prior to
12        August 2020?
13   A.   October 2015 to May 2020.
14   Q.   It was the same position over that period of
15        time, those five years?
16   A.   Yes.
17   Q.   Can you explain to me what your responsibilities
18        were in that position of Associate Vice
19        President of HR for SUNY Albany?
20   A.   It was -- the responsibility for the human
21        resource function.
22   Q.   You held that position of Associate Vice
23        President for Human Resources from January 2018
24        to August 2018?
25   A.   No; it was October 2015 to May 2021.
```

RANDY STARK                                           8

1   Q.   Sorry; I was trying to clarify.

2        During the period of February 2018 to August

3        2018, you held the same position with SUNY

4        Albany?

5   A.   Yes.

6   Q.   The same responsibilities for the HR function?

7   A.   Yes.

8   Q.   Just as we are going forward to clarify for the

9        record, if I'm referring to the State University

10       of New York at Albany, I might refer to SUNY

11       Albany or the university, is that clear?

12  A.   Yes.

13  Q.   If I refer to the Global Institute for Health

14       and Human Rights, I will be referring to,

15       likely, GIHHR.

16  A.   Yes.

17                (Discussion held off the record.)

18  Q.   Mr. Stark, I'm showing you what's been

19       previously marked as Plaintiff's Exhibit A-1.

20       Do you recognize this document?

21  A.   Yes.

22  Q.   I can have her scroll down to the next page so

23       you can see the whole thing.

24  A.   Okay.

25  Q.   Mr. Stark, can you identify what this document

```
 1        is for me?
 2   A.   This is the alternate assignment document that
 3        was given to Dr. Alaei.
 4   Q.   Is that your signature on it?
 5   A.   Yes.
 6   Q.   In the first paragraph, this document talks
 7        about conducting a disciplinary investigation.
 8        Do you see that?  It's the last sentence of the
 9        first paragraph.
10   A.   Yes.
11   Q.   When did you first learn of the grounds for SUNY
12        Albany to conduct that disciplinary
13        investigation?
14   A.   Right around the time when the letter was
15        issued.  I don't have an exact date.
16   Q.   Do you recall what the concerns were, what the
17        grounds were that prompted SUNY to issue this
18        letter dated February 8, 2018?
19   A.   Issues with students.
20   Q.   When you say "issues with students," can you
21        explain?
22   A.   Well, it was a Title IX investigation or inquiry
23        made with regards to a hostile work environment,
24        potential hostile work environment.
25   Q.   Was there anything else that was raised for the
```

RANDY STARK                                        10

```
 1        basis of this letter at that time?
 2   A.   Without having my notes, I would be speculating
 3        what some of the other issues were.
 4   Q.   I'm going to start off generally, then we can go
 5        through the documents to get through this
 6        quicker.
 7            You were involved in this disciplinary
 8        investigation?
 9   A.   Yes.
10   Q.   What was your role, generally, in this
11        investigation?
12   A.   Well, the person who conducted the actual
13        investigation, if you will, interrogation was
14        Brian Selchick and Brian and I would discuss the
15        situation with each other as we progressed
16        through the process.
17   Q.   Were there other people that had any role
18        related to conducting this investigation?
19   A.   Not in Human Resources; no.
20   Q.   Did you conduct any interviews yourself that
21        were related to this investigation?
22   A.   Not alone.  They were individual interviews that
23        Brian and I conducted.
24   Q.   Was anyone at SUNY Albany overseeing your
25        investigation?
```

1   A.   We communicated with the Title IX office as well

2        as with the Provost's office and the President's

3        office.

4   Q.   Who was the Provost that you were communicating

5        with at the time?

6   A.   That would have been Jim Stellar.

7   Q.   The President was -- who was the President at

8        the time?

9   A.   Come on; take a shot at it.  Havidan Rodriguez.

10  Q.   I want to read you some names and you can, as

11       you recall, generally explain to me what role,

12       if any, they had related to the investigation

13       concerning Dr. Alaei.

14            Bruce Szelest.

15  A.   He was the Chief of Staff in the President's

16       office.

17  Q.   Generally speaking, what type of role or

18       involvement did he have in this investigation

19       over time?

20  A.   He kept the President informed.  And if we had

21       decisions to be made or actions to be taken,

22       they would be discussed with Bruce.  And he

23       would respond from the President's office as to

24       what direction we were to take.

25  Q.   So then President Rodriguez had involvement in

```
 1          terms of oversight and consultation and he would
 2          make decisions and convey them to Bruce, is that
 3          fair to say?
 4    A.    I guess you would have to ask Bruce.  One would
 5          presume that but I don't know what the
 6          communication was there.
 7    Q.    What about James Stellar?
 8    A.    Same thing.  Had very few conversations with Dr.
 9          Stellar.  Much of the communications were group
10          communications via email.
11    Q.    You explained Brian Selchick was involved in
12          conducting the investigation?
13    A.    Yes.
14    Q.    Who is Chantelle Cleary?
15    A.    She was the Director for Title IX and I believe
16          that was her title.  She oversaw Title IX
17          investigations and any student complaints.
18    Q.    What about Valerie Ayers?
19    A.    She was counsel at SUNY Albany -- excuse me, at
20          SUNY Central.
21    Q.    If you recall, when did the disciplinary
22          investigation identified in Plaintiff's Exhibit
23          A-1 end?
24    A.    Probably it was in the summer.  I would say
25          probably June, July.
```

RANDY STARK                                                    13

1    Q.    Are you aware of efforts by SUNY Albany over the
2          course of that investigation to nonrenew Dr.
3          Alaei's employment?
4    A.    Yes, I am.
5    Q.    Did you have any involvement in those efforts?
6    A.    Nothing other than reviewing the letter that he
7          received upon accepting the position.
8    Q.    Do you recall names of individuals with SUNY
9          Albany that were working on efforts towards
10         nonrenewal of Dr. Alaei's employment?
11   A.    No.  I would just be speculating as to who would
12         be involved in making those determinations.
13         That wasn't something that HR would have gotten
14         involved with.
15   Q.    Did there come a time, as far as you recall,
16         when SUNY Albany determined to terminate Dr.
17         Alaei's employment on or about August 8, 2019?
18   A.    Yes.
19   Q.    Were you involved in that determination?
20   A.    I was involved infer delivering the message.
21   Q.    Do you know why SUNY Albany determined to
22         terminate Dr. Alaei's employment at that time?
23   A.    I wasn't given any specific reasons.
24   Q.    I want to go back to A-1.  Who decided to start
25         the disciplinary investigation reflected in this

RANDY STARK                                    14

```
 1        February 8, 2018 letter identified as
 2        Plaintiff's Exhibit A-1?
 3   A.   That was -- I believe that was from the
 4        Provost's office.
 5   Q.   By Provost, you mean James Stellar?
 6   A.   Yes.
 7   Q.   Before this time, February 2018, how many
 8        investigations had you done as part of your HR
 9        role with SUNY up to that point?
10   A.   That's hard to say.  Again, I would have to look
11        at my files.  We had investigations maybe -- I
12        don't know.  I would be guessing.  Maybe a half
13        a dozen.  I mean, we certainly had meetings with
14        individuals with regards to disciplinary matters
15        but, you know, if you are referring to
16        investigations to this extent, maybe three or
17        four.
18   Q.   Referring to this letter, A-1, it talks about
19        Dr. Alaei not being allowed at university
20        facilities during the time of the investigation.
21   A.   Yes.
22   Q.   Why was Dr. Alaei not allowed at university
23        facilities during this part of the
24        investigation?
25   A.   Typically, when a person was put out on an
```

RANDY STARK                              15

```
 1        alternative assignment, the alternative
 2        assignment would take place usually off campus.
 3   Q.   Was there a prohibition for those other
 4        alternative assignment situations where the
 5        person under investigation was not allowed to
 6        come back on campus for any reason?
 7   A.   They would have to contact either my office or
 8        the director or the dean of their program.
 9   Q.   Was that something that was explained to them
10        typically --
11   A.   Yes.
12   Q.   -- in other situations?
13            Yes?
14   A.   Sorry; I jumped ahead.
15            Yes.
16   Q.   That's all right.
17                MR. CASTIGLIONE:  This document on the
18            second page, if you can scroll down,
19            actually, if you scroll up a little more so
20            the last paragraph on the first page and
21            first paragraph on the second page is
22            legible.
23   Q.   Mr. Stark, in this last paragraph on the first
24        page of this letter, it continues on on the
25        second page, in part it says, generally, that
```

```
 1          Dr. Alaei was not allowed to discuss this matter
 2          in any way with others.  Is that direction
 3          common in these types of matters?
 4    A.    Yes.
 5    Q.    Why is that?
 6    A.    As you conduct the investigation, we requested
 7          the person involved to not have any interaction
 8          with staff.  It's just protocol, I guess, if you
 9          will.
10                    MR. CASTIGLIONE:  If I can have
11              Stephanie scroll done to the next sub
12              exhibit, Exhibit A-2.
13    Q.    Mr. Stark, I'm showing you what's been marked as
14          Plaintiff's Exhibit A-2.  It's an email that
15          looks to be from Brian Selchick,
16          S.E.L.C.H.I.C.K., to a number of people
17          including you.
18          Do you recall this email?
19    A.    Well, I'm on there so I must have read it.
20    Q.    In this email it talks about relieving KA, who I
21          assume is Dr. Alaei, of his card access and
22          keys.  Was that a typical course of conduct by
23          SUNY Albany in these types of investigations?
24    A.    Yes.  We have done that in the past.  Yes.
25    Q.    Are there other instances when you conducted
```

```
 1        these investigations when you did not do that?
 2  A.    Not that I recall.
 3  Q.    Were there any concerns raised by Dr. Alaei
 4        having, you know, card access or email access --
 5        card access or key access?  Sorry.
 6  A.    The first part of your question was?
 7  Q.    Were there any concerns raised by anybody about
 8        Dr. Alaei having keys or card access?
 9  A.    It was -- you know, it was a directive that we
10        not allow him to have, you know, card access or
11        key access to his office or to that area, to the
12        university.
13  Q.    When you say "it was a directive," who gave you
14        the directive?
15  A.    That came as a result of meetings that we had
16        with, you know, with the Provost's office and
17        others.
18  Q.    Would that be Provost Jim Stellar?
19  A.    Yes, Jim Stellar.  Yes.
20  Q.    Would Bruce Szelest be involved in that too?
21  A.    He would be involved.  He would be aware of it.
22  Q.    Now, as part of this email, Exhibit A sub
23        Exhibit 2, it identifies that SUNY was removing
24        email access to Dr. Alaei.  Is that common in
25        these types of alternative assignments or
```

RANDY STARK                                                    18

```
1          investigation situations?
2    A.    No, it is not.
3    Q.    Why was that done here?
4    A.    It was a directive from the President that he
5          not have email access.
6    Q.    Did the President ever explain to you why he
7          issued that directive?
8    A.    No.  It was just they did not want him to have
9          access.  It was his decision.
10   Q.    As far as you are aware, were any concerns ever
11         raised by Dr. Alaei inappropriately using his
12         email in the past?
13   A.    Using his email inappropriately in the past?
14   Q.    Yes; before this time.
15   A.    No; not that I'm aware of.  Not that I recall.
16   Q.    Were there any concerns raised around this time
17         that Dr. Alaei would somehow use his email
18         inappropriately?
19   A.    I guess I would need to know what you mean by
20         "inappropriately."
21   Q.    Sure.
22             If, for example, if anybody had raised a
23         specific situation that we think Dr. Alaei is
24         going to do something inappropriate, contact
25         people inappropriately or say something
```

RANDY STARK                                    19

```
 1        inappropriate and send it by email, any of those
 2        types of concerns?
 3   A.   I believe the purpose was just to not allow him
 4        any form of communication via email with any of
 5        the staff members period.
 6   Q.   And was that a directive from the President?
 7   A.   Yes, it was.
 8   Q.   Chantelle Cleary was on this email as well if
 9        you look in the upper right-hand corner.
10   A.   Yup.
11   Q.   Did you conduct a separate investigation than
12        Ms. Cleary was conducting?
13   A.   It would -- it was a joint investigation.
14   Q.   So what issues was your office looking at as
15        compared to what her office was looking at?
16   A.   We were looking at how the issues that addressed
17        related to the UUP contract.  I mean, there was
18        a lot of discussion that went back and forth but
19        there were issues that they would investigate
20        and then they would share with us and that would
21        have been part of whatever questions we may have
22        asked Dr. Alaei.
23   Q.   Ms. Cleary was conducting Title X and related
24        investigations?
25   A.   Yes.
```

RANDY STARK                                                20

```
 1    Q.    Was the President made aware of the February 8
 2          letter in this email before these actions were
 3          taken?
 4    A.    I believe so.  Not by my office.
 5    Q.    Sorry?
 6    A.    Not by my office.
 7    Q.    You were looking into the UUP Agreement.  By
 8          UUP, so we are clear, are we referring to the
 9          agreement between United University Professions
10          and the State of New York that was applicable
11          during that time?
12    A.    Yes.
13    Q.    If I call it the UUP Agreement, you will
14          understand what I'm referring to?
15    A.    Yes.
16    Q.    You said you were looking at UUP Agreement
17          issues.  Did you ever determine if removing
18          email access was a violation of the UUP
19          Agreement or consistent with the UUP Agreement?
20    A.    It was not consistent with the UUP Agreement.
21          Alternative assignment is an alternative
22          assignment.  It's not a form of disciplinary
23          action.  And being that disciplinary action,
24          then the email would have remained in place.
25    Q.    But for the directive of the President here?
```

1   A.   Correct.

2   Q.   Mr. Stark, I'm showing you what's been

3        identified as Plaintiff's Exhibit A-3.  It looks

4        to be an email from a Karl Rethemeyer dated

5        February 2018 to a number of people including

6        you.  Do you recall this email?

7   A.   It looks familiar; yes.

8   Q.   In the middle of this email, they are talking

9        about the GIHHR website making changes.  In the

10       middle of the email towards the beginning it

11       says:  In part, we will also need to change all

12       references to KA.

13           Do you know why that was needed to be done

14       at that point?

15  A.   No.  Again, that wasn't in my area.  That was a

16       decision or discussion that occurred at

17       different levels of the university.

18  Q.   Can you explain to me who Karl Rethemeyer was,

19       R.E.T.H.E.M.E.Y.E.R.?

20  A.   Again, as it states there, he was the Interim

21       Dean for the Rockefeller College of Public

22       Affairs & Policy.  I believe, again, I don't

23       have the information but I believe he had

24       oversight, some oversight, some involvement,

25       with GIHHR.

```
 1   Q.   In your prior experience with other
 2        investigations and alternative assignments, was
 3        removing an employee's references from the SUNY
 4        website consistent with those prior
 5        investigatory or alternative assignment
 6        practices by SUNY Albany?
 7   A.   I don't recall that having happened.
 8   Q.   Did you ever look into removing an employee from
 9        the website during an investigation, whether
10        that was consistent with the UUP Agreement?
11   A.   I don't recall ever having done that; no.
12   Q.   If I can refer you to the next document, Exhibit
13        A sub Exhibit 4, Mr. Stark.  I'm showing you
14        what's been identified as Plaintiff's Exhibit
15        A-4 which is an email from Harvey Charles dated
16        February 8, 2018 to a number of individuals
17        talking about setting up a meeting on Friday
18        afternoon at 3:00 p.m. which appears to be the
19        next day, February 9.
20            Do you recall a meeting being held by GIHHR
21        personnel or other SUNY personnel to discuss
22        issues concerning Dr. Alaei and the change in
23        leadership at the institute?
24   A.   Yes.
25   Q.   Did you attend that meeting?
```

```
 1   A.   I believe so.
 2   Q.   Why was it decided to have that meeting in the
 3        first place?
 4   A.   Well, my recollection or the concerns were the
 5        students were upset and felt that they needed to
 6        have some communication from the university in
 7        terms of what was happening with regards to the
 8        issues surrounding the alleged actions of Dr.
 9        Alaei and it was more of, I believe, an
10        informational meeting just to inform students
11        what the status was of GIHHR and Dr. Alaei at
12        that point in time.
13   Q.   Do you recall who spoke on behalf of SUNY Albany
14        at that meeting?
15   A.   I believe Chantelle Cleary may have spoken.
16        Honestly, I don't recall those who spoke.
17        Again, it was a room full of people and I don't
18        recall others who may have spoken.
19   Q.   If I can refer you to what's been marked as
20        Plaintiff's Exhibit G.
21              (Discussion held off the record.)
22   Q.   Do you recall, Mr. Stark, generally what was
23        discussed at that meeting on February 9, 2018?
24   A.   Not specifics; just an update.  Dr. Alaei was
25        not on campus.  I don't remember what specifics
```

```
 1        were given with regards to him not being
 2        present.
 3  Q.    Do you recall if any students that attended that
 4        meeting or GIHHR staff raised any concerns after
 5        that meeting about racial or cultural issues?
 6  A.    I don't recall any racial issues.  There may
 7        have been some discussion on cultural issues
 8        but, again, it's a few years back.  I don't
 9        remember the specifics.
10  Q.    Do you recall the name Elizabeth Gray?
11  A.    Yes.
12  Q.    Do you recall if Ms. Gray during a deposition
13        with Ms. Cleary ever raised a concern that there
14        was a cultural difference and maybe a
15        misunderstanding or something like that in terms
16        of interactions with the female student that
17        initiated or, I guess, raised the issue of
18        concern in the first place?
19  A.    That sounds familiar.  I don't know if it was
20        Ms. Gray but that sounds familiar.
21  Q.    Were any of those issues ever taken into account
22        when doing the investigation?
23  A.    Yes.
24  Q.    Can you explain to me what you did to take them
25        into account?
```

```
1    A.    Well, just, again, different cultures.  And
2          based on, I think, what Dr. Alaei may have
3          communicated and, you know, what we heard from
4          staff, that, you know, again, their culture, our
5          culture, if you will, there may have been some
6          things that could have been misinterpreted.
7    Q.    Mr. Stark, I'm referring you to what's been
8          marked as Plaintiff's A-6.  This is an email
9          from Brian Selchick dated February 9, 2018.
10         There are a number of recipients including
11         yourself, if you take a look at that.
12   A.    Yup.
13               MR. CASTIGLIONE:  If you scroll down to
14            the next page please.
15   Q.    As reflected in this chain of emails,
16         Plaintiff's A-6, there was an email sent along
17         from a Jon Ventura dated February 8.  Part of
18         that email explains that they were seeking to
19         have Dr. Alaei sit on a panel with a North
20         Korean refugee and U.S. Ambassador to the UN
21         Nikki Haley.  They were asking him to give a
22         20-minute presentation on his experiences inside
23         Iran based upon his unlawful imprisonment.
24               MR. CASTIGLIONE:  If you go up, scroll
25            up in that email please.
```

```
 1   Q.    It appears there was communications between
 2         Harvey Charles and others inquiring about
 3         whether or not Dr. Alaei was allowed to do that.
 4         And it looks like there was a determination made
 5         that he was able to do so in his individual
 6         capacity and not as a representative of the
 7         university.
 8             In your prior experience with investigations
 9         or alternative assignments, was that common or
10         typical protocol, that the person subject to the
11         investigation or alternative assignment was not
12         able to attend these types of lectures or
13         speaking engagements and not represent
14         themselves as being an employee or being a
15         representative of SUNY Albany?
16   A.    I don't recall that having come up in the
17         previous investigations.
18   Q.    Do you recall if there was a determination by
19         the President or Mr. Szelest about this issue?
20   A.    I don't -- again, with regards to this, I don't
21         recall what the outcome was of that.  That was
22         not a decision that HR would have made.
23   Q.    Referring again to this email, Plaintiff's
24         Exhibit A-6, were any concerns raised by anybody
25         at the time about Dr. Alaei speaking at these
```

RANDY STARK                                          27

```
 1           types of matters and representing himself as an
 2           employee?
 3   A.     I don't believe that they wanted him
 4           representing the university as an employee of
 5           the university at that point in time.
 6   Q.     Was that a decision by your office?
 7   A.     No.
 8   Q.     Mr. Stark, I'm showing you what has been
 9           identified as Plaintiff's Exhibit A-7.  This is
10           an email from Harvey Charles dated February 9,
11           2018 to a number of individuals including a
12           number of individuals it appears outside of the
13           SUNY Albany community.  This email says -- it's
14           going to GIHHR colleagues and supporters
15           basically advising that they have named two
16           individuals as Interim Co-Directors of GIHHR.
17               Do you know why this email was sent?
18   A.     Again, speculating, just to inform, you know,
19           those in the email as to what the status was of
20           GIHHR.  Other than that, it's just speculation.
21               MR. ROTONDI:  Randy, don't speculate or
22           guess.
23   Q.     Did you have anything to do in drafting this
24           email or the concept of sending it out?
25   A.     No.
```

RANDY STARK                                                28

1    Q.    Do you know if anyone raised any concerns before
2          it was sent out about whether this email might
3          violate Dr. Alaei's rights under the UUP
4          Agreement?
5    A.    No.
6    Q.    Did anyone ever discuss any concerns with you
7          actually before sending this email about
8          possible adverse consequences?
9    A.    No.
10   Q.    Do you know who decided to appoint these two
11         identified Interim Co-Directors of GIHHR?
12   A.    No.
13   Q.    Do you know who these two individuals are, Dina
14         Refki, R.E.F.K.I., and Gina Volynsky,
15         V.O.L.Y.N.S.K.Y.?
16   A.    Yes.
17   Q.    We will get back to that.
18             Mr. Stark, I'm showing you what's been
19         marked as Plaintiff's Exhibit A-11.  This is an
20         email from James Stellar dated February 22, 2018
21         to a number of people including Bruce Szelest.
22         In this email, Mr. Szelest talks about new
23         directors for GIHHR.
24             Are you aware of whether or not as of this
25         date somebody with SUNY Albany had made a

1        determination to appoint new directors for

2        GIHHR?

3    A.   No.

4    Q.   You are just not aware?

5    A.   I'm not aware.

6    Q.   Do you know the professional qualifications for

7        the two individuals that were appointed as

8        Interim or Co-Directors, Interim Co-Directors,

9        of GIHHR?

10   A.   No, I don't.

11   Q.   Do you know their race?

12   A.   I believe both are Caucasian.  One spoke with an

13       accent, I believe.

14   Q.   Are they both females?

15   A.   Yes.

16   Q.   In this email, Mr. Stellar is communicating with

17       Bruce Szelest.  Is that consistent with your

18       understanding, that they were discussing matters

19       about Dr. Alaei and the investigation and

20       employment issues?

21   A.   That's where -- I'm aware discussion did take

22       place between the President's office and the

23       Provost's office.  To what extent, I don't know.

24   Q.   If I can refer you to what's been marked as

25       Plaintiff's A-12, which would be PDF page 49.

```
 1          Mr. Stark, I'm showing you what's been marked as
 2          Plaintiff's Exhibit A-12.  This is an email
 3          between Dr. Alaei and Harvey Charles dated
 4          February 27, 2018.  In this email, Dr. Alaei
 5          refers to SUNY Albany barring him from
 6          communicating on any grant or program he was
 7          administering and raising concerns about who
 8          would be taking care of those grants and
 9          programs.
10              Was this concern about Dr. Alaei not being
11          able to oversee his programs and grants ever
12          raised during the investigation process, as far
13          as you recall?
14    A.    Not that I'm aware of.
15    Q.    So you wouldn't know if there was any action
16          taken in response to the issues raised by Dr.
17          Alaei in this email?
18    A.    No.
19    Q.    If I can refer you to what's been marked as
20          Plaintiff's Exhibit A-13.  Plaintiff's Exhibit
21          A-13 is an email from Chantelle Cleary to others
22          dated March 9, 2018.  You are not a recipient
23          but Brian Selchick is a recipient.  And you and
24          Brian were working together on this matter,
25          correct?
```

1    A.    Yes.

2    Q.    In the first sentence Ms. Cleary states:  I have

3          been asked by Bruce to make this matter our top

4          priority.

5              Do you know what Ms. Cleary was referring to

6          about making this matter concerning Dr. Alaei

7          her first priority?

8    A.    No, I don't.  That would be a question for Ms.

9          Cleary.

10   Q.    Let me ask you about Ms. Cleary.  If I can refer

11         you to Plaintiff's Exhibit J, what's being shown

12         to you as Plaintiff's Exhibit J, a copy of the

13         decision by the State of New York, Supreme

14         Court, Appellate Division, Third Judicial

15         Department, decided on November 25, 2020,

16         identified as In the Matter of Alexander M. v.

17         Chantelle Cleary, as Former Title IX Coordinator

18         at the State University of New York at Albany

19         and others.

20             Are you aware of a decision involving Ms.

21         Cleary concerning her prior conduct while at

22         SUNY Albany identified in this caption here?

23   A.    No, I'm not.

24   Q.    If I can have you scroll down to page 6 of the

25         document, PDF page 133.  If I can refer you to

```
 1           the middle of this page, which is page 6 of the
 2           document itself, it states in part:  As to the
 3           possibility of individual bias, Cleary
 4           admittedly altered the facts as reported to
 5           her.
 6               Are you aware of any concerns ever being
 7           raised in the past about matters Ms. Cleary was
 8           involved in about altering facts that were
 9           reported to her during her investigations?
10   A.      No, I'm not aware of any.
11   Q.      If I can scroll down to the end of this page,
12           the bottom of this paragraph states in part,
13           Cleary's phrasing portrays a significantly
14           different rendering of the event.  At the
15           hearing, when Cleary was asked why she changed
16           the wording, her response, in the words of the
17           Supreme Court's order denying petitioner's
18           motion for discovery, bordered on the
19           incoherent.  It is not unreasonable to question
20           whether Cleary changed the wording, open
21           parenthesis, and as such the alleged facts,
22           close parenthesis, to correspond with the
23           definition of sexual assault I as found in the
24           student code.
25               Are you aware of any concerns ever being
```

```
 1          raised while you were at SUNY Albany as to Ms.
 2          Cleary trying to make allegations fit into the
 3          definition of assault or other terms dealing
 4          with sexual harassment or assault?
 5     A.   No, I'm not aware.
 6     Q.   The middle paragraph of page 7 of this court
 7          decision states in part:  In addition,
 8          petitioner presented an affidavit from his
 9          advisor, who was present with him in his
10          meetings with Cleary.  The advisor averred that,
11          at said meetings, Cleary raised her voice,
12          physically leaned toward petitioner and acted in
13          an aggressive manner.
14               Are you aware of any similar type of
15          behavior by Ms. Cleary in conducting her
16          investigations at SUNY Albany over time?
17     A.   No, I'm not.
18     Q.   Did Ms. Cleary ever express to you in any
19          opinion or belief that she believed Dr. Alaei
20          was guilty for violating any SUNY policy related
21          to this investigation?
22     A.   Not to me, no.
23     Q.   Did she ever make any statements to you that she
24          believed Dr. Alaei had done whatever was alleged
25          as against him?
```

RANDY STARK                                          34

```
1   A.    I don't recall any comments from her regarding
2         that, no.
3              You are muted.  I can't hear you.
4   Q.    Sorry about that.
5              Did Ms. Cleary leave SUNY Albany's
6         employment during your time?
7   A.    Yes, she did.
8   Q.    Do you know the circumstances of why she left
9         employment with SUNY Albany?
10  A.    She accepted a position at Cornell University.
11  Q.    Do you know if there was any investigation ever
12        conducted by SUNY Albany concerning alleged
13        improper acts by Ms. Cleary?
14  A.    Not aware of any.
15  Q.    If I can refer you to what's been marked as
16        Exhibit M.  This would have been provided to you
17        yesterday or today.  I think it was yesterday.
18             Mr. Stark, I'm showing you what's been
19        marked as Plaintiff's Exhibit M.  It's a number
20        of letters so I will go through.
21             Mr. Stark, as I'm scrolling through the
22        letters, there are three letters from my office
23        to you as well as an email.  The letters are
24        dated February 14, 2018, February 16, 2018,
25        February 28, 2018, then an email March 7, 2018.
```

RANDY STARK                                                    35

```
1              Do you generally recall receiving letters
2         from my office asserting objections or concerns
3         on behalf of Dr. Alaei when this matter started?
4    A.   Yes.
5    Q.   Do you recall these letters generally raised
6         issues of Dr. Alaei being removed as Director of
7         GIHHR or being punished without just cause?
8    A.   Yes.
9    Q.   Do you recall these letters and emails raising
10        the issue of lack of email access?
11   A.   Yes.
12   Q.   Did you ever send these to anybody at SUNY and
13        ask them to review these to see if SUNY was
14        wrong or to address any of the concerns being
15        raised?
16   A.   Yes.
17   Q.   First of all, who would you send them to, if you
18        recall?
19   A.   I would forward them to counsel at the
20        university as well as to counsel down at SUNY
21        Central.
22   Q.   Do you remember SUNY ever providing a response
23        of looking into these to see if they were
24        consistent or a violation of the UUP Agreement?
25              MR. ROTONDI:  I object just to anything
```

```
 1              he heard from SUNY counsel as
 2              attorney-client privilege, otherwise, no
 3              objection.
 4   Q.   So the question is:  Did SUNY ever provide any
 5        response to address whether any of these issues
 6        were a violation of the UUP Agreement or not,
 7        the objections about if there was illegal
 8        communications made?
 9   A.   I don't recall.
10   Q.   As far as you are aware, SUNY never provided Dr.
11        Alaei access to his email again during the time
12        of this investigation, is that correct?
13   A.   As far as I'm aware, yes, that's correct.
14   Q.   You had mentioned earlier part of what you were
15        looking into was UUP Agreement issues.  Do you
16        recall the UUP allowing for informal resolution
17        of disciplinary issues?
18   A.   You know, informal resolution of disciplinary
19        issues.
20   Q.   Let me take a look here.
21              So referring back to Plaintiff's Exhibit M
22        sub Exhibit 1, a letter from Young/Sommer dated
23        February 14, 2018, the paragraph in the middle
24        of the screen starting with "initially," this
25        paragraph states:  The agreement recites that
```

```
 1        the purpose of the article is to provide a
 2        prompt, equitable and efficient procedure.
 3        Further, the agreement is clear that prior to
 4        initiating any formal action under the article,
 5        the university is encouraged to resolve matters
 6        of discipline informally citing UUP Agreement
 7        Section 19.1.
 8            Do you recall that provision of the UUP
 9        Agreement?
10   A.   Not until you just presented it.
11   Q.   Do you recall why SUNY never decided to try to
12        resolve this issue informally versus the
13        investigatory process it followed?
14   A.   I believe based on the allegations that were
15        reported, not to our office but to Chantelle
16        Cleary's office and I believe the Provost's
17        office, that was, you know, requested that we do
18        an investigation.
19   Q.   Generally speaking, after this investigation
20        started per the February 8, 2018 letter, what
21        did SUNY do over time conducting its
22        investigation?
23   A.   Interviews were conducted with the students, you
24        know, whose names were brought to our attention.
25   Q.   Was there anything else?
```

```
 1   A.   From an HR standpoint, no.
 2   Q.   I'm showing you what's marked as Plaintiff's
 3        Exhibit L-2.  Generally speaking, do you recall
 4        or have you ever seen this document?
 5   A.   I saw -- I'm looking through it.  The time line
 6        I don't recall seeing.  But -- again, I don't
 7        recall.  Again, I'm not going to -- I don't
 8        recall.  I may have at some point.  There is
 9        documents and stuff going on, you know, but I
10        honestly don't recall if I read this document or
11        not.
12   Q.   Do you recall if your office prepared this
13        document?
14   A.   I don't believe we did.  This is not something
15        that we would necessarily prepare; no.
16   Q.   This document, Exhibit L-2, on the first page of
17        the document there are three Roman numerals and
18        they identify the investigation on the following
19        possible violations of policies.  Roman numeral
20        I states in part, insert policy violations for
21        permitting Dr. Arash Alaei to conduct business
22        on behalf of GIHHR after his separation from the
23        University at Albany.  Roman numeral II says,
24        insert policy violations for facilitating
25        contact between Dr. Arash Alaei and GIHHR staff
```

```
1            and students during Arash Alaei's alternative
2            assignment and after his separation from the
3            University at Albany.  And then number III says,
4            a violation of the University at Albany's sexual
5            harassment policy for engaging in unwelcomed
6            conduct of a sexual nature directed at GIHHR
7            student intern blank that created a
8            sexually-hostile environment for working and
9            learning.
10                    MR. CASTIGLIONE:  For the record, I
11               said "blank" rather than saying the
12               student's name.
13   A.   I understand.
14   Q.   So were these the three issues that served as
15        the basis of the investigation by Ms. Cleary and
16        your office concerning Dr. Alaei?
17   A.   I would say Roman numeral III was the primary
18        one.  And in the course of discussion, the other
19        two issues with what Dr. Arash Alaei had done in
20        the meantime did come up in the course of, you
21        know, our investigation.
22   Q.   Was Ms. Cleary looking into the allegations of
23        Roman numeral number III?
24   A.   Those would have been her, yes.  Those would
25        have been -- that would have been her area of
```

1          review.
2    Q.    And then your area, your office's area for HR
3          would have been Roman numerals I and II as shown
4          on this document?
5    A.    That's correct.
6    Q.    Okay.
7    A.    And -- yes.
8    Q.    Over the course of investigation of what I'm
9          going to identify as Roman numerals I and II,
10         based upon exhibit L-2, did you ever speak with
11         Harvey Charles about those issues?
12   A.    No; I don't recall ever specifically talking to
13         him about those.
14             Could I just clarify one thing?
15   Q.    Sure.
16   A.    On Roman numeral III, that is what Chantelle was
17         investigating but that was also part of what we
18         in HR needed to do in terms of our investigation
19         and interrogation.
20   Q.    These issues were overlapping, III with II?
21   A.    Right.
22   Q.    For number I, Roman numerals I and II, you don't
23         recall speaking with Harvey Charles?
24   A.    No, I don't.  I mean, at what point in time, you
25         know, and where it came up and who it was with,

RANDY STARK                                                        41

```
 1           there was concern raised in regards to, you
 2           know, Dr. Arash's interaction with Kamiar's --
 3           what the interactions were.  Those came up
 4           through in the course of discussions with, you
 5           know, who, what, when and where it was with, I
 6           don't know; I don't recall.
 7    Q.     If I can refer you to Exhibit F-1, the first
 8           document is an email from Arash Alaei to Harvey
 9           Charles dated March 22, 2017.  If you can take a
10           look at that email.
11    A.     Okay.
12    Q.     Then there was a response email from Harvey
13           Charles to Arash Alaei dated March 29, 2017.
14           This email reflects a response by Mr. Charles to
15           Arash Alaei's inquiry.
16    A.     Okay.
17    Q.     As part of your investigation, do you recall
18           ever learning that Arash Alaei had been
19           communicating with people by reaching out to
20           Harvey Charles in the first instance to ask for
21           permission?
22    A.     Sorry; could you ask the question again?
23    Q.     Sure.
24              Do you recall in the course of your
25           investigation learning about whether Arash Alaei
```

 1          was contacting Harvey Charles to request
 2          permission to contact individuals or go on
 3          campus or attend events?
 4    A.    I don't recall.
 5    Q.    That exhibit, Exhibit F-1, there is another
 6          email dated March 28, 2017 from Arash Alaei to
 7          Harvey Charles.  He is laying out apparently his
 8          work plan if you take a second to read this
 9          over.
10    A.    This is from Arash.
11    Q.    Arash to Charles.
12    A.    Could you scroll up a little bit?
13    Q.    In particular, if I can refer you to the
14          second-to-last paragraph on this page, it starts
15          with in order to complete the above-mentioned
16          tasks, I will be in touch with the following
17          people.
18    A.    Okay.
19    Q.    During the investigation, were you aware if Dr.
20          Charles was giving permission to Arash Alaei to
21          talk to various people including the people
22          listed on this document?
23    A.    I don't recall.  I don't recall.
24    Q.    Do you recall coming across any other emails or
25          specifically dealing with Arash reaching out to

RANDY STARK                                43

1          Harvey Charles?

2    A.   No, I don't.  I don't recall.

3    Q.   Do you recall during this time, referring to

4         Exhibit F-1, the email dated March 28, 2017, was

5         Arash Alaei on alternative assignment at that

6         point?

7    A.   I will have to look at the record.  I don't

8         recall.  I don't know if he was.

9    Q.   Do you recall that Arash Alaei at some point was

10        on alternative assignment before he left SUNY

11        Albany?

12   A.   Yes.

13   Q.   Do you recall if during that time he had access

14        to his email?

15   A.   I believe he did.

16   Q.   Do you know who Dr. Kamiar Alaei's supervisor

17        was in 2018?

18   A.   I believe it was Harvey Charles.

19   Q.   Would that be the same for year 2017?

20   A.   Yes; I believe so.

21   Q.   Was Dr. Charles during those two years also the

22        supervisor for Arash Alaei while he was with

23        SUNY?

24   A.   Yes.

25   Q.   If I can refer you to Exhibit L-1.  I want to go

RANDY STARK                                          44

```
 1        through this document and ask if you take a
 2        look, if you recognize what this is.  Do you
 3        recall what that document was?
 4   A.   I believe that was a letter that was sent.  I
 5        don't know what office it went to, if it went to
 6        -- looks like it may have gone to Chantelle's
 7        office, possibly the Provost's office.  I
 8        believe it was a letter from the students listed
 9        below.  And the bulleted items were the
10        responses prepared for each of those questions.
11   Q.   Was this document used by SUNY Albany at some
12        meeting or in some form to respond to questions
13        raised by students?
14   A.   Not that I'm aware of.
15   Q.   So these responses prepared at the bullets,
16        would they have ever been communicated to
17        somebody outside of SUNY administration?
18   A.   I believe it was communicated to those who wrote
19        the letter.
20   Q.   I'm referring you now to specifically the second
21        page of that document, L-1.  It states in part:
22        It was Arash Alaei and Kamiar Alaei who misled
23        students, not the university.
24            Do you recall what the reference to Dr.
25        Kamiar Alaei misleading students was referring
```

RANDY STARK                                          45

```
 1        to?
 2   A.   No.
 3   Q.   I will refer you to what's been previously
 4        marked as Exhibit L-3.  I will scroll through
 5        it.
 6             Do you have any understanding of what this
 7        document is?
 8   A.   I don't recall.  I don't recall having read that
 9        document.  Doesn't mean I might not have seen
10        it.  I'm just not recalling the document right
11        now.  It's pretty lengthy.
12   Q.   In the upper left corner, it says last edit JCE.
13        Do you have any understanding if that's a
14        reference to Jordan Cargilio Evangelis (ph)?
15   A.   That's what I would think.
16   Q.   He was the person working for SUNY Albany at the
17        time for communications PR?
18   A.   Yes.
19   Q.   Do you recall a time there was an interrogation
20        of Dr. Alaei?
21   A.   Yes.
22   Q.   That was in early May 2018, is that fair to say?
23   A.   I believe so.
24   Q.   Do you recall learning anything new at that
25        interrogation that you had not otherwise
```

```
 1         uncovered about allegations concerning Dr. Alaei
 2         at that point?
 3    A.   Offhand, I don't recall there being any
 4         additional.
 5    Q.   I refer you to Exhibit C-3, a letter dated May
 6         21, 2018 from my office to you.
 7              Do you recall receiving this letter?
 8    A.   Yes.
 9    Q.   At this point in this letter, towards the end,
10         Dr. Alaei raised pursuing discipline informally
11         and resolving issues of discipline informally.
12         Did anybody consider that option at that point
13         after receiving this letter, Plaintiff's Exhibit
14         C-3?
15    A.   I'm just reading it.
16    Q.   Sure.
17    A.   The question is, did we give any consideration
18         to that?
19    Q.   Yes.
20              If you read the last paragraph in the middle
21         of the page it starts, by this letter, Dr. Alaei
22         is requesting one last time that your office
23         revise its February 8 determination and endeavor
24         to address this matter informally as provided
25         for by the UUP Agreement.
```

```
 1            Do you remember making a decision not to
 2      pursue that?
 3  A.  We continued to pursue the investigation
 4      further.  I don't recall there having been any
 5      informal or whatever the wording is of the
 6      document to remedy that.
 7  Q.  Do you recall sharing this document with anybody
 8      else to seek their input?
 9  A.  Sure.  Any of those documents I would share with
10      counsel at the university as well as counsel at
11      SUNY Central.
12  Q.  Do you recall sharing these with Mr. Szelest or
13      the President's office?
14  A.  I would forward those to their offices also.
15  Q.  And same as Provost Stellar?
16  A.  Yes.
17  Q.  If I can refer you to what was previously marked
18      as Exhibit H.
19            MR. CASTIGLIONE:  Do you mind if we
20         take a quick five-minute break?
21            MR. ROTONDI:  I was just going to ask
22         you.
23            (Brief recess.)
24  EXAMINATION BY
25  MR. CASTIGLIONE:
```

```
 1   Q.   Before I move to Exhibit H, I was able to track
 2        down another exhibit.  This is what is being
 3        identified as Plaintiff's Exhibit N.  If I can
 4        scroll down and show you starting here, which is
 5        an email from Harvey Charles to Arash Alaei
 6        dated June 14, 2017, regarding my report and
 7        communication with interns.
 8   A.   Okay.
 9   Q.   There was a prior email from Arash dated June 13
10        and here is the content.
11             Did you ever come across this email in your
12        investigation regarding Arash Alaei's contact
13        with SUNY Albany personnel during his
14        alternative assignment?
15   A.   No; I don't recall that email.
16   Q.   When we last left off, I was referring to the
17        prior Exhibit H, Plaintiff's Exhibit H.  If you
18        take a look at this document, do you recall a
19        time where SUNY scheduled and held a counseling
20        session with Dr. Alaei on or about August 9,
21        2018?
22   A.   Yes.
23   Q.   Is Exhibit H the counseling memorandum that your
24        office prepared concerning Dr. Alaei and the
25        investigation?
```

RANDY STARK                                              49

```
 1   A.    Yes.
 2   Q.    At that time, is it correct to say that SUNY
 3         Albany made a determination that there was no
 4         violation of any of SUNY Albany's policies by
 5         Dr. Alaei?
 6   A.    Yes.
 7   Q.    Is it correct to say at that time SUNY Albany
 8         determined not to impose any discipline against
 9         Dr. Alaei?
10   A.    That's correct.  There was no NOD issued.
11   Q.    Did you solicit any input from others before
12         issuing this counseling memorandum?
13   A.    Yes.
14   Q.    If you recall, who did you seek input from?
15   A.    Well, we would have that reviewed by, again,
16         SUNY counsel at campus, U Albany counsel, as
17         well as SUNY counsel, downtown central SUNY or
18         SUNY Central.
19   Q.    And the findings reflective of this counseling
20         memo not to impose discipline and no policies
21         have been violated, do you recall at what point
22         you made that determination?
23   A.    We made that determination -- I believe it was
24         earlier, earlier than that.  But we weren't able
25         to meet with Kamiar because I believe he was
```

RANDY STARK                                    50

```
 1        away.
 2   Q.   We discussed earlier that on the following day,
 3        August 10, 2018, SUNY A made the determination
 4        to terminate Dr. Alaei's appointment.  Is that
 5        fair to say?
 6   A.   Yes.
 7   Q.   If I can refer you to what was previously marked
 8        Plaintiff's Exhibit B-8.  If you can take a look
 9        at that letter.
10            Do you recall what this letter is?
11   A.   Yeah; that was the letter that was issued to Dr.
12        Alaei the day after.
13   Q.   So this was the letter that was notifying Dr.
14        Alaei his employment was being terminated?
15   A.   Yeah.
16   Q.   His appointment was being terminated as of
17        August 10, 2018?
18   A.   Yes.
19   Q.   You previously stated that you don't have any
20        knowledge as to why it was terminated?
21   A.   Nope.
22   Q.   When did you first learn that SUNY had made a
23        determination to terminate Dr. Alaei's
24        appointment?
25   A.   I would say probably within a couple of days or
```

```
 1          a week or July -- maybe it was back in July when
 2          we wanted to initially have a meeting with him.
 3  Q.      Do you know --
 4  A.      Prior to that date.
 5  Q.      Do you know who was involved in making the
 6          determination to terminate Dr. Alaei's
 7          appointment?
 8  A.      No, I don't.
 9  Q.      Would the President have to approve it?
10  A.      Yes, he would.
11  Q.      Would Provost Stellar have to approve it?
12  A.      Yes, he would have.
13  Q.      I want to backtrack a little bit here.
14              Actually, when somebody is terminated or
15          their appointment is terminated, is it usual for
16          your office to sign the letter?
17  A.      Yes.
18  Q.      I'm going to refer you to Exhibit D-1.  Let me
19          ask you as a follow-up to that last exhibit, the
20          August 10, 2018 letter, after there has been a
21          determination of no policy violations or
22          determination not to impose discipline, is it
23          common to terminate that employee?
24  A.      It hasn't -- it did not happen while I was at
25          the University at Albany.
```

1    Q.    I'm referring you to D-1.  This is a chain of

2          emails between Brian Selchick and Chantelle

3          dated March 26.  In this email, if you take a

4          minute to read it, in the email from Ms. Cleary

5          dated March 26, 2018 she says, I thought we

6          agreed he wasn't going to come back.

7              As of March 26, 2018, did SUNY Albany make a

8          determination that Dr. Alaei wasn't going to

9          come back to employment at SUNY Albany?

10   A.    Not that I'm aware of.

11   Q.    Do you have any understanding what Mr. Selchick

12         and Ms. Cleary are referring to about an

13         agreement that Dr. Alaei wasn't going to come

14         back?

15   A.    No, I'm not.

16   Q.    In the email -- sorry.

17   A.    I'm just reading the email over.

18   Q.    The ultimate response from Mr. Selchick is,

19         right, but there will probably be a short gap in

20         time after the interrogation after which we have

21         to bring him back in the nonrenewal prebuyout

22         assuming the President approves the buy out.

23             Are you aware of any such agreement or

24         decision by SUNY Albany personnel about that

25         time concerning Dr. Alaei?

RANDY STARK                                                    53

```
 1   A.    I think at that point, that would have been
 2         general discussion I think back and forth in
 3         that email.  But we knew that we still had to
 4         conduct the interrogation and find out what
 5         information we gleaned from the interrogation
 6         before the next steps were taken.
 7   Q.    So the reference by Ms. Cleary about agreeing he
 8         wasn't going to come back and the confirmation
 9         by Mr. Selchick, you are indicating that they
10         still understood they had to do a determination
11         about or investigation about whether he was
12         guilty of what was alleged?
13   A.    Absolutely.
14               MR. ROTONDI:  I object to the form of
15           the question.  You are asking him to
16           speculate on what other people are thinking.
17               MR. CASTIGLIONE:  I'm phrasing that
18           because he was the head of the office and in
19           charge of Brian Selchick.
20               MR. ROTONDI:  But he said he wasn't
21           aware of this.
22               MR. CASTIGLIONE:  Okay.
23   Q.    I'm referring you to what was previously marked
24         Plaintiff's Exhibit L-4.  If you can take a look
25         at these notes, it appears to be handwritten
```

1           notes, it looks like, dated 4/3/18 possibly.

2           They are cut off at the corner.

3    A.    Right.

4    Q.    Do you recognize whose handwriting this is?

5    A.    That's Brian's handwriting, Brian Selchick.

6    Q.    At the beginning of this document, there is a

7           note that says, how do we maintain the integrity

8           of the nonrenewal with or without the

9           NOD/interrogation.

10              Do you know what Mr. Selchick was referring

11          to about maintaining the integrity of the

12          nonrenewal?

13   A.    No, I don't.

14   Q.    Do you know if that was a determination or

15          reflective of a determination by somebody at

16          SUNY Albany to not renew Dr. Alaei's employment?

17   A.    Again, I can't speculate.

18   Q.    If you scroll down and I'm running the pointer

19          on my mouse over the line, it's the fourth line

20          down from this page, it says, goal is to make

21          sure he does not come back.

22              Are you aware if there was a decision by

23          SUNY that their goal was to make sure at that

24          point Kamiar Alaei did not come back to work?

25   A.    There may have been discussion regarding that,

RANDY STARK                                          55

```
 1          again, I think based on the allegations that
 2          were made, if they proved to be true.
 3    Q.    SUNY was making a determination possibly in
 4          advance of concluding the investigation, that if
 5          the allegations are true, the goal was to make
 6          sure Dr. Alaei does not come back?
 7                   MR. ROTONDI:  Object to form.
 8    A.    Yes.
 9    Q.    The next line, which would be the fifth sentence
10          down, it says, can we keep nonrenewal clean.
11               Do you have any understanding what Mr.
12          Selchick was referring to there?
13    A.    No, I don't.
14    Q.    This last line on this document, I'm running the
15          mouse pointer over to, says, performance
16          evaluations to support nonrenewal-we could
17          recreate them.
18               Are you aware of efforts by anybody at SUNY
19          Albany to recreate performance evaluations to
20          support a nonrenewal?
21    A.    No, I'm not.
22    Q.    Do you have an understanding why Mr. Selchick
23          would have written that sentence?
24    A.    No, I don't.
25    Q.    Do you recall a time where SUNY began to pursue
```

```
 1        nonrenewal of Dr. Alaei's employment?
 2   A.   I believe it was the beginning of May of 2018.
 3   Q.   I'm going to show you what's been marked as
 4        Plaintiff's Exhibit E-1.  If you take a look at
 5        that document, this is an email from a Liesl
 6        Zwicklbauer dated April 4, 2018.  Take a look at
 7        this.
 8             Do you recall receiving this email?
 9   A.   It was addressed to me; yeah.  I must have seen
10        it; yes.
11   Q.   Do you recall why Ms. Zwicklbauer was providing
12        you with this information?
13   A.   No; would depend on what the previous email
14        there was, if there was one, asking for her
15        opinion.  She is the SUNY Central attorney.
16   Q.   She makes comments about a current performance
17        program and evaluation.  Do you have any
18        understanding of what those were referring to?
19   A.   Yeah.  The performance program is basically the
20        annual evaluation of any and all employees
21        that's to be conducted.
22   Q.   Do you recall finding any evaluations for Dr.
23        Alaei at that time?
24   A.   I may have looked but I don't recall.
25   Q.   So this form, Exhibit E-1, sorry, this email,
```

RANDY STARK                                      57

```
 1           included a December 4, 2017 cover letter to Dr.
 2           Alaei from Provost Stellar as well as a form
 3           identified as change of status request form.  If
 4           you take a look at that form.
 5    A.     Okay.
 6    Q.     On this form in the middle it says, appointment
 7           type term.
 8               Do you have an understanding of what that
 9           reference to "term" means?
10    A.     I should know but -- the only thing I can think
11           of, it would be term or tenure because he was
12           not in a tenured position.  So I think the
13           appointment type was term subject to specific
14           terms.
15    Q.     So when it says following along that line a box
16           says, duration, parentheses, term appointments,
17           this one says, other, two year nine months?
18    A.     Yes.
19    Q.     Do you have any understanding of what that is
20           referring to?
21    A.     That would be the duration of that employment
22           from November of 2017 to August of 2020.
23    Q.     Do you recall what SUNY Albany did after this
24           April 4 email at Exhibit E-1 in terms of
25           nonrenewing Dr. Alaei's employment?
```

RANDY STARK                                    58

```
 1    A.   No, not after that.  I believe a nonrenewal was

 2         sent in May or was being processed in May but

 3         other than that, nothing further on this email

 4         that I'm aware of.

 5    Q.   Do you recall if you ever located or HR located

 6         any evaluations concerning Dr. Alaei?

 7    A.   Again, I may have looked.  I don't recall.  I'm

 8         sure we would review the file but I don't

 9         recall.

10    Q.   Do you recall ever having any conversations with

11         Dr. Alaei about his work product or work

12         quality?

13    A.   No, I don't recall.

14    Q.   Do you recall talking to anybody with any

15         supervisory capacity concerning Dr. Alaei about

16         nonrenewing his employment?

17    A.   It would have been Bill Hedberg and Harvey

18         Charles.

19    Q.   What was Bill Hedberg's role?

20    A.   He is the Assistant Provost.  He sat in the

21         Provost's office.

22    Q.   He would be basically supervisory capacity over

23         Dr. Alaei in GIHHR?

24    A.   I believe he would be, yes.  He would be over

25         Harvey Charles.  But, yeah, I believe that would
```

RANDY STARK                                                  59

```
 1        be the structure.
 2   Q.   At that time in April of 2018, did you ever gain
 3        any understanding of the work quality of Dr.
 4        Alaei's work?
 5   A.   No; I don't recall.
 6   Q.   If I can refer you to what was previously marked
 7        as Exhibit B-1, a letter dated April 27, 2018 to
 8        Provost James Stellar from Harvey Charles
 9        concerning Dr. Alaei.  It says, I am writing to
10        recommend that Dr. Alaei's appointment be
11        nonrenewed, that it not be extended beyond its
12        current termination date or one year following
13        notice of nonrenewal.
14            Do you know who created this document?
15   A.   No, I don't.
16   Q.   Do you know if this document was ever sent to
17        Dr. Alaei?
18   A.   I don't know.
19   Q.   Fair to say you don't have any information or
20        knowledge about this document?
21   A.   I don't recall.  I don't recall seeing that.
22   Q.   If I can refer you to what was marked as Exhibit
23        B-3, a series of emails between William Hedberg
24        and Harvey Charles dated April 28.  If you can
25        just take a look at the bottom up.
```

1  A.    Okay.

2  Q.    In the middle of this exhibit page, there is an

3        email April 28, 2018 at 3:21 p.m., indicates

4        Harvey Charles wrote to Bill.  Hello, Bill, I'm

5        looking at the letter of nonrenewal.  It is

6        actually a recommendation from me to the

7        Provost.  As you know, I know practically

8        nothing about this situation and I feel

9        uncomfortable making a recommendation to the

10       Provost without a basis to do so.

11            Did you know at the time that Harvey Charles

12       had these uncomfortable feelings about making

13       any recommendation concerning nonrenewal of Dr.

14       Alaei?

15 A.    Not up until that time.  I was not aware of his

16       feeling until this time period.

17 Q.    Do you know if anyone ever consulted with Harvey

18       Charles about whether or not SUNY should pursue

19       nonrenewal of Dr. Alaei?

20 A.    That, I don't know.

21 Q.    Do you know who wanted Harvey Charles to sign

22       this letter besides William Hedberg, if anybody?

23 A.    I believe that would have been the protocol, as

24       I believe.  Like I said before, Harvey Charles

25       was the supervisor.  So I believe that's why

```
1          William Hedberg wanted him to sign off on that.
2    Q.    Usually in these situations of seeking
3          nonrenewal, is it the supervisor who initiates
4          the nonrenewal in terms of their opinion about
5          whether an employee should be nonrenewed or not?
6    A.    Yes.
7    Q.    In this case it was Mr. Charles was not giving
8          that opinion that Dr. Alaei be nonrenewed?
9    A.    No.  Well, based on the documents here, I would
10         say no.
11   Q.    If I can show you what's been previously marked
12         as Exhibit B-4, appears to be a chain of emails.
13         The one in the middle of the screen is May 2,
14         2018, appears to be from Harvey Charles to you.
15   A.    Yes.
16   Q.    Do you recall receiving this email?
17   A.    Yes.
18   Q.    Did you have any response to this email, as far
19         as you are aware, in terms of SUNY Albany's
20         efforts to seek nonrenewal of Dr. Alaei at that
21         time?
22   A.    From what I recall, I believe I contacted Harvey
23         Charles and discussed it with him over the phone
24         and he indicated that he, you know, was not in
25         favor of or he was not recommending the
```

RANDY STARK                                    62

```
 1        nonrenewal as he stated and he declined to sign
 2        that letter.
 3   Q.   As a result of Mr. Charles declining to sign the
 4        letter, did you take any particular course of
 5        action?
 6   A.   I spoke with Bill Hedberg.
 7   Q.   Do you recall what you discussed?
 8   A.   We discussed that.  What the outcome was, I
 9        don't recall.  But I know we discussed that and,
10        you know, I don't recall if Bill Hedberg signed
11        off on the forms to initiate the nonrenewal or
12        not.  Again, I don't have access to the files.
13   Q.   Do you know if the President or Bruce Szelest
14        was advised of Dr. Charles' reluctance to sign
15        off on any nonrenewal because he had no basis to
16        recommend any nonrenewal?
17   A.   I don't know if that was shared with him.  I
18        have no knowledge of that.
19   Q.   At this point, who was seeking to have this
20        nonrenewal move forward?
21   A.   I believe it would have been the Provost's
22        office.
23   Q.   Did you ever have any discussions with the
24        Provost's office about the nonrenewal efforts?
25   A.   In terms of?
```

RANDY STARK                                            63

```
 1    Q.    Just the process that was being employed by SUNY
 2          to further nonrenewal?
 3    A.    No.  I mean, if it was coming from the Provost's
 4          office, they are the next step up, if you will.
 5          And, you know, HR, myself, wasn't in a position
 6          to, you know, to question or deny.
 7    Q.    If I can refer you to what was previously
 8          identified as Plaintiff's Exhibit B-6.  This is
 9          an email from William Hedberg to Dr. Alaei
10          cc'ing you apparently and Mr. Charles, Harvey
11          Charles, Dr. Charles, dated May 14, 2018.  This
12          indicates that the Provost has signed off on the
13          form.
14              Is that consistent with your understanding
15          of what happened with the nonrenewal process we
16          have been going through and the form at issue?
17    A.    I believe he would have -- that the Provost
18          would have signed off on it.
19    Q.    This indicates, this email, that the next step
20          in the process is for the President to review
21          the file and make a decision.
22              Are you aware of the President having
23          decided before this point that he was endorsing
24          or promoting nonrenewal of Dr. Alaei?
25    A.    No.  I had no knowledge of that.
```

```
 1   Q.   This does refer to Dr. Alaei having an
 2        opportunity to submit a response.
 3   A.   That's correct.
 4   Q.   Continued on in this document is a letter which
 5        appears to be from Dr. Alaei.  I'm scrolling
 6        down so you can see the bottom from Dr. Alaei to
 7        Bill Hedberg.
 8            Were you aware that Dr. Alaei submitted this
 9        letter in response to the opportunity indicated
10        by Mr. Hedberg in his prior email?
11   A.   Yes.
12   Q.   Did you review this letter?
13   A.   Yes, I did.
14   Q.   Did you discuss this letter, the merits of the
15        issues being raised by Dr. Alaei, with anybody?
16   A.   I don't believe I did.  I may have had a
17        discussion with Bill Hedberg but other than
18        that, no.
19   Q.   Was it within your job responsibilities and
20        authority at any point to decide whether or not
21        Dr. Alaei was renewed or not renewed?
22   A.   No.  That's a decision by his supervisors, his
23        superiors.
24   Q.   In the normal process, is it fair to say that
25        the supervisors are the ones that initiate and
```

RANDY STARK                                          65

1          pursue nonrenewal?

2    A.    Yes.

3    Q.    Are you aware whether the President ultimately

4          approved nonrenewal of Dr. Alaei's employment?

5    A.    Yes, he did.  He did approve it.

6    Q.    Did you have any concerns at that point in the

7          process regarding the nonrenewal process?

8    A.    No.

9    Q.    If I can refer you to what was previously marked

10         as Plaintiff's Exhibit I-3.  This is a chain of

11         emails from May 23 between you and Valerie

12         Ayers.  At the bottom of this exhibit there is

13         an email from Ms. Ayers asking if you received

14         his nonrenewal.  Your response was yes, it was

15         for one year not two.  The one year versus the

16         two has been discussed.  We are staying with one

17         year.

18             Can you explain to me the reference to one

19         year versus two years?

20   A.    With the one year, I -- it was based on the

21         agreement that he had back when he first

22         started.  And based on the agreement because,

23         again, it was a non-tenured position, you know,

24         there were some salary guarantees made back with

25         that letter, talked about, you know further

```
 1        extending that based on performance, performance
 2        reviews, I believe.
 3   Q.   Do you recall my office or the union
 4        representative, I think her name was Maureen
 5        Seidel, raising the term of Evergreen
 6        appointment?
 7   A.   Yes.
 8   Q.   I'm showing you or I will be showing you what's
 9        been previously identified as Plaintiff's
10        Exhibit E-2 which is a letter dated April 16,
11        2014 from SUNY concerning appointment of Dr.
12        Alaei.
13            Do you recall reviewing this letter at some
14        point?
15   A.   Yes, I do.
16   Q.   I'm going to point out using my mouse arrow key,
17        it's the second paragraph of this letter,
18        states, to give you the security of at least two
19        years of employment, the appointment will be
20        reviewed annually for possible extension by
21        another year.
22            Is that what you were referring to about the
23        one-year versus two-year issue?
24   A.   Yes, I am.
25   Q.   In your prior email, you talk about a decision
```

RANDY STARK                                           67

1        being made and a discussion had.  Do you recall
2        that or want me to put it back up?
3   A.   With regards to the one versus two years?
4   Q.   Yes.
5   A.   I recall.
6   Q.   So who was involved in the discussion about one
7        year versus two years of employment?
8   A.   It was the President's office and the Provost's
9        office.
10  Q.   What was the extent of the discussion?
11  A.   That we would go with the one year because the
12       way that the document was written, it was felt
13       that -- I believe that document was 2014 and we
14       were in 2018.  And I believe it was interpreted
15       that the two years was related to that
16       particular document and that going forward after
17       that, that it would be, you know, assuming, you
18       know, the performance was there, that it would
19       be a one year -- you would receive one year.
20  Q.   Are you aware of whether Dr. Alaei ever received
21       any negative performance evaluations?
22  A.   Not that I'm aware of.
23  Q.   This letter, Plaintiff's Exhibit E-2, it had a
24       number of people cc'd on it including Vice
25       President James Dias and Vice Provost Kevin

1        Williams?

2   A.   Yes.

3   Q.   Do you know who Vice President James Dias was at

4        the time in 2018?

5   A.   Yes.

6   Q.   Who was he and what position did he hold, if

7        any?

8   A.   He was over the research part, research

9        foundation.

10  Q.   What about Vice Provost Kevin Williams?

11  A.   He wasn't Vice Provost when I was there.

12       Obviously, he was Vice Provost when the letter

13       was signed off on.  But I want to say he was a

14       dean.  I don't recall what his exact title was.

15       His title back then was, obviously, Vice

16       Provost.

17  Q.   Did you ever consult with or did anyone ever

18       consult with Dr. Williams or Mr. Williams

19       concerning this one-year versus two-year

20       contract issue?

21  A.   Not that I'm aware of.

22  Q.   If I can refer you to Plaintiff's Exhibit E-4.

23       It appears to be an email from Kevin Williams to

24       Dr. Alaei dated May 31, 2017.  It appears to be

25       providing an opinion or interpretation regarding

1        an appointment letter and one year versus two

2        year.

3   A.   Okay.

4   Q.   Did you review this email as part of the

5        decision-making process as to Dr. Alaei here as

6        to one or two years?

7   A.   I don't ever recall seeing that letter.

8   Q.   Ultimately, the decision as to one year versus

9        two years, would that have been made by the

10       President?

11  A.   The final decision would have been made by the

12       President's office, yes.

13  Q.   So back to Exhibit I.  This is the chain of

14       emails between Ms. Ayers and you.  In this email

15       that's on the screen as part of Exhibit I-3, Ms.

16       Ayers asks, are you going to issue an NOD.  And

17       your response is, at some point we probably

18       will.

19          Does the term "NOD" refer to notice of

20       discipline?

21  A.   Yes, it is.

22  Q.   Do you recall why your thoughts were at some

23       point you probably would issue a notice of

24       discipline as to Dr. Alaei?

25  A.   I think based on the information we had at that

RANDY STARK                                        70

```
 1        point, you know, from what was conducted by the
 2        Title IX office and also some of the information
 3        that we had received or gleaned from talking to
 4        some of the students, again, I don't know the
 5        time line but, you know, it appeared that an NOD
 6        was a possibility.
 7   Q.   That sentence further continues in a May 23
 8        email from you, he still remains on alternative
 9        leave while we investigate management issues
10        that were identified during the other
11        investigation.
12             Can you explain to me what you were
13        referring to with that statement?
14   A.   I think the management issues were the use of
15        funding, how the funding was -- how certain
16        things were funded through GIHHR, if they were
17        being funded appropriately or not.
18   Q.   So your response about NOD, was that based on
19        the Title IX portion of the investigation?
20   A.   The Title IX portion.
21   Q.   So the allegations about inappropriate conduct?
22   A.   Sorry; yes.  Correct.  I'm thinking of the
23        contract.  Yes, that's correct.
24   Q.   To be clear, that reference, at some point we
25        probably will, about NOD was referring to the
```

 1        Title IX portion of the investigation?
 2   A.   That's correct.
 3   Q.   So at this point, May 23, 2018, you were still
 4        conducting the investigation?
 5   A.   Yes.
 6   Q.   Do you know if Chantelle was still conducting
 7        any part of her investigation at that point?
 8   A.   I don't know if she was still -- I don't know.
 9        Ours is more interviewing the names -- students
10        whose names came up through her course of
11        investigation and if there were additional names
12        that came up during our interviewing -- when I
13        say "our interviewing," Brian Selchick's and my
14        interviewing -- of these individuals, we would
15        add names to the list of people that we needed
16        to interview.  What she was doing at her end, I
17        can't speak for.
18   Q.   At this point in time, had any part of your
19        investigation concluded?
20   A.   Yeah, it did.  And the conclusion, I don't know
21        when it concluded but the conclusion was, you
22        know, as outlined in the counseling memo.
23   Q.   I mean reflective of this May 23, 2018 email, at
24        that point in time, had any part of your
25        investigation that was going on come to a

1        conclusion?
2   A.   I don't know.  I don't know what the date was
3        that it concluded.
4   Q.   Do you recall as of this May 23, 2018 date if
5        there was anything knew at that point in time
6        related to the investigation that had not been
7        raised at the May 9, 2018 interrogation?
8   A.   I don't believe so.  I don't recall.
9   Q.   As to the investigation, do you recall what you
10       did to move forward with or look into further
11       any issues after May 23, 2018?
12  A.   If anything, it would have been -- if there were
13       more discussions to be had with individuals
14       named, we would have continued with that but,
15       again, I don't have a time line.
16  Q.   If I can refer you to Exhibit D-2.  If you can
17       take a look at this, which appears to be an
18       email from you dated July 6, 2018 to Valerie
19       Ayers.
20  A.   Yes.
21  Q.   Do you recall this email?
22  A.   Yes.
23  Q.   Is it fair to say in this email you were
24       expressing your opinion that the misconduct
25       allegations were unfounded?

```
1   A.    Yes.
2   Q.    Do you recall when you reached that conclusion?
3   A.    I would say -- again, probably within a few days
4         before that, before that email was sent.  It was
5         within that time frame.  It was within that time
6         period.
7   Q.    Was this a reflection that all allegations or
8         any issues being investigated by SUNY at that
9         point concerning Dr. Alaei were determined to be
10        not a violation of policy or not grounds for
11        imposing discipline?
12  A.    Correct.  They were unfounded so...
13  Q.    In this email, you talk about, we are going to
14        nonrenew him and buy him out.
15              Can you explain to me what you were
16        referring to by that statement?
17  A.    That we would nonrenew him.  And as far as a
18        buyout goes, we would just pay him the balance
19        of -- I don't know if it was one year from the
20        date of the nonrenewal or one year from that,
21        the date we met with him.  But, in other words,
22        buy him out would be his termination.  His
23        appointment would cease but we would continue to
24        pay him for one year.
25  Q.    Who made the determination about not renewing
```

```
 1        and buying him out?
 2   A.   That decision was made by the Provost and the
 3        President's office.  It would have been at that
 4        level.
 5   Q.   Did you ever communicate around the time of this
 6        email your, you know, determination that there
 7        was no violation of policy or no grounds to
 8        impose discipline because the grounds were
 9        unfounded?
10   A.   Yes.
11   Q.   Did you convey it to Provost Stellar?
12   A.   Yes.
13   Q.   And the President?
14   A.   Yes.
15   Q.   And Mr. Szelest?
16   A.   Yes; it would have gone through Mr. Szelest.
17        Yes.
18   Q.   What response did Provost Stellar have?
19   A.   You know, again, I don't recall.  I mean, we
20        continued to move forward with, you know, with
21        the nonrenewal so...
22   Q.   Would your response be the same as to any
23        response the President had or Mr. Szelest?
24   A.   Yes.
25   Q.   Did they ever explain to you or identify why
```

```
 1          they were continuing to nonrenew and buy out Dr.
 2          Alaei even though you had determined the
 3          allegations were unfounded?
 4    A.    No.
 5    Q.    Did you make any recommendations to the Provost
 6          or the President or Mr. Szelest about how to
 7          move forward with Dr. Alaei's employment based
 8          upon your findings of unfounded allegations?
 9    A.    We just reported what our findings were and, you
10          know, the final decision was being left up to
11          them.  We gave no recommendations.  It was -- I
12          believe there was a lot that occurred during
13          that period of time and that was a decision for
14          them to make and not for HR to make.
15    Q.    Do you recall if there was ever any actual
16          formal complaint or informal complaint ever
17          filed with the Title IX office concerning Dr.
18          Alaei?
19    A.    I believe, again, from the information that I
20          received from Mr. Rotondi, that there was no
21          formal complaint.  We did not receive a formal
22          complaint.
23    Q.    How about informal?
24              Let me see if I can refresh your
25          recollection.
```

```
 1              I'm going to show you what's been previously
 2         marked as Plaintiff's Exhibit D-3.
 3    A.   Right; no informal or formal.  This got underway
 4         based on complaints, again, so that were
 5         registered earlier in the year so that's what
 6         kicked this -- got the whole matter underway.
 7         But in terms of -- if you are talking informal
 8         or formal, was there anything filed with Title
 9         IX, I don't know what they received other than
10         what, you know, Trisha George responded to us
11         stating that they have no record of an informal
12         or formal complaint.
13    Q.   So what started this all off, is it fair to say
14         it was Provost Stellar that raised a concern to
15         start the basis of this investigation?
16              MR. ROTONDI:  Objection to the form of
17           the question.  If he knows.  You can answer.
18    A.   I think he had some concerns that were brought
19         to him by students and that he wanted there to
20         be an investigation of the allegations.
21    Q.   If I an refer you to Plaintiff's Exhibit I, sub
22         Exhibit 4.  I'm referring you to what was marked
23         Plaintiff's Exhibit I-4.  This appears to be an
24         email from Bruce Szelest dated July 23, 2018 to
25         a number of people including you.
```

```
 1              Do you recall receiving this email or as you
 2         sit here you might not?
 3    A.   Yeah.  Again, my name is on there so I must have
 4         received it.
 5    Q.   It says in part, the President has okayed
 6         proceeding as we laid out in the last meeting
 7         and sets out an apparent schedule for moving
 8         forward.  Is that fair to say?
 9    A.   Yes.  If I can read it quickly.
10    Q.   Sure.  Take your time.
11    A.   Okay.
12    Q.   Do you recall what was laid out at that last
13         meeting as referred to in this email?
14    A.   No, I don't.
15    Q.   Do you recall anybody at that meeting referred
16         to explaining why they would still want to move
17         forward to terminate Dr. Alaei even in light of
18         your findings?
19    A.   No specific -- there wasn't anything specific
20         that laid out why they wanted to continue with
21         the nonrenewal.
22    Q.   But it was clear that the President was
23         directing the course of conduct?
24    A.   Yes.
25              MR. CASTIGLIONE:  Do you mind if we
```

RANDY STARK                                              78

```
 1              take a quick ten-minute break?  I have some
 2              things I want to go through and I'll try to
 3              wrap it up in a half hour.
 4                   MR. ROTONDI:  That's fine.
 5                   (Brief recess.)
 6    EXAMINATION BY
 7    MR. CASTIGLIONE:
 8    Q.   I'm going to show you what was previously marked
 9         as Exhibit D-2 which is an email from you to
10         Valerie Ayers dated July 9, 2018, then a
11         response from Ms. Ayers to you dated July 9,
12         2018.
13    A.   Okay.
14    Q.   Ms. Ayers' response says in part, there has to
15         be something you can get out of the student's
16         complaint.
17              What was your understanding of what Ms.
18         Ayers was conveying?
19    A.   That there must be something -- that there must
20         be something there.  It's the only thing I can
21         think of.
22    Q.   What do you mean by "there must be something
23         there"?  Can you explain that a little bit?
24    A.   In terms of what our investigation had but there
25         was nothing.
```

```
 1   Q.   If I can refer you to what was previously
 2        identified as Defendant's Exhibit I-5, an email
 3        from Valerie Ayers to you dated January 28,
 4        2019.  I will give you a second to review this.
 5   A.   Okay.
 6   Q.   Do you recall grievances being filed on behalf
 7        of Dr. Alaei under the UUP Agreement?
 8   A.   Grievances being filed by?
 9   Q.   Or on behalf of Dr. Alaei.
10   A.   No, I don't.
11   Q.   Do you have any recollection of what Ms. Ayers
12        is referring to here when she says, there is a
13        grievance about Harvey Charles.  And it says,
14        they are willing to settle if we make some
15        general promises about 19.10 being
16        nondisciplinary?
17   A.   Yeah.  I mean, I know it was addressed to me.
18   Q.   You don't recall as you sit here?
19   A.   Yeah; I don't recall.  But it's a grievance
20        about Harvey Charles sending out that email.  I
21        know that was sent out but, again, we issued a
22        counseling.  We didn't do a -- it wasn't a
23        discipline.  There was no discipline involved.
24   Q.   Let me ask you, you have dealt with other
25        nonrenewals during your time with SUNY Albany,
```

1        is that correct?

2    A.   Yes; just about a few.

3    Q.   Were there any non-Middle Eastern males

4        nonrenewed for employment during your time with

5        SUNY Albany?

6    A.   I don't recall.  Again, as far as the faculty

7        goes, I don't recall.  I'm not recalling any

8        faculty nonrenewals.  And, like I said, it may

9        have only been a few of the other nonrenewals

10       for other non-faculty, if you will, departments

11       but I don't recall the backgrounds or what have

12       you.

13              MS. CASTIGLIONE:  Would you mind giving

14          me another minute so we can wrap up?  I want

15          to go through my notes.

16              MR. ROTONDI:  That's fine.

17              (Brief recess.)

18              MR. CASTIGLIONE:  I don't have any

19          other questions.

20              (Discussion held off the record.)

21              MR. CASTIGLIONE:  I will order the same

22          as last time; hard copy and PDF.

23              (Whereupon, the proceedings concluded

24          at 3:50 p.m.)

25

RANDY STARK                                               81

```
 1                    I N D E X

 2  TO TESTIMONY:

 3  WITNESS              EXAMINATION BY          PAGE

 4  Randy Stark          Mr. Castiglione            4

 5

 6

 7  TO EXHIBITS:

 8  FOR ID               DESCRIPTION            PAGE

 9  (None marked)

10

11

12  INFORMATION/REQUESTS

13  DOCUMENTS                                   PAGE

14  (No requests)

15

16

17

18

19

20

21

22

23

24

25
```

RANDY STARK                                                    82

```
 1              SHORTHAND REPORTER CERTIFICATION

 2        I, the undersigned, a certified shorthand
    reporter of the State of New York, do hereby
 3  certify:

 4        That the proceedings within were taken
    before me at the time and place herein set
 5  forth; that any witnesses in the foregoing
    proceedings, prior to testifying, were duly
 6  sworn; that a record of the proceedings was made
    by me using machine shorthand, which was
 7  thereafter transcribed under my direction; that
    the foregoing transcript is a true record of the
 8  testimony given.

 9        Further, that if the foregoing pertains to
    the original transcript of a deposition in a
10  federal case, before completion of the
    proceedings, review of the transcript [    ] was
11  [    ] was not requested.

12        I further certify I am neither financially
    interested in the action nor a relative or
13  employee of any attorney or party to this
    action.

14

15  Dated:  March 27, 2021

16

17

18

19              Stephanie Picozzi

20              STEPHANIE PICOZZI, CRR, RPR

21              Notary Public, State of New York
                Qualified in Saratoga County
22              Commission Expires:  January 27, 2023

23

24

25
```

1    DECLARATION/WITNESS CERTIFICATION

2    Case:  Alaei v. SUNY
     Witness:  RANDY STARK
3    Deposition Date:  March 24, 2021

4          I declare under penalty of perjury that
     I, RANDY STARK, the witness herein, have read the
5    entire transcript of my deposition taken in
     the captioned matter or the same has been read
6    to me, and the same is true and accurate, save
     and except for changes and/or corrections, if
7    any, as indicated by me on the DEPOSITION ERRATA
     SHEET hereof, with the understanding that I
8    offer these changes as if still under oath.

9

10                _____

11                     RANDY STARK

12
     Sworn to, before me, this _____ day
13   of _____, 20___.

14

15   _____

16   [_____] (print)

17   Notary Public.

18   Registration No:  _____

19   State of _____

20   Qualified in _____ County.

21   My commission expires _____.

22

23

24

25

1    DEPOSITION ERRATA SHEET

2    Case:  Alaei v. SUNY
     Witness:  RANDY STARK
3    Deposition Date:  March 24, 2021

4    1:  To clarify the record
     2:  To conform to the facts
5    3:  To correct transcription errors

6    PAGE/LINE          CORRECTION MADE          REASON CODE

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25

1                    DEPOSITION ERRATA SHEET

2    PAGE/LINE          CORRECTION MADE          REASON CODE

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18

19   _____ Subject to the above changes, I
     Certify that the transcript is true and correct.
20   _____ No changes have been made.  I
     Certify that the transcript is true and correct.

21

22

23                      _____

24                           RANDY STARK

25

Case 1:21-cv-00377-BKS-TWD    Document 119-7    Filed 04/29/25    Page 88 of 95

DR. KAMIAR ALAEI v.                                                          RANDY STARK
STATE UNIVERSITY OF NEW YORK, et al.                                         March 24, 2021

## A

**A-1 (5)** 8:19;12:23;
13:24;14:2,18
**A-11 (1)** 28:19
**A-12 (2)** 29:25;30:2
**A-13 (2)** 30:20,21
**A-2 (2)** 16:12,14
**A-3 (1)** 21:3
**A-4 (1)** 22:15
**A-6 (3)** 25:8,16;26:24
**A-7 (1)** 27:9
**ability (2)** 5:15,24
**able (6)** 6:20;26:5,12;
30:11;48:1;49:24
**above (1)** 85:19
**above-mentioned (1)**
42:15
**Absolutely (1)** 53:13
**accent (1)** 29:13
**accepted (1)** 34:10
**accepting (1)** 13:7
**access (16)** 16:21;
17:4,4,5,5,8,10,11,24;
18:5,9;20:18;35:10;
36:11;43:13;62:12
**account (2)** 24:21,25
**accurately (1)** 5:23
**across (2)** 42:24;
48:11
**acted (1)** 33:12
**action (5)** 20:23,23;
30:15;37:4;62:5
**actions (3)** 11:21;
20:2;23:8
**acts (1)** 34:13
**actual (2)** 10:12;75:15
**actually (4)** 15:19;
28:7;51:14;60:6
**ad (1)** 4:19
**add (1)** 71:15
**addition (1)** 33:7
**additional (2)** 46:4;
71:11
**address (3)** 35:14;
36:5;46:24
**addressed (3)** 19:16;
56:9;79:17
**administering (1)** 30:7
**administration (1)**
44:17
**admittedly (1)** 32:4
**advance (3)** 6:4,11;
55:4
**adverse (1)** 28:8
**advised (1)** 62:14
**advising (1)** 27:15
**advisor (2)** 33:9,10
**Affairs (1)** 21:22
**affidavit (1)** 33:8
**affirmed (1)** 4:3
**afternoon (1)** 22:18

**Again (30)** 14:10;
21:15,20,22;23:17;
24:8;25:1,4;26:20,23;
27:18;36:11;38:6,7;
41:22;49:15;54:17;
55:1;58:7;62:12;
65:23;70:4;72:15;
73:3;74:19;75:19;
76:4;77:3;79:21;80:6
**against (3)** 4:16;
33:25;49:8
**aggressive (1)** 33:13
**agree (1)** 5:13
**agreed (1)** 52:6
**agreeing (1)** 53:7
**Agreement (22)** 20:7,
9,13,16,19,19,20;
22:10;28:4;35:24;
36:6,15,25;37:3,6,9;
46:25;52:13,23;
65:21,22;79:7
**ahead (1)** 15:14
**Alaei (97)** 4:13,16;
9:3;11:13;14:19,22;
16:1,21;17:3,8,24;
18:11,17,23;19:22;
22:22;23:9,11,24;
25:2,19;26:3,25;
29:19;30:3,4,10,17;
31:6;33:19,24;35:3,6;
36:11;38:21,25;
39:16,19;41:8,13,18,
25;42:6,20;43:5,9,22;
44:22,22,25;45:20;
46:1,10,21;48:5,20,
24;49:5,9;50:12,14;
52:8,13,25;54:24;
55:6;56:23;57:2;58:6,
11,15,23;59:9,17;
60:14,19;61:8,20;
63:9,24;64:1,5,6,8,15,
21;66:12;67:20;
68:24;69:5,24;73:9;
75:2,18;77:17;79:7,9
**Alaei's (19)** 13:3,10,
17,22;28:3;39:1;
41:15;43:16;48:12;
50:4,23;51:6;54:16;
56:1;57:25;59:4,10;
65:4;75:7
**Albany (44)** 4:17;7:8,
19;8:4,10,11;9:12;
10:24;12:19;13:1,9,
16,21;16:23;22:6;
23:13;26:15;27:13;
28:25;30:5;31:18,22;
33:1,16;34:9,12;
38:23;39:3;43:11;
44:11;45:16;48:13;
49:3,7,16;51:25;52:7,
9,24;54:16;55:19;
57:23;79:25;80:5
**Albany's (4)** 34:5;

39:4;49:4;61:19
**Alexander (1)** 31:16
**allegations (12)** 33:2;
37:14;39:22;46:1;
55:1,5;70:21;72:25;
73:7;75:3,8;76:20
**alleged (5)** 23:8;
32:21;33:24;34:12;
53:12
**allow (2)** 17:10;19:3
**allowed (5)** 14:19,22;
15:5;16:1;26:3
**allowing (1)** 36:16
**along (2)** 25:16;57:15
**altered (1)** 32:4
**altering (1)** 32:8
**alternate (1)** 9:2
**alternative (15)** 15:1,
1,4;17:25;20:21,21;
22:2,5;26:9,11;39:1;
43:5,10;48:14;70:8
**Ambassador (1)** 25:20
**annual (1)** 56:20
**annually (1)** 66:20
**apparent (1)** 77:7
**apparently (2)** 42:7;
63:10
**appeared (1)** 70:5
**appears (11)** 22:18;
26:1;27:12;53:25;
61:12,14;64:5;68:23,
24;72:17;76:23
**Appellate (1)** 31:14
**applicable (1)** 20:10
**appoint (2)** 28:10;
29:1
**appointed (1)** 29:7
**appointment (13)**
50:4,16,24;51:7,15;
57:6,13;59:10;66:6,
11,19;69:1;73:23
**appointments (1)**
52:16
**appropriately (1)**
70:17
**approve (3)** 51:9,11;
65:5
**approved (1)** 65:4
**approves (1)** 52:22
**April (7)** 56:6;57:24;
59:2,7,24;60:3;66:10
**Arash (21)** 38:21,25;
39:1,19;41:8,13,15,
18,25;42:6,10,11,20,
25;43:5,9,22;44:22;
48:5,9,12
**Arash's (1)** 41:2
**area (5)** 17:11;21:15;
39:25;40:2,2
**around (3)** 9:14;
18:16;74:5
**arrow (1)** 66:16

**article (2)** 37:1,4
**assault (3)** 32:23;
33:3,4
**asserting (1)** 35:2
**assignment (12)** 9:2;
15:1,2,4;20:21,22;
22:5;26:11;39:2;43:5,
10;48:14
**assignments (3)**
17:25;22:2;26:9
**Assistant (1)** 58:20
**Associate (3)** 7:10,18,
22
**assume (1)** 16:21
**assuming (2)** 52:22;
67:17
**attend (3)** 22:25;
26:12;42:3
**attended (1)** 24:3
**attention (1)** 37:24
**attorney (4)** 4:12,21;
6:13;56:15
**attorney-client (1)**
36:2
**August (12)** 7:4,5,7,
12,24;8:2;13:17;
48:20;50:3,17;51:20;
57:22
**authority (1)** 64:20
**averred (1)** 33:10
**aware (35)** 13:1;
17:21;18:10,15;20:1;
28:24;29:4,5,21;
30:14;31:20;32:6,10,
25;33:5,14;34:14;
36:10,13;42:19;
44:14;52:10,23;
53:21;54:22;55:18;
58:4;60:15;61:19;
63:22;64:8;65:3;
67:20,22;68:21
**away (1)** 50:1
**Ayers (11)** 12:18;
65:12,13;69:14,16;
72:19;78:10,11,18;
79:3,11
**Ayers' (1)** 78:14

## B

**B-1 (1)** 59:7
**B-3 (1)** 59:23
**B-4 (1)** 61:12
**B-6 (1)** 63:8
**B-8 (1)** 50:8
**back (21)** 13:24;15:6;
19:18;24:8;28:17;
36:21;51:1;52:6,9,14,
21;53:2,8;54:21,24;
55:6;65:21,24;67:2;
68:15;69:13
**backgrounds (1)**
80:11

**backtrack (1)** 51:13
**balance (1)** 73:18
**barring (1)** 30:5
**based (13)** 25:2,23;
37:14;40:10;55:1;
61:9;65:20,22;66:1;
69:25;70:18;75:7;
76:4
**basically (3)** 27:15;
56:19;58:22
**basis (5)** 10:1;39:15;
60:10;62:15;76:15
**began (1)** 55:25
**beginning (3)** 21:10;
54:6;56:2
**behalf (5)** 23:13;35:3;
38:22;79:6,9
**behavior (1)** 33:15
**belief (1)** 33:19
**below (1)** 44:9
**besides (1)** 60:22
**best (2)** 5:15,23
**beyond (1)** 59:11
**bias (1)** 32:3
**Bill (8)** 58:17,19;60:4,
4;62:6,10;64:7,17
**bit (3)** 42:12;51:13;
78:23
**blank (2)** 39:7,11
**bordered (1)** 32:18
**both (3)** 5:7;29:12,14
**bottom (2)** 32:12;
59:25;64:6;65:12
**box (1)** 57:15
**break (5)** 5:17;47:20;
78:1
**Brian (12)** 10:14,14,
23;12:11;16:15;25:9;
30:23,24;52:2;53:19;
54:5;71:13
**Brian's (1)** 54:5
**Brief (3)** 47:23;78:5;
80:17
**bring (1)** 52:21
**brought (2)** 37:24;
76:18
**Bruce (10)** 11:14,22;
12:2,4;17:20;28:21;
29:17;31:3;62:13;
76:24
**bulleted (1)** 44:9
**bullets (1)** 44:15
**business (1)** 38:21
**buy (4)** 52:22;73:14,
22;75:1
**buying (1)** 74:1
**buyout (1)** 73:18

## C

**C-3 (2)** 46:5,14
**call (1)** 20:13
**called (1)** 4:2

Case 1:21-cv-00377-BKS-TWD    Document 119-7    Filed 04/29/25    Page 89 of 95

DR. KAMIAR ALAEI v.                                                    RANDY STARK
STATE UNIVERSITY OF NEW YORK, et al.                              March 24, 2021

**came (5)** 17:15;
40:25;41:3;71:10,12
**campus (5)** 15:2,6;
23:25;42:3;49:16
**can (58)** 5:2,6,12,21;
6:1,7;7:17;8:22,23,
25;9:20;10:4;11:10;
15:18;16:10;21:18;
22:12;23:19;24:24;
29:24;30:19;31:10,
24,25;32:11;34:15;
41:7,9;42:13;43:25;
47:17;48:3;50:7,8;
53:24;55:10;57:10;
59:6,22,24;61:11;
63:7;64:6;65:9,18;
68:22;70:12;72:16,
16;73:15;75:24;
76:17;77:9;78:15,20,
23;79:1;80:14
**capacity (3)** 26:6;
58:15,22
**caption (1)** 31:22
**card (5)** 16:21;17:4,5,
8,10
**care (1)** 30:8
**Cargilio (1)** 45:14
**case (1)** 61:7
**CASTIGLIONE (17)**
4:10;12;6:22;15:17;
16:10;25:13,24;
39:10;47:19,25;
53:17,22;77:25;78:7;
80:13,18,21
**Caucasian (1)** 29:12
**cause (1)** 35:7
**cautioned (1)** 4:3
**cc'd (1)** 67:24
**cc'ing (1)** 63:10
**cease (1)** 73:23
**Central (6)** 12:20;
35:21;47:11;49:17,
18;56:15
**certain (1)** 70:15
**certainly (1)** 14:13
**Certified (1)** 4:4
**chain (5)** 25:15;52:1;
61:12;65:10;69:13
**change (3)** 21:11;
22:22;57:3
**changed (2)** 32:15,20
**changes (3)** 21:9;
85:19,20
**Chantelle (9)** 12:14;
19:8;23:15;30:21;
31:17;37:15;40:16;
52:2;71:6
**Chantelle's (1)** 44:6
**charge (1)** 53:19
**Charles (36)** 22:15;
26:2;27:10;30:3;
40:11,23;41:9,13,14,
20;42:1,7,11,20;43:1,

18,21;48:5;58:18,25;
59:8,24;60:4,11,18,
21,24;61:7,14,23;
62:3;63:10,11,11;
79:13,20
**Charles' (1)** 62:14
**Chief (1)** 11:15
**circumstances (1)**
34:8
**citing (1)** 37:6
**claims (1)** 4:16
**clarify (3)** 8:1,8;40:14
**clarifying (1)** 6:23
**clean (1)** 55:10
**clear (7)** 5:5,10;8:11;
20:8;37:3;70:24;
77:22
**Cleary (29)** 12:14;
19:8,12,23;23:15;
24:13;30:21;31:2,5,9,
10,17,21;32:3,7,15,
20;33:2,10,11,15,18;
34:5,13;39:15,22;
52:4,12;53:7
**Cleary's (2)** 32:13;
37:16
**close (1)** 32:22
**code (2)** 32:24;85:2
**Co-Directors (4)**
27:16;28:11;29:8,8
**colleagues (1)** 27:14
**College (1)** 21:21
**coming (2)** 42:24;63:3
**comments (2)** 34:1;
56:16
**common (4)** 16:3;
17:24;26:9;51:23
**communicate (1)** 74:5
**communicated (4)**
11:1;25:3;44:16,18
**communicating (4)**
11:4;29:16;30:6;
41:19
**communication (4)**
12:6;19:4;23:6;48:7
**communications (5)**
12:9,10;26:1;36:8;
45:17
**community (1)** 27:13
**compared (1)** 19:15
**complaint (6)** 75:16,
16,21,22;76:12;78:16
**complaints (2)** 12:17;
76:4
**complete (1)** 42:15
**concept (1)** 27:24
**concern (5)** 24:13,18;
30:10;41:1;76:14
**concerning (8)** 4:16;
11:13;22:22;31:6,21;
34:12;39:16;46:1;
48:24;52:25;58:6,15;
59:9;60:13;66:11;

68:19;73:9;75:17
**concerns (18)** 9:16;
17:3,7;18:10,16;19:2;
23:4;24:4;26:24;28:1,
6;30:7;32:6,25;35:2,
14;65:6;76:18
**concluded (4)** 71:19,
21;72:3;80:23
**concluding (1)** 55:4
**conclusion (4)** 71:20,
21;72:1;73:2
**conduct (11)** 9:12;
10:20;16:6,22;19:11;
31:21;38:21;39:6;
53:4;70:21;77:23
**conducted (7)** 10:12,
23;16:25;34:12;
37:23;56:21;70:1
**conducting (9)** 9:7;
10:18;12:12;19:12,
23;33:15;37:21;71:4,
6
**confirmation (1)** 53:8
**consequences (1)**
28:8
**consider (1)** 46:12
**consideration (1)**
46:17
**consistent (7)** 20:19,
20;22:4,10;29:17;
35:24;63:14
**consult (4)** 5:18,21;
68:17,18
**Consultant (1)** 7:2
**consultation (1)** 12:1
**consulted (1)** 60:17
**contact (5)** 15:7;
18:24;38:25;42:2;
48:12
**contacted (1)** 61:22
**contacting (1)** 42:1
**content (6)** 6:15;48:10
**continue (2)** 73:23;
77:20
**continued (4)** 47:3;
64:4;72:14;74:20
**continues (2)** 15:24;
70:7
**continuing (1)** 75:1
**contract (3)** 19:17;
68:20;70:23
**conversations (4)**
6:10,13;12:8;58:10
**convey (2)** 12:2;74:11
**conveying (1)** 78:18
**Coordinator (1)** 31:17
**copy (3)** 6:20;31:12;
80:22
**Cornell (1)** 34:10
**corner (3)** 19:9;45:12;
54:2
**CORRECTION (1)**
85:2

**correspond (1)** 32:22
**counsel (11)** 5:19,21;
12:19;35:19,20;36:1;
47:10,10;49:16,16,17
**counseling (6)** 48:19,
23;49:12,19;71:22;
79:22
**County (1)** 4:6
**couple (1)** 50:25
**course (10)** 13:2;
16:22;39:18,20;40:8;
41:4,24;62:4;71:10;
77:23
**court (3)** 5:3;31:14;
33:6
**Court's (1)** 32:17
**cover (1)** 57:1
**created (2)** 39:7;
59:14
**creating (1)** 5:2
**cultural (3)** 24:5,7,14
**culture (2)** 25:4,5
**cultures (1)** 25:1
**current (2)** 56:16;
59:12
**currently (1)** 6:24
**cut (1)** 54:2

## D

**D-1 (2)** 51:18;52:1
**D-2 (2)** 72:16;78:9
**D-3 (1)** 76:2
**date (8)** 9:15;28:25;
51:4;59:12;72:2,4;
73:20,21
**dated (32)** 9:18;21:4;
22:15;25:9,17;27:10;
28:20;30:3,22;34:24;
36:22;41:9,13;42:6;
43:4;46:5;48:6,9;
52:3,5;54:1;56:6;
59:7,24;63:11;66:10;
68:24;72:18;76:24;
78:10,11;79:3
**day (3)** 22:19;50:2,12
**days (3)** 50:25;73:3
**dealing (2)** 33:3;
42:25
**dealt (1)** 79:24
**dean (3)** 15:8;21:21;
68:14
**December (1)** 57:1
**decide (1)** 64:20
**decided (6)** 13:24;
23:2;28:10;31:15;
37:11;63:23
**decision (18)** 18:9;
21:16;26:22;27:6;
31:13,20;33:7;47:1;
52:24;54:22;63:21;
64:22;66:25;69:8,11;
74:2;75:10,13

**decision-making (1)**
69:5
**decisions (2)** 11:21;
12:2
**declined (1)** 62:1
**declining (1)** 62:3
**Defendant's (1)** 79:2
**definition (2)** 32:23;
33:3
**delivering (1)** 13:20
**deny (1)** 63:6
**denying (1)** 32:17
**Department (1)** 31:15
**departments (1)** 80:10
**depend (1)** 56:13
**deposition (4)** 6:4,11;
24:12;85:1
**determination (20)**
13:19;26:4,18;29:1;
46:23;49:3,22,23;
50:3,23;51:6,21,22;
52:8;53:10;54:14,15;
55:3;73:25;74:6
**determinations (1)**
13:12
**determine (1)** 20:17
**determined (5)** 13:16,
21;49:8;73:9;75:2
**Dias (2)** 67:25;68:3
**difference (1)** 24:14
**different (3)** 21:17;
25:1;32:14
**Dina (1)** 28:13
**directed (1)** 39:6
**directing (1)** 77:23
**direction (2)** 11:24;
16:2
**directive (7)** 17:9,13,
14;18:4,7;19:6;20:25
**Director (3)** 12:15;
15:8;35:6
**directors (2)** 28:23;
29:1
**directs (1)** 4:24
**disciplinary (10)** 9:7,
12;10:7;12:21;13:25;
14:14;20:22,23;
36:17,18
**discipline (12)** 37:6;
46:10,11;49:8,20;
51:22;69:20,24;
73:11;74:8;79:23,23
**discovery (1)** 32:18
**discuss (5)** 10:14;
16:1;22:21;28:6;
64:14
**discussed (8)** 11:22;
23:23;50:2;61:23;
62:7,8,9;65:16
**discussing (1)** 29:18
**Discussion (14)** 8:17;
19:18;21:16;23:21;
24:7;29:21;39:18;

Case 1:21-cv-00377-BKS-TWD    Document 119-7    Filed 04/29/25    Page 90 of 95
DR. KAMIAR ALAEI v.                                                    RANDY STARK
STATE UNIVERSITY OF NEW YORK, et al.                              March 24, 2021

53:2;54:25;64:17;
67:1,6,10;80:20
**discussions (3)** 41:4;
62:23;72:13
**Division (1)** 31:14
**document (36)** 8:20,
25;9:2,6;15:17;22:12;
31:25;32:2;38:4,10,
13,16,17;40:4;41:8;
42:22;44:1,3,11,21;
45:7,9,10;47:6,7;
48:18;54:6;55:14;
56:5;59:14,16,20;
64:4;67:12,13,16
**documents (7)** 4:20;
6:3,8;10:5;38:9;47:9;
61:9
**done (9)** 5:6;14:8;
16:11,24;18:3;21:13;
22:11;33:24;39:19
**down (12)** 8:22;
15:18;25:13;31:24;
32:11;35:20;48:2,4;
54:18,20;55:10;64:6
**downtown (1)** 49:17
**dozen (1)** 14:13
**Dr (107)** 4:13,16;9:3;
11:13;12:8;13:2,10,
16,22;14:19,22;16:1,
21;17:3,8,24;18:11,
17,23;19:22;22:22;
23:8,11,24;25:2,19;
26:3,25;28:3;29:19;
30:3,4,10,16;31:6;
33:19,24;35:3,6;
36:10;38:21,25;
39:16,19;41:2;42:19;
43:16,21;44:24;
45:20;46:1,10,21;
48:20,24;49:5,9;50:4,
11,13,23;51:6;52:8,
13,25;54:16;55:6;
56:1,22;57:1,25;58:6,
11,15,23;59:3,9,10,
17;60:13,19;61:8,20;
62:14;63:9,11,24;
64:1,5,6,8,15,21;65:4;
66:11;67:20;68:18,
24;69:5,24;73:9;75:1,
7,17;77:17;79:7,9
**drafting (1)** 27:23
**duly (1)** 4:3
**duration (2)** 57:16,21
**During (21)** 8:2;14:20,
23;20:11;22:9;24:12;
30:12;32:9;34:6;
36:11;39:1;42:19;
43:3,13,21;48:1,13;
70:10;71:12;75:12;
79:25;80:4

**E**

**E-1 (3)** 56:4,25;57:24
**E-2 (2)** 66:10;67:23
**E-4 (1)** 68:22
**earlier (5)** 36:14;
49:24,24;50:2;76:5
**early (1)** 45:22
**Eastern (1)** 80:3
**EBT (1)** 6:18
**edit (1)** 45:12
**efficient (1)** 37:2
**efforts (6)** 13:1,5,9;
55:18;61:20;62:24
**either (1)** 15:7
**Elizabeth (1)** 24:10
**else (4)** 6:15;9:25;
37:25;47:8
**email (92)** 12:10;
16:14,18,20;17:4,22,
24;18:5,12,13,17;
19:1,4,8;20:2,18,24;
21:4,6,8,10;22:15;
25:8,16,18,25;26:23;
27:10,13,17,19,24;
28:2,7,20,22;29:16;
30:2,4,17,21;34:23,
25;35:10;36:11;41:8,
10,12,14;42:6;43:4,
14;48:5,9,11,15;52:3,
4,16,17;53:3;56:5,8,
13,25;57:24;58:3;
60:3;61:16,18;63:9,
19;64:10;65:13;
66:25;68:23;69:4,14;
70:8;71:23;72:18,21,
23;73:4,13;74:6;
76:24;77:1,13;78:9;
79:2,20
**emails (8)** 25:15;35:9;
42:24;52:2;59:23;
61:12;65:11;69:14
**employed (2)** 6:24;
63:1
**employee (6)** 22:8;
26:14;27:2,4;51:23;
61:5
**employees (1)** 56:20
**employee's (1)** 22:3
**employment (23)**
4:17;7:1,5,7;13:3,10,
17,22;29:20;34:6,9;
50:14;52:9;54:16;
56:1;57:21,25;58:16;
65:4;66:19;67:7;
75:7;80:4
**encouraged (1)** 37:5
**end (4)** 12:23;32:11;
46:9;71:16
**endeavor (1)** 46:23
**endorsing (1)** 63:23
**engagements (1)**
26:13
**engaging (1)** 39:5
**environment (3)** 9:23,
24;39:8
**equitable (1)** 37:2
**ERRATA (1)** 85:1
**evaluation (2)** 56:17,
20
**evaluations (5)** 55:16,
19;56:22;58:6;67:21
**Evangelis (1)** 45:14
**even (2)** 75:2;77:17
**event (1)** 32:14
**events (1)** 42:3
**Evergreen (1)** 66:5
**exact (2)** 9:15;68:14
**EXAMINATION (3)**
4:9;47:24;78:6
**examined (1)** 4:8
**example (1)** 18:22
**excuse (1)** 12:19
**Exhibit (70)** 6:18;
8:19;12:22;14:2;
16:12,12,14;17:22,
23;21:3;22:12,13,14;
23:20;26:24;27:9;
28:19;30:2,20,20;
31:11,12;34:16,19;
36:21,22;38:3,16;
40:10;41:7;42:5,5;
43:4,25;45:4;46:5,13;
47:18;48:1,2,3,17,17,
23;50:8;51:18,19;
52:24;56:4,25;57:24;
59:7,22;60:2;61:12;
63:8;65:10,12;66:10;
67:23;68:22;69:13,
15;72:16;76:2,21,22,
23;78:9;79:2
**exhibits (1)** 6:17
**experience (2)** 22:1;
26:8
**experiences (1)** 25:22
**explain (11)** 7:17;
9:21;11:11;18:6;
21:18;24:24;65:18;
70:12;73:15;74:25;
78:23
**explained (2)** 12:11;
15:9
**explaining (1)** 77:16
**explains (1)** 25:18
**express (1)** 33:18
**expressing (1)** 72:24
**extended (1)** 59:11
**extending (1)** 66:1
**extension (1)** 66:20
**extent (3)** 14:16;
29:23;67:10

**F**

**F-1 (3)** 41:7;42:5;
43:4
**facilitating (1)** 38:24
**facilities (2)** 14:20,23
24;39:8
**facts (3)** 32:4,8,21
**faculty (2)** 80:6,8
**fair (8)** 12:3;45:22;
50:5;59:19;64:24;
72:23;76:13;77:8
**familiar (3)** 21:7;
24:19,20
**far (8)** 13:15;18:10;
30:12;36:10,13;
61:18;73:17;80:6
**favor (1)** 61:25
**February (20)** 8:2;
9:18;14:1,7;20:1;
21:5;22:16,19;23:23;
25:9,17;27:10;28:20;
30:4;34:24,24,25;
36:23;37:20;46:23
**feel (1)** 60:8
**feeling (1)** 60:16
**feelings (1)** 60:12
**felt (2)** 23:5;67:12
**female (1)** 24:16
**females (1)** 29:14
**few (5)** 12:8;24:8;
73:3;80:2,9
**fifth (1)** 55:9
**file (2)** 58:8;63:21
**filed (4)** 75:17;76:8;
79:6,8
**files (2)** 14:11;62:12
**final (2)** 69:11;75:10
**find (1)** 53:4
**finding (1)** 56:22
**findings (4)** 49:19;
75:8,9;77:18
**fine (4)** 5:19;6:14;
78:4;80:16
**firm (1)** 4:12
**first (19)** 4:3;5:20;9:6,
9,11;15:20,21,23;
17:6;23:3;24:18;31:2,
7;35:17;38:16;41:7,
20;50:22;65:21
**fit (1)** 33:2
**five (1)** 7:15
**five-minute (1)** 47:20
**followed (1)** 37:13
**following (5)** 38:18;
42:16;50:2;57:15;
59:12
**follows (1)** 4:8
**follow-up (1)** 51:19
**form (13)** 19:4;20:22;
44:12;53:14;55:7;
56:25;57:2,3,4,6;
63:13,16;76:16
**formal (7)** 37:4;75:16,
21,21;76:3,8,12
**Former (1)** 31:17
**forms (1)** 62:11
**forth (2)** 19:18;53:2
**forward (10)** 8:8;
35:19;47:14;62:20;
67:16;72:10;74:20;
75:7;77:8,17
**found (1)** 32:23
**foundation (1)** 68:9
**four (1)** 14:17
**fourth (1)** 54:19
**frame (1)** 73:5
**Friday (1)** 22:17
**full (1)** 23:17
**function (2)** 7:21;8:6
**funded (2)** 70:16,17
**funding (2)** 70:15,15
**Further (7)** 37:3;47:4;
58:3;63:2;65:25;
70:7;72:10

**G**

**gain (1)** 59:2
**gap (1)** 52:19
**gave (2)** 17:13;75:11
**general (2)** 53:2;
79:15
**generally (10)** 10:4,
10;11:11,17;15:25;
23:22;35:1,5;37:19;
38:3
**George (1)** 76:10
**GIHHR (19)** 8:15;
21:9,25;22:20;23:11;
24:4;27:14,16,20;
28:11,23;29:2,9;35:7;
38:22,25;39:6;58:23;
70:16
**Gina (1)** 28:14
**given (5)** 9:3;13:23;
24:1
**giving (3)** 42:20;61:7;
80:13
**gleaned (2)** 53:5;70:3
**Global (1)** 8:13
**goal (3)** 54:20,23;
55:5
**goes (2)** 73:18;80:7
**Good (1)** 4:11
**grant (1)** 30:6
**grants (2)** 30:8,11
**Gray (3)** 24:10,12,20
**grievance (2)** 79:13,
19
**grievances (2)** 79:6,8
**grounds (5)** 9:11,17;
73:10;74:7,8
**group (1)** 12:9
**guarantees (1)** 65:24
**guess (5)** 12:4;16:8;
18:19;24:17;27:22
**guessing (1)** 14:12
**guilty (2)** 33:20;53:12

**H**

**Haley (1)** 25:21

Case 1:21-cv-00377-BKS-TWD    Document 119-7    Filed 04/29/25    Page 91 of 95
DR. KAMIAR ALAEI v.                                                    RANDY STARK
STATE UNIVERSITY OF NEW YORK, et al.                                   March 24, 2021

**half (2)** 14:12;78:3
**handwriting (2)** 54:4,5
**handwritten (1)** 53:25
**happen (1)** 51:24
**happened (2)** 22:7;
   63:15
**happening (1)** 23:7
**harassment (2)** 33:4;
   39:5
**hard (2)** 14:10;80:22
**Harvey (28)** 22:15;
   26:2;27:10;30:3;
   40:11,23;41:8,12,20;
   42:1,7;43:1,18;48:5;
   58:17,25;59:8,24;
   60:4,11,17,21,24;
   61:14,22;63:10;
   79:13,20
**Havidan (1)** 11:9
**head (2)** 5:10;53:18
**Health (1)** 8:13
**hear (1)** 34:3
**heard (2)** 25:3;36:1
**hearing (1)** 32:15
**Hedberg (10)** 58:17;
   59:23;60:22;61:1;
   62:6,10;63:9;64:7,10,
   17
**Hedberg's (1)** 58:19
**held (8)** 7:9,22;8:3,
   17;22:20;23:21;
   48:19;80:20
**Hello (1)** 60:4
**herein (1)** 4:6
**hereinbefore (1)** 4:2
**himself (1)** 27:1
**hold (2)** 7:11;68:6
**Honestly (2)** 23:16;
   38:10
**hostile (2)** 9:23,24
**hour (1)** 78:3
**HR (13)** 7:2,2,19;8:6;
   13:13;14:8;26:22;
   38:1;40:2,18;58:5;
   63:5;75:14
**Human (5)** 7:10,20,
   23;8:14;10:19

## I

**I-3 (2)** 65:10;69:15
**I-4 (1)** 76:23
**I-5 (1)** 79:2
**identified (14)** 12:22;
   14:1;21:3;22:14;
   27:9;28:11;31:16,22;
   48:3;57:3;63:8;66:9;
   70:10;79:2
**identifies (1)** 17:23
**identify (5)** 6:7;8:25;
   38:18;40:9;74:25
**II (5)** 38:23;40:3,9,20,
   22

**III (5)** 39:3,17,23;
   40:16,20
**illegal (1)** 36:7
**impose (4)** 49:8,20;
   51:22;74:8
**imposing (1)** 73:11
**imprisonment (1)**
   25:23
**improper (1)** 34:13
**inappropriate (3)**
   18:24;19:1;70:21
**inappropriately (5)**
   18:11,13,18,20,25
**included (1)** 57:1
**including (8)** 16:17;
   21:5;25:10;27:11;
   28:21;42:21;67:24;
   76:25
**incoherent (1)** 32:19
**indicated (2)** 61:24;
   64:9
**indicates (3)** 60:3;
   63:12,19
**indicating (1)** 53:9
**individual (3)** 10:22;
   26:5;32:3
**individuals (11)** 13:8;
   14:14;22:16;27:11,
   12,16;28:13;29:7;
   42:2;71:14;72:13
**infer (1)** 13:20
**inform (2)** 23:10;
   27:18
**informal (8)** 36:16,18;
   47:5;75:16,23;76:3,7,
   11
**informally (5)** 37:6,12;
   46:10,11,24
**information (8)** 4:19;
   21:23;53:5;56:12;
   59:19;69:25;70:2;
   75:19
**informational (1)**
   23:10
**informed (1)** 11:20
**initially (2)** 36:24;51:2
**initiate (2)** 62:11;
   64:25
**initiated (1)** 24:17
**initiates (1)** 61:3
**initiating (1)** 37:4
**input (3)** 47:8;49:11,
   14
**inquiring (1)** 26:2
**inquiry (2)** 9:22;41:15
**insert (2)** 38:20,24
**inside (1)** 55:22
**instance (1)** 41:20
**instances (1)** 16:25
**Institute (2)** 8:13;
   22:23
**integrity (2)** 54:7,11
**interaction (2)** 16:7;

41:2
**interactions (2)** 24:16;
   41:3
**Interim (5)** 21:20;
   27:16;28:11;29:8,8
**intern (1)** 39:7
**interns (1)** 48:7
**interpretation (1)**
   68:25
**interpreted (1)** 67:14
**interrogation (8)**
   10:13;40:19;45:19,
   25;52:20;53:4,5;72:7
**interrupt (2)** 6:16,21
**interview (1)** 71:16
**interviewing (4)** 71:9,
   12,13,14
**interviews (3)** 10:20,
   22;37:23
**into (9)** 20:7;22:8;
   24:21,25;33:2;35:23;
   36:15;39:22;72:10
**investigate (2)** 19:19;
   70:9
**investigated (1)** 73:8
**investigating (1)** 40:17
**investigation (59)** 9:7,
   13,22;10:8,11,13,18,
   21,25;11:12,18;
   12:12,22;13:2,25;
   14:20,24;15:5;16:16;
   18:1;19:11,13;22:9;
   24:22;26:11;29:19;
   30:12;33:21;34:11;
   36:12;37:18,19,22;
   38:18;39:15,21;40:8,
   18;41:17,25;42:19;
   47:3;48:12,25;53:11;
   55:4;70:11,19;71:1,4,
   7,11,19,25;72:6,9;
   76:15,20;78:24
**investigations (12)**
   12:17;14:8,11,16;
   16:23;17:1;19:24;
   22:2;26:8,17;32:9;
   33:16
**investigatory (2)** 22:5;
   37:13
**involved (13)** 10:7;
   12:11;13:12,14,19,
   20;16:7;17:20,21;
   32:8;51:5;67:6;79:23
**involvement (4)** 11:18,
   25;13:5;21:24
**involving (1)** 31:20
**Iran (1)** 25:23
**issue (10)** 9:17;24:17;
   26:19;35:10;37:12;
   63:16;66:23;68:20;
   69:16,23
**issued (5)** 9:15;18:7;
   49:10;50:11;79:21
**Issues (30)** 9:19,20;

10:3;19:14,16,19;
   20:17;22:22;23:8;
   24:5,6,7,21;29:20;
   30:16;35:6;36:5,15,
   17,19;39:14,19;
   40:11,20;46:11;
   64:15;70:9,14;72:11;
   73:8
**issuing (1)** 49:12
**items (1)** 44:9
**IX (11)** 9:22;11:1;
   12:15,16;31:17;70:2,
   19,20;71:1;75:17;
   76:9

## J

**James (6)** 12:7;14:5;
   28:20;59:8;67:25;
   68:3
**January (3)** 7:4,23;
   79:3
**JCE (1)** 45:12
**Jim (3)** 11:6;17:18,19
**job (1)** 64:19
**Joe (2)** 4:11;6:16
**joint (1)** 19:13
**Jon (1)** 25:17
**Jordan (1)** 45:14
**Judicial (1)** 31:14
**July (7)** 12:25;51:1,1;
   72:18;76:24;78:10,11
**jumped (1)** 15:14
**June (3)** 12:25;48:6,9

## K

**KA (1)** 16:20;21:12
**Kamiar (5)** 43:16;
   44:22,25;49:25;54:24
**Kamiar's (1)** 41:2
**Karl (2)** 21:4,18
**keep (2)** 5:4;55:10
**keeping (1)** 5:4
**kept (1)** 11:20
**Kevin (3)** 67:25;
   68:10,23
**key (3)** 17:5,11;66:16
**keys (2)** 16:22;17:8
**kicked (1)** 76:6
**knew (2)** 53:3;72:5
**knowledge (5)** 4:19;
   50:20;59:20;62:18;
   63:25
**knows (1)** 76:17
**Korean (1)** 25:20

## L

**L-1 (2)** 43:25;44:21
**L-2 (3)** 38:3,16;40:10
**L-3 (1)** 45:4
**L-4 (1)** 53:24

**lack (1)** 35:10
**laid (3)** 77:6,12,20
**last (13)** 7:1;9:8;
   15:20,23;45:12;
   46:20,22;48:16;
   51:19;55:14;77:6,12;
   80:22
**later (1)** 5:3
**law (1)** 4:12
**laying (1)** 42:7
**leadership (1)** 22:23
**leaned (1)** 33:12
**learn (2)** 9:11;50:22
**learning (4)** 39:9;
   41:18,25;45:24
**least (1)** 66:18
**leave (1)** 34:5;70:9
**lectures (1)** 26:12
**left (5)** 34:8;43:10;
   45:12;48:16;75:10
**legible (1)** 15:22
**lengthy (1)** 45:11
**letter (42)** 9:14,18;
   10:1;13:6;14:1,18;
   15:24;20:2;36:22;
   37:20;44:4,8,19;46:5,
   7,9,13,21;50:9,10,11,
   13;51:16,20;57:1;
   59:7;60:5,22;62:2,4;
   64:4,9,12,14;65:25;
   66:10,13,17;67:23;
   68:12;69:1,7
**letters (7)** 34:20,22,
   22,23;35:1,5,9
**level (1)** 74:4
**levels (1)** 21:17
**Liesl (1)** 56:5
**light (1)** 77:17
**likely (1)** 8:15
**line (8)** 38:5;54:19,
   19;55:9,14;57:15;
   70:5;72:15
**list (1)** 71:15
**listed (2)** 42:22;44:8
**little (4)** 15:19;42:12;
   51:13;78:23
**located (2)** 58:5,5
**long (1)** 7:11
**look (17)** 14:10;19:9;
   22:8;25:11;36:20;
   41:10;43:7;44:2;
   48:18;50:8;53:24;
   56:4,6;57:4;59:25;
   72:10,17
**looked (2)** 56:24;58:7
**looking (11)** 6:15;
   19:14,15,16;20:7,16;
   35:23;36:15;38:5;
   39:22;60:5
**looks (6)** 16:15;21:3,
   7;26:4;44:6;54:1
**lot (2)** 19:18;75:12

Case 1:21-cv-00377-BKS-TWD    Document 119-7    Filed 04/29/25    Page 92 of 95

DR. KAMIAR ALAEI v.                                                    RANDY STARK
STATE UNIVERSITY OF NEW YORK, et al.                              March 24, 2021

## M

**maintain (1)** 54:7
**maintaining (1)** 54:11
**makes (1)** 56:16
**making (8)** 13:12;
  21:9;31:6;47:1;51:5;
  55:3;60:9,12
**males (1)** 80:3
**management (2)** 70:9,
  14
**manner (1)** 33:13
**many (1)** 14:7
**March (9)** 30:22;
  34:25;41:9,13;42:6;
  43:4;52:3,5,7
**marked (24)** 6:18;
  8:19;16:13;23:19;
  25:8;28:19;29:24;
  30:1,19;34:15,19;
  38:2;45:4;47:17;
  50:7;53:23;56:3;59:6,
  22;61:11;65:9;76:2,
  22;78:8
**matter (9)** 4:14;16:1;
  30:24;31:3,6,16;35:3;
  46:24;76:6
**matters (6)** 14:14;
  16:3;27:1;29:18;
  32:7;37:5
**Maureen (1)** 66:4
**May (30)** 7:13,25;
  19:21;23:15,18;24:6;
  25:2,5;38:8;44:6;
  45:22;46:5;54:25;
  56:2,24;58:2,2,7;
  61:13;63:11;64:16;
  65:11;68:24;70:7;
  71:3,23;72:4,7,11;
  80:8
**maybe (5)** 14:11,12,
  16;24:14;51:1
**mean (11)** 14:5,13;
  18:19;19:17;40:24;
  45:9;63:3;71:23;
  74:19;78:22;79:17
**means (1)** 57:9
**meantime (1)** 39:20
**meet (1)** 49:25
**meeting (14)** 22:17,
  20,25;23:2,10,14,23;
  24:4,5;44:12;51:2;
  77:6,13,15
**meetings (4)** 14:13;
  17:15;33:10,11
**members (1)** 19:5
**memo (2)** 49:20;
  71:22
**memorandum (2)**
  48:23;49:12
**mentioned (1)** 36:14
**merits (1)** 64:14

**message (1)** 13:20
**met (1)** 73:21
**middle (9)** 21:8,10;
  32:1;33:6;36:23;
  46:20;57:6;60:2;
  61:13
**might (7)** 4:19,20,22;
  8:10;28:2;45:9;77:2
**mind (3)** 47:19;77:25;
  80:13
**minute (2)** 52:4;80:14
**misconduct (1)** 72:24
**misinterpreted (1)**
  25:6
**misleading (1)** 44:25
**misled (1)** 44:22
**misunderstanding (1)**
  24:15
**months (1)** 57:17
**more (4)** 15:19;23:9;
  71:9;72:13
**morning (1)** 4:11
**motion (1)** 32:18
**mouse (3)** 54:19;
  55:15;66:16
**move (6)** 48:1;62:20;
  72:10;74:20;75:7;
  77:16
**moving (1)** 77:7
**Much (1)** 12:9
**must (6)** 16:19;56:9;
  77:3;78:19,19,22
**muted (1)** 34:3
**myself (1)** 63:5

## N

**name (6)** 4:11;6:1;
  24:10;39:12;66:4;
  77:3
**named (3)** 4:2;27:15;
  72:14
**names (7)** 11:10;
  13:8;37:24;71:9,10,
  11,15
**nature (1)** 39:6
**necessarily (1)** 38:15
**need (3)** 5:17;18:19;
  21:11
**needed (4)** 21:13;
  23:5;40:18;71:15
**negative (1)** 67:21
**New (9)** 4:5,16;8:10;
  20:10;28:22;29:1;
  31:13,18;45:24
**next (9)** 8:22;16:11;
  22:12,19;25:14;53:6;
  55:9;63:4,19
**Nikki (1)** 25:21
**nine (1)** 57:17
**nod (7)** 5:19;46:9;10;
  69:16,19;70:5,18,25
**NOD/interrogation (1)**

  54:9
**nondisciplinary (1)**
  79:16
**non-faculty (1)** 80:10
**non-Middle (1)** 80:3
**nonrenew (4)** 13:2;
  73:14,17;75:1
**nonrenewal (31)**
  13:10;52:21;54:8,12;
  55:10,20;56:1;58:1;
  59:13;60:5,13,19;
  61:3,4,20;62:1,11,15,
  16,20,24;63:2,15,24;
  65:1,4,7,14;73:20;
  74:21;77:21
**nonrenewals (3)**
  79:25;80:8,9
**nonrenewal-we (1)**
  55:16
**nonrenewed (4)**
  59:11;61:5,8;80:4
**nonrenewing (2)**
  57:25;58:16
**non-tenured (1)** 65:23
**Nope (1)** 50:21
**normal (1)** 64:24
**North (1)** 25:19
**Notary (1)** 4:5
**note (1)** 54:7
**notes (4)** 10:2;53:25;
  54:1;80:15
**notice (3)** 59:13;
  69:19,23
**notifying (1)** 50:13
**November (2)** 31:15;
  57:22
**number (13)** 16:16;
  21:5;22:16;25:10;
  27:11,12;28:21;
  34:19;39:3,23;40:22;
  67:24;76:25
**numeral (5)** 38:19,23;
  39:17,23;40:16
**numerals (4)** 38:17;
  40:3,9,22

## O

**oath (1)** 5:2
**object (3)** 35:25;
  53:14;55:7
**objection (4)** 4:22;
  5:11;36:3;76:16
**objections (2)** 35:2;
  36:7
**Obviously (2)** 68:12,
  15
**occurred (2)** 21:16;
  75:12
**October (2)** 7:13,25
**off (15)** 5:14;8:17;
  10:4;15:2;23:21;
  48:16;54:2;61:1;

  62:11,15;63:12,18;
  68:13;76:13;80:20
**Offhand (1)** 46:3
**office (43)** 11:1,2,3,16,
  23;14:4;15:7;17:11,
  16;19:14,15;20:4,6;
  27:6;29:22,23;34:22;
  35:2;37:15,16,17;
  38:12;39:16;44:5,7,7;
  46:6,22;47:13;48:24;
  51:16;53:18;58:21;
  62:22,24;63:4;66:3;
  67:8,9;69:12;70:2;
  74:3;75:17
**offices (1)** 47:14
**office's (1)** 40:2
**okayed (1)** 77:5
**One (25)** 12:4;29:12;
  39:18;40:14;46:22;
  56:14;57:17;59:12;
  61:13;65:15,15,16,18,
  20;67:3,6,11,19,19;
  69:1,6,8;73:19,20,24
**ones (1)** 64:25
**one-year (2)** 66:23;
  68:19
**only (3)** 57:10;78:20;
  80:9
**open (1)** 32:20
**opinion (6)** 33:19;
  56:15;61:4,8;68:25;
  72:24
**opportunity (2)** 64:2,9
**option (1)** 46:12
**order (3)** 32:17;42:15;
  80:21
**others (7)** 16:2;17:17;
  23:18;26:2;30:21;
  31:19;49:11
**otherwise (2)** 36:2;
  45:25
**Ours (1)** 71:9
**out (20)** 14:25;27:24;
  28:2;41:19;42:7,25;
  52:22;53:4;66:16;
  73:14,22;74:1;75:1;
  77:6,7,12,20;78:15;
  79:20,21
**outcome (2)** 26:21;
  62:8
**outlined (1)** 71:22
**outside (2)** 27:12;
  44:17
**over (15)** 6:20;7:14;
  11:19;13:1;33:16;
  37:21;40:8;42:9;
  52:17;54:19;55:15;
  58:22,24;61:23;68:8
**overlapping (1)** 40:20
**oversaw (1)** 12:16
**oversee (1)** 30:11
**overseeing (1)** 10:24
**oversight (3)** 12:1;

  62:11,15;63:12,18;
  68:13;76:13;80:20

  21:24,24

## P

**page (20)** 8:22;15:18,
  20,21,24,25;25:1;14;
  29:25;31:24,25;32:1,
  1,11;33:6;38:16;
  42:14;44:21;46:21;
  54:20;60:2
**PAGE/LINE (1)** 85:2
**panel (1)** 25:19
**paragraph (12)** 9:6,9;
  15:20,21,23;32:12;
  33:6;36:23,25;42:14;
  46:20;66:17
**parentheses (1)** 57:16
**parenthesis (2)** 32:21,
  22
**part (24)** 14:8,23;
  15:25;17:6,22;19:21;
  21:11;25:17;32:2,12;
  33:7;36:14;38:20;
  40:17;41:17;44:21;
  68:8;69:4,15;71:7,18,
  24;77:5;78:14
**particular (3)** 42:13;
  62:4;67:16
**past (4)** 16:24;18:12,
  13;32:7
**pay (2)** 73:18,24
**PDF (3)** 29:25;31:25;
  80:22
**people (15)** 5:9;
  10:17;16:16;18:25;
  21:5;23:17;28:21;
  41:19;42:17,21,21;
  53:16;67:24;71:15;
  76:25
**per (1)** 37:20
**performance (8)**
  55:15,19;56:16,19;
  66:1,1;67:18,21
**period (7)** 7:4,14;8:2;
  19:5;60:16;73:6;
  75:13
**permission (3)** 41:21;
  42:2,20
**permitting (1)** 38:21
**person (6)** 10:12;
  14:25;15:5;16:7;
  26:10;45:16
**personnel (4)** 22:21,
  21;48:13;52:24
**petitioner (2)** 33:8,12
**petitioner's (1)** 32:17
**ph (1)** 45:14
**phone (1)** 61:23
**phrasing (2)** 32:13;
  53:17
**physically (1)** 33:12
**PICOZZI (1)** 4:4
**Pinnacle (1)** 7:2

Case 1:21-cv-00377-BKS-TWD    Document 119-7    Filed 04/29/25    Page 93 of 95

DR. KAMIAR ALAEI v.                                                RANDY STARK
STATE UNIVERSITY OF NEW YORK, et al.                           March 24, 2021

**place (5)** 15:2;20:24;
  23:3;24:18;29:22
**Plaintiff's (35)** 8:19;
  12:22;14:2;16:14;
  21:3;22:14;23:20;
  25:8,16;26:23;27:9;
  28:19;29:25;30:2,20,
  20;31:11,12;34:19;
  36:21;38:2;46:13;
  48:3,17;50:8;53:24;
  56:4;63:8;65:10;
  66:9;67:23;68:22;
  76:2,21,23
**plan (1)** 42:8
**please (4)** 5:8,15;
  25:14,25
**pm (3)** 22:18;60:3;
  80:24
**point (31)** 5:17;14:9;
  21:14;23:12;27:5;
  38:8;40:24;43:6,9;
  46:2,9,12;49:21;53:1;
  54:24;62:19;63:23;
  64:20;65:6;66:14,16;
  69:17,23;70:1,24;
  71:3,7,18,24;72:5;
  73:9
**pointer (2)** 54:18;
  55:15
**policies (3)** 38:19;
  49:4,20
**Policy (8)** 21:22;
  33:20;38:20,24;39:5;
  51:21;73:10;74:7
**portion (3)** 70:19,20;
  71:1
**portrays (1)** 32:13
**posed (1)** 5:20
**position (13)** 7:1,9,11,
  14,18,22;8:3;13:7;
  34:10;57:12;63:5;
  65:23;68:6
**possibility (2)** 32:3;
  70:6
**possible (4)** 4:15;
  28:8;38:19;66:20
**possibly (3)** 44:7;
  54:1;55:3
**potential (1)** 9:24
**PR (1)** 45:17
**practically (1)** 60:7
**practices (1)** 22:6
**prebuyout (1)** 52:21
**preparation (1)** 6:5
**prepare (1)** 38:15
**prepared (4)** 38:12;
  44:10,15;48:24
**present (2)** 24:2;33:9
**presentation (1)** 25:22
**presented (3)** 5:24;
  33:8;37:10
**President (27)** 7:10,
  19,23;11:7,7,20,25;

18:4,6;19:6;20:1,25;
  26:19;51:9;52:22;
  62:13;63:20,22;65:3;
  67:25;68:3;69:10;
  74:13,23;75:6;77:5,
  22
**President's (8)** 11:2,
  15,23;29:22;47:13;
  67:8;69:12;74:3
**presume (1)** 12:5
**pretty (1)** 45:11
**previous (2)** 26:17;
  56:13
**previously (14)** 8:19;
  45:3;47:17;50:7,19;
  53:23;59:6;61:11;
  63:7;65:9;66:9;76:1;
  78:8;79:1
**primary (1)** 39:17
**prior (12)** 6:18;7:11;
  22:1,4;26:8;31:21;
  37:3;48:9,17;51:4;
  64:10;66:25
**priority (2)** 31:4,7
**privilege (1)** 36:2
**Probably (8)** 12:24,
  25;50:25;52:19;
  69:17,23;70:25;73:3
**probing (1)** 4:18
**problem (1)** 6:22
**procedure (1)** 37:2
**proceeding (1)** 77:6
**proceedings (2)** 5:3;
  80:23
**process (10)** 10:16;
  30:12;37:13;63:1,15,
  20;64:24;65:7,7;69:5
**processed (1)** 58:2
**product (1)** 58:11
**professional (1)** 29:6
**Professions (1)** 20:9
**program (4)** 15:8;
  30:6;56:17,19
**programs (2)** 30:9,11
**progressed (1)** 10:15
**prohibition (1)** 15:3
**promises (1)** 79:15
**promoting (1)** 63:24
**prompt (1)** 37:2
**prompted (1)** 9:17
**protocol (3)** 16:8;
  26:10;60:23
**proved (1)** 55:2
**provide (4)** 5:8,8;
  36:4;37:1
**provided (4)** 6:8;
  34:16;36:10;46:24
**providing (3)** 35:22;
  56:11;68:25
**provision (1)** 37:8
**Provost (22)** 11:4;
  14:5;17:18;47:15;
  51:11;57:2;58:20;

59:8;60:7,10;63:12,
  17;67:25;68:10,11,
  12,16;74:2,11,18;
  75:5;76:14
**Provost's (11)** 11:2;
  14:4;17:16;29:23;
  37:16;44:7;58:21;
  62:21,24;63:3;67:8
**Public (2)** 4:5;21:21
**punished (1)** 35:7
**purpose (2)** 19:3;37:1
**pursue (5)** 47:2,3;
  55:25;60:18;65:1
**pursuing (1)** 46:10
**put (3)** 4:22;14:25;
  67:2

## Q

**qualifications (1)** 29:6
**qualified (1)** 4:6
**quality (3)** 58:12;59:3
**quick (2)** 47:20;78:1
**quicker (1)** 10:6
**quickly (1)** 77:9

## R

**race (1)** 29:11
**racial (2)** 24:5,6
**raised (24)** 9:25;17:3,
  7;18:11,16,22;24:4,
  13,17;26:24;28:1;
  30:12,16;32:7;33:1,
  11;35:5,15;41:1;
  44:13;46:10;64:15;
  72:7;76:14
**raising (3)** 30:7;35:9;
  66:5
**RANDY (4)** 4:1;6:2;
  27:21;85:24
**rather (1)** 39:11
**reached (1)** 73:2
**reaching (2)** 41:19;
  42:25
**read (8)** 11:10;16:19;
  38:10;42:8;45:8;
  46:20;52:4;77:9
**reading (2)** 46:15;
  52:17
**reason (3)** 5:22;15:6;
  85:2
**reasons (1)** 13:23
**recall (12)** 9:16;
  11:11;12:21;13:8,15;
  16:18;17:2;18:15;
  21:6;22:7,11,20;
  23:13,16,18,22;24:3,
  6,10,12;26:16,18,21;
  30:13;34:1;35:1,5,9,
  18;36:9,16;37:8,11;
  38:3,6,7,8,10,12;
  40:12,23;41:6,17,24;

42:4,23,23,24;43:2,3,
  8,9,13;44:3,24;45:8,8,
  19,24;46:3,7;47:4,7,
  12;48:15,18;49:14,
  21;50:10;55:25;56:8,
  11,22,24;57:23;58:5,
  7,9,10,13,14;59:5,21,
  21;61:16,22;62:7,9,
  10;66:3,13;67:1,5;
  68:14;69:7,22;72:4,8,
  9,21;73:2;74:19;
  75:15;77:1,12,15;
  79:6,18,19;80:6,7,11
**recalling (2)** 45:10;
  80:7
**receive (2)** 67:19;
  75:21
**received (7)** 13:7;
  65:13;67:20;70:3;
  75:20;76:9;77:4
**receiving (6)** 35:1;
  46:7,13;56:8;61:16;
  77:1
**recess (3)** 47:23;78:5;
  80:17
**recipient (2)** 30:22,23
**recipients (1)** 25:10
**recites (1)** 36:25
**recognize (3)** 8:20;
  44:2;54:4
**recollection (3)** 23:4;
  75:25;79:11
**recommend (2)** 59:10;
  62:16
**recommendation (3)**
  60:6,9,13
**recommendations (2)**
  75:5,11
**recommending (1)**
  61:25
**record (12)** 4:23;5:10,
  13,14;6:1;8:9,17;
  23:21;39:10;43:7;
  76:11;80:20
**recreate (2)** 55:17,19
**refer (27)** 8:10,13;
  22:12;23:19;29:24;
  30:19;31:10,25;
  34:15;41:7;42:13;
  43:25;45:3;46:5;
  47:17;50:7;51:18;
  59:6,22;63:7;64:1;
  65:9;68:22;69:19;
  72:16;76:21;79:1
**reference (6)** 44:24;
  45:14;53:7;57:9;
  65:18;70:24
**references (2)** 21:12;
  22:3
**referred (2)** 77:13,15
**referring (27)** 8:9,14;
  14:15,18;20:8,14;
  25:7;26:23;31:5;

36:21;43:3;44:20,25;
  48:16;52:1,12;53:23;
  54:10;55:12;56:18;
  57:20;66:22;70:13,
  25;73:16;76:22;79:12
**refers (1)** 30:5
**Refki (2)** 28:14,14
**reflected (2)** 13:25;
  25:15
**reflection (1)** 73:7
**reflective (3)** 49:19;
  54:15;71:23
**reflects (1)** 41:14
**reformat (1)** 6:19
**refresh (1)** 75:24
**refugee (1)** 25:20
**regarding (7)** 4:17;
  34:1;48:6,12;54:25;
  65:7;68:25
**regards (7)** 9:23;
  14:14;23:7;24:1;
  26:20;41:1;67:3
**registered (1)** 76:5
**related (8)** 10:18,21;
  11:12;19:17,23;
  33:20;67:15;72:6
**relieving (1)** 16:20
**reluctance (1)** 62:14
**remained (1)** 20:24
**remains (1)** 70:8
**remedy (1)** 47:6
**remember (4)** 23:25;
  24:9;35:22;47:1
**removed (1)** 35:6
**removing (4)** 17:23;
  20:17;22:3,8
**rendering (1)** 32:14
**renew (1)** 54:16
**renewed (2)** 64:21,21
**renewing (1)** 73:25
**report (1)** 48:6
**reported (2)** 32:4,9;
  37:15;75:9
**Reporter (1)** 4:4
**represent (2)** 4:13;
  26:13
**representative (3)**
  26:6,15;66:4
**representing (2)** 27:1,
  4
**request (2)** 42:1;57:3
**requested (2)** 16:6;
  37:17
**requesting (1)** 46:22
**research (2)** 68:8,8
**resolution (2)** 36:16,
  18
**resolve (2)** 37:5,12
**resolving (1)** 46:11
**resource (1)** 7:21
**Resources (3)** 7:10,
  23;10:19
**respond (4)** 5:15,23;

11:23;44:12
**responded (1)** 76:10
**response (20)** 5:8,9;
30:16;32:16;35:22;
36:5;41:12,14;52:18;
61:18;64:2,9;65:14;
69:17;70:18;74:18,
22,23;78:11,14
**responses (2)** 44:10,
15
**responsibilities (3)**
7:17;8:6;64:19
**responsibility (1)** 7:20
**result (2)** 17:15;62:3
**Rethemeyer (3)** 21:4,
18,19
**review (8)** 6:3;35:13;
40:1;58:8;63:20;
64:12;69:4;79:4
**reviewed (4)** 4:20;6:7;
49:15;66:20
**reviewing (2)** 13:6;
66:13
**reviews (1)** 66:2
**revise (1)** 46:23
**Right (7)** 9:14;15:16;
40:21;45:10;52:19;
54:3;76:3
**right-hand (1)** 19:9
**Rights (2)** 8:14;28:3
**Rockefeller (1)** 21:21
**Rodriguez (1)** 11:9,25
**role (6)** 10:10,17;
11:11,17;14:9;58:19
**Roman (9)** 38:17,19,
23;39:17,23;40:3,9,
16,22
**room (1)** 23:17
**Rotondi (13)** 4:21;6:8,
16;27:21;35:25;
47:21;53:14,20;55:7;
75:20;76:16;78:4;
80:16
**running (2)** 54:18;
55:14

## S

**salary (1)** 65:24
**same (9)** 5:7;7:14;
8:3,6;12:8;43:19;
47:15;74:22;80:21
**Saratoga (1)** 4:6
**sat (1)** 58:20
**saw (1)** 38:5
**saying (1)** 39:11
**schedule (1)** 77:7
**scheduled (1)** 48:19
**screen (3)** 36:24;
61:13;69:15
**scroll (12)** 8:22;15:18,
19;16:11;25:13,24;
31:24;32:11;42:12;

45:4;48:4;54:18
**scrolling (2)** 34:21;
64:5
**second (7)** 15:18,21,
25;42:8;44:20;66:17;
79:4
**second-to-last (1)**
42:14
**Section (1)** 37:7
**security (1)** 66:18
**seeing (3)** 38:6;
59:21;69:7
**seek (3)** 47:8;49:14;
61:20
**seeking (3)** 25:18;
61:2;62:19
**Seidel (1)** 66:5
**Selchick (15)** 10:14;
12:11;16:15,16;25:9;
30:23;52:2,11,18;
53:9,19;54:5,10;
55:12,22
**Selchick's (1)** 71:13
**send (3)** 19:1;35:12,
17
**sending (3)** 27:24;
28:7;79:20
**Senior (1)** 7:2
**sent (9)** 6:17;25:16;
27:17;28:2;44:4;
58:2;59:16;73:4;
79:21
**sentence (5)** 9:8;31:2;
55:9,23;70:7
**separate (1)** 19:11
**separation (2)** 38:22;
39:2
**series (1)** 59:23
**served (1)** 39:14
**session (1)** 48:20
**sets (1)** 77:7
**setting (1)** 22:17
**settle (1)** 79:14
**sexual (4)** 32:23;33:4;
39:4,6
**sexually-hostile (1)**
39:8
**shake (1)** 5:10
**share (2)** 19:20;47:9
**shared (1)** 62:17
**sharing (2)** 47:7,12
**SHEET (1)** 85:1
**short (1)** 52:19
**Shorthand (1)** 4:4
**shot (1)** 11:9
**show (5)** 48:4;56:3;
61:11;76:1;78:8
**showing (11)** 8:18;
16:13;21:2;22:13;
27:8;28:18;30:1;
34:18;38:2;66:8,8
**shown (2)** 31:11;40:3
**sign (6)** 51:16;60:21;

61:1;62:1,3,14
**signature (1)** 9:4
**signed (4)** 62:10;
63:12,18;68:13
**significantly (1)** 32:13
**similar (1)** 33:14
**sit (3)** 25:19;77:2;
79:18
**situation (3)** 10:15;
18:23;60:8
**situations (4)** 15:4,12;
18:1;61:2
**solicit (1)** 49:11
**somebody (4)** 28:25;
44:17;51:14;54:15
**somehow (1)** 18:17
**sorry (11)** 6:16,20;
8:1;15:14;17:5;20:5;
34:4;41:22;52:16;
56:25;70:22
**sounds (2)** 24:19,20
**speak (2)** 40:10;71:17
**speaking (6)** 11:17;
26:13,25;37:19;38:3;
40:23
**specific (5)** 13:23;
18:23;57:13;77:19,19
**specifically (4)** 4:24;
40:12;42:25;44:20
**specifics (3)** 23:24,25;
24:9
**speculate (3)** 27:21;
53:16;54:17
**speculating (1)** 10:2;
13:11;27:18
**speculation (1)** 27:20
**spoke (4)** 23:13,16;
29:12;62:6
**spoken (2)** 23:15,18
**Staff (6)** 11:15;16:8;
19:5;24:4;25:4;38:25
**standpoint (1)** 38:1
**STARK (19)** 4:1,11;
6:2,3,24;8:18,25;
15:23;16:13;21:2;
22:13;23:22;25:7;
27:8;28:18;30:1;
34:18,21;85:24
**start (3)** 10:4;13:24;
76:15
**started (4)** 35:3;
37:20;65:22;76:13
**starting (2)** 36:24;48:4
**starts (2)** 42:14;46:21
**State (8)** 4:5,17,21;
6:1;8:9;20:10;31:13,
18
**stated (2)** 50:19;62:1
**statement (2)** 70:13;
73:16
**statements (1)** 33:23
**states (9)** 21:20;31:2;
32:2,12;33:7;36:25;

38:20;44:21;66:18
**stating (1)** 76:11
**status (3)** 23:11;
27:19;57:3
**staying (1)** 65:16
**Stellar (15)** 11:6;12:7,
9;14:5;17:18,19;
28:20;29:16;47:15;
51:11;57:2;59:8;
74:11,18;76:14
**stenographer (1)** 5:1
**step (2)** 63:4,19
**STEPHANIE (2)** 4:4;
16:11
**steps (1)** 53:6
**still (8)** 4:23;53:3,10;
70:8;71:3,6,8;77:16
**structure (1)** 59:1
**student (4)** 12:17;
24:16;32:24;39:7
**students (14)** 9:19,20;
23:5,10;24:3;37:23;
39:1;44:8,13,23,25;
70:4;71:9;76:19
**student's (2)** 39:12;
78:15
**stuff (1)** 38:9
**sub (5)** 16:11;17:22;
22:13;36:22;76:21
**subject (2)** 26:10;
57:13;85:19
**submit (1)** 64:2
**submitted (1)** 64:8
**summer (1)** 12:24
**SUNY (75)** 4:17;7:8,
19;8:3,10;9:11,17;
10:24;12:19,20;13:1,
8,16,21;14:9;16:23;
17:23;22:3,6,21;
23:13;26:15;27:13;
28:25;30:5;31:22;
33:1,16,20;34:5,9,12;
35:12,13,20,22;36:1,
4,10;37:11,21;43:10,
23;44:11,17;45:16;
47:11;48:13,19;49:2,
4,7,16,17,17,18;50:3,
22;52:7,9,24;54:16,
23;55:3,18,25;56:15;
57:23;60:18;61:19;
63:1;66:11;73:8;
79:25;80:5
**superiors (1)** 64:23
**supervisor (4)** 43:16,
22;60:25;61:3
**supervisors (2)** 64:22,
25
**supervisory (2)** 58:15,
22
**support (2)** 55:16,20
**supporters (1)** 27:14
**Supreme (2)** 31:13;
32:17

**Sure (10)** 18:21;
40:15;41:23;46:16;
47:9;54:21,23;55:6;
58:8;77:10
**surrounding (1)** 23:8
**swear (1)** 5:1
**sworn (1)** 4:3
**Szelest (13)** 11:14;
17:20;26:19;28:21,
22;29:17;47:12;
62:13;74:15,16,23;
75:6;76:24

## T

**talk (3)** 42:21;66:25;
73:13
**talked (1)** 65:25
**talking (7)** 5:7;21:8;
22:17;40:12;58:14;
70:3;76:7
**talks (4)** 9:6;14:18;
16:20;28:22
**tasks (1)** 42:16
**tend (1)** 5:9
**ten-minute (1)** 78:1
**tenure (1)** 57:11
**tenured (1)** 57:12
**term (57)** 7:9,11,13,
16;66:5;69:19
**terminate (7)** 13:16,
22;50:4,23;51:6,23;
77:17
**terminated (5)** 50:14,
16,20;51:14,15
**termination (2)** 59:12;
73:22
**terms (12)** 12:1;23:7;
24:15;33:3;40:18;
57:14,24;61:4,19;
62:25;76:7;78:24
**testified (1)** 4:8
**thinking (2)** 53:16;
70:22
**Third (1)** 31:14
**though (1)** 75:2
**thought (1)** 52:5
**thoughts (1)** 69:22
**three (4)** 14:16;34:22;
38:17;39:14
**Title (15)** 9:22;11:1;
12:15,16,16;19:23;
31:17;68:14,15;70:2,
19,20;71:1;75:17;
76:8
**today (5)** 4:18;5:22;
6:4,11;34:17
**together (1)** 30:24
**top (1)** 31:3
**touch (1)** 42:16
**toward (1)** 33:12
**towards (3)** 13:9;
21:10;46:9

**track (1)** 48:1
**transcript (2)** 5:2,4
**Trisha (1)** 76:10
**true (2)** 55:2,5
**truth (3)** 4:7,7,7
**truthfully (1)** 5:23
**try (2)** 37:11;78:2
**trying (2)** 8:1;33:2
**two (17)** 27:15;28:10,
13;29:7;39:19;43:21;
57:17;65:15,16,19;
66:18;67:3,7,15;69:1,
6,9
**two-year (2)** 66:23;
68:19
**type (5)** 5:6;11:17;
33:14;57:7,13
**types (6)** 16:3,23;
17:25;19:2;26:12;
27:1
**typical (2)** 16:22;
26:10
**Typically (2)** 14:25;
15:10

## U

**ultimate (1)** 52:18
**ultimately (2)** 65:3;
69:8
**UN (1)** 25:20
**uncomfortable (2)**
60:9,12
**uncovered (1)** 46:1
**under (5)** 5:1;15:5;
28:3;37:4;79:7
**understood (1)** 53:10
**underway (2)** 76:3,6
**unfounded (5)** 72:25;
73:12;74:9;75:3,8
**union (1)** 66:3
**United (1)** 20:9
**University (22)** 7:8;
8:9,11;14:19,22;
17:12;20:9;21:17;
23:6;26:7;27:4,5;
31:18;34:10;35:20;
37:5;38:23;39:3,4;
44:23;47:10;51:25
**unlawful (1)** 25:23
**unless (2)** 4:24;5:13
**unreasonable (1)**
32:19
**unwelcomed (1)** 39:5
**up (20)** 4:22;14:9;
15:19;22:17;25:24,
25;26:16;39:20;
40:25;41:3;42:12;
59:25;60:15;63:4;
67:2;71:10,12;75:10;
78:3;80:14
**update (1)** 23:24
**upon (4)** 13:7;25:23;

40:10;75:8
**upper (2)** 19:9;45:12
**upset (1)** 23:5
**use (2)** 18:17;70:14
**used (2)** 5:3;44:11
**using (3)** 18:11,13;
66:16
**usual (1)** 51:15
**usually (2)** 15:2;61:2
**UUP (18)** 19:17;20:7,
8,13,16,18,19,20;
22:10;28:3;35:24;
36:6,15,16;37:6,8;
46:25;79:7

## V

**Valerie (5)** 12:18;
65:11;72:18;78:10;
79:3
**various (1)** 42:21
**Ventura (1)** 25:17
**verbal (1)** 5:9
**versus (9)** 37:12;
65:15,19;66:23;67:3,
7;68:19;69:1,8
**via (2)** 12:10;19:4
**Vice (10)** 7:10,18,22;
67:24,25;68:3,10,11,
12,15
**violate (1)** 28:3
**violated (1)** 49:21
**violating (1)** 33:20
**violation (7)** 20:18;
35:24;36:6;39:4;
49:4;73:10;74:7
**violations (4)** 38:19,
20,24;51:21
**voice (1)** 33:11
**Volynsky (2)** 28:14,15

## W

**wait (1)** 5:5
**way (2)** 16:2;67:12
**website (3)** 21:9;22:4,
9
**week (1)** 51:1
**weren't (1)** 49:24
**what's (19)** 8:18;
16:13;21:2;22:14;
23:19;25:7;28:18;
29:24;30:1,19;31:11;
34:15,18;38:2;45:3;
56:3;61:11;66:8;76:1
**Whereupon (1)** 80:23
**whole (3)** 4:7;8:23;
76:6
**whose (3)** 37:24;54:4;
71:10
**William (4)** 59:23;
60:22;61:1;63:9
**Williams (5)** 68:1,10,

18,18,23
**willing (1)** 79:14
**within (5)** 50:25;
64:19;73:3,5,5
**Without (4)** 10:2;35:7;
54:8;60:10
**witness (2)** 4:2,15
**wording (3)** 32:16,20;
47:5
**words (2)** 32:16;73:21
**work (8)** 9:23,24;42:8;
54:24;58:11,11;59:3,
4
**working (4)** 13:9;
30:24;39:8;45:16
**wrap (2)** 78:3;80:14
**writing (1)** 59:9
**written (2)** 55:23;
67:12
**wrong (1)** 35:14
**wrote (2)** 44:18;60:4

## Y

**year (20)** 43:19;
57:17;59:12;65:15,
15,17,19,20;66:21;
67:7,11,19,19;69:1,2,
8;73:19,20,24;76:5
**years (10)** 7:15;24:8;
43:21;65:19;66:19;
67:3,7,15;69:6,9
**yesterday (2)** 34:17,
17
**York (6)** 4:5,16;8:10;
20:10;31:13,18
**Young/Sommer (2)**
4:13;36:22
**Yup (2)** 19:10;25:12

## Z

**Zwicklbauer (2)** 56:6,
11

## 1

**1 (2)** 6:19;36:22
**10 (3)** 50:3,17;51:20
**13 (1)** 48:9
**133 (1)** 31:25
**14 (4)** 34:24;36:23;
48:6;63:11
**16 (2)** 34:24;66:10
**19.1 (1)** 37:7
**19.10 (1)** 79:15

## 2

**2 (3)** 6:19;17:23;
61:13
**2014 (2)** 66:11;67:13
**2015 (2)** 7:13,25

**2017 (9)** 41:9,13;
42:6;43:4,19;48:6;
57:1,22;68:24
**2018 (48)** 7:23,24;
8:2,3,9:18;14:1,7;
21:5;22:16;23:23;
25:9;27:11;28:20;
30:4,22;34:24,24,25,
25;36:23;37:20;
43:17;45:22;46:6;
48:21;50:3,17;51:20;
52:5,7;56:2,6;59:2,7;
60:3;61:14;63:11;
67:14;68:4;71:3,23;
72:4,7,11,18;76:24;
78:10,12
**2019 (2)** 13:17;79:4
**2020 (7)** 7:4,5,7,12,
13;31:15;57:22
**2021 (2)** 7:4,25
**20-minute (1)** 25:22
**21 (1)** 46:6
**22 (2)** 28:20;41:9
**23 (7)** 65:11;70:7;
71:3,23;72:4,11;
76:24
**25 (1)** 31:15
**26 (3)** 52:3,5,7
**27 (2)** 30:4;59:7
**28 (6)** 34:25;42:6;
43:4;59:24;60:3;79:3
**29 (1)** 41:13

## 3

**3 (1)** 6:19
**3:00 (1)** 22:18
**3:21 (1)** 60:3
**3:50 (1)** 80:24
**31 (1)** 68:24

## 4

**4 (5)** 22:13;56:6;57:1,
24;76:22
**4/3/18 (1)** 54:1
**49 (1)** 29:25

## 6

**6 (3)** 31:24;32:1;
72:18

## 7

**7 (2)** 33:6;34:25

## 8

**8 (8)** 9:18;13:17;14:1;
20:1;22:16;25:17;
37:20;46:23

## 9

**9 (9)** 22:19;23:23;
25:9;27:10;30:22;
48:20;72:7;78:10,11