**EXHIBIT A**

1                          EBT of CHANTELLE BOTTICELLI

2

3    UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF NEW YORK
4    ****************************************************

5    DR. KAMIAR ALAEI,

6                              Plaintiff,

7          -against-          No. 1:21-cv-0377 (BKS/TWD)

8    STATE UNIVERSITY OF NEW YORK
     AT ALBANY, HAVIDAN RODRIGUEZ,
9    individually and in his official
     capacity on behalf of the STATE
10   UNIVERSITY OF NEW YORK AT ALBANY,
     BRUCE P. SZELEST, individually
11   and in his official capacity on
     behalf of the STATE UNIVERSITY
12   OF NEW YORK AT ALBANY, JAMES R.
     STELLAR, individually and in his
13   official capacity on behalf of the
     STATE UNIVERSITY OF NEW YORK AT
14   ALBANY,

15                           Defendants.
     ****************************************************
16

17          EXAMINATION BEFORE TRIAL of the Defendant,

18   State University of New York at Albany, by CHANTELLE

19   BOTTICELLI, held in the above-entitled matter pursuant

20   to Notice, on the 26th day of July, 2023, commencing

21   at 1:00 p.m., via Zoom Videoconferencing, before Kari

22   L. Reed, a Shorthand Reporter and Notary Public of the

23   State of New York.

24

25

1   A P P E A R A N C E S:

2

3        YOUNG/SOMMER LLC
         Executive Woods, Five Palisades Drive
         Albany, New York 12205
4        BY:  JOSEPH F. CASTIGLIONE, ESQ.
         518.438.9907
5        jcastiglione@youngsommer.com

6

7        OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL
         Attorneys for Defendants
8        The Capitol
         Albany, New York 12224
9        BY:  DAVID WHITE, ESQ.
         800.771.7755
10       david.white@ag.ny.gov

11

12
     ALSO PRESENT:
13
     Amanda Maleszweski, Chief Campus Counsel, SUNY Albany
14

15

16

17

18

19

20

21

22

23

24

25

1                    S T I P U L A T I O N S

2

3           IT IS HEREBY STIPULATED AND AGREED by and

4       between the attorneys for the respective

5       parties hereto, that filing, sealing and

6       certification be and the same are hereby

7       waived.

8

9           IT IS FURTHER STIPULATED AND AGREED that

10      all objections, except as to the form of the

11      question, be reserved to the time of the trial.

12

13          IT IS FURTHER STIPULATED AND AGREED that

14      the within examination may be signed and sworn

15      to before any notary public with the same force

16      and effect as though signed and sworn to before

17      this court.

18

19           *                  *                  *

20

21

22

23

24

25

Chantelle Botticelli

1    CHANTELLE BOTTICELLI, called as a witness, having been

2    first duly sworn/affirmed by the notary public, was

3    examined and testified as follows:

4    EXAMINATION BY

5    MR. CASTIGLIONE:

6        Q    Good afternoon.  My name is Joe Castiglione.

7    I'm an attorney with the law firm of Young/Sommer.  We

8    represent Dr. Kamiar Alaei in the litigation matter

9    involving the State University of New York and other

10   individuals.  I'm here today to ask you questions

11   about information you might have or might not have

12   about the claims and allegations in the matter, as

13   well as to go over some documents to see if you have

14   any recollection or understanding of what's raised in

15   the documents.

16            Just so you're aware, there's a stenographer

17   here to take a transcript of the proceedings.  She can

18   only type one person speaking at a time.  So for

19   clarity of the record, I'll ask you a question, wait

20   until I'm finished and then you can respond.  Is that

21   clear?

22       A    It is.

23       Q    Okay.  And just so it's clear, if you're

24   giving a response, make a verbal or articulated

25   response with words versus mm-hmms or a nodding of the

Chantelle Botticelli

1    head, because she can't record that.  Okay?

2        A    Yes.  Thank you.

3        Q    Sure.

4             Let me know if any questions I'm asking, if

5    you don't understand or you want me to clarify, we can

6    certainly do that.

7             If at any point you want to take a break, we

8    could do that, just let us know.  If I pose a question

9    first, you have to answer it before we can take a

10   break, though.

11       A    Understood.

12       Q    Okay.

13            Is there any reason today you cannot answer

14   questions being presented truthfully or accurately to

15   the best of your ability?

16       A    No.

17       Q    So no hindering medications or anything like

18   that that might interfere with your ability to recall

19   or provide a response?

20       A    Just pregnancy.

21       Q    Okay, I got it.

22            At the outset you stated your name as

23   Chantelle Botticelli?

24       A    That is correct.

25       Q    Did you go by or were known as Chantelle

Chantelle Botticelli

1  Cleary in 2018?

2      A    That's right.

3      Q    So same first name spelling, but last name

4  was C-L-E-A-R-Y?

5      A    That is correct.

6      Q    Okay.

7           And just so it's clear to you, if I say SUNY

8  Albany or the university or the school, I'm referring

9  to the University at Albany, State University of New

10 York.  Is that understood?

11     A    It is.  And I would appreciate very much

12 that you say University at Albany, as opposed to of.

13     Q    I've learned that over time.

14          Also, if I refer to GIHHR or the institute,

15 I'm referring to the Global Institute for Health and

16 Human Rights.

17          (Witness nods head).

18     Q    Okay?

19     A    Yes.

20     Q    Okay.

21          Are you currently employed, Ms. Botticelli?

22     A    I am.

23     Q    Where are you employed?

24     A    I am employed at a consulting firm called

25 Grand River Solutions.

Chantelle Botticelli

1      Q      And what is your position at Grand River
2   Solutions?
3      A      I am the senior director of business
4   development.
5      Q      And how long have you had that position?
6      A      Since January of 2020.
7             Excuse me, I need to correct that.  I've
8   held my current position with Grand River Solutions
9   since June 1st of 2023.  Prior to that I was the
10  director of strategic partnerships, client relations
11  and business development.
12     Q      And what time period did you hold that
13  position?
14     A      From January 2020 to June 1st, 2023.
15     Q      And in that prior position can you just
16  generally explain to me what your job duties entailed?
17     A      So we're a startup, or were a startup.  When
18  I started with the firm there were six of us.  So I
19  did a little bit of everything.  That included
20  managing client accounts, developing business,
21  developing a strategic plan for reaching strategic
22  goals for growth, as well as serving clients as either
23  an investigator and/or interim Title IX or equity
24  coordinator.  I also did and still do training for the
25  organization for our clients and larger community.

Chantelle Botticelli

1   And I think that's a pretty comprehensive role,

2   description of my role from January of 2020 to June.

3        Q    Okay.  And in your current position is there

4   a significant difference in responsibilities?

5        A    Yes.  I no longer do direct client work.

6        Q    Okay.

7        A    I now manage a team of eight.  And I'm

8   responsible for oversight of the strategic goals and

9   objectives, the growth of the business.  And our sales

10  staff, our client management staff, our operations

11  staff.  Yeah.

12       Q    And what is the general business of Grand

13  River Solutions?

14       A    Sure.  We provide support in the primarily

15  Title IX equity spaces.  But support includes

16  providing consulting support on developing and

17  implementing policy and procedure that is compliant

18  with the state and federal law.  We also do

19  investigations on behalf of our clients.  We conduct

20  hearings.  We do investigations into student conduct,

21  employee conduct, administration conduct.  We do

22  everything in the Title IX and equity space, not only

23  for institutions of higher ed but K-12, and we have

24  government and private sector clients as well.  And

25  there's about, I think I said we started at six

Chantelle Botticelli

1  employees in 2020, and we're now at about 90.

2       Q    Okay.  Before 2020 were you employed?

3       A    I was.

4       Q    What was your position before you came on

5  with Grand River Solutions in 2020?

6       A    I was the Title IX coordinator at Cornell

7  University.

8       Q    And how long did you hold that position?

9       A    From May -- I'm sorry, June of 2018 to

10 January of 2020.

11      Q    Can you generally explain your

12 responsibilities for having Title IX coordinator for

13 Cornell in that time period?

14      A    I oversaw the -- I oversaw the institutional

15 response to reports of discrimination on the basis of

16 sex at the university.  And I also oversaw the

17 institutional response to other forms of unlawful

18 discrimination committed or experienced by either

19 students, faculty or staff.  So although my title was

20 Title IX coordinator, my responsibilities included

21 oversight of the institutional response to all forms

22 of prohibited discrimination.

23      Q    Okay.  And before that were you employed at

24 the University of Albany or University at Albany in

25 2018?

Chantelle Botticelli

1    A    That's correct.

2    Q    Okay.  And what was your position while at

3  the university?

4    A    My initial position was university Title IX

5  coordinator.  And I held that position from I think

6  January of 2015 until I don't remember when.  I was

7  promoted to assistant vice president of, I think it

8  was institutional equity was my title, or equity and

9  compliance, something like that.  I think it was

10  assistant vice president of equity and compliance.

11    Q    Okay.  And can you just generally explain

12  what your job responsibilities included while in 2018?

13    A    Sure.  I oversaw the institutional response

14  to reports of prohibited discrimination generally,

15  including reports of sexual misconduct by students.

16    Q    Did you oversee sexual misconduct

17  allegations against faculty members at the time?

18    A    I did.

19    Q    Before January 2015 were you employed in

20  similar work doing with Title IX?

21    A    No.

22    Q    No, that was your first entry into working

23  Title IX?

24    A    That's correct.

25    Q    Okay.  Before June of 2015 were you employed

Chantelle Botticelli

1  or were you coming out of school?

2       A    Thank you for thinking that, but no, I was

3  employed for about a decade as a prosecutor.

4       Q    Where were you a prosecutor?

5       A    I was a prosecutor in Albany County from

6  2010 to 2015.  And I was a prosecutor in Clinton

7  County from 2006 to 2010.

8       Q    Did you have any special area of practice

9  while being a prosecutor besides general criminal, or

10 was it focused on something individual?

11      A    Special victims.

12      Q    The questions I'm going to ask you are

13 mostly related to your job duties in 2018.  In 2018,

14 I'm sorry, could you just clarify, your position was

15 Title IX coordinator for the university?

16      A    Can you say the year again, please?

17      Q    Sure.  2018.

18      A    It was assistant vice president of equity

19 and compliance.

20      Q    Okay.

21      A    And as a part of that I was also named the

22 university's Title IX coordinator.

23      Q    So Title IX was under your umbrella of

24 assistant vice president of equity and compliance?

25           Yes?

Chantelle Botticelli

1    A    Correct, yes.

2    Q    Oh, sorry, I didn't hear that.

3    A    That's okay.  I might have imagined that I

4    answered your question.

5    Q    All right.  Did you have a supervisor that

6    oversaw your work in 2018 as the assistant vice

7    president of equity and compliance?

8    A    Yes, I did.

9    Q    Who was that?

10   A    Bruce Szelest.

11   Q    Okay.  So he was your direct supervisor?

12   A    Actually, no.  Havidan Rodriguez was my

13   direct supervisor.

14   Q    And he was the president of the university

15   at the time?

16   A    That is correct.

17   Q    And Bruce Szelest was the chief of staff for

18   the president at that time?

19   A    That is correct.

20   Q    Did you report directly to the president in

21   2018 or did you report to Mr. Szelest and he would

22   communicate to the president?

23   A    A combination of both of those things.  But

24   I met primarily with Bruce.

25   Q    Okay.  How often did you meet with Bruce on

Chantelle Botticelli

1  a regular basis apart from investigations, just in

2  your general capacity as assistant vice president of

3  equity and compliance, or associate vice president,

4  I'm sorry.

5          A    I'm thinking.

6          Q    Sure.  Take your time.

7          A    So I met with him regularly, but I don't

8  recall the cadence.  I would say I met with him -- the

9  intention was to meet with him weekly, but sometimes

10  meetings would be rescheduled and we would just agree

11  to either touch base by phone, or if there weren't any

12  pressing agenda items, to discuss them in our next one

13  to one.  So I maintained regular contact with him but

14  I don't remember the cadence of our meetings.

15          Q    Do you recall how many Title IX

16  investigations you were undertaking in 2018?

17          A    The University at Albany I think in 2018 was

18  the second highest reporting institution insofar as

19  the number of reports we received.  So I will say that

20  it was a lot.  Second only to Cornell.  And so, you

21  know, there was, at the time I had a staff of three

22  investigators and a case manager.  And all three --

23  all four of us, the three of us, the investigators and

24  myself, had full case loads.

25          Q    So would you be able to provide a number of,

Chantelle Botticelli

1    you know, 100 investigations possibly going on in 2018

2    while you were there, or 20 or --

3         A    It was well over 20.

4         Q    Okay.

5         A    But I don't want to speculate.  I would say

6    in the area of 100.  So it may be a little less, it

7    might be a little more.

8         Q    Now, when you would -- go ahead.

9         A    For the entire year, right.

10        Q    Okay.  When you would have meetings or

11   discussions with Mr. Szelest about, you know, what you

12   were doing as associate vice president, did you go

13   through each of the investigations you were dealing

14   with at the time for each respective meeting when you,

15   you know, either had a meeting or a call with Mr.

16   Szelest?

17        A    No.

18        Q    Was it more of a general, can you explain

19   what generally your interactions were at any given

20   times about investigations or how you were reporting

21   to Mr. Szelest?

22        A    Sure.  So I would give him an overview of

23   the, of the number of matters that we were working on

24   at the time, and I would alert him to any matters

25   that -- any matters that raised heightened concern for

Chantelle Botticelli

1    the health or safety of the students, faculty and

2    staff.

3        Q    Did Mr. Szelest give you direction about how

4    to undertake any of the investigations you were doing

5    in 2018?

6        A    I'm sure he would have made suggestions.

7        Q    By suggestions can you explain to me what

8    you mean?

9        A    He would, he would suggest -- let me, maybe

10   that's not the right word, maybe "suggestion" isn't

11   the right word.  He would ask questions to get a

12   deeper understanding of the work that we were doing.

13   Because he was providing support to me, so he would

14   ask questions to get a deeper understanding.  And I

15   would sometimes problem solve with him, right.  So if

16   I -- a good example would be we had a lot on our

17   plates right now, this was a common -- common

18   conversation, right, we had a lot on our plates right

19   now.  I was always seeking more resources, more staff.

20   And, you know, he might ask questions about how we

21   were managing the caseload and things like that.  And

22   he would make suggestions about that, but not

23   necessarily get into the details.  And when I say "not

24   necessarily", I should clarify.  He did not get into

25   the details insofar as how we conducted the

Chantelle Botticelli

1    investigations, right.  He never said you should ask

2    these questions or you should review this evidence,

3    right, because that was not his area of expertise.

4        Q    Can you explain to me how Title IX

5    investigations typically were initiated in 2018 as

6    well as processed and how they concluded, what the

7    process was from start to end?

8        A    Yeah.  So the institution had more than one

9    policy addressing processes for different items at

10    this time.  What I mean by that is, depending on the

11    identity of the respondent, the process might look a

12    little bit different.  So if the respondent was a

13    student, that's one process.  If the respondent was

14    faculty or staff, there was a different process.  But

15    for either process, right, reports came to the office

16    in a variety of ways.

17            At the time, my recollection is that all

18    employees at the university were what we called

19    "responsible employees", language from the Department

20    of Education.  And responsible employees had an

21    obligation to report to the office of the Title IX

22    coordinator any known instances of or any suspected

23    instances of sexual misconduct.  And so reports would

24    come from faculty, reports would come from staff.

25    Reports would come sometimes directly from the person

Chantelle Botticelli

1  who experienced the sexual misconduct.  Sometimes

2  reports would come from friends or parents of the

3  folks who experienced the sexual misconduct.

4          Once a report was received by the office of

5  Title IX coordinator, we would initiate a response,

6  which included reaching out to the power of attorney

7  who allegedly had the experience, providing them with

8  information or reaching out to them.  We'd invite them

9  to meet with us.  If they agreed to meet with us, we

10  would meet with them.  If they declined, we would send

11  them information about their rights and options for

12  support and for reporting their experience more

13  formally to the university.

14          If we met with them, if they chose to meet

15  with us, we would do the same.  That initial meeting

16  would be primarily focused on making sure that the

17  person understood his, her or their rights to be

18  supported by the institution, and their rights for

19  reporting their experience formally, either to the

20  institution to initiate an administrative

21  investigation to determine whether or not a violation

22  of whatever policies had been committed, and the right

23  and option to report it to law enforcement.  And those

24  were not mutually exclusive.  They were -- it was made

25  clear to them that they could do one or the other or

Chantelle Botticelli

1    neither or both.  And that was the initial meeting.

2            If folks chose not to make a formal report

3    to the institution, they were still entitled to

4    support.  Support could include things like academic

5    accommodation or residential accommodation.  Support

6    could also include things like referrals to resources

7    inside and outside of the university, like advocacy

8    resources, counseling, medical, et cetera.  And then

9    if folks chose to make a report or were interested in

10   making a more formal report, then we would walk

11   through the applicable policy, describe for them the

12   policy for making a formal complaint.  I think we

13   called them a formal report back then, but I don't

14   remember exactly.  And then they would decide do they

15   want to proceed with initiating that administrative

16   investigation that would be aimed at determining

17   whether or not a policy violation occurred.

18            If they chose not to make a formal report,

19   our office would do an assessment as to whether or not

20   we could honor their request to take a more formal

21   action, and we'd document our reasoning.  If we

22   decided that we couldn't honor that request, we didn't

23   initiate an investigation, but there were times where

24   we did initiate investigations irrespective of the

25   complainant's wishes.  And those situations occurred

Chantelle Botticelli

1    not frequently but when and where there was a greater

2    concern for the safety of the larger community.

3            If a person chose to initiate a formal

4    complaint and initiate that administrative

5    investigative process, then a notice of investigation

6    or allegation was generally drafted under the student

7    policy.  I honestly don't remember if we did the same

8    under the employee policy.  But under the student

9    policy there would be a notice of investigation or

10   allegation drafted.  The parties would be advised that

11   an investigation was being conducted.  The

12   investigation would be conducted, and under the

13   student process there would then be a hearing.

14           The employee process was different.  So if

15   the accused was an employee, there was different --

16   when the accused was UUP or unionized, and there was

17   two unions, maybe three, and we had to follow some of

18   those rules, and I don't remember what they are.  If

19   they were an employee at will, it was a different

20   process as well.

21   Q    Okay.

22           MR. CASTIGLIONE:  I am showing you, and

23       David, I didn't mark this as an exhibit, I will.

24       But I just wanted to generally show this to her

25       for a minute.

Chantelle Botticelli

1    Q   Do you recognize this document?  It's

2  identified as Sexual Violence Response Policy,

3  effective October 5, 2015, University at Albany.

4          MR. WHITE:  Joe, just for the sake of

5       clarity, can we just say that this is my Fifth

6       Supplemental Rule 26 disclosure, beginning at

7       Bates number, what is it, 20603, and I think it

8       goes to 20625.

9          MR. CASTIGLIONE:  It goes to 20625.  Yes, we

10      could stipulate to that.

11      MR. WHITE:  Great.

12    Q   Ms. Botticelli, is this the, does this

13  document outline the policy and procedures that your

14  office would file, or excuse me, follow if you

15  received a complaint of sexual misconduct or sexual

16  violence concerning a student?

17    A   Yes.

18    Q   If the conduct was alleged by a faculty

19  member or professor against a student, would you still

20  follow some of these protocols when you were doing a

21  Title IX investigation?

22          (Witness perusing documents)

23    A   I think so.

24    Q   So let me, I can clarify.  I believe you

25  said if the accused or the respondent was a faculty

Chantelle Botticelli

1   member or professor certain, you know, they might be

2   entitled or there might be certain other protocol to

3   be followed based on, you know, union agreements or

4   whatnot.  But if there was an allegation by or against

5   a faculty member engaging in allegedly sexual

6   misconduct or inappropriate conduct against a student,

7   you could still initiate a Title IX investigation,

8   then you would follow somewhat this protocol in doing

9   your Title IX investigation?

10       A    State your question, I feel like you asked

11   me one question and then you asked me a different

12   question, and maybe that's just my confusion.

13       Q    That's all right.  I believe you had said if

14   there's an allegation against a faculty member or a

15   professor for undertaking sexual misconduct, they

16   would follow generally the protocol if that employee

17   or faculty member was a part of a union; is that fair

18   to say?

19       A    Yeah.  There was different, I think there

20   were different procedures for the resolution of the

21   matter, yup.

22       Q    But if there was a, same type of situation,

23   a professor or a faculty member accused of sexual

24   misconduct against a student, you could initiate a

25   Title IX investigation and then pursue some of the

Chantelle Botticelli

1    process established in this document, the Sexual

2    Violence Response Policy?

3          A      That is my recollection.

4          Q      Okay.  Do you recall, was this policy I'm

5    showing you, the Sexual Violence Response Policy

6    effective October 5, 2015, in effect at the university

7    for 2018?

8          A      I don't remember.

9          Q      Okay.  Are you familiar with or do you

10   recall the document identified as Agreement Between

11   the State of New York and United University

12   Professions that was in place in 2018?

13         A      No.

14         Q      Do you recall, were you ever involved in

15   disciplinary investigations in your role as the Title

16   IX coordinator or vice president, or excuse me,

17   associate vice president of equity and compliance in

18   2018 disciplinary investigations under any union

19   related bargaining agreements?

20         A      I think the answer to that is yes, but as

21   support, not as -- not investigations.

22         Q      So more as to provide assistance possibly

23   but not in conducting the investigation?

24         A      The HR -- the HR specialists would lead

25   those investigations.  And, depending on the nature of

23

Chantelle Botticelli

1  the allegations, once it went through the UUP

2  disciplinary process or when it entered the UUP

3  disciplinary process, then my role was limited.

4      Q    So you just mentioned the UUP disciplinary

5  process.  Are you referring to a collective bargaining

6  agreement process laid out as to certain faculty and

7  professors at SUNY?

8      A    Yes.

9      Q    So if I refer to the UUP process generally,

10  you'll understand what I'm referring to?

11      A    I'll understand that it is a process that

12  was used, but I was not, I was not overly familiar

13  with the details of that process.

14      Q    Understood.  You'll understand it refers to

15  a process but you don't understand the minutiae or the

16  actual procedures involved in that process; is that

17  fair to say?

18      A    That's correct.

19      Q    Okay.

20          During your time at SUNY Albany in 2018,

21  were you ever involved in a non-renewal process of

22  faculty or professors that was provided for under UUP

23  processes?

24      A    Yes.

25      Q    I'm sorry, are you saying yes?

24

Chantelle Botticelli

1     A     Yes.

2     Q     Okay.

3     A     Actually, I'm going to withdraw that.  Can

4  you help me understand your question, when you say

5  involved in, what do you mean?

6     Q     Sure.  Were you providing any input or

7  making the decisions regarding possibly non-renewal of

8  a faculty member or professor under the UUP process in

9  2018?

10    A     So I definitely provided input, but I didn't

11 -- I was not a decision maker.

12    Q     Okay.  Were you, in your role as associate

13 vice president of equity and compliance, was that

14 something you regularly participated in in providing

15 input in non-renewal process of faculty or professors

16 that were following the UUP process for non-renewal?

17    A     Only if those faculty -- only if the faculty

18 member had been accused of some form of discriminatory

19 conduct, and particularly sexual harassment.

20    Q     Okay.

21    A     So an allegation against a faculty member,

22 any form of sexual misconduct or discriminatory

23 behavior, I, I -- my office would have, right, at

24 least done an initial assessment of the allegations,

25 may have also done an investigation.  And then we

Chantelle Botticelli

1   would advise HR as to the findings of our

2   investigation.  And sometimes we were asked to make

3   recommendations for next steps, right.  And those

4   recommendations would include things, do you think the

5   folks involved would participate in the UUP

6   disciplinary process in arbitration, right.  So

7   recommended -- recommendations weren't just about what

8   do we do with this employee or what do we do about

9   this employee.  It was what are the next steps in

10  moving forward, based on your understanding of the

11  willingness of folks to participate and the evidence

12  that you've gathered and/or reviewed.

13       Q    But is it fair to say ultimately it was

14  human resources that would make a determination about

15  how to deal with the employee at the end of any such

16  investigation?

17       A    Yes.

18       Q    If I can refer you to what was previously

19  marked as Plaintiff's Exhibit A-2.

20            Now I'm going to be asking you questions

21  about concerning Dr. Kamiar Alaei.  I'm showing you

22  what's been identified as Plaintiffs' Exhibit A-2.

23  It's a letter from the university to Dr. Alaei dated

24  February 8, 2018.  It says in part, "this letter is to

25  advise you that you are hereby directed to perform an

Chantelle Botticelli

1    alternative assignment in an alternative work

2    location."  It says, "the action is being taken

3    pursuant to the authority granted under Section

4    19.10.C of the agreement between the State of New York

5    and the United University Professions."  It then goes

6    on to say, "I'm the president's designee and I am

7    conducting a disciplinary investigation."

8              Do you recall a time where the university

9    initiated a disciplinary investigation against Dr.

10   Kamiar Alaei?

11        A    Yes.

12        Q    Do you recall, this letter is dated February

13   8, 2018.  Is that consistent with your recollection

14   about when the investigation concerning Dr. Alaei

15   started?

16        A    I don't recall this particular letter.  I

17   recall that he was placed on alternative assignment.

18   And I also recall -- I don't -- I don't recall when

19   the investigation began.  And I don't recall the

20   investigation conducted by at the time my office and

21   HR.

22        Q    Let me show you a couple more documents

23   here.  I'm going to refer you to what's been

24   identified as Plaintiff's Exhibit E-1.

25              I'm showing you what's been identified as

Chantelle Botticelli

1  Plaintiff's Exhibit E-1, and I'm going to scroll

2  through it slowly so you can take a look at it and see

3  if you recognize it.

4          MR. WHITE:  And Joe, just as we've done for

5      the past depositions in this case, I'd just like

6      to note for the record that these documents that

7      are marked "confidential and attorneys' eyes

8      only" are being disclosed and shown pursuant to

9      the two protective orders that we have in place.

10         MR. CASTIGLIONE:  Correct.

11         MR. WHITE:  Thank you.

12         (Witness perusing documents)

13  A    Okay.

14  Q    I'm just going to scroll a little quicker

15  through here now.  As I'm going through, do you recall

16  this document or have any understanding of what this

17  document is?

18  A    Yeah.  That's the investigative report

19  generated by my office summarizing the evidence

20  gathered during the investigation and allegations

21  against Dr. Alaei, Kamiar Alaei.

22  Q    I'm going to scroll up here to the

23  beginning.  This first paragraph states in part, "the

24  following report details the University at Albany's

25  coordinated response to a report received on February

Chantelle Botticelli

1    2nd, 2018 from Dr. James Stellar.  Specifically, the

2    report alleges that several students reported to him

3    that Dr. Arash Alaei has been interacting with

4    students in violation of a stipulation of settlement

5    entered into by and between Dr. Arash Alaei and the

6    university on September 18, 2017.  This report

7    initiated an inquiry which resulted in a joint

8    investigation by the Office of Equity and Compliance

9    and the Office of Human Resources Management.  The

10    investigation focused on the following possible

11    violations of the University at Albany policies by Dr.

12    Kamiar Alaei."  And then it identifies three distinct

13    issues with Roman numerals I, II and III.

14         A    Yes.

15         Q    As to the first sentence it states, you

16    know, in part, "it was a coordinated response to a

17    report received on February 2nd from Dr. James

18    Stellar."  Do you recall what that is referring to?

19         A    Yeah.  Dr. Stellar reached out to our office

20    and indicated that a number of students had approached

21    him with concerns about Dr. Arash Alaei's ongoing

22    interaction with them, and his ongoing engagement in

23    the business, the daily business of the GIHHR.

24         Q    Do you know why Dr. Stellar reached out to

25    Title IX about that issue?

Chantelle Botticelli

1        A      He was required to under university policy.

2        Q      Why was he required under university policy?

3        A      Because students were raising concerns that

4   triggered, right, the -- the institution's sexual

5   misconduct policy, and all employees were mandatory

6   reporters to the Title IX office if such concerns were

7   raised as that.

8        Q      Okay.  Then Roman numeral I says,

9   "insubordination and general misconduct for permitting

10  Dr. Arash Alaei to conduct business on behalf of the

11  GIHHR after his separation from the University at

12  Albany."  Is it fair to say that was the -- strike

13  that.

14              The second Roman numeral, Roman numeral II

15  then says, "insubordination and general misconduct for

16  facilitating contact between Dr. Arash Alaei and GIHHR

17  staff and students during Arash Alaei's alternative

18  assignment and after his separation from the

19  University at Albany."

20              Is it fair to say those two grounds

21  identified on this document at Roman numerals I and

22  Roman numeral II were the issues that were raised with

23  Dr. Stellar and that Dr. Stellar reached out to your

24  office on February 2nd, 2018?

25       A      Those were definitely two of the things that

Chantelle Botticelli

1   Dr. Stellar raised.  I should say those were

2   definitely two concerns that Dr. Stellar relayed based

3   on his interactions with the students.

4       Q    Okay.  The third Roman numeral, Roman

5   numeral III says, "a violation of the University at

6   Albany's sexual harassment policy for engaging in

7   unwelcome conduct of a sexual nature directed at GIHHR

8   student intern [blank] that created a sexually hostile

9   environment for working and learning."

10          That Roman numeral III allegation, did Dr.

11  Stellar raise that with your office?

12      A    I don't recall.

13      Q    Do you recall how that allegation was raised

14  to be included as part of this investigation?

15      A    I don't recall when it first came to my

16  attention, but I do recall that the complainant, the

17  student asserting that she had experienced this

18  conduct, came directly to us and participated in an

19  investigative interview and provided information.

20      Q    Did she come directly to you as a result of

21  you contacting her to investigate Roman numerals I and

22  II?

23      A    I don't recall.

24          MR. CASTIGLIONE:  I think we can, David, if

25      you agree, we previously discussed, we stipulated

Chantelle Botticelli

1        that this Roman numeral III included just one

2        person, Leah Diedrich.

3                MR. WHITE:  Yes.

4        Q    Do you recall, Ms. Botticelli, were there

5    other interns that you came across or other students

6    at the time that raised similar allegations or

7    concerns that served as the basis to initiate this

8    investigation?

9        A    The students raised a lot of concerns about

10   Dr. Alaei, but I don't recall any of them rising to

11   the level of a potential sexual harassment policy

12   violation.

13       Q    Okay.  And if I can refer you now to --

14   actually, before I do that, so just to be clear, this

15   is a document that your office created, this was the

16   final report resulting from the investigation by your

17   office concerning Dr. Kamiar Alaei in 2018?

18       A    Yes.

19       Q    And I'm just going to go down to the end

20   here.  Was there a formal conclusion ever written out

21   as part of this report as far as you recall?

22       A    No.

23       Q    Did you ever make a formal conclusion,

24   either verbally or by an opinion that you shared with

25   others, about the results of your investigation

Chantelle Botticelli

1    concerning Dr. Alaei concerning Roman numerals I, II

2    and III?

3        A    Can you help me understand what you mean by

4    "formal conclusion"?

5        Q    Sure.  You undertook an investigation

6    concerning Dr. Alaei into these three issues, Roman

7    numeral I, Roman numeral II and Roman numeral III as

8    shown on page one of Plaintiffs' Exhibit B-1.  And did

9    you ever, did your office ever formulate a formal

10   conclusion as to the issues you were investigating

11   here, Roman numeral I, Roman numeral II and Roman

12   numeral III?

13       A    I'm trying to think, and I honestly don't

14   recall the answer to that question.

15       Q    That's fine.  I'm --

16       A    I know that we discussed the evidence that

17   we collected.  And by evidence I mean the documents

18   and the investigation -- the 40 something

19   investigative interviews that we did.  We discussed

20   our, our -- what's the word I'm looking for -- our

21   assessment of the credibility and reliability of the

22   allegations.  I know we did that.

23       Q    And what was your assessment of the

24   credibility and reliability of the allegations?

25       A    That they were credible and reliable.

Chantelle Botticelli

1    Q    Excuse me?

2    A    That they were -- that the allegations being

3  made by the students were supported by the evidence.

4    Q    So you're saying your conclusion was the

5  allegations were true in terms of alleged actions that

6  they claimed Dr. Alaei engaged in?

7    A    I didn't say true.  I said that they were

8  credible, reliable and supported by the evidence, such

9  that it would support a finding that there was a

10  violation of these policies.

11    Q    If I can refer you to Claimant's Exhibit

12  A-7, or excuse me, Plaintiff's Exhibit A-7.

13  Plaintiff's Exhibit A-7 is a counseling memorandum

14  prepared by the university, the human resources

15  office, for Dr. Kamiar Alaei.  It's dated August 9 of

16  2018.

17          Is it accurate that you were no longer

18  employed at the university as of August 9, 2018?

19    A    That is correct.

20    Q    Okay.  This counseling memo, Plaintiff's

21  Exhibit A-7 says in part, "In early February 2018 it

22  was reported to the University of Albany's Office of

23  Equity and Compliance that a student involved in and

24  working for the Global Institute for Health and Human

25  Rights alleged that you engaged in unwelcome conduct

Chantelle Botticelli

1   of a sexual nature while at a conference in Beirut in

2   January 2018.  In response to that report, OEC and the

3   Office of Human Resources initiated an investigation,

4   and you were placed on alternate assignment beginning

5   February 8, 2018.  The specific allegations were that

6   you stared at the student in an intense and 'creepy'

7   manner; you repeatedly put your arm around her

8   shoulder; you told her that her fiance is a 'really

9   lucky guy'; you told her that she should let you read

10  her palm; you commented on the student's hair, eye

11  color and jewelry; and you repeatedly attempted to buy

12  her alcoholic beverages despite her repeatedly

13  declining the offer.  The student stated that your

14  behavior made her feel very uncomfortable."

15          Is it fair to say those were the allegations

16  raised by Ms. Diedrich with your office concerning the

17  basis for Roman numeral III in your report that we

18  previously looked at in Plaintiff's Exhibit E-1?

19      A    Those were her allegations with respect to

20  her experience while in Beirut with Dr. Alaei.

21      Q    Okay.  You had said "students" I believe

22  before.  Was there another student complainant or

23  student who had made statements regarding Dr. Alaei

24  that rose to the level of concern about sexual

25  misconduct?

Chantelle Botticelli

1    A    No.

2    Q    "No", is that what you said?

3    A    Not, yeah, not to this level, no.

4    Q    Okay.

5    A    Students raised other concerns about Dr.

6  Alaei.

7    Q    Right.

8    A    Related to Roman numerals I and II.

9    Q    Correct.  And I'll get to that.

10    A    Okay.

11    Q    And so did you ever look into the female

12  student's conduct, Ms. Diedrich, in Beirut in 2018 and

13  whether her conduct possibly constituted sexual

14  misconduct against Dr. Alaei?

15    A    There was another witness that was present

16  and engaged with both of them and observed their

17  interactions while in Beirut.  So yes.

18    Q    So you looked at whether the student's

19  actions constituted sexual misconduct against Dr.

20  Alaei?

21    A    That the facts surrounding the interactions

22  between Dr. Alaei and Ms. Diedrich while they were in

23  Beirut.

24    Q    I believe you said there was another student

25  on the trip.  Are you referring to somebody, she

Chantelle Botticelli

1  wasn't a student, but Leah Gray, or Elizabeth Gray,

2  I'm sorry?

3      A    Yeah, I'm referring to Elizabeth Gray.

4      Q    Do you have a recollection of what Ms. Gray

5  conveyed to you as part of her investigation

6  concerning what she had observed in Beirut concerning

7  interactions with Dr. Alaei and Ms. Diedrich?

8      A    Ms. Gray confirmed the interactions that

9  were described by Leah.

10     Q    Do you recall if Ms. Gray confirmed that she

11  witnessed those alleged interactions?

12     A    She did.

13          I should clarify.  She didn't confirm that

14  she witnessed every single one of them but she said

15  that she confirmed -- or she confirmed that she

16  observed that Dr. Alaei was, I think she said focused,

17  he seemed to be highly focused on both her and Ms. --

18  or her and Leah during the -- I remember the word

19  "focused", right.  She said, and she clarified, she

20  said, "for me it wasn't a big deal because we had a

21  longstanding professional relationship and we were

22  colleagues."  But when Leah expressed to her how Dr.

23  Dr. Alaei's focus made her uncomfortable, Ms. Grey

24  indicated to me that she understood why, that she saw

25  the behavior and she understood why it made Leah

Chantelle Botticelli

1  uncomfortable.  Particularly in light of the fact that

2  Leah was an intern and not a colleague of Dr. Alaei's.

3      Q    Did Ms. Gray raise in her discussion with

4  you her belief that she thought Dr. Alaei's general

5  personality was just intense in terms of focusing on

6  people?

7      A    That sounds familiar.

8      Q    Do you recall, did Ms. Diedrich, did she

9  contact Title IX directly or was this just you learned

10 about that as part of doing the investigation in Roman

11 numerals I and II?

12     A    I don't remember.

13     Q    You don't remember?

14     A    No, I'm sorry, I don't remember.

15     Q    That's all right.

16          Do you know, did Ms. Diedrich ever contact

17 human resources about the issue?

18     A    I don't know the answer to that.

19     Q    Do you know, you did have a discussion with

20 her at one point; is that correct?

21     A    Yes.

22     Q    Do you know, did she contact the police, did

23 she ever convey that to you?

24     A    I don't recall.

25     Q    Do you recall if she ever filed any written

238

Chantelle Botticelli

1  claim or verbal claim with your office regarding the

2  alleged interactions with Dr. Alaei?

3      A    You mean she was reporting as part of the

4  investigation?

5      Q    Yes, did she file an official report or

6  official claim of record?

7      A    I don't remember that that was an option

8  presented to her at the time.  I mean, she was -- she

9  knew that we were conducting an investigation.  She

10 also knew that the information that she was sharing

11 would be included in the investigative report and

12 considered as part of the institution's investigation

13 into Dr. Alaei's conduct, alleged conduct at the time.

14 And she was okay with that.  She was, she was -- I

15 shouldn't say she was okay with it.  She was hesitant,

16 she was concerned, she was nervous, but she agreed to

17 participate in the investigation and to have her

18 account included in our overall investigatory

19 findings.

20     Q    Okay.

21          MR. CASTIGLIONE:  I'm sorry, I'm just

22     looking for something.

23          THE WITNESS:  That's okay.  And I've got

24     about ten minutes and I'm going to need a break.

25          MR. CASTIGLIONE:  That's fine.

Chantelle Botticelli

1          Do you want to take ten minutes, David,

2     we'll come back on at 2:05?

3          MR. WHITE:  Yeah, perfect.

4          (Recess taken)

5          MR. CASTIGLIONE:  Back on the record.

6     BY MR. CASTIGLIONE:

7     Q    When the student, her alleged interactions

8     with Dr. Alaei were raised with you by however means

9     they were raised, did you immediately advise the

10    president of the university or Bruce Szelest?

11    A    I mean, I probably advised them close in

12    time to green light the information.  I don't know

13    that I immediately, like it's not like -- so an

14    immediate alert would be just somebody was just raped

15    on campus --

16    Q    Okay.

17    A    -- right, and I'm picking up the phone in

18    the middle of the night and making the call, right.  I

19    don't remember when I learned about these, these

20    allegations.  I don't remember if it came to me after

21    hours, I don't remember if it came to me during

22    business hours.  Like I said, I don't remember how the

23    allegations came to me, if it was part of the initial

24    report or sometime after.  But I definitely would have

25    told Bruce that there were allegations against Dr.

Chantelle Botticelli

1  Alaei consisting of violations of our sexual

2  harassment policy, and I would have done that quickly.

3      Q    Do you recall conveying that to Mr. Szelest?

4      A    I don't.

5      Q    Do you recall any response he might have had

6  after you first conveyed it to him?

7      A    I don't.

8      Q    You don't?

9      A    I don't, no.

10     Q    There came a time, is it fair to say, where

11 you did advise Bruce Szelest about these allegations?

12     A    Absolutely.

13     Q    Did Mr. Szelest give you any direction on

14 how to move forward after receiving these allegations?

15     A    Not the investigation.

16     Q    Did the president give you any direction at

17 any point about how to move forward or deal with these

18 allegations?

19     A    I am 99.9 percent sure that he did not

20 directly give me any direction.

21     Q    Do you know if the president was giving

22 Bruce information to have Bruce convey it to you

23 regarding this matter?

24     A    I'm sorry, I have no idea.

25     Q    So Bruce had never said anything to you

41

Chantelle Botticelli

1  during the course of this investigation that he was

2  conveying action or direction on behalf of the

3  president?

4      A    I don't remember him saying that.

5      Q    What about James Stellar, did he ever give

6  you any direction about how to move forward or deal

7  with the allegations?

8      A    No.

9      Q    Did you have a lot of interactions with

10 James Stellar on this issue over time?

11     A    No, I don't believe I did.

12     Q    Is it fair to say the investigation at issue

13 here regarding Dr. Kamiar Alaei starting in February

14 2018 was a collaborative investigation with human

15 resources and Title IX?

16     A    Yeah.  I mean, it was a collaborative

17 investigation in that we -- they participated in some

18 of the investigative interviews.  We collaborated on

19 the investigative strategy, like who were we going to

20 interview first or who we were going to interview or

21 not interview, what evidence we were going to collect.

22 We discussed the evidence.  But the bulk of the

23 evidence collection, including investigative

24 interviews, was conducted by my office really because

25 we had the capacity, right.  So it was a, it was -- a

Chantelle Botticelli

1   lot of the distribution of work in this matter came

2   down to capacity and skill.  So we were the more

3   skilled investigators.  I mean, we were the

4   investigators with the most capacity.  And so we --

5   that is the reason why we did the bulk of the evidence

6   collection.

7        Q    Okay.  Is it fair to say that HR, however,

8   made the final decision at the end of the

9   investigation about how to move forward and

10  determining whether there was appropriate action to be

11  taken against Dr. Alaei based on the allegations?

12       A    Yes.

13       Q    In working with human resources, was it

14  Randy Stark and Brian Selchick you primarily worked

15  with at human resources?

16       A    Yes.

17       Q    Who else at Title IX was involved in the

18  investigation?

19       A    My entire staff were the case managers.  So

20  Tricia George was the deputy Title IX coordinator, I

21  think that was her title at the time.  Abby Del Giacco

22  was an investigator and Lisa Recore was an

23  investigator.  And I think all of them did -- they all

24  participated in the investigation.  I don't remember

25  if they all did investigative interviews, although I

Chantelle Botticelli

1    think each of them did.  They definitely helped with

2    evidence collection and, and, you know, organization,

3    right, it's important to be organized.  So they helped

4    with that.

5         Q    Okay.  In your role as associate vice

6    president or otherwise as Title IX coordinator during

7    your time with the university, had you been involved

8    in sexual misconduct allegations for an investigation

9    before the one concerning Dr. Kamiar Alaei?

10        A    Oh, yeah.

11        Q    I'm sorry, I didn't understand that.

12        A    Yes.

13        Q    Okay.  How many other investigations

14   involving faculty had you been involved with in the

15   past while at the university?

16        A    I didn't hear you.

17        Q    Sure.

18        A    Involved with faculty?  So we did many,

19   many, many sexual misconduct investigations generally.

20   Involving faculty, I'm just thinking.  So I worked

21   with so many institutions over the years that it's

22   blurring, so I just want to try to be as accurate as

23   possible.  At UAlbany there's more than just this one.

24   I can't give you a number.  I can't give you a number.

25   There's at least three that stand out to me.  But I'm

44

Chantelle Botticelli

1  sure there was more.  I shouldn't say I'm sure there

2  was more.  I think there was more.  But I don't know

3  how many.  There was some prior to that, though.

4       Q    For the prior instances where you were

5  investigating sexual misconduct allegations concerning

6  a faculty member, was it typical to have the same

7  dedication of employee resources on investigating it

8  as you did for Dr. Kamiar Alaei?

9       A    It depended on the allegations.  So it was

10  not atypical, but we didn't do this for every -- we

11  didn't -- we didn't do -- we didn't move as quickly

12  and allocate as many resources in every matter as we

13  did here.

14       Q    Okay.  So this was -- strike that.  Go

15  ahead.

16       A    There were others that we did put, you know,

17  higher priority on.  And both here and absolutely when

18  I've been working at other institutions.

19       Q    In terms of your time at the university in

20  your capacity as working with Title IX issues, was

21  this investigation more time consuming and used more

22  resources than other investigations you had dealt with

23  while there?

24       A    No, I wouldn't say that it was.  You're

25  saying more -- can you clarify that?

Chantelle Botticelli

1      Q     In other words, sure, sure.  Compared to

2   other investigations did you dedicate more employee

3   resources in terms of you had two or three other

4   people working with you, you were working in concert

5   with human resources, you know, the amount of time and

6   the pace of investigating this matter as compared to

7   others, was this more of an involved -- strike that.

8            Was this more involved compared to the other

9   investigations you had worked on while at SUNY?

10     A     It was certainly one of the more involved

11  investigations given all of the allegations and all of

12  the folks who wanted to express -- all of the students

13  and employees and community members who came forward

14  wanting to understand or share their experience, so

15  wanting to understand what was going on or sharing

16  their own experiences with Dr. Alaei, with both Drs.

17  Alaei, but in this particular case we were focused on

18  Dr. Kamiar Alaei.

19     Q     Were you involved or was your office, Title

20  IX office involved in creating the terms of the

21  alternative assignment for Dr. Kamiar Alaei?

22     A     No.

23     Q     Were you involved with or provided input

24  into how Dr. Kamiar Alaei's alternative assignment was

25  communicated to university students and staff?

46

Chantelle Botticelli

1    A    Involved in how that was communicated.  Yes,
2  yeah.
3    Q    Was that typical when there was a faculty
4  member going on alternative assignment that you or
5  your office would be involved in that type of matter
6  communicating it to students and staff?
7    A    Yeah, usually and, and -- yes.  Yes.
8    Q    What about in terms of communicating Dr.
9  Alaei's alternative assignment to a third party,
10  meaning not students, not university personnel,
11  people, you know, outside of the university, were you
12  involved or provided input into that communication?
13    A    I don't believe so.
14    Q    Was a no contact order under the
15  university's Sexual Violence Response Policy ever
16  considered for Dr. Alaei?
17    A    I don't recall.
18    Q    So you don't recall if there was any
19  discussions on issuing the no contact order versus
20  doing an alternative assignment?
21    A    Well, I mean -- no, I don't recall.
22    Q    Do you recall other investigations
23  concerning sexual misconduct allegations involving
24  SUNY faculty or professors where they were not put on
25  alternative assignment but a no contact order was

Chantelle Botticelli

1    issued?

2        A    Sure I do.

3        Q    Okay.  Do you recall, can you explain to me

4    those instances that you recall?

5        A    Those instances involved might be a

6    complaint by one student against a particular faculty

7    member.  And so a no contact directive between those

8    two individuals would have been effective,

9    particularly if the student didn't have an ongoing

10   need to be in the same academic space as the faculty

11   respondent.

12       Q    Okay.  Do you have any recollection or

13   understanding of why a no contact order was not issued

14   here versus an alternative assignment for Dr. Kamiar

15   Alaei?

16       A    Because the majority of the students that

17   worked in the institute were complaining about their

18   interactions with Dr. Alaei.  And so a no contact

19   order would have made it such that he couldn't have

20   worked there anyway if the students were to be able to

21   continue to access their educational program and

22   activity in the GIHHR.

23       Q    When you say the majority of the students

24   were raising complaints concerning Dr. Alaei, can you

25   explain to me the nature of the complaints that these

Chantelle Botticelli

1    students were allegedly raising?

2         A    Sure.  The complaints, they spanned, right,

3    a spectrum.  Students were raising concerns about Dr.

4    Alaei's general way of interacting with them over --

5    and these are not their words, but the general sense

6    was overfamiliarity.  Some students described behavior

7    that was creepy.  They were highly concerned that Dr.

8    Alaei, Dr. Arash Alaei -- I'm going to use their first

9    names to distinguish.

10        Q    Sure.

11        A    These were concerns that Kamiar was

12   directing either them or their peers to continue to

13   engage with Arash.  Students were very upset about

14   that because they felt as if the university had put

15   them in danger, particularly Dr. -- and Kamiar had put

16   them in danger by continuing to -- and this was their

17   feelings, right --

18        Q    Sure.

19        A    -- this is what they were feeling.  They

20   were putting them in danger or putting them in a

21   vulnerable situation but continuing to require them,

22   Kamiar continuing to require them to engage with

23   Arash.  And so those were concerns that were raised by

24   students.

25             Students also raised concerns about how work

49
Chantelle Botticelli

1   was, how work was -- the assignments that were, that

2   they were given by Kamiar, promises that they were

3   made about salary and -- salary and credits that they

4   would receive that were then broken.  Unreasonable

5   expectations about the number of hours they worked.

6   For example, I remember one student reporting that

7   Kamiar had indicated to them that they couldn't take

8   sick leave even if they were sick.  And then if they

9   did things, students also raised concerns about

10  retaliatory conduct by the brothers.  And that was the

11  big concern across the board, because this is a thrust

12  that, that Kamiar and Arash were well-respected,

13  well-known in the field that these students were

14  trying to eventually find careers in, and they were

15  concerned that anything that they did, any complaints

16  that they raised would impact their ability to be

17  successful in their careers.

18        Q    Let me ask you about Arash Alaei.  Were you

19  involved in investigating Arash Alaei concerning

20  sexual misconduct allegations at the university in

21  2017?

22        A    I was.

23        Q    Dr. Arash Alaei, if I can refer you to

24  claimant's, or excuse me, Plaintiff's Exhibit G-2.  As

25  part of your investigation concerning the Roman

Chantelle Botticelli

1  numerals I and II that were identified in your Title

2  IX report, which was I believe Plaintiff's Exhibit

3  E-1, did you ever inquire whether anybody at SUNY

4  Albany directed Dr. Kamiar Alaei not to have Arash

5  Alaei interact with GIHHR students or staff at any

6  time in 2017 or 2018 after Arash Alaei separated from

7  the university?

8      A    Yeah, I asked the question, "did anybody

9  explicitly tell Kamiar that."

10     Q    Okay.  What was the answer provided?

11     A    There was no -- there was no -- no one that

12 could say "I did".  I mean, that's the only way to

13 answer it, right.

14     Q    Do you recall who you asked?

15     A    Bruce, Randy.

16     Q    So Bruce Szelest, Randy Stark?

17     A    I think that's it.

18     Q    Did you ever talk to Dr. Harvey Charles

19 about it?

20     A    You know, I don't remember any interactions

21 with Dr. Charles.  I know that there definitely was

22 some, but I don't -- I could walk into Dr. Harvey

23 Charles today and I'd have no idea who he is.

24     Q    So it's fair to say during the investigation

25 you didn't have much if any interaction with

Chantelle Botticelli

1    Dr. Harvey Charles involving the investigation

2    concerning Dr. Kamiar Alaei?

3        A    I honestly don't remember.  And it, it

4    wasn't, like you said, it wasn't much.  If there was

5    any, maybe I -- maybe we spoke to him.  I know that he

6    was part of a conversation with the students when they

7    were -- when they were demanding that we give them an

8    explanation as to why Arash was still participating

9    and Kamiar was forcing them to participate with Arash

10   or requiring them to participate with Arash.

11       Q    Okay.  If I can refer you to what was

12   previously identified as Plaintiff's Exhibit G-2,

13   which is a response by the defendants in this

14   litigation to certain document demands.  Number three,

15   excuse me, number one, asks for "copies of documents

16   relating to alternative assignment given to Arash

17   Alaei in or about 2017-2018, including copies of any

18   directives, guidance or protocols provided by SUNYA to

19   SUNY personnel about the terms of Arash Alaei's

20   alternative assignment, including whether he was able

21   to be in contact with interns or other individuals

22   working at SUNYA such as GIHHR staff and GIHHR

23   employees, including any such guidance, directive, or

24   protocols provided to Dr. Kamiar Alaei or Dr. Harvey

25   Charles or SUNY human resource personnel."

Chantelle Botticelli

1              Ultimately the defendants, you know, raised

2    objections, but provided certain documents, Bates

3    stamped number 20593.  20593 is several documents,

4    including the alternate assignment letter, dated

5    February 10, 2017, to Dr. Arash Alaei.  It identifies,

6    "You are further expressly prohibited from having any

7    verbal, written or electronic communication with any

8    current or former students or employees except as

9    approved in writing by Dr. Charles."  And then the

10   document was sent to Dr. Charles as a C recipient.

11             Do you recall seeing this document either

12   during your investigation of Arash Alaei or during

13   your investigation of Kamiar Alaei about Arash Alaei

14   having contact with students or GIHHR staff or

15   personnel?

16        A    I don't recall seeing this document.  But

17   it -- I don't recall.  So I'm not saying I didn't, I

18   just don't recall.

19        Q    Do you recall having any discussions with HR

20   personnel, such as Randy Stark, about whether or not

21   they have any record about if Arash Alaei was able to

22   communicate with students or employees during his

23   alternative assignment if he received approval from

24   Dr. Charles?

25        A    No, I don't recall.

Chantelle Botticelli

1      Q      Do you recall having discussions with HR

2   personnel, such as Randy Stark or Brian Selchick,

3   regarding whether this alternative assignment document

4   was ever shared with Kamiar Alaei and whether he was

5   given a copy of this?

6      A      My recollection is that when Dr. -- when

7   Arash was placed on leave, on alternate assignment,

8   former HR representative Kathy Tretheway was involved.

9   And I, I think that Kamiar was present when Arash was

10  told he was being placed on alternative assignment.

11     Q      So do you know what was said when Arash was

12  told, as you just conveyed, and Kamiar was present?

13     A      No.  I wasn't, I wasn't in that

14  conversation.

15     Q      Okay.

16     A      So I don't know exactly what was said.  But

17  I do know there was a conversation when Arash was

18  placed on alternative assignment.  I believe Kathy

19  Tretheway facilitated that conversation or was a part

20  of that conversation.  And my recollection is that

21  Kamiar was present for that conversation with Arash.

22  That is my recollection.

23     Q      Okay.  Was that ever raised in your report

24  regarding Dr. Kamiar Alaei as when you were doing the

25  investigation regarding what we had talked about as

54

Chantelle Botticelli

1   Roman numeral I and Roman numeral II?

2        A    I think it was.  I don't know, I'd have to

3   -- can I look at my report?

4        Q    Sure.  I'm referring you now to your report,

5   Plaintiff's Exhibit E-1.  Is there a specific section

6   you want me to refer you to?

7        A    Keep going, I'll tell you when to stop.

8   Past this to the body of the report.

9        Q    So keep going down?

10       A    Oh, wait, wait, go back up.

11            Oh, no, go back down, I'm sorry.  I wish I

12  could scroll it.  So let's stay here.

13            Yeah, so Arash Alaei was personally informed

14  of the alternative assignment by human resources

15  personnel Kathy Tretheway.  A meeting held at the

16  office of human resource management.  The term of the

17  alternate assignments were discussed with AA.

18  Michelle DeOcampo, she reported she was present at

19  meeting.  She also reported that Kamiar was present at

20  the meeting.  However, subsequent conversations with

21  Ms. Tretheway where the alternative assignment was

22  issued to Arash Alaei in the Office of Human

23  Resources.  According to Tretheway, the only folks

24  were herself, Kamiar Alaei and Dr. Charles.  So yeah,

25  that's why I remember that.

Chantelle Botticelli

1      Q    Do you know if the alternate assignment that
2  was communicated during that meeting included terms
3  about expressly he was not to be in contact with
4  students unless approved by Harvey Charles, do you
5  know if that was communicated verbally?
6      A    No.  But it was communicated -- I don't know
7  if it was communicated verbally, but it was
8  communicated in that alternative assignment.  And my
9  understanding of Ms. Trethaway's practice, having
10  worked with her for several years, is that she would
11  go through that letter and all of the requirements,
12  and say pursuant to this alternative assignment you
13  are required to do this, you're not allowed to do this
14  and this is what this requires, do you have any
15  questions.  So that's my understanding of her -- of
16  the way she would have done that.  And I'm trying to
17  think back to our conversation about whether or not
18  she confirmed that she did it that way, and I don't
19  remember.  But that was her general practice.  So she
20  would know.
21      Q    Are you aware of whether or not Kamiar Alaei
22  was a supervisor of Arash Alaei in February 2017 or at
23  any point thereafter?
24      A    My understanding was that they ran that,
25  that center as co-directors.  But I -- that could be

Chantelle Botticelli

1   wrong.

2        Q    But would that be, do you know if he was

3   supervisor of Arash Alaei, charged with overseeing his

4   employment obligations?

5        A    I don't know.

6        Q    Do you know if Dr. Harvey Charles was Arash

7   Alaei's supervisor at the time in 2017?

8        A    I think that he was.

9        Q    Okay.  Do you know who Linda Kryzowski is?

10       A    No, I'm sorry.  The name sounds familiar,

11  but I don't know who she was.

12       Q    So you wouldn't know if she was a supervisor

13  for Arash Alaei at some point in 2016, '17 or '18?

14       A    No.

15       Q    In terms of the issue about Arash

16  interacting with GIHHR staff and students, after he

17  separated with the university, did you ever review the

18  separation agreement between Arash and the university?

19       A    You know, I think I saw it, I think I did

20  see it.  But I don't remember what the terms were or

21  what it said.

22       Q    If I can show you Claimant's G-3,

23  Plaintiff's Exhibit G-3, excuse me.

24            Plaintiff's Exhibit G-2, scrolling down.

25  Okay, I'm referring you to a document included in

Chantelle Botticelli

1    Plaintiff's Exhibit G-2.  It's identified as

2    Stipulation of Settlement between the State University

3    the New York, University at Albany and Arash Alaei.

4    I'm just going to scroll through it so you can take a

5    look.  Do you recall as I'm scrolling through this

6    reviewing this document as part of your investigation

7    concerning Kamiar Alaei?

8         A    I honestly don't remember.

9         Q    Do you recall asking anybody if the terms of

10   Arash Alaei's separation had been communicated to

11   people outside of human resources as part of their job

12   responsibilities going forward once Arash Alaei had

13   separated from the university?

14        A    I'm sorry, can you repeat your question?

15   I'm not trying to be difficult, I want to make sure I

16   get it.

17        Q    No, that's fine.  Do you recall asking

18   questions to anybody about whether or not Arash

19   Alaei's separation and the terms of his separation had

20   been conveyed to anybody at SUNY Albany in terms of

21   Dr. Alaei or Harvey Charles with direction that they

22   not allow him to interact with GIHHR staff or students

23   after he separated from Albany?

24        A    Yeah, I think there was a question that

25   was -- that I asked, yes.

Chantelle Botticelli

1    Q    Do you recall who you asked that question?

2    A    Again, it would have been the folks in HR.

3  And it would have been -- it would have -- okay, so it

4  would have been the folks in HR, and definitely Bruce.

5  So I remember asking the question of Bruce, having a

6  conversation about this question with Bruce.  I

7  remember having the conversation with Randy and Brian.

8  And I'm trying to recall if I actually also reached

9  out to Kathy Tretheway to ask her, because I, I feel

10  like I would have done that.  But I don't know if I --

11  I don't know with -- I don't remember if I did or not.

12  And it might have been based on when she left here and

13  when the separation occurred, she might not have still

14  been here.  So I don't remember speaking to Kathy. I

15  just, I wanted to think more closely about whether or

16  not I had.

17    Q    That's all right.

18         During your investigation was Kathy

19  Tretheway still working at the University at Albany?

20    A    The investigation into Kamiar?

21    Q    Yes.

22    A    I don't believe that she was.

23    Q    Do you recall if she was working somewhere

24  in the area or was she retired?

25    A    She worked at SUNY systems.

Chantelle Botticelli

1    Q    So SUNY systems, is that the main SUNY?

2    A    Yeah.  She was in the counseling office.

3    Q    Okay.  Do you know if she's still there by

4  any chance?

5    A    She retired.

6    Q    Okay.

7    A    I think.  I'm quite sure actually.  I don't

8  want to say -- I'm quite sure she's retired now.

9    Q    Okay.  In your experience when doing Title

10  IX investigations and, you know, following up making

11  conclusions and determining whether actions should be

12  taken against accused faculty members, was it normal

13  practice to convey employment related determinations

14  to SUNY staff or other faculty so that they knew what

15  the outcome was and whether or not the person had any

16  restrictions or limitations in their ongoing

17  employment or if they were let go?

18    A    That was something that human resources

19  would take care of.  That -- that wouldn't be

20  something that I would do.  Yeah, I don't, I don't

21  remember doing that.

22    Q    Do you recall whether Dr. Kamiar Alaei had

23  his email access removed once he was put on

24  alternative assignment?

25    A    I'm quite sure they did.

Chantelle Botticelli

1      Q    Do you know why that was done?

2      A    I think it was protocol for when an employee

3  was placed on alternative assignment.

4      Q    Was that a determination made by the

5  president or Bruce as far as you're aware?

6      A    I don't know who made that determination.

7  Like I said, I think it was protocol.

8      Q    Did your office at the outset of learning of

9  allegations from the student about sexual misconduct,

10 alleged improper actions, determine that Dr. Kamiar

11 Alaei presented a continuing threat to the health and

12 safety of the community?

13     A    Wait, can you say that again, I'm sorry.

14     Q    Sure.  At the outset of the investigation

15 and when you learned about these statements from the

16 student about alleged sexual misconduct concerning Dr.

17 Alaei, did you determine at that time that Dr. Alaei

18 presented a continuing threat to the health and safety

19 of the community?

20     A    I think so, but I'm trying to -- just give

21 me a second to --

22     Q    Take your time.

23     A    So the allegations that were being made

24 overall, okay, were, were serious.  And, like I

25 mentioned earlier, there was a very large spectrum of

Chantelle Botticelli

1  concerns raised by a large number of students.  Some,

2  some -- and some former students, a couple of

3  community members, maybe some staff.  Some students

4  were also staff so the line was blurred.  Student

5  staff had graduated and stayed on as staff, if I

6  remember correctly.

7          So it wasn't just about the allegation of

8  sexual harassment.  There was a lot of concern and a

9  lot of students saying I feel unsafe in the GIHHR

10  under Kamiar's supervision, right.  And their

11  definition of feeling unsafe varied, right.  And my,

12  in my role my primary concern was the health and

13  safety of the students.  And we had, like I said, a

14  number of student complaints and concerns being

15  raised.  And given the volume of the concerns and the,

16  the content of the concerns, what the students were

17  expressing, I, I do recall making a recommendation

18  that given this, if these allegations are in fact

19  true, this is concerning.  And so while the

20  investigation is pending, Kamiar should not have

21  interaction with these students.  That was my

22  recommendation.  And I guess HR placed him on an

23  alternative assignment.

24      Q    Is it fair to say you assumed the truth of

25  the allegations being raised by these various students

Chantelle Botticelli

1    as you're stating?

2         A    Absolutely not fair to say at all.

3         Q    Okay.  Before you made that recommendation

4    did you have any discussion with Dr. Kamiar Alaei to

5    determine his position or his counter story as to

6    those issues?

7         A    No.

8         Q    Why not?

9         A    That wasn't our process, right.  So the

10   process was always you receive the complaints, you

11   assess the severity of the complaints, and then you

12   make a determination, right, as to what -- as to

13   whether or not the respondent for their own protection

14   and for the protection of the students be separated

15   from engaging with the complainants, right.  And

16   again, there was many here.  And it wasn't just about

17   the students' safety, it was also about Dr. Alaei's

18   safety.  And so our process was to take in the

19   complaint and then to do a thorough investigation.

20   That's why it was an alternative assignment and not an

21   immediate termination.  It was an alternative

22   assignment to keep everybody separated and safe while

23   we looked at the allegations more deeply.  And this

24   was common at UAlbany to do that, and I think most

25   workplaces.

Chantelle Botticelli

1     Q    Before making that determination, though,

2   about whether he presented a continuing threat to the

3   health and safety of the community, were you

4   prohibited from talking with him first before making

5   that decision about, you know, separating for the

6   entire duration of the investigation based on, you

7   know, the preliminary information you had from

8   students?

9          MR. WHITE:  Objection to form.  You can

10        answer.

11    A    Was I prohibited?

12    Q    Yeah.  So, in other words, was there a

13  reason why you couldn't do that?

14         MR. WHITE:  Objection to form.  You can

15        answer.

16    A    There was no reason that I, I guess couldn't

17  do that.

18    Q    Did the president have a similar opinion at

19  the outset that you did about based on the allegations

20  that it was determined that Dr. Kamiar Alaei was a

21  health and safety concern for the community and that

22  he should be removed from the community?

23         MR. WHITE:  Objection to form.  You can

24        answer.

25    A    I don't know what the president's opinion

Chantelle Botticelli

1   was.  And I think I mentioned earlier, I don't, I

2   don't recall having a conversation, detailed

3   conversation directly with Dr. Rodriguez about what

4   we're discussing now ever.

5        Q    How about Bruce Szelest, did he ever express

6   the opinion to you at the outset of the investigation

7   that he believed Kamiar Alaei presented a health and

8   safety concern to the community and that the best

9   option was to remove Dr. Alaei from campus and have

10  him on alternative assignment?

11       A    I don't remember if I talked to Bruce -- I

12  don't remember what Bruce's position was.

13       Q    Do you recall the available information that

14  you looked at to determine if immediate remedial

15  action should be taken to have Dr. Kamiar Alaei

16  separated or removed from campus to prevent any

17  interactions with students and staff?

18            MR. WHITE:  Objection to form.  You can

19       answer.

20       A    Do I remember what I looked at before making

21  the recommendation, is that the question?

22       Q    Yes.  What available information did you

23  seek out and look at to make that determination?

24       A    You know what, I'm sorry, but I don't

25  remember.  I do know that I spoke with Dr. Stellar,

Chantelle Botticelli

1    who was the initial reporter, and I spoke with

2    students from the GIHHR.  I spoke to the complainant.

3    Students that were raising the complaints and the

4    concerns.  I don't think I spoke to all 40 something

5    of them, but I spoke to a number of them.

6         Q    Okay.  During the investigation were there

7    discussions by Randy Stark, you and Brian Selchick

8    about seeking to push for non-renewal of Dr. Alaei

9    based on the allegations being raised as reflected in

10   your report, Roman numeral I, Roman numeral II and

11   Roman numeral III?

12             MR. WHITE:  Objection to form.  You can

13        answer.

14        A    Your question is did we talk about seeking

15   to push non-renewal as in -- I don't remember that

16   conversation, I don't remember having that

17   conversation about pushing anybody to not renew.

18        Q    What about having any discussions with Randy

19   Stark or Brian Selchick about advocating termination

20   of Dr. Alaei's appointment based upon the allegations

21   in Roman numerals I, II and III from your report?

22             MR. WHITE:  Objection to form.  You can

23        answer.

24        A    We, we certainly discussed the -- we

25   certainly discussed -- there were certainly

Chantelle Botticelli

1    discussions about the allegations that were raised,

2    the evidence that either supported or did not support

3    those allegations, the severity of the allegations,

4    the implication of the allegations for the safety of

5    the students at the GIHHR and more broadly safety of

6    the larger university community.  And then there was

7    discussion about what to do, and that discussion

8    included the option of not renewing Dr. Alaei.

9        Q    Based on the allegations that you were

10   investigating being reflected in Roman numerals I, II

11   and III of your report?

12       A    There was no other reason -- there was no

13   other conversation about non-renewing unrelated to

14   anything other than those allegations.

15       Q    Okay.

16       A    We didn't sit down and say hey, let's just

17   non-renew Dr. Alaei for, for no reason or for some

18   sort of reason unrelated to the three things in the

19   investigative report.

20       Q    So the discussions about I guess pursuing

21   non-renewal or looking into the non-renewal of Dr.

22   Alaei based on the three Roman numerals in the report,

23   that was the limitation of issues that would serve as

24   the basis for having discussions about whether to

25   non-renew for his continued employment?

Chantelle Botticelli

1    A    Right.

2    Q    Okay.

3         Did Bruce Szelest ever convey to you his

4    opinion that SUNY Albany should non-renew Dr. Alaei

5    based on the allegations you were investigating in

6    Roman numerals I, II and III?

7    A    I don't -- should non-renew based on the

8    allegations -- Bruce agreeing that non-renewal was a

9    potential remedy for all of the -- all of the

10   allegations that were being made, because the

11   allegations were concerning to all of us, right.

12   There was lots of allegations being made by lots of

13   students who were not only making allegations but

14   demanding that we listen to those allegations, right.

15   And so they weren't just -- we didn't have to like

16   convince students to come in and talk to us.  They

17   were so upset about what had occurred in that center,

18   and Dr. -- both Dr. Arash Alaei and Dr. Kamiar Alaei's

19   conduct, they were so upset about it, right, that they

20   were willing to share.

21        Fifty, 40, almost 50 witnesses came forward.

22   That was not common, right.  And that was not at our

23   prying or insistence.  They were just walking into my

24   office saying "I want to talk to you about what's

25   going on here, we are upset."  And so this was very

Chantelle Botticelli

1    concerning to everybody.  Because our students did not

2    feel safe, they felt betrayed, they didn't -- they

3    felt a significant distrust for the process.  And, and

4    it needed to be addressed.  And the allegations that

5    they were making were serious.

6        Q    Do you recall at the outset of the

7    investigation attending a meeting with GIHHR staff and

8    students concerning Dr. Arash Alaei and Kamiar Alaei

9    being replaced by two interim directors?

10       A    Yes.

11       Q    If I can refer you to Claimant's Exhibit

12   C-2, Plaintiff's Exhibit C-2 of Dr. Alaei.

13            Plaintiff's Exhibit C-2 is an email dated

14   February 9, 2018 from Jordan Carleo-Evangelist.  It

15   looks like you're a recipient, intended recipient of

16   this email.  If you can take a look, it says,

17   "importance, high.  Attached, GIHHR meeting talking

18   points."

19       A    Okay, I've read it to the bottom.  Thank

20   you.  Okay.

21       Q    Do you recall SUNY personnel having a

22   meeting or convening a meeting with GIHHR staff and

23   students about Dr. Kamiar Alaei and the issue of Arash

24   Alaei communicating with students?

25       A    Yes, I remember the meeting, yup.

Chantelle Botticelli

1      Q     Okay.  This email is referring to talking

2    points.  Did you have any input into developing these

3    talking points that are attached to this email?

4      A     Yes.

5      Q     Did you attend this meeting reflected in

6    Plaintiff's Exhibit C-2 that was held on February 9,

7    2018?

8      A     I did.

9      Q     You've been talking about students raising a

10   number of complaints and coming forward.  Did those,

11   did students raise those types of complaints at this

12   meeting dated February 9, 2018?

13     A     They expressed their concerns at this

14   meeting, yeah.

15     Q     The concerns you had just been raising about

16   how students, you know, interacting with Arash Alaei,

17   students, you know, not being happy or being afraid of

18   Kamiar Alaei based on how he ran GIHHR, were those

19   types of concerns raised at this meeting?

20     A     Those types of concerns were raised in

21   advance of the meeting by students individually.  And

22   when they came to the meeting, I don't -- I don't

23   remember exactly or like which of the concerns were

24   actually explicitly raised at the meeting, but there

25   was an overall -- the students were raising their

Chantelle Botticelli

1  overall concern and asking for information.  To my

2  recollection it was very much how did the -- how did

3  the university let this happen.

4       Q    But were concerns, when you say they were

5  raising concerns and how did the university let this

6  happen, can you explain what you are referring to, so

7  in other words, was it concerns about Kamiar Alaei and

8  their interactions with him and how he ran GIHHR?

9       A    Yes.  They were concerned that, one -- well,

10  no, let me, I want to be -- I remember them being

11  concerned that Arash Alaei was still an active

12  participant in the daily business of the institute,

13  that Kamiar was directing students working at the

14  institute to engage with Arash.

15       Q    After his separation; correct?

16       A    During his assignment and after his

17  separation.

18       Q    Okay.

19       A    And I remember that coming up at the

20  meeting.  That other concerns might have come up at

21  the meeting, but those are the concerns that I

22  remember.  And the students were explicitly asking

23  questions about the investigation and the

24  investigative findings with respect to Arash and what

25  the institution was going to do to address Kamiar's

Chantelle Botticelli

1    putting that -- address what the institution was going

2    to do to address that Kamiar in their opinion had put

3    them in an unsafe position by requiring them to

4    continue to engage with Arash.

5        Q    Okay.  So there were complaints that Kamiar

6    Alaei put the students in an unsafe position by having

7    them interact with Arash at this meeting?

8        A    I think so.

9        Q    Were there allegations or complaints raised

10   by Kamiar, you know, you had mentioned not a lot of

11   people have sick time or doing certain work --

12       A    Yes.

13       Q    -- or changing expectations.  Were those

14   raised at this meeting?

15       A    I don't, I don't remember.  I don't think

16   so, but I don't remember.

17       Q    Okay.  At this meeting did anyone explain

18   that Kamiar Alaei was Arash Alaei's supervisor in 2018

19   and 2017?

20       A    I don't remember.

21       Q    Did anyone explain whether Harvey Charles

22   was Arash's supervisor in 2017 and overseeing

23   implementation of his alternate assignment and about

24   whether he can talk to students or not?

25       A    I don't remember.

Chantelle Botticelli

1      Q    Do you know if during your investigation

2  about Arash Alaei and interacting with students when

3  he was on alternative assignment, did you ever ask

4  Harvey Charles if he had emails between him and Arash

5  where Arash was asking him if he could specifically

6  interact with certain students regarding GIHHR work

7  while on alternative assignment?

8      A    You are triggering a memory for me that

9  isn't clear.  So I think I asked the question, and I

10  feel like I received a response, but I don't remember

11  what that response was.  So if you have something to

12  show me, that --

13      Q    I will get to that at some point and I will

14  ask you.  So I just didn't have it here right now, but

15  I will get that after I assume our next break.

16      A    Another hour.

17      Q    Okay, if I can refer you to Plaintiff's

18  Exhibit F-1 and F-2.  Plaintiff's Exhibit F-1 --

19      A    I remember this.

20      Q    Okay.  Can you identify to me or explain to

21  me what your understanding of Plaintiff's Exhibit F-1

22  is?

23      A    A letter from the students, a letter

24  collectively from students in the GIHHR.  There was

25  several signatories, I don't remember how many, but a

Chantelle Botticelli

1  lot, raising concerns about the university's handling

2  of the GIHHR issue, the institute.

3      Q    Now, I want to go through this with you.  Do

4  you recall, was this letter issued after the meeting

5  on February 9, 2018?

6      A    I don't remember.  I don't remember.

7      Q    Okay.  So I'm just going to, I'm going to go

8  through this slowly.  Do you recall if this letter

9  reflects the same issues raised at the meeting on

10 February 9, 2018, or if it raised limited issues or

11 more issues than what was raised during that meeting?

12     A    This is the gist of what was raised at the

13 meeting.

14     Q    So this letter, Plaintiff's Exhibit F-1,

15 encompasses or reflects the gist of what students and

16 staff had raised at the meeting on February 9, 2018

17 regarding their concerns with GIHHR, Arash Alaei and

18 Kamiar Alaei?

19     A    Yeah.

20     Q    I'm sorry, was that a "yes"?  I didn't

21 understand that.

22     A    Yes.  Yes.

23     Q    Okay.  I'm going to show you now what's been

24 identified as Plaintiff's Exhibit F-2.  And I'll

25 scroll through this and if you can see if you

Chantelle Botticelli

1    recognize this.

2        A    I've never seen this document.

3        Q    No?

4        A    No.

5        Q    So you don't know what this document is; is

6    that fair to say?

7        A    Yeah, I don't, I don't know what this

8    document is.

9        Q    Okay.

10       A    David showed this to me already and I looked

11   at it and I don't know what this is.  I don't know

12   what the points are.  Or it looks like somebody wrote

13   into the document.  I don't know what those are.

14       Q    So as you sit here today you don't have any

15   understanding or recollection of what this document

16   is?

17       A    No.  And I am quite sure that I have never

18   seen this document before.

19       Q    Okay.

20       A    There were some documents where I'm like I

21   don't know, maybe I saw it, like the separation

22   agreement.  I'm quite sure I have never seen this

23   document.

24       Q    Okay.  During your time as Title IX

25   coordinator or otherwise as associate vice president,

75

Chantelle Botticelli

1   did your office ever accept complaints or process

2   statements about former employees of SUNY Albany?

3        A    Did we accept complaints or process -- what

4   do you mean by process statements?

5        Q    So if somebody came in and said I want to

6   make a statement about a former employee here that

7   might involve or involve Title IX related issues, did

8   you ever accept such statements and, you know,

9   undertake a recording of them, either written or

10  orally, and, you know, take them as part of your Title

11  IX files?

12       A    I did.

13       Q    Okay.  So was that a regular occurrence?

14       A    Yeah, and it -- it happens.  Students or

15  community members, people would come forward to raise

16  concerns about former employees.  And we would, we

17  would listen to those concerns, we would document

18  those concerns and we would -- and we would offer

19  support, right.  One of -- one of the goals and a

20  priority of our office, right, was -- one of the goals

21  and the priorities of our office was to make sure that

22  folks who felt as if they had experienced sexual

23  misconduct had a place to report and to seek

24  resources, right.  So it wasn't just about, most of

25  the time, about discipline.  A lot of the time it was

Chantelle Botticelli

1   about this happened to me, I don't want the university
2   to do anything or I recognize the university can't do
3   anything because this person isn't here anymore,
4   right, but I want the university to be aware of this.
5   And, and for -- people had all different reasons why
6   they wanted us to know.  And then we would provide
7   resources to them, right.  Here's resources in your
8   community, or our community if folks were still living
9   in the Albany area.  So that was -- that was one of
10  the things that we did.  So it wasn't overly common
11  for folks to come in and want to make complaints about
12  people who still weren't members of the Albany
13  community, but if they did come in, we certainly
14  engaged with them.
15      Q    Okay.
16           MR. CASTIGLIONE:  I was going to start with
17      a new line of questions.  I'm just asking if you
18      want to take a break or if you want to keep
19      going.
20           THE WITNESS:  Can I ask you, and I'm not
21      trying to rush you, I'm happy to spend my day
22      with you, but how much longer do you think it's
23      going to be?  If it's going to be like a half
24      hour then let's push through, but if it's not --
25           MR. CASTIGLIONE:  No, I would probably,

Chantelle Botticelli

1      look, I'm trying to do it too, I would say 4:30

2      the latest.  I'm trying.

3           THE WITNESS:  Okay.  No, it's fine.  I do

4           need a break, though, then.

5           MR. CASTIGLIONE:  Okay.  So do you want to

6           take five minutes or ten minutes?

7           THE WITNESS:  No, five minutes is good.

8           MR. WHITE:  So 3:13 we'll be back, Joe, all

9      right?

10          MR. CASTIGLIONE:  All right.  Thank you.

11          (Recess taken)

12  BY MR. CASTIGLIONE:

13      Q    Your report for Roman numerals I, II and III

14  on the first page.  Roman numeral I starts off, it

15  says, "insubordination, general misconduct for

16  permitting Arash Alaei to conduct business."  Number

17  II, it's the same type of the language.  And number

18  III says "a violation of University at Albany sexual

19  harassment policy."

20          How did you determine that it would be

21  insubordination and general misconduct as it relates

22  to Roman numerals I and II?

23          MR. WHITE:  Objection to form.  You can

24          answer.

25      A    It was a -- it was a conversation about

Chantelle Botticelli

1    potential policy violations of human resources.

2        Q    Okay.  So a discussion between you and human

3    resources, meaning Randy Stark and Brian Selchick, and

4    you guys agreed about what the potential violations

5    would be?

6        A    It's -- yes.  To help the investigators

7    assigned to participate in the investigation

8    understand the scope of the investigation.

9        Q    So for points one and two, insubordination,

10   what would be the basis for the insubordination

11   allegations?

12       A    I was not the university official charged

13   with the implementation of the policy that listed

14   subordination as problematic.  But my understanding,

15   right, is that that was included because there were

16   allegations, subsequently evidence, to support, with

17   respect to Roman numeral I, to support a finding, if

18   true, that Arash Alaei during his alternative

19   assignment and after his separation from the

20   university was still involved in the day-to-day

21   business of the institute.  By that I mean he was

22   directing staff, student staff.  He was engaged in

23   conversations about compensation of staff.  He was

24   engaged in conversations about budget and how funds

25   from the center, including a million dollar grant that

Chantelle Botticelli

1  helped fund the trip to Beirut was spent.  Not only

2  was he involved in that process, but in some areas he

3  was directing that process.  And that was concerning.

4  Just like it would be concerning if the current Title

5  IX coordinator at UAlbany today called me and said

6  hey, can you do my budget.  I don't work here anymore,

7  right.

8          And so that's what we were seeing.  We were

9  seeing this person, who no longer works here,

10  allowing -- right, we were seeing a person who's

11  charged with the oversight and direction of the

12  institute, Kamiar, allowing somebody who doesn't work

13  here anymore, and who he knew didn't work here

14  anymore, run the day-to-day business, at least in

15  part, of this center.  And so that was the grounds for

16  the general misconduct allegation and the

17  insubordination allegation that we were asked to more

18  fully investigate.

19      Q   Would the insubordination, though, I mean,

20  wouldn't that necessarily require that there was some

21  directive given that Dr. Kamiar Alaei ignored or

22  refused to comply with?

23          MR. WHITE:  Objection to form.  You can

24      answer.

25      A   Isn't it just an implicit directive that you

Chantelle Botticelli

1  can't have a essential non employee running an entire

2  institute of students?  I mean, I -- I mean that,

3  honestly, that's my answer to that question.  Do you

4  actually have to be given a directive saying you may

5  not have a stranger run your institute?

6      Q    Are you aware of whether or not human

7  resources ultimately determined that there was no

8  basis to support those allegations about allowing

9  others to run the institute?

10          MR. WHITE:  Objection to form.  You can

11      answer.

12      A    Can you repeat your question?

13      Q    Sure.  Are you aware of whether or not human

14  resources ultimately determined there was no basis to

15  support the allegations of misconduct about allowing

16  others to, outside of the GIHHR, to run the GIHHR or

17  otherwise financial misappropriations of GIHHR money?

18          MR. WHITE:  Objection to form.  You can

19      answer.

20      A    I don't know the answer to that.  But your

21  question was why did you include insubordination and

22  general misconduct, and my answer is because there was

23  allegations that he was letting this other person,

24  Arash Alaei, this former employee, run the day-to-day

25  business at least in part of the institute.  And so

81

Chantelle Botticelli

1  that's why we included that, right, as part of the

2  scope of our investigation.

3      Q   So when you say running the day-to-day

4  operations of GIHHR, would that information be

5  attached or referenced in this report?

6      A   Yeah.  It's discussed throughout the report,

7  the allegations of the students and sticks.  I'm using

8  the words "students" and "staff" kind of

9  interchangeably.  I probably shouldn't be doing that.

10 Some folks were just student interns, some folks were

11 just students, and others were student staff and

12 others were staff that used to be students.  So there

13 was, there was a lot of different institutional

14 identities working in this center.

15     Q   Did you ever ask anyone familiar with the

16 grant process or use of fundings, funding at GIHHR,

17 whether or not there was protocol that had to be in

18 place or whether or not there was approval by people

19 outside of GIHHR required for use of any funding that

20 was held by GIHHR or in the name of GIHHR?

21     A   I think that was discussed with respect to

22 one of those grants, particularly the million dollar

23 grant, right.  That there was some conversation, it

24 might have been with Michelle DeOcampo.  Oh, this is

25 Michelle DeOcampo's thing here.  Maybe if not Michelle

82

Chantelle Botticelli

1  there was another.  September Johnson was very

2  involved, if I recall, with the business aspect and

3  the money aspect.  And I think that there was some

4  mention about how some government agency, I don't

5  remember the name of it, was somehow involved in the

6  spending of the grant.  But I don't remember the

7  details.  I think it's in here somewhere.

8         MR. WHITE:  Joe, just for the record, the

9      witness referenced Michelle DeOcampo's statement

10      that's in Plaintiff's Exhibit E-1, I think it was

11      Bates number five.

12         MR. CASTIGLIONE:  Yes, Bates number five.

13     A    Maybe, it might have also been September

14  Johnson who talked to me a lot about the money.  I

15  don't remember.  I'd have to read the report.  Those

16  two names are standing out to me as folks that gave me

17  a lot of information.  I just don't remember.

18     Q    Michelle DeOcampo, it appears that this is

19  the summary of what she had conveyed to you.  Does

20  that appear correct?

21     A    Yes.

22         MR. WHITE:  And again, just for the sake of

23      clarity, it's Plaintiff's E-1, Bates number five.

24         MR. CASTIGLIONE:  Yes.

25     A    And this is not a summary of just what

Chantelle Botticelli

1  Michelle DeOcampo told me.  Some of what she shared is

2  referenced.  This is more of a summary of my

3  understanding of the business.  I shouldn't say the

4  business.  Of what was happening generally in the

5  institute between February 10th, 2017 and November

6  something 2017.

7       Q    I'm just looking at Michelle DeOcampo's

8  statement in part, this middle paragraph on page five

9  or Bates stamped five.  And, I'm sorry, it says "it

10  also included providing direction as to the spending

11  of GIHHR funds."

12            Was Ms. DeOcampo aware of whether or not

13  when she made that statement, people at possibly the

14  SUNY Albany Foundation or other such, you know, type

15  of entities at SUNY were required to take an

16  application, review it and determine whether spending

17  of any money was appropriate?

18       A    I don't -- I mean, my understanding, my

19  personal understanding of the process is that's

20  consistent with what you're saying.  But I don't

21  remember what she said about that.

22       Q    I mean, could some of these allegations

23  about spending money, it could have just been based on

24  a total ignorance of the actual process by Ms.

25  DeOcampo, for example?

Chantelle Botticelli

1      A    Ms. DeOcampo --

2           MR. WHITE:  Objection to form.  You can

3      answer.

4      A    Sorry.

5           Ms. DeOcampo was clear that when there

6    was some -- when there was questions about how they

7    there going to spend money, she would talk to Arash,

8    and Arash would direct her and Kamiar, or she would

9    ask Kamiar and Kamiar would say go ask Arash.  And so

10   they would be, right, like any other supervisor.  You

11   go to the supervisor first, are we going to spend this

12   money, yes, go ahead, do it, and then you follow the

13   process.  That's what she was describing, right.

14           So whatever the process was, she wasn't

15   making decisions about whether or not to engage in

16   that process for spending.  She was getting direction

17   from Arash about whether or not she needed to go

18   through the process to spend the money.  Does that

19   clarify, am I being clear?

20      Q    No, I understand.  You're saying it's more

21   Arash would essentially identify how to request that

22   moneys be spent from grant, how they be used.  But

23   then once the process was submitted to the SUNY Albany

24   Foundation or whatnot, there was some separate

25   approval process she wasn't involved with or aware of?

Chantelle Botticelli

1       A      Maybe, right.  I just know definitely yes to

2    the first part of what you just summarized.  Arash

3    would direct how they spent the money that was

4    available to them, in similar circumstances, not all

5    of them, right.  And Kamiar was aware that that was

6    happening.

7       Q      So I'm looking at, this is Bates stamped

8    seven of Plaintiff's Exhibit E-1, the Title IX report.

9    This is again a summary, it appears to be discussing

10   spending of money but appears to be based on again

11   Michelle DeOcampo and her statements.

12      A      Yeah.  It's based on that and all of the

13   emails, right, that supported what she was saying,

14   right.  So she's saying she reported this and thank

15   you for sharing this.  She reported that Arash was

16   doing things like developing an updated budget for the

17   limited environment, some grant.  That she was on

18   conference calls with both brothers in which they

19   talked to her about how to rework this budget.  So

20   they were giving her direction together.  That Arash

21   played a significant role in planning the Beirut trip

22   and spending the UAlbany funds relative to that trip.

23   And then there was also, and I don't remember if

24   Michelle gave me this, I don't remember where we got

25   the emails, but there was emails, right, that

86

Chantelle Botticelli

1  corroborated what Michelle was telling us, right.  So

2  emails between Arash and her about spending that

3  Kamiar was talking about.

4      Q    Okay.  If I can refer you to Plaintiff's

5  Exhibit C-5.  Plaintiff's Exhibit C-5 is an email from

6  James Dias dated April 13, 2018 to Bruce Szelest.

7          Did you know during the investigation who

8  James Dias was?

9      A    He was the institutional research VP I

10 think.  I think that's what he did, something about

11 research.

12     Q    Okay.  I'm going to refer you to this last

13 paragraph here.  It says, "if for some reason Arash

14 has been permitted to involve himself in any current

15 projects, it has been without our knowledge or

16 consent.  One final thought, at the time when Arash

17 left, the RF/SUNY at UAlbany offices were never

18 officially notified by the campus so that we could

19 formally remove him from awards.  My staff heard

20 thirdhand and proactively took steps on their own to

21 stop all activity.  I think there is a gap in the

22 campus process to notify the appropriate offices.  I

23 know that Kevin Wilcox voiced his concern about the

24 issue because there was activity on the state side as

25 well.  Perhaps a confidential need to know memo,

Chantelle Botticelli

1   particularly when someone is on administrative leave,

2   would be appropriate".  It's identified as James Dias,

3   Vice President for Research, Research Foundation

4   Operation Manager for University at Albany.

5          Did you have any discussions with Mr. Dias

6   about GIHHR and the use of grant money for matters

7   that were allegedly involving Arash Alaei during your

8   investigation?

9      A    I don't remember.

10     Q    I mean, this sentiment that he is expressing

11  in this email about offices not knowing, no official

12  notice to people on campus, I mean, did that seem

13  consistent with your understanding about whether or

14  not Arash's separation and his terms had been

15  communicated or not to people like Dr. Kamiar Alaei or

16  Harvey Charles or others involved with work that Arash

17  was dealing with in 2018?

18          MR. WHITE:  Objection to form.  You can

19      answer.

20     A    My focus during the investigation was not

21  about what everybody else knew.  It was about what

22  Kamiar knew.  And irrespective of whether or not the

23  university told Kamiar that Arash doesn't work for the

24  GIHHR anymore and therefore shouldn't be spending the

25  money or directing the spending of money, it was

Chantelle Botticelli

1   irrelevant to me because there was a bunch of other
2   evidence that showed that Kamiar did know that Arash
3   didn't work for the institution anymore, right, that
4   he did know that Arash was spending or directing the
5   spending of the institute's money.  So that's what I
6   was focused on during my investigation.

7        Q    Apart from the separation agreement, apart
8   from the alternative assignment, did you identify any
9   provisions that would prevent somebody, a third party
10  like Arash from having that type of involvement that
11  you were looking into at GIHHR or collaborating with a
12  director at GIHHR on those issues?

13       A    Did I find a policy or a prohibition that
14  said if a person doesn't work for the University at
15  Albany, the Research Foundation or any other state
16  authority that oversees the spending of university
17  money, did I find a policy that said folks other than
18  those groups are prohibited from directing the
19  spending, no, I did not find a policy explicitly that
20  said that.

21       Q    Did you find any policy that prohibited
22  GIHHR from bringing on consultants or individuals to
23  partner in that type of capacity as part of your
24  investigation?

25       A    No.  But my understanding from being an

Chantelle Botticelli

1  employee here is that if we were going to be working

2  with the public, there needed to be some sort of

3  consulting agreement than just, right, and I was aware

4  of no such consulting agreement.

5      Q    Did you ever speak with Dr. Kamiar Alaei

6  about that issue to determine if there had been some

7  sort of agreement to allow Arash to have some such

8  type of participation?

9      A    No.

10          MR. CASTIGLIONE:  David, I just sent you a

11      new exhibit, and it's just these emails with

12      Arash and Harvey Charles.

13          MR. WHITE:  Okay.

14          (Plaintiff's Exhibit M was marked for

15      identification.)

16      Q    I'm now referring you to what's been

17  identified as Plaintiff's Exhibit M.  Plaintiff's

18  Exhibit M includes an email from Harvey Charles dated

19  June 4, from Harvey Charles dated June 4, 2017 with

20  Arash Alaei at a Albany.edu email, stating "my report

21  and communication with interns."  The email says,

22  "Hello, Arash.  I have inquired of HR and am awaiting

23  advice on this matter.  I have conveyed that we need

24  to know as soon as possible.  I'll be in touch as soon

25  as I hear something.  Best, Harvey."  It appears to be

Chantelle Botticelli

1   responding to an email from Arash dated June 13, 2017

2   which says, "Dear Harvey, I hope this email finds you

3   well.  As you know, I have been assigned to work

4   remotely to develop grant proposals and send report to

5   you.  Writing grant is a progressive effort and time

6   consuming.  Given it takes time to identify relevant

7   grant opportunities and develop grants, could you

8   please advise me how quickly you want to send you a

9   regular report in order to have a more tangible

10  output."  It then continues, saying, "In addition, I

11  just wanted to inform you that I need to have Skype

12  communication with" an individual identified as a DrPH

13  student, two other individuals identified as PhD

14  students, and then another individual identified as a

15  UAlbany alumni.  And it says, "they are GIHHR's

16  interns and I need to have Skype meeting with them to

17  develop grant proposals.  Looking forward to hearing

18  from you.  Best, Arash."

19           During your investigation did you ask Harvey

20  Charles for any email communications he might have had

21  with Arash as to Arash asking to communicate with

22  GIHHR staff or interns as provided for in his

23  alternate assignment agreement?

24       A    I think that it -- I don't remember if I

25  did.  The emails would have been attached as exhibits

Chantelle Botticelli

1  to the report.

2      Q    Okay.

3      A    So, so if you can point me to either the

4  exhibits or lack of exhibits.

5      Q    Got you.

6           So, E-1.  Documents received in review on

7  page three of Plaintiff's Exhibit E-1, would this

8  reflect documents you reviewed as part of your

9  investigation concerning allegations concerning Dr.

10  Kamiar Alaei reflected in Roman numerals I through III

11  in this report?

12          (Witness perusing documents)

13      A    If you can scroll, if you can scroll down.

14      Q    Yeah.

15          (Witness perusing documents)

16      A    If you can scroll down.

17          (Witness perusing documents)

18      A    Okay.

19      Q    Other than those emails that I listed on the

20  Bates stamped page three, four and five of the Title

21  IX report, would there be any other documents that you

22  reviewed as part of your investigation concerning

23  Kamiar Alaei in 2018?

24      A    You know, I don't think -- not as part of

25  the investigation.  I'm now wondering, right, because

Chantelle Botticelli

1    you asked the question earlier and I had said it

2    triggered some recollection.  I'm wondering if after

3    the investigation I might have seen additional

4    documents more related to the spending, but I don't

5    remember.

6         Q    So when the investigation concerning an

7    allegation about Kamiar Alaei allowing or facilitating

8    Arash Alaei communicating with interns and staff

9    during his alternative assignment, Arash Alaei's

10   alternative assignment, did anyone say let's ask the

11   supervisor, Harvey Charles, per Arash Alaei's

12   alternative assignment if he was having communications

13   seeking to talk to interns and Harvey Charles or human

14   resources was approving it?

15             MR. WHITE:  Objection to form.  You can

16        answer.

17        A    I don't remember.

18        Q    Did Harvey Charles or anybody at human

19   resources explain at the meeting on February 9, 2018

20   that Arash had been communicating with his supervisor

21   about whether or not to have discussions with interns

22   or communications with interns and staff, which was

23   allowed as part of his alternative assignment with Dr.

24   Charles?

25             MR. WHITE:  Objection to form.  You can

Chantelle Botticelli

1    answer.

2       A    I wasn't aware that he was given a blanket

3    approval to talk to interns and staff.  That was your

4    question, no.  With respect to particular interns and

5    staff, it looks like from this email he was requesting

6    permission to speak to three interns.  I wouldn't know

7    what the outcome of that was.

8             MR. WHITE:  For the record again, Joe, the

9         witness is referencing Plaintiff's Exhibit M-1.

10            MR. CASTIGLIONE:  Yes, Plaintiff's Exhibit

11        M-1.  And just for the record it appears to

12        identify four interns at the time --

13       A    Oh, I'm sorry.

14            MR. CASTIGLIONE:  -- for developing grant

15        proposals.

16       Q    But do you know, did anybody ask are there

17   other emails, I mean, were there other instances that

18   Arash might have been contacting Harvey Charles and

19   asking to talk to other people?

20       A    I don't remember.

21       Q    Do you remember anybody specifically asking

22   Harvey Charles about the issue?

23       A    Like I mentioned earlier, this conversation

24   is triggering memories that are unclear.  So I don't

25   want to say nobody asked him because I'm having this

Chantelle Botticelli

1    recollection of conversations with Harvey Charles

2    about this issue.  But these are unclear memories, so

3    I can't say for sure that they happened.  I don't know

4    if it's just thinking they had happened because of you

5    asking the question, or they actually happened.  So my

6    answer is I don't recall.

7        Q    But at the meeting on February 9, 2018 you

8    don't recall Harvey Charles or anyone from human

9    resources responding that Arash had the ability to ask

10   us for permission and he did ask us for permission on

11   occasion, and possibly permission was given on

12   occasion by Harvey Charles or HR in response to the

13   students' concerns about Arash interacting with

14   students while he was on his alternative assignment?

15           MR. WHITE:  Objection to form.  You can

16       answer.

17       A    I don't remember that coming up on February

18   9th.  February 9th is the meeting with the students;

19   correct?

20       Q    GIHHR staff and students.

21       A    Okay.

22       Q    Okay.  So back to the report, Plaintiff's

23   Exhibit E-1.  The report says, it says "response time

24   line," there's an initial date 2/2/2018 and it says

25   "event, report received".  It then says, "TC Bruce

95

Chantelle Botticelli

1    Szelest."  It says then, "emails to schedule meetings
2    with initial three student reporters."  Do you have
3    any recollection of what that's referring to?

4        A    Yeah, I -- yeah.  I received the report from
5    Dr. Stellar.  I let Bruce know that I received the
6    report from Dr. Stellar, and I asked, I think I had
7    asked Bruce if he could help me get a better
8    understanding of the basis of the report, right.  So I
9    need to reach out to Randy, I need to reach out to HR,
10   is that okay with you, right.  If I was going to
11   collaborate with another office I wanted my supervisor
12   or my supervisor liaison to know that.  And then I
13   reached out to the three students who were raising
14   concerns, or at least three students who had raised
15   the initial concerns to Dr. Stellar, to schedule
16   meetings with them.

17       Q    Okay.  At the beginning of the report it
18   says, "The following report details the University at
19   Albany's coordinated response to a report received on
20   February 2nd, 2018 from James Stellar.  Specifically,
21   the report alleges that several students reported to
22   him that Dr. Arash Alaei has been interacting with
23   students in violation of a Stipulation of Settlement
24   entered into by and between Dr. Arash Alaei and the
25   University on September 18, 2017."

Chantelle Botticelli

1          Now, back referring to this response time

2    line date, February 2nd, 2018, is it fair to say then

3    that what Dr. Stellar had conveyed to you and the

4    three student reporters was involving that issue of

5    Arash Alaei interacting with students in violation of

6    the Stipulation of Settlement?

7          A    Yes.

8          Q    Okay.  And that was limited to that issue

9    or, you know, generally Arash communicating or

10   interacting with staff and students?

11         A    I believe yes.  The initial report from Dr.

12   Stellar focused on the students' concerns that Dr.

13   Arash Alaei was still engaging with them as if he was

14   still a director at the center or the institute.

15         Q    This then continues, it's 2/5/2018, it

16   identifies some meetings and then it says, "interview

17   of" and it's blacked out.  And I assume that's Leah

18   Diedrich, do you recall?

19         A    I don't remember.  I don't know why that's

20   blacked out.

21         Q    2/6 there's additional information, 2/7

22   additional information.

23         Is it fair to say this report is accurate,

24   or excuse me, this time line is accurate in terms of

25   dates identified corresponding with the events you've

Chantelle Botticelli

1  listed in the report?

2      A    Yes.

3      Q    Okay.  So it looks like your first meeting,

4  based on this, with Michelle DeOcampo occurred on

5  2/9/2018?

6      A    Yes.

7      Q    Okay.  So you didn't have any information

8  from her about the allegations she was raising

9  concerning Dr. Kamiar Alaei reflected in your report

10 until at the earliest 2/9/2018; is that fair to say?

11     A    Yes.

12     Q    And it looks like, you had said September

13 Johnson, it looks like there was an email or interview

14 of September Johnson on 2/6/2018.  Is it fair to say

15 that's the first time you obtained information from

16 September Johnson about her interactions or her

17 concerns with Dr. Kamiar Alaei?

18          I'm sorry, did you say yes?

19     A    Yes, I said yes, and then I said excuse me.

20     Q    That's all right, I just didn't hear it.

21          At the bottom of Bates stamped page two of

22 Plaintiff's Exhibit E-1 it says "individuals

23 interviewed."  It identifies Michelle DeOcampo and

24 September Johnson as employees.  Is that your

25 recollection, they were employees of GIHHR at the time

Chantelle Botticelli

1    they were giving statements?

2        A    Yes.

3        Q    So they weren't students, they were just

4    employees?

5        A    I would have to review their full statement

6    to have an accurate answer to that statement.  Whether

7    they were student employees or employees, I don't

8    recall.

9        Q    I'm just looking at the continued list, it

10   identifies at number five and six somebody as a GIHHR

11   student employee.

12       A    Okay.

13       Q    Would that refresh your recollection if you

14   made a distinction between just an employee and a

15   student employee?

16       A    Yes.  So if I didn't make that distinction

17   then, unless I made a mistake in the report, which is

18   possible because I'm not perfect, but my, my

19   recollection would be that if they were designated

20   just as employees at the time that I interviewed them,

21   they were employees of the institute and not students.

22       Q    Okay.

23       A    I think there were former employees, former

24   students involved, and then they graduated and stayed

25   on as employees.

Chantelle Botticelli

1      Q    So they, it's likely number two and three,

2   Michelle DeOcampo and September Johnson had been

3   student interns of GIHHR, they graduated from school

4   and then stayed on as employees of GIHHR?

5      A    Yes.

6      Q    This reflects, if you continue down on Bates

7   stamped page three, 43 individuals were interviewed as

8   part of your investigation.

9      A    Yes.

10      Q    Okay.  How did you go about identifying the

11   people to interview for your investigation as

12   reflected on this list of one through 43?

13      A    Yeah, sure, that's a good question.  So many

14   of them came directly to us.  As I mentioned earlier,

15   there were students who would just walk into the

16   office and want to talk to us about their experience

17   or their concerns.  Others were during the

18   investigative interviews named, right, they were

19   colleagues who, you know, they may have had additional

20   information.

21          And I think it was our practice and I don't

22   know that we did this for everyone, but for most folks

23   we would have asked a question like along the lines of

24   at the end of the interview is there anybody that you

25   think we should speak to.  We wanted to get as full of

Chantelle Botticelli

1  a picture of what was happening at the institute,

2  right, because again, serious allegations.  The

3  students were very upset.  And we really wanted to get

4  this right, not only for the students but for Kamiar

5  Alaei, right.  He was -- we were as concerned about

6  him as we were about them when we were trying to be

7  thorough and accurate in our investigation.  And so we

8  wanted to speak to as many people as possible, right,

9  to get an understanding, is what these students -- are

10  the allegations that are being made by some of these

11  students supported and corroborated by other folks.

12  If yes, right, that's important to know.  If not,

13  that's also really important to know.

14      Q    So what was the safety benefit or well-being

15  benefit for removing Kamiar Alaei from his job

16  position and prohibiting him from going on school or

17  emailing him at the outset of the investigation?

18      A    What was the safety benefit.  The safety to

19  whom, the students or to him?

20      Q    To him.

21      A    You have 43 students up in arms saying,

22  right, a report, a large number of students, not all

23  43 of those were up in arms about it, right, but a

24  large number of students, enough to fill a conference

25  room here in University Hall of students who were

Chantelle Botticelli

1   upset based on information that they had about what

2   they believed he did or didn't do, right.  And so we

3   also had concerns for him, right, continuing to engage

4   with these students who were angry with him, who felt

5   that he had betrayed their trust, who felt that he, he

6   had them in a vulnerable and unsafe position by

7   directing them to continue to engage with his brother,

8   right.  And so if he -- if the evidence showed that he

9   did not do the things that they were alleging, right,

10  we wanted to make sure that he was protected.

11          The other benefit is integrity of the

12  investigation, right.  Like you just want to separate

13  these people because there's high, high emotions

14  coming from these students.  Whether they were

15  justified or not, they were upset.  They were upset at

16  the university and they were, as that letter that they

17  wrote together showed, they were upset at Kamiar.

18  They say in the letter not only is the university at

19  fault but so is Kamiar Alaei.

20          And so we were also concerned for him,

21  right.  And I understand that might be hard for

22  someone in his position to understand.  But it is, it

23  is -- when you separate a person during an

24  investigation, it is not just about protecting the

25  complainants, it's also about protecting the

Chantelle Botticelli

1    respondent from the complainants and protecting the

2    respondent by ensuring that there is -- there is

3    integrity in the investigation.  There's no way if

4    they're separated the complainants can say Kamiar is

5    trying to influence the way I discussed the evidence

6    in this case, right.  That's one way of protecting

7    them by separating them.  So it's not -- it's not a

8    disciplinary action to do an administrative

9    reassignment during an investigation.  It's not

10   discipline, right.  It is, the goal is protecting the

11   parties and the institution.

12        Q    So you're referring to the UUP process; is

13   that fair to say?

14        A    I'm referring to the alternative assignment,

15   right, because that's part of the UUP process, sure.

16   Yeah, it's about -- it's not -- it's not about

17   disciplining or, or, what's the word I'm looking for,

18   like harming the respondent, right.  I understand that

19   it might feel that way.  And I've had conversations in

20   other contexts with respondents where we're placing

21   them on alternative assignment or a temporary leave,

22   right.  We explain to them this doesn't feel good,

23   right, it might feel like discipline, but we're

24   trying -- we're also looking out for your interests

25   here, which includes making sure that this

Chantelle Botticelli

 1   investigation is done completely and thoroughly and

 2   that the integrity of the investigation is protected.

 3   So that's the answer to your question.

 4       Q    So if the students were raising concerns

 5   about Kamiar Alaei facilitating or allowing Arash to

 6   interact with students and staff when Arash was on

 7   alternative assignment and then after separation, why

 8   didn't anybody in the February 9, 2018 meeting say we

 9   had a -- Arash is separated, on alternative

10   assignment, he was given the opportunity to interact

11   with students if it was approved by Harvey Charles and

12   human resources, and there were instances where Arash

13   was asking Harvey Charles for permission to interact

14   and it was conveyed to human resources and here is the

15   result of those.  So why didn't anybody raise that in

16   defense of Kamiar Alaei at that February 9, 2018

17   meeting?

18           MR. WHITE:  Objection to the form.  You can

19       answer.

20       A    I don't know the answer as to why nobody did

21   that.  But --

22       Q    Did anybody -- sorry, go ahead.

23       A    But his, Arash's interactions with students

24   went beyond interacting with a couple of them.  He was

25   interacting with everybody every day at the institute

Chantelle Botticelli

1    like he still worked there.  And so I think that that

2    response would have just gotten them more angry,

3    right.  Okay, so he was allowed to interact with some

4    people, which means we weren't controlling this

5    process, we weren't really controlling it because he

6    was interacting with all of us.

7         Q    When you say --

8         A    And Kamiar knew it.

9         Q    When you say he was "interacting with all of

10   us," is there a distinction between Arash on

11   alternative assignment and Arash after separation

12   there?

13        A    He was engaged in the everyday business,

14   according to these students, in the everyday business

15   of that center during his alternative assignment and

16   after his alternative assignment.

17        Q    So during his alternative assignment, it was

18   referenced in his email that you recall, Arash was

19   allowed to apply for grants and that was in fact part

20   of his job, at least as he's raising in his email to

21   Harvey Charles?

22        A    Yes.

23        Q    Does anybody know if the grants were issued

24   that he was seeking in his job for GIHHR at the time

25   or were issued in his name and required his

Chantelle Botticelli

1    involvement in order for the grants to be administered

2    and funding to be released for the GIHHR matters?

3        A    I don't know.  Sorry, I don't know the

4    answer.

5        Q    Okay.  Did anybody investigate that issue to

6    say he's directing spending of money through grants,

7    is he a recipient of the grant and required to have

8    participation and involvement in directing spending

9    and use of those grants money?

10       A    I don't know the answer to that.  But I

11   think one of the things we were focusing on too

12   insofar as the spending, was the spending he was doing

13   after he was fully separated, right.  So he was doing

14   a lot of spending with respect to the Beirut

15   conference.  He was not on alternative assignment

16   then.  He was --

17       Q    So after -- sorry, go ahead.

18       A    I said he was separated at that point in

19   time.

20       Q    So after he separated from GIHHR, did anyone

21   look in to say did Arash apply for and receive grants

22   that are still in his name, and for us to use them he

23   still has to be involved and directing use of the

24   moneys from those grants even though he's separated

25   from GIHHR, because those grants are still being used

Chantelle Botticelli

1  by GIHHR staff and students?

2          MR. WHITE:  Objection to form.  You can

3      answer.

4      A    I don't know the answer to that.

5      Q    Okay.  Did anybody at the February 9 meeting

6  in 2018 say nobody here has told Kamiar Alaei that

7  Arash is not to have any continuing involvement with

8  GIHHR period, even though he's separated?

9      A    I don't remember.

10     Q    I'm going to continue with this Plaintiff's

11 Exhibit E-1, the investigation report.

12     A    Okay.

13     Q    It says "Investigation Findings Relevant to

14 Allegations I and II" on Bates stamped page five.

15 There's then a sub, it says February 10, 2017 to, I

16 can't tell, it's blocked out, but it's November

17 something 2017 I think.  And this is information from

18 Michelle DeOcampo.  Then if you keep scrolling down,

19 there's an email chain regarding a GIHHR board of

20 directors, Elizabeth Dufort, regarding August 7, 2017.

21          In her email, you can read through it, at

22 some point she raises "additionally, do you think the

23 advisory board", it looks like affiliated faculty,

24 "should be made aware/updated of the blank of

25 transparency," it's blocked out.  But is it, as far as

Chantelle Botticelli

1    your understanding from what Ms. Dufort was raising,

2    was she raising that the board of directors of GIHHR

3    and affiliated faculty and the advisory board had not

4    been made aware of issues involving Arash Alaei's

5    employment with SUNY University at Albany in 2017?

6         A    That's what her email says.

7         Q    Did anybody look into that issue about

8    whether there had been any kind of formal notification

9    to the board of directors at least or affiliated

10   faculty about Arash's status and what the limitations

11   were on his employment at the time?

12        A    I believe I spoke to Liz Dufort and

13   confirmed that she had not, as a member of the board

14   of trustees, been made aware of Arash Alaei's

15   separation and the circumstances surrounding his

16   separation.

17        Q    Was it a separation or was it also an

18   alternative assignment if the email was dated August

19   7, 2017?

20        A    I don't remember.

21        Q    The stipulation of settlement appears to be

22   from September 18, 2017.  Announces his resignation.

23            There are some other concerns, and then

24   there's one, two, three, three individuals that raised

25   concerns in addition to Ms. DeOcampo and obviously

Chantelle Botticelli

1  Leah Diedrich.  Was there any investigation into these

2  issues raised by these other individuals under Roman

3  numeral IV, "other concerns", on Bates stamped page

4  nine of Plaintiff's Exhibit E-1?

5       A    You can scroll down a little.  If you go to

6  the top.  Sorry to --

7       Q    Yeah, no, that's fine.

8            (Witness perusing documents)

9       A    I believe questions were asked of other

10  students, right.  So Abby interviewed a lot of people

11  I remember, I believe asking questions, particularly

12  about the concerns raised by Isabel.

13       Q    Okay.  As you can --

14       A    In the right order.

15       Q    As you can --

16       A    In the right order.

17       Q    I'm sorry, go ahead.

18       A    In the right order.

19            The other, the other additional

20  investigation was we collected documents related to

21  her additional allegations here.

22       Q    Do you recall ever making any formal finding

23  about the allegations Ms. Pinheiro is raising here?

24       A    No.

25       Q    If you continue on, at Bates stamped page 10

Chantelle Botticelli

1  of Plaintiff's Exhibit E-1 it continues on with it

2  amounts to be a more in-depth statement or recounting

3  of the statement from Ms. DeOcampo.  It looks like she

4  was the one about raising using sick time, and Kamiar

5  Alaei allegedly not agreeing to that.  There's then a

6  more detailed recitation about allegations or comments

7  from September Johnson at page Bates stamped page 11

8  of Exhibit E-1, but that appears to be it.

9           Is it fair to say that September Johnson and

10 Michelle DeOcampo are the primary people providing

11 information or allegations regarding Kamiar Alaei and

12 how he was running or otherwise operating GIHHR, apart

13 from facilitating or allowing Arash to interact with

14 students and interns?

15          MR. WHITE:  Objection to form.  You can

16     answer.

17     A    It's not fair to say.  Three other students

18 identified above, who were also raising similar

19 concerns about how they ran, engaged with the

20 students, how they ran the center and how they engaged

21 with the students.  And there's themes, okay.  Hooman

22 says, he asked me doing writing for him and he's

23 taking credit.  And Michelle DeOcampo, the same thing.

24     Q    Was there any formal conclusion or findings

25 as to that allegation by Hooman Movassagh?

Chantelle Botticelli

1    A    So there was no formal, as we talked about
2    earlier, findings with any of this.  It's just a
3    collection of information.  And we were collecting
4    information to then be turned over to HR, and they
5    were going to decide what to do with the information.
6            And so it -- but your question, is it fair
7    to say that only Michelle and September raised
8    concerns about the way Kamiar was operating and
9    engaging with students at the GI -- at the Institute,
10   and the answer is no.  There was 46 students that
11   engaged with us, almost all of whom were raising some
12   sort of concerns that related either to the way they
13   were managed, the way they were paid, the way
14   expectations were set, the way that Kamiar engaged
15   with them, right, his boundaries with respect to their
16   personal, their professional relationships, his
17   boundaries with respect to their personal
18   relationships.  There's student after student after
19   student coming in and making bits and pieces that put
20   together this big picture that said this person is not
21   right.  Put it all together, and the allegations were
22   this person is running this institute in a way that is
23   inconsistent with the way we expect our faculty to
24   engage with students and to engage in the operations
25   of running something like an institute of this size.

Chantelle Botticelli

1      Q      Did you look into whether or not there were

2   governing bylaws or operating protocols that were

3   agreed to for GIHHR when it was created as an

4   institute at the university?

5      A      I don't remember.

6      Q      In this report, back to Plaintiff's Exhibit

7   E-1, you provided more information from allegations by

8   September Johnson, you provided more information from

9   Michelle DeOcampo, as well as then the three

10  individuals listed under "other concerns".  With the

11  list of 43 people interviewed, how come you only

12  provided an elaboration of allegations from those five

13  individuals and not from others as you just conveyed

14  who were raising concerns?

15     A      So their, their -- their testimony, right,

16  was also part of, or the information that they

17  provided was also part of the investigative record,

18  right.  You have the recordings of all of the

19  information.  So this was just a high level summary of

20  the most significant allegations brought about.  But

21  there was, like I mentioned earlier, many of these

22  people on this list were raising concerns that

23  contributed to or were corroborative of themes that

24  we're seeing laid out in the report.

25     Q      Are there transcripts of the interviews for

Chantelle Botticelli

1  these 43 people?

2      A    I don't remember if there's -- they're,

3  they're documented.  The, the summaries of the

4  interviews or the recordings of the interviews exist,

5  or at least they did when I left the office.

6      Q    So at the time you had tape recordings of

7  each interview of these people listed, one through 43,

8  on the Title IX report of Plaintiff's Exhibit E-1?

9      A    Yes.

10     Q    The file keeping process for Title IX during

11 your time, would you be able to access files for --

12 strike that.

13         Were files maintained, individual files for

14 each investigation concerning a claim of sexual

15 misconduct by a faculty member?

16     A    Yes.

17     Q    Would you be able to just locate those in

18 the filing system and say here are the allegations or

19 here's the denials related to allegations of sexual

20 misconduct about faculty members and find those?

21     A    There was -- it was not -- it wasn't

22 separated into here's a group of files about faculty.

23 It was for every -- so the system was, a report would

24 come in.  The report would be given a report number.

25 The details of the report would be added to a

Chantelle Botticelli

1    spreadsheet.  And then each report would get its own

2    electronic folder in our secured shared drive, shared

3    with the Office of Diversity and Equity.  And then

4    each folder would contain the evidence obtained during

5    the investigation, including evidence of investigative

6    interviews.

7        Q    Okay, so there were, okay.  And were they

8    maintained under a specific identified file or program

9    in your computer system?

10       A    Yeah, but I don't remember what the name of

11   that was.  But it was an organized -- it was an

12   organized recordkeeping system, right, it was

13   organized.  It was all organized when I -- when I was

14   there.  I don't know, when my predecessor came in she

15   might have adjusted the recordkeeping system, but I

16   don't know.

17       Q    An issue was raised at some point about

18   Barry Sherman also allegedly being able to interact

19   with students apparently under the oversight of Kamiar

20   Alaei.  Do you recall that?

21       A    I recall it but I don't recall the

22   circumstances or the facts surrounding it.

23       Q    Okay.  If a student's or a former student's

24   complaint or statement about Kamiar Alaei, which was

25   made in 2019, would that have been included as part of

Chantelle Botticelli

1    the materials you reviewed in 2018?

2        A    Say that again?

3        Q    Sure.  If a former student or a student made

4    a complaint or statement to Title IX in 2019, would

5    that have been included in your review of the

6    investigation and allegations against Dr. Alaei in

7    2018?

8        A    I'm sorry, I'm looking like that because I'm

9    so confused.  Are you asking if I went back in time?

10       Q    I'm asking if you would be able to consider

11   something raised in 2019 as part of your investigation

12   in 2018.  I would assume the answer is no, but that's

13   me.

14            MR. WHITE:  Objection to form.  You can

15            answer if you understand the question.

16       A    I don't understand your question.

17       Q    Sure.  If a complaint was raised concerning

18   Kamiar Alaei or a statement was raised about Kamiar

19   Alaei in 2019 by a former student, that clearly would

20   not have been included in your investigation or

21   something you reviewed in 2018?

22       A    Clearly.

23       Q    Okay.

24       A    I'm so confused, sorry.  I'm not trying to

25   be difficult.

Chantelle Botticelli

1       Q     No, I'm just trying to create a record, so I
2  appreciate it.
3       A     It would be hard.  Maybe there was a typo,
4  right.  So why don't you show me what you are talking
5  about.
6       Q     You know what, let's see.
7       A     So that the record is clear.
8       Q     Do you recall reviewing this sexual
9  misconduct summons report 19-046 allegedly from a
10 report received on March 1st, 2019 as part of your
11 investigation in 2018 concerning Dr. Alaei?
12            MR. WHITE:  Objection to form.
13      A     Okay.  It's scrolling too fast for me, I'm
14 so sorry.
15            (Witness perusing documents)
16      A     So want to discuss an experience with Dr.
17 Kamiar Alaei.  You can scroll down.  Scroll down.
18      Q     Is this something you reviewed in 2018 as
19 part of your investigation?
20            MR. WHITE:  Objection to form.
21            (Witness perusing documents)
22      A     No, it's not something I reviewed in 2018.
23 Like I mentioned earlier, right, it is not uncommon
24 for us to get a report from folks who are reporting
25 something that historically happened against somebody

Chantelle Botticelli

1  who's nobody -- no longer here.  Because our goal at
2  the Title IX office was to make sure that they were
3  heard and they were able to share their experience and
4  that we connected them with support.  So it's, I don't
5  think it's odd that Leah, the Title IX coordinator at
6  the time, actually sat down with that student to hear
7  her complaint about Kamiar.  Which is what I would
8  have done.

9       Q    In those instances in the past would human
10  resources also sit in on such matter when they were
11  recording a statement or taking a statement from a
12  former student about a former employee?

13      A    Sometimes, I think so, yeah.  And also this
14  particular coordinator.  So I don't know what -- what
15  Leah's practices were.  She may have always had human
16  resources engaged when there was a complaint about an
17  employee.

18      Q    Got you.

19           If I can refer you to what's been identified
20  as Plaintiff's Exhibit A-6.  Do you recall the time
21  when your investigation concerning Dr. Alaei came to
22  an end in the sense that you stopped soliciting
23  evidence or looking for evidence and ultimately
24  prepared that report that's Plaintiffs' Exhibit E-1?

25      A    Yes, there was a time where I stopped doing

Chantelle Botticelli

1   those things.

2        Q    Do you recall when that was, approximately?

3        A    No.  I'm frustrated with myself for not

4   indicating that on the report.

5        Q    I'm showing you what's been marked as

6   Plaintiff's Exhibit A-6.  It's a letter from my law

7   firm, Young/Sommer to Randy Stark.  It's dated May 21,

8   2018.  It says in part, "regarding written response

9   supplementing meeting held on May 9, 2018."

10            Were you aware there came a time where HR

11   conducted an interrogation of Dr. Alaei under the UUP

12   process?

13       A    I was -- I think I was aware that it was

14   happening, but I don't know when happened.  Did it

15   happen on May 9th?

16       Q    It happened on May 9th.

17       A    My last day at the university was May 10th.

18   So I was probably like I don't care, I'm out, right.

19       Q    Understood.

20            So it's fair to say then you didn't consider

21   this May 21, 2018 letter as part of your investigation

22   for Title IX matters?

23       A    I was not here when that letter came in.

24       Q    Is it fair to say you didn't consider what

25   was discussed at the meeting on May 9th of 2018, the

Chantelle Botticelli

1    interrogation, as part of your investigation

2    concerning Kamiar Alaei?

3        A    Yes.  And there's a why.  Thank you for

4    asking that question.  That is why there are no

5    findings in my investigative report.  The

6    investigative report and the purpose of the

7    investigative report was to gather all of the

8    information from the complainants, get an

9    understanding of, of their perspective, gather as much

10   information from other folks who weren't complaining

11   but would have had the opportunity to observe, right,

12   Dr. Kamiar Alaei's interactions and the allegations

13   surrounding those interactions, so that we could then

14   turn that over to human resources, who would then

15   conduct the interrogation.  And that is why -- thank

16   you, this is refreshing my recollection.  That is why

17   we never spoke to Kamiar, because he was a unionized

18   employee, and the process was that we would not, the

19   Office of Institutional Equity did not interview

20   employees.  Employees were only interviewed as part of

21   an interrogation process by human resources.  So that

22   is why there's no finding, right, because we didn't

23   have all the information, we didn't have Dr. Alaei's

24   side of the story.

25       Q    Do you know why they didn't solicit an

Chantelle Botticelli

1  interrogation sooner in the investigatory process

2  rather than May 9, 2018?

3       A    No, I don't know the answer to that question

4  other than that my understanding of that process is

5  that it's a real difficult process to work through, so

6  maybe that's why.  But I don't know.  That's a

7  question for Randy and Brian.

8       Q    Okay.  So you weren't familiar with the

9  charts reflecting the structure of the GIHHR

10 supervision and funding issues raised in this letter?

11      A    No.

12      Q    As to the Beirut issues concerning Leah

13 Diedrich and alleged sexual misconduct allegations,

14 when you spoke to Ms. Diedrich did you ask her if she

15 had any pictures or any documentation of interacting

16 with Dr. Alaei at the Beirut conference?

17      A    I didn't explicitly ask her for photographs.

18 But I asked her if she had any additional information

19 that would help me better understand her experience.

20 I think I asked her explicitly for the emails between

21 her and Dr. Alaei, and not just emails but related to

22 the conference.  But she was expressing an overall

23 discomfort with their interactions, both at the

24 conference, before the conference and after the

25 conference.  So I asked her for that.  I don't think I

Chantelle Botticelli

1   explicitly said pictures, but I might have.  I don't

2   know.

3        Q    So I'm just going to show you the pictures

4   attached to the Claimant's Exhibit A-6 letter from May

5   21, 2018.  Do you recognize Ms. Diedrich in one of

6   these pictures?

7        A    I don't remember which one.  I'm sorry, I

8   don't remember what she looks like.

9        Q    Okay.

10        A    And actually I've never seen, is that

11   Kamiar?

12        Q    Yes, it is.

13        A    I've never seen him before.

14        Q    So it's fair to say you didn't see these

15   pictures, Ms. Diedrich didn't provide you these

16   pictures regarding her interactions with Dr. Alaei at

17   the Beirut conference?

18        A    No, she did not.

19        Q    I'm just scrolling.

20        A    I've seen no pictures.

21        Q    Excuse me?

22        A    I said I've seen no pictures, ever.

23        Q    Okay.  Understood.

24             The last picture here, one of the

25   allegations by Ms. Diedrich was I think that Dr. Alaei

Chantelle Botticelli

1    had put his arms on her shoulders or around her or

2    something like that, and that gave cause for, you

3    know, concern about alleged sexual misconduct.  If the

4    complainant had engaged in that similar type of

5    conduct, would that have been grounds to initiate a

6    Title IX investigation concerning Ms. Diedrich?

7            MR. WHITE:  Objection to form.  You can

8        answer.

9        A    If Kamiar had wanted to file a complaint, if

10   he had come forward and said I'd like to file a

11   complaint of sexual harassment against Ms. Diedrich, I

12   would have done an intake like we did with her and we

13   would have asked if he could explain, right.

14       Q    Sure.

15       A    You know, we would ask questions about

16   whether or not Ms. Diedrich had engaged in unlawful

17   conduct of a sexual nature and created a sexually

18   hostile work environment for working and learning.  We

19   would also explore the power dynamic between those

20   two, because that's important in sexual harassment,

21   right, in a sexual harassment allegation.  So we're

22   always asking who's in a position of power here.  Is

23   it in this case Ms. Diedrich, and what is that

24   position of power that she holds over Kamiar.  So that

25   would have been something we would have explored, and

Chantelle Botticelli

1    to bring an initial assessment as to whether or not to

2    accept a complaint, right.  So he certainly could have

3    come forward and he certainly could have made that

4    report and we certainly would have considered it, much

5    in the same way we did with her, right.

6          She was alleging he was engaging in behavior

7    that made her uncomfortable.  Part of her allegations

8    is that he was her supervisor, she was an intern.  Not

9    only was he her supervisor, he's also somebody with

10   significant power control, or at least from her

11   perspective significant power control over her career

12   path, that she had worked very long and hard, right,

13   to build.  And so that was one of the reasons she was

14   concerned about her inclusion, the inclusion of her

15   report in this overall investigation.  It was a

16   concern raised by others as well.

17       Q    If I could refer you to now Plaintiff's

18   Exhibit I.  Plaintiff's Exhibit I, if you can take a

19   look at this.  Oh, no, that's the wrong one, sorry.

20   Plaintiff's Exhibit -- okay, that's the right one.

21         I'm showing you what has been marked as

22   Plaintiff's Exhibit I.  It might have been wrongly

23   identified as -- yeah, right.  So it's Plaintiff's

24   second Exhibit I, I apologize for that, there was some

25   mislabeling, but it's identified as Sexual Misconduct

123

Chantelle Botticelli

1   Report, a response report from February 2nd, 2018, it

2   says from Stellar.  If you can take a look and see if

3   you recognize what this is.

4        A    Yes, I recognize that.

5        Q    Can you explain to me what this document is?

6        A    So this is a document that helps us that we

7   use to document our institutional response.  So not

8   every report results in a full investigation or the

9   generation of a full investigative report.  And so

10  this was, it looks like a document that we initially

11  started to create to document our institutional

12  response.  Does that make sense?

13       Q    Yeah, no, it does.

14       A    So that when we were asked about it we were

15  able to remember.

16       Q    No, no, that's perfectly fine.

17            This on the page Bates stamped 20491 talks

18  about a meeting of 2/7/2018, and it says "purpose of

19  meeting on Friday with students was discussed," and

20  then it says "discussed departure of Kamiar."  Is that

21  regarding what was to be discussed at the meeting on

22  February 9, 2018?

23       A    Yeah.

24       Q    If you scroll down, the third bullet point

25  says "we must do" and then it says, "get pres approval

Chantelle Botticelli

1   to place KA on alternative assignment."  Does this

2   reflect that at a meeting on 2/7/2018 you and Randy

3   Stark and Brian Selchick were seeking to get or

4   decided to get the president's approval to put Kamiar

5   here on alternative assignment?

6        A    Yes.

7        Q    You know, this says "no contact with

8   students, cannot go to GIHHR, if he does he's

9   trespass."  This says "take keys and swipe access."

10  Do you know why removing his email access was not

11  identified at that meeting or discussion you had on

12  the seventh?

13       A    Yeah.  Probably because this is just me

14  taking notes of what I recall of a meeting after the

15  meeting.  And maybe I forgot to add it, maybe it

16  wasn't discussed.  You know, as I mentioned earlier,

17  the protocol for alternative assignment was one that

18  was really -- one that I was unfamiliar with because I

19  didn't implement the alternative assignments.  I might

20  be aware of them in cases involving sexual misconduct,

21  I might have weighed in on whether or not one was

22  beneficial or even necessary or advised, but I didn't

23  actually do it.  So it's either I forgot to add it or

24  I didn't know what was the right protocol at the time.

25       Q    Okay.

Chantelle Botticelli

1      A      But my understanding eventually was that

2    removing email access was, was something that was done

3    when folks were -- were placed on assignments.

4      Q      Okay.  And then this says "report date,

5    details and information obtained and reviewed" on the

6    page Bates stamped 2492.  Is this fair to say reflects

7    the meeting and what was discussed with you and Leah

8    Diedrich on February 5th, 2018?

9      A      Yes.

10     Q      And it continues to page 2494.  It looks

11   like there was another meeting with somebody on

12   February 9.  This might have been Leah or Elizabeth

13   Gray.

14     A      I don't know if it's Elizabeth Gray.  Let me

15   read it.

16     Q      Sure.

17     A      This looks like Elizabeth Gray, a summary of

18   my conversation with Elizabeth, it might have been.

19   It looks like it is.  I would have to -- yeah.

20     Q      This reflects apparently statements this

21   individual provided based on a conversation with Arash

22   and Kamiar about an investigation concerning Arash?

23     A      Yes.

24     Q      So this says "[blank] was with Arash when he

25   was pulled into a meeting with HR in February when a

Chantelle Botticelli

1  UUP representative told him he had the right to

2  reassignment or to work off campus.  [Blank] was then

3  asked to leave the meeting and did."

4          So does this appear she was at the meeting,

5  I think there was a reference earlier in your report

6  to a meeting where I forget the woman's name, but it

7  says she conveyed the alternative assignment to Arash?

8      A    Yeah.  Yes, Kathy Tretheway.

9      Q    Okay.

10     A    I don't think this is a summary of my

11 conversations with Elizabeth Gray.

12     Q    Okay.  Understood.

13         So these are interview summaries for

14 different individuals you had interviewed over the

15 course of the investigation it looks like as well?

16     A    It looks like in the very beginning of the

17 investigation.

18     Q    Okay.  What about Plaintiff's Exhibit J, can

19 you identify what this is and is it a draft of the

20 final report we looked at earlier, Plaintiff's Exhibit

21 E-1?

22     A    Can you go back a little bit?

23     Q    Yes.

24     A    Up there.  Go down a little bit.

25         Yeah, maybe it's a draft.  I don't remember.

Chantelle Botticelli

1     Q     As to payment for September Johnson, did you

2   ever look at the emails between Kamiar Alaei and

3   September Johnson regarding that issue?

4     A     If she sent them and I asked her to, then

5   yes, I looked at them.

6     Q     Do you know if she sent them?

7     A     If she did, they would have been a part of

8   the report.  I don't remember.

9     Q     Okay.  So the report was at Exhibit E-1.

10   Scrolling down to documents received.  Let me know if

11   you have seen the emails between September Johnson and

12   Kamiar about payment.

13     A     You can scroll down.  You can scroll down.

14   Oh, wait, go up.  I'm so sorry.

15     Q     That's all right.

16     A     Up again a little bit more.

17          (Witness perusing documents)

18     A     So I wonder if in the -- so I don't see it

19   listed here, which tells me one of two things.  She

20   never sent them, but I also wonder if there were other

21   documents, right, in the overall file related to this.

22   I don't know the answer.  I, I don't know.

23     Q     I'm just, if there were emails between

24   Kamiar Alaei and September Johnson, would their

25   various positions on her payment issue, would that

Chantelle Botticelli

1   have been relevant to the allegations by September

2   Johnson that there were alleged payment problems with

3   Kamiar Alaei?

4        A    Absolutely, yeah, that would have been.  So

5   maybe she -- she might not have sent them to me.

6        Q    Do you know if anybody asked Dr. Alaei if he

7   had any emails he could provide that would provide

8   insight into that issue?

9        A    I don't know.

10       Q    At the end of the, your end of the

11  investigation into Title IX issues, did you develop an

12  opinion that, based on the allegations reflected in

13  Roman numerals I, II and III, that Dr. Alaei had

14  violated SUNY Albany policies?

15       A    Develop an opinion that he violated the

16  policies.  Like I had said earlier, it wasn't my job

17  to "develop an opinion".  My job was to gather the

18  evidence and then turn it over to HR, who would

19  complete the investigation by talking to Kamiar if he

20  was willing to engage in conversation.  I remember my

21  opinion was that HR should proceed.  My recommendation

22  was based on the information I got.  My recommendation

23  was that HR should proceed through the disciplinary

24  process given the information that we had.

25       Q    All right.  So your recommendation was that

Chantelle Botticelli

1    HR should seek to impose discipline and possibly

2    terminate his appointment?

3        A    Yeah, right.  And you have to -- my

4    understanding at the time was that you initiate that

5    process to then do the interrogation, right.  So my

6    recommendation was there is -- if these allegations

7    are accepted as true, these would be -- this is

8    potential policy -- that's not right, let me -- my

9    recommendation was HR, here's all of the information I

10   gathered, there's a lot of information here, right,

11   lots of allegations and corroborating evidence to

12   continue this investigation.

13       Q    Do you know if under the UUP process HR

14   could have conducted an interrogation at any point in

15   time after it issued the alternative assignment letter

16   in early February 2018?

17       A    I don't know the answer to that.

18       Q    I'll show you some emails, let's see if we

19   can get through these.

20            I'm showing you what's been marked for

21   identification as Plaintiff's C-1, an email from Brian

22   Selchick, including you, dated February 2018.  It

23   reflects that they were going to be putting Dr. Kamiar

24   Alaei on alternative assignment, as well as removing

25   his email and card access and keys.

Chantelle Botticelli

1           Does this refresh your recollection about

2    the issue of email and how that issue was decided,

3    that Dr. Alaei be precluded from using his email

4    account with SUNY?

5       A    No, I don't know.  Again, my understanding

6    was that was just part of the process.

7       Q    Okay.

8       A    I was never part of the conversation about

9    cutting off his email, that I recall.

10      Q    Okay.  Showing you Plaintiff's Exhibit C-3.

11   C-3 is a document, it says "GIHHR next step".  There's

12   handwritten notes, 3/29/18, it says "Bruce S.

13   outline".  Do you recall or do you recognize this

14   document or recall what this document is?

15      A    I do remember the document but I don't

16   remember what it says.  I remember Bruce made it.

17      Q    So you recognize this as a document that

18   Bruce made?

19      A    I'm pretty sure, yes, yeah.

20      Q    Did Bruce generally make documents like this

21   when there were sexual misconduct allegations

22   concerning a faculty member?

23      A    I only worked for Bruce for like, or worked

24   under Bruce for I think it was -- I don't know if he

25   generally made documents like that.  I didn't work

Chantelle Botticelli

1  with -- for him very long.

2  Q    In your experience as Title IX coordinator

3  or otherwise as associate vice president, did he ever

4  prepare documents like this in other investigations

5  you were involved in?

6  A    No, I never saw him make other

7  investigation -- another document like this.

8  Q    This document, there's a handwritten note

9  that says "doesn't address student reaction".  Do you

10  have any understanding of what that's referring to,

11  any understanding?

12  A    I do not.

13  Q    I refer you to Plaintiff's Exhibit C-6.

14  Exhibit C-6.  Do you recognize this document?  It's

15  identified as the GIHHR time line.  There's a

16  handwritten note in the upper right hand corner that

17  appears to say 4/18/18, then there's handwritten notes

18  that appear to say Bruce, provost, maybe Jim Dias, JR

19  Lewis and somebody else, I can't read those.  But do

20  you recognize this document generally?

21  A    No.

22  Q    Does this look like a document that Bruce

23  may have created, Bruce Szelest?

24  A    I don't know.

25  Q    Do you know whether there had been a

Chantelle Botticelli

1  determination made by university personnel as of April

2  18, 2018 to issue a notice of discipline against Dr.

3  Alaei and to seek to initiate the non-renewal of Dr.

4  Alaei?

5        A    I don't remember.

6        Q    Okay.  And if I can prefer you to

7  Plaintiff's Exhibit D-1.  Plaintiff's Exhibit D-1

8  includes an email from you to others dated March 9,

9  2018.  I'll just let you take a look at it.  The

10  subject is GIHHR investigation.

11       A    Yeah.

12       Q    Do you recognize this document?

13       A    Yes.

14       Q    Did you write this email?

15       A    I sure did.

16       Q    This email says in part, "I have been asked,

17  Bruce, to make this matter our top priority."  Can you

18  explain to me what you were referring to about Bruce

19  asking you to make this matter a top priority?

20       A    Yeah.  So we -- he asked us to do the

21  investigation as quickly as possible, right, because

22  again, we had a number of students coming forward.

23  And their frustration, disappointment, whatever their

24  feelings, they had big feelings, right, and those

25  feelings were starting to be expressed more forcefully

Chantelle Botticelli

1   and loudly.  And so we wanted to get an understanding
2   of what the basis for those feelings were so that we
3   could address it.  Not only for the benefit of the
4   students but for the benefit of Dr. Alaei, right.
5   Because whether, what the students -- right, students
6   don't always get it right.  They sometimes think they
7   have an understanding it's something the university
8   has done, and they, whether appropriately or
9   inappropriately, can cause a lot of -- they can bring
10  a lot of attention to an issue that can be harmful,
11  right, if what -- the issue that they're raising or
12  the things that are making them upset are based on
13  untruths, right.  So not only were we concerned about
14  them and getting to the bottom of, of whatever it was
15  that they believed happened, but we were also
16  concerned about Dr. Alaei.  And, and if they were
17  getting upset about him, because they were directing
18  anger and upset, they were directing some of their
19  feelings towards him, what they were feeling about
20  some of those things, if what they were alleging was
21  based on information that was incorrect, we wanted to
22  correct that to protect Dr. Alaei.  And so Bruce said
23  this is -- this is getting big, this is getting
24  bigger, please look into this right away and get as
25  much information as you can so we can determine next

134

Chantelle Botticelli

1    steps to protect the community as a whole.

2        Q    So the students were upset with Kamiar Alaei

3    allegedly for facilitating contact with students and

4    staff and Arash on his alternative assignment and then

5    after separation.  So why at no point in the

6    investigation did anybody with SUNY Albany explain to

7    the students look, Arash on his alternative assignment

8    is able to communicate with students and staff if he

9    asked Harvey Charles and Harvey Charles approved it --

10           MR. WHITE:  Objection.

11       Q    -- and don't blame Dr. Kamiar Alaei, blame

12   Harvey Charles and SUNY and their alternative

13   assignment?

14           MR. WHITE:  Objection to form.  You can

15       answer.

16       A    Because that wouldn't have been an accurate

17   response to their concern.  That wouldn't have been

18   wholly accurate, so we did not say that.

19       Q    Well, it wouldn't have been wholly accurate

20   to the issue of the alternative assignment?

21       A    So any of it is inaccurate.

22       Q    I'm just saying as to -- let me clarify, I'm

23   sorry.

24       A    Okay.

25       Q    Just on the students' concerns, and I'm

Chantelle Botticelli

1   splitting up alternative assignment with post

2   separation of Arash Alaei.  Students' concerns

3   regarding alternative assignment and getting angry

4   with Kamiar Alaei, why didn't anyone ever explain to

5   the students that Arash Alaei's alternative assignment

6   provided for him to contact students and interns with

7   the approval of Harvey Charles that such there was,

8   you know, discussions of such over time, we don't know

9   the scope right now, but that was something that was

10  able to be done outside of Kamiar Alaei, don't blame

11  Kamiar Alaei.  So why wasn't something to that effect

12  ever conveyed to the students during this time about

13  the alternative assignment?

14          MR. WHITE:  Objection to form.  You can

15      answer.

16      A    It wouldn't have been accurate to say.

17  You're suggesting that we get up and say you don't

18  have to blame Kamiar Alaei for the fact that Arash is

19  engaging with students.  So it would not have been

20  accurate.  Because even if, and at the time I was not

21  aware that Harvey Charles told Arash, and I still

22  don't know whether or not Harvey Charles told Arash

23  that he could engage with the four students on the

24  list that you showed me earlier, Exhibit 5, right.  I

25  don't know if that's true, and as I sit here today I

Chantelle Botticelli

1    still don't know that it's true.  But it doesn't

2    address the issue with all of the other students,

3    right, all of the other students that he was not given

4    permission to engage with but that he nevertheless

5    engaged with and at Kamiar's direction, so.

6        Q    And I'm --

7        A    So that --

8        Q    Go ahead.

9        A    So that would have been inaccurate.

10       Q    So I'm breaking this up.  The students,

11   according to what you have stated today, they raised

12   concerns about Arash or Kamiar allegedly facilitating

13   or allowing Arash Alaei to interact with GIHHR

14   students and staff while Arash Alaei was on

15   alternative assignment, that's one.  Students were

16   raising issues and concerns with Kamiar Alaei

17   allegedly facilitating or directing or allowing Arash

18   Alaei to interact with students and staff after

19   separation.  That's issue two.  The other issues about

20   students raising concerns allegedly about how the

21   operations were going in terms of the payment or

22   changing expectations, now that's issue three.

23            So I'm asking now just about issue one as I

24   just presented.  Why didn't at any point during this

25   investigation SUNY Albany personnel explain to

Chantelle Botticelli

1    students, who are articulating and voicing their

2    concerns and frustration, that while Arash was on

3    alternative assignment there was a process set in

4    place that he would be able to contact students if

5    Harvey Charles approved, that we know there were times

6    where he did solicit it for certain people.  We don't

7    know other times that he might have solicited for

8    people, and we don't know yet if Harvey Charles

9    approved it.  But it doesn't involve Kamiar Alaei

10   because he had no oversight of Arash's alternative

11   assignment.  I mean, why couldn't something like that

12   have been articulated?

13           MR. WHITE:  Objection to form.  You can

14       answer.

15   A    I don't know.

16   Q    Now, the supervision issue with students

17   raising concerns about Kamiar Alaei that he allegedly

18   directed or facilitated Arash Alaei interacting with

19   them afterwards, why wasn't a statement ever made to

20   the students about look, we didn't direct Kamiar not

21   to allow that, there might be grants he's been working

22   on that he's required to still interact on because

23   they're still in the name of GIHHR for their programs

24   so we're looking into this.  I mean, why couldn't

25   something like that have been conveyed to the students

138

Chantelle Botticelli

1    at any point?

2            MR. WHITE:  Objection to form.  You can

3        answer.

4        A    I don't, I don't know the answer to the

5    question.  And I also don't know that something to

6    that effect wasn't communicated.  Now that you're just

7    talking, I don't remember what exactly was

8    communicated in that, in that meeting.  Maybe what

9    you're suggesting was in some form.  I don't remember.

10   But if it wasn't, then I don't know.

11       Q    At the meeting on February 9, 2018, if those

12   types of responses from SUNY personnel were not made,

13   you don't know why they wouldn't have been made; is

14   that fair to say?

15           MR. WHITE:  Objection to form.  You can

16       answer.

17       A    Yes.

18       Q    Okay.  Was it typical for Bruce to convey

19   that during a sexual misconduct investigation it

20   should be made a top priority as compared to other

21   things you were working on at the time?

22       A    There's other things that we prioritize,

23   yeah.  I can name several of them off the top of my

24   head.

25       Q    Okay.  Can you name those?

Chantelle Botticelli

1        A    Sure.  There was a situation where a student
2    was -- where somebody woke up to a stranger raping
3    them in the dorm.  That report came in on a Saturday,
4    and we all came to work.  There was other incidents
5    that we prioritized.  It depended on all sorts of
6    things, right.  And so it wasn't out of the ordinary
7    for us to try to work through something more quickly
8    to address situations that posed a threat to the
9    safety and stability of our community, including the
10   accused folks and the folks coming forward to raise
11   the complaints.

12       Q    So Bruce would make, Bruce Szelest would
13   direct you to make issues a top priority if he felt
14   they were a threat to the safety and well-being of the
15   SUNY Albany community?

16       A    Yes.  In this particular case, for the
17   reasons that I pointed out, there was concerns about
18   the student and about Dr. Alaei.  And so he said,
19   right, there's very serious allegations being made,
20   emotions are rising, those emotions can impact the
21   stability and safety of the students in the center,
22   and they can impact the safety and stability of Dr.
23   Alaei, so let's get to the bottom of this quickly so
24   that we can address it.

25       Q    Did anybody ever consider at the outset the

Chantelle Botticelli

1    impact on Dr. Alaei's professional career, his

2    reputation, being removed and cut off from having

3    access to his job and, you know, things he was working

4    on --

5         A    A hundred percent.

6         Q    -- when they made that decision?

7              MR. WHITE:  Objection to form.  You can

8         answer.

9         A    A hundred percent.  Which is why he asked us

10   to move quickly.

11        Q    So at least in these types of matters when

12   you say moving quickly, this investigation was

13   initiated in or about February 8, 2018, and then the

14   interrogation was held on May 9, 2018.  That's

15   typically a quick schedule for these matters?

16             MR. WHITE:  Objection to the form.

17        A    In my experience, and I've been conducting

18   university investigations since 2015 or overseeing

19   them, that is incredibly fast, particularly when

20   there's a union involved.  Incredibly fast.

21        Q    Would your files for other investigations

22   you were conducting at the time reflect the time

23   period in terms of when an investigation was started

24   and when it was concluded as to other types of sexual

25   misconduct investigations?

Chantelle Botticelli

1      A    I'm sure it would.

2      Q    If I can refer you to D-2.

3           MR. WHITE:  Joe, do you know how much longer

4      you're going to be?

5           MR. CASTIGLIONE:  Yeah, I'm trying to just

6      finish it up here.

7           MR. WHITE:  Do you need a break?

8           MR. CASTIGLIONE:  I mean, maybe five, ten

9      more minutes.

10          MR. WHITE:  Okay.

11     Q    I'm sorry, I am trying to get through it.

12 D-2.

13     A    I'm sorry, I'm just, I needed to just check

14 my phone because I wanted to see the time and if my

15 husband texted.

16     Q    That's all right.

17          Plaintiff's Exhibit D-2, it's a chain of

18 emails between you and Brian Selchick from March 26,

19 2018.  If you just read through these quickly, or take

20 your time obviously, but.

21          (Witness perusing documents)

22     A    Okay, I've seen them.

23     Q    So you recognize this email, you remember

24 this conversation?

25     A    Yeah.

Chantelle Botticelli

1      Q    Mr. Selchick was making sure that, he wanted
2   to make sure that he didn't miss a safety well-being
3   retaliation concern if and when Kamiar comes back.  Do
4   you know what he's referring to there?
5      A    I don't remember, no.
6      Q    Your response is "I thought we agreed he
7   wasn't going to come back.  I'm confused."  Do you
8   remember the basis of your response there?
9      A    Yeah.  My understanding was that there had
10  been a decision to not renew Kamiar.
11     Q    Okay.  So as of March 25th, 2018, a decision
12  had been made that, based on the allegations at issue,
13  SUNY should separate and non-renew Kamiar's
14  appointment; is that fair to say?
15     A    That was my understanding.  But clearly my
16  understanding was wrong, right, and so I was
17  corrected.  But that was my understanding.  I don't
18  remember why that was my understanding, but it was my
19  understanding.
20     Q    So Mr. Selchick responded, right, so,
21  confirming your understanding.  Is that what you
22  recall?
23     A    I guess, yeah.  I, I -- yes.
24     Q    So is it fair to say, as reflected in this
25  email, you and Mr. Selchick had discussed Dr. Alaei

Chantelle Botticelli

1    being decided not to have his employment renewed?

2        A    Yeah, there had been discussion about

3    non-renewal, yeah.

4        Q    And had there been a determination by SUNY

5    at this point, SUNY Albany, that they were going to

6    pursue non-renewal and non-renew Dr. Alaei's

7    appointment?

8        A    Apparently that was my understanding.  But I

9    guess I was wrong.  I thought that that was what was

10    going to happen, that he was going to be non-renewed

11    in March.  That was my understanding.  And then there

12    was this exchange wherein I left the exchange thinking

13    maybe I'm wrong, maybe that's not the plan.  Because

14    again, it wasn't my call, it's HR's call.

15        Q    Did the president have any input on the

16    decision about non-renewal at this point?

17        A    Not that I recall.

18        Q    What about Bruce Szelest?

19        A    Not that I recall.  My recollection is that

20    after I turned over my report, right, I basically said

21    here's the information, here's the facts that we

22    gathered, my recommendation is that you -- that this

23    matter proceed, right, and that you continue to gather

24    information.  And then I wasn't really fully involved.

25    I moved on to other -- right, I was assigned to do

Chantelle Botticelli

1    other work.  And so I don't remember being heavily

2    engaged in conversations about next steps.  Which is

3    why --

4         Q    Okay.

5         A    -- it looks like I was mistaken.

6         Q    So -- go ahead.

7         A    I was mistaken about what was going to

8    happen.

9         Q    I'm showing you a document identified as

10   Plaintiff's D-3, handwritten notes.  They appear to be

11   dated 4/3/18.  The top was "how do we maintain the

12   integrity of the non-renewal with or without the

13   notice of discipline (NOD) interrogation."

14             Do you recall SUNY maintaining that position

15   about deciding if non-renewal was appropriate with or

16   without notice of discipline or interrogation?

17        A    I don't remember.

18        Q    Okay.  There's a note here that says

19   "performance evaluation to support non-renewal, we

20   could recreate that."  Do you remember having

21   discussions or anybody discussing recreating

22   performance evaluations for Dr. Alaei in an effort to

23   support non-renewal of Dr. Alaei?

24        A    I do not remember any such conversation

25   ever.

Chantelle Botticelli

1      Q    Do you know if anybody consulted with Harvey

2  Charles on the issue to renew or not renew Dr. Alaei

3  in the spring of 2018?

4      A    Again, I wasn't part of the decision making

5  process.

6      Q    Okay.  I show you --

7      A    I remember being told that -- I remember

8  believing that that was the plan, based on a

9  conversation that I probably had with Brian Selchick.

10  But I wasn't part of the decision process.

11      Q    Sure.

12          I show you what's been marked as Plaintiff's

13  Exhibit D-4.  These are handwritten notes dated

14  5/2/18.  It says "12:00", it says "Chantelle, JR, BSS,

15  Tricia," and then I don't know what that other, I

16  think it's maybe Randy Stark.  Do you recall this

17  document?

18      A    "what documentation do we have that Kamiar

19  was in contact with employees."  I don't remember.  I

20  mean, I don't even know who created this document.

21      Q    Do you recall having a meeting on or about

22  May 2nd, 2018 with Randy Stark or Brian Selchick or I

23  believe one of your colleagues, Tricia in Title IX?

24      A    I'm sorry, I don't remember.  Obviously I

25  was at a meeting, but I don't recall.

Chantelle Botticelli

1      Q    Did you keep track of or notes or whatnot

2   reflecting if you had meetings on any given day?

3      A    No.  No.  And I know I saw in the section

4   there's not a response report.  I normally would, but

5   the matter was closed for us, right.  We were done

6   with our investigation, or our part of this in our

7   office was complete, and so I didn't document that.

8      Q    So as of May 2nd, 2018 the Title IX

9   investigation had been deemed complete concerning Dr.

10  Kamiar Alaei?

11     A    Yeah.  And remember, it wasn't just Title

12  IX's investigation, it was a collaborative

13  investigation with my office and HR.  And, like I

14  mentioned earlier, we took the bulk of it really

15  because of our capacity to do that.  We just had more

16  skilled investigators and we had more investigators

17  than HR.  Not to diminish Brian's investigative

18  skills, but.

19     Q    Sure.

20          And just going back to the email, excuse me,

21  Exhibit D-1, this will be my last question here.

22  Exhibit D-1 was the email from you dated March 9,

23  2018.  Included with that there's, it looks like an

24  email from Randy Stark.  It says "meeting status

25  accepted".

Chantelle Botticelli

1          Do you recall if you were scheduling
2    meetings or other people were scheduling meetings
3    regarding the investigation concerning Kamiar Alaei,
4    if they would send out these types of email meeting
5    notices?
6          A    When you say "these types of email meeting
7    notices", what do you mean?
8          Q    So this appears to, just based on my own
9    familiarity with my email system, it appears that
10   somebody has sent out an email invite to other people
11   at SUNY Albany regarding this GIHHR updates.  It says
12   subject, location, start, end time.
13         A    Yeah.
14         Q    "Recurrence, meeting status, accepted".
15         If you were trying to schedule meetings,
16   would you send out an email meeting invite similar to
17   what's shown here on Exhibit D-1?
18         A    My practice -- and I wasn't the organizer of
19   this meeting, I don't remember anything about this
20   meeting, and those notes there are not mine.  I don't
21   know what they say and I don't know who made them.
22   But I don't know that everybody did that, right.  So I
23   distinctly remember that, for example, like sometimes
24   people on this list would just call and be like be
25   here at one, and they didn't use technology.  So it

Chantelle Botticelli

1  was really, right.  So I wouldn't know -- that's how I

2  organized meetings.  If I was organizing a meeting I

3  would send the calendar invite to everyone that was

4  invited to the meeting.  That's my answer.

5      Q    Okay.  No, that's clear.

6           MR. CASTIGLIONE:  Thank you very much for

7      your time.  That's it.

8           THE WITNESS:  That's it.  All right.

9           MR. WHITE:  Nothing from me.  Thank you very

10     much.

11          MR. CASTIGLIONE:  Okay.  Take care.

12          THE WITNESS:  Thank you, have a good night.

13          (Time noted:  5:00 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                          ACKNOWLEDGMENT

2

3    STATE OF NEW YORK        )
                              )  ss:
4    COUNTY OF ALBANY         )

5

6              I, CHANTELLE BOTTICELLI, hereby certify I

7         have read the transcript of my testimony taken

8         under oath, on the 26th day of July, 2023; and

9         the transcript, except as noted in any attached

10        errata sheet(s), is a true record of my

11        testimony.

12

13

14                     _____

15                          CHANTELLE BOTTICELLI

16

17   Subscribed and sworn to before me

18   this _____ day of _____, 2023.

19

20   _____

21            NOTARY PUBLIC

22   My Commission expires the

23   ____ day of _____, 20___.

24

25

1                        CERTIFICATE

2
STATE OF NEW YORK              )
3                                )  SS:
COUNTY OF ORANGE                )
4

5

6           I, KARI L. REED, a Shorthand Reporter

7       (Stenotype) and Notary Public within and for

8       the State of New York, do hereby certify:

9           I reported the proceedings in the

10      within-entitled matter and that the within

11      transcript is a true record of such

12      proceedings.

13          I further certify that I am notrelated, by

14      blood or marriage, to any of the parties in

15      this matter and that I am in no way interested

16      in the outcome of this matter.

17          IN WITNESS WHEREOF, I have hereunto set my

18      hand this 12th day of September, 2023.

19

20
                                   *Kari L Reed*
21      _____
                               KARI L. REED
22

23

24

25

```
 1                          INDEX

 2   EXAMINATION BY                      PAGE

 3   MR. CASTIGLIONE                       4

 4

 5   EXHIBITS:

 6               PLAINTIFF'S

 7   NUMBER        DESCRIPTION           PAGE

 8   M        Email chain between Arash

 9            Alaei and Harvey Charles    89

10

11   INFORMATION REQUESTED:  (None)

12

13   QUESTIONS MARKED:  (None)

14

15

16

17

18

19

20

21

22

23

24

25
```