UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DR. KAMIAR ALAEI,

                                   Plaintiff,                    1:21-cv-00377 (BKS/TWD)

v.

STATE UNIVERSITY OF NEW YORK AT ALBANY,

                                  Defendant.
_____

**Appearances:**

*For Plaintiff:*
Joseph F. Castiglione
Young Sommer, LLC
500 Federal Street, 5th Floor
Troy, NY 12180

*For Defendant:*
Letitia James
Attorney General for the State of New York
David C. White
Matthew J. Gallagher
Assistant Attorneys General
Office of the Attorney General
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

      Plaintiff Dr. Kamiar Alaei brings this action against his former employer, Defendant State University of New York at Albany ("SUNY Albany" or the "University"), alleging that the University discriminated against him on the basis of sex, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"). (Dkt. No. 1). A jury trial in this

matter is scheduled to begin on September 22, 2025. Presently before the Court are Defendant's motion in limine, (Dkt. No. 110), and the parties' response submissions, (Dkt. Nos. 123, 124, 125). The Court heard oral argument on the motion in limine on May 15, 2025, at the final pretrial conference. For the following reasons Defendant's motion is granted in part and denied in part.

## II.  DEFENDANT'S MOTION IN LIMINE

### A.  Evidence of Underlying Investigation

#### 1.  Investigative Report

Defendant seeks to admit at trial, the investigative report prepared collaboratively by the University's Title IX Office and Human Resources. (Dkt. No. 110, at 4–7 (citing Def's Exh. 5); *see* Dkt. No. 75-33 (sealed investigative report)). Defendant contends that it is admissible under Federal Rule of Evidence 803(6) as a business record, that it is relevant to the "reasoning and motivation behind Defendant's decision to non-renew Plaintiff's employment," and "provides essential context and information to the jury" regarding that decision. (Dkt. No. 110, at 5–6). Plaintiff opposes admission of the investigative report on the grounds that it is "an unreliable, one-sided document" that does not include "his side of the story," contains inadmissible hearsay, and will confuse and wrongfully prejudice the jury against him. (Dkt. No. 123, at 39–40).

"Subject to the applicable Federal Rules of Evidence, courts have routinely admitted the reports of human resources investigations conducted in both the private and public sectors." *Accely v. Consol. Edison Co. of N.Y., Inc.*, No. 19-cv-5984, 2023 WL 3045795, at *2, 2023 U.S. Dist. LEXIS 69699, at *5–6 (S.D.N.Y. Apr. 20, 2023) (Chin, J.) (citing cases). In general, to evaluate the admissibility of such a report, "courts have asked, first, whether a report (and any out-of-court statements it may contain) satisfies one or more exclusions or exceptions to the rule against hearsay and, second, whether the circumstances of the report's preparation establish its

2

trustworthiness." *Id.* 2023 WL 3045795, at *2, 2023 U.S. Dist. LEXIS 69699, at *6 (citing *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 64-65 (2d Cir. 1998)).

The undated, unsigned report (stamped "Draft 1"), "details" the University's "coordinated response" and investigation into Plaintiff's possible violation of University policies based on reports that Plaintiff (1) permitted his brother, Arash Alaei to conduct business on behalf of a SUNY Albany-related research institute after Arash Alaei's separation from the University; (2) facilitated contact between Arash Alaei and institute staff and students during Arash Alaei's alternate assignment and after his separation from the University; and (3) that Plaintiff violated the University's sexual harassment policy by engaging in unwelcome conduct of a sexual nature directed at a student. (Def's Exh. 5, at 1). The report identifies the five "investigators," including Chantelle Botticelli from the Title IX office and Brian Selchick, from HR, and lists the 43 individuals interviewed as well as the documents reviewed. (*Id.* at 1–3). The 11-page report[1] sets forth "Investigative Findings" regarding the events that led to Arash Alaei's separation from the University the year before, namely sexual harassment allegations by three female students, the role that Arash Alaei continued to play in University projects and business, and the evidence that purported to show Plaintiff's knowledge of that involvement. (*Id.* at 5–8). It contains three paragraphs summarizing the report by the student intern alleging sexual harassment, and two University employees regarding their knowledge of the alleged harassment. (*Id.* at 8–9). The last three pages of the report summarize various issues reported by students and employees, which appear to be unrelated to the three subjects of the investigation. (*Id.* at 9–11). The University did not interview Plaintiff as part of the investigation.

---

[1] There are 15 exhibits attached to the investigative report not discussed by either party and not discussed herein.

3

While some of the investigative report may be relevant to the University's motivation for non-renewing and terminating Plaintiff's employment, to the extent it contains conclusions on disputed facts, see, e.g., (Def's Exh. 5, at 4–5 (citing "email sampling . . . showing that Kamiar Alaei had knowledge that Arash continued to be involved in [institute] projects"), 8 ("several witnesses indicated that they were directed by [Plaintiff] to work with Arash Aaei on projects") and was relied upon by the decision-makers, in the absence of Plaintiff's version of events, there is a danger of unfair prejudice to Plaintiff. Also, significant portions of the report detail the circumstances leading to Arash Alaei's separation from the University. Further, the University fails to identify the relevance of the three pages summarizing "Other Concerns," which appear unrelated to the three policy violations enumerated above. The report thus presents several dangers of unfair prejudice to Plaintiff and confusing the issues.

In addition, the investigative report itself raises questions about its reliability. Although Defendant refers to this report as providing "the basis for the decision to non-renew Plaintiff's employment," it contains no conclusion as to the claims it outlines or any recommendation as to Plaintiff's employment. As noted, it is undated, marked "Draft 1," unsigned, and, more importantly is entirely one-sided as Plaintiff was not interviewed, and Plaintiff claims it did not consider any information he provided in his May 2018 interrogation or May 2018 submission. (Dkt. No. 123, at 39); *see Paolitto*, 151 F.3d at 65 (observing that when a "party against whom such a determination is admitted must attempt to expose the weaknesses of the report, [it is] an effort that may well confuse or mislead the jury and result in an undue waste of time"). At oral argument, Defendant explained that the individual who authored the report, the University's Title IX Coordinator Chantelle Cleary Botticelli, left prior to making the investigative report final, but represented that it was complete. Nevertheless, despite questions from the Court, Defendant did

not indicate when the report was issued or to whom it was issued. Moreover, Defendant has identified two of the "investigators" as witnesses in this case. As Defendant argues, at least portions of the investigative report have probative value. However, the one-sided summaries of, and conclusions about, Plaintiff's alleged conduct, and the questions regarding the report (lack of finalization, unsigned, and undated) reflect a lack of trustworthiness. *See e.g.*, Fed. R. Evid. 803(6)(E). In any event, considering all of the factors, the Court finds that the probative value of the investigative report is substantially outweighed by the dangers of unfair prejudice and confusing the issues. Accordingly, the Court finds that the report is inadmissible.

### 2.    Testimony Regarding the Investigation

Defendant seeks to introduce evidence and testimony at trial regarding the complaints and underlying investigation "that resulted in the decision to non-renew Plaintiff." (Dkt. No. 110, at 5). Defendant argues that as it expects Plaintiff raise the fact that the HR office found the allegations against Plaintiff to be "unsubstantiated," it must be able to present evidence regarding the underlying investigation and "explain to the jury what occurred leading up to the decision at issue." (Dkt. No. 110, at 7; *see* Dkt. No. 75-23, ¶ 27 (Brian Selchick explaining that although HR determined the allegations against Plaintiff "were credible" because "there was insufficient evidence for the University to prove the allegations beyond a preponderance of the evidence at a disciplinary arbitration" absent subpoena power, HR found the "allegations . . . to be unsubstantiated")). Defendant further argues that testimony "pertaining to the underlying investigation" is admissible as relevant, probative evidence under Rules 401 and 403 as the "crux of the trial of this action is the reasoning and motivation behind Defendant's decision to non-renew Plaintiff." (*Id.* at 4–5). Plaintiff opposes the introduction of testimony "from Title IX investigation witnesses" on the ground that it is "totally irrelevant," arguing that the "facts and arguments show that" the decisions at issue were made by HR (Stark and Selchick) and

5

University officials (Rodriguez, Szelest, and Stellar), and none of the proposed witnesses were "involved on the non-renewal and termination decisions." (Dkt. No. 123, at 38–39).

In this case the jury will have to decide whether the decision-makers responsible for the termination and "non-renewal" of Plaintiff's employment unlawfully discriminated against Plaintiff based on gender. The jury will thus need to consider the information relied upon by the decision-makers, and what led them to make the decision that they made. Indeed, Defendant has identified the HR officials (Stark and Selchick) and the University officials (Rodriguez, Szelest, and Stellar) as witnesses who will testify regarding their "knowledge of, and involvement in, the investigation into Plaintiff" and "regarding the facts and circumstances surrounding the decision to non-renew Plaintiff's employment." (Dkt. No. 109, at 1–2). Defendant has, however, also identified an underlying complainant—Leah Furst— who "is expected to testify regarding . . . her experiences with Plaintiff while on a trip to Beruit, Lebanon," as well as six other students and two employees, as possible witnesses, who are expected to testify regarding their "interactions" or "experiences with Plaintiff." (Dkt. No. 109 at 2–4). While information considered by the decision-makers is clearly relevant and admissible, Defendant has not explained how testimony from the underlying complainants is relevant and admissible under Fed. R. Evid. 401 and 403. To the extent Defendant seeks to introduce such testimony, Defendant must submit a letter brief addressing this issue by August 4, 2025, and any response is due by August 11, 2025.

    **B.**    **Expert Medical Testimony**

Defendant seeks to preclude Plaintiff from introducing expert medical testimony at trial. (Dkt. No. 110, at 8–9). Defendant acknowledges that "Plaintiff may offer the testimony of any treating physicians in support of his claims," but argues that "such testimony must be limited to the treatment provided by the medical provider." (*Id.* at 8). Defendant further argues that

Plaintiff should be precluded from offering testimony "about his own injuries and/or medical records" because the "alleged injuries are not readily comprehensible by a lay juror without medical testimony" from a medical expert. (*Id.* at 9). Plaintiff agrees no experts have been identified in this case and therefore does not oppose Defendant's motion insofar as it seeks to preclude expert evidence. (Dkt. No. 123, at 32). Plaintiff also agrees that his medical providers "can only testify as fact witnesses to the treatment they provided to Dr. Alaei and their personal knowledge."[2] (*Id.*). However, Plaintiff opposes Defendant's motion to preclude him from testifying about his own medical conditions. (*Id.*). Specifically, Plaintiff states he intends to testify about "feeling depressed, not eating regularly, not being able to sleep regularly, losing weight, suffering anxious feelings," "hair loss, hives, and other skin conditions." (*Id.* at 34).

"[E]xpert testimony is not necessary to establish causation . . . when the finder of fact 'must draw only a common sense causal connection between a plaintiff's injury and one precipitating cause.'" *Doe v. Doe*, No. 16-cv-0332, 2017 WL 3025885, at *7, 2017 U.S. Dist. LEXIS 109692 at *20 (S.D.N.Y. July 14, 2017) (quoting *Young v. Sw. Airlines Co.*, 409 F. Supp. 3d 110, 116 (E.D.N.Y. 2017)). In contrast, "[e]xpert medical opinion evidence is required when the subject-matter 'is presumed not to be within [the] common knowledge and experience' of the jury." *Jimenez v. Supermarket Serv. Corp.*, No. 01-cv-3273, 2002 WL 662135 at *4, 2002 U.S. Dist. LEXIS 7029 at *12  (S.D.N.Y. Apr. 22, 2002) (quoting *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir. 1991)) (applying New York law). "This is particularly true in cases . . . where a plaintiff's injuries have 'multiple potential etiologies.'" *Young*, 409 F. Supp. 3d at 114 (quoting *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004)).

---

[2] Plaintiff has listed nine medical providers as trial witnesses, including two psychiatrists, a psychologist, a psychotherapist, two ophthalmologists, an otorhinolaryngologist, and two dermatologists, (Dkt. No. 127, at 3–5), and intends to introduce the medical records from five of those providers, (Dkt. No. 131, at 9).

7

Plaintiff may testify about the symptoms he has experienced. But to the extent he seeks to offer a lay opinion as to the cause of those symptoms, absent a "common sense causal connection," *Doe*, 2017 WL 3025885, at *7, 2017 U.S. Dist. LEXIS 109692 at *20, such testimony would be inadmissible without an expert, *see Senchyshyn v. BIC Sport N. Am., Inc.*, No. 6:17-cv-0162, 2022 WL 5240586, at *5, 2022 U.S. Dist. LEXIS 182963, at *15 (N.D.N.Y. Oct. 6, 2022) (allowing the plaintiff "to testify as to her feelings of depression and/or anxiety related to what she believed was causing the physical pain in her hands" but reserving decision for trial as to "whether any testimony sought from Plaintiff traverses the line between Plaintiff describing her feelings at particular times and offering a lay opinion as to the cause of Plaintiff's feelings"). Accordingly, the Court reserves decision.

### C. Foundation for Medical Records

Defendant seeks to preclude Plaintiff from admitting medical records at trial "absent the proper foundation and/or authentication." (Dkt. No. 110, at 10–11). Plaintiff responds that he "intends to supplement his witness list shortly to include his relevant medical doctors," who can establish the foundation "for their own medical records." (Dkt. No. 123, at 34). Indeed, Plaintiff has done so; the medical provider for each set of medical records identified on Plaintiff's exhibit list is named on Plaintiff's witness list. (Dkt. No. 127, at 3–5; Dkt. No. 131, at 9). Accordingly, Defendant's motion to preclude the introduction of Plaintiff's medical records is denied as moot.

### D. Evidence of Litigation involving Chantell Botticelli

Defendant seeks to preclude Plaintiff from introducing evidence of "an unrelated state court action involving Ms. Botticelli" on the ground that it will force the parties to conduct a "trial within a trial" and cause "needless delay." (Dkt. No. 110, at 11–12). Plaintiff opposes Defendant's motion and asserts he should be permitted to introduce "evidence that constitutes

evidence impeachment, bias and character," regarding Botticelli. (Dkt. No. 123, at 26, 31) (citing Rules 404(a)(3) and 607).

The "evidence" at issue consists of two decisions issued by the Third Department of the New York Supreme Court, Appellate Division: *Alexander M. v. Cleary ("Alexander M. I")*, 188 A.D.3d 1471 (N.Y. App. Div. 2020) and *Alexander M. v. Cleary ("Alexander M. II")*, 205 A.D.3d 1073 (N.Y. App. Div. 2022). Both decisions concern a petition brought by a male SUNY Albany student under Article 78 of the New York Civil Practice Law and Rules seeking review of SUNY Albany's determination that the student violated its code of conduct. As relevant here, the petitioner claimed that Botticelli, then SUNY Albany's Title IX coordinator, had been biased toward him during the underlying investigation and requested discovery on that issue before submitting the matter for Article 78 review. The Appellate Division granted that request, noting that "[a]s to the possibility of individual bias," Botticelli had "admittedly altered the facts reported to her" and that there was evidence that Botticelli had "raised her voice, physically leaned toward petitioner and acted in an aggressive manner." *Alexander M. I*, 188 A.D.3d at 1476; *see id.* (explaining that "[a]n impartial investigation performed by bias-free investigators is the substantive foundation of the entire administrative proceeding" and the issue "must be properly resolved before this proceeding can be considered by this Court").

Following discovery, the Appellate Division considered the evidence of bias but ultimately, was "not persuaded" that Botticelli's conduct "evidenced bias on her part." *Alexander M. II*, 205 A.D.3d at 1081. However, in explaining its decision, the Appellate Division specifically observed that Botticelli's conduct "indicate[d] some misjudgment" and that the "tone" she used with the petitioner was "unfortunate." *Id.*

9

In this case, Defendant argues that because the Appellate Division's bias finding regarding Botticelli was "subsequently reversed," impeachment would be "wholly improper," would result in a trial within a trial and cause needless delay. (Dkt. No. 110, at 11–12; Dkt. No. 124, at 1). Defendant's suggestion that in not finding bias, the Appellate Division exonerated Botticelli misrepresents the decision.[3] As reflected above, the Appellate Division specifically observed that Botticelli's conduct "indicate[d] some misjudgment" and that she used an "unfortunate tone" in her meeting with the petitioner. *Alexander M. II*, 205 A.D.3d at 1081. The Court therefore finds the Appellate Division's findings in *Alexander M. II*, may be an appropriate ground for impeachment under Rule 607; the Court will consider this issue at trial. Moreover, as Plaintiff does not appear to intend to do more than cross-examine Botticelli on this point, the Court sees little danger of a trial within a trial or delay, and to the extent such danger arises, the Court will address it during trial. Accordingly, Defendant's motion to preclude impeachment of Botticelli is reserved.

### E. Evidence Regarding Court of Claims Action for Breach of Contract and Collateral Estoppel

Defendant seeks to preclude Plaintiff from "any discussion of the Court of Claims action or the claims contained therein" on the ground that it would confuse the jury and cause unfair prejudice. (Dkt. No. 110, at 13). Plaintiff responds that the decision on the Court of Claims matter "is subject to collateral estoppel as to relevant determinations" but does not indicate whether he intends to discuss these claims at trial. (Dkt. No. 123, at 35; *see also* Dkt. No. 115, at

---

[3] In addition, Defendant's representation that the Appellate Division "subsequently reversed" *Alexander M. I*, wholly misstates the Appellate Division's disposition. As discussed, in *Alexander M. II*, the Appellate Division was not reviewing *Alexander M. I*, but returning to the matter after allowing discovery on the issue of bias.

10

15–19 (Plaintiff's Trial Brief, arguing that "collateral estoppel applies to many relevant determinations by" "the Court of Claims")).[4]

Collateral estoppel, or issue preclusion, "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000) (quoting *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494 (N.Y. 1984)). "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior application and is decisive to the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action" *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455–56 (N.Y. 1985)). In addition to these factors, the "court must satisfy itself that application of the doctrine is fair." *Bear, Stearns & Co. v. 1109580 Ont. Inc.*, 409 F.3d 87, 91 (2d Cir. 2005).

"[T]he burden of proving identity of issue rests on the proponent of collateral estoppel[.]" *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 730 (2d Cir. 2001). Courts take "a functional approach" to "analyzing collateral estoppel in New York, and it should not be applied rigidly." *Id.* at 731. The question is whether there is "an identity of issue which has necessarily been decided in the prior action and is decisive in the present action[.]" *Schwartz v. Public Adm'r of Cnty. of Bronx*, 24 N.Y.2d 65, 71 (N.Y. 1969). "The prior decision or issue need not have been explicit" for collateral estoppel to apply " 'if by necessary implication it is contained in that which has been explicitly decided.'" *Postlewaite v. McGraw-Hill, Inc.*, 333

---

[4] Plaintiff also argues that determinations in this Court's decision on Defendant's motion for summary judgment "constitute law of the case." (Dkt. No. 115, at 19 (referring to Dkt. No. 91)). To the extent Plaintiff implies that this Court's decision contains factual findings to which the parties are bound, such implication is erroneous.

F.3d 42, 48 (2d Cir. 2003) (quoting *Norris v. Grosvenor Marketing Ltd.*, 803 F.2d 1281, 1285 (2d Cir. 1986)). "The 'necessary implication' requirement must be clearly met for a decision to have collateral estoppel effect on an issue it does not explicitly address." *Fuchsberg & Fuchsberg v. Galizia*, 300 F.3d 105, 110 (2d Cir. 2002).

At the final pretrial conference, the Court directed Plaintiff to file further briefing on this issue.

### F. Damages: Fringe Benefits, Lost Employment Opportunities, Medical Expenses

Defendant seeks to preclude Plaintiff from testifying regarding lost fringe benefits as damages on the ground that Plaintiff has not disclosed any documentary evidence or expert testimony in support of such claim and that Plaintiff himself is "not qualified, to quantify, or explain what these alleged benefits are." (Dkt. No. 110, at 14). Defendant also seeks to preclude Plaintiff from introducing evidence or testimony of lost employment opportunities and medical expenses on the ground that he failed to provide such evidence as part of his initial disclosures under Rule 26. (Dkt. No. 110, at 15–17 (citing Fed. R. Civ. P. 26(a)(1)(A)(iii)). According to Defendant, the only documentation Plaintiff provided was a table listing damages. (Dkt. No. 110, at 16 (citing Dkt. Nos. 110-1, ¶ 4 (describing "damages spreadsheet provided by Plaintiff"); Dkt. No. 110-3 (spreadsheet)).

Plaintiff responds that he can "testify to the fringe benefits that he received while at SUNY Albany and therefore what he would have continued to receive" had his employment continued. (Dkt. No. 123, at 25). Plaintiff further asserts that the Court can take judicial notice under Rule 201(b)(2) that the University's website "lists all available fringe benefits," and that trial witnesses Stark and Selchick, who were employed in the University's HR department, can testify to the benefits available in 2018. (*Id.* (citing Fed. R. Evid. 201(b)(2))). Regarding medical

12

expenses, Plaintiff asserts that he testified that he had incurred out-of-pocket medical expenses. (Dkt. No. 110-6, at 202 (Plaintiff testifying that he incurred medical expenses but did not "exactly remember" how much)). As to lost employment opportunities, Plaintiff testified that he was a "finalist" for a deanship but that opportunity dissolved. (Dkt. No. 110-6, at 152). The Court notes that Plaintiff's Exhibit List does not contain any exhibits regarding fringe benefits, lost opportunities, or medical expenses—although it does reference medical records. (*See generally* Dkt. No. 131).

Defendant does not appear to dispute that lost benefits are available as a matter of law. *See*, *e.g.*, *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673, 2017 WL 10088567, at *12 (E.D.N.Y. Sept. 4, 2017) (finding, in Title VII action "that evidence regarding lost benefits is important to plaintiffs' claims because lost benefits are a component of plaintiffs' potential relief"). Instead, Defendant takes issue with the type of evidence required to establish the amount of lost damages, arguing that expert evidence is necessary. (Dkt. No. 110, at 14). However, the case Defendant cites in support of its argument, *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 444–446 (S.D.N.Y. 2008), (Dkt. No. 110, at 13–14), is unhelpful as it neither stands for the proposition that expert evidence is required to prove lost benefits nor bears any factual or legal resemblance to this case. In *Okraynets* the jury awarded the plaintiff, who was rendered a paraplegic in a work-place accident, nearly $4 million in "future lost fringe benefits." 555 F. Supp. 2d at 424–25. The court observed that under New York law, proof of "economic loss, and future loss *may* be established using expert testimony that assesses future probabilities." *Id.* at 444 (emphasis added). Defendant does not cite any case law establishing that expert testimony is required to establish lost benefits,

13

as a matter of law. While expert testimony may be required in cases where calculations are complex, the Court has no basis for determining whether such complexity is present in this case.

Furthermore, based on the parties' positions, as expressed in their briefing and at oral argument, it is apparent that these issues require additional discussion and that Plaintiff has failed to identify (and may have failed to disclose) specific evidence supporting these aspects of his damages claim. Accordingly, the Court has directed Plaintiff to file additional briefing by June 5, 2025, with a response from Defendant due by June 19, 2025.

### G.     Punitive Damages

Defendant seeks to preclude Plaintiff from seeking punitive damages in this case on the ground that the "sole remaining Defendant in this action" is a state agency. (Dkt. No. 110, at 14–15). Plaintiff responds that he is not seeking punitive damages against Defendant. (Dkt. No. 123, at 19 n.2). Accordingly, Defendant's motion in limine regarding punitive damages is denied as moot.

### H.     Previously Dismissed Claims

Defendant seeks to preclude Plaintiff from "introducing any evidence regarding previously dismissed claims." (Dkt. No. 110, at 17–18). Plaintiff responds that Defendant's motion is "unnecessary" as he acknowledges that "all other claims were dismissed and on[ly] the Title IX claim remains, based on gender discrimination." (Dkt. No. 123, at 38). Accordingly, Defendant's motion to preclude evidence of other claims is denied as moot.

### I.     Specific Dollar Amount

Defendant seeks to preclude Plaintiff from requesting "a specific dollar amount from the jury." (Dkt. No. 110, at 18–19). Plaintiff did not file a response to Defendant's motion in this regard but stated at oral argument that he does not expect to request a specific dollar amount

from the jury. Accordingly, Defendant's motion to preclude the introduction of a specific dollar amount is denied as moot.

### J.    Undisclosed Witnesses

Defendant seeks to preclude Plaintiff from presenting witnesses who were not disclosed during discovery. (Dkt. No. 110, at 19). Plaintiff responds that Defendant has not offered any evidence of undisclosed witnesses and that the motion should therefore be denied. (Dkt. No. 123, at 35). The Court agrees. Defendant's motion to preclude Plaintiff from presenting undisclosed witnesses at trial is denied as moot.

## III.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion in limine (Dkt. No. 110) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that to the extent Defendant seeks to introduce trial testimony from witnesses interviewed in connection with the joint Title IX Office/Human Resources investigation, Defendant must submit a letter brief addressing the admissibility of any such testimony under Fed. R. Evid. 401 and 403 by August 4, 2025, and any response is due by August 11, 2025; and it is further

**ORDERED** that in view of the parties' disagreement regarding the admissibility of Plaintiff's medical records, (*see* Dkt. No. 131, at 9 (Plf's Exhs. 56–62)), Defendant is directed to submit a letter brief by August 4, 2025, identifying which exhibits it objects to and the basis for its objection under the Federal Rules of Evidence and with citation to relevant caselaw. The parties are further directed to provide the Court, by August 4, 2025, with copies of the medical

records in dispute, which may be filed as restricted medical records on ECF. Any response is due by August 11, 2025; and it is further

**ORDERED** that Plaintiff's request, (Dkt. No. 140), for an extension of the deadline for filing deposition designations and further briefing on the issues of collateral estoppel, lost benefits, medical expenses, and lost opportunities, is **GRANTED**. Plaintiff's submissions on these issues shall be filed by June 13, 2025, and any response is due by June 26, 2025.

**IT IS SO ORDERED.**

Dated: May 30, 2025
         Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge